1  Adam Blair Corren, SBN: 183067
   acorren@correnlaw.com
2  Spencer D. Sinclair, SBN: 294340
   ssinclair@correnlaw.com
3  LAW OFFICES OF CORREN & CORREN
   5345 North El Dorado, Suite 7
4  Stockton, CA 95207
   P: 209-478-2621
5  F: 209-478-3038

6  Attorneys for Plaintiff, Christopher Dueker

7  Christopher C. McNatt, Jr. (SBN 174559)
   cmcnatt@scopelitis.com
8  SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
   2 North Lake Avenue, Suite 560
9  Pasadena, CA 91101
   P: 626-795-4700
10 F: 626-795-4790

11 Charles Andrewscavage (Admitted *Pro Hac Vice*)
   candrewscavage@scopelitis.com
12 Jared S. Kramer (Admitted *Pro Hac Vice*)
   jskramer@scopelitis.com
13 SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
   30 West Monroe Street, Suite 600
14 Chicago, IL 60603
   P: 312-255-7200
15 F: 312-422-1224

16 Attorneys for Defendant, CRST Expedited, Inc.

17 **ADDITIONAL COUNSEL LISTED ON NEXT PAGE**

18

19 UNITED STATES DISTRICT COURT

20 CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 21 CHRISTOPHER DUEKER, on behalf of himself and all persons similarly situated, | Case No.: 2:18-cv-08751-FMO-FFM |
| 22 | |
| 23 Plaintiff, | **JOINT BRIEF RE DEFENDANT'S MOTION IN LIMINE TO EXCLUDE PLAINTIFF'S EXPERTS** |
| 24 vs. | |
| 25 CRST EXPEDITED, INC., and DOES 1 through 50, inclusive, | Hearing Date: January 9, 2020 |
| 26 | Time: 10:00 a.m. |
| 27 Defendants. | Courtroom: 6D |
| | Judge: Fernando M. Olguin |

28

James H. Hanson (Admitted *Pro Hac Vice*)
jhanson@scopelitis.com
R. Jay Taylor, Jr. (Admitted *Pro Hac Vice*)
jtaylor@scopelitis.com
Elizabeth M. Bolka (Admitted *Pro Hac Vice*)
ebolka@scopelitis.com
SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-637-1777
F: 317-687-2414

Adam. C. Smedstad (SBN 303591)
asmedstad@scopelitis.com
SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.
3214 West McGraw Street, Suite 301F
Seattle, WA 98199
P: 206-288-6192
F: 206-299-9375

Attorneys for Defendant, CRST Expedited, Inc.

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................1

      A.    CRST's Introduction .............................................................1

      B.    Plaintiffs' Introduction ..........................................................4

II.   RELEVANT FACTUAL BACKGROUND ......................................4

      A.    CRST's Statement of Relevant Facts .................................4

            1.    Relevant Factual History and CRST's Records.........4

            2.    Woolfson's unreliable methodology..........................6

      B.    Plaintiffs' Statement of Relevant Facts ..............................7

III.  ARGUMENT...................................................................................12

      A.    Woolfson is not a data structuring and analysis expert.......12

            1.    CRST's Position.......................................................12

            2.    Plaintiffs' Position...................................................14

      B.    Woolfson's Analysis Is Unreliable and Inadmissible ........15

            1.    CRST's Position.......................................................15

            2.    Plaintiffs' Position...................................................17

IV.   CONCLUSION...............................................................................20

      A.    CRST's Conclusion ...........................................................20

      B.    Plaintiffs' Conclusion ........................................................20

# TABLE OF AUTHORITIES

## Cases

*Abarca v. Merck & Co., Inc.*,
2010 WL 4643642 (E.D. Cal. Nov. 9, 2010) ........................................13

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
2012 WL 5194085 (W.D. Wash. Oct. 18, 2012) ........................... 15, 17

*Chavez v. Angelica Corp.*,
2014 WL 6973497 (Cal. Ct. App. Dec. 10, 2014) ...................... 3, 6, 13

*Daubert v. Merrell Dow Pharms*,
509 U.S. 579 (1993) ........................................................................ 12, 15

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ..............................................................................12

*Robinson v. Open Top Sightseeing San Francisco, LLC*,
2018 WL 895572 (N.D. Cal. Feb. 14, 2018) .................................... 2, 13

*Rojas v. Marko Zaninovich, Inc.*,
2011 WL 4375297 (E.D. Cal. Sept. 19, 2011) ....................... 3, 13, 16, 17

*Rojas v. Marko Zaninovich, Inc.*,
2011 WL 6671737 (E.D. Cal. Dec. 21, 2011) ................................... 3, 13

*United States v. Rushing*,
388 F.3d 1153 (9th Cir. 2003) ............................................................. 13

## Rules

Fed. R. Civ. Evid. 702 ................................................. 1, 12, 13, 14, 15, 20

Fed. R. Civ. Evid. 704 ..................................................................................1

Fed. R. Civ. Proc. 26 ..................................................................................20

## Regulations

49 C.F.R. § 393 ..............................................................................................1

49 C.F.R. § 395 ..........................................................................................2, 3

Pursuant to the Court's Standing Order (Doc. 47) and Federal Rules of Evidence 702-704, Defendant, CRST Expedited, Inc. ("CRST"), and Plaintiff, Christopher Dueker, respectfully submit this Joint Motion in Limine addressing CRST's *Daubert* challenges to the testimony of Plaintiff's expert witnesses, Aaron Woolfson ("Woolfson") and Dr. Jeffrey S. Petersen ("Petersen").[1]

## I.    INTRODUCTION

### A.    CRST's Introduction

This wage and hour lawsuit involves more than 5,700 current and former California-resident employee drivers. CRST drivers operate in teams—when one driver drives for his 11 hours, the other is off duty resting in the sleeper berth to be ready to work the next day.[2] While the key *legal* issue in this case is whether time spent in the sleeper berth of a moving truck in California is compensable, the key *factual* inquiry at the heart of Plaintiff's claim is: when were putative class members in the sleeper berth of a truck while the truck was moving in California? To answer this question, Plaintiff hired Woolfson—a "self-taught" database expert—and

---

[1] The following exhibits are attached to this motion: Exhibit A, June 2019 Expert Report of Aaron Woolfson ("Woolfson June Report"); Exhibit B, September 2019 Expert Report of Aaron Woolfson, ("Woolfson Sept. Report"); Exhibit C, September 2019 Expert Report of Jeffrey Petersen ("Petersen Sept. Report"); Exhibit D, Transcript of Deposition of Aaron Woolfson ("Woolfson Tr."); Exhibit E, September 2019 Expert Report of Charles Platt ("Platt Report"); Exhibit F, October 2019 Supplemental Expert Report of Charles Platt ("Platt Suppl. Report"); Exhibit. G, Transcript of the Deposition of Charles Platt ("Platt Tr."); Exhibit H, Trial Transcript from *Robinson v. Open Top Sightseeing San Francisco, LLC*, Case No. 4:14-cv-00852-PJH (Doc. 234) (N.D. Cal. Oct. 19, 2017) ("Robinson Tr."); Exhibit I, Declaration of Adam Blair Corren ("Corren Decl."); Exhibit J, Transcript of the Deposition of Margaret Davis ("Davis Tr."). These documents are referred to by their defined terms throughout this brief.

[2] A sleeper berth is a rectangular cabin at the back of the truck meeting the requirements of 49 C.F.R. § 393.76 that contains a bed where drivers are free to sleep, meditate, watch television, surf the internet, talk on the phone or perform other personal tasks of their choosing.

Petersen—an economist. Woolfson attempted to "analyze and structure" CRST's data to determine when certain putative class members were in a sleeper berth while the truck was moving in California, and Petersen used Woolfson's analysis to calculate purported damages for that time. Ex. C, *Petersen Sept. Report,* ¶ 1. A court can only admit expert testimony if (i) the expert has sufficient expertise in the matters about which he opines and (ii) the expert's opinions are reliable. Here, Woolfson fails to meet either requirement.

Woolfson is not qualified to act as an expert in data structuring and analysis. He has no college degree. He holds no certifications. He has no formal training whatsoever in the database tools he used to perform his analysis. As the Northern District concluded just last year, "he's no expert" on data structuring and analysis. Ex. H, *Robinson Tr.* at 26:22-24; *Robinson v. Open Top Sightseeing San Francisco, LLC*, 2018 WL 895572, at * 9 (N.D. Cal. Feb. 14, 2018).

Compounding this issue, Woolfson has not provided CRST (or the Court) with a report or data that will allow it to recreate and test his methodology and analysis. His reports provide no meaningful insight into what he did with the data or how he performed his analysis. CRST's rebuttal expert could not recreate his methodology after analyzing his reports. Woolfson's computer code—which was central to his analysis and which he produced in full—did not help. The code was non-functional and would not execute, even with his own database that he used for his analysis.

Finally, taken at face value, Woolfson's calculations and conclusions are unreliable. Woolfson based his opinion on CRST's DOT driver logs used to record a driver's hours of service ("HOS") under the federal rules (*see* 49 C.F.R. Part 395). Platt demonstrated that these logs, which are completed by CRST's drivers, sometimes contain data anomalies, including excessive sleeper time.[3] Ex. F, *Platt*

---

[3] As a generic example, when a driver enters his "34-hour restart" (the extended time the federal HOS regulations require a driver to be "off-duty" to restart their workweeks), a driver may not differentiate between off-duty time he actually spends

*Supp. Report* ¶¶ 26-31. Woolfson testified that he excluded inordinately long sleeper berth times in his analysis; he did not do so. In fact, 44% of the time Woolfson included as unpaid time were instances where drivers logged more than 11 consecutive hours in the sleeper berth of an allegedly moving truck, a legal impossibility given that his co-driver would have had to stop under the HOS regulations by the end of the eight hour of being on-duty, and could drive for no more than 11 hours in a day. 49 C.F.R. § 395.3(a). The reliability concerns do not end there. Woolfson testified that he addressed duplicative and conflicting DOT log entries; he did not in fact do so. He also testified that he addressed anomalies in odometer readings on the DOT log data; again, he did not do so.

This is not the first time Woolfson has proffered opinions riddled with reliability issues; courts have previously excluded Woolfson from testifying because his methodology and opinions related to data structuring and analysis were unreliable for the same reasons CRST has identified here. *See Rojas v. Marko Zaninovich, Inc.*, 2011 WL 4375297, at *10 (E.D. Cal. Sept. 19, 2011) ("[the] Court concludes that Mr. Woolfson's methodology is so inherently flawed that it cannot permit the use of his opinions rendered thus far."); *Rojas v. Marko Zaninovich, Inc.*, 2011 WL 6671737, at *5 (E.D. Cal. Dec. 21, 2011) (finding Woolfson's expert report "was flawed" because he "did not use all available information available at the time he analyzed his data."); *Chavez v. Angelica Corp.*, 2014 WL 6973497, at *13 (Cal. Ct. App. Dec. 10, 2014) (unpublished) (explaining that "Woolfson made 'significant errors' in processing and analyzing [data]" and finding Woolfson "did not exercise care in the simplest steps of his assignment, an indicator that his analyses cannot be given weight").

---

in the sleeper berth from off-duty time he spends outside the sleeper berth at his residence. As a result, many drivers may record time as "sleeper berth" when they are not actually in the truck. Under Woolfson's analysis, he would have credited these entries, where an individual would be at home, as being compensable time spent in the sleeper berth *if the truck if the truck moved at all.*

Given these issues, Woolfson's testimony must be excluded. And because Petersen's testimony is wholly dependent on Woolfson's analysis, Petersen's opinions are also unreliable and inadmissible.

**B.   Plaintiffs' Introduction**

Defendant's Motion rests on the premise that the Defendant does not trust the accuracy of its own driver log records; and therefore, the Defendant contends  Class-wide damages for unpaid sleeper berth wages have been calculated "with unreasonable amounts of uncompensated time."

As Plaintiffs have mostly accepted the accuracy of Defendant's driver logs,   Mr. Woolfson was asked to calculate sleeper berth time in which a work shift segment had at least some truck movement.  The Defendant and its rebuttal expert, Mr. Platt, are now suggesting Mr. Woolfson should have only calculated sleeper berth time for when the truck indicated movement during an entire work shift segment. (Ex. G Platt Tr. 55:13 to 56:17)   Consequently, the Defendant and Mr. Platt are misleadingly alleging Mr. Woolfson's methodology is unreliable when, in fact, what they are really alleging is that their own driver log time records are unreliable.

Importantly, Mr. Platt agrees Mr. Woolfson did precisely what he was requested to do:

1) Analyze driver logs to determine when Class members were logged as sleeper berth;

2) Analyze the movement of the truck to determine if the vehicle moved while the Class members were logged as sleeper berth; and

3) Only calculate time in his analysis when the Class members were logged as sleeper berth and there was some truck movement.

**II.   RELEVANT FACTUAL BACKGROUND**

**A.   CRST's Statement of Relevant Facts**

**1.   Relevant Factual History and CRST's Records**

In order to establish liability and calculate damages in this case, Plaintiff's

4

counsel hired two "experts"—Woolfson, a "self-taught" expert in structuring and analyzing data, and Petersen, an economist, to project class-wide damages based on Woolfson's structured data—to calculate the amount of time a driver spent in the sleeper berth while a truck was moving in California.[4]

Woolfson used three sources of data (provided by CRST in discovery) to conduct his analysis—(1) detailed records from drivers' DOT logs ("DOT log data"); (2) GPS "ping" data from the GPS unit contained in any truck driven by the sampled putative class members ("GPS data"); and (3) pay statements issued to the sampled drivers. All of this data (for the non-representative sample of 370 class members) was available to Woolfson before he issued his final report on September 3, 2019.

The DOT log data indicates the driver's duty status each day in accordance with the HOS regulations as driving, on-duty not driving, off-duty, or off-duty sleeper berth. Ex. D, *Woolfson Tr.* at 32:17-21. It also includes information regarding the approximate location of the truck at the time of the indicated duty status. *See* Ex. B, *Woolfson Sept. Report*, ¶¶ 21, 34; Ex. E, *Platt Report*, ¶ 39. CRST's employee-drivers populate the DOT log data to record their activities for compliance with HOS regulations. Ex. D, *Woolfson Tr.* at 102:23-103:1. These records are not intended to, nor do they, indicate the speed of the truck, the route of the truck's movement, or the location of the truck while a driver is in the sleeper berth. Ex. E, *Platt Report*, ¶¶ 38-39. Additionally, they sometimes contain erroneous entries when drivers unintentionally fail to change their status between "on duty," "off duty," and off-duty "sleeper berth," resulting in inordinately long periods of time logged in a particular duty status.

The GPS data, on the other hand, comes from a truck's GPS unit and provides a

---

[4] Because Petersen is admittedly unqualified to analyze CRST's data to compute how much time drivers spent in the sleeper berth of a moving truck, his entire report is premised on the data analysis performed by Woolfson. Ex. C, *Peterson Sept. Report* ¶ 2.

more detailed depiction of exactly where the truck is located at any given point in time. Ex. D, *Woolfson Tr.* at 64:6-9; 70:2-11. Only the GPS data conclusively shows when, in fact, a tractor was moving within California, the speed at which it was moving, and the route it took. Ex. E, *Platt Report*, ¶¶ 25, 38, 39.

## 2. Woolfson's Unreliable Methodology

During expert discovery, Woolfson produced two reports, as well as the computer source code ("Code") and database ("Database"), which he used to conduct his analysis. He also testified at a deposition regarding his methodology and analysis. *See generally,* Exs. A, B, D, *Woolfson Sept. Report; Woolfson June Report; Woolfson Tr.* CRST hired Charles Platt ("Platt")—the Director of Data Analytics for iDiscovery Solutions—to review Woolfson's methodology and conclusions. Ex. E, *Platt Report*, ¶ 2. Platt issued two reports: (i) his September 30, 2019 rebuttal report, *id.*, ¶¶ 5, 8, and (ii) an October 12, 2019 supplemental rebuttal report that analyzed Woolfson's Database. Ex. F, *Platt Supplemental Report*, ¶ 8. As detailed in his reports, Platt identified the following shortcomings regarding Woolfson's methodology and analysis:

(1)    Woolfson's Code was not an accurate and complete representation of the Code he used in his analysis. Woolfson's Code contained syntax errors, was missing code, and included code that was not in the proper sequence. Ex. E, *Platt Report*, ¶¶ 11, 41, 43, 62-69. In short, the Code that was central to Woolfson's analysis was not functional, and Platt was never able use it to fully recreate and test Woolfson's methodology and analysis. *Id.*; Ex. F, *Platt Suppl. Report*, ¶¶ 12, 72-75, 76(f).

(2)    Woolfson claimed he placed a driver's activities into a single workday, but he did not—his Database shows that at times he attributed more than 24 hours of unpaid wages to drivers *for single workdays.* Ex. F, *Platt Suppl. Report,* ¶¶ 59-62.

(3)    Woolfson failed to consider the most accurate and relevant data available to him (GPS data) when conducting his analysis. Ex. E, *Platt Report*, ¶¶ 25, 38-40, 99.

(4)    Woolfson did not follow his purported methodology in determining the

time a driver spent in the sleeper berth when in California. Woolfson testified he used the time Google says it takes to travel between two locations to identify sleeper berth time. Ex. D, *Woolfson Tr.* at 84:19-86:13; 86:16-88:9. But Woolfson's Code and Database reveal he did *not* use Google's estimate for the amount of travel time and instead assumed that the truck was moving the entire time of a sleeper berth segment, regardless of how far the truck traveled. Ex. E, *Platt Report*, ¶¶ 29-36; Ex. F, *Platt Suppl. Report*, ¶¶ 32-34, 44, 51. Woolfson's methodology resulted in him *overestimating* sleeper berth durations by an average of 100% (for multi-state trips) and over 400% (for intra-state trips). *See* Ex. F, *Platt Suppl. Report*, ¶¶ 53, 54.

(5)    Woolfson did not consistently apply the same methodology throughout his analysis—he used one formula to compute sleeper berth time for multi-state segments for his first report and a different formula for his second report. Ex. E, *Platt Report*, ¶¶ 34-35. Again, Woolfson does not provide any explanation for the change.

(6)    Woolfson testified that he excluded excessively long sleeper berth segments from his analysis. Ex. D, *Woolfson Tr.* at 94:13-95:17; 96:11-20 But he did *not* include any limiter in his Code to exclude these segments. Ex. F, *Platt Suppl. Report*, ¶¶ 24, 31, 76(a). In fact, almost *half* (44%) of the hours Woolfson counted as allegedly unpaid sleeper berth time were instances where drivers logged themselves in the sleeper berth for more than 10 consecutive hours. *Id.*, ¶¶ 25, 52.

(7)    The time Woolfson allotted *to the same trip* varied wildly. For example, for the same 172-mile trip (which Google states should take approximately 2 hours and 41 minutes), Woolfson found different individuals were owed uncompensated sleeper berth ranging from 3 hours and 5 minutes to 14 hours and 51 minutes in length. *Id.,* ¶¶ 36-41. And for another 40-mile trip (which Google states should take approximately 47 minutes), the time he attributed to the segment ranges from 1 hour and 10 minutes to 14 hours and 6 minutes. *Id.,* ¶¶ 45-49.

## B.    Plaintiffs' Statement of Relevant Facts

In order to calculate unpaid sleeper berth time minimum wages and class-wide

7

damages, Plaintiffs propounded multiple discovery requests for all Class member time records and wage statements.  In response, the Defendant electronically provided Plaintiffs with driver wage statements and the only time related documents maintained by Defendant called driver logs, which are mandated by the Department of Transportation ("DOT") for safety reasons.  More specifically, these driver logs are maintained to establish compliance with the DOT's hours of service rules to help ensure drivers are properly rested and do not drive too many hours without receiving a safe amount of time to sleep.  The Defendant's driver logs record hours of service time in one of four time categories:  driving time, on duty (not driving) time, sleeper berth time, and off duty time. (Ex. I, Corren Decl.)

When the Class members log in as sleeper berth status, often the documented times are less than 15 hours per work shift segment and/or less than 10 hours per work shift segment.  However, there are occasions in which the Defendant driver logs correctly reflect documented times of greater than 15 hours per work shift segment and/or even greater than 24 hours per work shift segment.
(Ex. J, Davis Tr. 67:8-22)

Initially, the Defendant only provided such electronically maintained employment records for Plaintiff Class Representative, Chris Dueker.  However, after considerable meet and confer efforts, the Defendant subsequently provided such employment records for a sampling of 25 Class members, and then subsequently a second sampling for an additional 21 Class members for a total sample size of 47 (including Mr. Dueker). (Ex. I, Corren Decl.)

As these electronic records were very voluminous and the driver logs contained thousands of time clock entries and driver shift segments, Plaintiffs' counsel engaged the assistance of Dr. Jeffrey Petersen and Aaron Woolfson to analyze the records sample and project class-wide damages through the use of statistical analysis. (Ex. I, Corren Decl.)  Mr. Woolfson, who is an expert in organizing and analyzing voluminous electronic records and data, was requested "to structure data from time keeping and

payroll reports produced by the Defendant in electronic format" and calculate sample damage numbers. (Ex. B, Woolfson Sept. Report 6:22-23)

Dr. Petersen, who is an expert in economics and statistics, was then asked to use those sample damage numbers to further calculate and project damages for the entire Class. Additionally, Mr. Woolfson was tasked with determining if the Defendant's payroll data indicated Class members received compensation for their sleeper berth time (of which he found no evidence). (Exs. B&C, Woolfson & Peterson Reports).

Plaintiffs' counsel specifically retained the expertise of both Dr. Petersen and Mr. Woolfson because of their many years of experience performing the same and/or very similar types of assignments requested of them in this litigation. They have worked and been qualified as experts in a multitude of other similar employment transportation wage and hour class action type cases. They have also worked together "in several class action wage and hour cases in which [Mr. Woolfson] has structured data and [Dr. Petersen] [has] performed the statistical analysis." (Ex. C, Petersen Sept. Report ¶2) Among his other extensive litigation and expert witness experience, Mr. Woolfson has worked and/or been qualified as an expert witness in the following employment wage and hour class action cases in which he performed the same and/or very similar types of assignments requested of him by Plaintiffs' counsel:

> *Avalos v. La Salsa*, Superior Court Santa Barbara County; *Hines v. KFC*, U.S. District Court Southern District of CA Case #09cv2422 JM (POR); *Adriana Larios v. Moana Hotel and Restaurant Group*, Marin County Superior Court Case #CV082368; *Garcia, Flores and Carrillo v. Tamarindo Cocina Mexicana*, 3:14-cv-02271 JSC; *Lofton v. Verizon*, Case #3:13-cv-05665; *Lofton v. Collecto*, U.S. District Court Northern District of California Case #4:13-cv-03293-YGR; *Bluford v. Safeway*, Superior Court County of San Joaquin Case #CV014837, consolidated with Case #CV028541; *ABM Industries*, San Francisco Superior Court Case #JCCP 4502*; Beatriz Aldapa and Elmer Avalos v. Fowler Packing*, Case #1:15-CV-00420-DAD-SAB ED, CA; *Nevarez v. Foster Farms*, Fresno County Superior Court 13-CECG-02624.

(see Ex. B, Woolfson Sept. Report pp. 2-5)

9

1   After they both completed their tasks with respect to the 47 Class member
2   employment records sample, they both authored reports in June of this year which
3   explained the work they had performed and their findings, conclusions, and
4   calculations regarding Class damages.  Among other opinions they shared based on
5   their experience and expertise, was the idea that if the Defendant would provide
6   Plaintiffs with an even larger sample size closer to 400 Class members, they were
7   confident their calculations and Class-wide damage projections would be even more
8   reliable and accurate. (Exs. A&C, Woolfson & Peterson Reports)

9   Consequently, and after further meet and confer efforts by Plaintiffs' counsel,
10  the Defendant agreed to provide wage statements and driver logs for a sample of 371
11  Class members.  Said additional records then allowed Mr. Woolfson and Dr. Petersen
12  to ultimately provide a more reliable and accurate set of Class-wide damage
13  calculations and projections.  After completing their tasks with respect to the 371
14  Class member employment records sample, they both authored a second report in
15  September of this year which explained the work they had performed and their
16  findings, conclusions, and calculations regarding Class damages. (Exs. B&C
17  Woolfson & Peterson Reports)

18  In regards to the sleeper berth time issue, which is the sole subject of
19  Defendant's In Limine Motion, Mr. Woolfson organized, analyzed, and then
20  calculated the Class members' sleeper berth time as documented in Defendant's driver
21  logs.  More specifically, Mr. Woolfson used the Defendant's driver logs to calculate
22  Class members' logged sleeper berth shift segment time within the territorial
23  boundaries of California during which there was some truck movement.  And then Dr.
24  Petersen used said driver logs sleeper berth time calculations to further calculate and
25  project unpaid minimum wage sleeper berth damages for the entire Class. (Exs. B&C,
26  Woolfson & Peterson Reports)

27  Mr. Woolfson also performed wage statement calculations which were relied on
28  by Dr. Petersen to project Class-wide wage statement penalty damages and which are

not being challenged nor even commented on by the Defendant. Additionally, the Defendant is not challenging nor even commenting on Mr. Woolfson's opinion that the Defendant's payroll data fails to indicate Class members received compensation for their sleeper berth time. (Exs. B&C, Woolfson & Peterson Reports)

After Mr. Woolfson and Dr. Petersen shared their reports and electronic work product, the Defendant then hired a Washington D.C. based consultant named Charles Platt, who possesses nowhere near the same experience and expertise as Dr. Petersen and Mr. Woolfson with employment transportation wage and hour class action type cases.

> Q. So how many other cases have you worked on, of those six, involve wage and hour cases?
> A. As an expert, I think two.

(Ex. G, Platt Tr. 16:13-15)

> Q. Then back to the two wage and hour cases that you've been involved with, were either of those cases involving truck drivers or transportation issues.
> A. No sir, but I've worked on other cases that did involve truck drivers and Transportation, not as an expert.

(Ex. G, Platt Tr. 19:2-8)

Mr. Platt was specifically only hired "to review Mr. Woolfson's reports and provide opinions." (Ex. G, Platt Tr. 21:21-22) Among his opinions, Mr. Platt agreed Mr. Woolfson obtained the sleeper berth times from the Defendant's driver logs to make his ultimate damages calculations. (Ex. G, Platt Tr. 28:22-29:3 & 41:17-20) He agreed "Mr. Woolfson had to analyze the driver logs to determine when the driver went into sleeper berth status and then analyze the movement of the vehicle to see if it moved while the driver was in the sleeper berth." (Ex. G, Platt Tr. 31:18-22) He agreed, despite Defendant's driver logs indicating thousands of driver shift segments, Mr. Woolfson only counted 12 occasions when Class member drivers logged in as sleeper berth time for a period greater than 24 hours. (Ex. G, Platt Tr. 37:10-15) And maybe most importantly, Mr. Platt agreed Mr. Woolfson only calculated sleeper berth

11

1    time in which a shift segment had at least some truck movement in accordance with

2    Mr. Woolfson's assignment.

3        Q.  So would you agree that any sleeper berth time that ultimately Mr. Woolfson

4        counted in his analysis included only time in which a segment had at least some
         truck movement?  Correct?

5        A. Yes.

6    (Ex. G, Platt Tr. 64:11-15)

7        Additionally, Mr. Platt did not disagree nor find unreliable any of

8    Mr. Woolfson's ultimate findings, conclusions, or damage calculations.  Mr. Platt did

9    not disagree nor find unreliable as to any of Mr. Woolfson's work product in regards

10   to the wage statement damage calculations.  And Mr. Platt did not disagree nor find

11   unreliable Mr. Woolfson's opinion that the Defendant's payroll data fails to indicate

12   Class members received compensation for their sleeper berth time.  (see generally

13   Exs. E, F, & G, Platt Reports & Tr.)

14   **III.    ARGUMENT**

15       **A.    <u>Woolfson Is Not a Data Structuring and Analysis Expert.</u>**

16           **1.    CRST's Position**

17       Federal Rule of Evidence 702 requires a party seeking to present expert

18   testimony to demonstrate the proffered expert possesses the requisite "knowledge,

19   skill, experience, training, or education" to be deemed an expert in the subject on

20   which he testifies. Fed. R. Evid. 702. Assuming the witness is qualified as an expert,

21   the proponent of the expert testimony must then establish the proffered testimony is

22   sufficiently reliable to be admitted. The U.S. Supreme Court has imposed a

23   "gatekeeping responsibility" for courts to engage in objective screening to ensure that

24   evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms,*

25   509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42

26   (1999).

27       A proponent of expert testimony must demonstrate the testimony is sufficiently

28   reliable by showing: "(1) the testimony is based upon sufficient facts or data, (2) the

                                          12

testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable." *Abarca v. Merck & Co., Inc.*, 2010 WL 4643642, at * 4 (E.D. Cal. Nov. 9, 2010) (quoting *United States v. Rushing*, 388 F.3d 1153, 1156 (9th Cir. 2003)).

Here, Woolfson lacks the requisite knowledge, skill, experience, training, and education to qualify as an expert in structuring and analyzing data to determine the amount of time drivers spent in the sleeper berth of a moving truck in California.

Wolfson is completely self-taught. He has no college degree. Ex. D, *Woolfson Tr.* at 7:11-19. He has never taken any course in the relational databases he uses to perform his analysis. *Id.* Nor has he reviewed any materials about how to use them. *Id.* at 10:12-25. His only training is on the job experience working on databases and working with attorneys. *Id.* at 8:2-17. Although Woolfson claims he became an expert in analyzing and structuring GPS data "8 or 9 year ago," he admitted he has never been qualified by a court in this area. *Id.* at 18:17-19:15; 26:18-22.

Just last year, in the face of nearly identical qualification issues, a court deemed Woolfson to be "no expert" in data structuring and analysis. Ex. H, *Robinson Tr.* at 26:22-24. Specifically, the court in *Robinson*, found Woolfson unqualified to be an expert in data structuring and analysis because he "failed entirely to show he had the appropriate credentials" and failed to explain his methods. 2018 WL 895572, at *4; *see also Rojas,* 2011 WL 4375297, at *10 ("Mr. Woolfson's methodology is so inherently flawed that it cannot permit the use of his opinions rendered thus far."); *Rojas*, 2011 WL 6671737, at *5; *Chavez v. Angelica Corp.,* 2014 WL 6973497, at *13 (Cal. Ct. App. Dec. 10, 2014) (unpublished) ("Woolfson 'did not exercise care in the simplest steps of his assignment, an indicator that his analyses cannot be given weight"). The same for Woolfson is true here.

### 2.   Plaintiffs' Position

Fed. R. Evid. 702 does not require an expert to have a certain amount of formal education or training.  Instead, "knowledge, skill, and/or experience" is sufficient to allow a witness to testify on topics beyond the typical knowledge of a lay person. Mr. Woolfson, nor any expert, should be deemed less qualified or not qualified just because they did not receive a college degree.

As evidenced in his reports and deposition testimony, Mr. Woolfson has many years of experience performing the same and/or very similar types of assignments requested of him by Plaintiffs' counsel.  In stark contrast to Defendant's rebuttal expert, Mr. Woolfson has worked and been qualified as an expert in a multitude of other similar employment transportation wage and hour class action type cases.  (Exs. A, B, & D, Woolfson Reports & Tr.)

Contrary to Defendant's misleading assertion and deposition citation, various Courts have qualified Mr. Woolfson as an expert witness.  Again, his reports, resume, and deposition testimony speak for themselves in this regard.

> Q.  So my question is when were you first qualified in any case as an expert at the structure and organization of databases?
> A.  Archilla v. KFC and I don't remember the date.
> Q.  What year was it?
> A.  I don't remember.
> Q.  What decade was it?
> A.  Well, it's in my CV and it's in my report, so whatever the case is, you can see approximately when – I think the Order was actually attached to my report.

(Ex. D, Woolfson Tr. 23:23 to 24:7)

> 14.   My report is based on over twenty years of experience in creating databases and integrating them with computerized information delivery systems, such as telephone systems, email platforms, etc.  My report is also based upon methods and procedures that I have developed and used to analyze electronic data (in this case, time keeping in the form of electronic time keeping and payroll data contained within a Defendant's payroll and time keeping systems) in over 250 cases involving wage and labor matters.

15.   The methods and procedures that I undertook to analyze the data contained within the records provided by Defendant CSRT are the same steps that I used in other cases, including Moana, Bluford and ABM Janitorial, ACX Pacific Northwest and Leggett & Platt, and Fowler where the court relied upon my findings.  In specific, cases against Schneider, Biagi Brothers Trucking, Valley Slurry, and Bluford required the careful structuring and analysis of transportation logs to establish the timings of shifts and activities performed by the drivers.

(Ex. B, Woolfson Sept. Report ¶¶ 14 & 15)

## B.   Woolfson's Analysis Is Unreliable and Inadmissible

### 1.   CRST's Position

Even if Woolfson was qualified to offer an expert opinion, Plaintiff still must prove (1) his testimony is based on sufficient facts or data; (2) his testimony is the product of reliable principles and methods; and (3) he has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert,* 509 U.S. at 589. The party proffering the evidence "must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully." *Cascade Yarns, Inc. v. Knitting Fever, Inc.,* 2012 WL 5194085, at *3 (W.D. Wash. Oct. 18, 2012). To that end, courts may inquire as to how often an expert's methodology has produced erroneous results. *Id*.

Woolfson's methodology for both structuring and analyzing the data has not been peer reviewed; instead, his experience is largely related to his role as a testifying expert. Ex. D, *Woolfson Tr.* at 8:7-11 To make matters worse, Woolfson did not provide enough information to allow CRST—or any expert in the field—to wholly understand how Woolfson conducted his analysis, what assumptions he made and why he made them, or what steps he took to conduct his analysis. *See* Ex. E, *Platt Report,* ¶ 100. The ability to test Woolfson's methodology is particularly important because his methodology suffers from the same pitfalls prior courts have found to be problematic when excluding Woolfson's testimony.

For example, in excluding Woolfson's testimony as unreliable, the *Rojas* court found that Woolfson "fail[ed] to adequately explain why he took certain actions." *Rojas*, 2011 WL 4375297, at *9. Woolfson commits the same errors here by failing to explain (1) how or why he did not exclude excessive sleeper berth times (Ex. E, *Platt Report,* ¶¶ 23-31; Ex. F, *Platt Suppl. Report,* ¶¶ 10(a), 22-31); (2) why he took certain steps to structure his data (Ex. E, *Platt Report,* ¶ 60); (3) why he associates wildly different times spent in the sleeper berth for the same distance trip (Ex. F, *Platt Suppl. Report,* ¶¶ 36-41); (4) why he did not consult GPS data (Ex. E, *Platt Report,* ¶ 25); or (5) why he changed his approach to calculating time spent in a sleeper berth between his first report and his second report (*Id.,* ¶¶ 34-35). Even worse, the defendants' expert in *Rojas* was able to replicate Woolfson's analysis to demonstrate the "myriad of errors" he committed. *Rojas*, 2011 WL 4375297, at *9. Here, Woolfson did not even provide CRST the necessary information to identify, test, verify, or challenge Woolfson's methodology and analysis; the computer code at the heart of his analysis did not function and his database did not allow Platt to fully replicate his analysis. Ex. E, *Platt Report,* ¶¶ 100 (a)-(c); Ex. F, *Platt Supp. Report* ¶¶ 76-77.

This is particularly troubling given that what Platt was able to analyze demonstrated that Woolfson's analysis was unreliable on its face. For example, Platt explained that Woolfson's own calculations (1) have examples that credit drivers with unreasonable amounts of uncompensated time, such as more than 14 hours of unpaid wages for a *40 mile* trip, (Ex. F, *Platt Suppl. Report,* ¶ 49); (2) credit drivers more than 24 hours of compensation for single "single days" (*id.*, ¶¶ 59-62); (3) include excessively long sleeper berth periods (time spent in the berth over 11 hours) making up 44% of the time he claimed drivers were in the sleeper berth of a moving truck in California—a factual and legal impossibility (*id.*, ¶¶ 25, 52); and (4) require the Court to make implausible assumptions, such as attributing vastly different sleeper berth time for identical trips (*id.,* ¶¶ 36-41, 45-49), that results in an overestimate of time spent in the sleeper berth of a moving truck by an average of 400% for intrastate trips

16

and 100% for interstate trips (*id.* ¶¶ 53-54). Because Woolfson's methodology has previously produced erroneous results, has not been peer reviewed, is facially implausible, and cannot be recreated by any expert in the field, the Court should find Woolfson's testimony unreliable and therefore inadmissible. *Cascade Yarns, Inc.,* 2012 WL 5194085, at *3; *Rojas*, 2011 WL 4375297, at *9. And the same is true for Petersen, who relies entirely on Woolfson.

### 2.     Plaintiffs' Position

Defendant's Motion and unreliable argument rests on the premise that the Defendant does not trust the accuracy of its own driver log records; and therefore, the Defendant contends Class members should only be awarded damages for unpaid sleeper berth time when their truck indicated movement during the entire shift segment verses calculating such time in which a segment had at least some truck movement. (Ex. G, Platt Tr. 55:13-56:17)   Consequently, because Mr. Woolfson mostly accepted the accuracy of Defendant's driver logs, the Defendant and Mr. Platt are alleging his methodology is unreliable when, in fact, what they are really alleging is that their own time records are unreliable.

The alleged errors made by Mr. Woolfson are all alleged errors having to do with what the Defendant believes to be "unreasonable amounts of uncompensated time" recorded on the Defendant's driver logs.  As Mr. Platt testified at his deposition, he and the Defendant do not trust their own time records.

> Q.  Are you saying you don't trust the driver logs or you don't trust the driver when he says he's in and out of sleeper berth?
> A. I trust him when he says he goes into the sleeper berth, but I don't necessarily believe that he always flags when he goes out of sleeper berth.

(Ex. G, Platt Tr. 35:7-13)

Defendant's motion attacks Mr. Woolfson's credibility because Mr. Woolfson relied on the accuracy of Defendant's driver logs.  Defendant thinks if a driver logged in as sleeper berth for 10 or more hours at a time (let alone more than 15 or more than 24), the logs must be inaccurate and such time should not have been calculated by Mr.

1    Woolfson.

2          However, as one of Defendant's own managers clearly testified, Class members

3    log sleeper berth status more than 10 hours at a time for "many different reasons."

4    (Ex. J, Davis Tr. 67:22) For example, "they could be in the sleeper berth in between

5    loads, waiting for a load – if there's no freight.  They could be in the sleeper berth if

6    they're shutdown for weather." (Ex. J, Davis Tr. 68:5-8)

7          So instead of suggesting this motion is about Mr. Woolfson's qualifications and

8    alleged reliability, the Defendant is really just attempting to argue for a different

9    premise upon which to calculate damages.  As Mr. Platt conceded, how the sleeper

10   berth time is calculated should be in his opinion an issue to be decided by the

11   attorneys. (Ex. G, Platt Tr. 35:7-13)

12         Thus, it is quite disingenuous for the Defendant to try to distort Mr. Woolfson's

13   very impressive qualifications and experience by trying to focus the Court's attention

14   on a mere 3 situations (out of 100's of cases) which involve completely different

15   arguments verses Defendant's real issue not with Mr. Woolfson, but the underlying

16   legal/factual premise for how and when to determine damages.  Plus, Mr. Woolfson's

17   involvement with the *Rojas* and *Chavez* cases was quite some time ago when he did

18   not possess nearly the same skill, knowledge, and experience he currently possesses.

19   And in the *Robinson* case, the Court decided to treat Mr. Woolfson as a percipient

20   instead of an expert witness, and ultimately concluded Mr. Woolfson's testimony was

21   not necessary in light of the available and admissible documentary evidence.

22         In the unlikely event the Court is inclined to exclude Mr. Woolfson as an

23   expert, the Court should at least permit Mr. Woolfson to testify as a percipient witness

24   regarding the content of Defendant's records.  And whether Mr. Woolfson testifies as

25   an expert or a percipient witness, the Court should not exclude Dr. Peterson's expert

26   opinions because Dr. Peterson could at least rely upon Mr. Woolfson's percipient

27   testimony.

28         Further, it is not surprising that Mr. Platt, with his lack of experience and

expertise, and having never worked on a transportation employment wage and hour case as an expert, supposedly had some difficulty trying to use and/or understand Mr. Woolfson's computer code and methodology.  The reality that Defendant and Mr. Platt are actually only disputing this single sleeper berth time accuracy issue, evidences their true belief that, while they consider their driver logs to be unreliable, they actually consider Mr. Woolfson to be reliable.

For example and among his opinions, Mr. Platt agreed "Mr. Woolfson had to analyze the driver logs to determine when the driver went into sleeper berth status and then analyze the movement of the vehicle to see if it moved while the driver was in the sleeper berth."  (Ex. G, Platt Tr. 31:18-22)    Mr. Platt agreed Mr. Woolfson obtained the sleeper berth times from the Defendant's driver logs to make his ultimate damages calculations. (Ex. G, Platt Tr. 28:22-29:3 & 41:17-20)  He agreed despite Defendant's driver logs indicating thousands of driver shift segments, Mr. Woolfson only analyzed and counted 12 occasions when Class member drivers logged in as sleeper berth time for a period greater than 24 hours. (Ex. G, Platt Tr. 37:10-15)  And maybe most importantly, Mr. Platt agreed Mr. Woolfson only calculated sleeper berth time in which a shift segment had at least some truck movement in accordance with Mr. Woolfson's assignment.

> Q.  So would you agree that any sleeper berth time that ultimately Mr. Woolfson counted in his analysis included only time in which a segment had at least some truck movement?  Correct?
> A. Yes.

(Ex. G, Platt Tr. 64:11-15)

Additionally, Mr. Platt did not disagree nor find unreliable any of Mr. Woolfson's ultimate findings, conclusions, or damage calculations.  Mr. Platt did not disagree nor find unreliable as to any of Mr. Woolfson's work product in regards to the wage statement damage calculations.  And Mr. Platt did not disagree nor find unreliable Mr. Woolfson's opinion that the Defendant's payroll data fails to indicate Class members received compensation for their sleeper berth time. (Exs. E, F, & G,

Platt Reports & Tr.)

In fact, besides attempting to criticize or failing to understand some of Mr. Woolfson's work product methods, the only disagreement Mr. Platt articulated with respect to Mr. Woolfson is the idea received from Defense Counsel that Mr. Woolfson should have only calculated sleeper berth time for when the truck indicated movement during the entire shift segment verses calculating such time in which a segment had at least some truck movement. (Ex. G Platt Tr. 55:13 to 56:17)

## IV.   CONCLUSION

### A.   CRST's Conclusion

Experts are allowed to testify because they can assist the trier of fact in understanding something that could not otherwise be understood. They are witnesses who are allowed to analyze, interpret, and opine on issues within their expertise. To ensure that they are qualified to do so and have done so accurately, Fed. R. Civ. Proc. 26 and Fed. R. Evid. 702 require experts to explain what they have done, show how they did it, and verify that the methods they used have been tested by peers within their area of expertise and outside of litigation. Woolfson's testimony does not satisfy any of these requirements.

### B.   Plaintiffs' Conclusion

While the Defendant argues its own time records are unreliable, based on the foregoing reasons, evidence, and legal authority detailed by the Plaintiffs, both Dr. Petersen and Mr. Woolfson are expertly qualified and reliable. Their testimony should not be excluded, and this Motion In Limine should be denied.

1

2   Dated: November 22, 2019                   LAW OFFICES OF CORREN & CORREN

3

4                                              By: /s/ Spencer D. Sinclair

5                                                  Spencer D. Sinclair
                                                   Attorney for Plaintiff
6

7

8   Dated: November 22, 2019                   SCOPELITIS, GARVIN, LIGHT, HANSON
                                               & FEARY, P.C.
9

10                                             By: /s/ Charles Andrewscavage

11                                                 Charles Andrewscavage
                                                   Attorney for Defendant
12

13

14                            SIGNATURE CERTIFICATION

15          I hereby certify that the content of this document is acceptable to Spencer D.

16   Sinclair, counsel for Plaintiff, and that I have obtained the authorization from Spencer

17   D. Sinclair to affix his electronic signature to this document.

18

19   Dated: November 22, 2019                  /s/ Charles Andrewscavage
                                               Charles Andrewscavage
20

21

22   4811-0420-9833. v. 20

23

24

25

26

27

28

Case No. 2:18-cv-08751-FMO-FFM
Joint Brief Re Defendant's Motion in Limine to Exclude Plaintiff's Experts