# EXHIBIT A

**June 2019 Expert Report of Aaron Woolfson ("Woolfson June Report")**

Adam Blair Corren, SBN 183067
acorren@correnlaw.com
Spencer D. Sinclair, SBN 294340
ssinclair@correnlaw.com
**LAW OFFICES OF CORREN & CORREN**
5345 N El Dorado, Suite 7
Stockton, Ca 95207
Tel. (209) 478-2621
Fax (209) 478-3038

Attorneys for Plaintiff Christopher Dueker, individually, and on behalf of all others similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DUEKER, individually, and on behalf of all other similarly situated current and former employees of Defendants,<br><br>Plaintiffs,<br><br>v.<br><br>CRST EXPEDITED, INC. and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:18-cv-08751-FMO-FFM<br>[Assigned for all purposes to the Hon. Fernando M. Olguin, Dept. 10-B]<br><br><u>CLASS ACTION</u><br><br>**EXPERT REPORT OF AARON WOOLFSON**<br><br>Action Filed: December 27, 2017<br>Removed: February 16, 2018<br>Trial Date: Not Set |

I, Aaron Woolfson, state and declare as follows:

1. My name is Aaron Woolfson. I have been retained by the Law Offices of Corren and Corren, on behalf of Plaintiff in the matter of *Christopher Dueker et. al. v. CRST Expedited, Inc.; and Does 1 through 50, inclusive* (Case No. 2:18-cv-08751-FMO-FFM, DC Ca, Central District) to provide structure to, and analyze time keeping and payroll data produced by *CRST Expedited, Inc.* ("CRST")[1].

---

[1] For purposes of this report, I refer to "CRST Expedited, Inc." "CRST", and "Defendant" and "Defendants" to mean (footnote continued)

1

2. I have also been asked to provide an opinion on whether the data that is currently within our possession could be analyzed to show similar application of time-keeping rules to the time keeping for all putative class members.

3. I am personally familiar with the matters that are contained within this report, and if called to testify, I can accurately and competently testify as to the facts set forth herein.

**Qualifications and Expert Engagements:**

4. My qualifications and curriculum vitae are attached to this report as Exhibit A. A list of the other cases in which, during the previous four years, I have testified as an expert at trial or by deposition is attached as Exhibit B. I have been qualified by both Federal and State courts[2]. My testimony has been relied upon by courts in both individual and class actions[3], by plaintiffs and defendants, and most recently, my work has survived a Daubert challenge.[4] My opinions have also been relied upon in numerous arbitrations and hundreds of mediations.

5. I have been relied upon as a testifying expert on behalf of plaintiffs in wage and hour class actions where the court granted class certification. I was designated as an expert witness in the case of *Avalos v. La Salsa*, filed in the California Superior Court in Santa Barbara County (Judicial Council Coordinated Case No. 4488). In the *Avalos* case, the court accepted me as an expert with respect to plaintiff's motion for class certification, and based on my analysis the court certified the plaintiff's meal period and rest period, split-shift, reporting time, and off-the-clock claims. A true and correct copy of the court's order in the *Avalos* case is attached hereto as Exhibit C.

---

Defendant(s).

[2] *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)).* (Exhibit G).

[3] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Patricia Gaines, et al v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3. (Exhibit L)

[4] *Miguel Rojas-Cifuentes et al. v. ACX Pacific Northwest Inc, Pacific Leasing, LLC, John M. Gombos, John E. Gombos and Does 1-20*, Case No. 2:14-cv-00697-JAM-CKD (E.D. Cal.), May 17, 2018, ECF 73 at page 38.

6. I was also relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR)). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …." A true and correct copy of the court's order in the *Hines* case is attached hereto as Exhibit D.

7. My work was also relied upon by the court in the case of *Adriana Larios v. Moana Hotel and Restaurant Group* (Marin County Superior Court, Case No. CV082368) where structuring of information was required from a database maintained by the employer, using the same methods and procedures that I have outlined here. In the *Moana* matter, the data was similarly limited in scope in the original production. Similar to the *AMS* matter, *Moana's* system was based on the application of "rules" that were applied to the time keeping system maintained within a mechanized or computerized system. I was able to prove that the rules were being uniformly applied to all time keeping that *was* in recorded format with the mechanized system, and therefore would apply to all time keeping within the system for other employees.[5] A copy of the court's order in the *Moana* case is attached as Exhibit E.

8. In addition, I was retained in the case of *Garcia, Flores and Carrillo v. Tamarindo Cocina Mexicana* (3:14-cv-02271 JSC) to recover records on behalf of Defendant Tamarindo Cocina Mexicana for the purpose of defending a wage and hour matter. In that case, I was tasked with creating Excel™ sheets containing payroll and time keeping information from printed PDF's. The case eventually settled and my work was used as a basis for the settlement.

9. I have also used similar methods to structure large amounts of unstructured data on behalf of defendants in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the

---

[5] In *Moana*, the initial production of time keeping was extremely limited. The discovery referee ruled that all time keeping records should be produced by the Defendant, and it affirmed that the assertion that the rules were being applied consistently throughout the data, was in fact true.

Northern District of California to reconstruct a database from information that was in Defendant Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of analysis. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit F.

10. I was expert for plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court, County of San Joaquin). I have been told that, among other cases, *Bluford v Safeway, Inc.* established the framework for what eventually became known as AB1513 and Labor Code section 226.2, which governs compensation in the piece rate context. Similar to this matter, the *Bluford* case involved the careful analysis, and organization, of data contained within the employer's records.

11. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court). Relying heavily upon my expert finding, the Appellate Court reversed the trial court's ruling and certified Plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit G).

12. I was also an expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC*, (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where, similar to this matter, defendant *Fowler* maintained the time keeping and payroll records in an electronic time keeping and payroll system. The court order in *Fowler Packing* is attached as Exhibit H.

13. Finally, I was retained as an expert in *Jose M. Nevarez, et.al. v Foster Farms, LLC and Foster Poultry Farms, Inc., a California Corporation* (13-CECG-02624 Superior Court of Fresno County)., to structure and analyze a set of time keeping and payroll records, and to write a declaration in support of Class Certification. I also proffered a report in Support of Plaintiff's Opposition to Defendant *Foster Poultry Farm's* motion for summary adjudication of first and

4

second causes of action. The Court's opinion granting certification and denying Defendant's motion for summary adjudication is attached as Exhibit I.

14. My report is based on over twenty years of experience in creating databases and integrating them with computerized information delivery systems, such as telephone systems, email platforms, etc. My report is also based upon the methods and procedures that I have developed and used to analyze electronic data (in this case, time keeping in the form of electronic time keeping and payroll data contained within a Defendant's payroll and time keeping systems) in over 250 cases involving wage and labor matters.

15. The methods and procedures that I undertook to analyze the data contained within the records provided by Defendant *CRST* are the same steps that I used in other cases, including *Moana*, *Bluford* and *ABM Janitorial*, *ACX Pacific Northwest* and *Leggett & Platt, and Fowler* where the court relied upon my findings. In specific, cases against *Schneider*, *Biagi Brothers Trucking*, *Valley Slurry*, and *Bluford* required the careful structuring and analysis of Transportation ("DOT") transportation logs to establish the timings of shifts and activities performed by the drivers.

**Additional Relevant Expert Experience related to Analysis of Large Sets of Data:**

16. I was the developer of the automated Verification of Deposit and Verification of Mortgage system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and time keeping integration technologies. It also required me to build interfaces to the ACH[6] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[7] capabilities as

---

[6] Automated Clearing House ("ACH").

[7] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

17. I was also the inventor of Canvas, a programming language that I developed for interfacing between telephone systems and telephone networks, and which is capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of transactions have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering IVR services. Canvas is widely deployed in applications that require interface between the computer systems and call centers because of its capability of providing consumers with information from within databases over the telephone. Canvas was employed by American Automated Payroll to, among other things, collect timeclock information related to employee activities. My databases, and the source code that I wrote, was used to compile the results from the telephone-based time-keeping indicators

18. The databases and telephony systems that I have personally developed and/or coded are also used by telephone companies and call centers throughout the United States and Canada to catalogue, and index various activities related to timings of customer service activities.

19. Some of the companies that have used my databases and/or telephony equipment (which I personally created and manufactured) include Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing and FNCB. The United States Federal Government, including the U.S. Department of Justice has used my databases.

**Structuring the CRST Inc. time keeping logs.**

20. Plaintiffs' counsel asked me to structure data from time keeping and payroll reports produced by the Defendant in electronic format. The data, contained within a series of Excel and PDF sheets, consisted primarily of time entries in the form of an electronic representation of DOT transportation output worksheets, organized by driver (and co-driver) and the activity performed over multiple twenty-four (24) hour periods. The data was voluminous and contained multiple rows of data for the each employees' day's work, representative of work related activities that took place over multiple days

15. In order to analyze the data contained within the Excel sheets, I had to re-structure it in a manner that all events related to a single day's activity were contained within the same row on an SQL™ server, so that similar workplace activities were organized together, in chronological order, to tally the measurements of the cumulative time for each employee's activities. This was particularly important because the employees' driving schedules often indicated the start of activity on one calendar day, which extended into the next calendar day.

Example Worksheet from Defendant representing driver activity.

| DepotID | Activity | Descript | CoDriver | Confirmed | Distance | Driver Doc | DriverID | Duration | Edit | location | Logid | odom |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 1 | OffDuty | | TRUE | 0 | | GV77D | 28424 | 0 | | 96069870 | -1 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 1 | 0 | 4 mi WSW of Grand Terrace, CA | 96069898 | 19849 |
| 3 | 1 | OffDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 23 | 0 | 4 mi WSW of Grand Terrace, CA | 96070600 | 19849 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 10 | 0 | 4 mi WSW of Grand Terrace, CA | 96071016 | 19849 |
| 3 | 3 | Driving | 670ED | TRUE | 2 | 77667647: 77667647 | GV77D | 4 | 0 | 4 mi WSW of Grand Terrace, CA | 96071137 | 19849 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 13 | 0 | 4 mi WSW of Grand Terrace, CA | 96071592 | 19849 |
| 3 | 3 | Driving | 670ED | TRUE | 2 | 77667647: 77667647 | GV77D | 2 | 0 | 4 mi WSW of Grand Terrace, CA | 96071669 | 19849 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 6 | 0 | 4 mi WSW of Grand Terrace, CA | 96071858 | 19849 |
| 3 | 3 | Driving | 670ED | TRUE | 955 | 77667647: 77667647 | GV77D | 148 | 0 | 4 mi WSW of Grand Terrace, CA | 96076560 | 19849 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 5 | 0 | 3 mi ENE of Santa Clarita, CA | 96076655 | 19858 |
| 3 | 3 | Driving | 670ED | TRUE | 1 | 77667647: 77667647 | GV77D | 1 | 0 | 3 mi ENE of Santa Clarita, CA | 96076725 | 19858 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 12 | 0 | 3 mi ENE of Santa Clarita, CA | 96077066 | 19858 |
| 3 | 3 | Driving | 670ED | TRUE | 2 | 77667647: 77667647 | GV77D | 14 | 0 | 3 mi ENE of Santa Clarita, CA | 96077561 | 19858 |
| 3 | 1 | OffDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 97 | 0 | 3 mi NE of Santa Clarita, CA | 96080298 | 19858 |
| 3 | 3 | Driving | 670ED | TRUE | 639 | 77667647: 77667647 | GV77D | 147 | 0 | 3 mi ENE of Santa Clarita, CA | 96084531 | 19858 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 13 | 0 | 2 mi ESE of Santa Fe Springs, CA | 96084696 | 19865 |
| 3 | 3 | Driving | 670ED | TRUE | 1 | 77667647: 77667647 | GV77D | 2 | 0 | 2 mi ESE of Santa Fe Springs, CA | 96084900 | 19865 |
| 3 | 4 | OnDuty | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 13 | 0 | 2 mi ESE of Santa Fe Springs, CA | 96085054 | 19865 |
| 3 | 2 | Sleeper | 670ED | TRUE | 0 | 77667647: 77667647 | GV77D | 177 | 0 | 2 mi ESE of Santa Fe Springs, CA | 96088657 | 19865 |

14. I was guided by over twenty years of experience with creating structured SQL databases from structured and unstructured data contained within Excel sheets - which includes over ten years specifically related to electronic organization of Time Keeping and Payroll Data.

15. The methods and procedures that I employed in structuring CRST's Time Keeping and Payroll data from Extel™ formatted spreadsheets is consistent with the steps that I have used in over 250+ cases that I have been retained as an expert in the analysis and compilation of electronic records into structured databases.

**Materials relied upon to form my opinion:**

21. I relied upon the following materials to conduct my analysis, from which I formed my opinions:

(a) I was provided with a set of Excel™ formatted worksheets indicating the time

7

clock entries, grouped by employee and work-date, and the payroll outputs for selected employees.

```
CRST_D000031 - printable.xlsx        CRST_D012278_CONFIDENTIAL.xlsx        CRST_D014279_CONFIDENTIAL-p.xlsx
CRST_D000031.xlsx                    CRST_D012508_CONFIDENTIAL.xlsx        CRST_D014305_CONFIDENTIAL.xlsx
CRST_D000163 - printable.xlsx        CRST_D012517_CONFIDENTIAL.xlsx        CRST_D014324_CONFIDENTIAL.xlsx
CRST_D000163.xlsx                    CRST_D012555_CONFIDENTIAL.xlsx        CRST_D014325_CONFIDENTIAL.xlsx
CRST_D000627 - printable.xlsx        CRST_D012689_CONFIDENTIAL.xlsx        CRST_D014355_CONFIDENTIAL.xlsx
CRST_D000627.xlsx                    CRST_D012705_CONFIDENTIAL.xlsx        CRST_D014365_CONFIDENTIAL.xlsx
CRST_D000627-printable depo.xlsx     CRST_D012858_CONFIDENTIAL.xlsx        CRST_D014405_CONFIDENTIAL.xlsx
CRST_D010939_CONFIDENTIAL.xlsx       CRST_D012862_CONFIDENTIAL.xlsx        CRST_D014414_CONFIDENTIAL.xlsx
CRST_D010940_CONFIDENTIAL.xlsx       CRST_D012902_CONFIDENTIAL.xlsx        CRST_D014473_CONFIDENTIAL.xlsx
CRST_D010940_CONFIDENTIAL-p.xlsx     CRST_D012936_CONFIDENTIAL.xlsx        CRST_D014517_CONFIDENTIAL.xlsx
CRST_D011008_CONFIDENTIAL.xlsx       CRST_D013480_CONFIDENTIAL.xlsx        CRST_D014792_CONFIDENTIAL.xlsx
CRST_D011035_CONFIDENTIAL.xlsx       CRST_D013495_CONFIDENTIAL.xlsx        CRST_D014822_CONFIDENTIAL.xlsx
CRST_D011035_CONFIDENTIAL-print.xlsx CRST_D013527_CONFIDENTIAL.xlsx        CRST_D014852_CONFIDENTIAL.xlsx
CRST_D011058_CONFIDENTIAL.xlsx       CRST_D013615_CONFIDENTIAL.xlsx        CRST_D014853_CONFIDENTIAL.xlsx
CRST_D011126_CONFIDENTIAL.xlsx       CRST_D013640_CONFIDENTIAL.xlsx        CRST_D014881_CONFIDENTIAL.xlsx
CRST_D011126_CONFIDENTIAL-p.xlsx     CRST_D013760_CONFIDENTIAL.xlsx        CRST_D014882_CONFIDENTIAL.xlsx
CRST_D011148_CONFIDENTIAL.xlsx       CRST_D013764_CONFIDENTIAL.xlsx        CRST_D014897_CONFIDENTIAL.xlsx
CRST_D011155_CONFIDENTIAL.xlsx       CRST_D013786_CONFIDENTIAL.xlsx        CRST_D014901_CONFIDENTIAL.xlsx
CRST_D011241_CONFIDENTIAL.xlsx       CRST_D013787_CONFIDENTIAL.xlsx        CRST_D014952_CONFIDENTIAL.xlsx
CRST_D011242_CONFIDENTIAL.xlsx       CRST_D013820_CONFIDENTIAL.xlsx        CRST_D014959_CONFIDENTIAL.xlsx
CRST_D011276_CONFIDENTIAL.xlsx       CRST_D013830_CONFIDENTIAL.xlsx        CRST_D015068_CONFIDENTIAL.xlsx
CRST_D011276_CONFIDENTIAL-print.xlsx CRST_D013900_CONFIDENTIAL.xlsx        CRST_D015074_CONFIDENTIAL.xlsx
CRST_D011281_CONFIDENTIAL.xlsx       CRST_D013901_CONFIDENTIAL.xlsx        CRST_D015102_CONFIDENTIAL.xlsx
CRST_D011316_CONFIDENTIAL.xlsx       CRST_D014032_CONFIDENTIAL.xlsx        CRST_D015128_CONFIDENTIAL.xlsx
CRST_D011325_CONFIDENTIAL.xlsx       CRST_D014068_CONFIDENTIAL.xlsx        CRST_D015168_CONFIDENTIAL.xlsx
CRST_D011393_CONFIDENTIAL.xlsx       CRST_D014160_CONFIDENTIAL.xlsx        CRST_D015175_CONFIDENTIAL.xlsx
CRST_D011394_CONFIDENTIAL.xlsx       CRST_D014164_CONFIDENTIAL.xlsx        CRST_D015330_CONFIDENTIAL.xlsx
CRST_D011423_CONFIDENTIAL.xlsx       CRST_D014184_CONFIDENTIAL.xlsx        CRST_D015341_CONFIDENTIAL.xlsx
CRST_D011606_CONFIDENTIAL.xlsx       CRST_D014185_CONFIDENTIAL.xlsx        CRST_D015373_CONFIDENTIAL.xlsx
CRST_D011685_CONFIDENTIAL.xlsx       CRST_D014209_CONFIDENTIAL.xlsx        CRST_D015394_CONFIDENTIAL.xlsx
CRST_D011709_CONFIDENTIAL.xlsx       CRST_D014209_CONFIDENTIAL-p.xlsx      CRST_D015509_CONFIDENTIAL.xlsx
CRST_D011793_CONFIDENTIAL.xlsx       CRST_D014222_CONFIDENTIAL.xlsx        CRST_D015542_CONFIDENTIAL.xlsx
```

(b) The Excel™ worksheets contained approximately 149,293 timeclock entries between 09/30/2013 and 04/16/2019 for forty-seven (47) employees. I understood that I was tasked with analyzing those shifts that occurred after 12/27/2013, which left 141,754 timeclock entries.

(c) The timecards contained work-related activities organized by employee, grouped by (i) "offduty", (ii) "sleeper", (iii) "driving", and; (iv) "onduty".

(d) 1,910 of the 141,754 timeclock entries that had occurred after 12/27/2013 were duplicates. After tagging the duplicates and moving them to a separate database partition, I then tagged only those workday timeclock entries for employees whose activities occurred exclusively within California, or where the work contained portions of work that occurred within California. There were 37,089 timeclock entries for shifts worked by employees where one or more parts of the shift

occurred within California.

(e) My analysis was based upon the 37,089 timeclock data points covering the forty-seven (47) employees who had performed work within California between 12/27/2013 and 04/16/2019.

(f) I combined each of the sets of timeclock entries into contiguous work days, in a manner that allowed for the analysis of the workdays of employees, primarily for the purpose of determining how much time was spent by employees' where their timecards indicated "sleeper" despite the odometer reading that appeared on the electronic DOT logs indicating movement was taking place.

(g) When combined into single-work-days, the 37,089 time-clock entries represented 4,399 shifts worked by forty-seven (47) employees. 3,553 of the 4,399 shifts (80.77%) indicated at one portion of shifts contained a "sleeper" segment that had occurred during the shifts' twenty-four hour period of activity. 1,285 of the 3,553 shifts (36.16%) of the employee shifts indicated "sleeper" during movement. In other words, according to the odometer, the tractor was in motion while the "sleeper" segments were occurring for 1,285 shifts of the 3,553 shifts analyzed that had at least one "sleeper" segment during the respective shifts' 24-hour period.

(h) This data appeared to have been originated from Defendants, and is similar to time records for their employees that I have seen in other transportation matters, including *Bluford* in which I was asked to organize time records according to each workday's accumulation of timeclock entries, and then provide an analysis.

(i) To structure the data, I used the same formulas to organize the data in this matter as I had in *Bluford* where I was tasked with organizing data through a uniform set of normalization instructions that I wrote in SQL, and then analyzing time keeping (truck log) data.

(j) As part of this standard methodological approach toward the structuring of data, I have also organized the Defendant's timeclock data into structures that accommodate calculation, or tallying, by payroll period for the easy attribution of

9

which employee timeclock activities fell within a particular payroll period.

(k) If provided with the payroll and time records for all class members, I could quickly establish whether employees received the proper pay for the time that their time cards indicated "sleeper" where the truck was moving in California.

**Methods and Tools Utilized to analyze Records provided by Defendant:**

22. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

23. When analyzing an employer's timekeeping and/or payroll data, I create databases to serve as a repository for time keeping and payroll data. I then create the SQL queries that provide the means to: (a) identify whether an event occurred in the data (such as a meal period or rest break if such data is provided); (b) accumulate the number of hours and type of work that was performed in a work day; and overlay any (c) identify the persons associated with that event (such as the employees).

24. This is precisely the task that I undertook for Plaintiff in this matter, and I was guided by my many years of experience with similar tasks.

**Steps that I undertook to structure the data:**

25. The following illustration provides an overview of the process that I undertook to import the set of defendant-produced database backups into a SQL database running on my local computer so that I could conduct an analysis:

| DepotID | Activity | Descript | CoDriver | Confirmec | DistanceDriven | Doc | DriverID | Duration | Edit | location | Logid | odometer | OrigLogID | Sensor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | | Z369D | 548 | 0 | 4 mi W of Grand Terrace, CA | 30544646 | 2553072 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 548 | 0 | 4 mi W of Grand Terrace, CA | 30544646 | 2553072 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 14 | 0 | 4 mi W of Grand Terrace, CA | 30545177 | 2553081 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | | Z369D | 14 | 0 | 4 mi W of Grand Terrace, CA | 30545177 | 2553081 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 42 | 0 | 4 mi W of Grand Terrace, CA | 30546762 | 2553085 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | | Z369D | 42 | 0 | 4 mi W of Grand Terrace, CA | 30546762 | 2553085 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 11 | 0 | 3 mi SSE of San Bernardino, CA | 30547064 | 2553230 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | | Z369D | 11 | 0 | 3 mi SSE of San Bernardino, CA | 30547064 | 2553230 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 31 | 0 | 3 mi SSE of San Bernardino, CA | 30548419 | 2553232 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | | Z369D | 31 | 0 | 3 mi SSE of San Bernardino, CA | 30548419 | 2553232 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 6 | 0 | 3 mi SW of Fontana, CA | 30548506 | 2553399 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | | Z369D | 6 | 0 | 3 mi SW of Fontana, CA | 30548506 | 2553399 | 0 | FALSE |
| 1 | 2 | Sleeper | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 707 | 0 | 3 mi SW of Fontana, CA | 30572658 | 2553399 | 0 | FALSE |
| 1 | 4 | OnDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 16 | 0 | 34 mi W of Needles, CA | 30573029 | 2555604 | 0 | FALSE |
| 1 | 1 | OffDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 8 | 0 | 34 mi W of Needles, CA | 30573243 | 2555604 | 0 | FALSE |
| 1 | 3 | Driving | Z542D | TRUE | 531 | 66212970: 18122721 | Z369D | 56 | 0 | 34 mi W of Needles, CA | 30574562 | 2555604 | 0 | FALSE |
| 1 | 4 | OnDuty | Z542D | TRUE | 0 | 66212970: 18122721 | Z369D | 1 | 0 | 16 mi NNW of Lake Havasu City, AZ | 30574868 | 2556135 | 0 | FALSE |

26. The computer code that I authored to restore the structure and contents of the time cards into the local SQL database is attached as Exhibit J1. The SQL code that I used to conduct my calculations is attached as Exhibit J2.

27. The steps that I took to organize and structure the clock punches contained within the Defendant's data ("source data") sets were:

a) I started by downloading the .XLS-files containing the contents of the Defendant's time keeping accumulators, and placing it onto a local folder on a computer server running Microsoft SQL.

b) Then I ran them through a program through a data parser that I wrote in visual

    studio script to convert the contents of the Excel™ pages into text files that could easily be imported into a SQL database. I then loaded each of the individual TXT files and established the "text" boundaries of where the time clock information appeared on the pages.

c)    I then ran the visual studio program to read the contents of the Excel™ files that contained the timeclock entries representing employee activity, and compared the number of miles driven on the odometer, against the number of miles that was in the Google geocoding distance matrix, to determine what percentage of driven miles were in California, so that the Defendant's data that contained the timeclock information could be attributed with the number of miles driven as either (i) all mileage driven within California or (ii) the mileage driven within California on a segment that was driven between two states where the timeclock indicated "sleeper".

d)    I then wrote a program using Microsoft Visual Studio™ to read the contents of the employees' time clock in/out punches that had appeared on the Excel sheets that I had converted to .txt files. Using the Visual Basic code, I was able to organize the time-in, time-out timeclock sequences from the .txt files into the employee's workday within a Microsoft SQL™ database – aligning the time clock entries from the .txt file in date/time order within the Microsoft SQL™ database. The process of reconstructing the employees' work-day – so that that each employees' time-clock punches for a particular day appeared on the same row – is known as applying "normalization" to the data.

e)    I then conducted a process to convert the recorded work-related activities, including the work-type (sleeper, on-duty, etc.), into a set of direct-import transfer so that each row of the original database containing a set of recorded entries, could be imported, in the structure to which it was originally conformed. This turned the text files into excel files, and then into a set of .mdb files inside of the Microsoft SQL database.

| | | |
|---|---|---|
| | f) | I then ran a set of commands to confirm that the .mdb files could be read by Microsoft SQL™ in order to make sure that SQL query manager could query the timekeeping data in the precise manner as it was originally maintained in defendant's time keeping system, and presented within the original defendant-originated Excel™ files. I did this step to ensure that I could run queries on my local server as if it were residing on a live, replicated server. |
| | g) | Finally, I established the local SQL database workspace on a the local server with the Defendant-provided time keeping data set so that I could understand the time keeping contained within the defendant's timekeeping and payroll system. |
| | h) | Using the information contained within the data provided, I set up a series of validations sufficient to establish a database structure from the data contained in the formats – and to make sure that the recorded time entries for each employee aligned properly into a contiguous set of recorded time entries so that all employee's recorded work time on a single day was represented on a single row. This process, known as "normalization", allows a single database query to be run against all of the segments of the employee's related-work day time entries that had previously been on separate rows within an Excel™ table or other output structure. Using normalization techniques, queries can be run in a manner that would not otherwise be possible if all of the recorded time entries were not on the same row. This leads to a highly efficient and accurate way of reaching a determination of the timings of the events, during particular work day. |
| | i) | Using SQL code, I then was able to organize each workday's time entries within the Microsoft SQL™ database – aligning the entries from the employee activities in the order according to the work-type designations. For instance, I placed all employees' work day activities in a single row, so that each employee's row contained the recorded time entries for that day. In other words, each employee's daily activity appeared on the same row. This process is colloquially known as applying "normalization" to the data. |

13

j) Following normalization, I then ran several SQL queries to provide cross-checks, to ensure that the underlying subtotals matched with the sum of the constituent shift's hours according to the information in timecards corresponding with the employee's workdays. Using mathematical formulas within SQL to validate the entries, I was able to ensure the integrity of the detailed entries matched to the summaries, and to make sure that the alignment of the shifts could be analyzed and the duration of "sleeper" segments while the tractor was in motion could be measured.

k) I then used Microsoft SQL™ Query Analyzer to apply a set of queries to the time-keeping entries within the SQL database that I created from the converted time keeping contained on the defendant's records. By writing SQL queries, I was able to organize the data by the number of minutes worked in a day containing all of the activity that took place in that day.

**Conclusions:**

28. Using the electronic information contained within the files provided by defendant that had been converted into a SQL database server, I was able to determine the following:

a) The data contained within the excel-style timeclock files provided by the Defendants appeared to contain approximately 141,754 time clock entries within the Excel files. After tagging for California-work, 37,089 of the time clock entries were for activities where one or more parts of the daily work activity indicated that employee work had taken place in California for forty-seven (47) employees between 12/27/2013 and 04/16/2019.

b) After applying normalization techniques to the 37,089 timeclock entries to associate each of the related employee time clock entries together into a single workday, the data indicates 4,399 work shifts consisting of one or more work-day segments (i.e. clock-in, clock-out segments indicating work related activities) for forty-seven (47) employees.

29.     It appears that the Defendants produced data representing 47 employees, which appears to be a portion of the employees in the class.[8] I will be able to apply precisely the same set of formulas that I applied to the data that I analyzed in this report, to the full set of data to achieve a precise calculation.

<u>Findings – employees marked "sleeper" while the tractor was in transit:</u>

- Number of employees appearing within the data: 47 employees[9]
- Number of shifts in Defendant's production that indicated "sleeper" where the shift occurred in California: 4,399.
- Number of shifts indicating at least one "sleeper" segment (indicating an employee was in the sleeper-berth of the tractor) in shifts in California: 3,553 of 4,399 (80.77%).
- Number of shifts whose timeclocks indicated at least one "sleeper" segment where the odometer indicated truck movement occurred while the employee was in the sleeper[10] in California: 1,285 of 3,553 (36.17%).
- Number of employees whose timeclocks indicated at least one shift containing a "sleeper" segment in California, regardless of the number of sleeper segments with movement also present: 46 of 47 (97.87%).
- Number of employees whose timeclocks indicated they experienced at least one "sleeper" segment where the odometer indicated truck movement occurred while the employee was in the sleeper within California[11]: 42 of 47 (89.36%).

---

[8] For purposes of computing damages, I intend to simply replicate the queries and analysis against the full set of data using the same approach that I have taken to achieve this particular analysis. I built the SQL data structures, as I have in many other matters, including *ABM Janitorial*, with the expectation that, if asked, I would be able to simply run the same set of standard applications of the SQL to the larger data set, and the full set of damages, for all data.

[9] I included the named plaintiff, Mr. Dueker, within the analysis of the data. My analysis of Mr. Duecker's timeclock entries indicates that his shifts exhibited characteristics that were typical of the other individuals who appeared in the data.

[10] My analysis included only those "sleeper" segments where the truck was experiencing movement, as indicated by an increase in the odometer, and the truck was (i) exclusively within California, or (ii) the truck was within California during part of one or more "sleeper" segment.

[11] 42 of 46 employees who experienced at least one shift segment indicating "sleeper" had truck movement during that segment that they were marked as "sleeper" within California.

- Total number of weekly pay periods for data supplied by defendant for the 47 employees[12],[13]: 1,941.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed this 3rd day of June 2019 in Oakland, California.

_____
Aaron Woolfson

---

[12] The weekly pay period runs a Wednesday through the following Tuesday.

[13] The time frame of timekeeping data provided by defendant covers 1,941 weekly pay periods. Of the 1,941 weekly pay-periods contained within the data provided by Defendant, timeclock data was present for 1,857 pay-periods.



343 East Main Street, Suite 319, Stockton, CA 95202
t (209) 235-5555 • 1 (209) 235-5565 • www.telswitch.com

Standard Expert "Rate Sheet" – Rates for Appearances and Depositions:

Rates for:
    Reports / Expert Opinions        $250.00 per hour.
    Declarations                           $250.00 per hour
    Court Appearances and Depositions:   $375.00 per hour.


Materials, and supplies – billed to client.
    Airfare, Hotels, Meals, Parking, Gasoline, Rental Car:
    Passthrough (billed to client)

**Payments are due at time of deposition by deposing party;**