# EXHIBIT B

**September 2019 Expert Report of Aaron Woolfson ("Woolfson Sept. Report")**

Adam Blair Corren, SBN 183067
acorren@correnlaw.com
Spencer D. Sinclair, SBN 294340
ssinclair@correnlaw.com
**LAW OFFICES OF CORREN & CORREN**
5345 N El Dorado, Suite 7
Stockton, Ca 95207
Tel. (209) 478-2621
Fax (209) 478-3038

Attorneys for Plaintiff Christopher Dueker,
individually, and on behalf of all others
similarly situated

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DUEKER, individually, and on behalf of all other similarly situated current and former employees of Defendants,<br><br>Plaintiffs,<br><br>v.<br><br>CRST EXPEDITED, INC. and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:18-cv-08751-FMO-FFM [Assigned for all purposes to the Hon. Fernando M. Olguin, Dept. 10-B]<br><br>CLASS ACTION<br><br>**EXPERT REPORT OF AARON WOOLFSON**<br><br>Action Filed: December 27, 2017<br>Removed: February 16, 2018<br>Trial Date: Not Set |

I, Aaron Woolfson, state and declare as follows:

     1.     My name is Aaron Woolfson. I have been retained by the Law Offices of Corren and Corren, on behalf of Plaintiff in the matter of *Christopher Dueker et. al. v. CRST Expedited, Inc.; and Does 1 through 50, inclusive* (Case No. 2:18-cv-08751-FMO-FFM, DC Ca, Central District) to provide structure to, and analyze time keeping and payroll data produced by *CRST Expedited, Inc.* ("CRST")[1].

---

[1] For purposes of this report, I refer to "*CRST Expedited, Inc.*" "*CRST*", and "Defendant" and "Defendants" to mean
(footnote continued)

1

1    2.    I have also been asked to provide an opinion on whether the data that is currently

2    within our possession could be analyzed to show similar application of time-keeping rules to the

3    time keeping for all putative class members.

4    3.    I am personally familiar with the matters that are contained within this report, and

5    if called to testify, I can accurately and competently testify as to the facts set forth herein.

6    **Qualifications and Expert Engagements:**

7    4.    My qualifications and curriculum vitae are attached to this report as Exhibit A.  A

8    list of the other cases in which, during the previous four years, I have testified as an expert at trial

9    or by deposition is attached as Exhibit B.  I have been qualified by both Federal and State courts[2].

10    My testimony has been relied upon by courts in both individual and class actions[3], by plaintiffs

11    and defendants, and most recently, my work has survived a Daubert challenge.[4]   My opinions

12    have also been relied upon in numerous arbitrations and hundreds of mediations.

13    5.    I have been relied upon as a testifying expert on behalf of plaintiffs in wage and

14    hour class actions where the court granted class certification. I was designated as an expert witness

15    in the case of *Avalos v. La Salsa*, filed in the California Superior Court in Santa Barbara County

16    (Judicial Council Coordinated Case No. 4488). In the *Avalos* case, the court accepted me as an

17    expert with respect to plaintiff's motion for class certification, and based on my analysis the court

18    certified the plaintiff's meal period and rest period, split-shift, reporting time, and off-the-clock

19    claims. A true and correct copy of the court's order in the *Avalos* case is attached hereto as Exhibit

20    C.

21    _____

22    Defendant(s).

23    [2]   *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both

24    state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)).* (Exhibit G).

25    [3]   "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues."  *Patricia Gaines, et al v. Law Office of Patenaude & Felix, A.P.C.*, Case No

26    3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3. (Exhibit L)

27    [4]   *Miguel Rojas-Cifuentes et al. v. ACX Pacific Northwest Inc, Pacific Leasing, LLC, John M. Gombos, John E. Gombos and Does 1-20,* Case No. 2:14-cv-00697-JAM-CKD (E.D. Cal.), May 17, 2018, ECF 73 at page 38.

28

2

6.    I was also relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …." A true and correct copy of the court's order in the *Hines* case is attached hereto as Exhibit D.

7.    My work was also relied upon by the court in the case of *Adriana Larios v. Moana Hotel and Restaurant Group* (Marin County Superior Court, Case No. CV082368) where structuring of information was required from a database maintained by the employer, using the same methods and procedures that I have outlined here. In the *Moana* matter, the data was similarly limited in scope in the original production.  Similar to the *AMS* matter, *Moana's* system was based on the application of "rules" that were applied to the time keeping system maintained within a mechanized or computerized system.  I was able to prove that the rules were being uniformly applied to all time keeping that *was* in recorded format with the mechanized system, and therefore would apply to all time keeping within the system for other employees.[5]  A copy of the court's order in the *Moana* case is attached as Exhibit E.

8.    In addition, I was retained in the case of *Garcia, Flores and Carrillo v. Tamarindo Cocina Mexicana* (3:14-cv-02271 JSC) to recover records on behalf of Defendant Tamarindo Cocina Mexicana for the purpose of defending a wage and hour matter.  In that case, I was tasked with creating Excel™ sheets containing payroll and time keeping information from printed PDF's.  The case eventually settled and my work was used as a basis for the settlement.

9.    I have also used similar methods to structure large amounts of unstructured data on behalf of defendants in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the

---

[5] In *Moana*, the initial production of time keeping was extremely limited.  The discovery referee ruled that all time keeping records should be produced by the Defendant, and it affirmed that the assertion that the rules were being applied consistently throughout the data, was in fact true.

3

1    Northern District of California to reconstruct a database from information that was in Defendant

2    Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of

3    analysis.  I was able to complete the re-structuring of Verizon's data so that the parties could reach

4    a successful settlement.  The portion of the Court's Order from *Lofton v. Verizon* instructing me to

5    create a database from Verizon's unstructured data is attached as Exhibit F.

6          10.    I was expert for plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler*

7    *and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case

8    No. CV014837 [Consolidated with Case No. CV028541] Superior Court, County of San Joaquin).

9    I have been told that, among other cases, *Bluford v Safeway, Inc*. established the framework for

10   what eventually became known as AB1513 and Labor Code section 226.2, which governs

11   compensation in the piece rate context.    Similar to this matter, the *Bluford* case involved the

12   careful analysis, and organization, of data contained within the employer's records.

13         11.    In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No

14   JCCP 4502, San Francisco Superior Court).    Relying heavily upon my expert finding, the

15   Appellate Court reversed the trial court's ruling and certified Plaintiffs' proposed wage and hour

16   classes.  The court noted that there was sufficient evidence contained within my expert report to

17   support certification of the classes and subclasses, and that my experience was sufficient to allow

18   my expert report to be admitted as evidence for that purpose. (Exhibit G).

19         12.    I was also an expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing*

20   *Company, Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-

21   DAD-SAB ED, Ca.), where, similar to this matter, defendant *Fowler* maintained the time keeping

22   and payroll records in an electronic time keeping and payroll system. The court order in *Fowler*

23   *Packing* is attached as Exhibit H.

24         13.    Finally, I was retained as an expert in *Jose M. Nevarez, et.al. v Foster Farms, LLC*

25   *and Foster Poultry Farms, Inc., a California Corporation*  (13-CECG-02624 Superior Court of

26   Fresno County)., to structure and analyze a set of time keeping and payroll records, and to write a

27   declaration in support of Class Certification. I also proffered a report in Support of Plaintiff's

28   Opposition to Defendant *Foster Poultry Farm's* motion for summary adjudication of first and

4

1    second causes of action.  The Court's opinion granting certification and denying Defendant's

2    motion for summary adjudication is attached as Exhibit I.

3           14.     My report is based on over twenty years of experience in creating databases and

4    integrating them with computerized information delivery systems, such as telephone systems,

5    email platforms, etc.  My report is also based upon the methods and procedures that I have

6    developed and used to analyze electronic data (in this case, time keeping in the form of electronic

7    time keeping and payroll data contained within a Defendant's payroll and time keeping systems)

8    in over 250 cases involving wage and labor matters.

9           15.     The methods and procedures that I undertook to analyze the data contained within

10   the records provided by Defendant *CRST* are the same steps that I used in other cases, including

11   *Moana, Bluford* and *ABM Janitorial*, *ACX Pacific Northwest* and *Leggett & Platt, and Fowler*

12   where the court relied upon my findings.  In specific, cases against *Schneider*, *Biagi Brothers*

13   *Trucking*, *Valley Slurry*, and *Bluford* required the careful structuring and analysis of

14   Transportation ("DOT") transportation logs to establish the timings of shifts and activities

15   performed by the drivers.

16   **Additional Relevant Expert Experience related to Analysis of Large Sets of Data:**

17          16.     I was the developer of the automated Verification of Deposit and Verification of

18   Mortgage system that was used by Chase, Wells Fargo, Bank of America, as well as some

19   regional banks and mortgage lenders, to facilitate the review of mortgage applications by call

20   center staff.  These systems required a great deal of integration between the telephone systems and

21   the financial institution's computer systems, and relied heavily on my deep understanding of

22   database and time keeping integration technologies.  It also required me to build interfaces to the

23   ACH[6] exchanges, and with Global Payments and other large automated electronic inter-exchanges

24   of financial information.  Other processes necessitated integrating fax and OCR[7] capabilities as

25   _____

26   [6] Automated Clearing House ("ACH").

27   [7] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

28

1  well as enhanced call routing – inbound and outbound – including predictive elements of

2  enhanced call processing, and the precise timings of these events.

3       17.    I was also the inventor of Canvas, a programming language that I developed for

4  interfacing between telephone systems and telephone networks, and which is capable of

5  processing hundreds of thousands of calls a day.  To date, hundreds of millions of transactions

6  have been handled by Canvas on behalf of call centers, financial institutions, conference calling

7  companies, and organizations offering IVR services. Canvas is widely deployed in applications

8  that require interface between the computer systems and call centers because of its capability of

9  providing consumers with information from within databases over the telephone.  Canvas was

10  employed by American Automated Payroll to, among other things, collect timeclock information

11  related to employee activities.  My databases, and the source code that I wrote, was used to

12  compile the results from the telephone-based time-keeping indicators

13       18.    The databases and telephony systems that I have personally developed and/or

14  coded are also used by telephone companies and call centers throughout the United States and

15  Canada to catalogue, and index various activities related to timings of customer service activities.

16       19.    Some of the companies that have used my databases and/or telephony equipment

17  (which I personally created and manufactured) include Japan Telecom, Experian, Bank of

18  America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone

19  Telecom (ANPI), Aion Networks, Smartcall Conferencing and FNCB. The United States Federal

20  Government, including the U.S. Department of Justice has used my databases.

21  **Structuring the CRST Inc. time keeping logs.**

22       20.    Plaintiffs' counsel asked me to structure data from time keeping and payroll reports

23  produced by the Defendant in electronic format. The data, contained within a series of Excel and

24  PDF sheets, consisted primarily of time entries in the form of an electronic representation of DOT

25  transportation output worksheets, organized by driver (and co-driver) and the activity performed

26  over multiple twenty-four (24) hour periods. The data was voluminous and contained multiple

27  rows of data for the each employees' day's work, representative of work related activities that

28  took place over multiple days

21. In order to analyze the data contained within the Excel sheets, I had to re-structure it in a manner that all events related to a single day's activity were contained within the same row on an SQL™ server, so that similar workplace activities were organized together, in chronological order, to tally the measurements of the cumulative time for each employee's activities. This was particularly important because the employees' driving schedules often indicated the start of activity on one calendar day, which extended into the next calendar day – although there was also sleeper indicated during truck movement entirely within the same calendar day.

Example Worksheet from Defendant representing "sleeper" activity.



22. I was guided by over twenty years of experience with creating structured SQL databases from structured and unstructured data contained within Excel sheets - which includes over ten years specifically related to electronic organization of Time Keeping and Payroll Data. The methods and procedures that I employed in structuring CRST's Time Keeping and Payroll data from Extel™ formatted spreadsheets is consistent with the steps that I have used in over 250+ cases that I have been retained as an expert in the analysis and compilation of electronic records into structured databases.

**Materials relied upon to form my opinion:**

23. I relied upon the following materials to conduct my analysis, from which I formed my opinions:

(a) I was provided with a set of Excel™ formatted worksheets indicating the time clock entries, grouped by employee and work-date, and the payroll outputs for selected employees.

7

| | | |
|---|---|---|
| CRST_D000031 - printable.xlsx | CRST_D012278_CONFIDENTIAL.xlsx | CRST_D014279_CONFIDENTIAL-p.xlsx |
| CRST_D000031.xlsx | CRST_D012508_CONFIDENTIAL.xlsx | CRST_D014305_CONFIDENTIAL.xlsx |
| CRST_D000163 - printable.xlsx | CRST_D012517_CONFIDENTIAL.xlsx | CRST_D014324_CONFIDENTIAL.xlsx |
| CRST_D000163.xlsx | CRST_D012555_CONFIDENTIAL.xlsx | CRST_D014325_CONFIDENTIAL.xlsx |
| CRST_D000627 - printable.xlsx | CRST_D012689_CONFIDENTIAL.xlsx | CRST_D014355_CONFIDENTIAL.xlsx |
| CRST_D000627.xlsx | CRST_D012705_CONFIDENTIAL.xlsx | CRST_D014365_CONFIDENTIAL.xlsx |
| CRST_D000627-printable depo.xlsx | CRST_D012858_CONFIDENTIAL.xlsx | CRST_D014405_CONFIDENTIAL.xlsx |
| CRST_D010939_CONFIDENTIAL.xlsx | CRST_D012862_CONFIDENTIAL.xlsx | CRST_D014414_CONFIDENTIAL.xlsx |
| CRST_D010940_CONFIDENTIAL.xlsx | CRST_D012902_CONFIDENTIAL.xlsx | CRST_D014473_CONFIDENTIAL.xlsx |
| CRST_D010940_CONFIDENTIAL-p.xlsx | CRST_D012936_CONFIDENTIAL.xlsx | CRST_D014517_CONFIDENTIAL.xlsx |
| CRST_D011008_CONFIDENTIAL.xlsx | CRST_D013480_CONFIDENTIAL.xlsx | CRST_D014792_CONFIDENTIAL.xlsx |
| CRST_D011035_CONFIDENTIAL.xlsx | CRST_D013495_CONFIDENTIAL.xlsx | CRST_D014822_CONFIDENTIAL.xlsx |
| CRST_D011035_CONFIDENTIAL-print.xlsx | CRST_D013527_CONFIDENTIAL.xlsx | CRST_D014852_CONFIDENTIAL.xlsx |
| CRST_D011058_CONFIDENTIAL.xlsx | CRST_D013615_CONFIDENTIAL.xlsx | CRST_D014853_CONFIDENTIAL.xlsx |
| CRST_D011126_CONFIDENTIAL.xlsx | CRST_D013640_CONFIDENTIAL.xlsx | CRST_D014881_CONFIDENTIAL.xlsx |
| CRST_D011126_CONFIDENTIAL-p.xlsx | CRST_D013760_CONFIDENTIAL.xlsx | CRST_D014882_CONFIDENTIAL.xlsx |
| CRST_D011148_CONFIDENTIAL.xlsx | CRST_D013764_CONFIDENTIAL.xlsx | CRST_D014897_CONFIDENTIAL.xlsx |
| CRST_D011155_CONFIDENTIAL.xlsx | CRST_D013786_CONFIDENTIAL.xlsx | CRST_D014901_CONFIDENTIAL.xlsx |
| CRST_D011241_CONFIDENTIAL.xlsx | CRST_D013787_CONFIDENTIAL.xlsx | CRST_D014952_CONFIDENTIAL.xlsx |
| CRST_D011242_CONFIDENTIAL.xlsx | CRST_D013820_CONFIDENTIAL.xlsx | CRST_D014959_CONFIDENTIAL.xlsx |
| CRST_D011276_CONFIDENTIAL.xlsx | CRST_D013830_CONFIDENTIAL.xlsx | CRST_D015068_CONFIDENTIAL.xlsx |
| CRST_D011276_CONFIDENTIAL-print.xlsx | CRST_D013900_CONFIDENTIAL.xlsx | CRST_D015074_CONFIDENTIAL.xlsx |
| CRST_D011281_CONFIDENTIAL.xlsx | CRST_D013901_CONFIDENTIAL.xlsx | CRST_D015102_CONFIDENTIAL.xlsx |
| CRST_D011316_CONFIDENTIAL.xlsx | CRST_D014032_CONFIDENTIAL.xlsx | CRST_D015128_CONFIDENTIAL.xlsx |
| CRST_D011325_CONFIDENTIAL.xlsx | CRST_D014068_CONFIDENTIAL.xlsx | CRST_D015168_CONFIDENTIAL.xlsx |
| CRST_D011393_CONFIDENTIAL.xlsx | CRST_D014160_CONFIDENTIAL.xlsx | CRST_D015175_CONFIDENTIAL.xlsx |
| CRST_D011394_CONFIDENTIAL.xlsx | CRST_D014164_CONFIDENTIAL.xlsx | CRST_D015330_CONFIDENTIAL.xlsx |
| CRST_D011423_CONFIDENTIAL.xlsx | CRST_D014184_CONFIDENTIAL.xlsx | CRST_D015341_CONFIDENTIAL.xlsx |
| CRST_D011606_CONFIDENTIAL.xlsx | CRST_D014185_CONFIDENTIAL.xlsx | CRST_D015373_CONFIDENTIAL.xlsx |
| CRST_D011685_CONFIDENTIAL.xlsx | CRST_D014209_CONFIDENTIAL.xlsx | CRST_D015394_CONFIDENTIAL.xlsx |
| CRST_D011709_CONFIDENTIAL.xlsx | CRST_D014209_CONFIDENTIAL-p.xlsx | CRST_D015509_CONFIDENTIAL.xlsx |
| CRST_D011793_CONFIDENTIAL.xlsx | CRST_D014222_CONFIDENTIAL.xlsx | CRST_D015542_CONFIDENTIAL.xlsx |
| CRST_D011835_CONFIDENTIAL.xlsx | CRST_D014279_CONFIDENTIAL.xlsx | CRST_D015635_CONFIDENTIAL.xlsx |

(b)    The Excel™ worksheets contained approximately 141,754 entries for forty-seven (47) employees covering from approximately 12/27/2013[8] and 04/16/2019.

(c)    The Excel™ sheets contained timecard entries indicating work-related activities organized by employee, grouped by (i) "off duty", (ii) "sleeper", (iii) "driving", and; (iv) "on duty".

(d)    I was also provided with a file CRST_D016054.txt which contained approximately 809,825 additional entries for 324 employee's driver-related activities, in the same format as those contained within the Excel™ sheets.

---

[8] I understood that I was tasked with analyzing only those entries that occurred after 12/27/2013.

Expert Report Aaron Woolfson                    Case No. 2:18-cv-08751-FMO-FFM

24.     This data appeared to have been originated from Defendants, and is similar to time records for their employees that I have seen in other transportation matters, including *Bluford* in which I was asked to organize time records according to each workday's accumulation of timeclock entries, and then provide an analysis.

25.     To structure the data, I used the same formulas to organize the data in this matter as I had in *Bluford* where I was tasked with organizing data through a uniform set of normalization instructions that I wrote in SQL, and then analyzing time keeping (truck log) data.

26.     As part of this standard methodological approach toward the structuring of data, I have also organized the Defendant's timeclock data into structures that accommodate calculation, or tallying, by payroll period for the easy attribution of which employee timeclock activities fell within a particular payroll period.

**Steps that I took to structure and analyze the data provided by Defendant:**

27.     I began by creating importing the entries from the Excel sheets and the .txt file indicating driver-activities into two tables: *dueker..allDrivers* and *dueker2..allDrivers*.

28.     I then aligned each of the work shift segments so that each shift's work entries appeared as a series contiguous set of workday activities, so that the work day activities could be grouped together for analysis purposes.  I conducted this to combine each of the sets of timeclock entries into contiguous work days, in a manner that allowed for the analysis of the workdays of employees, primarily for the purpose of determining how much time was spent by employees' where their timecards indicated "sleeper" despite the odometer reading that appeared on the electronic DOT logs indicating movement was taking place.

29.     I then tagged each of the shifts where sleeper was indicated, and placed those shifts into a table called *dueker..sleeper* and *dueker2..sleeper*, related to the two production sets.

30.     I then tagged the shifts where the sleeper segments occurred partly or fully within California, and if the segment took place over a state-line, what portion of the miles and minutes took place within California.

9

**Methods and Tools Utilized to analyze Records provided by Defendant:**

31.     I create and analyze databases using Structured Query Language (SQL).  A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information.  Tables that share at least one attribute in common are "related."  Tables without a common attribute may still be related via other tables with which they do share a common attribute.  The pathways relating those separate tables are called "joins."  Once tables have been related by a join, a user may view the combined information in the joined tables to derive new useful information.  To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages."  The most common query language is SQL.  A proper query in this language consists of one or more "clauses."  Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses.  Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

32.     When analyzing an employer's timekeeping and/or payroll data, I create databases to serve as a repository for time keeping and payroll data.  I then create the SQL queries that provide the means to: (a) identify whether an event occurred in the data (such as a meal period or rest break if such data is provided); (b) accumulate the number of hours and type of work that was performed in a work day; and overlay any (c) identify the persons associated with that event (such as the employees).

33.     This is precisely the task that I undertook for Plaintiff in this matter, and I was guided by my many years of experience with similar tasks.

**Steps that I undertook to structure the data:**

34.     The following illustration provides an overview of the process that I undertook to import the set of defendant-produced database backups into a SQL database running on my local computer so that I could conduct an analysis:

10



35.    The computer code that I authored to restore the structure and contents of the time cards into the local SQL database is attached as Exhibit J1.   The SQL code that I used to conduct my calculations is attached as Exhibit J2.

36.    The steps that I took to organize and structure the clock punches contained within the Defendant's data ("source data") sets were:

a)    I started by downloading the .XLS-files containing the contents of the Defendant's time keeping accumulators, and placing it onto a local folder on a computer server running Microsoft SQL.

b)    Then I ran them through a program through a data parser that I wrote in visual studio script to convert the contents of the Excel™ pages into text files that could easily be imported into a SQL database.  I then loaded each of the individual TXT files and established the "text" boundaries of where the time clock information appeared on the pages.

11

c)     I then ran the visual studio program to read the contents of the Excel™ files that contained the timeclock entries representing employee activity, and compared the number of miles driven on the odometer, against the number of miles that was in the Google geocoding distance matrix, to determine what percentage of driven miles were in California, so that the Defendant's data that contained the timeclock information could be attributed with the number of miles driven as either (i) all mileage driven within California or (ii) the mileage driven within California on a segment that was driven between two states where the timeclock indicated "sleeper".

d)     I then wrote a program using Microsoft Visual Studio™ to read the contents of the employees' time clock in/out punches that had appeared on the Excel sheets that I had converted to .txt files.  Using the Visual Basic code, I was able to organize the time-in, time-out timeclock sequences from the .txt files into the employee's workday within a Microsoft SQL™ database – aligning the time clock entries from the .txt file in date/time order within the Microsoft SQL™ database. The process of reconstructing the employees' work-day – so that that each employees' time-clock punches for a particular day appeared on the same row – is known as applying "normalization" to the data.

e)     I then conducted a process to convert the recorded work-related activities, including the work-type (sleeper, on-duty, etc.), into a set of direct-import transfer so that each row of the original database containing a set of recorded entries, could be imported, in the structure to which it was originally conformed.  This turned the text files into excel files, and then into a set of .mdb files inside of the Microsoft SQL database.

f)     I then ran a set of commands to confirm that the .mdb files could be read by Microsoft SQL™ in order to make sure that SQL query manager could query the timekeeping data in the precise manner as it was originally maintained in defendant's time keeping system, and presented within the original defendant-

12

1    originated Excel™ files.  I did this step to ensure that I could run queries on my

2    local server as if it were residing on a live, replicated server.

3    g)    Finally, I established the local SQL database workspace on a the local server with

4    the Defendant-provided time keeping data set so that I could understand the time

5    keeping contained within the defendant's timekeeping and payroll system.

6    h)    Using the information contained within the data provided, I set up a series of

7    validations sufficient to establish a database structure from the data contained in

8    the formats – and to make sure that the recorded time entries for each employee

9    aligned properly into a contiguous set of recorded time entries so that all

10    employee's recorded work time on a single day was represented on a single row.

11    This process, known as "normalization", allows a single database query to be run

12    against all of the segments of the employee's related-work day time entries that had

13    previously been on separate rows within an Excel™ table or other output structure.

14    Using normalization techniques, queries can be run in a manner that would not

15    otherwise be possible if all of the recorded time entries were not on the same row.

16    This leads to a highly efficient and accurate way of reaching a determination of the

17    timings of the events, during particular work day.

18    i)    Using SQL code, I then was able to organize each workday's time entries within

19    the Microsoft SQL™ database – aligning the entries from the employee activities

20    in the order according to the work-type designations.  For instance, I placed all

21    employees' work day activities in a single row, so that each employee's row

22    contained the recorded time entries for that day.  In other words, each employee's

23    daily activity appeared on the same row.  This process is colloquially known as

24    applying "normalization" to the data.

25    j)    Following normalization, I then ran several SQL queries to provide cross-checks,

26    to ensure that the underlying subtotals matched with the sum of the constituent

27    shift's hours according to the information in timecards corresponding with the

28    employee's workdays.  Using mathematical formulas within SQL to validate the

13

1    entries, I was able to ensure the integrity of the detailed entries matched to the

2    summaries, and to make sure that the alignment of the shifts could be analyzed and

3    the duration of "sleeper" segments while the tractor was in motion could be

4    measured.

5    k)    I then used Microsoft SQL™ Query Analyzer to apply a set of queries to the time-

6    keeping entries within the SQL database that I created from the converted time

7    keeping contained on the defendant's records.  By writing SQL queries, I was able

8    to organize the data by the number of minutes worked in a day containing all of the

9    activity that took place in that day.

10    l)    My analysis is based upon 15,998 shifts covering the 371 employees who experienced

11    one or more shift segments that indicated "sleeper" that took place within California

12    between 12/27/2013 and 04/16/2019.

13

14    **Conclusions from analyzing 15,998 shifts indicating sleeper minutes for 371 employees:**

15    37.    Using the electronic information contained within the files provided by defendant

16    that had been converted into a SQL database server,  I was able to determine the following:

17    (a)    When combined into single-work-days, the 951,579 time-clock entries represented

18    79,462 shifts worked by 371 employees.  15,998 of the 79,462 shifts (20.13%)

19    indicated at least one portion of the shift contained a "sleeper" segment that had

20    occurred.

21    (b)    Of the 15,998 shifts that indicated at least one portion of the shift contained a

22    "sleeper" segment that took place within California, 7,231 of the 15,998 shifts

23    indicated "sleeper" (45.20%) during movement. In other words, according to the

24    odometer within California. In other words, the Defendant's data indicated that the

25    tractor was in motion while the "sleeper" segments were occurring for 7,231 shifts

26    of the 15,998 shifts analyzed that had at least one "sleeper" segment during the

27    shift.

28

1

2

3        38.    It appears that the Defendants produced data representing 371 employees, which

4   appears to be a portion of the employees in the class.[9]  I will be able to apply precisely the same

5   set of formulas that I applied to the data that I analyzed in this report, to the full set of data to

6   achieve a precise calculation.

7   Findings – employees marked "sleeper" during movement, as indicated by Defendant's records:

8        • Number of employees appearing within the data: 371 employees[10]

9        • Number of shifts indicating at least one "sleeper" segment (indicating an employee

10          was in the sleeper-berth of the tractor) in the shift was within California: 15,998 of

11          79,462 (20.13%) (Regardless of movement of that vehicle).

12       • Number of shifts whose timeclocks indicated at least one "sleeper" segment where

13          the odometer indicated truck movement occurred while the employee was in the

14          sleeper[11] in California: 7,231 of 15,998 (45.20%).

15       • Number of employees whose timeclocks indicated they experienced at least one

16          "sleeper" segment where the odometer indicated truck movement occurred while

17          the employee was in the sleeper within California: 344 of 371 (92.73%).

18       • Total number of weekly pay periods covered by the truck data provided by the

19          Defendant for the 371 employees: 12,946.

20       • Number of weekly pay periods covered by shifts indicating movement during

21          "sleeper" segments in California: 5,613 out of 12,946 (43.36%) paychecks had at

22   _____

23   [9] For purposes of computing damages, I intend to simply replicate the queries and analysis against the full set of data using the same approach that I have taken to achieve this particular analysis.  I built the SQL data structures, as I have

24   in many other matters, including *ABM Janitorial*, with the expectation that, if asked, I would be able to simply run the same set of standard applications of the SQL to the larger data set, and the full set of damages, for all data.

25   [10] I included the named plaintiff, Mr. Dueker, within the analysis of the data.  My analysis of Mr. Duecker's timeclock entries indicates that his shifts exhibited characteristics that were typical of the other individuals who appeared in the

26   data.

27   [11] My analysis included only those "sleeper" segments where the truck was experiencing movement, as indicated by an increase in the odometer with a time indicated that the employee was (i) exclusively within California, or (ii) the truck was within California during part of one or more "sleeper" segment indicated by the driver.

28

15

1    one or more shift on that paycheck indicating sleeper minutes in California during

2    truck movement.

3        39.    Finally, I did not find any indications within the Defendant-provided paycheck data

4    that employees received compensation for "sleeper" – either by way of the use of any "code"

5    indicating "sleeper pay", nor any other miscellaneous description indicating that pay was provided

6    for "sleeper" segments.

7

**DESCRIPTION OF CODES**

| CODE | TAXABLE EARNINGS | CODE | REIMBURSEMENTS | CODE | DEDUCTIONS | | |
|------|------------------|------|----------------|------|-----------|---|---|
| BE | BEREAVEMENT | AA | VOID NET PAY | AD | ADVANCE | NC | PARTIAL BACK MED INS |
| BK | BREAKDOWN | LM | LUMPER | AR | DEFICIT AMT | NB | PARTIAL BACK MED INS |
| CW | CITY WORK | MO | MOTEL | AZ | SUPPLEMENT ACCIDENT | P4 | PREVIOUS DEFICIT |
| DB | DOT INSPEC BONUS | MS | MISC | BO | PHYS/DRUG SCREEN | PP | PASSENGER PROGRAM |
| FL | FLAT PAYROLL | PD | PER DIEM | BZ | BUS | PQ | PRE-EMP ADVANCE |
| FX | TAXABLE EARNING | PF | PERMITS | CD | CDL LICENSE | PY | PHYSICAL |
| LD | LIGHT DUTY | RT | REPAIR-WASH TRAC | CH | RENTAL CAR | SA | SETTLEMENT ADVANCE |
| LH | LOAD-UNLOAD HELP | RV | REPAIR-WASH TRLR | DS | DENTAL INSURANCE | SL | SUPPLEMENTAL LIFE INS |
| LO | LAYOVER | SC | SCALE | DT | DRUG TEST | UW | UNITED WAY |
| LT | LEAD DRIVER PAY | TO | TOLLS | DU | LOGO STORE | WC | WIRE CHARGE |
| LU | LOAD-UNLOAD | VD | VOID DIRECT PAY | FD | FINE DEDUCTION | ZA | GARNISHMENT |
| MI | MILEAGE ADJUST | 3Z | HAZMAT ENDORSEMENT | FE | FED EXP,UPS, ETC | ZB | GARNISHMENT |
| MM | MISSED MILES | | | FY | TRAINING DEDUCTION | ZC | GARNISHMENT |
| MP | MISC PAY | | | GA | GARNISHMENT ADM FEE | ZD | GARNISHMENT |
| OR | OUT OF ROUTE | | | HS | HOUSING | ZE | GARNISHMENT |
| RB | REFERRAL BONUS | | | JA | INVERTER INSTALL | ZF | GARNISHMENT |
| SB | SIGN ON BONUS | | | JB | CB INSTALL | ZG | GARNISHMENT |
| SF | BONUS MILES | | | JC | RADIO/CD INSTALL | ZH | GARNISHMENT |
| SZ | ORIENTATION TRAINING | | | JD | ANTENNA | 4M | MAP PAK |
| TO | LEAD DRIVER TRAINING | | | JE | MATTRESS | 7E | RENTAL CAR |
| VA | VACATION | | | JG | OUT OF FUEL CHARGE | | |
| WB | WALMART GIFT CERT | | | JH | MISC/KEYS-LOCKOUT | | |
| XS | EXTRA STOP | | | K4 | 401K REPAYMENT | | |
| 2F | DETENTION | | | KZ | 401K | | |
| | | | | KZ | REFRESHER COURSE | | |
| | | | | LS | SCHOOL CONT. BALANCE | | |
| | | | | ME | PRE-TAX INSURANC | | |
| | | | | M1 | VISION INSURANCE | | |
| | | | | MJ | PRE-TAX INSURANC | | |
| | | | | MC | MISC CHARGE | | |

19    I declare under penalty of perjury under the laws of the state of California that the foregoing is

20    true and correct. Executed this 6th day of September 2019 in Pleasant Hill, California.

23

24    _____

25    Aaron Woolfson

Expert Report Aaron Woolfson        Ex. B, p. 35        Case No. 2:18-cv-08751-FMO-FFM

# EXHIBIT A

**Curriculum Vitae**                                                    **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

## Career Summary

25 Years of Experience developing extremely large scale, highly efficient and accurate Database Applications, for commercial, government, aerospace, telecommunications and payroll industry, with special emphasis in IVR systems.

- Database transition planning and disaster recovery experience
- Client-Server Database Application Design and Development
- Developed extremely high performance IVR system  (1.5m calls/day)

- Efficient Database Design through Data modeling
- Full understanding of Database libraries, and transaction handlers
- Deep knowledge of Electronic Time Keeping Techniques

- Efficient Database Table Structuring and Indexing Techniques
- RDO/ADO interface techniques, incl. port 1433 direct interface
- Point of Sale Time Keeping Integration with Payroll

- Comprehensive data transformation, tallying through data analysis
- VB6 and .NET(2.0) bounded and unbounded objects
- GPS "as-Time Keeping" object, tracking, and analysis techniques

- Presentation of sophisticated data in easily-understood terms
- Web-Services data integration and multi data-source integration
- Networked Multi-Location Database Components related to Timekeeping

- An early investor in, and partial developer of QL2, a data-analysis tool for turning web-pages into rich-data searchable sources of information. QL2's customers include 7 of the top 10 global airlines, 5 of the top global online travel agencies, and Global 100 energy, car rental, retail, pharmaceutical and life science companies.

## Professional Experience (*consulting that resulted in deliverables*)

**University of Illinois, Champaign-Urbana** (1986, 1987, 1988). Employed to Program computer terminals attached to a Mainframe computer system (PLATO) that were used to generate databases containing class schedules based upon prospective students' interests and SAT scores.  Curriculum was graphically represented on Plasma Display Terminals attached to the University's PLATO computer Plato Computer Mainframe.  Student Curriculums included travel time between classrooms in different buildings and items related to classroom proximity.  Worked under the auspices of Don Bitzer, inventor of the Plato Computer System and co-inventor of the Plasma Display Panel, and Hugh Satterlee, Ombudsman of the University of Illinois, Champaign-Urbana.

**Computer Services Office, San Joaquin Delta College, Stockton California** (1991, 1992).  Maintained campus-wide network of mainframe-based computer terminals used for class scheduling and curriculum development;

**Delta Telecommunications, Stockton, Ca** (1993). Founded a California Based Public Utility (U-5410-C) focusing on a network of telephone switching systems connected to databases that were used to route telephone calls of customers within the State of California.  I invented the efficient IXC-10 Network Switch and the associated databases, as there were no highly efficient telephone switches during that time that took up a small amount of space, yet could handle the demands of a full-scale telephone switching office.

**Curriculum Vitae**                                                                   **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

**TelSwitch, Inc., Stockton, Ca** (1994). I authored the Airnet Billing and Call Collection Database software that was used at TelSwitch, Inc for the purpose of billing residential and commercial long distance customers for the calls that they made. I wrote database formulas to establish the rating of telephone calls based upon the elements provided by the switching network: call setup, call type, call routing, and rate plan assigned to customer. Determined the rates and taxes to charge the customers on each call, based upon the rate plans assigned, the time of day, the time and duration of the call, and whether that call was intrastate, interstate, or Intra-lata. Processed millions of telephone calls through my database.

**Japan Telecom America, San Ramon, Ca** (1996). I adopted the Airnet Billing Software and Call Collection Database that I had authored to specifically meet the needs of an international telecommunications corporation doing business in the United States, Japan, and in Canada, presenting bills to customers in multiple languages and font sets, accepting various currencies, which all had to be computed against the dollar in real time.

**Oersted Corporation (Sunstrand Contract)** (1997). Designed and authored an Automation Control and Database system used for the mass-production of mission-critical magnetic armatures used in Air Conditioning, and Electric Vehicle, and Aerospace applications. I created the process control mechanism that allowed the machine to "manufacture the part" and measure the results, and report the results to a master database that contained Quality Control statistics. This machine continues to operate at a Sunstrand Corporation facility in Wisconsin and has successfully manufactured hundreds of thousands of components.

**Network Services Solutions, LLC., Reno, Ca** (2001). Customized a database for tracking the overlapping time elements of telephone calls, and establish audit trails of telephone calls through the phone network, based upon origination, destination, time, and jurisdiction. The system is in use to track the costs for telephone lines and services to hundreds of schools, dozens of hospitals, and is the backbone for a national communication network, with over five million transactions being tracked through my database monthly.

**Decisionet, St. Charles, Il. (Experian Project)** (2004). I was contacted to build a Database and Electronic Gateway "Appliance" Device for customers to acquire credit reports from Experian's secure database. The system was used to facilitate the delivery of 7.2 million credit reports to commercial users, including credit unions, banks, car dealerships. The system tracked usage, report lengths, type of reports, and reporting tools to Experian's customers to view the quantities of reports that were used through the system, types of reports, and other information pertaining to the acquisition of reports. The service allowed Decisionet to extend the life of legacy interface environments between Experian and its' clients by several years.

**BankVOD / Billing Solutions, Inc. - (Bank of America, Wells Fargo Bank, JP Morgan Chase, PNC, Bank of the West)** (2005). Designed and built a network of Database Applications for the mortgage industry using Microsoft SQL and ASP.net. The system created a protocol for banks and mortgage brokers to exchange information on the status underwriting of loan applications, providing tracking of Verification of Income, Verifications of Deposit and Verification of Mortgage applications, as well as providing the analysis back to the banks for items such as Check Verification(s). The database also triggered the disbursements of processing costs and reimbursements toward the banks. To date, my system has been an integral part of the processing of over 1.2 million mortgage applications.

**SAIC - Patriot Missile Systems / Training Division  (Subcontract)  (DPAS Rated)** (2007). Designed the hardware, software, and firmware used within the modern-day re-instrumented version of Patriot Missile consoles. I was tasked with developing a hardware and software combination that retained full compatibility with both modern and legacy equipment, that could provide data to commercial and proprietary databases efficiently and reliably in extreme environments. I am proud that my work is considered to be an integral part of the battle-field readiness and preparedness of ground troops, and that dozens of our implements are in use throughout the world.

**Curriculum Vitae**                                                    **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

**Department of Justice, Sacramento California** (2007). Authored a specialized interface to
work with a telephone company database.

**Practice Technologies, Inc.** (2007).  I was contracted to develop the database to maintain
the billing and session tracking portion of Real Deal Docs, part of the Real Practice Suite of
document management tools used by dozens of law firms, including Littler.  I had been tasked
with developing the billing methods for tracking the use of Real Deal Docs, a Web Site that
indexes the documents that are filed by publicly-held companies, into searchable terms, and
maintaining presentations.

**Cogent Communications, Inc.** (2008).  I was tasked with authoring the database system
for tracking the timings and overlaps of telephone calls, and establishing an audit trail of
telephone calls through the phone network, based upon time, duration, origination,
destination, and other characteristics.  The database continues to be used to capture hundreds
of thousands of telephone transaction per month that traverse the Cogent Communications
Network, and maintains a detailed audit trail of service changes and inventories of equipment
and.

**Gallium Visual Systems - ATS (Air Traffic Control System)** (2008). Incorporate modern
software, hardware, and firmware into Aircraft Control Training Systems. I was tasked with
manufacturing Operator Keyboards and Consoles using modern day technologies as part of the
Air Traffic Control Training System, enabling ATS equipment to work with USB-enabled
computers, and modern data collection systems, including databases.

**First National Collection Bureau, Reno, Nv.** (2008).  Built a system of interconnected
databases and computers capable of capturing over 250 million telephone records per year,
and deep-content analyze the telephone calls for type-of-call, timing characteristics, and
customer contact effectiveness.  System had to maintain a minimum of 56 million phone calls
per year, any of which could be instantly retrieved.  The Microsoft SQL database components
required that I author an exacting set of high-performance SQL database analysis scripts in
conjunction with several inter-related computers, all operating autonomously operating
software programs that I wrote.  I have been told that I wrote the highest performance
(civilian use) telephone call analysis system in the world.

**American Automated Payroll, Charleston, Sc** (2009) - Payroll and Time Keeping.  I
Authored a set of scripts to work with databases to allow payroll companies to integrate their
payroll systems with the telephone network.  The program that I wrote allows the electronic
entry of time keeping records via telephone. Employees can use a telephone to clock in and
out of work sites, or an employer can use the telephone to enter time entries into their payroll
production.   I am an ongoing consultant to American Automated in the area of timekeeping,
payroll database integration, paycheck and time clock reporting, and phone network
integration.  Additionally, I authored a database system that comprises of an automated
inbound and outbound calling interface for customers of payroll companies to be able to input
their daily time sheets into payroll programs, for purposes of generating payroll.  The software
and hardware mechanism that I authored interfaces with system such as "Evolution" (a
popular and widely used payroll program), as well as Microsoft SQL, Oracle, and mySQL
American Automated Payroll and TelSwitch, Inc. are engaged in an ongoing partnership tasked
with developing further market verticals for my software.

**Reunion Communuications, La Grange, Il** (Airlink Wireless) (2010).  Database for keeping
track of usage, balances, and remaining minutes for a National Prepaid Wireless provider. I
authored a database, and associated network interface protocol, so that customers may
access real-time information about their accounts via telephone calls from their handsets. The
system also maintains real-time analysis of telephone the telephone companies' databases to
determine where the telephone callers are going to be routed, based upon their "OEM"
handset ID, calling characteristics, and other factors.  The Database, located downtown Los
Angeles, is used tens of thousands of times every day by prepaid mobile carriers and their

**Curriculum Vitae**                                                                    **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

customers all over the country, who rely my high-performance database application's speed and accuracy to delivery timely information on real-time usage.

**Rapid Announce, a Product of TelSwitch, Inc.** (2010). I authored the combined software (database) and hardware application that is used to conduct millions of daily inquiries into several linked databases.  The databases, which contain approximately three hundred thousand new collection accounts per day, are analyzed to determine to whom automated dialers should call and what those called individuals are being contacted regarding.  The calls are indexed, and are reported to time tracking databases for later analysis and quality assurance.  The system is currently in use by collection bureau(s), and makes decisions on hundreds of thousands of transactions per day. The system is also had been used for automated notifications in several non-collection industries.

**SAIC - Patriot Missile Systems / Training division** (2011).  Tasked with adopting some of the database SQL analysis tools that I use in expert database analysis toward use in personnel management and battlefield equipment positioning.  Expand the methods I developed for analyzing GPS data points, so that data points coming from disparate data sources could uniformly be applied into databases and then analyzed.  According to SAIC, the database formulas that I had applied in my capacity as an expert in the Moreno, et al. v. J. Redfern, Inc. (RG08375539) closely mimic the GPS data point analysis that is conducted GPS data points from projectiles (missiles) and personnel movement.

**AggravationSense and VoiceVault, a Product of TelSwitch, Inc.** (2011).  Built a database to analyze the voice characteristics of telephone calls in real-time, to determine when someone becomes aggravated, so that they can be proactively routed to customer Service supervisors.  VoiceVault contains approximately 130 characteristics of the human voice, and can be used to determine whether a telephone caller is who they say they are, with a very high degree of accuracy.  The partners in this project were Qwest, AT&T Business Services, Network Services Solutions LLC, and American Automated Payroll;

---

Education:

San Joaquin Delta College (1991-1994); Majored in Sociology and Cultural Anthropology.

---

Publications, Awards, Authored Works

1996, Young Entrepreneur of the year, San Joaquin County; California.

Authored Foundational White Paper on Voice Over Internet Protocol, and filed patent application on Wide Area Centrex using Internet as Communication Backbone, as part of the Tempo Networks LLC partnership between me and two of the co-founders of Worldcom.

Authored patent application for SMS (Text Message) Initiation of a telephone call between two people by connecting two outbound calls initiated by a phone switch in a foreign country.  One leg was placed to the "initiating party" and the other leg to the "called party", which were connected together to create a circuit through an intermediate county.

Co-wrote a paper presented to DARPA on the best-practices method of designing a database to conduct the analysis of large volumes of Telephone Calls.  Authored in conjunction with Ted Kubaitis, the founder and Chief Software Architect of QL2.

Analysis of Scheduled Flights and the Merger Effect on Flight Availability re: Merger of United Airlines and Continental Airlines (Declaration) – In Matter of the Merger of United Airlines and Continental Airlines, before the Senate Judiciary Subcommittee to Examine United/Continental Merger, May 27th, 2010, 2:15pm – Dirksen-226

**Curriculum Vitae**                                                          **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

Professional Certifications:

1994-2011; Certification Granted by California Public Utilities Commission  (U-5410-C) to
operate as a California Public Utility, after passing the standards for expertise necessary
related to the operation of telephone communication systems and telephonic records database
recording and billing / rating mechanisms.

2004; NACHA certification achieved for network integration of Payment Transaction Processing
between financial institutions; (Bank Interchange Network).

2006-2012; Credit Card Interchange Network Certification issued by Global Payments for
Software written by Aaron Woolfson related to the Networked Interchange of card member
payment transactions between merchants and correspondent banks, on behalf of Master
Card/Visa/American Express/Discover.

2010-2012; Certificate of PCI DSS Compliance issued by Security Metrics for maintaining best-
practices in database management related to secure transaction processing between
mechanized database systems.

Partial List of cases that the court has relied upon my expert findings:

| | | |
|---|---|---|
| Avalos v. La Salsa, Inc. | Mallison & Martinez | Santa Barbara County Superior Court, Case No. 1189077 |
| Domonique Hines vs. KFC | Rastegar & Matern Altshuler Berzon | 09cv2422 JM(POR) |
| Rafael De La Rosa, et al. v. UBS (United Building Services) | Rastegar & Matern | 077CC01206 |
| Guiterrez, Salazar et. al v. Commerce Casino | Rastegar & Matern | Superior Court, Los Angeles - BC360704 |
| Albert H. Cicairos, Frank A. Daniel, Richard Wheeler And George Thompson v Summit Logistics, Inc. Kenneth Bluford v Safeway Stores, Inc. | Weinberg, Roger & Rosenfeld | Superior Court, County of San Joaquin Case No. CV014837 [Consolidated with Case No. CV028541] |
| Adriana Larios v. Moana Hotel And Restaurant Group, LLC,  Et Al | Mallison & Martinez | Superior Court, County of Marin - CV082368 |
| Ranwick v Texas Gila, LLC, a Texas limited liability corporation d/b/a Municipal Services Bureau | Moss & Barnett | 0:13-cv-02792-RHK-SER |
| Patricia Gaines v Law Office of Patenaude & Felix A.P.C., | Kronick, Moskovitz, Tiedemann & Girard | 3:13-cv-01556 |
| Stein v Monterey Financial Services, Inc. | Lippes Mathias Wexler Friedman LLP | 2:13-cv-01336-AKK |
| Lofton v Verizon Wireless | Munger Tolles & Olson, LLP | 4:13-cv-05665 (ND, CA) |
| Maribel, Hernandez and Esquivel v. 15 main LLC | Mallison & Martinez | Superior Court of Ca., County of Alameda RG16809772 |
| ABM Industries, Inc. Consolidated Cases | Weinberg, Roger & Rosenfeld Mallison & Martinez Rastegar-Matern | A132387, A133077, A133695  (State of California First District Appellate, Unit 4) |

**Curriculum Vitae**                                                        **Aaron David Woolfson**

1601 N Main Street, Ste 101 – Walnut Creek, Ca 94596 - (209) 915-2483 mobile

| | | |
|---|---|---|
| Edgar Morales, Salvador Magaña, and Matthew Bagu, on behalf of themselves, the State of California, and all other similarly situated individuals v Leggett & Platt, Inc | Mallison & Martinez | 2:15-cv-01911-JAM-EFB (E.D., Ca) |
| Miguel Rojas-Cifuentes et.al. v. ACX Pacific Northwest Inc, Pacific Leasing, LLC, John M. Gombos, John E. Gombos | Mallison & Martinez | 2:14-cv-00697-JAM-CKD (E.D., Ca) |
| Darcel Keyes v Ocwen Loan Servicing, LLC | Hinshaw & Culbertson LLP | 2:17-cv-11492-GAD-SDD (E.D. Mich., S. Div.) |
| Stewart Roark v Credit One Bank, N.A. | Moss & Barnett | Case No. 0:16-cv-00173-RHK-FLN (E.D. Minn) |
| Jose M. Nevarez v Foster Farms, L.L.C. | Law Office of Cathe Caraway-Howard and Law Office of Martin Horwitz | 13-CECG-02624 (Superior Court of California, County of Fresno) |
| Frederick Luster And Narval Mangal, et. al.,v. Green Tree Servicing, LLC | Ballard Spahr LLP | 1:14-cv-01763 (ND, GA – Atlanta Division) |

In addition to the above cases, I have been retained as either a consulting or testifying expert in database analysis in over 250 cases, - approximately 90% of which are class actions.

I have worked with both plaintiffs and defendants.  I have been asked to analyze timekeeping, payroll records, telephone call records, credit card records, reimbursement records, and travel records (e.g., gps data and locations where employees worked), as well as provide analysis of technology related to Call Center and Collection Operations.

# EXHIBIT B

**Aaron Woolfson's List of Cases in which Testimony was Provided (as a Deponent or as an Expert at Trial)**

- *Archila v. KFC*
  Case No. 2:09-cv-00107 (FMOX0) (Central District, Ca)

- *Hines v KFC*
  Case No. 09cv2422 JM(POR) (Southern District, Ca)

- *Brian Behaien v. Pizza Hut*
  Case No. BC384563 (Superior Court of California, Los Angeles)

- *Laura Onofre v. Children's Hospital of Orange County*
  Case No. 30-2008-00180057 (Superior Court of California, County of Orange)

- *Rafael De La Rosa, et al. v. UBS (United Building Services)*
  Case No. 077CC01206  (Superior Court of California, County of Orange)

- *Larios, et al. vs Moana Hotel and Restaurant Group, LLC (Piatti)*
  Case No. CV-082368 (Superior Court of California, County of Marin)

- *Sergio Gutierrez vs California Commerce Casino Club, Inc.*
  Case No. BC360704  (Superior Court of Los Angeles)

- *Angela Brooks vs. TBS (Unity),*
  Case No. RG08401461 (Superior Court of Alameda)

- *Ashlee Stein v Monterey Financial Services*
  Case No. 13-cv-1336 (ND, Alabama, Southern Division)

- *Lofton v. Verizon Wireless*
  Case No. 4:13-cv-05665-YGR (Northern District, California)

- *Abrams v. SkyOne Credit Union*
  Case No. 605650 (Superior Court of California, Los Angeles - Central Division)

- *Barnes v. Conns Appliances, Inc.*
  Case No. 3:16-cv-00413-HTW -LRA (SD, Michigan)

- *Silvia Contreras et.al. v. JIB Management, Inc. et. al.*
  Case No. 15-cv-000143 (Superior Court of California, County of Monterey)

- *Harold L Robinson v. Open Top Sight Seeing of San Francisco, LLC*
  Case No. 14-cv-00852-PJH (Northern District, California)

- *Shields v. Security Paving*
  Case No. BC492828 (Superior Court of California Los Angeles - Central Division)

- *Maribel, Hernandez and Esquivel v. 15 main LLC*
  Case No. RG16809772 (Superior Court of Ca., County of Alameda)

- *Frederick Luster And Narval Mangal et al v Green Tree Servicing, LLC*
  Case No. 1:14-cv-01763-ELR (Northern District, Ga – Atlanta Division)

- *Eduardo Meza et. al. v Millennium Logistics & Transportation, Inc.*
  Case No. STK-CV-UJR-2014-0005465 (Superior Court of Ca, San Joaquin Co.)

- *Miguel Rojas-Cifuentes v ACX Pacific Northwest Inc, Pacific Leasing, LLC, John M. Gombos, John E. Gombos*
  Case No. 2:14-cv-00697-JAM-CKD (Eastern District, Ca – Sacramento Div.)

- *In re Crown Building Maintenance Wage and Hour Cases, JCCP No. 4876, consolidation of Flores vs. Crown Building Maintenance Co. dba Able Building Maintenance.* (Case No. RG16802930 – Superior Court of California, County of Alameda,), (Case No CIV530445 – Larreynaga vs. Able Building Services Group, Inc., Superior Court of California, County of San Mateo)

- *Phillip Gilmore, on behalf of himself and all others similarly situated, v.USCB Corp.*
  Case No. 5:17-cv-00119-MTT (Middle District, Ga, Macon Division).

- *Jose M. Nevarez, on behalf of himself and all other similarly situated individuals, Plaintiff, vs.Foster Farms, LLC a California Limited Liability Company; Foster Poultry Farms, Inc., a California corporation; and DOES 1 through 100, inclusive.* Case No. 13-CECG-02624 - Superior Court of State of California, County of Fresno

- *Christina Kinnamon et.al. v Ditech Financial LLC.*
  Case No. 4:16-cv-646 (ED, MO, Eastern Division

- *Susan Embree v. Ocwen Loan Servicing, LLC.*
  Case NO. 2:17-cv-000156, WA, Eastern District

- *Karen and Steve Bartolone v. Ocwen Loan Servicing, L.L.C.*
  Case No. 8:17-cv-00821, CD CA

- *Lourdes Olivo and Socorro Olivode Vasquez, v Fresh Harvest. Inc., Valley Harvesting And Packing, Inc., and Seco Packing A California Corporation.*
  Case No. 17-CV-02153-L-WVG, DC, Ca, S. Div.).

- *Albert Pieterson, on behalf of himself and all others similarly situated, Plaintiff, v. Wells Fargo Bank, N.A., Defendant and John Hastings, on behalf of himself and all others similarly situated, Plaintiff v Wells Fargo Bank, N.A., Defendant* (Case Nos..3:17-cv-02306-EDL and Case No. 3:17-cv-03633-EDL, ND Ca, San Francisco Div)

- *Gabriel F. Ayala et.al. v Cold Storage Manufacturing, Inc., and Cold Storage Design & Build, Inc.* (Case Nos. RG14725346, Superior Court of California, County of Alameda).

- *Taylor Carroll et.al. v SGS Automotive Services, Inc.* (Case No. 16-537-SDD-RLB (MD, La)

# EXHIBIT C

FILED
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

MAY 1 7 2010

GARY M. BLAIR, Executive Officer
BY_____
NARZRALLI BAKSH,  Deputy Clerk

1   Stan S. Mallison (SBN 184191)
    Hector R. Martinez (SBN 206336)
2   Marco A. Palau (SBN 242340)
    MALLISON & MARTINEZ
3   1939 Harrison Street, Suite 730
    Oakland, CA 94610
4   Telephone:    (510) 832-9999
    Facsimile:    (925) 283-3426
5   stanm@mallisonlaw.com
    hectorm@themmlawfirm.com
6   mpalau@themmlawfirm.com
7
8   Attorneys for Plaintiffs

9           SUPERIOR COURT OF THE STATE OF CALIFORNIA

10          IN AND FOR THE COUNTY OF SANTA BARBARA

11  SANDRA AVALOS, on behalf of herself and all    JUDICIAL COUNCIL COORDINATED CASE
12  others similarly situated,                     NO. 4488

13          Plaintiff,                             Superior Court of California County of Santa
                                                   Barbara Case No. 1189077
14      vs.
                                                   *Class Action*
15
16  LA SALSA, INC., a California Corporation, and  [~~PROPOSED~~] ORDER GRANTING IN
    DOES 1 through 50, inclusive,                  PART AND DENYING IN PART
17                                                 PLAINTIFF'S MOTION FOR CLASS
                                                   CERTIFICATION
18          Defendant.
19
20                                                 *Hon. Denise de Bellefeuille*
21
22
23
24
25
26
27
28

[PROPOSED] CLASS CERTIFICATION ORDER                    CASE NO. 4488
                                        Ex. B, p. 48

1    On March 25, 2010 a hearing was held on Plaintiff's Motion for Class Certification. The

2    Court, having considered the papers on file in this matter and the arguments of counsel, and good

3    cause appearing, GRANTS and DENIES in part, Plaintiff's motion for class certification.

4    **I.    DISCUSSION**

5        Plaintiff moved to certify the general class of California La Salsa Workers defined as

6    follows:

7        All non-exempt persons who are employed or have been employed by DEFENDANT in the
         State of California who, within four (4) years of the filing of this Complaint, have worked as
8        hourly restaurant employees and were not paid all lawful wages and/or reimbursed for
         necessary expenses. Second Amended Complaint ("SAC") ¶ 18.

9        Plaintiff also moved to certify seven subclasses: (1) Meal and Premium Subclass; (2) Rest

10   Premium Subclass; (3) Split-Shift Premium Subclass; (4) Reporting Time Premium Subclass; (5)

11   Unpaid Pre & Post-Shift Work Subclass ; (6) Waiting Time Penalties Subclass; and (7) Wage

12   Statement Penalties Subclass.

13       While the Court finds class certification appropriate as to the general class and the first

14   through fifth subclasses, it denies Plaintiffs' motion to certify subclasses six and seven as premature

15   at this time.

16   **A. Legal Standard for Class Certification**

17       In order to certify a class, class action requirements must be met. Under California Code of

18   Civil Procedure § 382, class actions are authorized when the question is one of a common or general

19   interest, of many persons, or when the parties the question is one of a common or general interest,

20   of many persons, or when the parties are numerous and it is impracticable to bring them all before

21   the court. The party seeking certification has the burden to establish the existence of both an

22   ascertainable class and a well-defined community of interest among class members. *Lockheed*

23   *Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104. The "community of interest"

24   requirement embodies three factors: (1) predominant common questions of law or fact, (2) class

25   representatives with claims or defenses typical of the class, and (3) class representatives who can

26   adequately represent the class. *Id.* The plaintiff must establish, by a preponderance of the evidence,

27   that the class action proceeding is superior to alternate means for a fair and efficient adjudication of

28

-2-

1  the litigation. *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 332.

2      The court determines whether the issues which may be jointly tried, when compared with

3  those requiring separate adjudication, are so numerous or substantial that the maintenance of a class

4  action would be advantageous to the judicial process and to the litigation. *Collins v. Rocha* (1972) 7

5  Cal.3d 232, 238.  The established legal standard for commonality is comparative; the relevant

6  comparison lies between the costs and benefits of adjudicating plaintiffs' claims in a class action

7  and the costs and benefits of proceeding by numerous separate actions—not between the complexity

8  of a class suit that must accommodate some individualized inquiries and the absence of any

9  remedial proceeding whatsoever. *Sav-On Stores, Inc. at 339, fn. 10*. A class can be certified based

10  upon a demonstration of partial commonality, meaning that not every single member of the

11  proposed class needs to be exposed to the wrongful practice, nor does the practice have to be lawful

12  or unlawful as to every member of the class. *Id.* at 338.

13      The certification question is essentially a procedural one that does not ask whether an action is

14  legally or factually meritorious. *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 439- 440. Courts

15  consider whether the theory of recovery is, as an analytical matter, likely to prove amenable to class

16  treatment, by looking to the allegations of the complaint and the declarations of the attorneys

17  representing the plaintiff class. *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 478;

18  *Lockheed Martin Corp* at 1106. California courts consider pattern and practice evidence, statistical

19  evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized

20  practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes

21  class certification appropriate. *Sav-On Drug Stores, Inc. v. Superior Court*, supra, 34 Cal.4th at 333.

22  Other relevant considerations include the probability that each class member will come forward

23  ultimately to prove his or her separate claim to a portion of the total recovery, and whether the class

24  approach would serve to deter and redress alleged wrongdoing. *Linder* at 435.

25      That the theory of recovery—i.e., the existence of a uniform corporate policy that results in

26  wage and hour violations—is disputed on its merits by the employer, both directly and through

27  putative class member declarations denying the existence of the policy, does not establish that

28  individual determinations are necessary, but rather in fact tends to confirm the predominance of

- 3 -

1    common legal and factual issues that make the class more amenable to class treatment. *See Jaimez*

2    *v. ADIOHS USA, Inc.* (2010) 181 Cal.App.4th 1286, 1300. The proper focus is not on the merits of

3    whether the practice in fact exists, but on the fact that whether or not the policies and practices exist

4    is a common issue in the action. *Id.*

5        Finally, that the calculation of individual damages may at some point be required does not

6    foreclose the possibility of taking common evidence on the liability questions. *Sav-On Drug Stores,*

7    *Inc.* at 332-333. A class action is not inappropriate simply because each member of the class may at

8    some point be required to make an individual showing as to his or her eligibility for recovery or as

9    to the amount of his or her damages. *Id., citing Employment Development Department v. Superior*

10    *Court* (1981) 30 Cal.3d 256, 266. These individual inquiries do not mean individual fact questions

11    predominate. *Id. at 334.* Individual issues do not render class certification inappropriate so long as

12    such issues may effectively be managed. *Id.*

13        **B. Legal Framework for Premium Pay Subclasses (1-4)**

14            **1. Meal and Premium Subclass**

15        Plaintiff's premium wage claims are largely based upon the Industrial Welfare Commission's

16    Wage Order 5, which is located at 8 CCR § 11050. Under Wage Order 5 and Labor Code § 512(a),

17    an employer may not employ an employee for a work period of more than five (5) hours per day

18    without providing a meal period of not less than 30 minutes, except that if the total work period is

19    no more than six (6) hours, the meal period may be waived by mutual consent. Unless the employee

20    is relieved of all duty during a 30-minute meal period, it is considered an on duty meal and counted

21    as time worked; on duty meal periods are permitted only when the nature of the work prevents an

22    employee from being relieved of all duty and there is a written agreement allowing the on-duty

23    period.

24        Under Section 512(a), in work periods of more than 10 hours per day, a second meal period of

25    at least 30 minutes must be provided, except that if no more than 12 hours are worked, the second

26    period may be waived by mutual consent if the first meal period was not waived.

27            **2. Rest Premium Subclass**

28        Wage Order 5 provides that every employer shall authorize and permit all employees to take

-4-

1  rest periods, which insofar as practicable shall be in the middle of each work period. The time shall

2  be based on the total hours worked daily, at 10 minutes net rest time/4 hours or major fraction. If the

3  total daily work time is less than 3.5 hours, no rest period need be authorized. An authorized rest

4  period is counted as hours worked, with no deduction from wages.

5       Under both the Wage order and Labor Code § 226.7, no employer shall require any employee

6  to work during any meal or rest period mandated by an applicable order of the

7  Industrial Welfare Commission, and if the employer fails to provide a meal or rest period in

8  accordance with the order, the employer shall pay one additional hour of pay at the employee's

9  regular rate of compensation for each workday that the meal or rest period is employee's regular

10  rate of compensation for each workday that the meal or rest period is not provided.

11       **3.  Split-Shift Premium Subclass**

12       A split shift occurs wherein an employee works more than one shift in a day, which are

13  separated by non-paid, non-working periods of time established by the employer that were not bona

14  fide rest or meal periods. Where the period exceeds one hour, the Department of Labor Standards

15  Enforcement assumes that the purpose of the split shift is for the employer, rather than for the

16  employee's benefit, and should be compensated. Wage Order 5, at subdivision (4)(C), provides that

17  when an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition

18  to the minimum wage for that workday.

19       **4.  Reporting Time Premium Subclass**

20       Wage Order 5, at subdivision 5, provides that for each workday an employee is required to

21  report for work and does report, but is not put to work or is furnished less than half the employee's

22  usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's

23  work, but in no event for less than 2 nor more than 4 hours, at the employee's regular rate of pay,

24  which shall not be less than the minimum wage.

25       **C.  Analysis of Class Certification Requirements for Premium Pay Subclasses**

26          **1.  Ascertainability**

27       For at least these subclasses (1-4), the court finds that the class is ascertainable—keeping in

28  mind that the Plaintiff does not need to show that all persons who might identify themselves as class

1    members are actually entitled to recover. Given the allegation of class-wide policies and practices,

2    the ascertainable class consists of all hourly employees to whom these policies apply.

3            2.    **Community of Interest**

4                    (i)    **Predominant Questions of Law and Fact**

5                            a.    <u>Rest & Meal Period Premiums</u>

6        With respect to the meal and rest period violation claims, Plaintiff asserts that common issues

7    predominate because the issues capable of being tried jointly are numerous, substantial, and subject

8    to common proof. Plaintiff has submitted evidence from a database made from a sampling of

9    information provided by Defendant, which shows that Defendant systematically failed to provide

10   premium rest and meal period wages, despite that employee time records show missed meal and rest

11   periods on their face, and evidence from declaration testimony of class members that shows a

12   practice of requiring employees to clock out for breaks but continue working. Plaintiff emphasizes

13   that the failure to pay premium wages for missed meal and rest periods is supported by the fact that

14   nowhere in the computerized records provided by defendant is there evidence of any premium

15   wages ever having been paid for any missed meal and rest period, in spite of the fact that the

16   computerized information gathered from employees clocking in and out shows thousands of missed

17   meal and rest periods. Plaintiff contends that a 100% failure to ever pay such premium wages

18   supports the conclusion that not doing so was a corporate policy or practice.

19       Plaintiff contends that the common rest and meal period issues include not only this policy

20   and practice of not paying premium wages for violations that occur on the face of the timekeeping

21   data, but also (1) the practice of requiring employees to clock out for meal breaks but continue

22   working (shown in computerized evidence of specified transactions occurring during the periods the

23   employees were clocked out); (2) the sporadic evidence of rest breaks; (3) the fact that the

24   California Supreme Court will determine whether the employer's obligation is merely to "provide"

25   rest and meal breaks, or to ensure that they are taken[1]; and (4) that the data shows the missed

26

27   _____
     [1] *See Brinkley v. Public Storage Inc.* (2008) 167 Cal.App.4th 1278. (Review granted Jan. 14, 2009) and *Brinker Restaurant Corp. v. Superior Court* (2008) 165 Cal.App.4th 25. (Review granted Oct. 22, 2008) (hereafter *Brinkley* and *Brinker*, respectively).

28

[PROPOSED] CLASS CERTIFICATION ORDER                                    CASE NO. 4488

Ex. B, p. 53

1  periods and the affected employee's wage rate, and can therefore establish damages. Plaintiff

2  emphasizes that although the law does not require an employer to keep evidence of taken rest

3  breaks, that its practice was to require employees to log out for breaks, and the data shows scant

4  evidence of breaks taken.

5  Where inadequate record-keeping prevents employees from proving their claims for unpaid

6  meal and rest breaks, the burden shifts to the employer to show that rest breaks were taken, and the

7  employees were relieved of all duty during such breaks. See *Amaral v. Cintas Corporation No. 2*

8  (2008) 163 Cal.App.4th 1157, 1189.

9  Defendant argues that common issues do not predominate, and that the applicable substantive

10  law will demand individual trials with respect to meal and rest periods, given that current federal

11  cases hold that an employer need only "provide" breaks, and need not ensure that they are taken—

12  the issue currently before the California Supreme Court in the *Brinkley* and *Brinker* cases. However,

13  this court does not find this to require that class certification be denied. Indeed, the federal district

14  court in *Bibo v. Federal Express, Inc.* (N.D. CA 2009) 2009 U.S. Dist LEXIS 37597, expressly

15  acknowledged that the federal cases upon which La Salsa now relies to claim that there is no

16  requirement to ensure that breaks are taken, were decided prior to the time that the California

17  Supreme Court decided to review the issue, and the law can no longer be considered "settled" on

18  that issue. *Id.* at *3. *Bibo* found the now-unsettled state of the law on the issue did not prevent

19  certification of a class based upon missed meal and rest periods, and the Second

20  District Court of Appeals agreed with that assessment in *Jaimez, supra*, at 1303-1305.

21  Defendant contends the trial would devolve into a series of mini-trials involving the ifs, hows

22  and whys of the purported violations. This argument might be persuasive if the data showed that

23  defendant had paid premium wages for some violations revealed by the timekeeping data, but not all

24  such violations. However, here, when the data revealing meal and rest break violations (as well as

25  split shift and reporting time violations) was cross-referenced with the data related to compensation

26  of employees, it revealed a 0% incidence of defendant having ever made payment of any premium

27

28  .

[PROPOSED] CLASS CERTIFICATION ORDER          CASE NO. 4488

1    wages. It is difficult for this court to believe that 100% of the violations could be explained away by

2    employees expressly waiving their rest or meal breaks, etc. Consequently, it is difficult to deny the

3    existence of a class-wide policy for non-payment of premium wages—whether de facto or formally

4    institutionalized—where the data show that no premium wages have ever been paid despite the

5    occurrence of thousands violations within defendant's time-keeping data. As pointed out by

6    Plaintiff's reply—it is precisely to avoid the issue of the "ifs, hows and whys" in determining the

7    pay that is due to its employees that Defendant utilizes the high-tech timekeeping system.

8        Defendant also attacks plaintiff's database analysis by emphasizing that the violation rate

9    ranges from approximately 1% to 5 %, and argues that the incidence of violation is so small as to

10   justify denial of the class certification motion. The Court must emphasize here that this was a

11   sampling of data. Further, defendant relies solely on the percentages of total shifts which appear in

12   the data in arguing that the percentage of violation is too small to justify certification. However, that

13   rest and meal breaks were sometimes properly recorded in the database does not disprove the

14   existence of a corporate policy.  Further, the percentages of total shifts worked where violations

15   occurred does not mean that only 1%- 5% of employees have ever suffered a violation, as defendant

16   implies, rather that a much larger percentage of employees suffered violations 1% to 5% of the time.

17                          b.  Split Shift Premium

18       With respect to the split shift subclass, Plaintiff asserts again that the time-keeping data show

19   the existence of split shifts for which payment of a split shift premium would be required. But when

20   cross-referenced with payroll data, the data again show that premium wages have never been paid

21   by La Salsa for any split shifts. Plaintiff emphasizes that the DLSE assumes that if the "split"

22   between the two shifts is for greater than one hour, the purpose of that split is for the employer,

23   rather than for the employee's benefit, and requires that it be compensated by the payment of the

24   premium wage.

25       Once again, Defendant contends that individual trials would be required, in that the employee

26   would be required to prove that he was forced to take an unpaid break during the day which was not

27   a bona fide rest or meal break, and that his hourly pay is so low that the employee's pay for the day

28   is less than it would be if the employee were paid the applicable minimum wage rate for all hours

- 8 -

1  worked that day plus one additional hour for the split shift again a reassertion of its claim that an

2  individual analysis of the ifs, hows, and whys of the split shift would require individual inquiries.

3      The Court disagrees. The data show when any split shift occurs, and yet clearly establishes

4  that no premium wages have ever been paid by La Salsa for any split shift. The issues are

5  predominantly common, and subject to common proof. That an individual employee might, at some

6  point in time, be required to make an individual showing as to his or her eligibility for recovery, or

7  as to the amount of damages, does not render class certification in appropriate. *Sav-On Drug Stores,*

8  *Inc.* at 332-333.

9                          c.  Reporting Time Premium

10     With respect to the reporting time premium subclass, the data provided by defendant  shows

11  the instances of employees who report for work, yet who are paid for less than two (2) hours of

12  time—which is the minimum they must be paid for reporting time violations under  Wage Order 5.

13  Defendant again asserts that a class-wide trial would necessarily break down into a person-by

14  person analysis of the "ifs, whys, and hows" to determine whether  the employee was forced not to

15  work, or forced to work less than half of the usual or  scheduled day's work, as opposed to

16  requesting or volunteering to leave early. Again the Court finds that the issues are predominantly

17  common, and subject to common proof. The  issues are predominantly common, and subject to

18  common proof. That an individual  employee might, at some point in time, be required to make an

19  individual showing as to his  or her eligibility for recovery, or as to the amount of damages, does

20  not render class  certification in appropriate. *Id.*

21                     (ii)    **Class Representative with Claims Typical of the Class**

22     Defendant contends that Plaintiff's claims are not typical of those of the class, given the fact

23  that the class members have arbitration agreements, and the agreement was found by this Court not

24  to be enforceable as to Plaintiff. The Court disagrees that this makes plaintiff's claims not typical at

25  this point in time.

26     Defendant asserts that putative class members with valid, enforceable arbitration agreements

27  covering their claims cannot obtain relief in a judicial forum as members of a  class action, citing

28  *Perry v. Thomas*  (1987) 482 U.S. 483, 489, and *Vernon v. Drexel,  Burnham & Co., Inc.* (1975) 52

-9-

1  Cal.App.3d 706, 716. Defendant then concludes that any decision to certify a class in arbitration

2  proceedings must be made by the arbitrator, citing *Garcia v. DirecTV, Inc.* (2004) 115 Cal.App.4th

3  297, 302-303.

4      The *Perry* case was not a class action lawsuit, and involved application of the federal

5  supremacy clause in pre-empting a state-created right to avoid arbitration in wage collection actions.

6  In this case, there is no federal supremacy issue, and the court finds the case of no import to this

7  matter. In *Vernon*, supra, the trial court had refused to order arbitration against a named class action

8  representative plaintiff, despite his execution of an enforceable arbitration agreement, solely

9  because to do so would subvert the class action by depriving it of its representative. The court of

10  appeal found that a class action could not be used to subvert an otherwise enforceable agreement to

11  arbitrate contained in a valid contract. That situation is not present here. This is not a motion to

12  compel arbitration; arbitration has already been denied as to the named plaintiffs herein.

13      Further, it is far from clear that enforceable arbitration agreements exist for the putative class

14  members. The hearing on defendant's motion to compel arbitration was held on June 14, 2007.

15  Rather than providing a transcript of that hearing, or relying on the order denying arbitration,

16  Defendant instead relies heavily on the transcript of a January 17, 2008 hearing on motions to

17  compel, in which the Court commented that it had not found the arbitration agreements per se

18  unenforceable in denying the motion to compel arbitration some eight months earlier. While that

19  may have been true, given that it was unnecessary for the Court in denying the motion to compel

20  arbitration to go beyond the facts that Avalos speaks, reads, and understands only Spanish, and the

21  arbitration agreement was presented to her only in English, without translation, and she did not

22  understand it when she signed it, the Court also did not find that the arbitration agreements were

23  otherwise valid and enforceable as to other class members. Indeed, the Court's June 2007 ruling on

24  the motion to compel arbitration included a substantial discussion of both the procedural and

25  substantive unconscionability of the arbitration agreement.

26      Further, subsequent to this court's June 2007 determination of the motion to compel

27  arbitration, there has been considerable development in the law related to class action waivers set

28  forth in arbitration agreements in the employment context. In August, 2007, the California Supreme

- 10 -

1    Court held, in *Gentry v. Superior Court* (2007) 42 Cal.4th 443, that class action waivers in

2    employment arbitration agreements may undermine the vindication of employees' unwaivable

3    statutory rights to overtime compensation, and would pose a serious obstacle to the enforcement of

4    the state's overtime laws. It found such waivers should not be enforced if the trial court determines

5    that class arbitration would be a significantly more effective way of vindicating the rights of

6    affected employees than individual arbitration. The *Gentry* court remanded the case for a

7    determination of whether merely severing the class action waiver would be sufficient, or if there

8    were other instances of substantive unconscionability that might warrant finding the entire

9    agreement unenforceable. The court in *Franco v. Athens Disposal Company* (2009) 171

10   Cal.App.4th 1277, the court extended the invalidation of class action waivers to alleged violations

11   of meal and rest period laws, given the modest size of the potential individual recovery, the

12   potential for retaliation against members of the class, and the fact that absent members of the class

13   may be ill informed about their rights. Indeed, in *Franco*, because the arbitration agreement was

14   invalid in more than one respect, it was found to be unenforceable in its entirety. Consequently, that

15   the agreement is valid, enforceable, and binding is far from certain, and a finding that the arbitration

16   agreements for the putative class members are valid and enforceable, the court cannot find that their

17   existence precludes class certification.

18        Defendant asserts further that individual issues predominate with respect to the arbitration

19   question, again emphasizing that the court did not find the agreement unconscionable as a matter of

20   law, and only found it unenforceable against Avalos because she could not read or write English.

21   Defendant again relies upon the Court's comments made in the discovery hearing, about an issue

22   that was not before the Court at that time, that determination of the issue would necessarily be based

23   upon an individualized analysis of language skills and other contract formation elements, claiming

24   they could not be done on a class wide basis. While it is next to impossible for this Court to recall

25   its meaning and intent in making comments at an unrelated hearing now more than two years after-

26   the-fact, a review of the statements shows that, to the extent the determination would be based upon

27   the same grounds as that ruled upon in this case—the language barrier—it would appear that the

28   determination of the existence of enforceable arbitration agreements for the remainder of the 3800

- 11 -

1   class members would require individualized determinations. However, the Court, in making its prior

2   arbitration ruling, did not need to reach the overall unconscionability argument, and in commenting

3   about individualized determinations was referring only to the language barrier. Its comments cannot

4   be taken to establish that any finding on arbitration enforceability would necessarily require

5   individualized determinations.

6       The Court does not properly have before it at this time the issue of the enforceability of the

7   arbitration agreements as they apply to the putative class members. Given the absence of a finding

8   of enforceability, under circumstances where that is far from certain—including La Salsa's

9   staunchly argued position that the arbitration agreement precluded class arbitrations and only

10  provided for individual arbitrations—the Court cannot find that the existence of arbitration

11  agreements for some putative class members necessarily requires denial of the certification motion

12  at this time. As noted by Plaintiff, the court also finds it interesting that, after having strenuously

13  argued that the arbitration agreement precluded class-wide arbitration, and only provided for one-

14  on-one arbitrations for all 3800 putative class members, it is now urging class-arbitration as a means

15  of defeating class certification in this Court. Such a 180 degree switch in positions on the identical

16  issue within  the same case would appear to be precluded by the principles of judicial estoppel. *See*

17  *People ex rel. Sneddon v. Torch Energy Services, Inc.* (2002) 102 Cal.App.4th 181, 189.

18              (iii)    **Class Representative who can Adequately Represent the Class**

19      Plaintiff's counsel is adequately experienced in class action litigation, such that it is qualified

20  to conduct this action. Counsel has already expended considerable resources to engage in discovery

21  common to the class members.

22          **3.  Class Action Proceeding is Superior to Alternate Means**

23      In spite of some individual inquiries which may be necessary for class members to prove

24  eligibility or damages, this is precisely the type of a case where a class action proceeding is superior

25  to alternate means. While Defendant would have each of the 3800 putative class members proceed

26  with individual arbitrations of the claimed violations, those class members would not have access to

27  the data collected by plaintiff's counsel and her expert, who have expended considerable resources

28  in both collecting and analyzing the data. The amount of any one class member's claim is extremely

- 12 -

1   modest, and class members are more likely to forego their claims than to risk angering their current

2   employer and potentially suffering retaliation. The putative class members largely make low wages,

3   and cannot afford to risk their employment, even if they believe the employer has shorted them in

4   some manner. Given the very modest recovery, they are unlikely to find counsel who could assist

5   them, even if recovery of attorneys' fees is possible. Class members with low paying jobs such as

6   these typically have had limited opportunities for higher education, often have language barriers,

7   and frequently are ill-informed of their rights. Finally, the class procedure is the best way to assure

8   the enforcement of statutory wage and hour policies. If a large employer has an infrequent

9   individual arbitration to contend with, it is much more likely to simply choose to pay off those

10  claims, and flaunt the wage and hour laws established by the State of California.

11         While the case may pose some challenges in terms of managing the evidence and

12  handling the trial, the court has concluded that class treatment of these subclasses is

13  superior to individual trials or arbitrations.

14     **D.  Analysis of Class Certification of Unpaid Time Subclass**

15         Regarding off-the-clock work, plaintiff seeks to certify a subclass of "'California La Salsa

16  Workers' who (a) worked the opening shift and were required to work prior to the time the

17  restaurant opened but were not compensated for that time, and (b) worked the closing shift and were

18  required to perform work tasks after the restaurant closed but were not paid for that time." Plaintiff

19  contends that defendant's policy, set forth in the Training Guide, requires that employees complete

20  a series of tasks prior to opening the restaurant, and requires that employees complete a series of

21  tasks at closing, which may only be started after the dinner rush.

22         Plaintiff asserts that many of these tasks were required to be performed "off the clock", and

23  that she can demonstrate the existence of unpaid time by comparison of time recorded with sales

24  data and store opening and closing times, along with the declarations of employees. In other words,

25  because she contends that employees who worked the opening shift were required to perform tasks

26  prior to opening the store, but that their clock-in times coincided with the time the store opened, the

27  pre-opening tasks they were required to perform were necessarily done "off the clock," and they

28  were not paid for that time.

1    Defendant acknowledges that California law requires payment of wages to an employee for

2    all time the employee is subject to the control of the employer, including the time the employee is

3    suffered or permitted to work, citing *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 582,

4    585. However, defendant contends that, implicit in this requirement is the employer's knowledge

5    that the employee is being controlled or permitted to work, and that if an employer did not know it

6    occurred, no wages are owed and the employer has no liability. Defendant cites to 4 federal cases,

7    all involving the Wal-Mart Stores, which defendant contends shows that an off-the-clock case is not

8    suitable for class treatment. Defendant urges that this case must have the same result, since both

9    liability and damages will require person-by-person examinations of whether the person ever

10   worked off the clock and contrary to time records, the extent of such time, what directions the

11   employee received to do so, why the employee did not seek a time-punch adjustment, and whether

12   La Salsa knew the employee worked off the clock.

13   The off-the-clock subclass presents by far the closest question for the court in resolving the

14   class certification motion. The court does not believe that off-the-clock cases are categorically never

15   subject to class treatment, as is apparently defendant's contention. However, the common issues

16   here appear to relate solely to the requirements that certain tasks be performed prior to opening, and

17   at closing. Plaintiff's expert contends he was not given the data to show when each store opened and

18   closed, but that if it was provided, he could determine whether violations could be shown by his

19   common data if, for example, employee log-ins were largely at the time of opening, in spite of the

20   requirement that a list of tasks be performed prior to opening. Whether or not violations exist, and

21   resulted from a corporate policy, are therefore issues subject to common proof.

22   The court will therefore certify this class, but will note that the propriety of certification can

23   be revisited at a later time if it appears that the off-the-clock subclass is inappropriate for class

24   treatment.

25   **E. Impact of the Private Attorney General's Act of 2004**

26   The California Supreme Court in *Arias v. Superior Court* (2009) 46 Cal.4th 969, 986,

27   explained the PAGA by stating that an employee suing under the PAGA does so as the proxy or

28   agent of the state's labor law enforcement agencies. The act's declared purpose is to supplement

- 14 -

1  enforcement actions by public agencies, which lack adequate resources to bring all such actions

2  themselves. The employee plaintiff in such an action represents the same legal right and interest as

3  state labor law enforcement agencies—recovery of civil penalties that otherwise would have been

4  assessed and collected by the Labor Workforce Development Agency. The employee plaintiff may

5  only bring the action after giving written notice to both the employer and to the Labor and

6  Workforce Development agency, and 75% of any civil penalties recovered must be distributed to

7  the agency. A judgment in such an action binds not only that employee and all nonparty aggrieved

8  parties for whom he or she acted as an agent or proxy, but also the state labor law enforcement

9  agencies. The act authorizes a representative action only for the purpose of seeking statutory

10  penalties for Labor Code violations (and not for "premium wages" due to employees for certain

11  violations), which is fundamentally a law enforcement action designed to protect the public and not

12  to benefit private parties. See Labor Code §§ 2699, et seq.

13       In *Arias*, supra, the court held that class action requirements need not be met when an

14  employee's representative action against an employer is seeking civil penalties under the

15  PAGA. It consequently upheld the Court of Appeal's reversal of the trial court's order striking the

16  PAGA cause of action for failure to comply with pleading requirements for class actions.

17       In her motion for class certification, plaintiff Avalos essentially argues that the court might as

18  well certify the classes for her damage-based claims, since she is entitled to prosecute the PAGA

19  claims in a representative capacity without meeting class action requirements, and her proof of

20  defendant's liability for civil penalties for the identical claims would be *res judicata* on defendant

21  and the other putative class members.

22       In opposing the claim, defendant urges that nothing in Arias requires class certification, and

23  that all it does is establish that a claim for PAGA penalties does not need to be certified as a class

24  action to proceed on a representative basis on behalf of non-party, aggrieved employees, and does

25  not act as a trump card for class certification. The Court has no problem with this contention, and

26  agrees that a class action should not be certified solely  because the plaintiff is also pursuing

27  representative claims under PAGA, and where the class action requirements are not otherwise met.

28  Given the court's findings on these proposed subclasses, however, the court also finds this

- 15 -

1  contention irrelevant.

2      Defendant then goes one giant step further and, citing a case which predated the PAGA by 15

3  years (*Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699), contends that the

4  court need not allow plaintiff to proceed on her PAGA claims on a representative basis just because

5  the California Supreme Court expressly authorized that representative basis just because the

6  California Supreme Court expressly authorized that procedure in Arias. The Court rejects the latter

7  contention, finding it legally unsupportable. The *Bronco Wine* case cited by La Salsa was not an

8  employment case, and did not involve the PAGA. Rather, it was a breach of contract case that

9  included a cause of action for unfair competition. The court notes that the California Supreme Court

10  in Arias found that class action requirements apply to representative claims brought under the unfair

11  competition law, but do not apply to representative claims brought under PAGA. Although

12  there is an unfair competition cause of action in the operative Second Amended Complaint,

13  and under *Arias* the class action requirements apply to it, its existence has no relationship to

14  plaintiff's ability to pursue representative claims under PAGA. Consequently, whether or not class

15  action requirements are met for the remainder of the action is completely irrelevant to whether

16  plaintiff can permissibly pursue her PAGA claims.

17

18  **VI.**    **Denial of Subclasses (6) and (7): Penalty Subclasses**

19      Waiting time/pay stub classes Subclasses 6 and 7 are dependent upon the existence of

20  the other subclasses. Subclass 6 is based upon the requirement, set forth in Labor Code §

21  202(a), that an employer pay all wages due an employee within 72 hours after the

22  termination of his or her employment. In essence, plaintiff contends that, for all putative

23  class members whose employment terminated during the class period, La Salsa violated

24  Section 202(a) by failing to pay these employees for any premium wages due for meal and

25  rest break violations, split shift violations, waiting time violations, and off-the-clock time.

26      With respect to plaintiff's claim of wage statement violations, Labor Code § 226(a) requires

27  an employer to furnish, when the employee is paid, an accurate itemized statement in writing

28  showing gross wages earned and total hours worked, among other information.

- 16 -

1    Similarly, Wage Order 5, at subdivision 7(B), requires an employer, at the time of each

2    payment of wages, to provide a similar itemized statement. Similar to her waiting time

3    claim, plaintiff contends that because the wage statements/pay stubs provided to the class

4    members did not reflect the wages due them for premium wages due, and did not reflect

5    the off-the-clock time worked, La Salsa is in violation of section 226(a) and Wage Order 5.

6         Defendant contends that these classes cannot be certified, given that both are inextricably tied

7    to determinations of liability for plaintiff's underlying substantive claims, and require the same

8    individual trials that the underlying claims do, plus additional determinations of whether the

9    violations were willful or without a good faith defense in law or fact. Defendant asserts that class

10   ascertainability is determined by examining class definition, class size, and the means for

11   identifying class members, and that the class definition must be precise, objective, and presently

12   ascertainable. *Global Minerals v. Superior Court* (2003) 113 Cal.App.4th 836, 859.

13        In preparing for the class certification hearing in this case, the court has reviewed a plethora of

14   class certification cases. In the cases reviewed involving certification of waiting time or wage

15   statement claims were certified along with other wage and hour violation claims, there existed a

16   separate and distinct across-the-board failure of the wage statements (etc) to reflect all information

17   legally required (such as a statement which only reflected all hours for which the employee was

18   paid, rather than properly reflecting all hours worked), and that failure was not based upon the

19   separately claimed wage and hour violations. *See e.g., Jaimez,* supra, at 1305-1306. The court has

20   already determined that common issues predominate for the underlying claims, and that certification

21   is proper. However, here, in essence, subclasses 6 and 7 will not be ascertainable until after there

22   has been a determination of liability and class member damages with respect to the other classes.

23   While waiting time and wage statement claims are both serious and important, the court agrees with

24   defendant that, under the circumstances presented by this case, the classes are not sufficiently

25   ascertainable at this time, and given the need to prove willful failure, it is likely that individual

26   issues may also predominate. In any event, the court at this time, does not find that plaintiff has

27   proven, by a preponderance of the evidence, that the issues raised by these proposed subclasses are

28   amenable to class-wide treatment. Plaintiffs may re-file their motion on these issues at some point

- 17 -

1   in the future.

2

3   **VII.  Motion to Strike**

4   The motion to strike declarations is denied. Certainly, plaintiff should have provided certified

5   translations of the Spanish-language declarations submitted with the motion for class certification.

6   However, such translations were provided long ago with the reply papers. Further, defendant has

7   had ample opportunity to depose, otherwise inquire of, or otherwise challenge the declarants. At this

8   late date, all parties and the court have long had the properly translated declarations, and it makes

9   little sense to essentially pull the rug out from under the class certification motion because of an

10   error that has long been corrected, and has caused no harm to defendant.

11   Specifically, the Court finds class certification appropriate as to the general class and the

12   first through fifth subclasses, and denies Plaintiffs' motion to certify the last two subclasses

13   IT IS ORDERED that the class and subclasses proposed by Plaintiff and set forth below

14   satisfy the requirements for class actions because the class members are readily ascertainable and a

15   well-defined community of interest exists in the questions of law and fact affecting the parties.

16   Therefore, the following general class is hereby certified:

17   **California La Salsa Workers** defined as follows:

18   All non-exempt persons who are employed or have been employed by DEFENDANT

19   in the State of California who, within four (4) years of the filing of this Complaint,

20   have worked as hourly restaurant employees and were not paid all lawful wages and/or

21   reimbursed for necessary expenses. SAC ¶ 18.

22   The following Subclasses are also certified:

23   1.  **Meal Premium Subclass:**

24   "California La Salsa Workers" who were not paid premium meal period wages when

25   they (1) worked shifts of at least five hours without a meal period, (2) worked shifts of at

26   least 10 hours without a second meal period, or (3) were provided a meal period *after* the

27   fifth hour of work.

28

- 18 -

**2. Rest Premium Subclass:**

"California La Salsa Workers" who were not paid premium rest period wages when they (1) worked four-hour work periods without rest breaks, or (2) were provided tardy rest breaks because they occurred after three-and-a-half hours of work.

**3. Split-Shift Premium Subclass:**

"California La Salsa Workers" who worked two shifts in a workday but were not paid an additional hour of wages.

**4. Reporting Time Premium Subclass:**

"California La Salsa Workers" who reported to work but were not paid at least two hours of wages.

**5. Unpaid Pre & Post-Shift Work Subclass:**

"California La Salsa Workers" who (a) worked the opening shift and were required to work prior to the time the restaurant opened but were not compensated for that time, and (b) worked the closing shift and were required to perform work tasks after the restaurant closed but were not paid for that time.

IT IS FURTHER ORDERED that Sandra Avalos is hereby appointed class representative.

IT IS FURTHER ORDERED Stan S. Mallison, Hector R. Martinez and Marco A. Palau of the Mallison & Martinez are hereby appointed Class Counsel.

Dated: _May 17_, 2010.

_Denise de Bellefeuille_

JUDGE DENISE DE BELLEFEUILLE

California Superior Court Judge

[PROPOSED] CLASS CERTIFICATION ORDER. B, p. 66                CASE NO. 4488

1        **PROOF OF SERVICE**

2

3    STATE OF CALIFORNIA

4    COUNTY OF ALAMEDA
         } ss.

5

6        I am employed in the County of Alameda, State of California. I am over the age of 18 and not a party to the within action; my business address is 1939 Harrison Street, Suite 730, Oakland, California 94612.

7

8        On April 28, 2010, I served the foregoing documents described as:

9        **Proposed Order Regarding Class Certification**

10   on *Interested Parties at the following* addresses:

11   Fermin H. Llaguno, Esq.
     Littler Mendelson
12   2050 Main Street, Suite 900
     Irvine, CA 92614
13
     Daniel Gonzalez. Esq.
14   Littler Mendelson
     2049 Century Park East, Suite 500
15   Los Angeles, CA 90067-0308

16   Attorneys for Defendants

17   [X]    **BY MAIL:** I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S.
18          Postal Service on that same day with postage thereon fully prepaid at Oakland, California in the ordinary course of business. I am aware that on motion of the party
19          served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.
20

21   [ ]    **BY PERSONAL DELIVERY:** I placed each for delivery in an envelope for personal delivery by _____ to be delivered same day.

22   [ ]    **BY FACSIMILE:** I am readily familiar with this firm's practice of transmitting documents
23          via facsimile. Under that practice it would be transmitted from (510) 832-1101 to those facsimile numbers set forth above.

24   [X]    **STATE:** I declare under penalty of perjury under the laws of the State of California that the
25          foregoing is true and correct.

26          Executed on April 28, 2010 at Oakland, California.

27

28          _____
                 Dyvianne Martinez

Proof of Service
                                        Ex. B, p. 67

# EXHIBIT D

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 51 of 367   Page
Case 3:09-cv-02422-JM-POR   Document 102   Filed 10/22/10   Page 1 of 18   Page
ID #:739

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOMONIQUE HINES, | CASE NO. 09cv2422 JM(POR) |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION |
| vs. | |
| KFC U.S. PROPERTIES, INC., | |
| Defendant. | |

Plaintiff Domonique Hines, and all similarly situated current and former employees of KFC U.S. Properties ("KFC"), move for class certification pursuant to Fed.R.Civ.P. 23. Defendant KFC opposes the motion. For the reasons set forth below, the court grants in part and denies in part the motion for class certification.

**BACKGROUND**

On October 2, 2009 Plaintiff Hines commenced a putative class action in the Superior Court for the County of San Diego. KFC, the only defendant, timely removed the action to federal court based upon the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332. Plaintiff Hines is a citizen of California who seeks to represent a class of similarly situated individuals, identified as current or former employees of KFC in the State of California. (Compl. ¶2). KFC asserts that it is incorporated in Delaware with its principal place of business in Kentucky. (Notice of Removal ¶8).

/ / /

/ / /

- 1 -

Case 2:12-cv-08751-MGS-FFM - Document 72-4  Filed 11/22/12  Page 52 of 367  Page
ID #:740
Case 3:09-cv-02422-JM - PDK - Document 102  Filed 10/22/10  Page 2 of 68

**The Claims**

In broad brush, Plaintiff alleges that KFC acted in furtherance of its

"policies and practices of not paying Plaintiffs all wages earned and due, through methods and schemes which included but are not limited to, failing to pay overtime premiums; failing to provide rest and meal periods; failing to properly maintain records; failing to provide accurate itemized statements for each pay period; and requiring, permitting or suffering the employees to work off the clock, in violation of California Labor Code and Industrial Welfare Commission ("IWC") Orders."

(Compl. ¶6). Plaintiff brings this action on behalf of potentially 14,200 class members who were employed by KFC at its approximately 250 California locations during the period October 2, 2005 through October 2, 2009. Based upon the complaint's allegations, Plaintiff alleges seven claims for (1) failure to provide meal periods in violation of Cal. Labor Code §226.7; (2) failure to provide rest periods in violation of Cal. Labor Code §226.7; (3) failure to pay overtime compensation in violation of Cal. Labor Code §510, 1194; (4) failure to pay minimum wages in violation of Cal. Labor Code §§1194, 1197; (5) failure to pay all wages due to discharged or quitting employees in violation of Cal. Labor Code §§201-203; (6) failure to provide employees accurate itemized statements in violation of Cal. Labor Code §226, 1174, 1174.5; and (7) unfair business practices in violation of Cal. Bus. & Prof. Code §17200 et seq.

**The Proposed Class**

Plaintiff seeks class certification of a class consisting of

All current and former non-exempt employees of KFC U.S. Properties, Inc. who were employed in California in the position of "Team Member" at any time since October 2, 2005.

(Motion at p.2:3-4). Plaintiff's class claims broadly encompass three distinct claims. Plaintiff argues that the class was not provided with (1) the required meal breaks, (2) the required rest breaks, and (3) full compensation for those who worked the closing shift, the so-called off-the-clock claim. For the reasons set forth herein, the court concludes that a single class is unmanageable. However, the court treats these claims as three separate subclasses consisting of a meal break subclass, a rest period subclass, and a closing shift subclass.

Team Members are non-managerial hourly employees who hold positions in either food service or customer service. (Sha Decl. Exh. 1). Plaintiff represents that KFC employs identical timekeeping systems at all its restaurants and enforces uniform timekeeping requirements. Team

- 2 -

1  Members are required to clock in and out of the timekeeping system using the cash registers at each

2  restaurant. (Sha Decl. Exh. 4). Plaintiff represents that KFC has the uniform policy of requiring Team

3  Members to obtain permission from a manager or supervisor prior to taking a meal or rest break.

4  At the end of each shift, Plaintiff represents that KFC requires each restaurant to close their

5  cash registers so that the "end of the day" process can begin. The end of day process transfers

6  information generated and stored in the cash registers. During this time, Team Members cannot clock

7  out at the end of the shift because of the running of the end of day process. In order to account for

8  Team Members' hours, the manager on duty estimates the amount of time to be worked by each

9  closing shift Team Member and enters the estimated time in the payroll system. Plaintiff argues that

10 this timekeeping procedure fails to accurately track the hours of the Team Members.

11 Plaintiff seeks injunctive relief and nominal, compensatory, punitive and restitution damages

12 arising from the alleged wage and hour violations, as well as an award of attorney's fees and costs.

13 (Compl. at pp.9:25-10:12). The parties have engaged in extensive discovery regarding, among other

14 things, class certification issues.

15 **Procedural Posture**

16 On October 29, 2010, KFC removed this action to federal court, asserting original jurisdiction

17 pursuant to the CAFA. On February 16, 2010, this court denied Plaintiff's motion to remand and

18 denied KFC's motion for a convenience transfer to the Central District of California.

19 **DISCUSSION**

20 **Legal Standards**

21 It is within this court's discretion to certify a class. <u>Bouman v. Block</u>, 940 F.2d 1211, 1232

22 (9th Cir. 1991). Under Rule 23(a), the class must satisfy four prerequisites:

23  (1) numerosity of [parties], (2) common questions of law or fact predominate, (3) the
    named [party's] claims and defenses are typical, and (4) the named [party] can
24  adequately protect the interests of the class.

25 <u>Hanon v. Dataproducts</u>, 976 F.2d 497, 508 (9th Cir. 1992). In addition to satisfying the requirements

26 of Rule 23(a), Plaintiff must satisfy at least one of the types of class actions identified in Rule 23(b).

27 Here, Plaintiff argues that the class satisfies both Rule 23(b)(2) (the class is subject to common

28 policies or unlawful acts, justifying injunctive relief) and Rule 23(b)(3) ( questions of law or fact

- 3 -

09cv2422

Case 2:12-cv-08751-MQS-FFM - Document 72-1 10 Filed 11/22/12 Page 54 of 367   Page
Case 3:09-cv-02422-JM - PDR Document 1 10 Filed 10/22/10 Page 4 of 8
ID #:742

common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy).

The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a), and at least one requirement of rule 23(b), have been satisfied. <u>Dukes v. Wal-Mart Stores, Inc.</u>, 603 F.3d 571, 580 (9th Cir. 2010) (en banc). As noted by the Ninth Circuit,

> When considering class certification under rule 23, district courts are not only at liberty to, but must, perform a rigorous analysis to ensure that the prerequisites of Rule 23(a) have been satisfied. It does not mean that a district court must conduct a full-blown trial on the merits prior to certification. A district court's analysis will often, though not always, require looking behind the pleadings, even to issues overlapping with the merits of the underlying claims.

<u>Id.</u> at 581. In making this showing, the plaintiff must submit evidence to support class certification under Rules 23(a) and (b). <u>Doninger v. Pacific Northwest Bell, Inc.</u>, 564 F.2d 1304, 1308-09 (9th Cir. 1977). If the court is not satisfied that all elements of class certification are satisfied, class certification should be denied. <u>Gen. Tel. Co. v. Falcon</u>, 457 U.S. 147, 161 (1982).

**Rule 23(a)**

<u>Numerosity</u>

The parties do not dispute that the class, consisting of approximately 14,000 current and former employees, is so numerous that joinder of all class members is impracticable.

<u>Commonality</u>

Commonality "focuses on the relationship of common facts and legal issues among class members." <u>Id.</u> at 599. "The fact that there is some factual variation among the class grievances will not defeat a class action . . . . A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." <u>Rosario v. Livaditis</u>, 963 F.2d 1013, 1018 (7th Cir. 1992). To justify class action treatment, there must be issues "common to the class as a whole" and the relief must "turn on questions of law applicable in the same manner to each member of the class." <u>General Tel. Co. Of Southwest v. Falcon</u>, 457 U.S. 147, 155 (1982). As noted by the Supreme Court, the commonality and typicality requirements of Fed.R.Civ.P. 23(a) "tend to merge . . . [but both] serve as guideposts for determining whether . . . maintenance of a class action is economical and whether

the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  Gen'l Tel., 456 U.S. at 157 n.13.

Before addressing this prerequisite, the court will briefly summarize the evidence supporting the uniform timekeeping policies and then discuss three distinct subsets of Plaintiff's wage and hour claims: the meal break subclass, the rest period subclass, and the closing shift subclass.

Plaintiff comes forward with evidence to show that KFC employs a uniform electronic timekeeping system called MERIT.  Each Team Member must clock out and in for their meal breaks.  In the event a Team Member fails to clock out for a meal period, a restaurant manager adjusts the timekeeping records to make sure that the break is properly reflected.  Further, KFC employs a payroll system to provide "an additional layer for ensuring the accuracy of KFC's time records," (Motion at p.5:14-15), by means of a program called People Soft to process payroll.  The software "creates and subsequently reviews varying reports in order to assess whether wages are being paid accurately and timely." (Motion at p.6:1-2).  Further, KFC adopted the "auto pay" system in 2008, a system which is intended to identify any missed meal period and to compensate the employee for the missed meal period.  The "auto pay" system automatically provides employees with one additional hour of compensation at their regular rate each time an employee works a shift of six hours and more and does not record a meal period.  KFC instigated this policy in January 2008 and by June 2008 all its KFC-owned stores used this system.  (Griffin Depo at 35:11-18).

KFC provides training to its managerial and non-managerial employees concerning KFC's break and meal policies.  The new hire training materials inform employees that they are entitled to meal and rest periods in accordance with state law.  (Griffin Depo. at 33:15-21).  KFC also identifies company policies whereby employees are provided the bi-monthly opportunity to review all time punches, including those entered by a manager to account for otherwise unaccounted time.  (Hines Depo. at 182:16-25; Baez Depo 59:1-5)

### (a) Missed, Interrupted, and Late Meal Periods

Plaintiff argues that there are several common issues with respect to the meal breaks: whether the class received the required meal break, whether the written waiver of meal breaks between five

Case 2:12-cv-08751-MWF-FFM   Document 72-1   Filed 11/22/12   Page 56 of 367   Page
ID #:744
Case 3:09-cv-02422-JM   -POR   Document 102   Filed 10/22/10   Page 6 of 8

1    and six hours contained in the employment agreements of Class Members is enforceable; whether

2    KFC maintained accurate records of all meal breaks; and whether KFC had the legal duty to

3    affirmatively ensure that the employees take the meal break (as opposed to simply making the meal

4    break available to employees).

5         In California, "[n]o employer shall employ any person for a work period of more than five

6    hours without a meal period of not less than 30 minutes." WC Wage Order 5-2001. If an employer

7    does employ a worker for more than five hours[1] without an uninterrupted meal period, Plaintiff argues

8    that the employer must pay "one additional hour of pay at the employee's regular rate of

9    compensation." Labor Code §226.7(b). Plaintiff identifies that the meal breaks do not occur at a fixed

10    time every day. Rather, the employee must first request permission from a manager or supervisor

11    prior to taking the meal break. (Griffin Depo. at 145:22-146:10). Further, each employee was

12    required to punch in and out for meal breaks.

13         In support of commonality, Plaintiff comes forward with evidence to show that KFC, for the

14    above-stated reasons, employs a uniform electronic timekeeping system. From the sampling of data,

15    Plaintiff's expert reaches several conclusions with respect to the failure of KFC to provide meal

16    breaks: a review of the time records reveals 78.7% of the restaurants with shifts of five to six hours

17    in length experienced one or more missed meal periods, (Woolfson Decl. ¶B). He also represents that

18    83.21% of employees who worked a shift over five hours did not receive a meal period and 71.45%

19    of employees who worked a shift between six and ten hours in length similarly did not receive a meal

20    break. However, for the reasons set forth in the rulings on the evidentiary objections, the court does

21    not consider Mr. Woolfson an expert for purposes of statistical analysis. Rather, Mr. Woolfson is an

22    expert in the compilation and analysis of databases, based upon his declaration which sets forth his

23    qualifications and the methods and procedures adopted to analyze the data. At a minimum, the

24    Woolfson declaration gives rise to an inference that the time cards of the meal break subclass

25    uniformly reflect whether or not an employee clocks in or out for a meal break (i.e. each employee

26    is required to punch in and punch out for meal breaks). The court notes that many of Plaintiff's claims

27

28         [1] KFC argues that the employment agreement waives the right to a meal break between five and six hours.

09cv2422

Ex. B, p. 74

Case 2:13-cv-08751-MCS-FFM   Document 72-1   Filed 11/22/19   Page 57 of 867   Page
Case 3:09-cv-02422-JM   -POR   Document 102   Filed 10/22/10   Page 76 of 98   Page
ID #:745

1    are based on the argument that KFC did not provide meal breaks to individuals who worked less than

2    six hours without a break.[2]  Further, declarations by putative class members establish that they were

3    not compensated for those meal breaks which were cut short by supervisors.  (Anderson Decl. ¶13).

4         While KFC comes forward with evidence to controvert Plaintiff's meal break claims - - per

5    written agreement the employees waived the meal break for periods under six hours, the "auto-pay"

6    system compensates all employees who worked six hours or more without recording a meal break

7    (Sugg Decl. Exh. 16) - - it is not the role of this court to resolve factual disputes on a motion for class

8    certification.  See Dukes, 603 F.3d at 587 ("it is the plaintiff's theory that matters at the class

9    certification stage, not whether the theory will ultimately succeed on the merits").  "[I]t is improper

10   to advance a decision on the merits to the class certification stage."  Moore v. Hughes Helicopters,

11   Inc., 708 F.2d 475, 480 (9th Cir. 1983).  KFC also argues that the commonality requirement is not

12   satisfied because "what Plaintiff truly alleges is that KFC's practices did not match its policies - - a

13   question that will require individual analysis for the scores of restaurant locations and thousands of

14   employees." (Oppo. At p.14:5-7).  KFC also represents that it makes 30 minute meal periods available

15   to all its employees and that 90% of meal periods for shifts over six hours are taken and for those that

16   are not, it automatically compensates employees with an hour of pay.  These merits-based arguments

17   fail to establish that the meal break issue is not a common issue subject to common proof, consisting

18   of the time and payroll records, as represented by Plaintiff's expert Mr. Woolfson.

19        In sum, the court concludes that there are common issues with respect to the meal break

20   subclass, including whether the subclass received the required meal break; whether the written waiver

21   of meal breaks between five and six hours contained in the employment agreements of Class Members

22   is enforceable; whether KFC maintained accurate records of all meal breaks; and whether KFC had

23   the legal duty to affirmatively ensure that the employees take meal breaks.

24                           **(b) Missed, Interrupted, and Late Rest Periods**

25        Employers in California are required to provide employees with a compensated 10-minute rest

26   period every four hours worked.  Labor Code §226.7.  Plaintiff asserts that KFC has the general policy

27   of requiring its employees to clock in and clock out for each break.  Plaintiff concludes that this claim

28   _____

     [2] The court notes that there are common factual and legal disputes concerning the validity of
     the six hour meal break waiver signed by certain KFC employees.

                                              - 7 -                                       09cv2422

Case 2:18-cv-08751-MCS-FFM   Document 72-1   Filed 11/22/19   Page 58 of 367   Page
Case 3:09-cv-02422-JM   -POR   Document 102   Filed 10/22/10   Page 8 of 18
ID #:746

is subject to common proof by reviewing time records and represents that, "on average, three-quarters of the time workers are working through their rest breaks." (RT at p.10:5-6). Plaintiff also submits various employee declarations to the effect that they were unable to take rest breaks when the restaurants were too busy. (Ramirez Decl. ¶11; Anderson Decl. ¶20). Plaintiff also argues that "KFC failed to have any policy or procedure to pay Team Members an extra hour of pay for missed, interrupted, or late rest periods." (Motion at p.11:16-17). In light of the evidence submitted in support of this claim, there is a legitimate inference that KFC policies regarding missed, interrupted, and late rest periods present shared common questions of law and fact.

KFC comes forward with evidence in an attempt to show that managers of its stores use different systems for tracking the rest periods of its employees.[3] For example, in one store, employees utilize a timer to track rest periods, rather than clocking in and out, (Laguna Depo at 92:13-25); another store uses a dry eraser board to inform employees of their breaks, (Matthiesen Depo. at 50:25-51:25); and another store uses a "shift planner" or daily schedule to manage employee breaks. (Dangel Decl. ¶12). As the managers and supervisors at different KFC locations use different means to track rest break periods, KFC concludes that Plaintiff must demonstrate that there are common factual issues amongst the class members. The court notes that it is not the function of this court to weigh the parties' evidence on a motion for class certification. Rather, this and related merits-based arguments are better argued in the context of an evidentiary motion or addressed at the time of trial.

In sum, the court concludes that there are shared common factual issues with respect to the rest period subclass.

### (c) The Closing Shift

Plaintiff explains that KFC requires each of its restaurants to close their cash registers so that the "end of the day" process can begin. During this process, information is transferred from the cash registers to KFC's main computer. The transfer of data prevents employees from clocking out. In order to account for the employees' time, the manager on duty would estimate the remaining time for each employee. (Motion at p. 12:3-9; Oppo. at p.9:11-19). In support of this theory, Griselda Godina

---

[3] The court notes that this argument is more appropriately addressed in context of an analysis under Rule 23(b)(3) (questions of law or fact common to the members of the class predominate over any questions affecting only individual members).

- 8 -

09cv2422

Case 2:12-cv-08751-MOS-FFM -POR Document 72-1 Filed 11/29/12 Page 59 of 367 Page
Case 3:09-cv-02422-JM -POR Document 102 Filed 10/22/10 Page 9 of 68 Page
ID #:747

declares that she routinely worked beyond closing time and was not compensated for up to 10 hours per week, (Godina Decl. ¶11), and, for example, Alejandro Bolanos declares that he routinely worked for 60 to 90 minutes each day beyond closing time and was not compensated for this time. (Bolanos Decl. ¶12). Plaintiff also submits the declarations of Dr. Abbott and Mr. Woolfson in support of the commonality of Plaintiff's claims. While Dr. Abbot declares that it is "feasible" to design a representative statistical model, the court concludes that the "feasibility" of a future study to support the existence of a present fact is not sufficiently probative of Plaintiff's closing shift claim.[4]

In light of the evidence submitted in support of this claim, there is a legitimate inference that there are shared common factual issues with regard to certain KFC employees who commonly performed work-related duties off-the-clock and were not compensated for that time.[5] KFC raises the merits-based argument that its managers accurately estimate the time to be worked beyond closing and that the time is adjusted to account for the employee working beyond the estimated amount. (Griffin Depo. 87:19-88:6). KFC also affords employees the opportunity to review all of the time punches, including those entered by a manager, and acknowledge that they have reviewed and agree with the time indicated on the time records. In the event an employee disagrees with the time records, the employee may speak with the manager or place an anonymous call to a toll free number if they have any questions about the hours worked. In short, KFC argues that its policies regarding off the clock work are strictly enforced and accurate. (Lagunas, a supervisor, testifies that his employment at KFC was terminated once KFC learned that he permitted an individual to work off-the-clock, Lagunas Depo. at 72:17-73:7; Oppo. at p. 9:3-10). As previously noted, it is inappropriate for the court to resolve factual disputes on a motion for class certification.[6]

In sum, the court concludes that there are shared common factual issues with respect to the

---

[4] For the reasons set froth in the Evidentiary Section, the declaration of Mr. Woolfson is not significantly probative of Plaintiff's off-the-clock claims.

[5] Whether common issues predominate over any individualized issue is discussed in relation to Rule 23(b)(3).

[6] The court notes that resolution of disputed genuine issues of material fact may impact the future viability of this class action. As noted in <u>Califano v. Yamasaki</u>, 442 U.S. 682, 701 (1979), class "certification is proper only when a determinative critical issue overshadows all other issues." In the event that individual factual disputes arise with respect to each employee and overshadow the common issues identified herein, the class action procedure may not provide the anticipated efficiencies.

09cv2422

1  closing shift.

2  <u>Typicality</u>

3  The focus of this requirement is on the similarity between the named plaintiff's legal and
4  remedial theories and those of the class. <u>Dukes</u>, 571 F.3d at 613. A representative's claims are typical
5  if they are reasonably coextensive with those of absent class members, they need not be substantially
6  identical. <u>Id.</u>

7  KFC argues that the claims of Plaintiff Hines are not typical of the class. With respect to the
8  meal break and rest period subclass, KFC cites her deposition testimony: "Q: Did you ever ask to take
9  a meal break but your request was denied: A: I've been told to wait, but actually told no, your not
10  allowed to go on your break. No." (Hines Depo at 225:22-25). This ambiguous testimony, without
11  more, does not establish that Hines always received timely, required breaks. This evidence gives rise
12  to a legitimate inference that Plaintiff Hines was told she was "not allowed to go on [] break" at the
13  required time and therefore Plaintiff Hines's claim is typical with respect to the meal and rest period
14  subclasses.[7]

15  With respect to the closing shift claim, KFC argues that Plaintiff Hines testified that she
16  requested to be paid for the closing shift claim and that her supervisor complied with the request.
17  (Hines Depo. at 247:20-248:6). However, she also testified that she was not compensated for all
18  overtime, although she could not quantify the amount of uncompensated overtime. (Hines Depo. at
19  250:5-11). While Plaintiff's inability to identify the amount of uncompensated overtime may render
20  this claim somewhat speculative, that it not an issue to be resolved on class certification.

21  In sum, the court finds that Plaintiff Hines' claims are "reasonably coextensive with those of
22  absent class members." <u>Dukes</u>, 603 F.3d at 613.

23  <u>Adequacy of Representation</u>

24  A class representative must be able to "fairly and adequately protect the interests" of all class
25  members. Fed.R.Civ.P. 23(a)(4). Here, Plaintiff Hines possesses the same type of interests and
26  generally suffered the same type of injury as other class members. Moreover, Plaintiff has retained

27

28  [7] The court acknowledges that the compound and imprecise nature of the questioning at the time of deposition created ambiguities in the testimony, not appropriately resolved on a motion for class certification.

- 10 -

1   Class Counsel who has extensive experience in litigating class action wage-and-hour claims.

2          KFC argues that Plaintiff Hines is inadequate to represent the class interests because (1)

3   Plaintiff did not decide to bring the class claims until counsel showed up at her home and asked her

4   questions about KFC's employment policies; (2) Plaintiff did not review the complaint prior to its

5   filing; and (3) Plaintiff has a conflict with other class members because Plaintiff signed a written

6   waiver of her meal periods for shifts between five and six hours.  These arguments are not persuasive.

7   Plaintiff Hines also testified that she understands her duties as class representative to "present the case

8   and see that we [the class] [are] compensated for [] missed wages."  (Sha Sup. Decl., Exh. 5 at 29:20-

9   30:11).  She also understands her duty to communicate with and cooperate with her attorneys.  (Id.

10  31:7-17).  The argument that there is a conflict between Plaintiff Hines and other employees who did

11  not sign the waiver of meal breaks for periods between five and six hours does not reach the level of

12  a debilitating conflict.  That is particularly true where Plaintiff has retained experienced class counsel

13  who play a pivotal role in prosecuting this case.

14          In sum, the court concludes that this prerequisite is satisfied.

15  **Rule 23(b)**

16          Rule 23(b)(2)

17          Certification pursuant to Rule 23(b)(2) is appropriate where the Class is subject to common

18  policies or unlawful acts, justifying injunctive relief.  Fed.R.Civ.P. 23(b)(2).  Where a party seeks both

19  injunctive and monetary relief, Rule 23(b)(2) "does not extend to cases in which the appropriate final

20  relief relates exclusively or predominantly to money damages."  Dukes, 603 F.3d at 615 (quoting

21  Fed.R.Civ.P. 23(b)(2) advisory committee's note to 1966 amends., 39 F.R.D. at 69).  To determine

22  whether monetary relief predominates, the "district court should consider, on a case-by-case basis, the

23  objective 'effect of the relief sought' on the litigation."  Id. at 617 (citations omitted).

24          Factors such as whether the monetary relief sought determines the key procedures that
       will be used, whether it introduces new and significant legal and factual issues,
25     whether it requires individualized hearing, and whether its size and nature - - as
       measured by recovery per class member - - raise particular due process and
26     manageability concerns would all be relevant, though no single factor would be
       determinative.

27  Id.

28  / / /

                                        - 11 -                                    09cv2422

1

2    Here, Plaintiff seeks both monetary and injunctive relief. Both types of relief play an

3    important role in obtaining Plaintiff's alleged litigation goals. As stated by Plaintiff Hines, she

4    perceives her overarching responsibility as class representative "to see that we [the class] are

5    compensated for our missed wages." (Hines Depo. at 30:6-9). Plaintiff's counsel characterizes the

6    action as one seeking "to properly provide or compensate Class Members for meal periods and rest

7    breaks, and [to obtain] pay for" off-the-clock work. (Motion at p.1:4-6). Furthermore, the court notes

8    that much of the evidentiary support submitted by the parties, including expert declarations, address

9    potential damages issues in terms of monetary relief, and not in terms of policy or governance issues

10   targeted to ensuring that employees are compensated in accordance with state and federal labor

11   requirements. Based upon this record, the court concludes that Plaintiff's claims for monetary relief

12   (compensatory damages, liquidated statutory damages, attorney's fees and costs) predominate over

13   Plaintiff's claims for equitable relief for each of the three subclasses.

14   Plaintiff also identifies broad forms of requested injunctive relief to (1) implement adequate

15   training and other safeguards to ensure that the employees are provided with their meal breaks and rest

16   periods; (2) modify the auto pay system to compensate the employees for all required statutorily

17   required premiums; and (3) ensure that all hours worked by the employee are accurately recorded and

18   properly compensated. (Motion at pp20:18-21:3). In light of Plaintiff's testimony and theory of the

19   case, the equitable remedies represent important goals of the litigation. However, they do not

20   predominate over the damages claims because the damages claims form the key procedures to be used

21   by Plaintiff in proving her case.

22   In sum, the court finds that class certification is not appropriate under Rule 23(b)(2).

23   <u>Rule 23(b)(3)</u>

24   A class may be certified pursuant to Rule 23(b)(3) where(1) common questions predominate

25   over any questions affecting only individual members and (2) class resolution is superior to other

26   available methods for the fair and efficient resolution of the issues presented. The objective of this

27   provision is to promote economy and efficiencies in actions primarily seeking monetary relief. Adv.

28   Comm. Note 39 F.R.D. 102 (1966). As there are three separate subclasses, each is discussed in turn.

### a) Missed, Interrupted, and Late Meal Breaks

With respect to the meal break claims, the court concludes that common issues predominate and the class action device is superior to individual determinations. According to Plaintiff, individualized determinations are not required to analyze the meal break issues claim because this claim is subject to a uniform analysis.[8] Plaintiff represents that a review of the time records is sufficient to establish that Class Members were not properly compensated for missed, interrupted, and late meal breaks. The parties also identify related issues concerning the validity of the waivers of a meal break for periods between five and six hours. While not all employees signed written waivers, for those who did purport to waive the meal break after five hours, the arguments in support are common to the subclass members. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998).

The court also concludes that the class action device is superior to individual determinations. As Plaintiff represents that proof of the meal period subclass is uniform and does not require individual testimony, the court concludes that class action treatment of this claim will lead to the fair and efficient resolution of the meal break claim(s).[9]

In sum, the court concludes that the meal break subclass is appropriately certified as a class action under Rules 23(a) and 23(b)(3).

### b) Missed, Interrupted, and Late Rest Periods

With respect to the rest period subclass, the court concludes that common issues predominate over individualized issues and the class action device provides a fair and efficient methods to resolve the claims of the rest period subclass. Plaintiff represents that KFC does not have a policy or procedure to ensure that the employees are compensated for missed, interrupted, or late rest periods

---

[8] The court finds the Woolfson declaration sufficiently probative on whether the meal break class claims are capable of uniform resolution based upon the time cards and payroll records. (Woolfson Decl. ¶¶17-35).

[9] KFC largely argues the merits of this claim: namely, that it provides all required breaks to its employees and that no labor code violations have occurred. The court notes that these merits-based arguments are not properly resolved on a motion for class certification.

as required by Cal.Labor Code §225.7. (Griffin Depo. at 85:22-86:4; Estrada Depo. at 54:16-22, 55:5-14). Plaintiff explains that KFC does not maintain regular rest period times. Rather, the employee must request and receive permission from a supervisor prior to taking a rest period. In the event the restaurant is too busy, Plaintiff submits evidence that some rest periods were missed, interrupted, or late. (Barenas Decl. ¶4; Bolden Decl. ¶6; Eldridge Decl. ¶6). In support of the predominance of common issues, Plaintiff's overarching argument is that KFC requires all employees to clock in and out for all rest periods. (Griffin Depo. at 79:19-22; Estrada Depo 42:14-16). In light of the procedures implemented by KFC, Plaintiff argues that the rest period claims are susceptible to a uniform analysis and common proof by reviewing the employee's time records. Based upon this evidentiary showing, the court concludes that a review of the time records is sufficient to establish both liability and damages.

In an effort to show that individualized issues predominate, KFC comes forward with evidence to show that managers of its stores use different systems for tracking the rest periods of its employees and therefore individualized issues predominate. For example, in one store, employees utilize a timer to track rest periods rather than clocking in and out (Laguna Depo at 92:13-25); another store uses a dry eraser board to inform employees of their rest periods, (Matthiesen Depo. at 50:25-51:25); and another store uses a "shift planner" or daily schedule to manage employee rest periods. (Dangel Decl. ¶12). As testified to by Plaintiff Hines, not all employees record every rest period. (Hines Depo at 167:16-20). As the managers and supervisors at different KFC locations use different means to track rest periods, KFC concludes that individual issues predominate over class-wide claims.

KFC's opposition is not persuasive. The fact that a relatively small number of stores employ different methods to track the rest periods of employees at KFC's approximately 250 stores (use of timer, use of a dry eraser board, use of a shift planner), does not mean that individualized methods predominate.[10] From the parties' submissions, it appears that the overwhelming majority of stores use time records to track the employee's rest periods. While a relatively small number of stores use different means, common issues predominate for the rest period subclass.

In sum, the court concludes that common issues predominate over individualized issues

---

[10] The parties only identify three stores that do not use time records to track rest periods.

- 14 -

1   such that the class action device will likely provide the anticipated efficiencies and economies.

2             **c) The Closing Shift**

3          With respect to the closing shift subclass, the court concludes that individualized issues

4   predominate such that the class action device does not provide the anticipated economies and

5   efficiencies. Plaintiff's theory for this subclass is that KFC permitted off-the-clock work by

6   underestimating the amount of time required for the employee to perform nightly closing duties.

7   (Oppo. at p.23:7-12). In support of this claim, Plaintiff submits the declarations of Mr. Woolfson and

8   Dr. Abbott to show that the closing shift claims can be uniformly resolved by reference to alarm

9   company records and statistical analysis. However, neither declaration is sufficient to establish that

10  common questions predominate over individualized determinations such that the class action device

11  is superior to individual actions.

12         Dr. Abbott, in preparing his testimony, did not review the time records in this action, did not

13  read KFC's store closing procedures, and did not review the complaint. (Abbot Depo. at 18:5-8; 28:9-

14  13; 34:3-5; 61:5-6; 83:9-24). After extensive discovery by the parties, Dr. Abbot declares that a

15  relevant study is "feasible," not that there presently exists a supporting analysis. The court similarly

16  finds that the declarations of Dr. Abbott are not sufficiently probative to demonstrate that the claims

17  are subject to class-wide treatment. The evidentiary record reveals that individualized inquiries of

18  putative class members and KFC supervisors will be required to resolve the closing shift claims.

19         Plaintiff argues that the only individualized determinations at issue concern the amount of

20  damages and cites numerous authorities, primarily from federal securities law authorities, noting that

21  the "amount of damages is invariably an individual question and does not defeat class action

22  treatment." Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975). The court notes that statements

23  concerning damages and class actions frequently arise in the federal securities law class action arena

24  where, under the fraud on the market theory, there is a presumption of reliance and therefore no

25  individualized determination (i.e. no need to show direct reliance on the misrepresentation) is required

26  to state a Rule 10b-5 claim. See Basic Inc. v. Levinson, 485 U.S. 224, 243-47 (1988). As Rule 10b-5

27  liability attaches to publicly disseminated materially misleading statements or omissions, whether the

28  individual investor purchased or sold securities during the class period becomes a ministerial task.

Id.

Case 2:18-cv-08751-MCS-FFM  Document 72-4  Filed 11/22/19  Page 66 of 367  Page
ID #:754
Case 3:09-cv-02422-JM-POR  Document 102  Filed 40/22/10  Page 16 of 78  Page

In the present context, a KFC employee does not establish liability and damages simply be being a KFC employee.  In order to seek compensation for off-the-clock work, the employee must first show that he or she worked off the clock and was not compensated for this time.   As Plaintiff fails to present a uniform basis for determining liability, the court concludes that individualized determinations predominate over common issues.

In sum, the court concludes that, on the current evidentiary record, individual issues predominate over common issues with respect to the off-the-clock claims such that the class action device will not likely provide the anticipated efficiencies and economies.  The court makes this finding without prejudice, subject to a further showing in support of class action treatment of the closing shift claims.

**Evidentiary Objections**

<u>a. Mr. Woolfson's Declaration</u>

KFC objects to the declaration of Mr. Woolfson on the ground that he is not a qualified expert.  Mr. Woolfson declares that he has "extensive experience in creating, managing, and analyzing large databases, including payroll, timekeeping, telecommunications, and other proprietary databases." (Woolfson Decl. ¶4; Ct. Dkt. 66-2).  Mr Woolfson's company, TelSwitch, Inc. "builds and develops telephonic database service for several major telecommunications companies to manage their billing." <u>Id.</u> ¶2.  To qualify as an expert, Plaintiff must demonstrate that Mr. Woolfson has the "knowledge, skill, experience, training, or education" to qualify as an expert.  Fed.R.Civ.P. 702.  "The issue with regard to expert testimony is not the qualification of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  <u>Berry v. City of Detroit</u>, 25 F.3d 132, 1352 (6th Cir. 1994).  As a motion for class certification is not intended to be merits-based, courts need not "uncritically accept all expert evidence . . . offered in support of, or against, class certification.  Rather, the question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met." <u>Dukes v. Wal-Mart</u>, 222 F.R.D. 189, 191 (N.D. Cal. 2004).

While Mr. Woolfson is qualified to provide expert opinions concerning database calculations, the court concludes that Mr. Woolfson's is not a qualified expert to offer opinions on statistical

analysis. Mr. Woolfson acknowledges that he is not a statistician, does not have a college degree, does not have statistical experience and that he could not provide an opinion on statistical matters. (Woolfson Depo. at 28:4-30:12; 27:24; 72:7-73:1' 78:5-7; 81:10-16; 82:6-7; 115:9-22). The processing of raw data requires a different skill set from, say, a social scientist or statistician who designs studies and interprets raw data to obtain statistically significant results. The declaration of Mr. Woolfson fails to establish his qualifications with respect to professional research and his knowledge of the field of statistics.

While there are deficiencies with respect to Mr. Woolfson's qualifications, the court finds his declaration sufficiently probative on the issue of whether the claims of the meal break subclass are susceptible to a uniform analysis of time cards and payroll records. (Woolfson Decl. ¶17-35). Based upon Mr. Woolfson's experience and qualifications, his opinions provide support for this fundamental issue asserted by Plaintiff. The weight of any such evidence, contrasted with the admissibility of evidence, is not an issue for the court to resolve on this motion for class certification.

The court does not consider the supplemental Woolfson declaration as sufficiently probative on whether the off the clock claims are subject to a uniform analysis based upon a comparison of the alarm company's time entry and exit records. As noted by KFC, the supplemental declaration was submitted in reply and therefore KFC did not have the opportunity to adequately reply to the declaration. Moreover, the basis for Mr. Woolfson's conclusions are not well-founded: the alarm company's records reviewed occurred well outside the class period, KFC has shown that outside vendors access certain of its locations after hours, and therefore the approach taken by Mr. Woolfson to structure and analyze the data may be suspect, and not all employees left the location at the same time and therefore there is no basis from which to assume that the last exit entry necessarily reflects the time when all employees exited the location.          In sum, the court considers the declaration of Mr. Woolfson for the limited purposes identified herein.

**b. Dr. Abbott's Declaration**

KFC also objects to the declaration of Plaintiff's expert, Robert Abbott, on the ground that his opinions are nothing more than speculation. Dr. Abbott, an undisputed qualified expert in the statistical and mathematical methods to study human behavior, opines that it is "feasible to draw a random sample representative of the 13,000 individuals and to collect data through surveys or

- 17 -

09cv2422

Case 2:18-cv-08751-MCS-FFM - Document 72-4 - Filed 11/22/19 - Page 68 of 367 Page
Case 3:09-cv-02422-JM-POR Document 102 Filed 10/22/10 Page 18 of 18 Page
ID #:756

1  interviews from the individuals in the sample that will be representative of the population." (Abbott

2  Decl. ¶6).  Dr. Abbott expresses no opinion on whether the data will support Plaintiff's theory of the

3  case.  A statement that an appropriate study is "feasible," the court notes, does not affirmatively

4  support Plaintiff's theory that a sample survey will accurately reflect and support the claims of each

5  class member.  The court considers Dr. Abbott's expert opinion only to the extent he opines that a

6  survey is "feasible," and not that there presently exists a survey or study supporting Plaintiff's claims.

7      KFC also comes forward to show that Dr. Abbott, in preparing his expert declaration, did not

8  review the time records of the KFC employees, did not read KFC's store closing procedures, and did

9  not review the complaint.  (Abbot Depo. at 18:5-8; 28:9-13; 34:3-5; 61:5-6; 83:9-24).  Consequently,

10  without having reviewed the circumstances of the case, Dr. Abbott's testimony concerning the

11  feasibility of future studies is not probative to presently establish that the claims of the meal period,

12  rest period, and closing shift subclasses are subject to common proof.

13      In sum, the court grants the motion for class certification with respect to the meal break

14  subclass and the rest period subclass, but denies the motion with respect to the closing shift subclass.

15      **IT IS SO ORDERED.**

16  DATED:  October 22, 2010

17  _____

18  Hon. Jeffrey T. Miller
   United States District Judge

19  cc:        All parties

20

21

22

23

24

25

26

27

28

# EXHIBIT E

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF MARIN

DATE: 06/25/14      TIME: 8:30 A.M.      DEPT: B      CASE NO: CV082368

PRESIDING:  HON. ROY O. CHERNUS

REPORTER:                                    CLERK:  STACI HENDRYX

PLAINTIFF:      ADRIANA LARIOS

vs.

DEFENDANT:    MOANA HOTEL AND
RESTAURANT GROUP, LLC, ET AL

NATURE OF PROCEEDINGS:  HEARING – ON CLASS CERTIFICATION AND
APPOINTMENT OF CLASS COUNSEL [PLTF] ADRIANA LARIOS

### RULING

**Plaintiff's motion to certify the following sub-classes of current and former hourly employees of Defendants' restaurants (collectively Piatti) for alleged wage and hour violations, is granted. (Code Civ. Proc. § 382.)  Plaintiff has proven the existence of: an ascertainable and a sufficiently numerous class; a well defined community of interest among class members; and certification is a fair and efficient adjudication of this action that render proceeding as a class superior to alternative means.  (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal. 4th 1004, 1018, 1021.)**

**Global Class: Current and former non-exempt restaurant workers at Piatti restaurant locations in California from May 14, 2004 to present.**

**Meal Period sub-class No. 1: all current and former non-exempt Piatti restaurant workers who worked at least one shift of six hours or longer between May 14, 2004 and the present;**

**Meal Period sub-class No. 3: all current and former non-exempt Piatti restaurant workers who worked at least one shift of six hours or longer between May 14, 2004 and the present; and received a meal period after 5 hours of work; and**

**Uniform Reimbursement sub-class: all current and former non-exempt Piatti restaurant workers who were required to purchase items of clothing for use as Piatti uniforms at any time between May 14, 2004 and the present, and who were not reimbursed.**

**The motion is denied as to Meal Period sub-class No. 2 – employees who worked more than 10-hour shifts, etc.  The complaint does not allege that any putative class member falls into this category.**

Plaintiff alleges that Piatti did not provide its employees uninterrupted 30-minute meal breaks for work-shifts of six hours or more, or pay employees premium wages when these breaks were not provided, in violation of Labor Code §§ 226.7, 512(a) and IWC Wage Order No. 5-2001, subd. 11.

Wage Order No. 5-2001 subd. (11)(A) provides, in relevant part:

> No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and employee.

The employer is also required to keep accurate time records showing that the meal periods were provided. (Wage Order, No. 5-2011 subd. (7)(A)(3).)

"Under Wage Order No. 5 and Labor Code section 512, subdivision (a), an employer must relieve the employee of all duty for the designated period, but need not ensure that the employee does no work." (*Brinker Restaurant*, *supra*, 53 Cal. 4th at p. 1034.)

Plaintiff also alleges that Defendant Piatti did not reimburse its employees for the mandatory uniforms Defendant required them to wear, in violation of California law. (See Labor Code § 2802(a); IWC Wage Order No. 5-2001, subd. (9)(A).)

Plaintiff, a former employee who worked as a busser in one of Defendant's restaurants for approximately one year, seeks to certify these sub-classes, *supra*, and to act as the class representative. According to Plaintiff's analysis of Defendant's timekeeping and payroll data bases, well over 1,000 current and former employees are reflected in these sub-classes.

Defendant Piatti opposes the motion arguing that class treatment for this action is improper because Plaintiff has not established that common issues predominate over individualized ones, and Plaintiff cannot adequately represent the class.

<u>Common Issues Predominate</u> –
Essentially, to answer the 'predominance' question, courts consider "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. [Citations.]" (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4[th] 319, 327.) In other words, the question to be determined is whether the elements necessary to establish liability are susceptible of common proof. (See *Brinker*, *supra*, at p. 1024.)

" 'As a general rule if the Defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' [Citation.]" (*Brinker Restaurant*, *supra*, 53 Cal. 4th at pp. 1021-1022.)

After examining the pleadings and the declarations submitted by the parties (see *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4[th] 908, 916), the court finds that common issues predominate. "Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and

properly, found suitable for class treatment. [Citations.]" (*Brinker Restaurant*, *supra*, 53 Cal. 4th at p. 1033.)

1.    The comparative analysis of Defendants' timekeeping and payroll data bases for the class period by Plaintiff's expert Aaron Woolfson shows an inordinate number of meal breaks available to thousands of employees, but not recorded in Defendant's system.  For example, of  the more than 183,000 shifts greater than 6 hours that Woolfson analyzed, over 63% did not have meal periods recorded.

Under the law discussed above, for shifts between 5-6 hours long, a meal period must be provided unless waived in writing by the employee; and for shifts longer than 6 hours the meal break must be provided within the first five hours.

Plaintiff's common proof of Defendants' own timekeeping and payroll records may create a rebuttable presumption that a centralized policy or de facto custom exists to prevent or to discourage the taking of the meal breaks, or at a minimum, it may suggest a systematic failure of Defendant's obligation to inform employees of their legal right to take meal breaks.  (See *Brinker Restaurant*, *supra*, 53 Cal. 4th at pp. 1052-1053, Werdegar, J. concurring.)

Woolfson also found entries for 1,346 shifts where the meal break time clock had been punched, but Defendant's Point of Sale records indicate the employee was conducting transactions with customers during the time of  the meal breaks.  According to Woolfson "the only way this can appear is if the manager inserted a meal [break] after the completion of the shift."  This evidence may also support a showing of a "pattern or practice" to require employees to work through their meal breaks.

Plaintiff also relies on declarations from herself and other former employees who state they did not receive the required meal breaks, were not told by their managers that they were legally entitled to them, and they were never compensated for having to work through the meal break period.  These declarations may be further evidence of a Defendant's centralized practice or procedure.

"California courts consider 'pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate.' [Citation.]"  (*Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4[th] 1286, 1298, 1304-1305 [evidence that the company routinely allowed its managers to create shift schedules that made it impossible or difficult for employees to take meal breaks, has been held to be common proof of Defendant's policy to violate the law].)

In opposition, Defendant argues that common issues do not predominate because Plaintiff's data analysis does not explain "why" these meal periods were missed, and that determination must be made on an individual basis involving a class of almost 2,000 employees.

In support of this opposition, Defendant has submitted declarations from 62 employees, all but five of whom are current employees, in which they assert that they are all familiar with the meal break policies after receiving the employee handbook as well as receiving continuous reminders from their managers of the break policy during their "line ups", group meetings, and/or during their shifts, and that Defendant has always provided them with the opportunity to take required rest and meal breaks, which sometimes they choose to skip.

Many declarants have attached copies of signed meal and rest break waivers, "Voluntary Double Shift Scheduling Request", and an occasional meal or rest break violation signed by the employee when the employee missed a break he/she was scheduled to take, or did not record a break actually taken.

On this record, the court finds that although Defendant's evidence raises issues concerning the amount of individual damages for missed meal breaks, if any, the common questions of fact concerning <u>the existence or not</u> of a company policy to deny or discourage meal breaks is susceptible of class-wide proof and the common issues concerning compliance with the wage/hour laws predominate over individualized issues of damages: e.g., whether a particular employee had agreed to waive his/her right to a meal break on a particular occasion; or whether on some shifts, one errant manager prevented his/her employees from taking their meal breaks.

These individual issues do not render class certification inappropriate as they can be fairly and effectively managed; e.g., by matching Defendant's time-keeping records with signed voluntary waivers by class members.

2.    Additionally, the issue whether Defendants' established policy not to reimburse for certain items of generic clothing required to be worn; e.g., black pants, black shoes and a white dress shirt or black T-shirt, violates labor laws regarding reimbursement for mandated "uniforms", involves a common question of law that predominates over individualized inquiries; e.g., whether an employee was given more than one apron or T-shirt without charge, or whether a manager improperly required an employee to put a deposit on a Piatti-branded shirt provided to her. (See e.g., *Jaimez*, *supra*, 181 Cal.App.4[th] at pp. 1302-1303 [company's policies of classifying employees as exempt and requiring employees to work overtime without compensation, are common issues that predominate the lawsuit].)

The merits of whether these clothes constitute a "uniform" within the meaning of the law is not an issue to be decided in the motion for class certification. (See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4[th] 429, 439-440 ["[W]e view the question of certification as essentially a procedural one that does not ask whether an action is legally or factually meritorious."].)

The court also concludes that class treatment is a superior method for adjudicating these numerous claims, as the class approach will more effectively deter and redress the alleged wrongdoing, especially given the reality that the vast majority of the affected low-wage earning class members are unlikely to incur the expense to prosecute hundreds of individual actions for relatively small amounts of recovery.  (See *Ghazaryan v. Diva*

*Limousine, Ltd.* **(2008) 169 Cal.App.4[th] 1524, 1537-1538;** *Linder v. Thrifty Oil Co.*, *supra*, **23 Cal.4[th] at pp. 435, 446 [relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing].)**

**The court also finds that Plaintiff is a typical and adequate class representative.  Her claims are typical"; i.e., relying on the legal theories and facts for relief that are substantially similar to other class members.  (See** *Classen v. Weller* **(1983) 145 Cal.App.3d 27, 46.) Plaintiff does not assert claims creating a fundamental conflict "that goes to the very subject matter of the litigation . . . ." (See** *Wershba v. Apple Computer, Inc.* **(2001) 91 Cal.App.4th 224, 238-239.)**

**The court finds that Plaintiff is an adequate class representative whose interests are not antagonistic to the interests of the class.  (See** *Capitol People First v. Dept. of Developmental Services (2007)* **155 CA4th 676, 696-697.)**

**There can be no serious dispute that Plaintiff's counsel have the experience, ability, and assets to represent the class.**

**Although Plaintiff, who spoke English as a second language, was clearly confused at her deposition when she stated that she believed this action was for workplace discrimination, that confusion was resolved to the court's satisfaction and her veracity and bona fides was not impeached so as to undermine the credibility of the other class members' claims.  She may have also reasonably believed she was being discriminated against.  (Compare,** *Jaimez*, *supra*, **181 Cal.App.4[th] at pp. 1307-1308 [plaintiff was deemed inadequate representative after he was fired from employment because he concealed his felony conviction and imprisonment on his job application].)  Plaintiff has not recanted any of her testimony or her declaration.**

**<u>Defendant's Evidentiary Objections</u> –**

**<u>Woolfson's Declaration</u>**
**Overrule.**

**<u>Mallison's Declaration</u>**

**1.  Overrule, if counsel supplies a signed reporter's certificate.**

**2.  Overrule, if counsel supplies a signed reporter's certificate.**

**<u>Adriana Larios' Declaration</u>**

**3.  Overrule.**

**4.  Sustain.**

**5-9.  Overrule.**

**Mehdi Kaci Declaration**

    **1-4.  Overrule.**

    **5.  Sustain.**

    **6.  Overrule.**

    **7.  Sustain.**

    **8 & 9. Overrule.**

**Andrea Connolly Declaration**

**Connolly declares she worked from 2001-2002, clearly outside the class period.  Her entire declaration is ordered to be stricken.**

**Andrew Miller Declaration**

**1 – 4. Overrule.**

**5.  Sustain.**

**6.  Overrule.**

**7.  Sustain.**

**8 & 9.  Overrule.**

**Lisa Avila Declaration**

**1 – 4.  Overrule.**

**5 & 6.  Sustain.**

**7 & 8.  Overrule.**

*In the event that no party requests oral argument in accordance with Marin County Superior Court Local Rules, Rule 1.6 B., the prevailing party shall prepare an order consistent with the announced ruling as required by Marin County Superior Court Local Rules, Rule 1.7.*

# EXHIBIT F

Case 2:18-cv-09751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 77 of 367   Page
Case 4:13-cv-05665-YGR   Document 170   Filed 04/18/19   Page 16 of 23   Page
ID #:765

United States District Court
Northern District of California

1  relevant to what sanction, if any, is imposed."  *Realnetworks, Inc. v. DVD Copy Control Ass'n,*

2  *Inc.*, 264 F.R.D. 517, 523 (N.D. Cal. 2009).

3  However, courts often decline to impose sanctions for spoliation where the documents

4  withheld are unlikely to material affect the outcome of the case, insofar as other evidence exists to

5  provide the same information.  *See Ahcom, Ltd. v. Smeding*, No. 07-1139 SC, 2011 WL 3443499,

6  at *8-9 (N.D. Cal. Aug. 8, 2011) (declining to impose sanctions for destruction of a computer that

7  contained the defendant's financial information where the plaintiff had other documents that

8  provided "extensive information" about the defendant's finances); *see also Med. Lab. Mgmt.*

9  *Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 825 (9th Cir. 2002) (affirming district court's

10  denial of sanctions where loss of original evidence was remedied by sufficient substitute).

11  Here, Collecto and Verizon concede that the call detail records are relevant to Plaintiff's

12  claims and that Collecto deleted the call detail records for two years while this case was pending.

13  And the Court concludes that Collecto was on notice of its duty to preserve the documents based

14  on the filing of Plaintiff's complaint and even the *Powell* litigation before it, *see Montoya v.*

15  *Orange Cnty. Sheriff's Dep't*, No. 11-1922, 2013 WL 6706992, at *7-9 (C.D. Cal. Dec. 18, 2013)

16  (noting that the duty to preserve documents can arise from similar prior litigation).  That Collecto

17  nevertheless allowed the documents to be destroyed is spoliation—whether or not Collecto did so

18  with a culpable mind.  *See Glover*, 6 F.3d at 1329.

19  But this case does not involve spoliation of an entire swath of evidence with no possible

20  substitution.  Rather, Collecto still maintained archives for all of its dialers and has provided these

21  records in discovery.  On the other hand, Plaintiff has proffered sufficient evidence why that

22  evidence is lacking.  For one, it is more expensive and time-consuming to digest.  Moreover,

23  Plaintiff's review indicated that it was missing wrong number codes for a substantial portion of

24  calls.  On the other hand, Collecto's expert consultant has submitted a declaration explaining that

25  the archived data provided contains the data that Plaintiff seeks.  The Court therefore ORDERS

26  Collecto and Verizon to bear the cost of having their own expert, Aaron Woolfson, reconstruct the

27  archived data for the time period lacking call logs according to the categories Plaintiff identifies.

28

# EXHIBIT G

Filed 12/11/17; Certified for Publication 1/10/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502 |
| | A132387, A133077 & A133695 |
| | (City & County of San Francisco Super. Ct. No. CJC-07-004502) |

Respondent ABM Industries, Inc. (collectively with related respondents, ABM) is a large facility services company with employees throughout the United States, including thousands of janitorial workers at hundreds of job sites in California.  Appellants (referred to herein as plaintiffs) are present or former ABM janitorial employees.  On behalf of themselves and similarly situated Californians, plaintiffs filed their complaint in this coordinated proceeding in September 2007, alleging that ABM violated California labor laws by, among other things, failing to properly record and compensate employees for meal breaks; requiring employees to work split shifts without appropriate compensation; and failing to ensure that employees were reimbursed for expenses incurred when traveling between work sites.  In June 2010, plaintiffs moved for class certification of a general class of ABM workers and various subclasses of such workers who had been subjected to particular wage and hour violations.  After briefing and argument, the trial court found plaintiffs' expert evidence inadmissible and indicated orally that it was denying the class certification motion.  In response, plaintiffs filed a

motion pursuant to Code of Civil Procedure section 473, subdivision (b) (the 473(b) motion), attempting to supplement the evidence previously provided with respect to the qualifications of their expert.  By order dated June 29, 2011, the trial court denied plaintiffs' 473(b) motion.  Thereafter, on September 1, 2011, the trial court issued its written order, formally denying plaintiffs' class certification motion.  We conclude that the trial court's wholesale exclusion of plaintiffs' expert evidence in this case was error. We further determine that the trial court's refusal to grant class certification on these facts was an abuse of discretion, and therefore reverse.

<h1 style="text-align:center">I.      BACKGROUND</h1>

**A.    *Facts Underlying the Consolidated Complaint***

ABM's numerous California janitorial employees work at customers' workplaces scattered throughout the state.  ABM's job sites in California are organized into two regions (Northern California and Southern California), various branches within a region, and dozens of distinct districts within a branch.  A district is a number of buildings within a geographic area.  Each branch is under the supervision of a different branch manager. Employees report to an individual site supervisor, who in turn reports to the branch manager.  According to ABM, the site supervisor is responsible for "the daily operations of the location, including assurance that employees are paid properly and provided with their meal and rest breaks . . . ."  However, it appears that ABM's wage and hour policies are controlled centrally and thus applied uniformly throughout all janitorial job sites.  In addition, ABM pays all of its employees through use of a single software application, the Labor Management System (LMS).

ABM provides janitorial services to clients under contracts obtained through competitive bidding.  According to ABM, "[t]he low cost of entry in the facility services business has led to strongly competitive markets comprised of a large number of mostly regional and local owner-operated companies, primarily located in major cities throughout the United States."  In order to compete, ABM provides various contracts at agreed-upon prices.  For instance, ABM provides a fixed price contract where "the client agrees to pay a fixed fee every month over a specified contract term."  Under the cost-

2

plus arrangement, "the clients reimburse [ABM] for the agreed-upon amount of wages and benefits, payroll taxes, insurance charges and other expenses associated with the contracted work."  Given the fixed-price nature of these contracts, it is ABM, not the customer, who is responsible for higher labor costs if their employees cannot finish their assigned work within budgeted timeframes.  As Faisal Algaheim, ABM's Regional Operations Manager for Northern California, testified:  "The customer paid the contracted amount; the contracted price.  And if it is a fixed job—which means the customer will only pay us a contracted amount—whether we work more or less, it is our problem to maintain the cleaning specifications, and pay the employees currently."

All of ABM's non-exempt janitorial employees, who provide the services under these contracts, are entitled to the benefits prescribed by California's labor laws and the related wage orders promulgated by the Industrial Welfare Commission (Wage Orders). For instance, "[p]ertinent meal period provisions require that '[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes . . . .' (Cal. Code Regs., tit. 8, § 11050, subd. 11(A).)  '[A]n employer's obligation is to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work.'  (*Brinker* [*Restaurant Corp. v. Superior Court* (2012)] 53 Cal.4th [1004,] 1049 [*Brinker*].)  To qualify as a lawful meal break under California law, an employee must be relieved of all duties for an uninterrupted 30 minutes.  (*Id.* at p. 1040; Cal. Code Regs., tit. 8, § 11050, subd. 11(A).) If an employer fails to comply with these requirements it must pay one hour of pay at the employee's regular rate 'for each workday that the meal period is not provided.'  (Cal. Code Regs., tit. 8, § 11050, subd. 11(B); see Lab. Code, § 226.7, subd. (c).)"  (*Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 400 (*Alberts*).)  We refer to any extra hours of wages potentially due to employees under the labor laws as premium pay.

Similarly, pursuant to Wage Order 5-2001(4)(C):  "When an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday . . . ."  (See Lab. Code, § 1197 ["The minimum wage for

employees fixed by the commission or by any applicable state or local law, is the minimum wage to be paid to employees, and the payment of a lower wage than the minimum so fixed is unlawful."]; see also *id.*, §§ 1194, subd. (a) & 1194.2 [allowing civil action for recovery of unpaid wages].)  For purposes of this requirement, "split shift" is defined to mean "a work schedule which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods."  (Wage Order 5-2001(2)(R).)  Although the Wage Order does not define "bona fide meal period," the Division of Labor Standards Enforcement (DLSE) has historically taken the position that a bona fide meal period "is one that does not exceed one hour (60 minutes) in length." (DLSE Of Counsel H. Thomas Cadell, Jr., letter to Paul K. Schrieffer, Dec. 11, 2002.)[1]

Finally, California law requires employers to fully reimburse employees for expenses actually and necessarily incurred in the discharge of their duties, including automobile expenses.  (Lab. Code, § 2802; *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 569 (*Gattuso*).)  This right to reimbursement cannot be waived. (*Gattuso*, *supra*, 42 Cal.4th at p. 561.)  However, an employer can discharge its reimbursement obligation in a number of different ways, including through reimbursement for actual expenses or mileage, or through lump sum payments.  (*Id.* at pp. 567–571.)

On September 19, 2007, plaintiffs filed their consolidated class action complaint in this matter (Complaint).  The Complaint alleges numerous violations of California's labor laws and Wage Orders, including violations related to missed meal periods, failure to provide mandatory split shift premium pay, and failure to compensate ABM employees for travel expenses incurred when travelling between job sites.  The Complaint additionally alleges unfair competition under Business & Professions Code section 17200, based on the asserted labor law violations.  Finally, it contains a claim

---

[1] Although the DLSE is responsible for enforcing California's labor laws, including Wage Orders, its interpretations of Wage Orders—while entitled to consideration and respect—are not binding.  (*Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 573 (*Aleman*).)

under the Private Attorneys General Act of 2004, Labor Code section 2698 et seq. (PAGA), to collect penalties based on ABM's alleged systemic wrongdoing.

**B.**     ***Class Certification Motion***

After a number of years of discovery and other preliminary matters, plaintiffs filed their motion for class certification on June 14, 2010.  The motion sought certification of a general class described as "[a]ll non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present" (ABM Workers) (italics omitted).  This putative class was estimated as of 2007 to include approximately 35,000 ABM janitorial employees.  In addition, the motion proposed seven subclasses of ABM Workers, the following four of which are relevant here:  (A) "ABM Workers who . . . suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period . . ." (Unpaid Time/Meal Period Subclass);  (B) "ABM Workers who were not paid premium meal period wages when they (1) worked shifts of at least five hours without an uninterrupted meal period of at least 30 minutes, (2) worked shifts of at least 10 hours without a second uninterrupted meal period of at least 30 minutes, or (3) were provided a first meal period *after* the fifth hour of work" (Unpaid Meal Premium Subclass);  (C) "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal period, but were not paid an additional hour of wages for each split shift" (Unpaid Split-Shift Premium Subclass);  and (D) "ABM Workers who were not reimbursed for expenses that were necessary to carry out their duties, including (1) the use of their own vehicles to travel between jobsites, or transport ABM supplies or equipment" (Reimbursement Subclass).[2]

Plaintiffs argued that class certification was warranted because, among other reasons, common legal and factual issues predominated.  For instance, plaintiffs alleged

---

[2] Plaintiffs declined to appeal from the denial of class certification for their other three proposed subclasses—the Unpaid Rest Premium subclass, the Unpaid Reporting Time subclass, and the Paystub subclass.

that ABM applied a uniform payroll policy which compensated employees according to anticipated work *schedules* rather than for hours actually worked, leading to uncompensated time.  In particular, according to plaintiffs, the LMS, ABM's payroll system, automatically deducted 30 minutes of work time for a meal period whenever an employee was scheduled for a shift of five or more hours, without sufficient documentary evidence that those meals were actually taken.  In addition, plaintiffs averred that analysis of the LMS disclosed a company policy of never paying statutorily required premium wages for missed meal periods or split shifts, despite the fact that some employees were scheduled to work split shifts and, reportedly, many routinely missed meals if they otherwise had insufficient time for cleaning.  Finally, plaintiffs claimed that, although ABM scheduled route workers to provide janitorial services at different locations within the same workday—and required them to travel between sites—the LMS disclosed very few instances in which employees were reimbursed for expenses.

According to plaintiffs, the legality of these common practices could most appropriately be decided on a classwide basis, and ABM's computerized payroll records could be used both to identify violations and to establish common policies.  In support of their motion, plaintiffs submitted declarations from 50 ABM Workers, including four named plaintiffs, stating that the schedules under which employees were paid often bore little relationship to the hours actually worked.  For instance, they often worked through meal periods because there was too much work to do.  In addition, plaintiffs provided evidence of company practices from various ABM supervisors and officials.  Finally, plaintiffs also submitted expert declarations from Aaron Woolfson, a provider of database services who analyzed certain timekeeping and payroll data maintained by ABM with respect to its employees.  For example, Woolfson determined that, of the 1,141,903 shifts greater than five hours that failed to show any time-out/time-in entries during the scheduled workday, 1,070,517 of those shifts (94 percent) nevertheless showed an automatic 30-minute meal period deduction.  Further, there was no indication in the records that premium pay was ever provided for missed meal periods.  In addition, although Woolfson identified 6,331 employees for whom ABM reported at least one shift

6

containing shift segments separated by more than one hour, there was no indication in the payroll records that split shift premium pay was ever provided. Finally, as stated above, analysis of the payroll records disclosed very few instances in which employees were reimbursed for travel expenses (12,834 checks to 826 employees out of the 6,396 employees who worked 155,485 shifts at more than one job site).

ABM opposed plaintiffs' class certification motion, claiming that plaintiffs had failed to offer any "common evidence of a pattern or practice of wrongdoing." Rather, ABM asserted, it promulgated its written meal policy both in its employee handbook and, as of late 2006, on timecards used by some employees.[3] ABM also had a policy for travel reimbursement, and stated that its practice was not to schedule split shifts. With respect to payroll, ABM acknowledges that there is no data in the LMS that describes when a meal period is taken. Rather, the LMS shows the hours scheduled for each employee, by listing the scheduled start and end time for each shift. In addition, the LMS automatically deducts a 30-minute meal period when warranted due to the length of the scheduled shift. According to ABM, when employees have worked their regularly scheduled shifts, they are paid according to their schedule as listed on the LMS. In contrast, if an employee worked additional time, including through a meal break, the site supervisor was required to submit an exception report for input into the payroll system, showing that the employee worked different hours than scheduled.[4] Under these

---

[3] Specifically, the employee handbook stated: "If you are a non-exempt employee . . . you may receive at least one half hour time off as a meal period. Your supervisor schedules meal . . . periods." The timecards, as of late 2006, stated more directly: "State law requires that you take a meal break of at least thirty (30) minutes whenever you work five consecutive hours or more in a day. The meal period must begin before you exceed five hours of work and you must sign in and out for your meal period." According to the plaintiffs, however, timecards that recorded meal breaks were used by less than 15 percent of ABM employees.

[4] According to Woolfson, however, despite ABM's "timesheet maintenance" policy, of the 1,836,083 time entries in the data he reviewed, only 5,625 (0.3 percent) contained any adjustments to pay. Moreover, at least one ABM manager testified that exception reports did not list missed meal breaks and that, in fact, supervisors were not required to report missed meals.

7

circumstances, ABM argued that class treatment was inappropriate because resolution of plaintiffs' claims would turn on multiple individualized inquiries, such as whether and when each employee took lunch breaks, why an employee failed to take a lunch break, how many miles a particular employee drove between work sites, whether a split shift employee received total wages for that day less than the minimum wage that they would otherwise have been owed, and whether the employee requested a split shift.

In support of its opposition, ABM submitted declarations from 14 current employees as well as excerpts from the depositions of certain of plaintiffs' declarants. According to ABM, the deposition testimony of plaintiffs' declarants cast "serious doubts" on their credibility. With respect to expert testimony, ABM did not provide its own expert, but argued generally that Woolfson's expert declaration should not be considered. ABM also requested that the court take judicial notice of certain deposition testimony provided by Woolfson in another case.

After hearing on April 19, 2011, the trial court issued its oral ruling denying class certification. As a preliminary matter, the court opined that the evidence submitted by Woolfson was inadmissible because his declarations failed to qualify him as an expert on anything material to the class certification motion. Although the court did not strike the Woolfson material, it concluded that it was not admissible "because it doesn't prove anything." When asked about the validity of the many factual findings set forth in the Woolfson declarations, the trial court responded that the question at hand was "whether or not a class should be certified" and that, in this regard, it was "not sufficient to ferret out individualized common questions." With respect to Woolfson himself, the court found many of the statements regarding his expertise conclusory and thus believed that he had not "demonstrated that this court should accept him as a person with particular background, experience, skills, [or] expertise to differentiate him from the rest of the world so he should be accepted by this court as an expert."[5] Since the trial judge rejected

---

[5] Although there was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court, it was attached to an attorney declaration rather than incorporated into Woolfson's own declaration. Under these

Woolfson as an expert, he was not qualified "to present to me opinions that are not generally understood by the rest of the world and to allow him to present hearsay material to rely on and to give me opinions."

On the merits, the trial court found certification inappropriate due to issues with the subclass definitions. In particular, the court appeared concerned that the subclasses were defined in terms of individuals who had been harmed, making class members unascertainable until the conclusion of the case. In addition, it concluded that the plaintiffs had failed to meet their burden to show that common issues of fact and law predominated over individual questions, "given the employment structure and the variety of circumstances that each worker finds him or her under." The trial court further noted with regards to predominance that the number of declarations submitted by plaintiffs disclosing labor code violations was insufficient standing on its own to establish commonality. Rather, it believed "evidence besides declarations would have to be submitted to show a common practice." However, when asked about whether the existence of ABM's auto-deduct policy for meal periods was evidence showing a common issue sufficient to support certification, the trial court responded: "Your class definition is wrong. It's not up to me to ferret through what you present and to see if I can craft a class somehow from what you are arguing." In the end, the trial court opined: "[T]he concept is not whether we can find a common question here. There are plenty of common questions, but the question is whether the common questions predominate over individual questions so that it would be appropriate to utilize the class action mechanism. And it's just a procedural device for the convenience and efficiency of the court and for the efficiency and economic self-interests of the litigants . . . . [¶] . . . Just because you might have a common question in here somewhere doesn't mean it's appropriate to have this case proceed as a class action."

Plaintiffs filed notices of appeal with respect to this oral ruling in June 2011 (case No. A132387).

---

circumstances, the court found it to be hearsay and indicated, regardless: "I feel it's my job to figure out whether somebody is an expert."

C.    *Motion for Relief Under Section 473, Subdivision (b)*

In the meantime, on May 11, 2011, following the oral denial of their class

certification motion, plaintiffs filed their 473(b) motion, asking to augment the record

with further evidence of Woolfson's credentials and expertise.  Plaintiffs sought

introduction of this additional evidence in hopes that the trial court would accept

Woolfson as an expert, reassess its ruling that Woolfson's declarations were hearsay, and

reconsider its class certification decision in light of Woolfson's expert findings and

conclusions.[6]  In support of their motion, plaintiffs argued that it was excusable neglect

not to have made a more thorough demonstration of Woolfson's qualifications prior to

the hearing on the class certification motion because ABM had given no indication that it

was raising a serious challenge to those qualifications.  Specifically, ABM had failed to

lodge a formal objection to the evidence, move to strike the declaration, depose Woolfson

on his credentials or conclusions, and/or provide their own contrary expert opinion.

Instead, ABM simply made a brief argument in its opposition papers that Woolfson was

not qualified to analyze the data in question and that the opinions he offered were

conclusory and based on common experience.[7]

The trial court denied plaintiffs' 473(b) motion after hearing on June 8, 2011.

According to the court, plaintiffs had not shown grounds for relief under that statute.  In

particular, the trial court opined:  "Well, the problem with your certification motion was

discussed in great detail at the hearing on the motion, and the problem was multifaceted.

It covered a full range of matters, none of which falls into the category of a technical

---

[6] Code of Civil Procedure section 473, subdivision (b), provides in relevant part:
"The court may, upon any terms as may be just, relieve a party or his or her legal
representative from a judgment, dismissal, order, or other proceeding taken against him
or her through his or her mistake, inadvertence, surprise, or excusable neglect."

[7] This was apparently in contrast to a previous case where counsel for ABM
(representing a different party) had vigorously challenged the same Woolfson declaration
by submitting written objections, filing rebuttal declarations by defense experts, and
extensively cross-examining Woolfson at deposition.  According to plaintiffs' 473(b)
motion, these efforts failed and Woolfson was nevertheless qualified as an expert in that
case.

failing by the lawyer; in other words, the idea that the problem here is that the lawyers did something wrong and therefore I should relieve the parties from the lawyers' mistake is not what happened here."

According to the trial court, the real issue in the case was that ABM Workers were not a group of workers that were susceptible to being treated as a class, and thus there were no predominant questions of fact or law.  The trial court also reiterated its problems with the plaintiffs' proposed class definitions.  In the end, the court indicated that it had reviewed the supplemental evidence provided by plaintiffs and that—even if it agreed to consider it—it would not change the court's view on certification.  As the court opined: "Whether or not this witness is qualified to give the opinions, the opinions are not material to this case . . . ."  A written order memorializing the trial court's denial of the 473(b) motion was filed on June 29, 2011, and a timely notice of appeal with respect to that order was filed on August 29, 2011 (case No. A133077).

**D.    *Order Denying Class Certification***

The trial court's written order denying class certification was ultimately filed on September 1, 2011.  The court first reiterated its conclusion that the Woolfson declarations submitted by plaintiffs in support of their class certification motion were inadmissible, stating "there is no evidence that Mr. Woolfson is an expert in any area that is material to this case."  As discussed above, the record did contain two orders (from state and federal courts) certifying Woolfson as an expert.  The trial court, however, found that the facts set forth in those orders were hearsay and concluded, regardless: "Whether Mr. Woolfson was accepted as an expert in state and federal court is immaterial:  the Court does its own work regarding the admissibility of expert testimony."

With respect to the merits, the trial court first concluded that plaintiffs' class definition was unworkable.  It found plaintiffs' general class definition permissible:  "All non-exempt janitorial employees and former non-exempt janitorial employees employed by ABM in the State of California at any time from April 6, 2002 to the present."  However, noting that courts have rejected class claims when the class definition is simply

11

shorthand for persons possibly wronged by the defendant, the trial court found fault with the plaintiffs' seven subclasses, opining that "defining the proposed class(es) by reference to the alleged injury or injuries sustained is a fatal defect, because the members of the class cannot be ascertained until the lawsuit is concluded." According to the trial court, under such circumstances, "it is impossible to identify who is a member of the putative class, which makes it impossible to provide them with notice of the lawsuit, and which therefore also makes it impossible to determine who will be bound by the judgment." The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class.

In addition to these ascertainability issues, the trial court also concluded that class treatment of plaintiffs' claims was inappropriate because plaintiffs failed to demonstrate that common questions predominate over individual inquiries. In particular, the court found that plaintiffs did not provide sufficient evidence of a common scheme with respect to the negotiation of contracts which, by their terms, led to ABM employees being underpaid. In addition, the court determined that the declarations submitted by plaintiffs regarding claimed labor law violations were insufficient in number, "without additional evidence," to demonstrate a common practice. In sum, the court opined that "consideration of all the factors relevant to class certification demonstrates that individual inquiries will predominate in determining all of the putative class members' claims, and therefore class certification is not a superior method of resolving the instant case."

Following entry of the trial court's written order denying class certification, appellants filed a third notice of appeal (case No. A133695). By order dated January 26, 2012, the three cases were consolidated for all future proceedings in this court. In addition, at the parties' request, we stayed the matter pending issuance by the Supreme Court of its decision in *Brinker*, *supra*, 53 Cal.4th 1004. Once the Supreme Court's opinion in *Brinker* was final, a briefing schedule was set, and the matter is now before us for decision.

## II.      DISCUSSION

### A.      *Admissibility of Expert Evidence*

As a preliminary matter, we must address the trial court's decision to disregard the declarations of plaintiffs' expert, Woolfson, in making its class certification determination.  As both parties have accurately asserted, we review a trial court's ruling on the admissibility of expert evidence for abuse of discretion.  (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187.)  " 'However, the discretion to admit or exclude evidence is not unlimited.  "The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown." ' "  (*Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291–292 (*Kotla*).)  This is especially true when, as here, a trial court's exercise of discretion "implicates a party's ability to present its case."  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon Enterprises*); see *Brown v. Colm* (1974) 11 Cal.3d 639, 647 (*Brown*) ["the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal"].)  Indeed, in this context, courts must "be cautious in excluding expert testimony" as the trial court's gatekeeping goal "is simply to exclude 'clearly invalid and unreliable' expert opinion."  (*Sargon Enterprises*, at p. 772.)

Should we determine in this case that an abuse of discretion has occurred, that conclusion alone is not sufficient to support reversal of the trial court's certification decision.  Rather, the "judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial."  (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 (*Grail Semiconductor*); see Code Civ. Proc., § 475.)  Article VI, section 13, of the California Constitution further provides that "a judgment may not be set aside based on the erroneous admission of evidence 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error

13

complained of has resulted in a miscarriage of justice.' " (*Grail Semiconductor*, *supra*, 225 Cal.App.4th at p. 799; see Evid. Code, § 353.)  "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Grail Semiconductor*, at p. 799.)  Thus, our task on appeal is to determine whether an abuse of discretion has occurred and, if so, whether it is reasonably probable that a result more favorable to plaintiffs would have been obtained absent the error.

As detailed above, the trial court in the present case based its decision to exclude Woolfson's expert declarations on two separate grounds—that Woolfson had not properly established himself as an expert and that, regardless, the information that he presented via expert declaration was not material to this case.  With respect to Woolfson's expert qualifications, although the trial court acknowledged in its order denying class certification that Woolfson indicated an expertise "in creating, managing and analyzing large databases," it rejected him as an expert, finding no evidence that he had "formal training or degrees that would qualify him as an expert to review the timekeeping and payroll data at issue."  The trial court also noted that "Mr. Woolfson's declaration does not set forth any evidence that he holds certificates, has obtained any kind of college or other professional degree, belongs to any professional organizations, has published any articles, taught or has ever testified as an expert witness at trial." Further, at the April 2011 hearing denying class certification, the trial court indicated that it believed the qualification information supplied by Woolfson in his expert declaration was too general to establish him as an expert.  For example, the trial court stated: "[Woolfson] says he has extensive experience in creating, managing, and analyzing large databases, including, and then he lists a number of things.  I have no idea what the term 'extensive' means.  It looks to me like a conclusion that he hasn't explained in any way. He doesn't say how many years, how many assignments, what the nature of the assignments were, what the nature of his tasks were or anything of the like."  Similarly, the trial court noted that "without any detail" Woolfson stated that he "has provided

payroll and timekeeping database analysis for attorneys in numerous wage-hour cases. That does not communicate any specific facts of the type that is usually relied upon to qualify an expert."

While the better course of action in this case clearly would have been to provide the trial court with a more extensive explanation of the specifics of Woolfson's expertise, we believe that, under the circumstances, the trial court erred by refusing to qualify Woolfson as an expert in database management and analysis based on the materials before it.  "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, *or* education sufficient to qualify him as an expert on the subject to which his testimony relates."  (Evid. Code, § 720, subd. (a), italics added.)  "Expertise, in other words, 'is relative to the subject,' and is not subject to rigid classification according to formal education or certification."  (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 408.) Rather, an expert's qualifications can be established in any number of different ways, including "a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion."  (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 (*Howard Entertainment*).)  In sum, with respect to expert qualification, "[t]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can be laid down which would be applicable in every circumstance."  (*Brown*, *supra*, 11 Cal.3d at p. 645; see *Howard Entertainment*, at p. 1115.)

Once this threshold has been met, questions regarding *the degree* of an expert's knowledge go more to the weight of the evidence presented than to its admissibility.  (See *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1079–1080; see also *Jordan v. Allstate Insurance Co.* (2004) 116 Cal.App.4th 1206, 1217 [where expert declaration was sufficient to demonstrate " 'special' " knowledge of the subject matter, the "weight and value" of the expert opinion was a matter for the trier of fact].)  Finally, the ability of an expert witness to testify as to either facts or opinions is limited to matters that are not

common knowledge.  Thus, for example, "[e]xpert testimony as to facts may be necessary where the facts from which conclusions are to be drawn are peculiarly within the expert's knowledge and are not a matter of common knowledge as to which an ordinary witness may competently testify."  (1 Witkin, Cal. Evid. (5th ed. 2012) Opinion Evidence, § 27, p. 638.)  Similarly, expert opinion should be excluded " ' "when 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " ' " (*Kotla*, *supra*, 115 Cal.App.4th at p. 291; see Evid. Code, § 801, subd. (a).)

Here, Woolfson provided a declaration indicating that he was a founder of TelSwitch, Inc., a company which "builds and develops telephonic database service for several major telecommunications companies to manage their billing, as well as calculating and maintaining extensive databases related to the accurate calculation of the rates and rounding mechanisms used on telecommunications services."  Woolfson further declared that he was a managing partner of Merkt-Woolfson, a company which "produces billing and database mechanisms for banks to keep track of the paperwork that banks require to maintain mortgage and loan origination" and also provides "extensive database management services to both government and private industries," including "the largest banks, military contractors, and publicly held telecommunications carriers where accuracy and accountability are a necessity."  Moreover, according to Woolfson, a "typical transaction load" for an "average database" maintained by his company was approximately one million records a day; he was "accustomed to, and comfortable with, working with a large amount of data across a variety of industries, including for litigation purposes"; and he had "extensive experience in creating, managing, and analyzing large databases," including specifically timekeeping databases.

Woolfson's expert declaration additionally indicated that he had provided "payroll and timekeeping database analysis for attorneys in Northern and Southern California involving numerous wage and hour class action cases."  He then described the timekeeping records he had received from ABM—including, for example, "1,836,083 Time Entries in Microsoft Excel™ files covering 27,183 employees who performed

16

1,500,175 shifts of work at 5380 Job Site locations from 12-08-02 through 07-18-07"—and walked through his step-by-step analysis of those records.  Indeed, Woolfson went so far as to set forth the specific Structured Query Language (SQL) queries he used to extract relevant information from ABM's records.[8]

   We reiterate that additional information regarding the specifics of Woolfson's expertise in matters relevant to this case would clearly have been preferable.[9]  However,

_____

   [8] As stated above, in addition to Woolfson's expert declarations, the plaintiffs submitted an attorney declaration that, among other things, attached two court orders from cases in which Woolfson had reportedly been qualified as an expert under similar circumstances.  (See *Avalos v. La Salsa, Inc.* (Super. Ct. Santa Barbara County, 2010, JCCP No. 4488 (*Avalos*) [order dated May 17, 2010, granting in part and denying in part plaintiff's motion for class certification]; see also *Hines v. KFC U.S. Properties, Inc.* (S.D. Cal., Oct. 22, 2010, No. 09-cv-02422-JM (POR)) (*Hines*) [order granting in part and denying in part motion for class certification, which states at page 6 that "Mr. Woolfson is an expert in the compilation and analysis of databases, based upon his declaration which sets forth his qualifications and the methods and procedures adopted to analyze the data."].)  At the April 2011 hearing on class certification, the trial court initially indicated that it believed there was evidence in the record that Woolfson had *not* previously qualified as an expert.  When plaintiffs' counsel mentioned the two cases cited above as instances where Woolfson had been qualified, the court opined that the referenced court orders were hearsay and that, regardless, it chose not to take judicial notice of them because it believed it was the court's job "to figure out whether somebody is an expert."  The court's written order denying class certification reiterated this sentiment, stating that whether Woolfson was "<u>accepted as an expert in state and federal court is immaterial; the Court does its own work regarding the admissibility of expert testimony</u>."  We agree with both the trial court and ABM that one court is not *required* to adopt another court's conclusion that an individual is an expert in a particular matter, although it may do so.  (See *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 513–514.)  However, that a proposed expert has been previously qualified seems, at the very least, relevant to another court's subsequent qualification analysis and we question the trial court's perhaps overly technical application of the hearsay rule when establishing prior expert qualification via judicially noticed court order.  Nevertheless, we need not finally reach the issue, as we would find error here regardless of whether Woolfson's history as a qualified expert is considered.

   [9] For instance, in a supplemental declaration filed in connection with plaintiffs' 473(b) motion, Woolfson clarified that he had *over 24 years* of experience developing highly accurate database applications for companies such as Japan Telecom America, Experian, Bank of America, and JP Morgan Chase; that his database techniques were

17

we conclude that the materials submitted in advance of the April 2011 hearing on class certification in this case were sufficient to qualify Woolfson as an expert in database management and analysis, and that the trial court's conclusion to the contrary was an abuse of discretion.  In particular, we find that the trial court's emphasis on formal education and membership in professional organizations was misplaced with respect to Woolfson's stated expertise, given his clear familiarity with numerous, highly complex transactions in that subject matter.  (See *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115.)  Indeed, while admittedly not detailed, Woolfson's declaration did indicate that he had "extensive experience" in database management and analysis, including statements that he held leadership positions in two database companies which serviced the "largest banks, military contractors, and publicly held telecommunications carriers"; that his company handled typical transaction loads of approximately one million records per day on "average" databases it maintained; and that he had previously provided payroll and timekeeping database analysis in numerous wage and hour class action cases in California.  Moreover, although ABM did argue briefly before the trial court that Woolfson was not qualified to analyze the data at issue and that certain of his conclusions were overly broad and lacked sufficient factual foundation, ABM did not challenge the veracity of any of Woolfson's qualifications as set forth in his declaration, nor did it contest *even a single one* of the myriad factual findings made by Woolfson during the course of his analysis.

---

used by the federal government, including by the Department of Justice and the Patriot Missile Defense Training System; that he had a number of relevant professional certifications; that his authored works included an analysis of the merger between Continental Airlines and United Airlines that was presented to the Senate Judiciary Committee in 2010; that he had qualified as an expert in *Avalos* and *Hines*, both wage and hour class actions in which the courts relied on his analysis in granting class certification; and that he had been retained as an expert in over 40 cases (90 percent class actions) by both plaintiffs and defendants to analyze "timekeeping, payroll records, telephone call records, credit card records, reimbursement records, and travel records (e.g., gps data and locations where employees worked)."

Under these circumstances, plaintiffs' evidence supporting Woolfson's expert qualifications showed that he had "sufficient skill or experience" in the field of database management and analysis such that his declarations should have been considered by the trial court. (See *Brown*, *supra*, 11 Cal.3d at p. 645.) Nevertheless, the trial court chose to reject all of the information provided by Woolfson, despite the fact that, as we discuss further below, Woolfson's analysis of the ABM database was central to plaintiffs' class certification motion, and thus the trial court's decision effectively foreclosed plaintiffs' ability to put on their case. (See *Sargon Enterprises*, *supra*, 55 Cal.4th at p. 773; *Brown*, *supra*, 11 Cal.3d at p. 647.) This was error.

While we do not here pass on the admissibility of *every* opinion reached by Woolfson based on his manipulation of ABM's database, we find the many facts generated by Woolfson's analysis clearly admissible as matters beyond the common knowledge or experience of an ordinary witness.[10] (See *Business Objects, S.A. v. MicroStrategy, Inc.* (Fed. Cir. 2005) 393 F.3d 1366, 1368 [noting that SQL requires the user to "understand the structure and content of the relational database as well as the complex syntax of the specific query language" and that "[t]hese complexities generally prevent laypersons from drafting queries in query languages."].) Moreover, as evidence of ABM's common wage and timekeeping practices, Woolfson's results would unquestionably aid a jury in its search for the truth regarding any alleged classwide wage or hour violations in this case. (See *Brown*, *supra*, 11 Cal.3d at p. 645; *Howard Entertainment*, *supra*, 208 Cal.App.4th at p. 1115; see also *Brinker*, *supra*, 53 Cal.4th at p. 1033 ["Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."].)

---

[10] As just one example, Woolfson identified ABM workers scheduled to work shift segments separated by more than one hour on the same day, without any indication of premium pay, through use of the following SQL queries: "1. *select count (\*) from workdata where SplitShiftViolation='YES' and isWork ='YES'* [¶] 2. *select distinct reference from workdata where SplitShiftViolation ='YES' and iswork ='YES'*."

Frankly, we are somewhat mystified by the trial court's wholesale exclusion of the entirety of Woolfson's evidence in this matter. Upon review, it appears that the trial court's conclusions regarding the admissibility of the Woolfson materials were impermissibly tainted by its strong views with respect to the underlying merits of plaintiffs' class certification motion—that is, that class certification was improper due to the individualized inquiries that would be required to establish which ABM employees, if any, had been harmed in this matter. This determination, moreover, appears to have been based, at least in part, on the mistaken notion that database analysis of timekeeping and payroll records cannot be used as a means to show common practices for purposes of class certification. Indeed, at the June 2011 hearing on plaintiffs' 473(b) motion, through which plaintiffs were attempting to bolster Woolfson's expert credentials, the trial court opined that ABM workers were "not susceptible to be treated as a class, period" and that the "basic problem" in the case was that "individualized analysis of working situations" would be needed "to understand why a worker may not have been given a lunch break." Thus, in the opinion of the trial court: "*Whether or not this witness is qualified* to give the opinions, the opinions are not material to this case." (Italics added.)

In sum, it was error for the trial court to completely disregard plaintiffs' proffered expert evidence of common practice, rather than accepting it for what it was and weighing it against the existence of any individualized inquiries that might properly have defeated plaintiffs' request for class certification. Moreover, as we discuss in detail below, the trial court's decision clearly prejudiced plaintiffs, as it left them without any evidence of systemic wrongdoing other than the information contained in the declarations and deposition testimony submitted in connection with their class certification motion, materials which the trial court found insufficient in number to demonstrate predominant common questions. Indeed, the trial court expressly stated: "The number of declarations [submitted by plaintiffs] compared to the number of employees by itself would not be sufficient [to demonstrate predominance]. . . . What I'm suggesting is that *evidence besides declarations would have to be submitted to show a common practice*." (Italics added.) Yet this was precisely the evidence that the trial court excluded. Since we find it

20

reasonably probable that a result more favorable to the plaintiffs would have been reached in the absence of this error, the trial court's order denying class certification cannot stand.  (See *Kotla*, *supra*, 115 Cal.App.4th at p. 294.)[11]

**B.**    ***Class Certification Issues***

1.    *Rules Governing Class Actions and Standard of Review*

The requirements for class certification are well established and were recently summarized by our high court in *Brinker*, *supra*, 53 Cal.4th 1004, 1021:  "Originally creatures of equity, class actions have been statutorily embraced by the Legislature whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .'  [Citations.]  Drawing on the language of Code of Civil Procedure section 382 and federal precedent, we have articulated clear requirements for the certification of a class.  The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' "

" '[T]his state has a public policy which encourages the use of the class action device.' "  (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340 (*Sav-On*).)  Further, whether class certification should be granted is a procedural question, and not a question of whether the action is " 'legally or factually meritorious.' "  (*Id.* at p. 326.)  As a general matter, " 'a class action is not inappropriate simply because

[11] Because we conclude that the trial court erred in failing to consider Woolfson's expert declarations when making its class certification determination at the hearing in April 2011 (as memorialized by the court's order denying plaintiffs' motion for class certification filed on September 1, 2011), we need not reach the issue of whether the trial court also erred in refusing to grant plaintiffs' 473(b) motion so that additional evidence of Woolfson's expert qualifications could be brought before the court.

each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages.' " (*Id.* at p. 333.)

In addition, with respect to the superiority of the class action mechanism—and as is pertinent to our present inquiry—we have previously noted that "[c]ourts regularly certify class actions to resolve wage and hour claims. [Citations.] In this arena the class action mechanism allows claims of many individuals to be resolved at the same time, eliminates the possibility of repetitious litigation and affords small claimants with a method of obtaining redress for claims which otherwise would be too insignificant to warrant individual litigation. [Citation.] Moreover, the issues slated for contest are primarily common issues involving common evidence. It would not be efficient or fair to relegate these complaints to multiple trials." (*Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 (*Bufil*); see *Brinker*, *supra*, 53 Cal.4th at p. 1033.)

Indeed, as our high court elaborated in *Brinker*, a theory of liability that an employer "has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.) "[I]n the general case to prematurely resolve such disputes, conclude a uniform policy complies with the law, and thereafter reject class certification . . . places defendants in jeopardy of multiple class actions, with one after another dismissed until one trial court concludes there *is* some basis for liability and in that case approves class certification. [Citation.] It is far better from a fairness perspective to determine class certification independent of threshold questions disposing of the merits, and thus permit defendants who prevail on those merits, equally with those who lose on the merits, to obtain the preclusive benefits of such victories against an entire class and not just a named plaintiff." (*Id.* at p. 1034.)

"California courts consider 'pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of a defendant's centralized practices in order to evaluate whether common behavior towards similarly situated plaintiffs makes class certification appropriate.' " (*Jaimez v. Daiohs USA, Inc.* (2010)

181 Cal.App.4th 1286, 1298 (*Jaimez*).)  Other relevant factors include " 'whether the class approach would actually serve to deter and redress alleged wrongdoing.' " (*Ibid.*) Moreover, in the wage and hour context, "[w]e have recognized that retaining one's employment while bringing formal legal action against one's employer is not 'a viable option for many employees,' " and thus a class action may be appropriate as "a current employee who individually sues his or her employer is at greater risk of retaliation." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 459, abrogated on other grounds as stated in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 359–360; see also *Williams v. Superior Court* (2017) 3 Cal.5th 531, 558, citing *Gentry*.)  And, in *Gentry* our high court noted that class actions may be particularly useful for immigrant workers with limited English language skills, as illegal employer conduct might otherwise escape their attention.  (*Gentry*, at p. 461.)

        A ruling on class certification is reviewed for abuse of discretion.  (*Brinker*, *supra*, 53 Cal.4th at p. 1022; *Sav-On*, *supra*, 34 Cal.4th at p. 326.)  Under this standard, " '[a] certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1022; see *Bufil*, *supra*, 162 Cal.App.4th at p. 1204 [noting that while "[t]rial courts enjoy wide discretion with regard to class certification," we will nevertheless reverse and order denying class certification "if the order is based on improper criteria or incorrect assumptions"].)  Moreover, "[a]n appeal from an order denying class certification presents an exception to customary appellate practice by which we review only the trial court's ruling, not its rationale.  If the trial court failed to conduct the correct legal analysis in deciding not to certify a class action, ' "an appellate court is required to reverse an order denying class certification . . . , 'even though there may be substantial evidence to support the court's order.' " ' [Citation.]  In short, we must ' "consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial." ' " (*Alberts*, *supra*, 241 Cal.App.4th at p. 399.)

On the issue of predominance, a trial court's finding is generally reviewed for substantial evidence. (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) Thus, "[w]e must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Ibid.*) However, since the focus of this type of certification dispute "is on what type of questions—common or individual—are likely to arise in the action, rather than on the merits of the case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the *theory of recovery* advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. [Citations.] 'Reviewing courts consistently look to the allegations of the complaint and the declarations of attorneys representing the plaintiff class to resolve this question.' " (*Sav-On*, *supra*, 34 Cal.4th at p. 327, italics added.)

In the instant case, plaintiffs contend that the trial court abused its discretion, both in concluding that their proposed subclasses are not ascertainable and in determining that common issues do not predominate over individual inquiries. We consider each claim in turn.

2.    *Ascertainability*

As stated above, the trial court refused to certify this matter as a class action because, among other reasons, it believed the subclasses proposed by appellants were not ascertainable. In particular, the trial court opined that defining the proposed subclasses by reference to the alleged Labor Code violations sustained was a "fatal defect," because the putative subclass members could not be identified without a determination on the merits of each class member's case. The court reasoned that, when the "class definition is simply shorthand for persons possibly wronged by the defendant," it is impossible to identify putative class members until the lawsuit is concluded, making it impossible both to provide appropriate notice and to determine who will be bound by the judgment. The trial court also found fault with the fact that the sum of the seven subclasses did not add up to the entire general class of non-exempt janitorial employees, because some members of the general class may not have suffered any harm. Unsurprisingly, ABM agrees with

24

the trial court on appeal, arguing that "the only means by which the many subclasses could be ascertained was by a trial on the merits, requiring the testimony of each and every putative class member on each and every claim, a concept that is antithetical to the very concept of class litigation."   In our opinion, however, both the trial court and ABM have fundamentally misapprehended the concept of ascertainability as it applies to the circumstances of this case.

"Ascertainability is achieved 'by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary.' " (*Bomersheim v. Los Angeles Gay & Lesbian Center* (2010) 184 Cal.App.4th 1471, 1483; see *Nicodemus v. Saint Francis Memorial Hospital* (2016) 3 Cal.App.5th 1200, 1212 (*Nicodemus*); *Aguirre v. Amscan Holdings, Inc.* (2015) 234 Cal.App.4th 1290, 1300 (*Aguirre*).)  "In determining whether a class is ascertainable, the trial court examines the class definition, the size of the class and *the means of identifying class members*." (*Bufil*, *supra*, 162 Cal.App.4th at p. 1207, italics added.)  Thus, a plaintiff is not required to establish the identity of class members at the class certification stage of the proceedings.  (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1274.)

Moreover, "[w]hile often it is said that '[c]lass members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records' [citations], that statement must be considered in light of the purpose of the ascertainability requirement." (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 101 (*Medrazo*).)  " 'Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.' " (*Aguirre*, *supra*, 234 Cal.App.4th at p. 1300.)  Therefore, "[t]he goal in defining an ascertainable class 'is to use terminology that will convey "sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent." [Citation.]  " . . . Otherwise, it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating." ' " (*Id.* at pp. 1300–1301; see also *Medrazo*, at p. 101

[ascertainability requirement is satisfied if "the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation"].)

In sum, a class is ascertainable if a plaintiff supplies a reasonable means of identifying potential class members and the class is defined in terms of objective characteristics and common transactional facts sufficient to allow a class member to identify himself or herself as having a right to recover based on that description.  So long as these requirements are met, a class is ascertainable "even if the definition pleads ultimate facts or conclusions of law."  (*Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915–916 (*Hicks*); see *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 226, 240–241 (*Faulkinbury*) [directing certification of subclasses based on meal break, rest break, and overtime violations]; *Jaimez*, *supra*, 181 Cal.App.4th at pp. 1291–1292, 1295–1296 [directing certification of classes found ascertainable by the trial court, including a meal break class "based upon the failure to permit or authorize meal breaks and the failure to pay one hour of wages for each meal break violation" and an overtime class "based upon the failure to pay overtime to the class"]; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1529, 1539 [directing certification of two subclasses based on failure to pay earned wages and overtime and failure to provide mandatory rest breaks].)  Under this established analytical framework—and when one considers the data supplied by Woolfson—the trial court's conclusion that the proposed subclasses in this case are unascertainable due to the need for individualized merit determinations is simply not defensible.

Indeed, we recently considered and rejected a similar argument in *Nicodemus*, *supra*, 3 Cal.App.5th 1200.  In that case, the plaintiff filed an action alleging that she was overcharged for copies of her patient medical records, which were sought in anticipation of litigation by her attorney pursuant to Evidence Code section 1158.  The named defendants were the plaintiff's hospital (Saint Francis) and HealthPort Technologies, LLC (HealthPort), a company that, during the relevant timeframe, provided Saint Francis

with patient medical record release of information services pursuant to a contract. (*Nicodemus*, at pp. 1205, 1207.)  The plaintiff moved for certification of a class comprised of all patients who requested medical records from a California medical provider through an attorney prior to litigation and who were charged by HealthPort more than the statutory maximum set forth in Evidence Code section 1158.  (*Id.* at pp. 1205–1206, 1208.)  The trial court concluded that the plaintiff's proposed class was unascertainable.  (*Id.* at p. 1210.)  Although HealthPort tracked all attorney requests using a separate billing code in its database, the trial court concluded that the data set was over-inclusive because the plaintiff "had not presented a mechanism for determining whether attorneys' requests were submitted ' "prior to litigation" . . . without individualized inquiry, for example, by asking' each attorney."  (*Ibid.*)

On appeal, we concluded that the trial court erred as a matter of law in finding that the proposed class was not ascertainable.  (*Nicodemus*, *supra*, 3 Cal.App.5th at pp. 1213–1217.)  Because it is highly relevant to the case at hand, we set out our reasoning in some detail:  "[E]ven assuming the attorney request data set does include some unknown number of requests that were submitted after litigation was commenced (or after defendants' first appearance) or for reasons unrelated to litigation, this fact would not defeat ascertainability.  HealthPort argued, and the trial court concluded, that a class is not ascertainable if the class members who are entitled to recover from the defendants cannot be identified without an individualized inquiry.  That is not, however, the standard for determining whether a class is *ascertainable*.  As noted, '[a]scertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.  [Citations.]  . . . As long as the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation, the ascertainability requirement is met.'  (*Medrazo*, *supra*, 166 Cal.App.4th at p. 101.)  Plaintiff here has identified the class in terms of objective characteristics, tracking the provisions of section 1158; if it is determined later in the litigation that the '07' data set includes requests not made

27

pursuant to section 1158, 'those [persons] can be eliminated from the class at that time.'
(*Aguiar v. Cintas Corp. No. 2*, *supra*, 144 Cal.App.4th at p. 136 (*Aguiar*); see also *Sav-On*, *supra*, 34 Cal.4th at p. 333 [' "a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery" ']; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 743 [class of all employees in certain job categories ascertainable even though some employees may not have worked overtime and thus may not be entitled to any recovery].)  Nor should a court 'decline to certify a class simply because it is afraid that insurmountable problems may later appear at the remedy stage.' "
(*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1214.)  Thus, contrary to the trial court's belief, possible over-inclusiveness in the method proposed for identifying potential class members does not defeat ascertainability.

In reaching our conclusion in *Nicodemus*, we distinguished *Hale v. Sharp Healthcare* (2014) 232 Cal.App.4th 50 (*Hale*)—a case relied on by ABM here—in which a class was decertified after nearly three years of litigation, discovery, and notice to potential class members.  (*Id.* at pp. 53–55; see *Nicodemus*, *supra*, 3 Cal.App.5th at pp. 1215–1216.)  *Hale* involved an allegation that a class of persons who self-paid for emergency room treatment were overcharged when compared to insured persons.  (*Hale*, at p. 53.)  In moving to decertify, the defendant argued that the class was not ascertainable because the defendant did not keep records in such a way "as to reasonably and readily identify those included in the class definition without individualized inquiries."  (*Id.* at p. 55.)  The trial court agreed with the defendant and the appellate court affirmed, opining with respect to ascertainability that "[i]t is the inability to reasonably distinguish those individuals [later determined to qualify for coverage] from individuals who were actually uninsured and then to identify any disparity in amounts paid that make it unreasonable to ascertain the defined class."  (*Ibid.*)  In *Nicodemus*, we distinguished *Hale*, both because of its "distinctive procedural posture" and because, under *Hale*'s facts, "it was indisputably demonstrated that there was simply no way to

avoid a complicated individualized inquiry to determine not just eligibility for damages but *to prove liability*." (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216, italics added.)

In contrast, we found *Bufil*, *supra*, 162 Cal.App.4th 1193, instructive.  In *Bufil*, which involved meal and rest break claims, "[t]he proposed class was defined as employees for whom the defendant's records showed a meal period not taken because the employee was the only person in the store or was the only person present except for a trainee." (*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216.)  "Although employees who missed a meal period could be identified from the defendant's records, employees who missed a rest period could not." (*Ibid.*)  However, Bufil submitted evidence that the defendant had a policy that hourly employees who were working alone or only with a trainee were not allowed to go off duty for any type of break, and argued that the records identifying class members who missed meal periods for the reasons specified thus also identified those who missed rest breaks. (*Bufil*, at pp. 1206, 1208.)  Under these circumstances, the appellate court reversed the trial court's denial of class certification, concluding that "the class was ascertainable from the defendant's records." (*Nicodemus*, at p. 1216.)  "In doing so, the court rejected the defendant's 'speculation' that an employee who missed a meal break nonetheless might have received a rest break, observing 'speculation that goes to the merits of ultimate recovery [was] an inappropriate focus for the ascertainability inquiry.' (*Ibid.*, citing *Medrazo*, *supra*, 166 Cal.App.4th at p. 101 [defendant's sales records offered an objective means of identifying potential class members, and plaintiff's inability at the class certification stage to identify precisely which buyers qualified as class members was "irrelevant"] and *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, 976 ["the need to individually examine each member's contract to ultimately determine whether he or she qualifies for inclusion in the class does not . . . demonstrate a lack of ascertainability or manageability"].)

Adopting this analysis in *Nicodemus*, we concluded that potential class members could be readily identified by reference to HealthPort's attorney request data set, and the "speculation" that the data set might be over-inclusive went "to the merits of each class member's recovery" and thus "was an inappropriate focus of the ascertainability inquiry."

(*Nicodemus*, *supra*, 3 Cal.App.5th at p. 1216.)  Our analysis of ascertainability in the present case mirrors our conclusions in *Nicodemus*.  Here, as established by Woolfson, the potential subclass members are all readily identifiable by reference to ABM's own employment and payroll records.

For instance, the subclass of ABM Workers who "suffered an automatic deduction of a half-hour although the employee actually worked through the deducted meal period" can be identified through ABM's timekeeping and payroll records showing numerous instances where a meal deduction was made for a shift without any corresponding time entry indicating that a meal period was taken.  The subclass of ABM Workers who were not paid premium meal period wages when they worked shifts of a particular length without a recorded meal period can similarly be ascertained through reference to the same records, reviewed to determine whether any required premium wages were paid where no meal period was recorded.  The Unpaid Split-Shift Premium Subclass— "ABM Workers who were scheduled or required in a workday to work two or more shifts separated by a period of time that was not a bona fide meal but were not paid an additional hour of wages for each split shift"—can be identified by examining ABM's timekeeping and payroll records to determine which employees worked two or more shifts in the same day separated by more than an hour, but were not paid premium wages related to the split shift(s).[12]  Finally, members of the Reimbursement Subclass—ABM Workers who were not reimbursed for expenses related to the use of their own vehicles for travel between jobsites—can be identified by searching ABM payroll records to determine which employees worked at multiple jobsites separated by a certain baseline number of miles during the same workday, but did not receive reimbursement for travel.[13]

---

[12] As discussed above, the DLSE has historically taken the position that a bona fide meal period is one that does not exceed one hour in length.  (See *ante* at p. 4 & fn. 1.)

[13] Woolfson opined below that the ABM databases contained location information for each worker's shift and that from this information, along with the addresses of the

In addition, the subclasses are all defined using objective characteristics and common transactional facts sufficient to allow a potential class member to identify himself or herself as having a right to recover pursuant to that subclass.  For example, the nonexempt ABM workers who would receive notice as part of the general class would all be aware whether they worked though meal periods, failed to receive reimbursement for their travel expenses between worksites, or otherwise fell within the articulated subclasses.  Under these circumstances, ABM's speculation that some potential class members identified in the data may ultimately not be entitled to relief—because, perhaps, they actually took an otherwise unrecorded meal, or were not entitled to a split shift premium on a particular day, or did not drive themselves between job sites—goes to the merits of each class member's recovery and, as such, was an inappropriate focus of the trial court's ascertainability inquiry.  (See *Sav-On*, *supra*, 34 Cal.4th at p. 338 [class can be certified based on partial commonality, meaning not every single member of the proposed class needs to be exposed to the wrongful practice nor does the practice have to be unlawful  or lawful as to every class member].)[14]

3.    *Predominance.*

Having determined that the plaintiffs have proposed ascertainable classes, we must next address the trial court's conclusion that class certification was inappropriate in this matter because individual inquiries predominate over common questions.  As mentioned above, "[t]he 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would

---

work locations, it would be possible to calculate the mileage each worker traveled each day.

[14] In this regard, we note additionally that "if necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable." (*Hicks*, *supra*, 89 Cal.App.4th at p. 916.)  Thus, as this action progresses, the trial court should be open to making modifications to the class definitions as necessary to avert developing certification problems or to otherwise enhance the efficiencies of the class certification model.

31

be advantageous to the judicial process and to the litigants.' [Citations.]  The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.]  A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible.  'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' "  (*Brinker*, *supra*, 53 Cal.4th at pp. 1021–1022, fn. omitted.)  Indeed, "at the class certification stage, as long as the plaintiff's posited theory of liability is amenable to resolution on a classwide basis, the court should certify the action for class treatment even if the plaintiff's theory is ultimately incorrect at its substantive level, because such an approach relieves the defendant of the jeopardy of serial class actions and, once the defendant demonstrates the posited theory is substantively flawed, the defendant 'obtain[s] the preclusive benefits of such victories against an entire class and not just a named plaintiff.' "  (*Hall v. Rite Aid Corp.* (2014)  226 Cal.App.4th 278, 293–294, italics omitted.)

    In short, when analyzing the element of predominance for purposes of class certification "the focus must be on the policy the plaintiffs are challenging and whether the legality of that policy can be resolved on a classwide basis." (*Lubin v. The Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 940.)  Thus, for example, in *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, the Court of Appeal affirmed the trial court's denial of class certification in a case alleging that the company required employees to purchase company clothing to wear to work but failed to reimburse such purchases. Because there were no clear companywide policies requiring employees to purchase company clothing as a condition of employment or describing what an employee was required to wear, the trial court determined there was no common method to prove the *fact of liability* on a classwide basis.  Rather, individualized inquiries would need to be made regarding, among other things, what employees were told by store managers about

32

wardrobe, how employees interpreted any such discussion, and what each store manager actually required employees to purchase.  (*Id.* at pp. 1356–1357.)

   In contrast, numerous other cases have held that individualized issues regarding *proof of the amount of damages* class members may recover does not defeat a class action so long as there are *common questions of liability* amenable to class resolution.  (See, e.g., *Faulkinbury*, *supra*, 216 Cal.App.4th 220, 232–240 [common issues of fact predominated for subclasses related to meal, rest, and overtime violations because liability could be determined classwide based on uniform policies, or lack thereof; individual issues, such as whether individuals took rest breaks, went to the issue of damages and did not preclude class certification]; *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 997 [a uniform policy denying compensation for preshift work presented predominantly common issues of fact and law because liability depended on the existence of the uniform policy, rather than individual damages determinations]; *Benton v. Telecom Network Specialists, Inc*. (2013) 220 Cal.App.4th 701, 726 [theory that defendant violated wage and hour requirements by failing to adopt meal and rest break policies is amenable to class treatment; whether employee was able to take required breaks goes to damages].)

   The common theme in these cases is that the plaintiff's theory of liability could be determined based on common uniform policies applicable to the class as a whole.  (See also *Department of Fish & Game v. Superior Court* (2011) 197 Cal.App.4th 1323, 1356 ["Class treatment is not barred where a single wrongful act has different effects on different claimants such that some may have claims while others may not.  ' "In such cases, the Courts will generally certify a class if the defendant's action can be found to be wrong in the abstract even if no individual person has been damaged.  [Citations.]  These situations are distinguishable from situations where the Court cannot determine the wrongfulness of an action without reference to individuals." ' "].)

   In line with this precedent, and of particular relevance to the case at hand, is the Second District's opinion in *Jaimez*, *supra*, 181 Cal.App.4th 1286.  In *Jaimez*—a case, like this one, involving claims of various wage and hour violations, including meal break

33

issues—the appellate court concluded that the "trial court misapplied the criteria [for determining whether a class should be certified], focusing on the potential conflicting issues of fact or law on an individual basis, rather than evaluating 'whether the *theory of recovery* advanced by the plaintiff is likely to prove amenable to class treatment.' " (*Id.* at p. 1294.) Since the plaintiff's theory of recovery focused on uniform policies and practices (such as the defendant's failure to compensate employees for missed meals, rest breaks, and earned overtime), it was "more amenable to class treatment than individual disposition." (*Id.* at p. 1300.) Indeed, in *Jaimez*, the defendant had a policy and practice of automatically deducting 30 minutes per shift for each employee's meal break regardless of whether that meal break was actually taken, and the appellate court expressly found that this policy raised common legal and factual issues. (*Id.* at pp. 1294, 1304.)

Further, in balancing these common issues against any individual inquiries necessary, the *Jaimez* court rejected the trial court's notion that common questions of fact and law did not predominate because the defendant had submitted declarations indicating that some employees did, in fact, get meal breaks, rest breaks, and proper pay stubs and thus there was a " 'strong indication that there could be conflicting testimony regarding whether these employees have common factual issues to be presented at trial.' " (*Jaimez*, *supra*, 181 Cal.App.4th at p. 1296.) Specifically, the appellate court declared that the trial court had improperly "focused on the *merits* of the declarations, evaluating the contradictions in the parties' responses to the company's uniform policies and practices, not the policies and practices themselves." (*Id.* at p. 1300.) Unfortunately, the trial court in this case fell prey to the same errors that infected the trial court's certification decision in *Jaimez*.

Specifically, instead of identifying the principal legal issues presented in this matter and determining whether those "operative legal principles, as applied to the facts of the case, render the claims susceptible of resolution on a common basis' " (*Alberts*, *supra*, 241 Cal.App.4th at p. 399), the trial court here improperly focused on the minutiae of each individual janitor's personal situation. This was a legal error and appears also to

34

have been the reason the trial court found Woolfson's evidence irrelevant to the class
certification inquiry.  However, when the merits of the ultimate damages issues are set
aside and Woolfson's analysis of ABM's payroll practices is considered, along with the
other evidence submitted by plaintiffs, it becomes clear that numerous common issues
predominate in this matter, rendering class certification appropriate.

      For instance, the legality of ABM's uniform payroll policy—which assumes each
employee works his or her scheduled shift and takes any legally required meal breaks
absent some type of exception report—is a legal question that can be determined by
reference to facts common to all class members.  Certainly, the evidence provided by
Woolfson that a mere 5,625 of the 1,836,083 time entries for ABM Workers he
investigated (0.3 percent) contained adjustments to pay calls into question the efficacy of
ABM's asserted "timesheet maintenance" procedure, as does the evidence presented by
plaintiffs that ABM does not generate exception reports for missed meals periods.
Moreover, the legality of ABM's auto-deduct policy for meal breaks in light of the
recordkeeping requirements for California employers is also an issue amenable to
classwide resolution.  (See Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).)  In addition,
ABM's apparent uniform practice of never providing premium pay to its employees,
either for split shifts or missed meal breaks, is susceptible to classwide treatment.
Moreover, ABM's defenses with respect to split shift premium pay—that voluntary split
shifts are not compensable and that class members are paid more than the threshold under
which premium pay is mandated—are also susceptible to common proof.  (See *Saechao
v. Landry's, Inc.* (N.D. Cal. Mar. 15, 2016, No. C 15-00815 WHA) 2016 U.S. Dist.
LEXIS 33409 at pp. *22–23; *Kamar v. Radio Shack Corp.* (C.D. Cal. 2008) 254 F.R.D.
387, 405; see *Aleman*, *supra*, 209 Cal.App.4th at pp. 574–575 [interpreting split shift
Wage Order as a legal matter].)  Finally, whether ABM fails to properly reimburse its
employees for work-related travel, despite its asserted policy to do so, is also subject to
common proof.  (See *Brewer v. General Nutrition Corp.* (N.D. Cal. Nov. 12, 2014,
No. 11-CV-3587 YGR) 2014 U.S. Dist. LEXIS 159380 at pp. *27–30 [predominance of
common questions on a travel reimbursement claim supported by evidence of

35

"exceedingly small percentage of employees who sought reimbursement"; evidence of mileage incurred could be determined on a class-wide basis where all relevant locations known].)  Under these circumstances, fear that the determination of individual damages might prove overly complex should not have provided a basis for denial of class certification.

Indeed, although we do not reach the issue, the trial court's concern regarding the need for numerous individualized damage inquiries in this case may turn out to be over-exaggerated, given existing precedent indicating that the burden of proof shifts to employers "in the wage and hour context when an employer's compensation records are so incomplete or inaccurate that an employee cannot prove his or her damages." (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1189; see *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" '[W]here the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee.  In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages.' "], overruled on another ground as stated in *York v. Starbucks Corp.* (C.D. Cal. Sept. 12, 2012, No. CV 08-07919 GAF (PJWx)) 2012 U.S. Dist. LEXIS 190086.)  Thus, for example, since employers have a duty to record their employees' meal periods, "[i]f an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." (*Brinker*, *supra*, 53 Cal.4th at p. 1053 [Werdegar, J., conc.]; see Cal. Code Regs., tit. 8, § 11050, subd. (7)(A)(3).) Under such circumstances, a court may award damages, even if they are only approximate and based on statistical sampling.  (*Bell v. Farmers Ins. Exchange*, *supra*, 115 Cal.App.4th at pp. 746–751.)

In summary, given that the classes proposed by plaintiffs in this case were ascertainable and plaintiffs' allegations presented predominantly common questions, the trial court's determinations to the contrary cannot stand.  Rather, we conclude that the trial court's denial of class certification—including its decision regarding the admissibility of the Woolfson materials—rested on improper criteria and erroneous legal

assumptions, amounting to an abuse of discretion.  Plaintiffs have made a showing sufficient to allow them to take the next step in attempting to prove the merits of their contentions on a classwide basis.[15]

### III.        DISPOSITION

The trial court's order denying class certification is reversed and the matter remanded for certification of classes as set forth in this opinion.  Plaintiffs are entitled to their costs on appeal.

---

[15] In making this determination, we are cognizant of the trial management concerns raised by counsel for ABM at oral argument in this case, issues which may make the ultimate resolution of all or parts of this matter on a classwide basis problematic.  However, as detailed above, our review following a denial of class certification is limited.  (See *Alberts*, *supra*, 241 Cal.App.4th at p. 399.)  Because the trial court's order was based on improper criteria and erroneous legal assumptions, we reverse.  Moreover, based on the record before us and as we have detailed at length above, it appears that plaintiffs have identified a number of common questions suitable for classwide resolution.  Should plaintiffs' trial plan subsequently prove unworkable, however, ABM may address any such issues to the trial court.

_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

Filed 1/10/18

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| ABM INDUSTRIES OVERTIME CASES | JCCP No. 4502 |
| | A132387, A133077 & A133695 |
| | (City & County of San Francisco Super. Ct. No. CJC-07-004502) |
| | ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION |
| | (NO CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed December 11, 2017, be modified as follows:

The citation to *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949 located on page 36 of the opinion shall be modified to delete the reference to subsequent history such that the case citation shall read in full:  "see also *Cicairos v. Summit Logistics, Inc.* (2005) 133 Cal.App.4th 949, 961 (*Cicairos*) [" 'Where the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee.  In such a situation, imprecise evidence by the employee can provide a sufficient basis for damages' "].)

There is no change in the judgment.

1

In addition, the opinion in the above matter was not certified for publication in the Official Reports when filed on December 11, 2017.  For good cause it now appears that the opinion, as modified herein, should be published in the Official Reports and it is so ordered.


Dated: _____        _____

RUVOLO, P. J.

Trial Court:                    City & County of San Francisco Superior Court

Trial Judge:                    Hon. Richard A. Kramer

Counsel for Appellants:         Weinberg, Roger & Rosenfeld, David A.
                                Rosenfeld, Christian L. Raisner, Emily P. Rich,
                                Roberta D. Perkins; Mallison & Martinez, Stan
                                S. Mallison, Marco A. Palau, Joseph D. Sutton;
                                Rastegar & Matern, Matthew J. Matern

Counsel for Respondents:        Littler Mendelson, Keith A. Jacoby, Dominic J.
                                Messiha, Lauren E. Robinson

# EXHIBIT H

# EXHIBIT I

**SUPERIOR COURT OF CALIFORNIA - COUNTY OF FRESNO**
**Civil Department - Non-Limited**

Entered by:

TITLE OF CASE:

**Jose M. Nevarez vs Foster Farms**

**LAW AND MOTION MINUTE ORDER**

Case Number:
**13CECG02624**

| | | |
|---|---|---|
| Hearing Date: | **July 16, 2018** | Hearing Type: **Motion - Certify Class Action/ Summary Judgment/ From Chambers** |
| Department: | **501** | Judge/Temp. Judge: **Snauffer, Mark** |
| Court Clerk: | **Whipple, Layla** | Reporter/Tape: **N/R** |

**Appearing Parties:**

Plaintiff:                                   Defendant:

Counsel:                                   Counsel:

[ ] Off Calendar

[ ] Continued to   [ ] Set for __ at __ Dept. __ for __

[ ] Submitted on points and authorities with/without argument.   [ ] Matter is argued and submitted.

[ ] Upon filing of points and authorities.

[ ] Motion is granted   [ ] in part and denied in part.   [ ] Motion is denied [ ] with/without prejudice.

**[X] Taken out from under advisement.**

[ ] Demurrer   [ ] overruled [ ] sustained with __ days to [ ] answer [ ] amend

[ ] Tentative ruling becomes the order of the court. No further order is necessary.

[ ] Pursuant to CRC 3.1312(a) and CCP section 1019.5(a), no further order is necessary. The minute order adopting the tentative ruling serves as the order of the court.

[ ] Service by the clerk will constitute notice of the order.

**[X] See attached copy of the Orders.**

[ ] Judgment debtor __ sworn and examined.

[ ] Judgment debtor __ failed to appear.
    Bench warrant issued in the amount of $ __

JUDGMENT:
[ ] Money damages   [ ] Default   [ ] Other __ entered in the amount of:
    Principal $__   Interest $__   Costs $__   Attorney fees $__   Total $ __
[ ] Claim of exemption [ ] granted [ ] denied. Court orders withholdings modified to $__ per __

FURTHER, COURT ORDERS:
[ ] Monies held by levying officer to be   [ ] released to judgment creditor. [ ] returned to judgment debtor.
[ ] $__ to be released to judgment creditor and balance returned to judgment debtor.
[ ] Levying Officer, County of __, notified.   [ ] Writ to issue
[ ] Notice to be filed within 15 days.   [ ] Restitution of Premises
[ ] Other: __

CV-14b R03-18
Mandatory Form

**LAW AND MOTION MINUTE ORDER**

```
FILED

JUL 1 6 2018

FRESNO COUNTY SUPERIOR COURT
By_____
                              DEPT. 501
```

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

CENTRAL DIVISION

| | | |
|---|---|---|
| JOSE M. NEVAREZ, | ) | No. 13CECG02624   Dept. 501 |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDERS |
| v. | ) | |
| | ) | |
| FOSTER FARMS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

The motion of Defendant FOSTER FARMS, LLC, for summary adjudication of the first and second causes of action of the Second Amended Complaint, and the motion for class certification of Plaintiff JOSE M. NEVAREZ, came on for hearing on June 15, 2018, in Department 501, the Honorable Mark W. Snauffer, Judge, presiding.  Following oral argument, the matters were taken under advisement.

The court has considered the papers filed by both parties herein, the arguments of counsel at the hearing, and the pleadings on file herein, and rules as follows:

(1)  The court denies the Defendant's motion for summary adjudication.

SUPERIOR COURT
County of Fresno

1     (2)  The court grants the Plaintiff's motion for class

2  certification.

3  <u>BACKGROUND</u>

4     Plaintiff Jose Nevarez filed this action on behalf of himself

5  and a class of individuals who manage chicken farms for their

6  employer Foster Farms.  Plaintiff asserts causes of action for

7  failure to pay minimum wage and overtime wages, as well as meal

8  and rest period violations under the Labor Code.  During their

9  breaks, and during their off-hours after work five days per week,

10  plaintiff and the class members were required to keep with them a

11  cell phone or pager so that they could be contacted and respond to

12  alarm calls alerting them to problems potentially affecting the

13  health of the chickens.  Plaintiff and the putative class members

14  were not paid for this on-call time or break time.

15     Defendant Foster Farms now moves for summary adjudication of

16  the first two causes of action for failure to pay minimum wage and

17  overtime wages, and Plaintiff Nevarez moves for class

18  certification.

19  <u>MOTION FOR SUMMARY ADJUDICATION</u>

20     Foster Farms moves for summary adjudication of Plaintiff's

21  causes of action for (1) failure to pay minimum wages in violation

22  of Labor Code §§ 1182.12, 1194, 1194.2, 1197, 1197.1, 1198 and

23  1199; and (2) failure to pay overtime compensation in violation of

24  Labor Code §§ 510, 1194, 1197, 1197.1,1198, 1199.

25     The motion must be denied because the motion does not clearly

26  dispose of all components of the claims making up the two causes

27  of action.

28  ///

SUPERIOR COURT
County of Fresno

13CECG02624 (2)-MWS (002)

-2-

1    "The function of the pleadings in a motion for summary

2    judgment is to delimit the scope of the issues; the function of

3    the affidavits or declarations is to disclose whether there is any

4    triable issue of fact within the issues delimited by the

5    pleadings." (*Orange Cnty. Air Pollution Control Dist. v. Superior*

6    *Court* (1972) 27 Cal.App.3d 109, 113.)  "The purpose of the motion

7    for summary judgment is to determine whether issues presented by

8    the pleadings actually are triable issues." (*Craig v. Earl* (1961)

9    194 Cal.App.2d 652, 655.)  Evidence in connection with a summary

10   judgment motion "must be directed to the issues raised in the

11   pleadings." (*Id.*)  The burden of a defendant moving for summary

12   adjudication only requires that he or she negate the plaintiff's

13   theories of liability as alleged in the complaint; that is, a

14   moving party need not refute liability on some theoretical

15   possibility not included in the pleadings.  (*Hutton v. Fidelity*

16   *National Tile Co.* (2013) 213 Cal.App.4th 486, 493.)

17        Summary adjudication must *completely dispose* of the cause of

18   action, defense, damages claim or duty issue to which it is

19   directed.  (Code Civ. Proc. § 437c(f)(1).)

20        In this case, the motion does not dispose of the components

21   of the causes of action that plaintiff was not paid for all Alarm

22   Response Time ("ART").

23        The Second Amended Complaint ("SAC") alleges that "Defendants

24   have paid Plaintiff and the CLASS for some, but not all, of the

25   on-call time spent responding to alarms and calls and employed

26   relief workers during some, but not all, of the on-call time.

27   (SAC ¶ 18.)  In the first cause of action for failure to pay

28   minimum wage compensation, the SAC alleges that the unpaid hours

SUPERIOR COURT
County of Fresno    13CECG02624 (2)-MWS (002)

-3-

1  worked by plaintiff and the class included time responding to

2  alarms and calls during on-call time, and other time spent

3  performing duties for defendants during on-call time.  (SAC ¶ 39.)

4  All allegations from the preceding paragraphs are re-alleged and

5  incorporated into the second cause of action.  (SAC ¶ 46.)

6       Accordingly, even if Foster Farms is correct that the off-

7  duty on-call time is not compensable, summary adjudication cannot

8  be granted unless there is no triable issue of fact as to whether

9  plaintiff was compensated for all ART.

10      To prevail, defendant has the burden of proving that there is

11  a complete defense or that plaintiff cannot establish one or more

12  elements of each of his causes of action.  (*Barber v. Marina*

13  *Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562.)  To show that

14  plaintiff cannot establish his claims, defendant may either (1)

15  affirmatively negate one or more elements of each claim, or (2) by

16  relying on plaintiff's inadequate discovery responses, show that

17  plaintiff does not possess and cannot reasonably obtain needed

18  evidence.  (*Aguilar v. Atlantic Richfield* (2001) 25 Cal.4th 826,

19  855.)

20      The ultimate burden of persuasion rests on defendant, as the

21  moving party.  The initial burden of production is on defendant to

22  show, by a preponderance of the evidence, that it is more likely

23  than not that a given element cannot be established, or that a

24  given defense can be established. (*Id.* at 850.)

25      If defendant carries this initial burden of production, the

26  burden of production shifts to plaintiff to show that a triable

27  issue of material fact exists.  Plaintiff does this if he can

28  show, by a preponderance of the evidence, that it is more likely

SUPERIOR COURT
County of Fresno

13CECG02624 (2)-MWS (002)

-4-

1  than not that a given element can be established or that a given

2  defense cannot be established.  (*Id.* at 850, 852.) In determining

3  whether any triable issues of material fact exist, the court must

4  strictly construe the moving papers and liberally construe the

5  declarations of the party opposing summary judgment.  Any doubts

6  as to whether a triable issue of material fact exist are to be

7  resolved in favor of the party opposing summary judgment.  (*Barber*

8  *v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562.)

9      The critical facts are UMF 91 and 92.  Defendant posits in

10  UMF 91 that plaintiff testified that he reported all hours worked

11  from 2009 to the present, except for the time he claims he was "on

12  call" while carrying the cell phone.  However, that is not exactly

13  what the testimony cited establishes.  It establishes that

14  defendant had a policy requiring honesty and forbidding falsifying

15  time cards, and plaintiff testified that he never falsified a time

16  card. (Nevarez Depo. 24:6-26:15, 94:20-99:22.)  In the other

17  testimony cited, plaintiff was asked, "Was it true from 2009 to

18  the present that you always would report the hours that you worked

19  but not the hours that you were on call?"  Plaintiff answered,

20  "Correct. Yes, 14 hours are missing that I'm on call."  (Nevarez

21  Depo. 226:16-20.)  Since the evidence establishes that plaintiff

22  worked 10 hour days, this testimony establishes nothing more than

23  that plaintiff accurately reported working those 10 hour shifts.

24  Plaintiff did not clearly state that he reported all ART since

25  2009, nor does the evidence show that plaintiff was paid for all

26  ART reported by plaintiff.

27      Additionally, defendant posits in UMF 92 that plaintiff

28  testified that he formed an impression in the past that after his

SUPERIOR COURT
County of Fresno

13CECG02624 (2)-MWS (002)

-5-

1   10-hour workday he was "on call" the remaining 14 hours in the

2   day, he shouldn't report work time over 10 hours, and there was a

3   period of time he did not report his alarm time (until he was

4   caught doing this and told to record the time). (UMF 92.)

5        In the deposition testimony cited in support of UMF 92,

6   plaintiff testified that he was specifically told by two

7   supervisors that there is no overtime after 10 hours.  (Nevarez

8   Depo. 120-123.)  Even if UMF 92 as drafted is accurate, it appears

9   to admit that plaintiff did not report all his ART until he was

10  directed to do so in 2013.  Thus, there is still a 3-4 year window

11  in which the ART was not reported.

12       Foster Farms has not met its threshold burden on this issue.

13  Even if Foster Farms had met its burden, plaintiff submits

14  sufficient evidence to raise a triable issue of fact.  The

15  evidence cited by plaintiff shows that there is at least a triable

16  issue of fact regarding whether plaintiff was paid for *all* ART

17  during the relevant period, since August 22, 2009.  (See E. Garcia

18  Depo. 119:11-121:1, 121:4-123:12, 124:14-127:21; Cortez Depo.

19  44:12-17, 58:7-11.)  There is evidence that plaintiff responded to

20  alarms and did not record that time on his time cards. (Nevarez

21  Depo. 139:13-140:4, 297:6-8.)  There is evidence of specific

22  instances in which plaintiff was not paid for unrecorded ART.

23  (See Garcia Depo 119:9-121:1 and Exh. 5, 121:4-15, 122:10-18,

24  123:1-12 and Exh. 6.)  While there may be issues with seeking

25  recovery of time worked that was not reported on the time card,

26  that is not an issue addressed in the papers.  Since Foster Farms

27  only posited that plaintiff was paid for all ART, and there is

28  evidence that he was not, the motion cannot be granted.

1    Foster Farms contends that the court can summarily adjudicate

2  this discrete component of the causes of action, because failure

3  to pay for item worked is a different primary right than failure

4  to pay for on-call time, and each separate primary right gives

5  rise to a separate cause of action.  (See *Lilienthal & Fowler v.*

6  *Superior Court* (1993) 12 Cal.App.4th 1848, 1854-55.)  However, the

7  court finds that there is just one primary right involved here.

8  Plaintiff's basic contention is that the on-call time constitutes

9  hours worked due to the degree of control exercised by Foster

10  Farms over him during that time.  Time worked is time worked.  It

11  is all the same primary right; otherwise every day, hour or minute

12  of time worked could constitute a separate cause of action subject

13  to summary adjudication.

14    In light of the limited basis for the denial of the motion

15  for summary adjudication, it is unnecessary to rule on the

16  parties' evidentiary objections.  (See Code Civ. Proc. § 437c(q).)

17                    <u>MOTION FOR CLASS CERTIFICATION</u>

18    Code of Civil Procedure section 382 permits class actions

19  "when the question is one of a common or general interest, of many

20  persons, or when the parties are numerous, and it is impracticable

21  to bring them all before the court …"

22    To obtain certification, a party must establish the
   existence of both an ascertainable class and a well-
23  defined community of interest among the class members.
   [citations.]   The community of interest requirement
24  involves three factors: "(1) predominant common
   questions of law or fact; (2) class representatives with
25  claims or defenses typical of the class; and (3) class
   representatives who can adequately represent the class."
26  [citation.]   Other relevant considerations include the
   probability that each class member will come forward
27  ultimately to prove his or her separate claim to a
   portion of the total recovery and whether the class
28  approach would actually serve to deter and redress

SUPERIOR COURT
County of Fresno

13CECG02624 (2)-MWS (002)

-7-

Ex. B, p. 147

1    alleged wrongdoing.   [citation.]

2  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.)

3    The party seeking certification of the class has the burden

4  of establishing the required elements.   (*Quacchia v.*

5  *DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1449.)

6  *I.    Ascertainable Class*

7    Ascertainability is required in order to give notice to

8  putative class members as to whom the judgment in the action will

9  be res judicata.   (*Bell v. Superior Court* (2007) 158 Cal.App.4th

10  147, 166.)   "Whether a class is ascertainable is determined by

11  examining (1) the class definition, (2) the size of the class, and

12  (3) the means available for identifying class members."   (*Reyes v.*

13  *Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1271.)

14    Ascertainability can best be achieved "by defining the class

15  in terms of objective characteristics and common transactional

16  facts," rather than defining it in such a way that proposed class

17  members must establish the merits of their case in order to be

18  considered part of the class.   (*Hicks v. Kaufman & Broad Home*

19  *Corp.* (2001) 89 Cal.App.4th 908, 914-915.) Class certification can

20  be denied for an unascertainable class when the proposed

21  definition is overbroad and the plaintiff offers no means by which

22  only those class members who have claims can be identified from

23  those who should not be included in the class.   (*Bell*, *supra*, 158

24  Cal.App.4th at p. 166.)

25    The SAC defines the class as "Plaintiff and all other current

26  and former Chicken Ranch Managers who are or were employed by

27  FOSTER FARMS in California and who reside or resided on FOSTER

28  FARMS premises as a condition of employment during the period from

1  August 22, 2009 to the present ('Class Period')." There is no

2  dispute as to the adequacy of the class definition.

3      Both parties agree there are over 150 current and former

4  managers, who can be readily identified from the Foster Farms

5  records.    There is no dispute as to the ascertainability of the

6  class, nor that it is sufficiently numerous to warrant class

7  treatment.

8  II.   *Community of Interest*

9      A.   *Predominate Common Questions of Law or Fact*

10     The plaintiffs' "burden on moving for class certification …

11 is not merely to show that some common issues exist, but, rather,

12 to place substantial evidence in the record that common issues

13 predominate." (*Lockheed Martin Corp. v. Superior Court*, *supra*, 29

14 Cal.4th 1096, 1108.)  Whether such substantial evidence exists

15 involves analysis of whether the proponent's "theory of recovery"

16 is likely to prove compatible with class treatment. (*Sav-On Drug*

17 *Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327.)  "A

18 trial court ruling on a certification motion determines 'whether …

19 the issues which may be jointly tried, when compared with those

20 requiring separate adjudication, are so numerous or substantial

21 that the maintenance of a class action would be advantageous to

22 the judicial process and to the litigants.' "  (*Id.* at p. 326.)

23 "In examining whether common issues of law or fact predominate,

24 the court must consider the plaintiff's legal theory of liability.

25 [Citation.] The affirmative defenses of the defendant must also be

26 considered, because a defendant may defeat class certification by

27 showing that an affirmative defense would raise issues specific to

28 each potential class member and that the issues presented by that

1 defense predominate over common issues." (*Walsh v. IKON Office*
2 *Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450.) "It is well
3 established that the necessity for an individual determination of
4 damages does not weigh against class certification. The community
5 of interest requirement recognizes that 'ultimately each class
6 member will be required in some manner to establish his individual
7 damages … .' " (*Bell v. Farmers Ins. Exchange*, supra, 115
8 Cal.App.4th at p. 742.)

9     In certifying a class action, the court must also conclude
10 that litigation of individual issues, including those arising from
11 affirmative defenses, can be managed fairly and efficiently.
12 (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906,
13 922-923.)

14     "Plaintiffs seeking class certification may demonstrate
15 common questions suitable for class treatment by showing defendant
16 has a uniform policy or practice affecting the putative class
17 members that results in violation of the law. Plaintiffs may not
18 simply allege such a policy or uniform practice, however. They
19 must present substantial evidence proving both the existence of
20 the defendant's uniform policy or uniform practice and the alleged
21 illegal effects of that policy or uniform practice could be
22 accomplished efficiently and manageably within a class setting."
23 (*Cruz v. Sun World Int'l, LLC* (2016) 243 Cal.App.4th 367, 384.)

24     "[E]vidence of a uniform policy or practice, not just an
25 allegation, is necessary in order to certify the class." (*Cruz v.*
26 *Sun World International, LLC* (2015) 243 Cal.App.4th 367, 388.)
27 *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004
28 held that where there was common proof of a company policy or

1   practice, a class action could proceed.  It did not matter whether

2   that policy was legal or unlawful; the merits are not important at

3   the certification stage.  (*Id.* at p. 1034; see also *Linder v.*

4   *Thrifty Oil Co.* (2000) 23 Cal.4th 429, 443.)

5        In the opinion of the court, plaintiff has submitted

6   substantial evidence of a uniform policy or practice affecting the

7   putative class members.

8        Foster Farms focuses heavily on the merits of the class

9   claims and application of *Mendiola v. CPS Security Solutions, Inc.*

10  (2015) 60 Cal.4th 833.  But the merits really are not the focus at

11  this stage.  Rather, "when analyzing the element of predominance

12  for purposes of class certification 'the focus must be on the

13  policy the plaintiffs are challenging and whether the legality of

14  that policy can be resolved on a Classwide basis." (*Lubin v. The*

15  *Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 940.)

16       Plaintiff provides substantial evidence that Foster Farms'

17  unpaid "on-call" time policy was commonly applied to all managers.

18  Foster Farms Human Resources and Payroll functions are centrally

19  operated. (AOE 362) Foster Farms uses the same time sheet form for

20  all Managers. (AOE 472-473, 479-480-old form, 486, 490 new form,

21  Caraway-Howard Dec. ¶ 1.) Foster Farms only pays its Managers for

22  10 hours of work a day (plus reported ART). (AOE 362.)  Managers

23  are not paid for on-call time while in possession of the pager or

24  phone. (AOE 362-363.) Plaintiff puts forth evidence that Foster

25  Farms does not even pay for all of the actual alarm response time

26  during on-call hours. (AOE 221-229, 236-246, 362-363.)

27       Additionally, there is substantial evidence that Foster Farms

28  has a policy requiring managers to keep the communication devices

SUPERIOR COURT
County of Fresno    13CECG02624 (2)-MWS (002)

-11-

Ex. B, p. 151

1  with them through their meal and rest periods.  Wage Order No. 14-

2  2001(11) requires Foster Farms to provide the managers with off-

3  duty rest periods in which any control over the employee is

4  relinquished.  And Wage Order No. 4(12)(A) requires provision of

5  off-duty meal periods.  (*Augustus v. ABM Security Services. Inc.*

6  (2016) 2 Cal.5th 257, 260, 273.)

7      As pointed out in the reply, Foster Farms uniformly does not

8  pay managers for their on-call time (time in possession of the

9  phone or pager making themselves available after work hours to

10 respond to alarms), nor their meal and rest breaks while in

11 possession of the device.  Managers are not free to ignore alarms,

12 and must attend to them, even if they sound during a break or meal

13 period. (AOE 255, 336.)  Managers are required to carry the

14 communication devices with them 24 hours a day, including meal and

15 rest breaks, when they are scheduled to work. They are required to

16 respond if they sound.   (AOE 335-336.)  There is substantial

17 evidence of common practices and policies pertaining to the

18 *Mendiola* factors, including how close to the ranch manager must

19 remain during on-call time, promptness of the response to alarms,

20 ease of trading on-call responsibilities, restrictions on personal

21 activities and use of the dwellings.  While there naturally is

22 some variation ranch to ranch regarding these factors, the

23 practice is sufficiently common to be resolved on a class-wide

24 basis.  The variation does not appear significant enough to

25 conclude that there are not common facts and questions suitable

26 for class treatment.

27      The SAC also includes allegations of wage statement

28 violations under Lab. Code § 226(a).  There is no opposition as to

1    the commonality of this claim. Any violations would be common

2    among all class members because the pay stubs would not show on-

3    call hours or on-duty meal and rest periods.

4        B.    *Representatives with Claims and Defenses Typical of the*

5    *Class*

6        Under the third prong of the community of interest

7    requirement, the class representative must be able to represent

8    the class adequately. (*Caro v. Procter & Gamble* (1993) 18

9    Cal.App.4th 644, 669.) "[I]t has never been the law in California

10   that the class representative must have identical interests with

11   the class members . . . The focus of the typicality requirement

12   entails inquiry as to whether the plaintiff's individual

13   circumstances are markedly different or whether the legal theory

14   upon which the claims are based differ from that upon which the

15   claims of the other class members will be based." (*Classen v.*

16   *Weller* (1983) 145 Cal.App.3d 27, 46.)

17       Foster Farms has not made any allegation of "unique defenses"

18   or any form of "distraction". Plaintiff states that he has never

19   been compensated for his on-duty meal and rest periods, and his

20   wage statements do not account for the on-call hours. His

21   responsibility to respond to alarms would be similar to that of

22   any other class member. The typicality requirement is satisfied.

23       The class representative must be able to represent the class

24   adequately. (*Caro v. Procter & Gamble* (1993) 18 Cal.App.4th 644,

25   669.) "[I]t has never been the law in California that the class

26   representative must have identical interests with the class

27   members . . . The focus of the typicality requirement entails

28   inquiry as to whether the plaintiff's individual circumstances are

SUPERIOR COURT
County of Fresno    13CECG02624 (2)-MWS (002)

-13-

1   markedly different or whether the legal theory upon which the

2   claims are based differ from that upon which the claims of the

3   other class members will be based." (*Classen, supra.*)

4       There is no indication of any adverse interest or conflict

5   between plaintiff and the other managers.  The court finds

6   plaintiff's counsel to be sufficiently experienced to serve as

7   counsel in a wage and hour class action.  (See Caraway-Howard Dec.

8   ¶ 14; Horwitz Dec. ¶ 14.)

9   *III. Objections*

10       Finally, the court notes the following rulings on objections.

11       Plaintiff's objection to Foster Farms' 85-page "Summary of

12   Class Certification Evidence" is overruled.

13       Plaintiff's objections to the declarations submitted in

14   support of the opposition are overruled.  The objections are not

15   narrowly tailored to only the statements later disavowed in the

16   declarants' depositions.

17       Plaintiff's objections to the declaration of Robert Crandall

18   are overruled, though the court notes that it gave the declaration

19   little weight as it goes more to the merits of the claims

20   (application of the *Mendiola* factors), which is not the primary

21   inquiry in the context of a motion for class certification.

22       The court sustains Foster Farms' objection numbers 2-4, 6-8,

23   12, 18, and overrules the remainder, including those directed at

24   the reply evidence.

25       Dated this 16th day of July, 2018.

26

27                              MARK W. SNAUFFER

28                        JUDGE OF THE SUPERIOR COURT

| SUPERIOR COURT OF CALIFORNIA - COUNTY OF FRESNO<br>Civil Department, Central Division<br>1130 "O" Street<br>Fresno, California  93724-0002<br>(559) 457-2000 | *FOR COURT USE ONLY* |
|---|---|
| TITLE OF CASE:<br> Jose M. Nevarez vs Foster Farms | |
| **CLERK'S CERTIFICATE OF MAILING** | CASE NUMBER:<br>13CECG02624 |

I certify that I am not a party to this cause and that a true copy of the:

**[Minute Order/ Orders]**

was placed in a sealed envelope and placed for collection and mailing on the date and at the place shown below following our ordinary business practice.   I am readily familiar with this court's practice for collecting and processing correspondence for mailing.   On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service with postage fully prepaid.

Place of mailing: **Fresno, California  93724-0002**

On Date: **07/16/2018**                    Clerk, by _____, Deputy

L. Whipple

| Sophia S Kwan<br>Seyfarth Shaw LLP<br>400 Capitol Mall<br>Suite 2350<br>Sacramento, CA 95814-4428 | Cathe L. Caraway-Howard<br>8117 West Manchester Avenue<br>Suite 505<br>Law Offices of   Cathe L. Caraway-Howard<br>Playa Del Rey, CA 90293 |
|---|---|

| Martin Leon Horwitz<br>9430 W Olympic BLVD<br>STE 400<br>Beverly Hills, CA 90212 | |
|---|---|

☐  Clerk's Certificate of Mailing Additional Address Page Attached

TGN-06b R08-06                    **CLERK'S CERTIFICATE OF MAILING**

# EXHIBIT J1

```
File:   9/3/2019, 12:12:10PM
```

```
Private Sub b_sequence_Click()

'; ===================================================
';  File name and file mask;
'; ===================================================

    Dim Filemask As String          '; Mask of the file.
    Dim Filepath As String          '; The filepath
    Dim FullFile As String          '; Filename
    Dim Filename As String          '; Filename
    Dim PrevFile As String          '; The Previous File
    Dim DoneFile As String          '; DoneFile
    Dim FileTest As String          '; For tesxting validity of the file.
    Dim FileList As String          '; Name of the file containing list.

    Dim AB As String                '; For text input
    Dim Text As String              '; For text input
    Dim Aaron() As String           '; uBound type String Array

    Dim Counter As Long             '; Counter
    Dim WorkCounter As Long '; Which row we are looking


'; ===================================================
';  Report Lines.
'; ===================================================

    Dim MaxRows As Integer
    Dim workdata() As String
    Dim Items As Integer

    Dim FileLength As Long
    Dim fNum As Integer
    Dim aByte As Byte


'; ===================================================
';  Set the file name and the folder...
'; ===================================================

';      filePath = t_folder.Text
';      Filename = t_filename.Text
';      fullFile = (filePath & Filename)

';      FileTest = Dir(fullFile)

';      If FileTest = "" Then Message "No such file " & fullFile & ".", 9
';      If FileTest = "" Then Exit Sub

    Filename = "c:\temp\timeclock.txt"

'; ===================================================
';  Establish start-of-data locations;
'; ===================================================

    Dim reference As String
```

Page: 1

Ex. B, p. 157

File:    9/3/2019, 12:12:10PM

```
    Dim prevRef As String              '; prevRef

    Dim tractorId As String
    Dim prevTractorId As String

    Dim jobRole As String
    Dim prevRole As String

    Dim workdate As String
    Dim Start As String
    Dim Finish As String
    Dim prevStart As String
    Dim prevFinish As String

    Dim sequence As Integer
    Dim isNew As Boolean
'; ================================================
';  Grab the fields from the file.
'; ================================================

   Counter = 0
   '; GoTo processHere:

    Open Filename For Output As #1

    SQL "select newId, driverId, tractorId, startTime, descript from allDrivers
order by driverId, startTime, record_ID"
    GoSQL

    Counter = 0
    Do While SqlResults And Not DoEvents()
         DoEvents


         Counter = Counter + 1
         If (Counter Mod 5000) = 0 Then L_Info(0).Caption = CStr(Counter)

         Print #1, G(1) & Chr(9) & G(2) & Chr(9) & G(3) & Chr(9) & G(4) & Chr(9)
& G(5)
         Call MoveNext:


    Loop


     Close #1

L_Info(0).Caption = CStr(Counter)

processHere:

    SQL "update allDrivers set sequence = null, crossRef = null"
    SQL "where sequence is not null"
    GoSQL

     SQL "select count(*) from allDrivers"
```

File:    9/3/2019, 12:12:10PM

```
        GoSQL

        Do While SqlResults And Not DoEvents()
            L_Info(0).Caption = G(1)
            Call MoveNext
        Loop

        Counter = 0
        Open Filename For Input As #1


        Do While Not EOF(1) And Not DoEvents()

            Counter = Counter + 1
            If (Counter Mod 250) = 0 Then L_Info(1).Caption = CStr(Counter)


            Line Input #1, AB$
            Aaron = Split(AB$, Chr(9))


            prevJobRole = jobRole
            prevRef = reference
            prevStart = Start


            newId = Aaron(0)
            reference = Aaron(1)
            tractorId = Aaron(2)
            Start = Aaron(3)
            jobRole = Aaron(4)
';         workdate = Format(Start, "mm/dd/yyyy")


            isNew = False
            If prevRef = "" Then prevRef = reference: isNew = True
            If prevStart = "" Then prevStart = Start: isNew = True
            If prevTractorId = "" Then prevTractorId = tractorId: isNew = True
            If prevJobRole = "" Then prevJobRole = jobRole: isNew = True
            '; what makes a new sequence

            '; must not be sleeper, and must
            If prevJobRole = "offduty" And DateDiff("n", prevStart, Start) > 240
Then
                isNew = True
            End If

            '; must not be sleeper, and must
            If DateDiff("n", Format(prevStart, "mm/dd/yyyy"), Format(Start,
"mm/dd/yyyy")) > 240 Then
                isNew = True
            End If

            '; must not be sleeper, and must
            If prevJobRole = "sleeper" And DateDiff("n", prevStart, Start) < 10
Then
```

File:    9/3/2019, 12:12:10PM

```
                isNew = False
        End If

        If Format(Start, "HH:MM:SS") = "00:00:00" Then
                If DateDiff("n", prevStart, Start) < 600 Then
                    isNew = False
                End If
        End If

        If Format(Start, "HH:MM:SS") = "00:00:00" And Format(prevStart,
"HH:MM:SS") = "00:00:00" Then
';          Stop
        End If

    '; If there is a new driver - then of course it's new.
        If prevRef <> reference Then isNew = True

        ';
===============================================================================
=
    '; If this is new.....
    '; If there is a new driver - then of course it's new.
        ';
===============================================================================
=

        If isNew Then
                If Format(prevStart, "mm/dd/yyyy") = Format(Start, "mm/dd/yyyy")
Then
                        sequence = 0: workdate = Format(Start, "MM/DD/YYYY")
                        crossref = workdate & "*|" & reference & ""
                Else
                        sequence = 0: workdate = Format(Start, "MM/DD/YYYY")
                        crossref = workdate & "|" & reference & ""
                End If
        End If

        sequence = sequence + 1

        SQL "update allDrivers set workdate = '" & workdate & "', "
        SQL "sequence = " & CStr(sequence) & ", crossref = '" & crossref & "'"
        SQL "where newId = '" & newId & "'"
        GoSQL


    Loop
    Close #1
    Close #2        '; earnings
    Close #3        '; payroll
    Close #4        '; hours


'; ================================================
';  Update data where there is unclear data...
'; ================================================
```

File:   9/3/2019, 12:12:10PM
_____

```
';    Call Folder(filePath & "done\", True)
';    Name fullFile As (filePath & "done\" & Filename)       '; rename the file
    Files.Refresh




End Sub




Private Sub b_sleeper_Click()

'; =================================================
';  File name and file mask;
'; =================================================

    Dim Filemask As String          '; Mask of the file.
    Dim Filepath As String          '; The filepath
    Dim FullFile As String          '; Filename
    Dim Filename As String          '; Filename
    Dim PrevFile As String          '; The Previous File
    Dim DoneFile As String          '; DoneFile
    Dim FileTest As String          '; For tesxting validity of the file.
    Dim FileList As String          '; Name of the file containing list.

    Dim AB As String                '; For text input
    Dim Text As String              '; For text input
    Dim Aaron() As String           '; uBound type String Array

    Dim Counter As Long             '; Counter
    Dim WorkCounter As Long '; Which row we are looking


'; =================================================
';  Report Lines.
'; =================================================

    Dim MaxRows As Integer
    Dim workdata() As String
    Dim Items As Integer

    Dim FileLength As Long
    Dim fNum As Integer
    Dim aByte As Byte


'; =================================================
';  Set the file name and the folder...
'; =================================================

';    filePath = t_folder.Text
```

_____

File:   9/3/2019, 12:12:10PM

```
';    Filename = t_filename.Text
';    fullFile = (filePath & Filename)

';    FileTest = Dir(fullFile)

';    If FileTest = "" Then Message "No such file " & fullFile & ".", 9
';    If FileTest = "" Then Exit Sub

    Filename = "c:\temp\timeclock.txt"

'; =================================================
';  Establish start-of-data locations;
'; =================================================


    Dim reference As String
    Dim prevRef As String              '; prevRef

    Dim tractorId As String
    Dim prevTractorId As String

    Dim prevJobRole As String
    Dim jobRole As String
    Dim prevRole As String

    Dim prevWorkdate As String
    Dim workdate As String
    Dim Start As String
    Dim Finish As String
    Dim prevStart As String
    Dim prevFinish As String

    Dim sleepcount As Double
    Dim sleepcount2 As Double
    Dim sequence As Integer
    Dim isNew As Boolean
'; =================================================
';  Grab the fields from the file.
'; =================================================

    Counter = 0
    GoTo processHere:

     Open Filename For Output As #1

     SQL "select newId, driverId, tractorId, startTime, descript from allDrivers
"
     SQL "/* where isSleeper is not null */"
     SQL "/* and driverId = 'al88d' and startTime > '2/7/2018' */ "
     SQL "order by driverId, startTime, record_ID"
     GoSQL

     Counter = 0
     Do While SqlResults And Not DoEvents()
          DoEvents
```

File:    9/3/2019, 12:12:10PM
_____

```
        Counter = Counter + 1
        If (Counter Mod 5000) = 0 Then L_Info(0).Caption = CStr(Counter)

        Print #1, G(1) & Chr(9) & G(2) & Chr(9) & G(3) & Chr(9) & G(4) & Chr(9)
& G(5)
        Call MoveNext:


    Loop


     Close #1

L_Info(0).Caption = CStr(Counter)

processHere:

    SQL "update allDrivers "
    SQL "set sequence = null, crossRef = null, sleepcount = null, workdate =
null, sequence2 = null, isSleeper = null "
    SQL "where sleepCount is not null"
    GoSQL

';   SQL "update drivers "
';   SQL "set isSleeper = 'YES' where isSleeper is not null"
';   GoSQL

';    L_Info(0).Caption = CStr(36584)

    Counter = 0
    sequence = 0
    sleepcount = 0

    Open Filename For Input As #1

    Do While Not EOF(1) And Not DoEvents()

        Line Input #1, AB$
        Aaron = Split(AB$, Chr(9))

    ';   newId, driverId, tractorId, startTime, isSleeper

        prevJobRole = LCase(jobRole)
        prevRef = reference
        prevStart = Start

        newId = Aaron(0)
        reference = Aaron(1)
        tractorId = Aaron(2)
        Start = Aaron(3)
        jobRole = LCase(Aaron(4))

        '; This is all good here.
        If workdate = "" Then workdate = Format(Start, "mm/dd/yyyy")
        If prevWorkdate = "" Then prevWorkdate = workdate:
```

_____

Ex. B, p. 163

File:    9/3/2019, 12:12:10PM

```
        If prevRef = "" Then prevRef = reference:
        If prevStart = "" Then prevStart = Start
        If prevTractorId = "" Then prevTractorId = tractorId
        If prevJobRole = "" Then prevJobRole = jobRole

        Counter = Counter + 1
        If (Counter Mod 500) = 0 Then L_Info(1).Caption = CStr(Counter)

        If newId = "72FF0580-6B90-4C0A-A471-AA0619C4BFDB" Then
';          Stop
        End If

        If prevRef <> reference Then
            sequence = 0:
        End If

        If (prevJobRole <> "sleeper" And jobRole = "sleeper") Then
            sleepcount = sleepcount + 1: sequence = 0:
            prevWorkdate = workdate
            workdate = Format(Start, "mm/dd/yyyy")
        End If


';      If (DateDiff("n", prevStart, Start) > 800) _
';              Or (DateDiff("d", prevWorkdate, Start) > 999) Then
';                  sleepcount = sleepcount + 1: sequence = 0:
';                  prevWorkdate = workdate
';                  workdate = Format(Start, "mm/dd/yyyy")
';      End If


';      Debug.Print Start & " | " & workdate & " | " & sleepcount & " |" &
Counter

        If jobRole = "sleeper" Or prevJobRole = "sleeper" Then

            sequence = sequence + 1


            SQL "update allDrivers set sequence = " & CStr(sequence) & ",
isSleeper = 'YES',"
            SQL "sleepcount = " & CStr(sleepcount) & ","
            SQL "workdate = " & p(workdate, 0, True) & ","
            SQL "sequence2 = " & CStr(sleepcount) & "." &
Format(CStr(sequence), "0000")
            SQL "where newId = " & p(newId, 0, True)
            GoSQL
        End If

        '; what makes a new sequence

        '; post update - analyze and process
        '; post update - analyze and process
        '; post update - analyze and process
```

Ex. B, p. 164

```
File:   9/3/2019, 12:12:10PM
```

```
        isNew = False




    Loop
    Close #1
    Close #2          '; earnings
    Close #3          '; payroll
    Close #4          '; hours


'; ================================================
';  Update data where there is unclear data...
'; ================================================
Stop


';    Call Folder(filePath & "done\", True)
';    Name fullFile As (filePath & "done\" & Filename)        '; rename the file
    Files.Refresh




End Sub

Private Sub b_distance_Click()


'; ================================================
';  File name and file mask;
'; ================================================

    Dim Filemask As String          '; Mask of the file.
    Dim Filepath As String          '; The filepath
    Dim FullFile As String          '; Filename
    Dim Filename As String          '; Filename
    Dim PrevFile As String          '; The Previous File
    Dim DoneFile As String          '; DoneFile
    Dim FileTest As String          '; For tesxting validity of the file.
    Dim FileList As String          '; Name of the file containing list.

    Dim AB As String                '; For text input

    Dim Text As String              '; For text input
    Dim Counter As Long             '; Counter

'; ================================================
';  For the use of system filetype objects
'; ================================================
```

File:   9/3/2019, 12:12:10PM

```
    Dim bResultFile As IsFileResults
    Set FileObject = CreateObject("Scripting.FileSystemObject")

'; ================================================
';  Report Lines.
'; ================================================

    Dim Aaron() As String

    Dim MaxRows As Integer

    Dim FileLength As Long
    Dim fNum As Integer
    Dim aByte As Byte

'; ============================================================
';  XML host variables
'; ============================================================

    Dim Target          As String
    Dim CommandLine     As String

    Dim xmlHost         As String
    Dim xmlPost         As String
    Dim xmlRequest      As String
    Dim xmlVariables    As String
    Dim xmlResponse     As String

    Dim isDistance      As Boolean
    Dim isDuration      As Boolean

'; ================================================
';  Set the file name and the folder...
'; ================================================

    Dim locationA       As String
    Dim locationZ       As String
    Dim distance        As String
    Dim duration        As String
    Dim travelTime      As String

    Dim isData          As Boolean
    Dim whereIs         As Integer


'; ================================================
';  Set the file name and the folder...
'; ================================================

    Filepath = t_folder.Text
    Filename = t_filename.Text
    FullFile = (Filepath & Filename)
    Filename = "c:\temp\xml.txt"
    addressFile = "c:\temp\address.txt"
```

```
File:   9/3/2019, 12:12:10PM
```

```
';      FileTest = Dir(fullFile)
';      fullFile = LCase(fullFile)            '; all lower case.
';      If FileTest = "" Then Message "No such file " & fullFile & ".", 9
';      If FileTest = "" Then Exit Sub


'; =================================================
';  Establish start-of-data locations;
'; =================================================

';      SQL "select distinct address1 as locationA, address2 as locationZ into
#daily from daily where address1 is not null and address2 is not null"
';      GoSQL
';      SQL "insert into #daily select distinct address2, address3 from daily
where address2 is not null and address3 is not null"
';      GoSQL
';      SQL "insert into #daily select distinct address3, address4 from daily
where address3 is not null and address4 is not null"
';      GoSQL

    SQL "select distinct [cityA], [cityZ] from AZ where [hombrook] is null"

    GoSQL

    Counter = 0
    Open addressFile For Output As #1
    Do While SqlResults() And Not DoEvents()

        Counter = Counter + 1
        L_Info(0).Caption = CStr(Counter)

        cityA = LCase(G(1))
        cityZ = LCase(G(2))

        If Right(cityA, 2) = "ca" Then
            Print #1, cityA & Chr(9) & "hombrook, ca"
            Print #1, cityA & Chr(9) & "blythe, ca"
            Print #1, cityA & Chr(9) & "needles, ca"
            Print #1, cityA & Chr(9) & "nipton, ca"
            Print #1, cityA & Chr(9) & "mystic, ca"
        End If

        If Right(cityZ, 2) = "ca" Then
            Print #1, cityZ & Chr(9) & "hombrook, ca"
            Print #1, cityZ & Chr(9) & "blythe, ca"
            Print #1, cityZ & Chr(9) & "needles, ca"
            Print #1, cityZ & Chr(9) & "nipton, ca"
            Print #1, cityZ & Chr(9) & "mystic, ca"
        End If

        Call MoveNext
    Loop

    Close #1

';
https://maps.googleapis.com/maps/api/distancematrix/xml?origins=16%20matisse%20
```

File:    9/3/2019, 12:12:10PM

---

```
ct,%20pleasant%20hill,%20ca&destinations=1601%20n%20main%20st,%20walnut%20creek
,%20ca&departure_time=now&units=imperial&key=[REDACTED]


        Counter = 0
        Open addressFile For Input As #1
        Do While Not EOF(1) And Not DoEvents()


                Counter = Counter + 1
                L_Info(1).Caption = CStr(Counter)
                Line Input #1, AB$
                Aaron = Split(AB$, Chr(9))

                locationA = Aaron(0)
                locationZ = Aaron(1)

                Target = "c:\curl\curl.exe"
                xmlHost = "https://maps.googleapis.com/maps/api/distancematrix/xml" & _
                          "?origins=" & URLEncode(locationA & ", CA") & _
                          "&destinations=" & URLEncode(locationZ & ", CA") & _
                          "&units=imperial" & _
                          "&key=[REDACTED]"

                          '; "&key=[REDACTED]"

                '; xmlPost =  ""
                If Dir(Filename) <> "" Then Kill (Filename)

                CommandLine = "--url """ & xmlHost & """ " & _
                              "--crlf " & _
                              "--insecure " & _
                              "--silent " & _
                              "-H ""Content-Type: text/xml"" " & _
                              "-H ""X-BWC-IN-Control-Processing-Type: process"" " & _
                              "--output " & Chr(34) & ("c:\temp\xml.txt") & Chr(34)


                '; "--data """ & replace(xmlPost, """", "\""") & """"


        ';
========================================================================
        Call ShellExecute(0, vbNullString, Target, CommandLine & "", 0&, 0&)
        ';
========================================================================
        '; ==== Loop while we wait for the file to be created.

';      Do While Dir(Filename) = "" And Not DoEvents
';              DoEvents
';      Loop

        '; ==== Loop while we wait for the file to finish being written.

        Do While Not DoEvents()
```

---

File:    9/3/2019, 12:12:10PM

```
        bResultFile = IsFileInUse(Filename)
        If bResultFile = FILE_FREE Then Exit Do
        DoEvents
    Loop


    '; ==============================================================
    ';  File has been created - now read it back through
    '; ==============================================================

        Set FileOpen = FileObject.GetFile(Filename)
        Set FileText = FileOpen.OpenAsTextStream(1, 0)

        Text = ""
        Do While Not FileText.atendofstream And Not DoEvents()

            AB$ = FileText.ReadLine

            If InStr(AB$, "<duration>") > 0 Then isDuration = True: isDistance
= False: duration = ""
            If InStr(AB$, "<distance>") > 0 Then isDuration = False: isDistance
= True: distance = ""
            Debug.Print AB
            If isDuration Then
                Text = XML(AB$, "<text>")
                If Text <> "" Then duration = Text
            End If

            If isDistance Then
                Text = XML(AB$, "<text>")
                If Text <> "" Then distance = Text
            End If

        Loop

        FileText.Close

        If distance <> "" Then

            miles = 0
            miles = (Val(LTrim(RTrim(Before(distance, "mi")))))

            If locationZ = "hombrook, ca" Then
                SQL "update AZ set [hombrook] = " & p(miles, 0, True) & ""
                SQL "where cityA = " & p(locationA, 0, True)
                SQL "or cityZ = " & p(locationA, 0, True)
                GoSQL
            End If

            If locationZ = "blythe, ca" Then
                SQL "update AZ set [blythe] = " & p(miles, 0, True) & ""
                SQL "where cityA = " & p(locationA, 0, True)
                SQL "or cityZ = " & p(locationA, 0, True)
                GoSQL
            End If
```

Ex. B, p. 169

File:   9/3/2019, 12:12:10PM

```
        If locationZ = "needles, ca" Then
            SQL "update AZ set [needles] = " & p(miles, 0, True) & ""
            SQL "where cityA = " & p(locationA, 0, True)
            SQL "or cityZ = " & p(locationA, 0, True)
            GoSQL
        End If

        If locationZ = "nipton, ca" Then
            SQL "update AZ set [nipton] = " & p(miles, 0, True) & ""
            SQL "where cityA = " & p(locationA, 0, True)
            SQL "or cityZ = " & p(locationA, 0, True)
            GoSQL
        End If

        If locationZ = "mystic, ca" Then
            SQL "update AZ set [mystic] = " & p(miles, 0, True) & ""
            SQL "where cityA = " & p(locationA, 0, True)
            SQL "or cityZ = " & p(locationA, 0, True)
            GoSQL
        End If


        End If


    Loop

    If Dir(Filename) <> "" Then Kill (Filename)




    Close #1
    Close #2          '; earnings
    Close #3          '; payroll
    Close #4          '; hours


'; ================================================
';  Update data where there is unclear data...
'; ================================================


End Sub

Private Sub b_distance2_Click()


'; ================================================
';  File name and file mask;
'; ================================================

    Dim Filemask As String          '; Mask of the file.
    Dim Filepath As String          '; The filepath
    Dim FullFile As String          '; Filename
    Dim Filename As String          '; Filename
```

```
File:   9/3/2019, 12:12:10PM
```

```
    Dim PrevFile As String          '; The Previous File
    Dim DoneFile As String          '; DoneFile
    Dim FileTest As String          '; For tesxting validity of the file.
    Dim FileList As String          '; Name of the file containing list.

    Dim AB As String                '; For text input

    Dim Text As String              '; For text input
    Dim Counter As Long             '; Counter

'; ===================================================
';  For the use of system filetype objects
'; ===================================================

    Dim bResultFile As IsFileResults
    Set FileObject = CreateObject("Scripting.FileSystemObject")

'; ===================================================
';  Report Lines.
'; ===================================================

    Dim Aaron() As String

    Dim MaxRows As Integer

    Dim FileLength As Long
    Dim fNum As Integer
    Dim aByte As Byte

'; =================================================================
';  XML host variables
'; =================================================================

    Dim Target         As String
    Dim CommandLine    As String

    Dim xmlHost        As String
    Dim xmlPost        As String
    Dim xmlRequest     As String
    Dim xmlVariables   As String
    Dim xmlResponse    As String

    Dim isDistance     As Boolean
    Dim isDuration     As Boolean

'; ===================================================
';  Set the file name and the folder...
'; ===================================================

    Dim locationA      As String
    Dim locationZ      As String
    Dim distance       As String
    Dim duration       As String
    Dim travelTime     As String

    Dim isData         As Boolean
```

File:   9/3/2019, 12:12:10PM

```
    Dim whereIs         As Integer


';  ================================================
';  Set the file name and the folder...
';  ================================================

    Filepath = t_folder.Text
    Filename = t_filename.Text
    FullFile = (Filepath & Filename)
    Filename = "c:\temp\xml.txt"
    addressFile = "c:\temp\address.txt"


';  ================================================
';  Establish start-of-data locations;
';  ================================================

    SQL "select distinct [cityA], [cityZ] from AZ where miles is null"
    GoSQL

    Counter = 0
    Open addressFile For Output As #1
    Do While SqlResults() And Not DoEvents()

        Counter = Counter + 1
        L_Info(0).Caption = CStr(Counter)

        cityA = LCase(G(1))
        cityZ = LCase(G(2))

        Print #1, (cityA) & Chr(9) & (cityZ)

        Call MoveNext
    Loop

    Close #1

';
https://maps.googleapis.com/maps/api/distancematrix/xml?origins=16%20matisse%20
ct,%20pleasant%20hill,%20ca&destinations=1601%20n%20main%20st,%20walnut%20creek
,%20ca&departure_time=now&units=imperial&key=[REDACTED]


    Counter = 0
    Open addressFile For Input As #1
    Do While Not EOF(1) And Not DoEvents()


        Counter = Counter + 1
        L_Info(1).Caption = CStr(Counter)
        Line Input #1, AB$
        Aaron = Split(AB$, Chr(9))

        locationA = Aaron(0)
        locationZ = Aaron(1)
```

Ex. B, p. 172

File:    9/3/2019, 12:12:10PM

```
        Target = "c:\curl\curl.exe"
        xmlHost = "https://maps.googleapis.com/maps/api/distancematrix/xml" & _
                  "?origins=" & URLEncode(locationA) & _
                  "&destinations=" & URLEncode(locationZ) & _
                  "&units=imperial" & _
                  "&key=[REDACTED]"

                  '; "&key=[REDACTED]"

        '; xmlPost = ""
        If Dir(Filename) <> "" Then Kill (Filename)

        CommandLine = "--url """ & xmlHost & """ " & _
                      "--crlf " & _
                      "--insecure " & _
                      "--silent " & _
                      "-H ""Content-Type: text/xml"" " & _
                      "-H ""X-BWC-IN-Control-Processing-Type: process"" " & _
                      "--output " & Chr(34) & ("c:\temp\xml.txt") & Chr(34)

        '; "--data """ & replace(xmlPost, """", "\""") & """"


    ';
=======================================================================
        Call ShellExecute(0, vbNullString, Target, CommandLine & "", 0&, 0&)
    ';
=======================================================================

    '; ==== Loop while we wait for the file to be created.

';   Do While Dir(Filename) = "" And Not DoEvents
';         DoEvents
';   Loop

    '; ==== Loop while we wait for the file to finish being written.

    Do While Not DoEvents()
        bResultFile = IsFileInUse(Filename)
        If bResultFile = FILE_FREE Then Exit Do
        DoEvents
    Loop


    '; =========================================================
    '; File has been created - now read it back through
    '; =========================================================

        Set FileOpen = FileObject.GetFile(Filename)
        Set FileText = FileOpen.OpenAsTextStream(1, 0)

        Text = ""
        Do While Not FileText.atendofstream And Not DoEvents()
```

File:    9/3/2019, 12:12:10PM

```
            AB$ = FileText.ReadLine

            If InStr(AB$, "<duration>") > 0 Then isDuration = True: isDistance
= False: duration = ""
            If InStr(AB$, "<distance>") > 0 Then isDuration = False: isDistance
= True: distance = ""
            Debug.Print AB
            If isDuration Then
                Text = XML(AB$, "<text>")
                If Text <> "" Then duration = Text
            End If

            If isDistance Then
                Text = XML(AB$, "<text>")
                If Text <> "" Then distance = Text
            End If

        Loop

        FileText.Close

        If distance <> "" Then

            miles = 0
            miles = (Val(LTrim(RTrim(Before(distance, "mi")))))

            SQL "update AZ set [miles] = " & p(miles, 0, True) & ""
            SQL "where cityA = " & p(locationA, 0, True)
            SQL "and cityZ = " & p(locationZ, 0, True)
            GoSQL


        End If


    Loop

    If Dir(Filename) <> "" Then Kill (Filename)




    Close #1
    Close #2          '; earnings
    Close #3          '; payroll
    Close #4          '; hours


'; ==================================================
';  Update data where there is unclear data...
'; ==================================================


End Sub
```

```
File:    9/3/2019, 12:12:10PM
```

```
Private Sub b_california_Click()

'; ====================================================
';  File name and file mask;
'; ====================================================

    Dim Filemask As String          '; Mask of the file.
    Dim Filepath As String          '; The filepath
    Dim FullFile As String          '; Filename
    Dim Filename As String          '; Filename
    Dim PrevFile As String          '; The Previous File
    Dim DoneFile As String          '; DoneFile
    Dim FileTest As String          '; For tesxting validity of the file.
    Dim FileList As String          '; Name of the file containing list.

    Dim AB As String                '; For text input
    Dim Text As String              '; For text input
    Dim Aaron() As String           '; uBound type String Array

    Dim Counter As Long             '; Counter
    Dim WorkCounter As Long '; Which row we are looking


'; ====================================================================
';  XML host variables
'; ====================================================================

    Dim Target        As String
    Dim CommandLine   As String

    Dim xmlHost       As String
    Dim xmlPost       As String
    Dim xmlRequest    As String
    Dim xmlVariables  As String
    Dim xmlResponse   As String

    Dim isDistance    As Boolean
    Dim isDuration    As Boolean
    Dim caMiles       As Currency

'; ====================================================
';  Locations
'; ====================================================

    Dim locationA     As String
    Dim locationZ     As String
    Dim distance      As String
    Dim duration      As String
    Dim travelTime    As String

    Dim isData        As Boolean
    Dim whereIs       As Integer


'; ====================================================
';  Report Lines.
```

File:    9/3/2019, 12:12:10PM

```
'; ==================================================

    Dim MaxRows As Integer
    Dim workdata() As String
    Dim Items As Integer

    Dim FileLength As Long
    Dim fNum As Integer
    Dim aByte As Byte

'; ==================================================
';  For the use of system filetype objects
'; ==================================================

    Dim bResultFile As IsFileResults
    Set FileObject = CreateObject("Scripting.FileSystemObject")



'; ==================================================
';  Set the file name and the folder...
'; ==================================================

';     filePath = t_folder.Text
';     Filename = t_filename.Text
';     fullFile = (filePath & Filename)

';     FileTest = Dir(fullFile)

';     If FileTest = "" Then Message "No such file " & fullFile & ".", 9
';     If FileTest = "" Then Exit Sub

    Filename = "c:\temp\timeclock.txt"

'; ==================================================
';  Establish start-of-data locations;
'; ==================================================

    Dim reference As String
    Dim prevRef As String              '; prevRef

    Dim tractorId As String
    Dim prevTractorId As String

    Dim jobRole As String
    Dim prevRole As String

    Dim prevWorkdate As String
    Dim workdate As String
    Dim Start As String
    Dim Finish As String
    Dim prevStart As String
    Dim prevFinish As String

    Dim sleepcount As Integer
    Dim sequence As Integer
```

```
File:    9/3/2019, 12:12:10PM
```

```
    Dim isNew As Boolean
    Dim stateStart(40) As String
    Dim stateFinish(40) As String

    Dim miles(40) As String
    Dim minutes(40) As String
    Dim californiaMiles(40) As String
    Dim californiaMinutes(40) As String

    Dim temp2 As Integer
'; =================================================
';  Grab the fields from the file.
'; =================================================

   Counter = 0
';    GoTo processHere:

    Open Filename For Output As #1

    SQL "SELECT crossRef, "
    SQL " [stateStart1] , [stateFinish1] , [minutes1]   , [miles1]  ,"
    SQL " [stateStart2] , [stateFinish2] , [minutes2]   , [miles2]  ,"
    SQL " [stateStart3] , [stateFinish3] , [minutes3]   , [miles3]  ,"
    SQL " [stateStart4] , [stateFinish4] , [minutes4]   , [miles4]  ,"
    SQL " [stateStart5] , [stateFinish5] , [minutes5]   , [miles5]  ,"
    SQL " [stateStart6] , [stateFinish6] , [minutes6]   , [miles6]  ,"
    SQL " [stateStart7] , [stateFinish7] , [minutes7]   , [miles7]  ,"
    SQL " [stateStart8] , [stateFinish8] , [minutes8]   , [miles8]  ,"
    SQL " [stateStart9] , [stateFinish9] , [minutes9]   , [miles9]  ,"
    SQL " [stateStart10], [stateFinish10], [minutes10]  , [miles10] ,"
    SQL " [stateStart11], [stateFinish11], [minutes11]  , [miles11] ,"
    SQL " [stateStart12], [stateFinish12], [minutes12]  , [miles12] ,"
    SQL " [stateStart13], [stateFinish13], [minutes13]  , [miles13] ,"
    SQL " [stateStart14], [stateFinish14], [minutes14]  , [miles14] ,"
    SQL " [stateStart15], [stateFinish15], [minutes15]  , [miles15] ,"
    SQL " [stateStart16], [stateFinish16], [minutes16]  , [miles16] ,"
    SQL " [stateStart17], [stateFinish17], [minutes17]  , [miles17] ,"
    SQL " [stateStart18], [stateFinish18], [minutes18]  , [miles18] ,"
    SQL " [stateStart19], [stateFinish19], [minutes19]  , [miles19] ,"
    SQL " [stateStart20], [stateFinish20], [minutes20]  , [miles20] ,"
    SQL " [stateStart21], [stateFinish21], [minutes21]  , [miles21] ,"
    SQL " [stateStart22], [stateFinish22], [minutes22]  , [miles22] ,"
    SQL " [stateStart23], [stateFinish23], [minutes23]  , [miles23] ,"
    SQL " [stateStart24], [stateFinish24], [minutes24]  , [miles24] ,"
    SQL " [stateStart25], [stateFinish25], [minutes25]  , [miles25] ,"
    SQL " [stateStart26], [stateFinish26], [minutes26]  , [miles26] ,"
    SQL " [stateStart27], [stateFinish27], [minutes27]  , [miles27] ,"
    SQL " [stateStart28], [stateFinish28], [minutes28]  , [miles28] ,"
    SQL " [stateStart29], [stateFinish29], [minutes29]  , [miles29] ,"
    SQL " [stateStart30], [stateFinish30], [minutes30]  , [miles30] ,"
    SQL " [stateStart31], [stateFinish31], [minutes31]  , [miles31] ,"
    SQL " [stateStart32], [stateFinish32], [minutes32]  , [miles32] ,"
    SQL " [stateStart33], [stateFinish33], [minutes33]  , [miles33] ,"
    SQL " [stateStart34], [stateFinish34], [minutes34]  , [miles34] ,"
    SQL " [stateStart35], [stateFinish35], [minutes35]  , [miles35] ,"
    SQL " [stateStart36], [stateFinish36], [minutes36]  , [miles36] ,"
```

Ex. B, p. 177

File:    9/3/2019, 12:12:10PM

```
        SQL " [stateStart37], [stateFinish37], [minutes37]  , [miles37] ,"
        SQL " [stateStart38], [stateFinish38], [minutes38]  , [miles38] ,"
        SQL " [stateStart39], [stateFinish39], [minutes39]  , [miles39] ,"
        SQL " [stateStart40], [stateFinish40], [minutes40]  , [miles40] "
        SQL " from sleeper"
        SQL "where [1] is not null"
        GoSQL

        Counter = 0
        Do While SqlResults And Not DoEvents()
             DoEvents

             Counter = Counter + 1
             If (Counter Mod 50) = 0 Then L_Info(0).Caption = CStr(Counter)

             Text = ""
             For temp = 1 To 161
                 Text = Text & G((temp)) & Chr(9)
             Next
             Text = Left(Text, Len(Text) - 1)
             Print #1, Text

         Call MoveNext:

        Loop


         Close #1


processHere:
'; L_Info(0).Caption = CStr(12760)



';
========================================================================
';  Reset any existing pointers.   Reset any existing pointers.
';
========================================================================

             Text = ""
             For temp = 1 To 40
                 Text = Text & "californiaMiles" & CStr(temp) & " = null,"
                 Text = Text & "californiaMinutes" & CStr(temp) & " = null,"
             Next

             Text = Left(Text, Len(Text) - 1)
             SQL "update sleeper"
             SQL "set " & Text
             GoSQL

';
========================================================================
';  Bring in the file and run it though the system.
';
```

File:   9/3/2019, 12:12:10PM

========================================================================

```
    Counter = 0
    Open Filename For Input As #1

    Do While Not EOF(1) And Not DoEvents()


        Counter = Counter + 1
        L_Info(1).Caption = CStr(Counter)
        Line Input #1, AB$
        Aaron = Split(AB$, Chr(9))

    ';   CLEAR THESE

        For temp = 0 To 40:
            miles(temp) = "":
            minutes(temp) = "":
            stateStart(temp) = "":
            stateFinish(temp) = ""
            californiaMiles(temp) = "":
            californiaMinutes(temp) = ""
        Next


    ';   newId, driverId, tractorId, startTime, isSleeper

        crossref = Aaron(0)
        temp1 = 0
        For temp = 1 To UBound(Aaron) Step 4
            temp1 = temp1 + 1
            stateStart(temp1) = LCase(Aaron(temp))
            stateFinish(temp1) = LCase(Aaron(temp + 1))
            minutes(temp1) = LCase(Aaron(temp + 2))
            miles(temp1) = Aaron(temp + 3)
            If Val(miles(temp1)) <= 2 Then miles(temp1) = ""
            If Val(miles(temp1)) > 900 Then miles(temp1) = ""
        Next

    For temp = 1 To 40
        If Val(miles(temp)) > 0 Then
            If Val(minutes(temp)) > 0 Then


                locationA = LCase(stateStart(temp))
                locationZ = LCase(stateFinish(temp))

                Debug.Print locationA, locationZ

                If Right(locationA, 2) = "ca" And Right(locationZ, 2) =
"ca" Then
                    californiaMiles(temp) = miles(temp)
                    californiaMinutes(temp) = minutes(temp)
                End If

                If Right(locationA, 2) <> "ca" And Right(locationZ, 2) <>
```

File:    9/3/2019, 12:12:10PM

```
"ca" Then
                              minutes(temp) = 0
                              californiaMiles(temp) = ""
                              californiaMinutes(temp) = ""
                              '; californiaMinutes(temp) = minutes(temp)
                         End If

                    If (Right(locationA, 2) <> "ca" And Right(locationZ, 2) =
"ca") Or _
                         (Right(locationA, 2) = "ca" And Right(locationZ, 2) <>
"ca") Then

                              SQL "select hombrook, blythe, needles, mystic, nipton"
                              SQL "from AZ where locationA = " & p(locationA, 0,
True)
                              SQL "and locationZ = " & p(locationZ, 0, True)
                              GoSQL

                              isFound = False
                              Do While SqlResults And Not DoEvents()
                                   isFound = True
                                   caMiles = Val(G(1))
                                   If Val(G(2)) < caMiles Then caMiles = Val(G(2))
                                   If Val(G(3)) < caMiles Then caMiles = Val(G(3))
                                   If Val(G(4)) < caMiles Then caMiles = Val(G(4))
                                   If Val(G(5)) < caMiles Then caMiles = Val(G(5))
                                   Call MoveNext:
                              Loop

                              If Not isFound Then
                                   Stop
                              End If


                              If caMiles < 5 Then caMiles = 0
                              californiaMiles(temp) = caMiles
                              If caMiles > 0 Then
                                   californiaMinutes(temp) = CInt(Val(minutes(temp) *
(caMiles / miles(temp)))) - 1
                              End If

';                            SQL "insert into AZ (locationA, locationZ) "
';                            SQL "select " & p(locationA, 0, True) & ", "
';                            SQL p(locationZ, 0, True)
';                            GoSQL

                         End If
                    End If
               End If
          Next

          '; do some SQL craziness here!
          '; do some SQL craziness here!
          '; do some SQL craziness here!

          Text = ""
```

Page: 24

File:    9/3/2019, 12:12:10PM

```
        For temp2 = 1 To 40

            If Val(californiaMinutes(temp2)) > 900 Then
californiaMinutes(temp2) = ""
            If Val(californiaMinutes(temp2)) < 0 Then californiaMinutes(temp2)
= ""

            Text = Text & "californiaMiles" & CStr(temp2) & " = " &
p(californiaMiles(temp2), 0, True) & ","
            Text = Text & "californiaMinutes" & CStr(temp2) & " = " &
p(californiaMinutes(temp2), 0, True) & ","
        Next

        Text = Left(Text, Len(Text) - 1)
        SQL "update sleeper"
        SQL "set " & Text
        SQL "where crossRef = " & p(crossref, 0, True)
        GoSQL

    Loop


    Close #1
    Close #2          '; earnings
    Close #3          '; payroll
    Close #4          '; hours


'; ===================================================
';  Update data where there is unclear data...
'; ===================================================
Stop


';    Call Folder(filePath & "done\", True)
';    Name fullFile As (filePath & "done\" & Filename)        '; rename the file
    Files.Refresh




End Sub
```

# EXHIBIT J2

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
use dueker
-- let's start looking at the data
-- remove a couple of things that are clearly not supposed to be.
delete from data where [column 2] = '';
delete from data where [column 1] = '';
delete from data where [date] like '%:%'
delete from data where [date] like '%nb%'
delete from data where charindex('.',[column 0]) = 0;
update data set [column 0] = replace([column 0] ,'.txt','.xlsx')

-- add a column for the benefit of a unique identifier ...

alter table data add newId varchar(42) null
update data set newId = convert(varchar(42),newId())

-- this is just more or less a set of data that is for the benefit of
-- headers which aren't actually part of the data that we analyze
delete from data where [column 2] in ( 'driver logs','date','trip
inquiry','"crst international, inc."')


-- look at the most common headers.
select [column 4], count(*) from data group by [column 4]  order by count(*)
desc
select * into driver from data where [column 4] in
('driving','onDuty','offDuty','sleeper')
select * into hours from data where [column 2] like '%/%'
select * into trips  from data where [column 5] like '%/%'

-- now since we have done this, let's figure
-- out what we need to do next.
delete from data where newId in (select newId from drivers)
delete from data where newId in (select newId from hours)
delete from data where newId in (select newId from trips)

sp_rename hours, b_hours


select
[Column 0]      as source  ,
[Column 1]      as counter ,
[Column 2]      as Date    ,
[Column 3]      as Driver  ,
[Column 4]      as fname   ,
[Column 5]      as lName   ,
[Column 6]      as City    ,
[Column 7]      as State   ,
[Column 8]      as Phone   ,
[Column 9]      as Driving ,
[Column 10]     as OffDuty,
[Column 11]     as OnDuty ,
[Column 12]     as Sleeper ,
[Column 13]     as Total   ,
[newId]     as newId
into hours from b_hours
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
-- driver driver
sp_rename driver, b_driver

select
[Column 0]      as source,
[Column 1]      as  counter              ,
[Column 2]      as  DepotID      ,
[Column 3]      as  Activity     ,
[Column 4]      as  Descript     ,
[Column 5]      as  CoDriver     ,
[Column 6]      as  Confirmed    ,
[Column 7]      as  Distance     ,
[Column 8]      as  Doc          ,
[Column 9]      as  DriverID     ,
[Column 10]     as  Duration     ,
[Column 11]     as  Edit         ,
[Column 12]     as  location     ,
[Column 13]     as  Logid        ,
[Column 14] as                  odometer     ,
[Column 15] as                  OrigLogID    ,
[Column 16] as                  SensorFailure,
[Column 17] as                  Starttime    ,
[Column 18] as                  State        ,
[Column 19] as                  TimeZone     ,
[Column 20] as                  Tractorid    ,
[Column 21] as                  TrailerID    ,
[newId]      as newId
into drivers from b_drivers

update driver set location = replace(location,'"','')

select
[Column 0]      as source,
[Column 1]      as  counter,
[Column 2]      as          loadNumber   ,
[Column 3]      as          LdOrDh       ,
[Column 4]      as          Leg          ,
[Column 5]      as          pickup       ,
[Column 7]      as          completed    ,
[Column 8]      as          startCity    ,
[Column 10]      as          startState   ,
[Column 11]      as          startAlias   ,
[Column 12]     as          finishCity   ,
[Column 13]     as          finishState  ,
[Column 15]     as          finishAlias  ,
[Column 16]     as          miles        ,
[Column 17] as              TractorId        ,
[Column 18] as              trailerId        ,
[Column 19] as              TrlrDivi         ,
[Column 20] as              driver1          ,
[Column 21] as              name1            ,
[Column 22] as              driver2      ,
[Column 23] as              name2        ,
[Column 24] as              bookingSource        ,
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
[column 25] as                driver1Division,
[newId]      as newId
into trips from b_trips

select * from trips order by source, counter
alter table trips alter column counter int null
alter table hours alter column counter int null
alter table driver alter column counter int null


select top 10 * from drivers
select * into drivers_including_all_duplicates from drivers
insert into drivers ([DepotID], [Activity], [Descript], [CoDriver],
[Confirmed], [Distance], [Doc], [DriverID], [Duration], [Edit], [location],
[Logid], [odometer], [OrigLogID], [SensorFailure], [Starttime], [State],
[TimeZone], [Tractorid], [TrailerID], [newId], [crossRef], [driver1],
[driver2], [date], [sequence], [workdate])
  select distinct [DepotID], [Activity], [Descript], [CoDriver], [Confirmed],
[Distance], [Doc], [DriverID], [Duration], [Edit], [location], [Logid],
[odometer], [OrigLogID], [SensorFailure], [Starttime], [State], [TimeZone],
[Tractorid], [TrailerID], null, [crossRef], [date], null, null, null,
[workdate] from drivers_including_all_duplicates

update drivers set newId = (select top 1 newId from
drivers_including_all_duplicates
  where drivers_including_all_duplicates.crossRef = drivers.crossRef
    and drivers_including_all_duplicates.startTime = drivers.startTime
    and drivers_including_all_duplicates.descript = drivers.descript
    and drivers_including_all_duplicates.doc = drivers.doc)

---
alter table drivers add crossRef varchar(30) null
alter table drivers add driver1 varchar(120) null
alter table drivers add driver2 varchar(120) null
alter table drivers add date datetime null
alter table drivers alter column startTime datetime null
update drivers set date = convert(varchar(30),startTime,101)

-- test some thing shere
select top 10 * from workdata
select top 10 * from drivers where crossRef = '07/25/2014|4453' and driverId =
'z369d'
select top 10 * from drivers where date = '7/25/2014' and DriverId = 'z369d'
select top 10 * from drivers where date = '7/25/2014' and DriverId = '5142d'

drop table crossRef
select distinct crossRef, date, driverId, tractorId into crossRef from drivers
alter table crossRef add isDriver varchar(30) null, isCoDriver varchar(30) null
update crossRef set isDriver = (select top 1 'yes' from drivers where
drivers.date = crossRef.date and drivers.driverId = crossRef.driverId and
drivers.tractorId = crossRef.tractorId)
update crossRef set isCoDriver = (select top 1 'yes' from drivers where
drivers.date = crossRef.date and drivers.coDriver = crossRef.driverId and
drivers.tractorId = crossRef.tractorId)
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
select top 10 * from crossRef where isCoDriver = 'YES'

select * from drivers where  crossRef = '06/08/2017|101890' order by startTime

select count(*) from crossRef where isDriver = 'YES' and isCodriver ='yES'

alter table drivers alter column distance money null
alter table drivers alter column odometer money null
alter table drivers alter column duration money null
update drivers set distance = distance / 10
update drivers set odometer = odometer / 10
update drivers set duration = duration * 10

select count(*) from drivers where coDriver <> driverId and descript =
'sleeper' and duration > 0

select dateadd(minute,704, '6/8/2017  8:47:00 AM')


-- calendar day?
-- this is just california crews where the entirety of the trips from the excel
sheets
-- within califonia
select * into b_drivers
select * into allDrivers from drivers

-- selection of dates to make sure that we exclude shifts before 11/27/2013.
select * into [allDriversBefore12-27-2013] from allDrivers where date <=
'12/27/2013'
delete from allDrivers where date <= '12/27/2013'

-- any part of the trip touches california
select * into drivers from allDrivers where crossRef in (select crossRef from
allDrivers (nolock) where state = 'CA')
-- all parts of the trip are exclusively within california
select * into driversEntirelyWithinCalifornia from allDrivers where crossRef in
(select crossRef from allDrivers (nolock) where state = 'CA')
delete from driversEntirelyWithinCalifornia where crossRef in (select crossRef
from californiaOnlyDrivers where state <> 'CA')

-- SET THE CROSSREF
select top 10 * from drivers
update drivers set crossRef = convert(varchar(30),date,101) + '|' + tractorId +
'|' + driverId
update allDrivers set crossRef = convert(varchar(30),date,101) + '|' +
tractorId + '|' + driverId
update driversEntirelyWithinCalifornia set crossRef =
convert(varchar(30),date,101) + '|' + driverId

-- add these columns and then establish the frequencies...
alter table drivers add sequence int null
alter table drivers add workdate datetime null;
alter table drivers add isSleepStart varchar(3) null
alter table drivers add isSleepFinish varchar(3) null
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
-- THIS IS WHERE WE BUILD THE SLEEPERS
-- THIS IS A LOT OF INFORMATION
-- we just use this for a visual reference
-- in the microsoft excel (XLSX) sheets so that
-- we can do a visual look-over because we want to be
-- clear that we have captured it in the computer as intended.
drop table #sleep
select distinct driverId, sleepCOunt, convert(int, null) as sequence into
#sleep from drivers where sequence is not null

update #sleep set sequence = (select top 1 sequence from drivers
  where drivers.driverId = #sleep.driverId
    and drivers.sleepCount = #sleep.sleepCount
  order by sequence desc)

update drivers set isSleeper = '(start)' where sequence = 1
update drivers set isSleeper = '(finish)' where driverId + '|' +
convert(varchar(30),sleepCount) + '|' + convert(varchar(30),sequence) in
 (select driverId + '|' + convert(varchar(30),sleepCount) + '|' +
convert(varchar(30),sequence) from #sleep)
update drivers set isSleeper = '(cont)' where isSleeper in ('CONT','YES')
update drivers set isSleeper = '(--)' where isSleeper = 'FINISH' and sequence =
1

-- this is a nice output.
select  descript, counter, startTime, workdate, driverId, isSleeper,
sleepcount, sequence , sequence2, odometer, '(' + state + ') ' + location as
location, newId
from drivers where isSleeper is not null and sequence is not null order by
driverId, counter

select  descript, counter, startTime, workdate, driverId, isSleeper,
sleepcount, sequence , sequence2, odometer, '(' + state + ') ' + location as
location, newId
from drivers where date = '01/05/2017' and driverId = '021nd' order by
driverId, counter

select * from sleeper where crossRef = '01/05/2017|021nd'

-- this is just to preserve the continuity...
update drivers set crossRef = convert(varchar(30),starttime,101) + '|' +
driverId where crossRef is null

-- ============================================================
-- This is where we attribute the disperate, discrete elements
-- to the various categories so that we can determine when
-- and where the time is taking place.
-- ============================================================
-- create a master crossWalk for sleeper
-- create a master crossWalk for sleeper
-- create a master crossWalk for sleeper
-- create a master crossWalk for sleeper
-- drop table sleeper
select distinct driverId, crossRef into sleeper from drivers where descript =
```

Ex. B, p. 187

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
'sleeper'

alter table sleeper add [1] money null
alter table sleeper add [2] money null
alter table sleeper add [3] money null
alter table sleeper add [4] money null
alter table sleeper add [5] money null
alter table sleeper add [6] money null
alter table sleeper add [7] money null
alter table sleeper add [8] money null
alter table sleeper add [9] money null
alter table sleeper add [10] money null
alter table sleeper add [11] money null
alter table sleeper add [12] money null
alter table sleeper add [13] money null
alter table sleeper add [14] money null
alter table sleeper add [15] money null
alter table sleeper add [16] money null
alter table sleeper add [17] money null
alter table sleeper add [18] money null
alter table sleeper add [19] money null
alter table sleeper add [20] money null
alter table sleeper add [21] money null
alter table sleeper add [22] money null
alter table sleeper add [23] money null
alter table sleeper add [24] money null
alter table sleeper add [25] money null
alter table sleeper add [26] money null
alter table sleeper add [27] money null
alter table sleeper add [28] money null
alter table sleeper add [29] money null
alter table sleeper add [30] money null
alter table sleeper add [31] money null
alter table sleeper add [32] money null
alter table sleeper add [33] money null
alter table sleeper add [34] money null
alter table sleeper add [35] money null
alter table sleeper add [36] money null
alter table sleeper add [37] money null
alter table sleeper add [38] money null
alter table sleeper add [39] money null
alter table sleeper add [40] money null

alter table sleeper add [c1] int null
alter table sleeper add [c2] int null
alter table sleeper add [c3] int null
alter table sleeper add [c4] int null
alter table sleeper add [c5] int null
alter table sleeper add [c6] int null
alter table sleeper add [c7] int null
alter table sleeper add [c8] int null
alter table sleeper add [c9] int null
alter table sleeper add [c10] int null
alter table sleeper add [c11] int null
alter table sleeper add [c12] int null
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
alter table sleeper add [c13] int null
alter table sleeper add [c14] int null
alter table sleeper add [c15] int null
alter table sleeper add [c16] int null
alter table sleeper add [c17] int null
alter table sleeper add [c18] int null
alter table sleeper add [c19] int null
alter table sleeper add [c20] int null
alter table sleeper add [c21] int null
alter table sleeper add [c22] int null
alter table sleeper add [c23] int null
alter table sleeper add [c24] int null
alter table sleeper add [c25] int null
alter table sleeper add [c26] int null
alter table sleeper add [c27] int null
alter table sleeper add [c28] int null
alter table sleeper add [c29] int null
alter table sleeper add [c30] int null
alter table sleeper add [c31] int null
alter table sleeper add [c32] int null
alter table sleeper add [c33] int null
alter table sleeper add [c34] int null
alter table sleeper add [c35] int null
alter table sleeper add [c36] int null
alter table sleeper add [c37] int null
alter table sleeper add [c38] int null
alter table sleeper add [c39] int null
alter table sleeper add [c40] int null

update sleeper set [1]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef order by sequence2 asc)
update sleeper set [2]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[1]   order by sequence2 asc)
update sleeper set [3]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[2]   order by sequence2 asc)
update sleeper set [4]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[3]   order by sequence2 asc)
update sleeper set [5]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[4]   order by sequence2 asc)
update sleeper set [6]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[5]   order by sequence2 asc)
update sleeper set [7]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[6]   order by sequence2 asc)
update sleeper set [8]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[7]   order by sequence2 asc)
update sleeper set [9]  = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[8]   order by sequence2 asc)
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [10] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[9]   order by sequence2 asc)
update sleeper set [11] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[10]  order by sequence2 asc)
update sleeper set [12] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[11]  order by sequence2 asc)
update sleeper set [13] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[12]  order by sequence2 asc)
update sleeper set [14] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[13]  order by sequence2 asc)
update sleeper set [15] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[14]  order by sequence2 asc)
update sleeper set [16] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[15]  order by sequence2 asc)
update sleeper set [17] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[16]  order by sequence2 asc)
update sleeper set [18] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[17]  order by sequence2 asc)
update sleeper set [19] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[18]  order by sequence2 asc)
update sleeper set [20] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[19]  order by sequence2 asc)
update sleeper set [21] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[20]  order by sequence2 asc)
update sleeper set [22] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[21]  order by sequence2 asc)
update sleeper set [23] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[22]  order by sequence2 asc)
update sleeper set [24] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[23]  order by sequence2 asc)
update sleeper set [25] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[24]  order by sequence2 asc)
update sleeper set [26] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[25]  order by sequence2 asc)
update sleeper set [27] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[26]  order by sequence2 asc)
update sleeper set [28] = (select top 1 sequence2 from drivers where descript =
```

Ex. B, p. 190

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
8/27/2019, 10:05:31PM

```
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[27]  order by sequence2 asc)
update sleeper set [29] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[28]  order by sequence2 asc)
update sleeper set [30] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[29]  order by sequence2 asc)
update sleeper set [31] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[30]  order by sequence2 asc)
update sleeper set [32] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[31]  order by sequence2 asc)
update sleeper set [33] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[32]  order by sequence2 asc)
update sleeper set [34] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[33]  order by sequence2 asc)
update sleeper set [35] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[34]  order by sequence2 asc)
update sleeper set [36] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[35]  order by sequence2 asc)
update sleeper set [37] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[36]  order by sequence2 asc)
update sleeper set [38] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[37]  order by sequence2 asc)
update sleeper set [39] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[38]  order by sequence2 asc)
update sleeper set [40] = (select top 1 sequence2 from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 >
sleeper.[39]  order by sequence2 asc)

update sleeper set [c1]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [1] )
update sleeper set [c2]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [2] )
update sleeper set [c3]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [3] )
update sleeper set [c4]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [4] )
update sleeper set [c5]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [5] )
update sleeper set [c6]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [6] )
update sleeper set [c7]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [7] )
update sleeper set [c8]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [8] )
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [c9]  = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [9] )
update sleeper set [c10] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [10])
update sleeper set [c11] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [11])
update sleeper set [c12] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [12])
update sleeper set [c13] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [13])
update sleeper set [c14] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [14])
update sleeper set [c15] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [15])
update sleeper set [c16] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [16])
update sleeper set [c17] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [17])
update sleeper set [c18] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [18])
update sleeper set [c19] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [19])
update sleeper set [c20] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [20])
update sleeper set [c21] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [21])
update sleeper set [c22] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [22])
update sleeper set [c23] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [23])
update sleeper set [c24] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [24])
update sleeper set [c25] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [25])
update sleeper set [c26] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [26])
update sleeper set [c27] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [27])
update sleeper set [c28] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [28])
update sleeper set [c29] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [29])
update sleeper set [c30] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [30])
update sleeper set [c31] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [31])
update sleeper set [c32] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [32])
update sleeper set [c33] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [33])
update sleeper set [c34] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [34])
update sleeper set [c35] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [35])
update sleeper set [c36] = (select top 1 counter from drivers where descript =
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [36])
update sleeper set [c37] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [37])
update sleeper set [c38] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [38])
update sleeper set [c39] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [39])
update sleeper set [c40] = (select top 1 counter from drivers where descript =
'sleeper' and drivers.crossRef = sleeper.crossRef and drivers.sequence2 = [40])


alter table sleeper add [start1] dateTime  null; alter table sleeper add
[finish1] dateTime  null;
alter table sleeper add [start2] dateTime  null; alter table sleeper add
[finish2] dateTime  null
alter table sleeper add [start3] dateTime  null; alter table sleeper add
[finish3] dateTime  null
alter table sleeper add [start4] dateTime  null; alter table sleeper add
[finish4] dateTime  null
alter table sleeper add [start5] dateTime  null; alter table sleeper add
[finish5] dateTime  null
alter table sleeper add [start6] dateTime  null; alter table sleeper add
[finish6] dateTime  null
alter table sleeper add [start7] dateTime  null; alter table sleeper add
[finish7] dateTime  null
alter table sleeper add [start8] dateTime  null; alter table sleeper add
[finish8] dateTime  null
alter table sleeper add [start9] dateTime  null; alter table sleeper add
[finish9] dateTime  null
alter table sleeper add [start10] dateTime  null; alter table sleeper add
[finish10] dateTime  null
alter table sleeper add [start11] dateTime  null; alter table sleeper add
[finish11] dateTime  null
alter table sleeper add [start12] dateTime  null; alter table sleeper add
[finish12] dateTime  null
alter table sleeper add [start13] dateTime  null; alter table sleeper add
[finish13] dateTime  null
alter table sleeper add [start14] dateTime  null; alter table sleeper add
[finish14] dateTime  null
alter table sleeper add [start15] dateTime  null; alter table sleeper add
[finish15] dateTime  null
alter table sleeper add [start16] dateTime  null; alter table sleeper add
[finish16] dateTime  null
alter table sleeper add [start17] dateTime  null; alter table sleeper add
[finish17] dateTime  null
alter table sleeper add [start18] dateTime  null; alter table sleeper add
[finish18] dateTime  null
alter table sleeper add [start19] dateTime  null; alter table sleeper add
[finish19] dateTime  null
alter table sleeper add [start20] dateTime  null; alter table sleeper add
[finish20] dateTime  null
alter table sleeper add [start21] dateTime  null; alter table sleeper add
[finish21] dateTime  null
alter table sleeper add [start22] dateTime  null; alter table sleeper add
[finish22] dateTime  null
alter table sleeper add [start23] dateTime  null; alter table sleeper add
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
[finish23] dateTime  null
alter table sleeper add [start24] dateTime  null; alter table sleeper add
[finish24] dateTime  null
alter table sleeper add [start25] dateTime  null; alter table sleeper add
[finish25] dateTime  null
alter table sleeper add [start26] dateTime  null; alter table sleeper add
[finish26] dateTime  null
alter table sleeper add [start27] dateTime  null; alter table sleeper add
[finish27] dateTime  null
alter table sleeper add [start28] dateTime  null; alter table sleeper add
[finish28] dateTime  null
alter table sleeper add [start29] dateTime  null; alter table sleeper add
[finish29] dateTime  null
alter table sleeper add [start30] dateTime  null; alter table sleeper add
[finish30] dateTime  null
alter table sleeper add [start31] dateTime  null; alter table sleeper add
[finish31] dateTime  null
alter table sleeper add [start32] dateTime  null; alter table sleeper add
[finish32] dateTime  null
alter table sleeper add [start33] dateTime  null; alter table sleeper add
[finish33] dateTime  null
alter table sleeper add [start34] dateTime  null; alter table sleeper add
[finish34] dateTime  null
alter table sleeper add [start35] dateTime  null; alter table sleeper add
[finish35] dateTime  null
alter table sleeper add [start36] dateTime  null; alter table sleeper add
[finish36] dateTime  null
alter table sleeper add [start37] dateTime  null; alter table sleeper add
[finish37] dateTime  null
alter table sleeper add [start38] dateTime  null; alter table sleeper add
[finish38] dateTime  null
alter table sleeper add [start39] dateTime  null; alter table sleeper add
[finish39] dateTime  null
alter table sleeper add [start40] dateTime  null; alter table sleeper add
[finish40] dateTime  null

update sleeper set [start1] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c1]);
update sleeper set [start2] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c2]);
update sleeper set [start3] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c3]);
update sleeper set [start4] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c4]);
update sleeper set [start5] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c5]);
update sleeper set [start6] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c6]);
update sleeper set [start7] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c7]);
update sleeper set [start8] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c8]);
update sleeper set [start9] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c9]);
update sleeper set [start10] = (select startTime from drivers where
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
drivers.driverId = sleeper.Driverid and drivers.counter = [c10]);
update sleeper set [start11] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c11]);
update sleeper set [start12] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c12]);
update sleeper set [start13] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c13]);
update sleeper set [start14] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c14]);
update sleeper set [start15] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c15]);
update sleeper set [start16] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c16]);
update sleeper set [start17] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c17]);
update sleeper set [start18] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c18]);
update sleeper set [start19] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c19]);
update sleeper set [start20] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c20]);
update sleeper set [start21] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c21]);
update sleeper set [start22] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c22]);
update sleeper set [start23] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c23]);
update sleeper set [start24] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c24]);
update sleeper set [start25] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c25]);
update sleeper set [start26] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c26]);
update sleeper set [start27] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c27]);
update sleeper set [start28] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c28]);
update sleeper set [start29] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c29]);
update sleeper set [start30] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c30]);
update sleeper set [start31] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c31]);
update sleeper set [start32] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c32]);
update sleeper set [start33] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c33]);
update sleeper set [start34] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c34]);
update sleeper set [start35] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c35]);
update sleeper set [start36] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c36]);
update sleeper set [start37] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c37]);
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [start38] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c38]);
update sleeper set [start39] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c39]);
update sleeper set [start40] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c40]);

update sleeper set [finish1] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c1]+1)
update sleeper set [finish2] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c2]+1)
update sleeper set [finish3] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c3]+1)
update sleeper set [finish4] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c4]+1)
update sleeper set [finish5] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c5]+1)
update sleeper set [finish6] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c6]+1)
update sleeper set [finish7] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c7]+1)
update sleeper set [finish8] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c8]+1)
update sleeper set [finish9] =  (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c9]+1)
update sleeper set [finish10] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c10]+1)
update sleeper set [finish11] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c11]+1)
update sleeper set [finish12] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c12]+1)
update sleeper set [finish13] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c13]+1)
update sleeper set [finish14] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c14]+1)
update sleeper set [finish15] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c15]+1)
update sleeper set [finish16] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c16]+1)
update sleeper set [finish17] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c17]+1)
update sleeper set [finish18] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c18]+1)
update sleeper set [finish19] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c19]+1)
update sleeper set [finish20] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c20]+1)
update sleeper set [finish21] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c21]+1)
update sleeper set [finish22] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c22]+1)
update sleeper set [finish23] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c23]+1)
update sleeper set [finish24] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c24]+1)
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [finish25] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c25]+1)
update sleeper set [finish26] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c26]+1)
update sleeper set [finish27] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c27]+1)
update sleeper set [finish28] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c28]+1)
update sleeper set [finish29] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c29]+1)
update sleeper set [finish30] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c30]+1)
update sleeper set [finish31] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c31]+1)
update sleeper set [finish32] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c32]+1)
update sleeper set [finish33] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c33]+1)
update sleeper set [finish34] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c34]+1)
update sleeper set [finish35] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c35]+1)
update sleeper set [finish36] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c36]+1)
update sleeper set [finish37] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c37]+1)
update sleeper set [finish38] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c38]+1)
update sleeper set [finish39] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c39]+1)
update sleeper set [finish40] = (select startTime from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c40]+1)


-- odometer
alter table sleeper add [oStart1] money  null; alter table sleeper add
[oFinish1] money  null ;
alter table sleeper add [oStart2] money  null; alter table sleeper add
[oFinish2] money  null ;
alter table sleeper add [oStart3] money  null; alter table sleeper add
[oFinish3] money  null ;
alter table sleeper add [oStart4] money  null; alter table sleeper add
[oFinish4] money  null ;
alter table sleeper add [oStart5] money  null; alter table sleeper add
[oFinish5] money  null ;
alter table sleeper add [oStart6] money  null; alter table sleeper add
[oFinish6] money  null ;
alter table sleeper add [oStart7] money  null; alter table sleeper add
[oFinish7] money  null ;
alter table sleeper add [oStart8] money  null; alter table sleeper add
[oFinish8] money  null ;
alter table sleeper add [oStart9] money  null; alter table sleeper add
[oFinish9] money  null ;
alter table sleeper add [oStart10] money  null; alter table sleeper add
[oFinish10] money  null ;
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
alter table sleeper add [oStart11] money  null; alter table sleeper add
[oFinish11] money  null ;
alter table sleeper add [oStart12] money  null; alter table sleeper add
[oFinish12] money  null ;
alter table sleeper add [oStart13] money  null; alter table sleeper add
[oFinish13] money  null ;
alter table sleeper add [oStart14] money  null; alter table sleeper add
[oFinish14] money  null ;
alter table sleeper add [oStart15] money  null; alter table sleeper add
[oFinish15] money  null ;
alter table sleeper add [oStart16] money  null; alter table sleeper add
[oFinish16] money  null ;
alter table sleeper add [oStart17] money  null; alter table sleeper add
[oFinish17] money  null ;
alter table sleeper add [oStart18] money  null; alter table sleeper add
[oFinish18] money  null ;
alter table sleeper add [oStart19] money  null; alter table sleeper add
[oFinish19] money  null ;
alter table sleeper add [oStart20] money  null; alter table sleeper add
[oFinish20] money  null ;
alter table sleeper add [oStart21] money  null; alter table sleeper add
[oFinish21] money  null ;
alter table sleeper add [oStart22] money  null; alter table sleeper add
[oFinish22] money  null ;
alter table sleeper add [oStart23] money  null; alter table sleeper add
[oFinish23] money  null ;
alter table sleeper add [oStart24] money  null; alter table sleeper add
[oFinish24] money  null ;
alter table sleeper add [oStart25] money  null; alter table sleeper add
[oFinish25] money  null ;
alter table sleeper add [oStart26] money  null; alter table sleeper add
[oFinish26] money  null ;
alter table sleeper add [oStart27] money  null; alter table sleeper add
[oFinish27] money  null ;
alter table sleeper add [oStart28] money  null; alter table sleeper add
[oFinish28] money  null ;
alter table sleeper add [oStart29] money  null; alter table sleeper add
[oFinish29] money  null ;
alter table sleeper add [oStart30] money  null; alter table sleeper add
[oFinish30] money  null ;
alter table sleeper add [oStart31] money  null; alter table sleeper add
[oFinish31] money  null ;
alter table sleeper add [oStart32] money  null; alter table sleeper add
[oFinish32] money  null ;
alter table sleeper add [oStart33] money  null; alter table sleeper add
[oFinish33] money  null ;
alter table sleeper add [oStart34] money  null; alter table sleeper add
[oFinish34] money  null ;
alter table sleeper add [oStart35] money  null; alter table sleeper add
[oFinish35] money  null ;
alter table sleeper add [oStart36] money  null; alter table sleeper add
[oFinish36] money  null ;
alter table sleeper add [oStart37] money  null; alter table sleeper add
[oFinish37] money  null ;
alter table sleeper add [oStart38] money  null; alter table sleeper add
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
8/27/2019, 10:05:31PM

---

[oFinish38] money  null ;
alter table sleeper add [oStart39] money  null; alter table sleeper add
[oFinish39] money  null ;
alter table sleeper add [oStart40] money  null; alter table sleeper add
[oFinish40] money  null ;


-- odometer start/finish

update sleeper set [oStart1] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c1]);
update sleeper set [oStart2] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c2]);
update sleeper set [oStart3] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c3]);
update sleeper set [oStart4] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c4]);
update sleeper set [oStart5] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c5]);
update sleeper set [oStart6] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c6]);
update sleeper set [oStart7] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c7]);
update sleeper set [oStart8] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c8]);
update sleeper set [oStart9] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c9]);
update sleeper set [oStart10] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c10]);
update sleeper set [oStart11] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c11]);
update sleeper set [oStart12] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c12]);
update sleeper set [oStart13] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c13]);
update sleeper set [oStart14] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c14]);
update sleeper set [oStart15] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c15]);
update sleeper set [oStart16] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c16]);
update sleeper set [oStart17] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c17]);
update sleeper set [oStart18] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c18]);
update sleeper set [oStart19] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c19]);
update sleeper set [oStart20] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c20]);
update sleeper set [oStart21] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c21]);
update sleeper set [oStart22] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c22]);
update sleeper set [oStart23] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c23]);

---

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [oStart24] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c24]);
update sleeper set [oStart25] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c25]);
update sleeper set [oStart26] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c26]);
update sleeper set [oStart27] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c27]);
update sleeper set [oStart28] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c28]);
update sleeper set [oStart29] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c29]);
update sleeper set [oStart30] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c30]);
update sleeper set [oStart31] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c31]);
update sleeper set [oStart32] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c32]);
update sleeper set [oStart33] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c33]);
update sleeper set [oStart34] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c34]);
update sleeper set [oStart35] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c35]);
update sleeper set [oStart36] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c36]);
update sleeper set [oStart37] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c37]);
update sleeper set [oStart38] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c38]);
update sleeper set [oStart39] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c39]);
update sleeper set [oStart40] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c40]);
update sleeper set [oFinish1] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c1]+1)
update sleeper set [oFinish2] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c2]+1)
update sleeper set [oFinish3] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c3]+1)
update sleeper set [oFinish4] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c4]+1)
update sleeper set [oFinish5] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c5]+1)
update sleeper set [oFinish6] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c6]+1)
update sleeper set [oFinish7] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c7]+1)
update sleeper set [oFinish8] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c8]+1)
update sleeper set [oFinish9] =  (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c9]+1)
update sleeper set [oFinish10] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter =  [c10]+1)
update sleeper set [oFinish11] = (select odometer from drivers where
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
drivers.driverId = sleeper.Driverid and drivers.counter = [c11]+1)
update sleeper set [oFinish12] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c12]+1)
update sleeper set [oFinish13] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c13]+1)
update sleeper set [oFinish14] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c14]+1)
update sleeper set [oFinish15] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c15]+1)
update sleeper set [oFinish16] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c16]+1)
update sleeper set [oFinish17] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c17]+1)
update sleeper set [oFinish18] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c18]+1)
update sleeper set [oFinish19] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c19]+1)
update sleeper set [oFinish20] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c20]+1)
update sleeper set [oFinish21] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c21]+1)
update sleeper set [oFinish22] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c22]+1)
update sleeper set [oFinish23] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c23]+1)
update sleeper set [oFinish24] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c24]+1)
update sleeper set [oFinish25] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c25]+1)
update sleeper set [oFinish26] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c26]+1)
update sleeper set [oFinish27] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c27]+1)
update sleeper set [oFinish28] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c28]+1)
update sleeper set [oFinish29] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c29]+1)
update sleeper set [oFinish30] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c30]+1)
update sleeper set [oFinish31] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c31]+1)
update sleeper set [oFinish32] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c32]+1)
update sleeper set [oFinish33] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c33]+1)
update sleeper set [oFinish34] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c34]+1)
update sleeper set [oFinish35] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c35]+1)
update sleeper set [oFinish36] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c36]+1)
update sleeper set [oFinish37] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c37]+1)
update sleeper set [oFinish38] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c38]+1)
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [oFinish39] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c39]+1)
update sleeper set [oFinish40] = (select odometer from drivers where
drivers.driverId = sleeper.Driverid and drivers.counter = [c40]+1);


alter table sleeper add miles1   money null;
alter table sleeper add miles2   money null;
alter table sleeper add miles3   money null;
alter table sleeper add miles4   money null;
alter table sleeper add miles5   money null;
alter table sleeper add miles6   money null;
alter table sleeper add miles7   money null;
alter table sleeper add miles8   money null;
alter table sleeper add miles9   money null;
alter table sleeper add miles10  money null;
alter table sleeper add miles11  money null;
alter table sleeper add miles12  money null;
alter table sleeper add miles13  money null;
alter table sleeper add miles14  money null;
alter table sleeper add miles15  money null;
alter table sleeper add miles16  money null;
alter table sleeper add miles17  money null;
alter table sleeper add miles18  money null;
alter table sleeper add miles19  money null;
alter table sleeper add miles20  money null;
alter table sleeper add miles21  money null;
alter table sleeper add miles22  money null;
alter table sleeper add miles23  money null;
alter table sleeper add miles24  money null;
alter table sleeper add miles25  money null;
alter table sleeper add miles26  money null;
alter table sleeper add miles27  money null;
alter table sleeper add miles28  money null;
alter table sleeper add miles29  money null;
alter table sleeper add miles30  money null;
alter table sleeper add miles31  money null;
alter table sleeper add miles32  money null;
alter table sleeper add miles33  money null;
alter table sleeper add miles34  money null;
alter table sleeper add miles35  money null;
alter table sleeper add miles36  money null;
alter table sleeper add miles37  money null;
alter table sleeper add miles38  money null;
alter table sleeper add miles39  money null;
alter table sleeper add miles40  money null;


update sleeper set [miles1] =   [oFinish1]  - [oStart1] ;
update sleeper set [miles2] =   [oFinish2]  - [oStart2] ;
update sleeper set [miles3] =   [oFinish3]  - [oStart3] ;
update sleeper set [miles4] =   [oFinish4]  - [oStart4] ;
update sleeper set [miles5] =   [oFinish5]  - [oStart5] ;
update sleeper set [miles6] =   [oFinish6]  - [oStart6] ;
update sleeper set [miles7] =   [oFinish7]  - [oStart7] ;
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [miles8] =    [oFinish8]  - [oStart8] ;
update sleeper set [miles9] =    [oFinish9]  - [oStart9] ;
update sleeper set [miles10] =   [oFinish10] - [oStart10];
update sleeper set [miles11] =   [oFinish11] - [oStart11];
update sleeper set [miles12] =   [oFinish12] - [oStart12];
update sleeper set [miles13] =   [oFinish13] - [oStart13];
update sleeper set [miles14] =   [oFinish14] - [oStart14];
update sleeper set [miles15] =   [oFinish15] - [oStart15];
update sleeper set [miles16] =   [oFinish16] - [oStart16];
update sleeper set [miles17] =   [oFinish17] - [oStart17];
update sleeper set [miles18] =   [oFinish18] - [oStart18];
update sleeper set [miles19] =   [oFinish19] - [oStart19];
update sleeper set [miles20] =   [oFinish20] - [oStart20];
update sleeper set [miles21] =   [oFinish21] - [oStart21];
update sleeper set [miles22] =   [oFinish22] - [oStart22];
update sleeper set [miles23] =   [oFinish23] - [oStart23];
update sleeper set [miles24] =   [oFinish24] - [oStart24];
update sleeper set [miles25] =   [oFinish25] - [oStart25];
update sleeper set [miles26] =   [oFinish26] - [oStart26];
update sleeper set [miles27] =   [oFinish27] - [oStart27];
update sleeper set [miles28] =   [oFinish28] - [oStart28];
update sleeper set [miles29] =   [oFinish29] - [oStart29];
update sleeper set [miles30] =   [oFinish30] - [oStart30];
update sleeper set [miles31] =   [oFinish31] - [oStart31];
update sleeper set [miles32] =   [oFinish32] - [oStart32];
update sleeper set [miles33] =   [oFinish33] - [oStart33];
update sleeper set [miles34] =   [oFinish34] - [oStart34];
update sleeper set [miles35] =   [oFinish35] - [oStart35];
update sleeper set [miles36] =   [oFinish36] - [oStart36];
update sleeper set [miles37] =   [oFinish37] - [oStart37];
update sleeper set [miles38] =   [oFinish38] - [oStart38];
update sleeper set [miles39] =   [oFinish39] - [oStart39];
update sleeper set [miles40] =   [oFinish40] - [oStart40];

alter table sleeper add minutes1   money null;
alter table sleeper add minutes2   money null;
alter table sleeper add minutes3   money null;
alter table sleeper add minutes4   money null;
alter table sleeper add minutes5   money null;
alter table sleeper add minutes6   money null;
alter table sleeper add minutes7   money null;
alter table sleeper add minutes8   money null;
alter table sleeper add minutes9   money null;
alter table sleeper add minutes10  money null;
alter table sleeper add minutes11  money null;
alter table sleeper add minutes12  money null;
alter table sleeper add minutes13  money null;
alter table sleeper add minutes14  money null;
alter table sleeper add minutes15  money null;
alter table sleeper add minutes16  money null;
alter table sleeper add minutes17  money null;
alter table sleeper add minutes18  money null;
alter table sleeper add minutes19  money null;
alter table sleeper add minutes20  money null;
alter table sleeper add minutes21  money null;
```

Ex. B, p. 203

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
alter table sleeper add minutes22  money null;
alter table sleeper add minutes23  money null;
alter table sleeper add minutes24  money null;
alter table sleeper add minutes25  money null;
alter table sleeper add minutes26  money null;
alter table sleeper add minutes27  money null;
alter table sleeper add minutes28  money null;
alter table sleeper add minutes29  money null;
alter table sleeper add minutes30  money null;
alter table sleeper add minutes31  money null;
alter table sleeper add minutes32  money null;
alter table sleeper add minutes33  money null;
alter table sleeper add minutes34  money null;
alter table sleeper add minutes35  money null;
alter table sleeper add minutes36  money null;
alter table sleeper add minutes37  money null;
alter table sleeper add minutes38  money null;
alter table sleeper add minutes39  money null;
alter table sleeper add minutes40  money null;


update sleeper set  minutes1 = null,  minutes2 = null,  minutes3 = null,
minutes4 = null,  minutes5 = null,  minutes6 = null,  minutes7 = null,
minutes8 = null,  minutes9 = null,  minutes10 = null,  minutes11 = null,
minutes12 = null,  minutes13 = null,  minutes14 = null,  minutes15 = null,
minutes16 = null,  minutes17 = null,  minutes18 = null,  minutes19 = null,
minutes20 = null,  minutes21 = null,  minutes22 = null,  minutes23 = null,
minutes24 = null,  minutes25 = null,  minutes26 = null,  minutes27 = null,
minutes28 = null,  minutes29 = null,  minutes30 = null,  minutes31 = null,
minutes32 = null,  minutes33 = null,  minutes34 = null,  minutes35 = null,
minutes36 = null,  minutes37 = null,  minutes38 = null,  minutes39 = null,
minutes40 = null;

update sleeper set [minutes1] =  datediff(minute,[start1]  , [finish1] ) where
[miles1]  > 2;
update sleeper set [minutes2] =  datediff(minute,[start2]  , [finish2] ) where
[miles2]  > 2;
update sleeper set [minutes3] =  datediff(minute,[start3]  , [finish3] ) where
[miles3]  > 2;
update sleeper set [minutes4] =  datediff(minute,[start4]  , [finish4] ) where
[miles4]  > 2;
update sleeper set [minutes5] =  datediff(minute,[start5]  , [finish5] ) where
[miles5]  > 2;
update sleeper set [minutes6] =  datediff(minute,[start6]  , [finish6] ) where
[miles6]  > 2;
update sleeper set [minutes7] =  datediff(minute,[start7]  , [finish7] ) where
[miles7]  > 2;
update sleeper set [minutes8] =  datediff(minute,[start8]  , [finish8] ) where
[miles8]  > 2;
update sleeper set [minutes9] =  datediff(minute,[start9]  , [finish9] ) where
[miles9]  > 2;
update sleeper set [minutes10] = datediff(minute,[start10] , [finish10]) where
[miles10] > 2;
update sleeper set [minutes11] = datediff(minute,[start11] , [finish11]) where
[miles11] > 2;
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [minutes12] = datediff(minute,[start12] , [finish12]) where
[miles12] > 2;
update sleeper set [minutes13] = datediff(minute,[start13] , [finish13]) where
[miles13] > 2;
update sleeper set [minutes14] = datediff(minute,[start14] , [finish14]) where
[miles14] > 2;
update sleeper set [minutes15] = datediff(minute,[start15] , [finish15]) where
[miles15] > 2;
update sleeper set [minutes16] = datediff(minute,[start16] , [finish16]) where
[miles16] > 2;
update sleeper set [minutes17] = datediff(minute,[start17] , [finish17]) where
[miles17] > 2;
update sleeper set [minutes18] = datediff(minute,[start18] , [finish18]) where
[miles18] > 2;
update sleeper set [minutes19] = datediff(minute,[start19] , [finish19]) where
[miles19] > 2;
update sleeper set [minutes20] = datediff(minute,[start20] , [finish20]) where
[miles20] > 2;
update sleeper set [minutes21] = datediff(minute,[start21] , [finish21]) where
[miles21] > 2;
update sleeper set [minutes22] = datediff(minute,[start22] , [finish22]) where
[miles22] > 2;
update sleeper set [minutes23] = datediff(minute,[start23] , [finish23]) where
[miles23] > 2;
update sleeper set [minutes24] = datediff(minute,[start24] , [finish24]) where
[miles24] > 2;
update sleeper set [minutes25] = datediff(minute,[start25] , [finish25]) where
[miles25] > 2;
update sleeper set [minutes26] = datediff(minute,[start26] , [finish26]) where
[miles26] > 2;
update sleeper set [minutes27] = datediff(minute,[start27] , [finish27]) where
[miles27] > 2;
update sleeper set [minutes28] = datediff(minute,[start28] , [finish28]) where
[miles28] > 2;
update sleeper set [minutes29] = datediff(minute,[start29] , [finish29]) where
[miles29] > 2;
update sleeper set [minutes30] = datediff(minute,[start30] , [finish30]) where
[miles30] > 2;
update sleeper set [minutes31] = datediff(minute,[start31] , [finish31]) where
[miles31] > 2;
update sleeper set [minutes32] = datediff(minute,[start32] , [finish32]) where
[miles32] > 2;
update sleeper set [minutes33] = datediff(minute,[start33] , [finish33]) where
[miles33] > 2;
update sleeper set [minutes34] = datediff(minute,[start34] , [finish34]) where
[miles34] > 2;
update sleeper set [minutes35] = datediff(minute,[start35] , [finish35]) where
[miles35] > 2;
update sleeper set [minutes36] = datediff(minute,[start36] , [finish36]) where
[miles36] > 2;
update sleeper set [minutes37] = datediff(minute,[start37] , [finish37]) where
[miles37] > 2;
update sleeper set [minutes38] = datediff(minute,[start38] , [finish38]) where
[miles38] > 2;
update sleeper set [minutes39] = datediff(minute,[start39] , [finish39]) where
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
[miles39] > 2;
update sleeper set [minutes40] = datediff(minute,[start40] , [finish40]) where
[miles40] > 2;

select top 10 * from drivers
alter table sleeper add stateStart1    varchar(120) null;
alter table sleeper add stateStart2    varchar(120) null;
alter table sleeper add stateStart3    varchar(120) null;
alter table sleeper add stateStart4    varchar(120) null;
alter table sleeper add stateStart5    varchar(120) null;
alter table sleeper add stateStart6    varchar(120) null;
alter table sleeper add stateStart7    varchar(120) null;
alter table sleeper add stateStart8    varchar(120) null;
alter table sleeper add stateStart9    varchar(120) null;
alter table sleeper add stateStart10   varchar(120) null;
alter table sleeper add stateStart11   varchar(120) null;
alter table sleeper add stateStart12   varchar(120) null;
alter table sleeper add stateStart13   varchar(120) null;
alter table sleeper add stateStart14   varchar(120) null;
alter table sleeper add stateStart15   varchar(120) null;
alter table sleeper add stateStart16   varchar(120) null;
alter table sleeper add stateStart17   varchar(120) null;
alter table sleeper add stateStart18   varchar(120) null;
alter table sleeper add stateStart19   varchar(120) null;
alter table sleeper add stateStart20   varchar(120) null;
alter table sleeper add stateStart21   varchar(120) null;
alter table sleeper add stateStart22   varchar(120) null;
alter table sleeper add stateStart23   varchar(120) null;
alter table sleeper add stateStart24   varchar(120) null;
alter table sleeper add stateStart25   varchar(120) null;
alter table sleeper add stateStart26   varchar(120) null;
alter table sleeper add stateStart27   varchar(120) null;
alter table sleeper add stateStart28   varchar(120) null;
alter table sleeper add stateStart29   varchar(120) null;
alter table sleeper add stateStart30   varchar(120) null;
alter table sleeper add stateStart31   varchar(120) null;
alter table sleeper add stateStart32   varchar(120) null;
alter table sleeper add stateStart33   varchar(120) null;
alter table sleeper add stateStart34   varchar(120) null;
alter table sleeper add stateStart35   varchar(120) null;
alter table sleeper add stateStart36   varchar(120) null;
alter table sleeper add stateStart37   varchar(120) null;
alter table sleeper add stateStart38   varchar(120) null;
alter table sleeper add stateStart39   varchar(120) null;
alter table sleeper add stateStart40   varchar(120) null;
alter table sleeper add stateFinish1   varchar(120) null;
alter table sleeper add stateFinish2   varchar(120) null;
alter table sleeper add stateFinish3   varchar(120) null;
alter table sleeper add stateFinish4   varchar(120) null;
alter table sleeper add stateFinish5   varchar(120) null;
alter table sleeper add stateFinish6   varchar(120) null;
alter table sleeper add stateFinish7   varchar(120) null;
alter table sleeper add stateFinish8   varchar(120) null;
alter table sleeper add stateFinish9   varchar(120) null;
alter table sleeper add stateFinish10  varchar(120) null;
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
alter table sleeper add stateFinish11  varchar(120) null;
alter table sleeper add stateFinish12  varchar(120) null;
alter table sleeper add stateFinish13  varchar(120) null;
alter table sleeper add stateFinish14  varchar(120) null;
alter table sleeper add stateFinish15  varchar(120) null;
alter table sleeper add stateFinish16  varchar(120) null;
alter table sleeper add stateFinish17  varchar(120) null;
alter table sleeper add stateFinish18  varchar(120) null;
alter table sleeper add stateFinish19  varchar(120) null;
alter table sleeper add stateFinish20  varchar(120) null;
alter table sleeper add stateFinish21  varchar(120) null;
alter table sleeper add stateFinish22  varchar(120) null;
alter table sleeper add stateFinish23  varchar(120) null;
alter table sleeper add stateFinish24  varchar(120) null;
alter table sleeper add stateFinish25  varchar(120) null;
alter table sleeper add stateFinish26  varchar(120) null;
alter table sleeper add stateFinish27  varchar(120) null;
alter table sleeper add stateFinish28  varchar(120) null;
alter table sleeper add stateFinish29  varchar(120) null;
alter table sleeper add stateFinish30  varchar(120) null;
alter table sleeper add stateFinish31  varchar(120) null;
alter table sleeper add stateFinish32  varchar(120) null;
alter table sleeper add stateFinish33  varchar(120) null;
alter table sleeper add stateFinish34  varchar(120) null;
alter table sleeper add stateFinish35  varchar(120) null;
alter table sleeper add stateFinish36  varchar(120) null;
alter table sleeper add stateFinish37  varchar(120) null;
alter table sleeper add stateFinish38  varchar(120) null;
alter table sleeper add stateFinish39  varchar(120) null;
alter table sleeper add stateFinish40  varchar(120) null;


update sleeper set [stateStart1] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c1]);
update sleeper set [stateStart2] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c2]);
update sleeper set [stateStart3] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c3]);
update sleeper set [stateStart4] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c4]);
update sleeper set [stateStart5] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c5]);
update sleeper set [stateStart6] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c6]);
update sleeper set [stateStart7] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c7]);
update sleeper set [stateStart8] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c8]);
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [stateStart9] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c9]);
update sleeper set [stateStart10] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c10]);
update sleeper set [stateStart11] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c11]);
update sleeper set [stateStart12] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c12]);
update sleeper set [stateStart13] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c13]);
update sleeper set [stateStart14] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c14]);
update sleeper set [stateStart15] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c15]);
update sleeper set [stateStart16] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c16]);
update sleeper set [stateStart17] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c17]);
update sleeper set [stateStart18] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c18]);
update sleeper set [stateStart19] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c19]);
update sleeper set [stateStart20] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c20]);
update sleeper set [stateStart21] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c21]);
update sleeper set [stateStart22] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c22]);
update sleeper set [stateStart23] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c23]);
update sleeper set [stateStart24] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c24]);
update sleeper set [stateStart25] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c25]);
update sleeper set [stateStart26] =   (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c26]);
update sleeper set [stateStart27] =   (select '(' + [state] + ') ' +
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c27]);
update sleeper set [stateStart28] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c28]);
update sleeper set [stateStart29] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c29]);
update sleeper set [stateStart30] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c30]);
update sleeper set [stateStart31] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c31]);
update sleeper set [stateStart32] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c32]);
update sleeper set [stateStart33] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c33]);
update sleeper set [stateStart34] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c34]);
update sleeper set [stateStart35] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c35]);
update sleeper set [stateStart36] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c36]);
update sleeper set [stateStart37] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c37]);
update sleeper set [stateStart38] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c38]);
update sleeper set [stateStart39] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c39]);
update sleeper set [stateStart40] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c40]);
update sleeper set [stateFinish1] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c1]+1)
update sleeper set [stateFinish2] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c2]+1)
update sleeper set [stateFinish3] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c3]+1)
update sleeper set [stateFinish4] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c4]+1)
update sleeper set [stateFinish5] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
drivers.counter =  [c5]+1)
update sleeper set [stateFinish6] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c6]+1)
update sleeper set [stateFinish7] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c7]+1)
update sleeper set [stateFinish8] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c8]+1)
update sleeper set [stateFinish9] =  (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter =  [c9]+1)
update sleeper set [stateFinish10] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c10]+1)
update sleeper set [stateFinish11] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c11]+1)
update sleeper set [stateFinish12] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c12]+1)
update sleeper set [stateFinish13] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c13]+1)
update sleeper set [stateFinish14] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c14]+1)
update sleeper set [stateFinish15] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c15]+1)
update sleeper set [stateFinish16] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c16]+1)
update sleeper set [stateFinish17] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c17]+1)
update sleeper set [stateFinish18] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c18]+1)
update sleeper set [stateFinish19] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c19]+1)
update sleeper set [stateFinish20] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c20]+1)
update sleeper set [stateFinish21] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c21]+1)
update sleeper set [stateFinish22] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c22]+1)
update sleeper set [stateFinish23] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c23]+1)
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
update sleeper set [stateFinish24] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c24]+1)
update sleeper set [stateFinish25] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c25]+1)
update sleeper set [stateFinish26] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c26]+1)
update sleeper set [stateFinish27] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c27]+1)
update sleeper set [stateFinish28] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c28]+1)
update sleeper set [stateFinish29] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c29]+1)
update sleeper set [stateFinish30] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c30]+1)
update sleeper set [stateFinish31] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c31]+1)
update sleeper set [stateFinish32] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c32]+1)
update sleeper set [stateFinish33] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c33]+1)
update sleeper set [stateFinish34] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c34]+1)
update sleeper set [stateFinish35] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c35]+1)
update sleeper set [stateFinish36] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c36]+1)
update sleeper set [stateFinish37] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c37]+1)
update sleeper set [stateFinish38] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c38]+1)
update sleeper set [stateFinish39] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c39]+1)
update sleeper set [stateFinish40] = (select '(' + [state] + ') ' +
isnull(location,'') from drivers where drivers.driverId = sleeper.Driverid and
drivers.counter = [c40]+1);


-- this is where we create a table
-- to create the major ingress/egress points in califorina
```

Ex. B, p. 211

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```
---

```
-- to determine the number of miles.

create table AZ (locationA varchar(180) null, locationZ varchar(180) null)
alter table AZ add cityA varchar(120) null, cityZ varchar(120) null
alter table AZ add offsetA int null
alter table AZ add offsetZ int null

update az set cityA = substring(locationa,charindex('of ',locationA)+3,50)
update az set cityZ = substring(locationz,charindex('of ',locationZ)+3,50)
update az set cityA = substring(citya,4,50) where substring(cityA,2,1) = ')'
update az set cityZ = substring(cityz,4,50) where substring(cityz,2,1) = ')'

update AZ set offsetA = null
update AZ set offsetZ = null

UPDATE AZ set offsetA = rtrim(ltrim(substring(locationA,
charindex('mi',locationA)-3,2)))  from az  where charindex('mi',locationA) > 0
UPDATE AZ set offsetZ = rtrim(ltrim(substring(locationZ,
charindex('mi',locationZ)-3,2)))  from az  where charindex('mi',locationZ) > 0

UPDATE AZ set offsetA = 0 where offsetA is null
UPDATE AZ set offsetZ = 0 where offsetZ is null

select distinct cityA, cityZ into #cityPair from AZ
select distinct cityZ, cityA from AZ

alter table AZ add HOMBROOK money null
alter table AZ add BLYTHE money null
alter table AZ add NEEDLES money null
alter table AZ add NIPTON money null
alter table AZ add MYSTIC money null


-- now we put the californiaMiles in here...
select count(*) from sleeper where californiaMiles1 is not null
select top 10 * from az
 select hombrook, blythe, needles, mystic, nipton from AZ where locationA =
'(ca) 1 mi wnw of commerce, ca' and locationZ = '(az) 44 mi nnw of st. johns,
az'
select * from az where hombrook is not null



alter table sleeper add californiaMiles1   money null;
alter table sleeper add californiaMiles2   money null;
alter table sleeper add californiaMiles3   money null;
alter table sleeper add californiaMiles4   money null;
alter table sleeper add californiaMiles5   money null;
alter table sleeper add californiaMiles6   money null;
alter table sleeper add californiaMiles7   money null;
alter table sleeper add californiaMiles8   money null;
alter table sleeper add californiaMiles9   money null;
alter table sleeper add californiaMiles10  money null;
alter table sleeper add californiaMiles11  money null;
alter table sleeper add californiaMiles12  money null;
```
---

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM

```
alter table sleeper add californiaMiles13  money null;
alter table sleeper add californiaMiles14  money null;
alter table sleeper add californiaMiles15  money null;
alter table sleeper add californiaMiles16  money null;
alter table sleeper add californiaMiles17  money null;
alter table sleeper add californiaMiles18  money null;
alter table sleeper add californiaMiles19  money null;
alter table sleeper add californiaMiles20  money null;
alter table sleeper add californiaMiles21  money null;
alter table sleeper add californiaMiles22  money null;
alter table sleeper add californiaMiles23  money null;
alter table sleeper add californiaMiles24  money null;
alter table sleeper add californiaMiles25  money null;
alter table sleeper add californiaMiles26  money null;
alter table sleeper add californiaMiles27  money null;
alter table sleeper add californiaMiles28  money null;
alter table sleeper add californiaMiles29  money null;
alter table sleeper add californiaMiles30  money null;
alter table sleeper add californiaMiles31  money null;
alter table sleeper add californiaMiles32  money null;
alter table sleeper add californiaMiles33  money null;
alter table sleeper add californiaMiles34  money null;
alter table sleeper add californiaMiles35  money null;
alter table sleeper add californiaMiles36  money null;
alter table sleeper add californiaMiles37  money null;
alter table sleeper add californiaMiles38  money null;
alter table sleeper add californiaMiles39  money null;
alter table sleeper add californiaMiles40  money null;

alter table sleeper add californiaMinutes1   money null;
alter table sleeper add californiaMinutes2   money null;
alter table sleeper add californiaMinutes3   money null;
alter table sleeper add californiaMinutes4   money null;
alter table sleeper add californiaMinutes5   money null;
alter table sleeper add californiaMinutes6   money null;
alter table sleeper add californiaMinutes7   money null;
alter table sleeper add californiaMinutes8   money null;
alter table sleeper add californiaMinutes9   money null;
alter table sleeper add californiaMinutes10  money null;
alter table sleeper add californiaMinutes11  money null;
alter table sleeper add californiaMinutes12  money null;
alter table sleeper add californiaMinutes13  money null;
alter table sleeper add californiaMinutes14  money null;
alter table sleeper add californiaMinutes15  money null;
alter table sleeper add californiaMinutes16  money null;
alter table sleeper add californiaMinutes17  money null;
alter table sleeper add californiaMinutes18  money null;
alter table sleeper add californiaMinutes19  money null;
alter table sleeper add californiaMinutes20  money null;
alter table sleeper add californiaMinutes21  money null;
alter table sleeper add californiaMinutes22  money null;
alter table sleeper add californiaMinutes23  money null;
alter table sleeper add californiaMinutes24  money null;
alter table sleeper add californiaMinutes25  money null;
alter table sleeper add californiaMinutes26  money null;
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
alter table sleeper add californiaMinutes27  money null;
alter table sleeper add californiaMinutes28  money null;
alter table sleeper add californiaMinutes29  money null;
alter table sleeper add californiaMinutes30  money null;
alter table sleeper add californiaMinutes31  money null;
alter table sleeper add californiaMinutes32  money null;
alter table sleeper add californiaMinutes33  money null;
alter table sleeper add californiaMinutes34  money null;
alter table sleeper add californiaMinutes35  money null;
alter table sleeper add californiaMinutes36  money null;
alter table sleeper add californiaMinutes37  money null;
alter table sleeper add californiaMinutes38  money null;
alter table sleeper add californiaMinutes39  money null;
alter table sleeper add californiaMinutes40  money null;


UPDATE dueker..sleeper
  set miles1= null,miles2= null,miles3= null,miles4= null,miles5= null,miles6=
null,miles7= null,miles8= null,miles9= null,miles10= null,miles11=
null,miles12= null,miles13= null,miles14= null,miles15= null,miles16=
null,miles17= null,miles18= null,miles19= null,miles20= null,miles21=
null,miles22= null,miles23= null,miles24= null,miles25= null,miles26=
null,miles27= null,miles28= null,miles29= null,miles30= null,miles31=
null,miles32= null,miles33= null,miles34= null,miles35= null,miles36=
null,miles37= null,miles38= null,miles39= null,miles40= null;


-- RUN THE SQL / VB PROCESS HERE.
-- RUN THE SQL / VB PROCESS HERE.
-- RUN THE SQL / VB PROCESS HERE.

select top 10 * from sleeper
select count(*) from sleeper where miles39 is not null

-- create an index on the driver table
-- create an index on the driver table
create index newId on drivers (newId)

-- final step is to build the workdata
-- workdata
-- final step is to build the workdata
-- final step is to build the workdata

-- build the workdata
-- drop table workdata


select distinct driverId, crossRef into workdata from drivers where crossRef is
not null

-- add these columns
alter table workdata
  add
  sleepMinutes int null;
--  sleepMiles int null,
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

```
  sleepStart datetime null,
  sleepFinish datetime null,
  mileageStart money null,
  mileageFinish money null,
  minutes money null,
  miles money null,
  isEntirelyWithinCa varchar(3) null;
--

select * from workdata

update workdata set shiftStart =
  (select top 1 convert(varchar(30),startTime,101)
          from drivers where drivers.crossRef = workdata.crossRef order by
startTime Asc)

update workdata set shiftFinish =
  (select top 1 convert(varchar(30),startTime,101)
          from drivers where drivers.crossRef = workdata.crossRef order by
startTime desc)


update workdata set sleepMinutes =
  (select isnull(californiaMinutes1 ,0)+ isnull(californiaMinutes2 ,0)+
isnull(californiaMinutes3 ,0)+ isnull(californiaMinutes4 ,0)+
isnull(californiaMinutes5 ,0)+ isnull(californiaMinutes6 ,0)+
isnull(californiaMinutes7 ,0)+ isnull(californiaMinutes8 ,0)+
isnull(californiaMinutes9 ,0)+ isnull(californiaMinutes10,0)+
isnull(californiaMinutes11,0)+ isnull(californiaMinutes12,0)+
isnull(californiaMinutes13,0)+ isnull(californiaMinutes14,0)+
isnull(californiaMinutes15,0)+ isnull(californiaMinutes16,0)+
isnull(californiaMinutes17,0)+ isnull(californiaMinutes18,0)+
isnull(californiaMinutes19,0)+ isnull(californiaMinutes20,0)+
isnull(californiaMinutes21,0)+ isnull(californiaMinutes22,0)+
isnull(californiaMinutes23,0)+ isnull(californiaMinutes24,0)+
isnull(californiaMinutes25,0)+ isnull(californiaMinutes26,0)+
isnull(californiaMinutes27,0)+ isnull(californiaMinutes28,0)+
isnull(californiaMinutes29,0)+ isnull(californiaMinutes30,0)+
isnull(californiaMinutes31,0)+ isnull(californiaMinutes32,0)+
isnull(californiaMinutes33,0)+ isnull(californiaMinutes34,0)+
isnull(californiaMinutes35,0)+ isnull(californiaMinutes36,0)+
isnull(californiaMinutes37,0)+ isnull(californiaMinutes38,0)+
isnull(californiaMinutes39,0)+ isnull(californiaMinutes40,0)
          from sleeper where sleeper.crossRef = workdata.crossRef)

update workdata set sleepMinutes = null where isnull(sleepMinutes,0) not
between 1 and 900

-- select
select  driverId, crossRef, sleepMinutes as sleeperMinutes
from workdata order by driverId, crossRef

-- selections for the declarations
-- selections for the declarations
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - a0. build and structure.sql
 8/27/2019, 10:05:31PM
```

---

```
-- selections for the declarations
select (select count(*) from [allDrivers])+
       (select count(*) from [alldriversBefore12-27-2013])

select count(*) from [alldrivers]
select count(*) from drivers_duplicate
select count(*) from drivers

select distinct driverId from drivers
select distinct activity, descript from drivers
select top 1 date from [alldriversBefore12-27-2013] order by date asc
select top 1 date from [allDrivers] order by date asc
select top 1 date from [allDrivers] order by date desc

select distinct driverId, date from drivers

select * from workdata  where sleepMinutes > 0
select distinct driverId from workdata  where sleepMinutes > 0

select distinct driverId from workdata

select * from workdata

select distinct driverId into #drivers from [alldriversBefore12-27-2013]
insert into #drivers select distinct driverId from [allDrivers]
select count(*) from

select count(*) from [drivers]
```

Ex. B, p. 216

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```sql
use dueker2

-- add a column for the benefit of a unique identifier ...
alter table allDrivers add newId varchar(42) null
update allDrivers set newId = convert(varchar(42),newId())
create index newId on allDrivers (newId)

-- allDrivers [remove anything from startDate of before...
alter table allDrivers alter column start_date datetime null
select * into [allDriversBefore12-27-2013] from dueker2..alldrivers where
start_date <'12/27/2013'
delete from dueker2..alldrivers where start_date <'12/27/2013'

--- crossRef / driver1 / driver2
alter table allDrivers add crossRef varchar(30) null
alter table allDrivers add driver1 varchar(120) null
alter table allDrivers add driver2 varchar(120) null
alter table allDrivers add date datetime null
alter table allDrivers add workdate datetime null;

update allDrivers set date = convert(varchar(30),start_date,101)
 -- update allDrivers set crossRef = convert(varchar(30),date,101) + '|' +
tractorId + '|' + driverId
update allDrivers set crossRef = null

-- ==========================================================================
-- Run the sequences here.  Run the sequences here.   Run the sequences here.
-- ==========================================================================

-- test the sequence
select top 100 workdate, date, startTime, sequence, descript, driverId,
coDriver from allDrivers  order by record_ID asc
select top 10 * from allDrivers

--
-- drop table crossRef
select distinct crossRef, date, driverId, tractorId into crossRef from
allDrivers
alter table crossRef add isDriver varchar(30) null, isCoDriver varchar(30) null
update crossRef set isDriver = (select top 1 'yes' from allDrivers where
allDrivers.date = crossRef.date and allDrivers.driverId = crossRef.driverId and
allDrivers.tractorId = crossRef.tractorId)
update crossRef set isCoDriver = (select top 1 'yes' from allDrivers where
allDrivers.date = crossRef.date and allDrivers.coDriver = crossRef.driverId and
allDrivers.tractorId = crossRef.tractorId)

-- check the crossRef to see what's going on here.
-- this is just for crossRef only...
select top 800 * from allDrivers order by record_ID asc
update allDrivers set driver1 = driverId;
update allDrivers set driver2 = coDriver;

update alldrivers set driverId = null where driverId = '';
update alldrivers set coDriver = null where coDriver = '';
```

Ex. B, p. 217

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
-- let's build the shift segments and look to see whether there are any
california segments...


select top 10 * from crossRef where isCoDriver = 'YES'

select * from allDrivers where  crossRef = '06/08/2017|101890' order by
startTime

select count(*) from crossRef where isDriver = 'YES' and isCodriver ='yES'

-- alter table allDrivers alter column distance money null
alter table allDrivers alter column odometer money null
alter table allDrivers alter column duration money null
--update allDrivers set distance = distance / 10
update allDrivers set odometer = odometer / 10
select top 1000 odometer from alldrivers


--update allDrivers set duration = duration * 10

select top 10 * from allDrivers
select top 10 * from dueker2..allDrivers
select top 1000 workdate, date, startTime, driverId, coDriver, descript,
sequence, crossRef from dueker2..allDrivers order by recordId
select count(*) from workdata


select top 10 duration from dueker..allDrivers
select top 10 duration from dueker..allDrivers


select count(*) from allDrivers where coDriver <> driverId and descript =
'sleeper' and duration > 0

select dateadd(minute,704, '6/8/2017  8:47:00 AM')


-- calendar day?
-- this is just california crews where the entirety of the trips from the excel
sheets
-- within califonia
select * into b_drivers
select * into allDrivers from allDrivers

-- selection of dates to make sure that we exclude shifts before 11/27/2013.
select * into [allDriversBefore12-27-2013] from allDrivers where date <=
'12/27/2013'
delete from allDrivers where date <= '12/27/2013'



-- any part of the trip touches california
select * into allDrivers from allDrivers where crossRef in (select crossRef
from allDrivers (nolock) where state = 'CA')
```

Ex. B, p. 218

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
-- all parts of the trip are exclusively within california
select * into allDriversEntirelyWithinCalifornia from allDrivers where crossRef
in (select crossRef from allDrivers (nolock) where state = 'CA')
delete from allDriversEntirelyWithinCalifornia where crossRef in (select
crossRef from californiaOnlyDrivers where state <> 'CA')

-- SET THE CROSSREF
select top 10 * from allDrivers
update allDrivers set crossRef = convert(varchar(30),date,101) + '|' +
tractorId + '|' + driverId
update allDrivers set crossRef = convert(varchar(30),date,101) + '|' +
tractorId + '|' + driverId
update allDriversEntirelyWithinCalifornia set crossRef =
convert(varchar(30),date,101) + '|' + driverId

-- add these columns and then establish the frequencies...
alter table allDrivers add sequence int null
alter table allDrivers add workdate datetime null;
alter table allDrivers add isSleepStart varchar(3) null
alter table allDrivers add isSleepFinish varchar(3) null


-- THIS IS WHERE WE BUILD THE SLEEPERS
-- THIS IS A LOT OF INFORMATION
-- we just use this for a visual reference
-- in the microsoft excel (XLSX) sheets so that
-- we can do a visual look-over because we want to be
-- clear that we have captured it in the computer as intended.
drop table #sleep
select distinct driverId, sleepCOunt, convert(int, null) as sequence into
#sleep from allDrivers where sequence is not null

select top 5000 * from allDrivers order by record_ID
select
update alldrivers set driver1 = null where driver1 = ''
update alldrivers set driver2 = null where driver2 = ''

update #sleep set sequence = (select top 1 sequence from allDrivers
  where allDrivers.driverId = #sleep.driverId
    and allDrivers.sleepCount = #sleep.sleepCount
  order by sequence desc)

alter table allDrivers alter column sequence2 money null
alter table allDrivers add sleepcount int null;
alter table allDrivers add sequence2 int null


update allDrivers set isSleeper = '(start)' where sequence = 1
update allDrivers set isSleeper = '(finish)' where driverId + '|' +
convert(varchar(30),sleepCount) + '|' + convert(varchar(30),sequence) in
 (select driverId + '|' + convert(varchar(30),sleepCount) + '|' +
convert(varchar(30),sequence) from #sleep)
update allDrivers set isSleeper = '(cont)' where isSleeper in ('CONT','YES')
update allDrivers set isSleeper = '(--)' where isSleeper = 'FINISH' and
sequence = 1
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
-- aaron aaron here.
-- this is a nice output.
-- this is a nice output.
-- this is a nice output.
-- this is a nice output.
select  top 100 descript, record_ID, startTime, workdate, driverId, isSleeper,
sleepcount, sequence , sequence2, odometer, '(' + state + ') ' + location as
location, newId
from allDrivers
/* where isSleeper is not null and sequence is not null order by driverId,
counter */
order by driverId, record_ID, startTime


select  top 100 descript, record_ID, startTime, workdate, driverId, isSleeper,
sleepcount, sequence , sequence2, odometer, '(' + state + ') ' + location as
location, newId
from allDrivers  (nolock)
order by driverId, record_ID, startTime


-- this is just to preserve the continuity...


-- ==============================================================
-- This is where we attribute the disperate, discrete elements
-- to the various categories so that we can determine when
-- and where the time is taking place.
-- ==============================================================
-- create a master crossWalk for sleeper
-- create a master crossWalk for sleeper
-- create a master crossWalk for sleeper
-- create a master crossWalk for sleeper
-- drop table sleeper


-- because ... well, because
update allDrivers set crossRef = convert(varchar(30),workdate,101) + '|' +
convert(varchar(30),sleepCOunt) + '|' + driverId

create index crossRef on allDrivers (crossRef);
create index isSleeper on allDrivers (isSleeper)
create index sequence2 on allDrivers (sequence2)

select descript, count(*) from allDrivers (nolock) where isSleeper = 'YES'
group by descript
select count(*) from allDrivers (nolock) where isSleeper = 'YES' and descript
<> 'SLEEPER'

-- build this puppy
-- drop table sleeper
-- drop table sleeper_noCalifornia
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
select distinct driverId, crossRef into sleeper from allDrivers where isSleeper
= 'YES'  and crossRef is not null;
alter table sleeper add isCalifornia varchar(3) null;

-- if the state is 'CALIFORNIA' then we are going to run with it.
-- otherwise, there's no reason if there's not a portion of the sleeper
-- that took place in California.

update sleeper set isCalifornia = 'YES' where
crossRef in (select crossRef from allDrivers where isSleeper = 'YES' and state
= 'CA')

select * into sleeper_noCalifornia from sleeper where isCalifornia is null;
delete from sleeper where isCalifornia is null;

---

alter table sleeper add [1] money null
alter table sleeper add [2] money null
alter table sleeper add [3] money null
alter table sleeper add [4] money null
alter table sleeper add [5] money null
alter table sleeper add [6] money null
alter table sleeper add [7] money null
alter table sleeper add [8] money null
alter table sleeper add [9] money null
alter table sleeper add [10] money null
alter table sleeper add [11] money null
alter table sleeper add [12] money null
alter table sleeper add [13] money null
alter table sleeper add [14] money null
alter table sleeper add [15] money null
alter table sleeper add [16] money null
alter table sleeper add [17] money null
alter table sleeper add [18] money null
alter table sleeper add [19] money null
alter table sleeper add [20] money null
alter table sleeper add [21] money null
alter table sleeper add [22] money null
alter table sleeper add [23] money null
alter table sleeper add [24] money null
alter table sleeper add [25] money null
alter table sleeper add [26] money null
alter table sleeper add [27] money null
alter table sleeper add [28] money null
alter table sleeper add [29] money null
alter table sleeper add [30] money null
alter table sleeper add [31] money null
alter table sleeper add [32] money null
alter table sleeper add [33] money null
alter table sleeper add [34] money null
alter table sleeper add [35] money null
alter table sleeper add [36] money null
alter table sleeper add [37] money null
alter table sleeper add [38] money null
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
alter table sleeper add [39] money null
alter table sleeper add [40] money null


alter table sleeper add [c1] varchar(30) null
alter table sleeper add [c2] varchar(30) null
alter table sleeper add [c3] varchar(30) null
alter table sleeper add [c4] varchar(30) null
alter table sleeper add [c5] varchar(30) null
alter table sleeper add [c6] varchar(30) null
alter table sleeper add [c7] varchar(30) null
alter table sleeper add [c8] varchar(30) null
alter table sleeper add [c9] varchar(30) null
alter table sleeper add [c10] varchar(30) null
alter table sleeper add [c11] varchar(30) null
alter table sleeper add [c12] varchar(30) null
alter table sleeper add [c13] varchar(30) null
alter table sleeper add [c14] varchar(30) null
alter table sleeper add [c15] varchar(30) null
alter table sleeper add [c16] varchar(30) null
alter table sleeper add [c17] varchar(30) null
alter table sleeper add [c18] varchar(30) null
alter table sleeper add [c19] varchar(30) null
alter table sleeper add [c20] varchar(30) null
alter table sleeper add [c21] varchar(30) null
alter table sleeper add [c22] varchar(30) null
alter table sleeper add [c23] varchar(30) null
alter table sleeper add [c24] varchar(30) null
alter table sleeper add [c25] varchar(30) null
alter table sleeper add [c26] varchar(30) null
alter table sleeper add [c27] varchar(30) null
alter table sleeper add [c28] varchar(30) null
alter table sleeper add [c29] varchar(30) null
alter table sleeper add [c30] varchar(30) null
alter table sleeper add [c31] varchar(30) null
alter table sleeper add [c32] varchar(30) null
alter table sleeper add [c33] varchar(30) null
alter table sleeper add [c34] varchar(30) null
alter table sleeper add [c35] varchar(30) null
alter table sleeper add [c36] varchar(30) null
alter table sleeper add [c37] varchar(30) null
alter table sleeper add [c38] varchar(30) null
alter table sleeper add [c39] varchar(30) null
alter table sleeper add [c40] varchar(30) null


update sleeper set [1]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef order by sequence2
asc)
update sleeper set [2]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[1]   order by sequence2 asc)
update sleeper set [3]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[2]   order by sequence2 asc)
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
update sleeper set [4]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[3]   order by sequence2 asc)
update sleeper set [5]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[4]   order by sequence2 asc)
update sleeper set [6]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[5]   order by sequence2 asc)
update sleeper set [7]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[6]   order by sequence2 asc)
update sleeper set [8]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[7]   order by sequence2 asc)
update sleeper set [9]  = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[8]   order by sequence2 asc)
update sleeper set [10] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[9]   order by sequence2 asc)
update sleeper set [11] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[10]  order by sequence2 asc)
update sleeper set [12] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[11]  order by sequence2 asc)
update sleeper set [13] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[12]  order by sequence2 asc)
update sleeper set [14] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[13]  order by sequence2 asc)
update sleeper set [15] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[14]  order by sequence2 asc)
update sleeper set [16] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[15]  order by sequence2 asc)
update sleeper set [17] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[16]  order by sequence2 asc)
update sleeper set [18] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[17]  order by sequence2 asc)
update sleeper set [19] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[18]  order by sequence2 asc)
update sleeper set [20] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[19]  order by sequence2 asc)
update sleeper set [21] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[20]  order by sequence2 asc)
update sleeper set [22] = (select top 1 sequence2 from allDrivers where
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[21]  order by sequence2 asc)
update sleeper set [23] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[22]  order by sequence2 asc)
update sleeper set [24] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[23]  order by sequence2 asc)
update sleeper set [25] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[24]  order by sequence2 asc)
update sleeper set [26] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[25]  order by sequence2 asc)
update sleeper set [27] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[26]  order by sequence2 asc)
update sleeper set [28] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[27]  order by sequence2 asc)
update sleeper set [29] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[28]  order by sequence2 asc)
update sleeper set [30] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[29]  order by sequence2 asc)
update sleeper set [31] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[30]  order by sequence2 asc)
update sleeper set [32] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[31]  order by sequence2 asc)
update sleeper set [33] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[32]  order by sequence2 asc)
update sleeper set [34] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[33]  order by sequence2 asc)
update sleeper set [35] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[34]  order by sequence2 asc)
update sleeper set [36] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[35]  order by sequence2 asc)
update sleeper set [37] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[36]  order by sequence2 asc)
update sleeper set [38] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[37]  order by sequence2 asc)
update sleeper set [39] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 > sleeper.[38]  order by sequence2 asc)
update sleeper set [40] = (select top 1 sequence2 from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

---

```
allDrivers.sequence2 > sleeper.[39]  order by sequence2 asc)

update sleeper set [c1]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [1] )
update sleeper set [c2]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [2] )
update sleeper set [c3]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [3] )
update sleeper set [c4]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [4] )
update sleeper set [c5]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [5] )
update sleeper set [c6]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [6] )
update sleeper set [c7]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [7] )
update sleeper set [c8]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [8] )
update sleeper set [c9]  = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [9] )
update sleeper set [c10] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [10])
update sleeper set [c11] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [11])
update sleeper set [c12] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [12])
update sleeper set [c13] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [13])
update sleeper set [c14] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [14])
update sleeper set [c15] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [15])
update sleeper set [c16] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [16])
update sleeper set [c17] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [17])
update sleeper set [c18] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
allDrivers.sequence2 = [18])
update sleeper set [c19] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [19])
update sleeper set [c20] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [20])
update sleeper set [c21] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [21])
update sleeper set [c22] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [22])
update sleeper set [c23] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [23])
update sleeper set [c24] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [24])
update sleeper set [c25] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [25])
update sleeper set [c26] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [26])
update sleeper set [c27] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [27])
update sleeper set [c28] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [28])
update sleeper set [c29] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [29])
update sleeper set [c30] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [30])
update sleeper set [c31] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [31])
update sleeper set [c32] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [32])
update sleeper set [c33] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [33])
update sleeper set [c34] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [34])
update sleeper set [c35] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [35])
update sleeper set [c36] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [36])
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
update sleeper set [c37] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [37])
update sleeper set [c38] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [38])
update sleeper set [c39] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [39])
update sleeper set [c40] = (select top 1 record_id from allDrivers where
isSleeper = 'YES' and allDrivers.crossRef = sleeper.crossRef and
allDrivers.sequence2 = [40])


alter table sleeper add [start1] dateTime  null; alter table sleeper add
[finish1] dateTime  null;
alter table sleeper add [start2] dateTime  null; alter table sleeper add
[finish2] dateTime  null
alter table sleeper add [start3] dateTime  null; alter table sleeper add
[finish3] dateTime  null
alter table sleeper add [start4] dateTime  null; alter table sleeper add
[finish4] dateTime  null
alter table sleeper add [start5] dateTime  null; alter table sleeper add
[finish5] dateTime  null
alter table sleeper add [start6] dateTime  null; alter table sleeper add
[finish6] dateTime  null
alter table sleeper add [start7] dateTime  null; alter table sleeper add
[finish7] dateTime  null
alter table sleeper add [start8] dateTime  null; alter table sleeper add
[finish8] dateTime  null
alter table sleeper add [start9] dateTime  null; alter table sleeper add
[finish9] dateTime  null
alter table sleeper add [start10] dateTime  null; alter table sleeper add
[finish10] dateTime  null
alter table sleeper add [start11] dateTime  null; alter table sleeper add
[finish11] dateTime  null
alter table sleeper add [start12] dateTime  null; alter table sleeper add
[finish12] dateTime  null
alter table sleeper add [start13] dateTime  null; alter table sleeper add
[finish13] dateTime  null
alter table sleeper add [start14] dateTime  null; alter table sleeper add
[finish14] dateTime  null
alter table sleeper add [start15] dateTime  null; alter table sleeper add
[finish15] dateTime  null
alter table sleeper add [start16] dateTime  null; alter table sleeper add
[finish16] dateTime  null
alter table sleeper add [start17] dateTime  null; alter table sleeper add
[finish17] dateTime  null
alter table sleeper add [start18] dateTime  null; alter table sleeper add
[finish18] dateTime  null
alter table sleeper add [start19] dateTime  null; alter table sleeper add
[finish19] dateTime  null
alter table sleeper add [start20] dateTime  null; alter table sleeper add
[finish20] dateTime  null
alter table sleeper add [start21] dateTime  null; alter table sleeper add
[finish21] dateTime  null
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
alter table sleeper add [start22] dateTime  null; alter table sleeper add
[finish22] dateTime  null
alter table sleeper add [start23] dateTime  null; alter table sleeper add
[finish23] dateTime  null
alter table sleeper add [start24] dateTime  null; alter table sleeper add
[finish24] dateTime  null
alter table sleeper add [start25] dateTime  null; alter table sleeper add
[finish25] dateTime  null
alter table sleeper add [start26] dateTime  null; alter table sleeper add
[finish26] dateTime  null
alter table sleeper add [start27] dateTime  null; alter table sleeper add
[finish27] dateTime  null
alter table sleeper add [start28] dateTime  null; alter table sleeper add
[finish28] dateTime  null
alter table sleeper add [start29] dateTime  null; alter table sleeper add
[finish29] dateTime  null
alter table sleeper add [start30] dateTime  null; alter table sleeper add
[finish30] dateTime  null
alter table sleeper add [start31] dateTime  null; alter table sleeper add
[finish31] dateTime  null
alter table sleeper add [start32] dateTime  null; alter table sleeper add
[finish32] dateTime  null
alter table sleeper add [start33] dateTime  null; alter table sleeper add
[finish33] dateTime  null
alter table sleeper add [start34] dateTime  null; alter table sleeper add
[finish34] dateTime  null
alter table sleeper add [start35] dateTime  null; alter table sleeper add
[finish35] dateTime  null
alter table sleeper add [start36] dateTime  null; alter table sleeper add
[finish36] dateTime  null
alter table sleeper add [start37] dateTime  null; alter table sleeper add
[finish37] dateTime  null
alter table sleeper add [start38] dateTime  null; alter table sleeper add
[finish38] dateTime  null
alter table sleeper add [start39] dateTime  null; alter table sleeper add
[finish39] dateTime  null
alter table sleeper add [start40] dateTime  null; alter table sleeper add
[finish40] dateTime  null

update sleeper set [start1] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c1]);
update sleeper set [start2] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c2]);
update sleeper set [start3] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c3]);
update sleeper set [start4] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c4]);
update sleeper set [start5] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c5]);
update sleeper set [start6] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c6]);
update sleeper set [start7] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c7]);
update sleeper set [start8] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c8]);
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

---

```
update sleeper set [start9] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c9]);
update sleeper set [start10] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c10]);
update sleeper set [start11] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c11]);
update sleeper set [start12] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c12]);
update sleeper set [start13] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c13]);
update sleeper set [start14] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c14]);
update sleeper set [start15] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c15]);
update sleeper set [start16] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c16]);
update sleeper set [start17] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c17]);
update sleeper set [start18] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c18]);
update sleeper set [start19] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c19]);
update sleeper set [start20] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c20]);
update sleeper set [start21] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c21]);
update sleeper set [start22] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c22]);
update sleeper set [start23] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c23]);
update sleeper set [start24] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c24]);
update sleeper set [start25] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c25]);
update sleeper set [start26] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c26]);
update sleeper set [start27] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c27]);
update sleeper set [start28] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c28]);
update sleeper set [start29] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c29]);
update sleeper set [start30] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c30]);
update sleeper set [start31] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c31]);
update sleeper set [start32] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c32]);
update sleeper set [start33] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c33]);
update sleeper set [start34] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c34]);
update sleeper set [start35] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c35]);
update sleeper set [start36] = (select startTime from allDrivers where
```

---

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

---

```
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c36]);
update sleeper set [start37] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c37]);
update sleeper set [start38] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c38]);
update sleeper set [start39] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c39]);
update sleeper set [start40] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c40]);

update sleeper set [finish1] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c2])
update sleeper set [finish2] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c3])
update sleeper set [finish3] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c4])
update sleeper set [finish4] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c5])
update sleeper set [finish5] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c6])
update sleeper set [finish6] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c7])
update sleeper set [finish7] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c8])
update sleeper set [finish8] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c9])
update sleeper set [finish9] =  (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c10])
update sleeper set [finish10] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c11])
update sleeper set [finish11] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c12])
update sleeper set [finish12] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c13])
update sleeper set [finish13] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c14])
update sleeper set [finish14] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c15])
update sleeper set [finish15] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c16])
update sleeper set [finish16] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c17])
update sleeper set [finish17] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c18])
update sleeper set [finish18] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c19])
update sleeper set [finish19] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c20])
update sleeper set [finish20] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c21])
update sleeper set [finish21] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c22])
update sleeper set [finish22] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c23])
update sleeper set [finish23] = (select startTime from allDrivers where
```

Ex. B, p. 230

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c24])
update sleeper set [finish24] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c25])
update sleeper set [finish25] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c26])
update sleeper set [finish26] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c27])
update sleeper set [finish27] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c28])
update sleeper set [finish28] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c29])
update sleeper set [finish29] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c30])
update sleeper set [finish30] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c31])
update sleeper set [finish31] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c32])
update sleeper set [finish32] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c33])
update sleeper set [finish33] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c34])
update sleeper set [finish34] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c35])
update sleeper set [finish35] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c36])
update sleeper set [finish36] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c37])
update sleeper set [finish37] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c38])
update sleeper set [finish38] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c39])
update sleeper set [finish39] = (select startTime from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c40])


-- odometer
alter table sleeper add [oStart1] money  null; alter table sleeper add
[oFinish1] money  null ;
alter table sleeper add [oStart2] money  null; alter table sleeper add
[oFinish2] money  null ;
alter table sleeper add [oStart3] money  null; alter table sleeper add
[oFinish3] money  null ;
alter table sleeper add [oStart4] money  null; alter table sleeper add
[oFinish4] money  null ;
alter table sleeper add [oStart5] money  null; alter table sleeper add
[oFinish5] money  null ;
alter table sleeper add [oStart6] money  null; alter table sleeper add
[oFinish6] money  null ;
alter table sleeper add [oStart7] money  null; alter table sleeper add
[oFinish7] money  null ;
alter table sleeper add [oStart8] money  null; alter table sleeper add
[oFinish8] money  null ;
alter table sleeper add [oStart9] money  null; alter table sleeper add
[oFinish9] money  null ;
alter table sleeper add [oStart10] money  null; alter table sleeper add
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
[oFinish10] money  null ;
alter table sleeper add [oStart11] money  null; alter table sleeper add
[oFinish11] money  null ;
alter table sleeper add [oStart12] money  null; alter table sleeper add
[oFinish12] money  null ;
alter table sleeper add [oStart13] money  null; alter table sleeper add
[oFinish13] money  null ;
alter table sleeper add [oStart14] money  null; alter table sleeper add
[oFinish14] money  null ;
alter table sleeper add [oStart15] money  null; alter table sleeper add
[oFinish15] money  null ;
alter table sleeper add [oStart16] money  null; alter table sleeper add
[oFinish16] money  null ;
alter table sleeper add [oStart17] money  null; alter table sleeper add
[oFinish17] money  null ;
alter table sleeper add [oStart18] money  null; alter table sleeper add
[oFinish18] money  null ;
alter table sleeper add [oStart19] money  null; alter table sleeper add
[oFinish19] money  null ;
alter table sleeper add [oStart20] money  null; alter table sleeper add
[oFinish20] money  null ;
alter table sleeper add [oStart21] money  null; alter table sleeper add
[oFinish21] money  null ;
alter table sleeper add [oStart22] money  null; alter table sleeper add
[oFinish22] money  null ;
alter table sleeper add [oStart23] money  null; alter table sleeper add
[oFinish23] money  null ;
alter table sleeper add [oStart24] money  null; alter table sleeper add
[oFinish24] money  null ;
alter table sleeper add [oStart25] money  null; alter table sleeper add
[oFinish25] money  null ;
alter table sleeper add [oStart26] money  null; alter table sleeper add
[oFinish26] money  null ;
alter table sleeper add [oStart27] money  null; alter table sleeper add
[oFinish27] money  null ;
alter table sleeper add [oStart28] money  null; alter table sleeper add
[oFinish28] money  null ;
alter table sleeper add [oStart29] money  null; alter table sleeper add
[oFinish29] money  null ;
alter table sleeper add [oStart30] money  null; alter table sleeper add
[oFinish30] money  null ;
alter table sleeper add [oStart31] money  null; alter table sleeper add
[oFinish31] money  null ;
alter table sleeper add [oStart32] money  null; alter table sleeper add
[oFinish32] money  null ;
alter table sleeper add [oStart33] money  null; alter table sleeper add
[oFinish33] money  null ;
alter table sleeper add [oStart34] money  null; alter table sleeper add
[oFinish34] money  null ;
alter table sleeper add [oStart35] money  null; alter table sleeper add
[oFinish35] money  null ;
alter table sleeper add [oStart36] money  null; alter table sleeper add
[oFinish36] money  null ;
alter table sleeper add [oStart37] money  null; alter table sleeper add
[oFinish37] money  null ;
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
alter table sleeper add [oStart38] money  null; alter table sleeper add
[oFinish38] money  null ;
alter table sleeper add [oStart39] money  null; alter table sleeper add
[oFinish39] money  null ;
alter table sleeper add [oStart40] money  null; alter table sleeper add
[oFinish40] money  null ;


-- odometer start/finish

update sleeper set [oStart1] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c1]);
update sleeper set [oStart2] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c2]);
update sleeper set [oStart3] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c3]);
update sleeper set [oStart4] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c4]);
update sleeper set [oStart5] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c5]);
update sleeper set [oStart6] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c6]);
update sleeper set [oStart7] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c7]);
update sleeper set [oStart8] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c8]);
update sleeper set [oStart9] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c9]);
update sleeper set [oStart10] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c10]);
update sleeper set [oStart11] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c11]);
update sleeper set [oStart12] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c12]);
update sleeper set [oStart13] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c13]);
update sleeper set [oStart14] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c14]);
update sleeper set [oStart15] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c15]);
update sleeper set [oStart16] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c16]);
update sleeper set [oStart17] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c17]);
update sleeper set [oStart18] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c18]);
update sleeper set [oStart19] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c19]);
update sleeper set [oStart20] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c20]);
update sleeper set [oStart21] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c21]);
update sleeper set [oStart22] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c22]);
update sleeper set [oStart23] = (select odometer from allDrivers where
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c23]);
update sleeper set [oStart24] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c24]);
update sleeper set [oStart25] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c25]);
update sleeper set [oStart26] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c26]);
update sleeper set [oStart27] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c27]);
update sleeper set [oStart28] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c28]);
update sleeper set [oStart29] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c29]);
update sleeper set [oStart30] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c30]);
update sleeper set [oStart31] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c31]);
update sleeper set [oStart32] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c32]);
update sleeper set [oStart33] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c33]);
update sleeper set [oStart34] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c34]);
update sleeper set [oStart35] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c35]);
update sleeper set [oStart36] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c36]);
update sleeper set [oStart37] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c37]);
update sleeper set [oStart38] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c38]);
update sleeper set [oStart39] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c39]);
update sleeper set [oStart40] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c40]);
update sleeper set [oFinish1] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =   [c2])
update sleeper set [oFinish2] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =   [c3])
update sleeper set [oFinish3] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =   [c4])
update sleeper set [oFinish4] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =   [c5])
update sleeper set [oFinish5] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =   [c6])
update sleeper set [oFinish6] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =   [c7])
update sleeper set [oFinish7] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c8])
update sleeper set [oFinish8] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =   [c9])
update sleeper set [oFinish9] =  (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID =  [c10])
update sleeper set [oFinish10] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c11])
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
update sleeper set [oFinish11] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c12])
update sleeper set [oFinish12] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c13])
update sleeper set [oFinish13] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c14])
update sleeper set [oFinish14] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c15])
update sleeper set [oFinish15] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c16])
update sleeper set [oFinish16] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c17])
update sleeper set [oFinish17] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c18])
update sleeper set [oFinish18] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c19])
update sleeper set [oFinish19] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c20])
update sleeper set [oFinish20] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c21])
update sleeper set [oFinish21] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c22])
update sleeper set [oFinish22] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c23])
update sleeper set [oFinish23] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c24])
update sleeper set [oFinish24] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c25])
update sleeper set [oFinish25] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c26])
update sleeper set [oFinish26] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c27])
update sleeper set [oFinish27] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c28])
update sleeper set [oFinish28] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c29])
update sleeper set [oFinish29] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c30])
update sleeper set [oFinish30] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c31])
update sleeper set [oFinish31] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c32])
update sleeper set [oFinish32] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c33])
update sleeper set [oFinish33] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c34])
update sleeper set [oFinish34] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c35])
update sleeper set [oFinish35] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c36])
update sleeper set [oFinish36] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c37])
update sleeper set [oFinish37] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c38])
update sleeper set [oFinish38] = (select odometer from allDrivers where
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c39])
update sleeper set [oFinish39] = (select odometer from allDrivers where
allDrivers.driverId = sleeper.Driverid and alldrivers.record_ID = [c40])


update sleeper set isIgnore = 'X', ofinish1 = oStart1, oStart2 = oStart1 where
oFinish1 = 0 and oStart2 = 0;
update sleeper set isIgnore = 'X', ofinish2 = oStart2, oStart3 = oStart2 where
oFinish2 = 0 and oStart3 = 0;
update sleeper set isIgnore = 'X', ofinish3 = oStart3, oStart4 = oStart3 where
oFinish3 = 0 and oStart4 = 0;
update sleeper set isIgnore = 'X', ofinish4 = oStart4, oStart5 = oStart4 where
oFinish4 = 0 and oStart5 = 0;
update sleeper set isIgnore = 'X', ofinish5 = oStart5, oStart6 = oStart5 where
oFinish5 = 0 and oStart6 = 0;
update sleeper set isIgnore = 'X', ofinish6 = oStart6, oStart7 = oStart6 where
oFinish6 = 0 and oStart7 = 0;
update sleeper set isIgnore = 'X', ofinish7 = oStart7, oStart8 = oStart7 where
oFinish7 = 0 and oStart8 = 0;
update sleeper set oStart1 = oFinish1 where ofinish1 > 0 and oStart1 = 0;

update sleeper set isIgnore = 'YES - odometer' where
    oStart1  <= 0 or oFinish1  <= 0 or oStart2  <= 0 or oFinish2  <= 0 or
oStart3  <= 0 or oFinish3  <= 0
 or oStart4  <= 0 or oFinish4  <= 0 or oStart5  <= 0 or oFinish5  <= 0 or
oStart6  <= 0 or oFinish6  <= 0
 or oStart7  <= 0 or oFinish7  <= 0 or oStart8  <= 0 or oFinish8  <= 0 or
oStart9  <= 0 or oFinish9  <= 0
 or oStart10 <= 0 or oFinish10 <= 0 or oStart11 <= 0 or oFinish11 <= 0 or
oStart12 <= 0 or oFinish12 <= 0
 or oStart13 <= 0 or oFinish13 <= 0 or oStart14 <= 0 or oFinish14 <= 0 or
oStart15 <= 0 or oFinish15 <= 0


alter table sleeper add miles1   money null;
alter table sleeper add miles2   money null;
alter table sleeper add miles3   money null;
alter table sleeper add miles4   money null;
alter table sleeper add miles5   money null;
alter table sleeper add miles6   money null;
alter table sleeper add miles7   money null;
alter table sleeper add miles8   money null;
alter table sleeper add miles9   money null;
alter table sleeper add miles10  money null;
alter table sleeper add miles11  money null;
alter table sleeper add miles12  money null;
alter table sleeper add miles13  money null;
alter table sleeper add miles14  money null;
alter table sleeper add miles15  money null;
alter table sleeper add miles16  money null;
alter table sleeper add miles17  money null;
alter table sleeper add miles18  money null;
alter table sleeper add miles19  money null;
alter table sleeper add miles20  money null;
alter table sleeper add miles21  money null;
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
alter table sleeper add miles22  money null;
alter table sleeper add miles23  money null;
alter table sleeper add miles24  money null;
alter table sleeper add miles25  money null;
alter table sleeper add miles26  money null;
alter table sleeper add miles27  money null;
alter table sleeper add miles28  money null;
alter table sleeper add miles29  money null;
alter table sleeper add miles30  money null;
alter table sleeper add miles31  money null;
alter table sleeper add miles32  money null;
alter table sleeper add miles33  money null;
alter table sleeper add miles34  money null;
alter table sleeper add miles35  money null;
alter table sleeper add miles36  money null;
alter table sleeper add miles37  money null;
alter table sleeper add miles38  money null;
alter table sleeper add miles39  money null;
alter table sleeper add miles40  money null;


update sleeper set [miles1] =   [oFinish1]  - [oStart1] ;
update sleeper set [miles2] =   [oFinish2]  - [oStart2] ;
update sleeper set [miles3] =   [oFinish3]  - [oStart3] ;
update sleeper set [miles4] =   [oFinish4]  - [oStart4] ;
update sleeper set [miles5] =   [oFinish5]  - [oStart5] ;
update sleeper set [miles6] =   [oFinish6]  - [oStart6] ;
update sleeper set [miles7] =   [oFinish7]  - [oStart7] ;
update sleeper set [miles8] =   [oFinish8]  - [oStart8] ;
update sleeper set [miles9] =   [oFinish9]  - [oStart9] ;
update sleeper set [miles10] =  [oFinish10] - [oStart10];
update sleeper set [miles11] =  [oFinish11] - [oStart11];
update sleeper set [miles12] =  [oFinish12] - [oStart12];
update sleeper set [miles13] =  [oFinish13] - [oStart13];
update sleeper set [miles14] =  [oFinish14] - [oStart14];
update sleeper set [miles15] =  [oFinish15] - [oStart15];
update sleeper set [miles16] =  [oFinish16] - [oStart16];
update sleeper set [miles17] =  [oFinish17] - [oStart17];
update sleeper set [miles18] =  [oFinish18] - [oStart18];
update sleeper set [miles19] =  [oFinish19] - [oStart19];
update sleeper set [miles20] =  [oFinish20] - [oStart20];
update sleeper set [miles21] =  [oFinish21] - [oStart21];
update sleeper set [miles22] =  [oFinish22] - [oStart22];
update sleeper set [miles23] =  [oFinish23] - [oStart23];
update sleeper set [miles24] =  [oFinish24] - [oStart24];
update sleeper set [miles25] =  [oFinish25] - [oStart25];
update sleeper set [miles26] =  [oFinish26] - [oStart26];
update sleeper set [miles27] =  [oFinish27] - [oStart27];
update sleeper set [miles28] =  [oFinish28] - [oStart28];
update sleeper set [miles29] =  [oFinish29] - [oStart29];
update sleeper set [miles30] =  [oFinish30] - [oStart30];
update sleeper set [miles31] =  [oFinish31] - [oStart31];
update sleeper set [miles32] =  [oFinish32] - [oStart32];
update sleeper set [miles33] =  [oFinish33] - [oStart33];
update sleeper set [miles34] =  [oFinish34] - [oStart34];
```

Ex. B, p. 237

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
update sleeper set [miles35] =  [oFinish35] - [oStart35];
update sleeper set [miles36] =  [oFinish36] - [oStart36];
update sleeper set [miles37] =  [oFinish37] - [oStart37];
update sleeper set [miles38] =  [oFinish38] - [oStart38];
update sleeper set [miles39] =  [oFinish39] - [oStart39];
update sleeper set [miles40] =  [oFinish40] - [oStart40];

select top 10 crossRef from sleeper_misalignOdometer




alter table sleeper add minutes1   money null;
alter table sleeper add minutes2   money null;
alter table sleeper add minutes3   money null;
alter table sleeper add minutes4   money null;
alter table sleeper add minutes5   money null;
alter table sleeper add minutes6   money null;
alter table sleeper add minutes7   money null;
alter table sleeper add minutes8   money null;
alter table sleeper add minutes9   money null;
alter table sleeper add minutes10  money null;
alter table sleeper add minutes11  money null;
alter table sleeper add minutes12  money null;
alter table sleeper add minutes13  money null;
alter table sleeper add minutes14  money null;
alter table sleeper add minutes15  money null;
alter table sleeper add minutes16  money null;
alter table sleeper add minutes17  money null;
alter table sleeper add minutes18  money null;
alter table sleeper add minutes19  money null;
alter table sleeper add minutes20  money null;
alter table sleeper add minutes21  money null;
alter table sleeper add minutes22  money null;
alter table sleeper add minutes23  money null;
alter table sleeper add minutes24  money null;
alter table sleeper add minutes25  money null;
alter table sleeper add minutes26  money null;
alter table sleeper add minutes27  money null;
alter table sleeper add minutes28  money null;
alter table sleeper add minutes29  money null;
alter table sleeper add minutes30  money null;
alter table sleeper add minutes31  money null;
alter table sleeper add minutes32  money null;
alter table sleeper add minutes33  money null;
alter table sleeper add minutes34  money null;
alter table sleeper add minutes35  money null;
alter table sleeper add minutes36  money null;
alter table sleeper add minutes37  money null;
alter table sleeper add minutes38  money null;
alter table sleeper add minutes39  money null;
alter table sleeper add minutes40  money null;

update sleeper set  minutes1  = null,  minutes2  = null,  minutes3  = null,
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
minutes4  = null,  minutes5  = null,  minutes6  = null,  minutes7  = null,
minutes8  = null,  minutes9  = null,  minutes10 = null,  minutes11 = null,
minutes12 = null,  minutes13 = null,  minutes14 = null,  minutes15 = null,
minutes16 = null,  minutes17 = null,  minutes18 = null,  minutes19 = null,
minutes20 = null,  minutes21 = null,  minutes22 = null,  minutes23 = null,
minutes24 = null,  minutes25 = null,  minutes26 = null,  minutes27 = null,
minutes28 = null,  minutes29 = null,  minutes30 = null,  minutes31 = null,
minutes32 = null,  minutes33 = null,  minutes34 = null,  minutes35 = null,
minutes36 = null,  minutes37 = null,  minutes38 = null,  minutes39 = null,
minutes40 = null;

update sleeper set [minutes1] = datediff(minute,[start1]  , [finish1] ) where
[miles1] > 2;
update sleeper set [minutes2] = datediff(minute,[start2]  , [finish2] ) where
[miles2] > 2;
update sleeper set [minutes3] = datediff(minute,[start3]  , [finish3] ) where
[miles3] > 2;
update sleeper set [minutes4] = datediff(minute,[start4]  , [finish4] ) where
[miles4] > 2;
update sleeper set [minutes5] = datediff(minute,[start5]  , [finish5] ) where
[miles5] > 2;
update sleeper set [minutes6] = datediff(minute,[start6]  , [finish6] ) where
[miles6] > 2;
update sleeper set [minutes7] = datediff(minute,[start7]  , [finish7] ) where
[miles7] > 2;
update sleeper set [minutes8] = datediff(minute,[start8]  , [finish8] ) where
[miles8] > 2;
update sleeper set [minutes9] = datediff(minute,[start9]  , [finish9] ) where
[miles9] > 2;
update sleeper set [minutes10] = datediff(minute,[start10] , [finish10]) where
[miles10] > 2;
update sleeper set [minutes11] = datediff(minute,[start11] , [finish11]) where
[miles11] > 2;
update sleeper set [minutes12] = datediff(minute,[start12] , [finish12]) where
[miles12] > 2;
update sleeper set [minutes13] = datediff(minute,[start13] , [finish13]) where
[miles13] > 2;
update sleeper set [minutes14] = datediff(minute,[start14] , [finish14]) where
[miles14] > 2;
update sleeper set [minutes15] = datediff(minute,[start15] , [finish15]) where
[miles15] > 2;
update sleeper set [minutes16] = datediff(minute,[start16] , [finish16]) where
[miles16] > 2;
update sleeper set [minutes17] = datediff(minute,[start17] , [finish17]) where
[miles17] > 2;
update sleeper set [minutes18] = datediff(minute,[start18] , [finish18]) where
[miles18] > 2;
update sleeper set [minutes19] = datediff(minute,[start19] , [finish19]) where
[miles19] > 2;
update sleeper set [minutes20] = datediff(minute,[start20] , [finish20]) where
[miles20] > 2;
update sleeper set [minutes21] = datediff(minute,[start21] , [finish21]) where
[miles21] > 2;
update sleeper set [minutes22] = datediff(minute,[start22] , [finish22]) where
[miles22] > 2;
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
update sleeper set [minutes23] = datediff(minute,[start23] , [finish23]) where
[miles23] > 2;
update sleeper set [minutes24] = datediff(minute,[start24] , [finish24]) where
[miles24] > 2;
update sleeper set [minutes25] = datediff(minute,[start25] , [finish25]) where
[miles25] > 2;
update sleeper set [minutes26] = datediff(minute,[start26] , [finish26]) where
[miles26] > 2;
update sleeper set [minutes27] = datediff(minute,[start27] , [finish27]) where
[miles27] > 2;
update sleeper set [minutes28] = datediff(minute,[start28] , [finish28]) where
[miles28] > 2;
update sleeper set [minutes29] = datediff(minute,[start29] , [finish29]) where
[miles29] > 2;
update sleeper set [minutes30] = datediff(minute,[start30] , [finish30]) where
[miles30] > 2;
update sleeper set [minutes31] = datediff(minute,[start31] , [finish31]) where
[miles31] > 2;
update sleeper set [minutes32] = datediff(minute,[start32] , [finish32]) where
[miles32] > 2;
update sleeper set [minutes33] = datediff(minute,[start33] , [finish33]) where
[miles33] > 2;
update sleeper set [minutes34] = datediff(minute,[start34] , [finish34]) where
[miles34] > 2;
update sleeper set [minutes35] = datediff(minute,[start35] , [finish35]) where
[miles35] > 2;
update sleeper set [minutes36] = datediff(minute,[start36] , [finish36]) where
[miles36] > 2;
update sleeper set [minutes37] = datediff(minute,[start37] , [finish37]) where
[miles37] > 2;
update sleeper set [minutes38] = datediff(minute,[start38] , [finish38]) where
[miles38] > 2;
update sleeper set [minutes39] = datediff(minute,[start39] , [finish39]) where
[miles39] > 2;
update sleeper set [minutes40] = datediff(minute,[start40] , [finish40]) where
[miles40] > 2;


select top 10 * from allDrivers
alter table sleeper add stateStart1    varchar(120) null;
alter table sleeper add stateStart2    varchar(120) null;
alter table sleeper add stateStart3    varchar(120) null;
alter table sleeper add stateStart4    varchar(120) null;
alter table sleeper add stateStart5    varchar(120) null;
alter table sleeper add stateStart6    varchar(120) null;
alter table sleeper add stateStart7    varchar(120) null;
alter table sleeper add stateStart8    varchar(120) null;
alter table sleeper add stateStart9    varchar(120) null;
alter table sleeper add stateStart10   varchar(120) null;
alter table sleeper add stateStart11   varchar(120) null;
alter table sleeper add stateStart12   varchar(120) null;
alter table sleeper add stateStart13   varchar(120) null;
alter table sleeper add stateStart14   varchar(120) null;
alter table sleeper add stateStart15   varchar(120) null;
alter table sleeper add stateStart16   varchar(120) null;
alter table sleeper add stateStart17   varchar(120) null;
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
alter table sleeper add stateStart18   varchar(120) null;
alter table sleeper add stateStart19   varchar(120) null;
alter table sleeper add stateStart20   varchar(120) null;
alter table sleeper add stateStart21   varchar(120) null;
alter table sleeper add stateStart22   varchar(120) null;
alter table sleeper add stateStart23   varchar(120) null;
alter table sleeper add stateStart24   varchar(120) null;
alter table sleeper add stateStart25   varchar(120) null;
alter table sleeper add stateStart26   varchar(120) null;
alter table sleeper add stateStart27   varchar(120) null;
alter table sleeper add stateStart28   varchar(120) null;
alter table sleeper add stateStart29   varchar(120) null;
alter table sleeper add stateStart30   varchar(120) null;
alter table sleeper add stateStart31   varchar(120) null;
alter table sleeper add stateStart32   varchar(120) null;
alter table sleeper add stateStart33   varchar(120) null;
alter table sleeper add stateStart34   varchar(120) null;
alter table sleeper add stateStart35   varchar(120) null;
alter table sleeper add stateStart36   varchar(120) null;
alter table sleeper add stateStart37   varchar(120) null;
alter table sleeper add stateStart38   varchar(120) null;
alter table sleeper add stateStart39   varchar(120) null;
alter table sleeper add stateStart40   varchar(120) null;
alter table sleeper add stateFinish1   varchar(120) null;
alter table sleeper add stateFinish2   varchar(120) null;
alter table sleeper add stateFinish3   varchar(120) null;
alter table sleeper add stateFinish4   varchar(120) null;
alter table sleeper add stateFinish5   varchar(120) null;
alter table sleeper add stateFinish6   varchar(120) null;
alter table sleeper add stateFinish7   varchar(120) null;
alter table sleeper add stateFinish8   varchar(120) null;
alter table sleeper add stateFinish9   varchar(120) null;
alter table sleeper add stateFinish10  varchar(120) null;
alter table sleeper add stateFinish11  varchar(120) null;
alter table sleeper add stateFinish12  varchar(120) null;
alter table sleeper add stateFinish13  varchar(120) null;
alter table sleeper add stateFinish14  varchar(120) null;
alter table sleeper add stateFinish15  varchar(120) null;
alter table sleeper add stateFinish16  varchar(120) null;
alter table sleeper add stateFinish17  varchar(120) null;
alter table sleeper add stateFinish18  varchar(120) null;
alter table sleeper add stateFinish19  varchar(120) null;
alter table sleeper add stateFinish20  varchar(120) null;
alter table sleeper add stateFinish21  varchar(120) null;
alter table sleeper add stateFinish22  varchar(120) null;
alter table sleeper add stateFinish23  varchar(120) null;
alter table sleeper add stateFinish24  varchar(120) null;
alter table sleeper add stateFinish25  varchar(120) null;
alter table sleeper add stateFinish26  varchar(120) null;
alter table sleeper add stateFinish27  varchar(120) null;
alter table sleeper add stateFinish28  varchar(120) null;
alter table sleeper add stateFinish29  varchar(120) null;
alter table sleeper add stateFinish30  varchar(120) null;
alter table sleeper add stateFinish31  varchar(120) null;
alter table sleeper add stateFinish32  varchar(120) null;
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
alter table sleeper add stateFinish33  varchar(120) null;
alter table sleeper add stateFinish34  varchar(120) null;
alter table sleeper add stateFinish35  varchar(120) null;
alter table sleeper add stateFinish36  varchar(120) null;
alter table sleeper add stateFinish37  varchar(120) null;
alter table sleeper add stateFinish38  varchar(120) null;
alter table sleeper add stateFinish39  varchar(120) null;
alter table sleeper add stateFinish40  varchar(120) null;

update sleeper set [stateStart1] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c1]);
update sleeper set [stateStart2] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c2]);
update sleeper set [stateStart3] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c3]);
update sleeper set [stateStart4] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c4]);
update sleeper set [stateStart5] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c5]);
update sleeper set [stateStart6] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c6]);
update sleeper set [stateStart7] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c7]);
update sleeper set [stateStart8] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c8]);
update sleeper set [stateStart9] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c9]);
update sleeper set [stateStart10] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c10]);
update sleeper set [stateStart11] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c11]);
update sleeper set [stateStart12] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c12]);
update sleeper set [stateStart13] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c13]);
update sleeper set [stateStart14] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c14]);
update sleeper set [stateStart15] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c15]);
update sleeper set [stateStart16] =  (select '(' + [state] + ') ' +
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c16]);
update sleeper set [stateStart17] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c17]);
update sleeper set [stateStart18] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c18]);
update sleeper set [stateStart19] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c19]);
update sleeper set [stateStart20] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c20]);
update sleeper set [stateStart21] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c21]);
update sleeper set [stateStart22] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c22]);
update sleeper set [stateStart23] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c23]);
update sleeper set [stateStart24] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c24]);
update sleeper set [stateStart25] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c25]);
update sleeper set [stateStart26] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c26]);
update sleeper set [stateStart27] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c27]);
update sleeper set [stateStart28] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c28]);
update sleeper set [stateStart29] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c29]);
update sleeper set [stateStart30] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c30]);
update sleeper set [stateStart31] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c31]);
update sleeper set [stateStart32] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c32]);
update sleeper set [stateStart33] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c33]);
update sleeper set [stateStart34] =  (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
9/3/2019, 2:29:31PM

```
sleeper.Driverid and alldrivers.record_ID = [c34]);
update sleeper set [stateStart35] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c35]);
update sleeper set [stateStart36] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c36]);
update sleeper set [stateStart37] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c37]);
update sleeper set [stateStart38] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c38]);
update sleeper set [stateStart39] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c39]);
update sleeper set [stateStart40] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c40]);
update sleeper set [stateFinish1] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c2])
update sleeper set [stateFinish2] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c3])
update sleeper set [stateFinish3] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c4])
update sleeper set [stateFinish4] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c5])
update sleeper set [stateFinish5] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c6])
update sleeper set [stateFinish6] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c7])
update sleeper set [stateFinish7] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c8])
update sleeper set [stateFinish8] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c9])
update sleeper set [stateFinish9] =  (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID =  [c10])
update sleeper set [stateFinish10] = (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c11])
update sleeper set [stateFinish11] = (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c12])
update sleeper set [stateFinish12] = (select '(' + [state] + ')' ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c13])
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
update sleeper set [stateFinish13] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c14])
update sleeper set [stateFinish14] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c15])
update sleeper set [stateFinish15] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c16])
update sleeper set [stateFinish16] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c17])
update sleeper set [stateFinish17] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c18])
update sleeper set [stateFinish18] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c19])
update sleeper set [stateFinish19] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c20])
update sleeper set [stateFinish20] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c21])
update sleeper set [stateFinish21] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c22])
update sleeper set [stateFinish22] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c23])
update sleeper set [stateFinish23] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c24])
update sleeper set [stateFinish24] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c25])
update sleeper set [stateFinish25] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c26])
update sleeper set [stateFinish26] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c27])
update sleeper set [stateFinish27] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c28])
update sleeper set [stateFinish28] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c29])
update sleeper set [stateFinish29] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c30])
update sleeper set [stateFinish30] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c31])
update sleeper set [stateFinish31] = (select '(' + [state] + ') ' +
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c32])
update sleeper set [stateFinish32] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c33])
update sleeper set [stateFinish33] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c34])
update sleeper set [stateFinish34] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c35])
update sleeper set [stateFinish35] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c36])
update sleeper set [stateFinish36] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c37])
update sleeper set [stateFinish37] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c38])
update sleeper set [stateFinish38] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c39])
update sleeper set [stateFinish39] = (select '(' + [state] + ') ' +
isnull(location,'') from allDrivers where allDrivers.driverId =
sleeper.Driverid and alldrivers.record_ID = [c40])


-- this is where we create a table
-- to create the major ingress/egress points in califorina
-- to determine the number of miles.

create table AZ (locationA varchar(180) null, locationZ varchar(180) null)
alter table AZ add cityA varchar(120) null, cityZ varchar(120) null
alter table AZ add offsetA int null
alter table AZ add offsetZ int null

insert into #AZ (locationA, locationZ) select distinct stateStart1  ,
stateFinish1  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart2  ,
stateFinish2  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart3  ,
stateFinish3  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart4  ,
stateFinish4  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart5  ,
stateFinish5  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart6  ,
stateFinish6  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart7  ,
stateFinish7  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart8  ,
stateFinish8  from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart9  ,
stateFinish9  from sleeper
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

---

```
insert into #AZ (locationA, locationZ) select distinct stateStart10  ,
stateFinish10 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart11  ,
stateFinish11 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart12  ,
stateFinish12 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart13  ,
stateFinish13 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart14  ,
stateFinish14 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart15  ,
stateFinish15 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart16  ,
stateFinish16 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart17  ,
stateFinish17 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart18  ,
stateFinish18 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart19  ,
stateFinish19 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart20  ,
stateFinish20 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart21  ,
stateFinish21 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart22  ,
stateFinish22 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart23  ,
stateFinish23 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart24  ,
stateFinish24 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart25  ,
stateFinish25 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart26  ,
stateFinish26 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart27  ,
stateFinish27 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart28  ,
stateFinish28 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart29  ,
stateFinish29 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart30  ,
stateFinish30 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart31  ,
stateFinish31 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart32  ,
stateFinish32 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart33  ,
stateFinish33 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart34  ,
stateFinish34 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart35  ,
stateFinish35 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart36  ,
stateFinish36 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart37  ,
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
stateFinish37 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart38  ,
stateFinish38 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart39  ,
stateFinish39 from sleeper
insert into #AZ (locationA, locationZ) select distinct stateStart40  ,
stateFinish40 from sleeper

insert into AZ (locationA, locationZ) select distinct locationA, locationZ from
#az where locationA is not null and locationZ is not null



update az set cityA = substring(locationa,charindex('of ',locationA)+3,50)
update az set cityZ = substring(locationz,charindex('of ',locationZ)+3,50)
update az set cityA = substring(citya,4,50) where substring(cityA,2,1) = ')'
update az set cityZ = substring(cityz,4,50) where substring(cityz,2,1) = ')'

delete from az where citya = '' or cityz = ''

update AZ set offsetA = null
update AZ set offsetZ = null

UPDATE AZ set offsetA = rtrim(ltrim(substring(locationA,
charindex('mi',locationA)-3,2)))  from az  where charindex('mi',locationA) > 0
UPDATE AZ set offsetZ = rtrim(ltrim(substring(locationZ,
charindex('mi',locationZ)-3,2)))  from az  where charindex('mi',locationZ) > 0

UPDATE AZ set offsetA = 0 where offsetA is null
UPDATE AZ set offsetZ = 0 where offsetZ is null

select distinct cityA, cityZ into #cityPair from AZ
select distinct cityZ, cityA from AZ

delete from az where right(cityA,2) = right(cityZ,2) and right(cityZ,2) = 'CA'
delete from az where right(cityA,2) <> 'CA' and right(cityZ,2) <> 'CA'

alter table AZ add HOMBROOK money null
alter table AZ add BLYTHE money null
alter table AZ add NEEDLES money null
alter table AZ add NIPTON money null
alter table AZ add MYSTIC money null


-- now we put the californiaMiles in here...
select count(*) from sleeper where californiaMiles1 is not null
select top 10 * from az
 select hombrook, blythe, needles, mystic, nipton from AZ where locationA =
'(ca) 1 mi wnw of commerce, ca' and locationZ = '(az) 44 mi nnw of st. johns,
az'
select * from az where hombrook is not null
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
alter table sleeper add californiaMiles1     money null;
alter table sleeper add californiaMiles2     money null;
alter table sleeper add californiaMiles3     money null;
alter table sleeper add californiaMiles4     money null;
alter table sleeper add californiaMiles5     money null;
alter table sleeper add californiaMiles6     money null;
alter table sleeper add californiaMiles7     money null;
alter table sleeper add californiaMiles8     money null;
alter table sleeper add californiaMiles9     money null;
alter table sleeper add californiaMiles10    money null;
alter table sleeper add californiaMiles11    money null;
alter table sleeper add californiaMiles12    money null;
alter table sleeper add californiaMiles13    money null;
alter table sleeper add californiaMiles14    money null;
alter table sleeper add californiaMiles15    money null;
alter table sleeper add californiaMiles16    money null;
alter table sleeper add californiaMiles17    money null;
alter table sleeper add californiaMiles18    money null;
alter table sleeper add californiaMiles19    money null;
alter table sleeper add californiaMiles20    money null;
alter table sleeper add californiaMiles21    money null;
alter table sleeper add californiaMiles22    money null;
alter table sleeper add californiaMiles23    money null;
alter table sleeper add californiaMiles24    money null;
alter table sleeper add californiaMiles25    money null;
alter table sleeper add californiaMiles26    money null;
alter table sleeper add californiaMiles27    money null;
alter table sleeper add californiaMiles28    money null;
alter table sleeper add californiaMiles29    money null;
alter table sleeper add californiaMiles30    money null;
alter table sleeper add californiaMiles31    money null;
alter table sleeper add californiaMiles32    money null;
alter table sleeper add californiaMiles33    money null;
alter table sleeper add californiaMiles34    money null;
alter table sleeper add californiaMiles35    money null;
alter table sleeper add californiaMiles36    money null;
alter table sleeper add californiaMiles37    money null;
alter table sleeper add californiaMiles38    money null;
alter table sleeper add californiaMiles39    money null;
alter table sleeper add californiaMiles40    money null;

alter table sleeper add californiaMinutes1     money null;
alter table sleeper add californiaMinutes2     money null;
alter table sleeper add californiaMinutes3     money null;
alter table sleeper add californiaMinutes4     money null;
alter table sleeper add californiaMinutes5     money null;
alter table sleeper add californiaMinutes6     money null;
alter table sleeper add californiaMinutes7     money null;
alter table sleeper add californiaMinutes8     money null;
alter table sleeper add californiaMinutes9     money null;
alter table sleeper add californiaMinutes10    money null;
alter table sleeper add californiaMinutes11    money null;
alter table sleeper add californiaMinutes12    money null;
alter table sleeper add californiaMinutes13    money null;
alter table sleeper add californiaMinutes14    money null;
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
alter table sleeper add californiaMinutes15  money null;
alter table sleeper add californiaMinutes16  money null;
alter table sleeper add californiaMinutes17  money null;
alter table sleeper add californiaMinutes18  money null;
alter table sleeper add californiaMinutes19  money null;
alter table sleeper add californiaMinutes20  money null;
alter table sleeper add californiaMinutes21  money null;
alter table sleeper add californiaMinutes22  money null;
alter table sleeper add californiaMinutes23  money null;
alter table sleeper add californiaMinutes24  money null;
alter table sleeper add californiaMinutes25  money null;
alter table sleeper add californiaMinutes26  money null;
alter table sleeper add californiaMinutes27  money null;
alter table sleeper add californiaMinutes28  money null;
alter table sleeper add californiaMinutes29  money null;
alter table sleeper add californiaMinutes30  money null;
alter table sleeper add californiaMinutes31  money null;
alter table sleeper add californiaMinutes32  money null;
alter table sleeper add californiaMinutes33  money null;
alter table sleeper add californiaMinutes34  money null;
alter table sleeper add californiaMinutes35  money null;
alter table sleeper add californiaMinutes36  money null;
alter table sleeper add californiaMinutes37  money null;
alter table sleeper add californiaMinutes38  money null;
alter table sleeper add californiaMinutes39  money null;
alter table sleeper add californiaMinutes40  money null;


UPDATE sleeper
  set miles1= null,miles2= null,miles3= null,miles4= null,miles5= null,miles6=
null,miles7= null,miles8= null,miles9= null,miles10= null,miles11=
null,miles12= null,miles13= null,miles14= null,miles15= null,miles16=
null,miles17= null,miles18= null,miles19= null,miles20= null,miles21=
null,miles22= null,miles23= null,miles24= null,miles25= null,miles26=
null,miles27= null,miles28= null,miles29= null,miles30= null,miles31=
null,miles32= null,miles33= null,miles34= null,miles35= null,miles36=
null,miles37= null,miles38= null,miles39= null,miles40= null;


update sleeper set miles1 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart1 and AZ.locationZ = sleeper.stateFinish1)
update sleeper set miles2 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart2 and AZ.locationZ = sleeper.stateFinish2)
update sleeper set miles3 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart3 and AZ.locationZ = sleeper.stateFinish3)
update sleeper set miles4 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart4 and AZ.locationZ = sleeper.stateFinish4)
update sleeper set miles5 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart5 and AZ.locationZ = sleeper.stateFinish5)
update sleeper set miles6 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart6 and AZ.locationZ = sleeper.stateFinish6)
update sleeper set miles7 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart7 and AZ.locationZ = sleeper.stateFinish7)
update sleeper set miles8 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart8 and AZ.locationZ = sleeper.stateFinish8)
update sleeper set miles9 =  (select miles from AZ where AZ.locationA =
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
sleeper.stateStart9 and AZ.locationZ = sleeper.stateFinish9)
update sleeper set miles10 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart10 and AZ.locationZ = sleeper.stateFinish10)
update sleeper set miles11 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart11 and AZ.locationZ = sleeper.stateFinish11)
update sleeper set miles12 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart12 and AZ.locationZ = sleeper.stateFinish12)
update sleeper set miles13 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart13 and AZ.locationZ = sleeper.stateFinish13)
update sleeper set miles14 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart14 and AZ.locationZ = sleeper.stateFinish14)
update sleeper set miles15 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart15 and AZ.locationZ = sleeper.stateFinish15)
update sleeper set miles16 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart16 and AZ.locationZ = sleeper.stateFinish16)
update sleeper set miles17 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart17 and AZ.locationZ = sleeper.stateFinish17)
update sleeper set miles18 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart18 and AZ.locationZ = sleeper.stateFinish18)
update sleeper set miles19 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart19 and AZ.locationZ = sleeper.stateFinish19)
update sleeper set miles20 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart20 and AZ.locationZ = sleeper.stateFinish20)
update sleeper set miles21 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart21 and AZ.locationZ = sleeper.stateFinish21)
update sleeper set miles22 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart22 and AZ.locationZ = sleeper.stateFinish22)
update sleeper set miles23 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart23 and AZ.locationZ = sleeper.stateFinish23)
update sleeper set miles24 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart24 and AZ.locationZ = sleeper.stateFinish24)
update sleeper set miles25 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart25 and AZ.locationZ = sleeper.stateFinish25)
update sleeper set miles26 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart26 and AZ.locationZ = sleeper.stateFinish26)
update sleeper set miles27 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart27 and AZ.locationZ = sleeper.stateFinish27)
update sleeper set miles28 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart28 and AZ.locationZ = sleeper.stateFinish28)
update sleeper set miles29 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart29 and AZ.locationZ = sleeper.stateFinish29)
update sleeper set miles30 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart30 and AZ.locationZ = sleeper.stateFinish30)
update sleeper set miles31 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart31 and AZ.locationZ = sleeper.stateFinish31)
update sleeper set miles32 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart32 and AZ.locationZ = sleeper.stateFinish32)
update sleeper set miles33 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart33 and AZ.locationZ = sleeper.stateFinish33)
update sleeper set miles34 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart34 and AZ.locationZ = sleeper.stateFinish34)
update sleeper set miles35 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart35 and AZ.locationZ = sleeper.stateFinish35)
update sleeper set miles36 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart36 and AZ.locationZ = sleeper.stateFinish36)
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
update sleeper set miles37 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart37 and AZ.locationZ = sleeper.stateFinish37)
update sleeper set miles38 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart38 and AZ.locationZ = sleeper.stateFinish38)
update sleeper set miles39 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart39 and AZ.locationZ = sleeper.stateFinish39)
update sleeper set miles40 =  (select miles from AZ where AZ.locationA =
sleeper.stateStart40 and AZ.locationZ = sleeper.stateFinish40)


select * into sleeper_misalignOdometer
from sleeper where
    ([californiaMiles1]  < 0) or  ([californiaMiles2]  < 0) or
([californiaMiles3]  < 0) or  ([californiaMiles4]  < 0) or  ([californiaMiles5]
< 0) or  ([californiaMiles6]  < 0) or  ([californiaMiles7]  < 0)
or  ([californiaMiles8]  < 0) or  ([californiaMiles9]  < 0) or
([californiaMiles10] < 0) or  ([californiaMiles11] < 0) or
([californiaMiles12] < 0) or  ([californiaMiles13] < 0) or
([californiaMiles14] < 0)
or  ([californiaMiles15] < 0) or  ([californiaMiles16] < 0) or
([californiaMiles17] < 0) or  ([californiaMiles18] < 0) or
([californiaMiles19] < 0) or  ([californiaMiles20] < 0) or
([californiaMiles21] < 0)
or  ([californiaMiles22] < 0) or  ([californiaMiles23] < 0) or
([californiaMiles24] < 0) or  ([californiaMiles25] < 0) or
([californiaMiles26] < 0) or  ([californiaMiles27] < 0) or
([californiaMiles28] < 0)
or  ([californiaMiles29] < 0) or  ([californiaMiles30] < 0) or
([californiaMiles31] < 0) or  ([californiaMiles32] < 0) or
([californiaMiles33] < 0) or  ([californiaMiles34] < 0) or
([californiaMiles35] < 0)
or  ([californiaMiles36] < 0) or  ([californiaMiles37] < 0) or
([californiaMiles38] < 0) or  ([californiaMiles39] < 0) or
([californiaMiles40] < 0)
or  ([californiaMiles1] > 600) or  ([californiaMiles2] > 600) or
([californiaMiles3] > 600) or  ([californiaMiles4]  > 600) or
([californiaMiles5] > 600) or  ([californiaMiles6] > 600) or
([californiaMiles7] > 600)
or  ([californiaMiles8] > 600) or  ([californiaMiles9]  > 600) or
([californiaMiles10] > 600) or  ([californiaMiles11] > 600) or
([californiaMiles12] > 600) or  ([californiaMiles13] > 600) or
([californiaMiles14] > 600)
or  ([californiaMiles15] > 600) or  ([californiaMiles16] > 600) or
([californiaMiles17] > 600) or  ([californiaMiles18] > 600) or
([californiaMiles19] > 600) or  ([californiaMiles20] > 600) or
([californiaMiles21] > 600)
or  ([californiaMiles22] > 600) or  ([californiaMiles23] > 600) or
([californiaMiles24] > 600) or  ([californiaMiles25] > 600) or
([californiaMiles26] > 600) or  ([californiaMiles27] > 600) or
([californiaMiles28] > 600)
or  ([californiaMiles29] > 600) or  ([californiaMiles30] > 600) or
([californiaMiles31] > 600) or  ([californiaMiles32] > 600) or
([californiaMiles33] > 600) or  ([californiaMiles34] > 600) or
([californiaMiles35] > 600)
or  ([californiaMiles36] > 600) or  ([californiaMiles37] > 600) or
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```sql
([californiaMiles38] > 600) or  ([californiaMiles39] > 600) or
([californiaMiles40] > 600)


delete from sleeper
where crossRef in (select crossRef from sleeper_misalignOdometer);


-- RUN THE SQL / VB PROCESS HERE.
-- RUN THE SQL / VB PROCESS HERE.
-- RUN THE SQL / VB PROCESS HERE.

select top 10 * from sleeper

-- create an index on the driver table
-- create an index on the driver table
create index newId on allDrivers (newId)

-- final step is to build the workdata
-- workdata
-- final step is to build the workdata
-- final step is to build the workdata


-- build the workdata
-- drop table workdata


-- set the sleeperMinutes
alter table sleeper add sleeperMinutes money null;
update sleeper set sleeperMinutes = isnull(californiaMinutes1 ,0)+
isnull(californiaMinutes2 ,0)+ isnull(californiaMinutes3 ,0)+
isnull(californiaMinutes4 ,0)+ isnull(californiaMinutes5 ,0)+
isnull(californiaMinutes6 ,0)+ isnull(californiaMinutes7 ,0)+
isnull(californiaMinutes8 ,0)+ isnull(californiaMinutes9 ,0)+
isnull(californiaMinutes10,0)+ isnull(californiaMinutes11,0)+
isnull(californiaMinutes12,0)+ isnull(californiaMinutes13,0)+
isnull(californiaMinutes14,0)+ isnull(californiaMinutes15,0)+
isnull(californiaMinutes16,0)+ isnull(californiaMinutes17,0)+
isnull(californiaMinutes18,0)+ isnull(californiaMinutes19,0)+
isnull(californiaMinutes20,0)+ isnull(californiaMinutes21,0)+
isnull(californiaMinutes22,0)+ isnull(californiaMinutes23,0)+
isnull(californiaMinutes24,0)+ isnull(californiaMinutes25,0)+
isnull(californiaMinutes26,0)+ isnull(californiaMinutes27,0)+
isnull(californiaMinutes28,0)+ isnull(californiaMinutes29,0)+
isnull(californiaMinutes30,0)+ isnull(californiaMinutes31,0)+
isnull(californiaMinutes32,0)+ isnull(californiaMinutes33,0)+
isnull(californiaMinutes34,0)+ isnull(californiaMinutes35,0)+
isnull(californiaMinutes36,0)+ isnull(californiaMinutes37,0)+
isnull(californiaMinutes38,0)+ isnull(californiaMinutes39,0)+
isnull(californiaMinutes40,0)

drop table workdata
-- build this table baby


select distinct driverId as reference, crossRef, convert(varchar(30),'DUEKER')
```

Ex. B, p. 253

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
as Source, sleeperMinutes into workdata FROM dueker..sleeper where crossRef is
not null and isnull(sleeperMinutes,0) > 0
insert into workdata select distinct driverId, crossRef, 'DUEKER2' as
Source,sleeperMinutes as source FROM dueker2..sleeper where crossRef is not
null and isnull(sleeperMinutes,0) > 0


select distinct driverId as [reference], crossRef,
convert(varchar(30),'DUEKER') as [source] into #workdata from
dueker..alldrivers
insert into #workdata select distinct driverId as [reference], crossRef,
'DUEKER2' as [source] from dueker2..alldrivers

delete from #workdata where crossRef in (select crossRef from workdata)

insert into workdata (source, reference, crossRef, sleeperMinutes, date)
select distinct source, reference, crossRef, 0, substring(crossref,1,10) from
#workdata


-- add these columns
alter table workdata add date datetime null;
alter table workdata add checkFinish datetime null;

update workdata set date = left(crossRef, 10)
update workdata set checkFinish = (select checkFinish from checkDates where
workdata.date between checkStart and checkFinish)
-- delete from workdata where checkFinish is null (OUTLIERS)

alter table workdata add minimumWage money null
update workdata set minimumWage = (select minimumWage from minimumWage where
workdata.date between minimumWage.start and minimumWage.finish)

delete from workdata where minimumWage is null;
delete from workdata where checkFinish is null;

select count(*) from workdata where sleeperMinutes > 0 order by reference, date

alter table workdata add crossRef2 varchar(120) null;
update workdata set crossRef2 = convert(varchar(30),checkFinish,101) + '|' +
reference

select top 10* from workdata order by reference, date
-- create workstudy
-- drop table workstudy
select distinct reference into workstudy from workdata
alter table workstudy add source varchar(30) null;
update workstudy set source = (select top 1 source from workdata where
workdata.reference = workstudy.reference)
alter table workstudy add start datetime null, finish datetime null, shifts
integer null;
update workstudy set start = (select top 1 date from workdata where
workdata.reference = workstudy.reference order by date asc);
update workstudy set finish = (select top 1 date from workdata where
workdata.reference = workstudy.reference order by date desc);
update workstudy set shifts = (select count(*) from workdata where
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
workdata.reference = workstudy.reference)
alter table workstudy add paychecks int null;
select distinct reference, crossRef2 into #checks from workdata
update workstudy set paychecks = (select count(*) from #checks where
#checks.reference = workstudy.reference)
alter table workstudy add shiftsWithCaSleeper int null;
alter table workstudy add paychecksWithCaSleeper int null;
update workstudy set shiftsWithCaSleeper = (select count(*) from workdata where
workdata.reference = workstudy.reference and sleeperMinutes > 0)
select distinct reference, crossRef2 into #checks2 from workdata where
sleeperMinutes > 0
update workstudy set paychecksWithCaSleeper = (select count(*) from #checks2
where #checks2.reference = workstudy.reference)
alter table workstudy add sleeperMinutes money null;
update workstudy set sleeperMinutes  = (select sum(sleeperMinutes) from
workdata where workdata.reference = workstudy.reference)
select * from workstudy

-- anything that has a shift segment more than 2 days...
-- and cleans up any other ambiguities
select * into workdata_misAlign from workdata where crossRef in
(select crossref from alldrivers
  where abs(datediff(day,substring(crossRef,1,10), date)) > 2)

delete from workdata where crossRef in (select crossref from workdata_misAlign)



select top 10 * from payroll


select top 10 * from dueker2..alldrivers

select top 10 * from sleeper
use dueker2
select top 10 * from sleeper


select * from
select top 10 * from az where cityZ like '%john%'
-- a very specific query to provide a set of validations
select source, crossRef, stateStart1, stateFinish1, stateStart2, stateFinish2,
stateStart3, stateFinish3,
miles1, miles2, miles3, californiaMiles1, californiaMiles2, californiaMiles3
minutes1, minutes2, californiaMinutes1, californiaMinutes2, californiaMinutes3,
sleeperMinutes
from sleeper
order by sleeperMinutes

select * from allDrivers where

select * from allDrivers where crossRef = '08/07/2017|41785|DM72D' order by
startTime
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
where right(statestart1,2) = 'CA' and right(statefinish1,2) <> 'CA'
and stateStart5 is null and stateStart4 is not null

select top 10 * from sleeper where sleeperminutes > 0

select top 10 * from allDrivers where record_id in
('DLG0000643696','DLG0000643697','DLG0000643698','DLG0000643699') order by
record_id
select * from sleeper where crossRef = '09/03/2016|35022|AN51D'


select count(*) from sleeper
select * from dueker..alldrivers where date = '12/28/2013'



update alldrivers set checkFinish = (select checkFinish from checkDates where
date between checkDates.checkStart and checkDates.checkFinish)
update dueker..alldrivers set checkFinish = (select checkFinish from checkDates
where date between checkDates.checkStart and checkDates.checkFinish)
update allDrivers set crossRef2 = convert(varchar(30),checkFinish,101) + '|' +
driverId;
update dueker..allDrivers set crossRef2 = convert(varchar(30),checKFinish,101)
+ '|' + driverId;

alter table dueker..sleeper add crossRef2 varchar(60) null
alter table dueker2..sleeper add crossRef2 varchar(60) null

alter table dueker..alldrivers  add crossRef_aw varchar(60) null
alter table dueker2..alldrivers  add crossRef_aw varchar(60) null

update dueker..alldrivers set crossRef_aw = convert(varchar(30),date,101) + '|'
+ driverId
update dueker2..alldrivers set crossRef_aw = convert(varchar(30),date,101) +
'|' + driverId

select top 10 crossRef, crossRef_aw from dueker2..alldrivers
select top 10 crossRef from dueker2..sleeper

alter table dueker..sleeper add checkFinish datetime null;
alter table dueker2..sleeper add checkFinish datetime null;
update dueker..sleeper set checkFinish =
 (select checkFinish from checkDates where
convert(varchar(30),substring(sleeper.crossRef,1,10)) between
checkDates.checkStart and checkDates.checkFinish)
update dueker2..sleeper set checkFinish =
 (select checkFinish from checkDates where
convert(varchar(30),substring(sleeper.crossRef,1,10)) between
checkDates.checkStart and checkDates.checkFinish)

update dueker..sleeper set crossRef2 = convert(varchar(30),checkFinish,101) +
'|' + driverId
update dueker2..sleeper set crossRef2 = convert(varchar(30),checkFinish,101) +
'|' + driverId
```

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM

```
select top 10 crossRef, crossRef2 from dueker..sleeper



select distinct crossRef2 from allDrivers
select distinct crossRef2 from dueker2..allDrivers

select count(*) from dueker..allDrivers
select count(*) from dueker2..allDrivers
select distinct driverId from dueker2..allDrivers

select
(select count(*) from dueker..allDrivers)
+
(select count(*) from dueker2..allDrivers)



select distinct crossRef into #x from dueker..allDrivers
insert into #x select distinct crossRef from dueker2..allDrivers
select count(*) from #x

select top 10 * from #x


select
(select count(*) from dueker..allDrivers)
+
(select count(*) from dueker2..allDrivers)

select
(select count(*) from dueker..sleeper)
+
(select count(*) from dueker2..sleeper)

-- number of shifts in the data.
select distinct crossRef into #shifts from dueker..allDrivers
insert into #shifts select distinct crossRef from dueker2..allDrivers
select count(*) from #shifts

select
(select count(*) from dueker..sleeper where sleeperMinutes > 0)
+
(select count(*) from dueker2..sleeper where sleeperMinutes > 0)

select distinct driverId into #y from dueker..sleeper where sleeperMinutes > 0
insert into #y select distinct driverId from dueker2..sleeper where
sleeperMinutes > 0


select distinct crossRef2 into #z from dueker..alldrivers
insert into #z select distinct crossRef2 from dueker2..alldrivers
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
select count(*) from #z


select distinct crossRef2 into #z2 from dueker..sleeper where sleeperMinutes >
0
insert into #z2 select distinct crossRef2 from dueker2..sleeper where
sleeperMinutes > 0
select count(*) from #z2


select count(*) from #z

select top 10 checkFinish from dueker..alldrivers
alter table alldrivers add checkFinish datetime null;



select distinct driverId from #y

-- WORKSTUDY IS DEPRECIATED. LOOK AT dbo.FINAL.
-- WORKSTUDY IS DEPRECIATED. LOOK AT dbo.FINAL.
-- WORKSTUDY IS DEPRECIATED. LOOK AT dbo.FINAL.
-- WORKSTUDY IS DEPRECIATED. LOOK AT dbo.FINAL.
-- WORKSTUDY IS DEPRECIATED. LOOK AT dbo.FINAL.

/* This is just here for reference to codebase
   but is not part of this. */
select count(*) from workstudy

select count(*) f

select top 10 * from dueker2..sleeper
select top 10 * from workdata
select count(*) from workdata



select count(*) from workstudy
select
select top 10 * from workstudy



select distinct crossRef from allDrivers

select select count(*) from workstudy where shifts > 0
delete from workstudy where shifts = 0
/* depreciated -->
update workdata set shiftStart =
  (select top 1 convert(varchar(30),startTime,101)
          from allDrivers where allDrivers.crossRef = workdata.crossRef order
by startTime Asc)

update workdata set shiftFinish =
  (select top 1 convert(varchar(30),startTime,101)
```

```
File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b0. build and structure.sql
 9/3/2019, 2:29:31PM
```

```
            from allDrivers where allDrivers.crossRef = workdata.crossRef order
by startTime desc)
<-- */

update workdata set sleeperMinutes =
  (select sleeperMinutes
         from dueker..sleeper where sleeper.crossRef = workdata.crossRef)
where source = 'dueker'

update workdata set sleeperMinutes =
  (select sleeperMinutes
         from dueker2..sleeper where sleeper.crossRef = workdata.crossRef)
where source = 'dueker2'

-- remove anything that didn't indicate sleeper minutes (in california)
delete from workdata where isnull(sleeperMinutes,0) not between 1 and 900


-- select
select  driverId, crossRef, source, sleeperMinutes as sleeperMinutes
from workdata order by driverId, source, crossRef

-- selections for the declarations
-- selections for the declarations
-- selections for the declarations
select (select count(*) from [allDrivers])+
       (select count(*) from [alldriversBefore12-27-2013])

select count(*) from [alldrivers]
select count(*) from allDrivers_duplicate
select count(*) from allDrivers

select distinct driverId from allDrivers
select distinct activity, descript from allDrivers
select top 1 date from [alldriversBefore12-27-2013] order by date asc
select top 1 date from [allDrivers] order by date asc
select top 1 date from [allDrivers] order by date desc

select distinct driverId, date from allDrivers

select * from workdata  where sleeperMinutes > 0
select distinct driverId from workdata  where sleeperMinutes > 0

select distinct driverId from workdata

select * from workdata

select distinct driverId into #drivers from [alldriversBefore12-27-2013]
insert into #drivers select distinct driverId from [allDrivers]
select count(*) from

select count(*) from [drivers]
```

Ex. B, p. 259

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b1. finalization.sql  9/3/20
19, 2:21:03PM

```
select distinct driverId, 'dueker2' as source into final from
dueker2..alldrivers
insert into final select distinct driverId, 'dueker' as source from
dueker..alldrivers
create index driverId on final (driverId)


alter table final add start datetime null;
alter table final add finish datetime null;
alter table final add count int null;

update final set start = (select top 1 date from dueker..allDrivers where
allDrivers.driverId = final.driverId order by date asc)  where start is null
update final set finish = (select top 1 date from dueker..allDrivers where
allDrivers.driverId = final.driverId order by date desc) where finish is null

update final set start = (select top 1 date from dueker2..allDrivers where
allDrivers.driverId = final.driverId order by date asc)  where start is null
update final set finish = (select top 1 date from dueker2..allDrivers where
allDrivers.driverId = final.driverId order by date desc) where finish is null


select distinct driverId, crossRef_aw into #1 from dueker..alldrivers
select distinct driverId, crossRef_aw into #2 from dueker2..alldrivers

update final set count = (select count(*) from #1 where #1.driverId =
final.driverId) where isnull(count,0) = 0
update final set count = (select count(*) from #2 where #2.driverId =
final.driverId) where isnull(count,0) = 0;

select distinct driverId, crossRef2 into #a from dueker..alldrivers
select distinct driverId, crossRef2 into #b from dueker2..alldrivers

alter table final add payPeriods int null
update final set payPeriods = (select count(*) from #a where #a.driverId =
final.driverId) where isnull(payPeriods,0) = 0
update final set payPeriods = (select count(*) from #b where #b.driverId =
final.driverId) where isnull(payPeriods,0) = 0

alter table final add shiftsWithCaMinutesOwed int null

update final set shiftsWithCaMinutesOwed = (select count(*) from
dueker..sleeper where sleeper.driverId = final.driverId and sleeperminutes > 0)
where isnull(shiftsWithCaMinutesOwed,0) = 0
update final set shiftsWithCaMinutesOwed = (select count(*) from
dueker2..sleeper where sleeper.driverId = final.driverId and sleeperminutes >
0) where isnull(shiftsWithCaMinutesOwed,0) = 0

alter table final add paychecksWithCaMinutesOwed int null

select distinct driverId, crossRef2 into #y from dueker..sleeper where
sleeperMinutes > 0
select distinct driverId, crossRef2 into #z from dueker2..sleeper where
sleeperMinutes > 0
```

Ex. B, p. 260

File: D:\stan\_Dueker (Jeff) - 05-24-2019\justSql - b1. finalization.sql  9/3/20
19, 2:21:03PM

---

```
update final set paychecksWithCaMinutesOwed = (select count(*) from #y where
#y.driverId = final.driverId) where isnull(paychecksWithCaMinutesOwed,0) = 0
update final set paychecksWithCaMinutesOwed = (select count(*) from #z where
#z.driverId = final.driverId) where isnull(paychecksWithCaMinutesOwed,0) = 0

alter table final add totalSleeperMinutesOwed money null

select sum(totalSleeperMinutesOwed) from final
update final set totalSleeperMinutesOwed = (select sum(sleeperminutes) from
dueker..sleeper where sleeper.driverId = final.driverId) where
isnull(totalSleeperMinutesOwed,0) = 0
update final set totalSleeperMinutesOwed = (select sum(sleeperminutes) from
dueker2..sleeper where sleeper.driverId = final.driverId) where
isnull(totalSleeperMinutesOwed,0) = 0
select sum(payPeriods) from final
select * from final where driverId = 'B283D'

select distinct crossRef2 from dueker2..sleeper where sleeperMinutes > 0 and
driverId = 'B283D'
select distinct crossRef2 from dueker2..sleeper where sleeperMinutes > 0 and
driverId = 'B283D'

select * from final

select distinct date, crossRef from dueker2..alldrivers where driverId =
'1145D'
select count(*) from dueker2..alldrivers    where

select distinct date, crossRef_aw from dueker2..alldrivers where driverId =
'573ZD'  order by date
```

Ex. B, p. 261

# EXHIBIT K

## DESCRIPTION OF CODES

| CODE | TAXABLE EARNINGS | CODE | REIMBURSEMENTS | CODE | DEDUCTIONS | | |
|------|------------------|------|----------------|------|------------|------|------|
| BE | BEREAVEMENT | AA | VOID NET PAY | AD | ADVANCE | NC | PARTIAL BACK MED INS |
| BK | BREAKDOWN | LM | LUMPER | AR | DEFICIT AMT | NB | PARTIAL BACK MED INS |
| CW | CITY WORK | MO | MOTEL | AZ | SUPPLEMENT ACCIDENT | P4 | PREVIOUS DEFICIT |
| DB | DOT INSPEC BONUS | MS | MISC | BO | PHYS/DRUG SCREEN | PP | PASSENGER PROGRAM |
| FL | FLAT PAYROLL | PD | PER DIEM | BZ | BUS | PQ | PRE-EMP ADVANCE |
| FX | TAXABLE EARNING | PF | PERMITS | CD | CDL LICENSE | PY | PHYSICAL |
| LD | LIGHT DUTY | RT | REPAIR-WASH TRAC | CH | RENTAL CAR | SA | SETTLEMENT ADVANCE |
| LH | LOAD-UNLOAD HELP | RV | REPAIR-WASH TRLR | DS | DENTAL INSURANCE | SL | SUPPLEMENTAL LIFE INS |
| LO | LAYOVER | SC | SCALE | DT | DRUG TEST | UW | UNITED WAY |
| LT | LEAD DRIVER PAY | TO | TOLLS | DU | LOGO STORE | WC | WIRE CHARGE |
| LU | LOAD-UNLOAD | VD | VOID DIRECT PAY | FD | FINE DEDUCTION | ZA | GARNISHMENT |
| MI | MILEAGE ADJUST | 3Z | HAZMAT ENDORSEMENT | FE | FED EXP,UPS, ETC | ZB | GARNISHMENT |
| MM | MISSED MILES | | | FY | TRAINING DEDUCTION | ZC | GARNISHMENT |
| MP | MISC PAY | | | GA | GARNISHMENT ADM FEE | ZD | GARNISHMENT |
| OR | OUT OF ROUTE | | | HS | HOUSING | ZE | GARNISHMENT |
| RB | REFERRAL BONUS | | | JA | INVERTER INSTALL | ZF | GARNISHMENT |
| SB | SIGN ON BONUS | | | JB | CB INSTALL | ZG | GARNISHMENT |
| SF | BONUS MILES | | | JC | RADIO/CD INSTALL | ZH | GARNISHMENT |
| SZ | ORIENTATION TRAINING | | | JD | ANTENNA | 4M | MAP PAK |
| TQ | LEAD DRIVER TRAINING | | | JE | MATTRESS | 7E | RENTAL CAR |
| VA | VACATION | | | JG | OUT OF FUEL CHARGE | | |
| WB | WALMART GIFT CERT | | | JH | MISC/KEYS-LOCKOUT | | |
| XS | EXTRA STOP | | | KC | 401K REPAYMENT | | |
| 2F | DETENTION | | | K4 | 401K | | |
| | | | | KZ | REFRESHER COURSE | | |
| | | | | LS | SCHOOL CONT. BALANCE | | |
| | | | | ME | PRE-TAX INSURANC | | |
| | | | | M1 | VISION INSURANCE | | |
| | | | | MJ | PRE-TAX INSURANC | | |
| | | | | MC | MISC CHARGE | | |

# EXHIBIT L

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PATRICIA GAINES, on behalf of herself and all others similarly situated,

Plaintiff,

v.

LAW OFFICE OF PATENAUDE & FELIX, A.P.C.,

Defendant.

Case No.: 13cv1556-JLS (DHB)

**ORDER DENYING PLAINTIFF'S REQUEST TO RE-OPEN CLASS DISCOVERY**

On July 7, 2015, Judge Sammartino denied Plaintiff's motion for class certification without prejudice. (ECF No. 118.) Thereafter, the Court held a case management conference, and directed the parties to file supplemental briefing regarding Plaintiff's request to re-open class discovery. On August 18, 2015, Plaintiff filed a brief, proposing six areas of additional class discovery she would like to pursue. (ECF No. 128.) Defendant filed an opposition on August 31, 2015 (ECF No. 129), and a notice of recent authority on September 1, 2015. (ECF No. 131.) Having reviewed the parties' submissions, the Court **DENIES** Plaintiff's request to re-open class discovery.

/ / /

/ / /

1

Case 2:18-cv-08751-MCS-FFM   Document 72-432   Filed 11/22/19   Page 248 of 367
Case 3:13-cv-01556-JLS-DHB   Document 132   Filed 09/21/15   Page 2 of 4
Page ID #:936

## I.   Plaintiff's Request to Use Dial List Information to Identify a New Class Representative

Earlier in this litigation, the Court ordered Defendant to produce its outbound dial list to Plaintiff.  (ECF Nos. 35, 49.)  However, the Court imposed limitations on Plaintiff's use of the information.  The Court held Plaintiff was not permitted to contact any telephone numbers on the dial list.  Further, the Court held that in the event "a class is not certified, Plaintiff is prohibited from using the information contained in the outbound dial list for any other purpose."[1]  (ECF No. 49 at 6.)  Plaintiff now requests permission to contact a sampling of the numbers identified on the dial lists for the purpose of finding a new class representative.  However, "seeking to add or replace class members is not grounds for discovery of class member identities."  *Feske v. MHC Thousand Trails Ltd. P'ship*, 2013 WL 1120816, *4 (N.D. Cal. Mar. 18, 2013) citing *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 416 (9th Cir. 1985).  *See also Bradbury v. T-Mobile USA, Inc.*, 2009 WL 3388163, *1 (N.D. Cal. Oct. 20, 2009) (denying plaintiff's motion to compel names and contact information for putative class members where the plaintiff "only seeks discovery to find a putative class member who will replace him."); *In re Facebook Privacy Litigation*, 2015 WL 3640518, *3 (N.D. Cal. June 11, 2015) (noting that "a plaintiff may not seek information from a defendant to find a proper representative to keep the case alive.")

Accordingly, the Court DENIES Plaintiff's request for permission to use the dial list information as a means to identify a substitute class representative.

## II.   Plaintiff's Request for Discovery Regarding Defendant's Records, Loan Documents, Skip Tracing, and "Green Check Mark" Notations

Plaintiff also seeks to re-open class discovery.[2]  Plaintiff seeks discovery regarding (1) Defendant's records relating to the 221,880 cell phone numbers Defendant allegedly

---

[1] Subsequently, the parties stipulated to protective orders that similarly prohibited Plaintiff from using the information contained in the "LiveVox call list" and the "EasyLink call list."  (ECF Nos. 67, 85.)

[2] The final deadline for class certification discovery in this action was February 27, 2015.  (ECF No. 83.)

2

Case 2:18-cv-08751-MCS-FFM Document 72-32 Filed 11/22/19 Page 249 of 367
Case 3:13-cv-01556-JLS-DHB Document 132 Filed 09/21/15 Page 3 of 4
Page ID #:937

called; (2) loan applications; (3) evidence of skip tracing; and (4) "green check mark" notations in Defendant's account notes.

Federal Rule of Civil Procedure 16 requires that district courts issue a scheduling order "limit[ing] the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P 16(b)(3)(A). A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Court has discretion whether to reopen discovery or to hold the parties to discovery cutoff dates. *Cardenas v. Whittemore*, 2013 WL 244374 (S.D. Cal. 2013) citing *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006).

Having carefully considered Plaintiff's arguments, the Court finds Plaintiff has not demonstrated with particularity[3] how the discovery she is requesting will cure the issues raised by Judge Sammartino in the order denying Plaintiff's motion for class certification. The Court further notes that the discovery Plaintiff seeks will implicate the privacy rights of the putative class members, as well as debtors who would not be members of the putative class. In light of the potential privacy issues at stake, the Court is not persuaded that Plaintiff has met her burden to justify re-opening class discovery. Accordingly, Plaintiff's request to re-open class discovery is DENIED.

### III.  Plaintiff's Request for Discovery Regarding Defendant's Expert

Finally, Plaintiff requests permission to seek discovery regarding Defendant's Expert Aaron Woolfson. Plaintiff does not address how such discovery would be pertinent to the concerns raised by Judge Sammartino. Therefore, the Court finds Plaintiff has not met her burden to re-open class discovery as it relates to Mr. Woolfson. The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues. Thus, to the extent Plaintiff wishes to

---

[3] Plaintiff has provided little information regarding the specific discovery mechanisms she intends to use. For example, with regard to her generalized request to be permitted discovery into Defendant's account records for the 221,800 cell phone numbers, she states only that the exact type of discovery necessary will have to be determined after consulting with her IT expert or consultant.

13cv1556-JLS (DHB)

Case 2:18-cv-08751-MCS-FFM Document 72-4 Filed 11/22/19 Page 250 of 367
Case 3:13-cv-01556-JLS-DHB Document 132 Filed 09/21/15 Page 4 of 4
Page ID #:938

depose Mr. Woolfson regarding his opinions concerning the merits, Plaintiff is not precluded from doing so under the Court's current scheduling order. (*See* ECF No. 123.) However, Plaintiff's request to pursue class discovery related to Mr. Woolfson is DENIED.

    IT IS SO ORDERED.

Dated: September 21, 2015

DAVID H. BARTICK
United States Magistrate Judge

13cv1556-JLS (DHB)

# EXHIBIT M

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 252 of 367
Page ID #:940
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 1 of 46

1

2

3

4

5

6

7

8   **UNITED STATES DISTRICT COURT**

9   **EASTERN DISTRICT OF CALIFORNIA**

10

11   RAFAEL MUNOZ,  et al.,                     )   Case No.: 1:09-cv-00703 - AWI- JLT
                                                )
12              Plaintiffs,                     )   FINDINGS AND RECOMMENDATIONS
                                                )   GRANTING FINAL APPROVAL OF THE CLASS
13        v.                                    )   SETTLEMENT AND GRANTING IN PART THE
                                                )   REQUESTS FOR CLASS REPRESENTATIVE
14   GIUMARRA VINEYARDS CORP.,                  )   FEES, ATTORNEYS FEES AND COSTS
                                                )
15              Defendant.                      )
                                                )   (Doc. 227)
16   _____        )

17        Rafael Munoz, Santos Valenzula, Trindad Ruiz, Marta Rincon de Diaz, Ramon Cervantes

18   Perales and Hugo Perez Rios (collectively, "Plaintiffs") seek final approval of a class settlement

19   reached in this action with Defendant Giumarra Vineyards Corporation.  In addition, Plaintiffs seek an

20   award of attorneys' fees and costs from the settlement fund, fees for claims administration, and class

21   representative enhancement payments.  (Doc. 227)

22        Because Plaintiffs carry their burden to demonstrate certification the settlement terms are fair,

23   reasonable, and adequate, the Court recommends Plaintiffs' request for final approval of the

24   Settlement be **GRANTED**.  In addition, the Court recommends the request for attorney fees be

25   **GRANTED** in the modified amount of $1,525,000; costs be awarded in the modified amount of

26   $175,000.00; enhancement payments be **GRANTED in PART** for Rafael Munoz, Santos Valenzuela,

27   Ramon Perales, Hugo Perez, Trinidad Ruiz, and Marta Rincon de Diaz; and enhancement payments be

28   **DENIED** for Lidia Cruz, and Yanet Hernandez.

1

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 253 of 367
Page ID #:941
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 2 of 46

1

## BACKGROUND

2

On March 5, 2004, Arnaldo Lara, Mario Laveaga, Mirna Diaz, Paula Leon, and Raul Diaz,

3

individually and acting for the interests of the general public, ("Lara Plaintiffs") initiated an action in

4

the Kern County Superior Court against Rogelio Casimiro, doing business as Golden Grain Farm

5

Labor.[1]  On September 12, 2005, the Lara Plaintiffs filed a second amended complaint and identified

6

other employers of agricultural farm workers as defendants, including El Rancho Farms; Stevco, Inc.;

7

Lucich Family Farms; and Castlerock Farming and Transport, Inc.  The Lara Plaintiffs never identified

8

Giumarra as a defendant in the state court action.

9

On November 9, 2005, Plaintiffs' counsel initiated an action against table grape growers based

10

in Kern County, including Giumarra Vineyards Corporation; Marko Zaninovich, Inc.; Sunview

11

Vineyards of California, Inc.; Castlerock; D.M. Camp & Sons; Sunview Vineyards of California; El

12

Rancho Farms; Stevco, Inc; and FAL, Inc.[2]  (*See* Doc. 46 at 12, n.17; *see also Doe v. D.M. Camp &*

13

*Sons*, 624 F.Supp.2d 1153 (E.D. Cal. 2008).  At the time the action was initiated, the plaintiffs were

14

unnamed former and current employees of the defendants.  *Id.* at 1156.  The Court acknowledged the

15

*Doe* matter was related to several other cases initiated against grape growers.  *Id.*

16

On December 16, 2005, Santos R. Valenzuela, Trinidad Ruiz, Marta Ricon de Diaz, Ramon

17

Cervantes Perales, and Hugo Perez Rios filed a complaint against Giumarra Vineyards, initiating Case

18

No. 1:05-cv-1600-AWI-SMS.  The plaintiffs alleged violations of the Migrant and Seasonal

19

Agricultural Worker Protection Act, common law breach of contract, failure to pay wages and/or

20

overtime, failure to reimburse expenses in violation of California Labor Code § 2802, failure to allow

21

for meal and rest breaks pursuant to California Labor Code § 226.7, failure to keep accurate records,

22

and violations of California Business and Professions Code § 17200.  (*Valenzuela*, Doc. 1 at 1-2)

23

24

[1] The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  The record of a court proceeding is a source whose accuracy cannot reasonably be questioned, and judicial notice may be taken of court records.  *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), *aff'd* 645 F.2d 699 (9th Cir. 1981); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236m 1239 (4th Cir. 1989); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980).  Therefore, judicial notice is taken of the original Complaint and the Second Amended Complaint filed in *Lara v. Casimiro*, case number S-1500-CV-252445-SPC.  In addition, judicial notice is taken of the state court's docket of the *Lara* action, available at http://www.kern.courts.ca/gov.

25

26

27

[2] For the reasons set forth above, judicial notice is taken of the Court's docket in *Doe v. D.M. Camp & Sons*, Case No. 1:05-cv-01417-AWI-SMS, and *Valenzuela v. Giumarra Vineyards Corp.*, Case No. 1:05-cv-01600-AWI-SMS.

28

2

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 254 of 367
Page ID #:942
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 3 of 46

1   Defendants in *Doe* action, including Giumarra Vineyards, filed motions to dismiss the operative

2   complaint.  The Court granted the motions to dismiss and to sever the action and ordered the plaintiffs

3   to file amended pleadings against each defendant.  (*Doe*, Doc. 168)  On May 29, 2008, Rafael Munoz,

4   Lidia Cruz, and Yanet Hernandez were identified as plaintiffs in the Third Amended Complaint against

5   Giumarra Vineyards.  (*Doe*, Doc. 172)  On March 31, 2009, the Court ordered Plaintiffs to re-file their

6   suit in a new action within twenty days to finalize the severance.  (*Doe*, Doc. 238)

7   On April 20, 2009, plaintiffs Rafael Munoz, Lidia Cruz, and Yanet Hernandez filed a complaint

8   against Giumarra Vineyards.  (Doc. 1)  The plaintiffs filed a notice of related cases, including

9   *Valenzuela*.  (Doc. 6)  The Court directed the parties to file briefs regarding consolidation (Doc. 8), and

10  on August 20, 2009, the Court ordered the cases be consolidated.  (Doc. 27)

11  On May 4, 2009, the Court observed the plaintiffs in *Munoz* and *Valenzuela* were "suing

12  Giumarra on largely the same legal grounds" (Doc. 8 at 1) and were represented by "two groups of

13  allied attorneys."  (Doc. 20 at 1)  The *Munoz* plaintiffs were represented by Mallison & Martinez;

14  Weinberg, Roger & Rosenfeld; and Milberg LLP; while the *Valenzuela* plaintiffs were represented by

15  McNicholas & McNicholas; Kingsley & Kingsley; Bush, Gottlieb, Singer, Lopez, Kohanski, Adelstein

16  & Dickinson; and the Law Offices of Marcos Camacho.  (*See* Doc. 20 at 1)  The Court consolidated

17  *Munoz* and *Valenzuela,* and Court arranged class counsel as follows:

18      1.    Co-Lead Counsel[3]
             ▪ Mallison & Martinez
19           ▪ McNicholas & McNicholas, LLP

20      2.    Members of the Executive Committee[4]
             ▪ Bush, Gottlieb, Singer, Lopez, Kohanski, Adelstein, Dickinson
21           ▪ Kingsley & Kingsley, APC
             ▪ Law Offices of Marcos Camacho
22           ▪ Milberg, LLP
             ▪ Weinberg, Roger & Rosenfeld
23

24  (Doc. 27 at 1-2)  Thus, each of the law firms remained designated as Plaintiffs' counsel in the action.

25  _____

26      [3] The Court explained the Co-Lead Counsel had "day-to-day responsibility for the conduct of the consolidated litigation; shall determine how to prosecute the case and shall initiate, coordinate and supervise the efforts of plaintiffs' counsel in the consolidated action in the areas of discovery, briefing, trial and settlement."  (Doc. 27 at 2)

27      [4] The law firms of Kingsley & Kingsley and Milberg, LLP were appointed Co-Chairs of the Executive Committee. (Doc. 27 at 2) Members of the Executive Committee were obligated to "execute the orders of the Court concerning the conduct of the litigation; formulate and draft material for plaintiffs in the Consolidated Actions, including interrogatories, document requests, pleadings, briefs and motion papers; and perform such other tasks as are delegated by Co-Lead Counsel, including, for example, the taking of depositions upon oral examination."  (*Id.*)

28

3

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 255 of 367
Page ID #:943
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 4 of 46

On September 22, 2009, the plaintiffs filed the "consolidated complaint" that identified all named plaintiffs in the action: Rafael Munoz, Lidia Cruz, Yanet Hernandez, Santos R. Valenzula, Trinidad Ruis, Marta Rincon de Diaz, Ramon Cervantes Perales and Hugo Perez Rios. (Doc. 28) Plaintiffs alleged Giumarra was liable for: violations of the Agricultural Workers Protection Act, 29 U.S.C. § 1801, failure to pay wages, failure to pay reporting time wages, failure to reimburse required expenses, failure to provide meal and rest periods, failure to pay wages of terminated or resigned employees, knowing and intentional failure to comply with itemized employee wage statement provisions and record keeping requirements, breach of contract, and violation of unfair competition law. (*Id.* at 1-2) Plaintiffs brought the action "on behalf of Plaintiffs and members of the Plaintiff Class comprising all non-exempt agricultural, packing shed, and storage cooler employees employed, or formerly employed, by each of the Defendants within the State of California." (*Id.* at 9) In April 2011, the parties stipulated to amend the operative complaint, "withdrawing Lidia Cruz and Yanet Hernandez as named plaintiffs and class representatives." (Doc. 36)

In November 2011, the parties requested a stay in the action pending the resolution of *Brinker Restaurant Corp. v. Sup. Ct.*, 165 Cal. App. 4th 25 (2008). The parties noted, "At issue in *Brinker* is the standard for determining an employer's obligations with respect to California's rest and meal break laws." (Doc. 79 at 2) Because Plaintiffs' amended complaint raised issues pending resolution in *Brinker*, the Court granted the request for a stay. (Doc. 80) On April 12, 2012, the California Supreme Court issued its decision in *Brinker*. Therefore, the Court lifted the stay and heard oral arguments regarding the motion for class certification.

The Court granted Plaintiff's motion for class certification in part, certifying the "Late Meal Class" and "Tools Class" on June 13, 2013. (Docs. 109, 121) Each class included "all fieldworkers employed by Giumarra from 11/9/2001 to the present." (*See* Doc. 121 at 16) Plaintiffs' proposed Class Notice—which included "the nature of the action, the class definitions approve by the Court, the claims and issues to be resolved, how a class member may enter appear through an attorney or chose to be excluded from the class, the time and method to opt-out of the class, and the binding effect of a class judgment"—was approved by the Court on December 11, 2013. (Doc. 137 at 1)

Following the Court's rulings on the parties' cross-motions for summary judgment, Defendant

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 256 of 367
Page ID #:944
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 5 of 46

1   filed a motion to decertify the Late Meals Class (Doc. 189), which was denied by the Court on

2   September 30, 2016.  (*See* Docs. 202, 210)

3        The parties engaged in mediation with Steven Vartabedian, a retired justice of California's Fifth

4   District Court of Appeal.  (Doc. 218 at 8)  On November 29, 2016, Plaintiffs notified the Court that the

5   parties had "come to an agreement in principle to resolve the matter entirely," and began "the process

6   of formally documenting the timers of the proposed settlement."  (Doc. 213 at 3)  By January 6, 2017,

7   the parties reported the terms had been finalized "and the settlement agreement [was being] circulated

8   for signatures."  (Doc. 215 at 3)

9        The Court granted preliminary approval of the proposed settlement agreement on March 27,

10  2017.  (Docs. 223)  The Court granted conditional certification of the Settlement Class, which was

11  defined as a combination of the previously-certified Tools Class and Late Meal Break Class, stating:

12       The "Tool Class" means all fieldworkers employed by Giumarra from November 9,
         2001 through and including December 1, 2016 who were "required to purchase
13       necessary tools. The "Late Meal Break Class" consists of all field workers employed by
         Giumarra from 11/9/2001 November 9, 2001 through and including December 1, 2016
14       who were not provided a timely meal period.

15       The "Class" for purposes of settling both claims consists of the combined Tool and Late
         Meal Break Class. The Class does not include irrigators and drivers; only employees,
16       exclusive of foremen, assigned to crews that performed tasks similar to those of the
         named Plaintiffs: tying, pruning, picking and packing.

17

18  (*Id.* at 15; Doc. 219-1 at 4, Settlement § I.D)  In addition, Rafael Munoz, Santos Valenzuela, Trinidad

19  Ruiz, Marta R. Rincon de Diaz, Ramon Perales, and Hugo Perez Rios were appointed as the Settlement

20  Class Representatives, and authorized to seek enhancement payments up to $7,500 for their

21  representation of the class.  (Doc. 223 at 15)  The law firm of Mallison & Martinez remained appointed

22  as the Class counsel, and authorized to seek fees that did not "exceed 33 1/3% of the gross settlement

23  amount" and costs up to $175,000.  (*Id.*)  Finally, Rust Consulting ("Rust") was appointed the

24  Settlement Administrator.  (*Id.*)  On April 3, 2017, the Court approved the Class Notice Packet that

25  conveyed this information to class members.  (Doc. 225)

26       On April 17, 2017, the Settlement Administrator mailed the Class Notice Packet to 13,449 class

27  members.  (Doc. 227-6 at 3, Schwartz Decl. ¶ 11)  In total, the Settlement Administrator received 3,809

28  Claim Forms, of which 3,385 were considered complete.  (Doc. 227-6 at 4, Schwartz Decl. ¶ 15)

5

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 257 of 367
Page ID #:945
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 6 of 46

1   However, per the instructions of the parties, the Settlement Administrator will consider claim forms

2   received prior to June 20, 2017 to be valid.  (*Id.*)  In addition, the Settlement Administrator received

3   143 Exclusion Forms, but "113 Class Members sent both a Claim Form and Exclusion Form."  (*Id.*, ¶¶

4   17-18)  Therefore, the Settlement Administrator sent the 113 individuals letters inquiring as to what

5   action the class member intended, and stating "if that if a Class Member does not respond to the letter

6   of intention, the Claim Form shall take precedence."  (*Id.*, ¶ 18)

7         No written objections to the proposed settlement terms were received by the Settlement

8   Administrator.  (Doc. 227-6 at 3, Schwartz Decl. ¶ 19)  Similarly, the Court did not receive any

9   objections from class members.

10        Plaintiffs filed the motion for final approval of the class settlement terms, as well as approval of

11  payments from the settlement fund, on May 30, 2015.  (Doc. 227)

12                              **SETTLEMENT TERMS**

13        Pursuant to the proposed settlement ("the Settlement"), the parties agreed to a gross settlement

14  amount totaling $6,100,000.00, plus interest. (Doc. 227-3 at 3, Settlement § I.S)  Giumarra agreed to

15  fund the Settlement for the following classes:

16        The Tools Class: all fieldworkers employed by Giumarra from 11/9/2001 to the present
          who were required to purchase necessary tools.

17
18        The Late Meal Break Class: all field workers by Giumarra from 11/9/2001 to the present
          who were not provided a timely meal period.

19  (*Id.* at 1, Settlement § I.D) These classes include only "employees, exclusive of foremen, assigned to

20  crews that performed tasks similar to those of the named Plaintiffs: tying, pruning, pickling and

21  packing."  (*Id.*) Thus, the classes do not include irrigators and drivers.  (*Id.*) For purposes of settlement,

22  the Settlement Class "consists of the combined Tool and Late Meal Break Class."  (*Id.*)

23        Giumarra agreed to pay $2,100,000 of the Gross Settlement Amount by June 1, 2017; another

24  $2,000,000 plus 5% interest on December 1, 2017; and a final payment of $2,000,000 plus 5% interest

25  on November 1, 2018.  (Doc. 227-3 at 11-12, Settlement §III.F.7)  If any of the payments are made

26  after these deadlines, the interest rate will rise to 10%.  (*Id.* at 12)

27  **I.       Payment Terms**

28        The settlement fund will cover payments to class members with additional compensation to the

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 258 of 367
Page ID #:946
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 7 of 46

Class Representatives.  (Doc. 227-3 at 5-6, Settlement § III.B)  In addition, the Settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement Administrator, and the California Labor & Workforce Development Agency.  (*Id*.)  Specifically, the settlement provides for the following payments from the gross settlement amount:

- The named Class Representatives will receive up to $7,500 each;

- Plaintiffs who withdrew from the action will receive up to $3,500 each;

- Class counsel will receive no more than 33 1/3% of the gross settlement amount for fees, and up to $175,000 for expenses;

- The Claims Administrator will receive up to $75,000 for fees and expenses.[5]

(Doc. 227-3 at 5-7, Settlement § III.B; Doc. 218-7 at 17)  After these payments have been made, the remaining money ("Net Settlement Amount") will be distributed as settlement shares to Class Members.  (Doc. 227-3 at 3, Settlement §§ I.V, III.D)

Class members must have submitted the Claim Form to receive a share from the Net Settlement Amount.  (Doc. 227-3 at 6, Settlement § III.D)  Shares for each class member will be based upon:

> (a) that Claimant's total number of Months of Employment during the Class Period (b) divided by the aggregate number of Months of Employment of all Participating Class Members during the Class Period (with the division rounded to four decimal places) (c) multiplied by the value of the Net Settlement Amount. Months of employment during the time period 2001 through 2008 will be weighted four times higher than those subsequent to 2008 because of Defendants' changes in practices.

(*Id.*, Settlement § III.D.1)  Therefore, the formula acknowledges Defendant's contention that the practices employed by the company changed in 2008.  In addition, the exact amount each individual will receive depends upon how many individuals submitted timely and valid claim forms and the period of time Giumarra employed each class member.

## II.     Releases

The Settlement provides that Plaintiffs and Class Members, other than those who elect to participate in the Settlement, shall release Giumarra from the claims arising in the class period at the

---

[5] Rust Consulting estimated the fees and costs for claim administration to be $50,000.  (Doc. 218-1 at 17)  For purposes of preliminary approval of the Settlement and notice to the class members, Plaintiffs' counsel increased the estimate to $75,000.  (*Id.*)

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 259 of 367
Page ID #:947
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 8 of 46

1   time final judgment is entered.  Specifically, the release for the class members states:

2       As of the date of the Judgment, all Participating Class Members hereby fully and finally
        release Defendant, and its shareholders, parents, predecessors, successors, subsidiaries,
3       affiliates, and trusts, and all of its employees, directors, officers, agents, attorneys,
        stockholders, fiduciaries, other service providers, and assigns, from any and all claims,
4       known and unknown, for or related to all claims provided for in the certified class,
        namely meal period violations and reimbursement claims for tools for the time period of
5       November 9, 2001 to December 1, 2016.

6   (Doc. 227-3 at 13-14, Settlement § III.G)  The release for Plaintiffs encompasses more claims than the

7   release of Class Members, which releases any claims related to improper compensation.  (*Id.* at 13; *see*

8   *also* Doc. 218-1 at 10)  Specifically, Plaintiffs' release provides:

9       As of the date of the Judgment, Plaintiffs and their Counsel hereby fully and finally
        release Defendant, and its shareholders, parents, predecessors, successors, subsidiaries,
10      affiliates, and trusts, and all of its employees, directors, officers, agents, attorneys,
        fiduciaries, other service providers, and assigns, <u>from claims based on or arising from</u>
11      <u>the allegations that they were or are improperly compensated under federal, California,</u>
        <u>or local law</u> (the "Class's Released Claims"). The Class's Released Claims include all
12      such claims for alleged unpaid wages, including overtime compensation, missed meal-
        period and rest-break wages or penalties, and interest; related penalties, including, but
13      not limited to, recordkeeping penalties, pay-stub penalties, minimum-wage penalties,
        missed meal-period and rest-break penalties, and waiting-time penalties; and costs and
14      attorneys' fees and expenses, and reimbursements for tools purchased.

15  (*Id.*, emphasis added).  Plaintiffs' claims are intended to "include all claims, whether known or

16  unknown" at this time.  (Doc. 227-3 at 14, Settlement § III.G.4)

17          Defendant also agreed to "fully and finally release Plaintiffs and each of their parents,

18  predecessors, successors, subsidiaries, affiliates, and trusts, and all of its employees, officers, agents,

19  attorneys, stockholders, fiduciaries, other service providers, and assigns, from any and all claims."

20  (Doc. 227-3 at 14, Settlement § III.G.3)  This release covers all claims "known and unknown, including

21  but not limited to claims arising from or related to Defendant's employment of Plaintiffs and

22  Participating Class Members, including any issues under federal, state and/or local law, statute,

23  ordinance, regulation, common law, or other source of law."  (*Id.*)

24  **III.    Objections and Opt-Out Procedure**

25          Any class member who wished had an opportunity to object or elect not to participate in the

26  Settlement.  The Class Notice Packet explained the procedures for class members to make objections

27  to Settlement terms, or elect not to be excluded from the Settlement Class.  (*See* Docs. 224, 225).  In

28  addition, the Class Notice Packet explained claims that were to be released by Class Members as part

8

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 260 of 367
Page ID #:948
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 9 of 46

1   of the Settlement.  (*Id.*)

2   **IV.    Service of the Notice Packets and Responses Received**

3           On March 24, 2017, the Court ordered the Settlement Administrator, Rust Consulting, to mail

4   the Class Notice Packet to class members no later than April 17, 2017.  (Doc. 223 at 16-17)  Rust

5   Consulting served the Class Notice Packet to the extent possible.  (*See generally*, Doc. 227-6)

6           According to Abigail Schwartz, a program manager for Rust Consulting, the Class Notice

7   Packets were mailed via the United States Postal Service to 13,449 the class members identified by

8   Defendant on April 17, 2017.  (Doc. 227-6 at 3, Schwartz Decl. ¶¶ 6-8)  The Postal Service returned

9   3,135 of the packets to the Rust Consulting as undeliverable.  (*Id.*, ¶ 13)  The Settlement Administrator

10  performed address traces and located new addresses, but 2,275 Class Notice Packets remained

11  undeliverable. (*Id.*)  On May 3, 2017, a postcard reminder was mailed to the class members who had

12  not submitted a Claim Form or Exclusion Form, reminding them of the May 17, 2017 submission

13  deadline.  (*Id.*, ¶ 12)

14          Ms. Schwartz reports that in total, Rust Consulting received 3,809 Claim Forms, of which 3,385

15  were considered complete.  (Doc. 227-6 at 4, Schwartz Decl. ¶ 15)  However, per the instructions of the

16  parties, the Settlement Administrator will consider claim forms received prior to June 20, 2017 to be

17  valid.  (*Id.*)  The Settlement Administrator received 55 forms disputing the employment information

18  provided by Giumarra, and has resolved 50 of the disputes at this time.  (*Id.*, ¶16)  In addition, the

19  Settlement Administrator received 143 Exclusion Forms, but "113 Class Members sent both a Claim

20  Form and Exclusion Form."  (*Id.*, ¶¶ 17-18)  Therefore, the Settlement Administrator sent the 113

21  individuals letters inquiring as to what action the class member intended, and stating "if that if a Class

22  Member does not respond to the letter of intention, the Claim Form shall take precedence."  (*Id.*, ¶ 18)

23          According to Ms. Schwartz, with the 3,809 Claim Forms—including the 113 class members

24  who sent in both the Claim Form and Exclusion Form—the average settlement share is estimated to be

25  $990.82.  (Doc. 227-6 at 4-5, Schwartz Decl. ¶ 20)  She reports the smallest share is estimated to be

26  $3.19, while the highest is $5,341.00.  (*Id.* at 5, ¶ 20)  No objections to the Settlement were mailed to

27  Rust Consulting or filed with the Court.

28  ///

9

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 261 of 367
Page ID #:949
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 10 of 46

## **APPROVAL OF A CLASS SETTLEMENT**

When parties reach a settlement agreement prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Approval of a class settlement is generally a two-step process. First, the Court must assess whether a class exists. *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the Court must "determine whether the proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)). The decision to approve or reject a settlement is within the Court's discretion. *Hanlon*, 150 F.3d at 1026.

## **I.    Class Certification**

Parties seeking class certification bear the burden of demonstrating the elements of Rule 23 are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977). The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982). Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *Falcon*, 457 U.S. at 156. If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b). *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

Previously, the Court certified the "Late Meal Class" and "Tools Class" in this action (Docs. 109 and 121), and the proposed Settlement encompasses both classes. Because the Court determined the Rule 23 requirements were satisfied by these classes, and there has not been any change in circumstances, the Court need not re-evaluate the Rule 23 requirements, and simply affirms its prior

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 262 of 367
Page ID #:950
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 11 of 46

1  orders.  *See Adoma v. University of Phoenix, Inc.*, 913 F. Supp.2d 964, 974 (E.D. Cal. 2012)

2  (explaining that the Court had previously certified classes and "need not find anew that the settlement

3  class meets the certification requirements"); *In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, *4

4  (D. Ariz. 2012) ("The Court has previously certified, pursuant to Rule 23 of the Federal Rules of Civil

5  Procedure, and hereby reconfirms its order certifying a class").

6  **II.    Evaluation of the Settlement Terms**

7          Settlement of a class action requires approval of the Court, which may be granted "only after a

8  hearing and on finding that [the settlement] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

9  Approval is required to ensure the settlement is consistent with Plaintiffs' fiduciary obligations to the

10  class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  The Ninth Circuit

11  identified several of factors to evaluate whether a settlement meets these standards, including:

12          the strength of plaintiff's case; the risk, expense, complexity, and likely duration of
           further litigation; the risk of maintaining class action status throughout the trial; the
13          amount offered in settlement; the extent of discovery completed, and the stage of the
           proceedings; the experience and views of counsel; the presence of a governmental
14          participant;[6] and the reaction of the class members to the proposed settlement.

15  *Staton*, 327 F.3d at 959 (citation omitted).  Further, a court should consider whether settlement is "the

16  product of collusion among the negotiating parties."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at

17  458 (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)).  In reviewing settlement

18  terms, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law

19  which underlie the merits of the dispute."  *Class Plaintiffs*, 955 F.2d at 1291(internal quotations and

20  citation omitted).

21          **A.    Strength of Plaintiffs' Case**

22          When evaluating the strength of a case, the Court should "evaluate objectively the strengths and

23  weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to

24  reach these agreements."  *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012)

25  (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F.Supp 1379, 1388 (D. Az. 1989)).

26          In this action, there are several disputed claims the fact-finder would be required to determine

27

28  _____

          [6] This factor does not weigh in the Court's analysis because the government is not a party in this action.

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 263 of 367
Page ID #:951
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 12 of 46

1  related to the alleged failure to provide meal periods and tools for Giumarra fieldworkers. In addition,

2  Plaintiffs acknowledge that "there are clear uncertainties surrounding Plaintiffs' ability to prove their

3  claims given the unpredictability of a lengthy and complex jury trial." (Doc. 227-1 at 14) Because the

4  parties have conducted thorough investigations and discovery allowing them to assess the strengths and

5  weaknesses of the case, this factor weights in favor of final approval of the Settlement.

6  **B.    Risk, Expense, Complexity, and Likely Duration of Further Litigation**

7  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain

8  results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004). If

9  the settlement were to be rejected, the parties would have to engage in further litigation, including re-

10  certification of a class and discovery on the issue of damages. Previously, Plaintiffs asserted:

11  > Counsel for Plaintiffs carefully considered the risks of trial and other normal perils of
   > litigation, including the merits of the affirmative defenses asserted by Defendant, the
12  > difficulties of complex litigation, the lengthy process of establishing specific damages,
   > the difficulty in fully analyzing and utilizing the evidence at issue in this case, potential
13  > new legal decisions affecting pivotal issues in the case, potential class decertification
   > issues, and other various possible risks and delays. [Citation.] Plaintiffs' counsel
14  > realizes that no matter how good the facts and law, every trial retains inherent risk
   > while the proposed settlement provides a certain recovery for Class Members.
15

16  (Doc. 218 at 6-7, citation omitted) Further, Plaintiffs observe the "case has been pending in one form

17  or another for 12 years," which "is a long time for any class member to wait." (Doc. 227-1 at 17) On

18  the other hand, the Settlement provides for the immediate recovery for the class, with the average

19  payment estimated to be $990.82. (Doc. 227-1 at 22, citing Schwartz Decl. ¶ 20) Given the risks and

20  uncertainties faced by Plaintiffs, this factor weighs in favor of approval of the Settlement.

21  **C.    Maintenance of Class Status throughout the Trial**

22  Plaintiffs contend that there is a "risk that the case may not survive a contested decertification

23  proceeding." (Doc. 227-1 at 15, citing Mallison Decl. ¶ 51) Notably, Defendant filed motion to

24  decertify the late meal break class, which was denied. (*See* Docs. 189, 202, 210) However, if the

25  classes were decertified by the Court, the class members would not recover any awards. Thus, this

26  factor supports final approval of the Settlement.

27  **D.    Amount offered in Settlement**

28  The Ninth Circuit observed that "the very essence of a settlement is compromise, 'a yielding of

12

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 264 of 367
Page ID #:952
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 13 of 46

1    absolutes and an abandoning of highest hopes.'" *Officers for Justice v. Civil Serv. Commission*, 688

2    F.2d 615, 624 (9th Cir. 1982) (citation omitted).  Thus, when analyzing the amount offered in

3    settlement, the Court should examine "the complete package taken as a whole," and the amount is "not

4    to be judged against a hypothetical or speculative measure of what might have been achieved by the

5    negotiators.' *Id.* at 625, 628.

6        In this case, the proposed gross settlement amount is $6,100,000.00, plus interest. (Doc. 227-3

7    at 3, Settlement § I.S)  Plaintiffs report the action settled "for nearly the entire trial value of the certified

8    claims."  (Doc. 227-1 at 16, citing Doc. 227-2 at 28, Mallison Decl. ¶ 66).  Plaintiffs explain that Class

9    Counsel "conservatively estimates the value of the late meal period claims to be approximately $3

10   million for the narrowed class, excluding interest and attorneys fees," and that when interest is

11   included, "the value of the late meal period claim is approximately $6.4 million."  (*Id.*)  Based upon the

12   parties' agreement that this amount provides adequate compensation for the wage and hour claims

13   against Giumarra, the Court finds the amount offered supports final approval of the Settlement.

14       **E.        Extent of Discovery Completed and Stage of the Proceedings**

15       The Court is "more likely to approve a settlement if most of the discovery is completed because

16   it suggests that the parties arrived at a compromise based on a full understanding of the legal and

17   factual issues surrounding the case." *Adoma*, 913 F. Supp. 2d at 977 (quoting *DIRECTV, Inc.,* 221

18   F.R.D. at 528).  Here, Plaintiffs report:

19       Plaintiffs conducted substantial discovery spanning a 12-year period including
         propounding and responding to many sets of special interrogatories and document
20       requests, taking and defending twenty-one (21) depositions. Perhaps most impressive is
         the fact that Plaintiffs' counsel and their database expert scanned and copied
21       approximately 36,000 crewsheets reflecting late meal periods, comprehensively
         reviewed them, and created a FRE 1006 evidence summary compiling the 1.2 million
22       work shifts in the 36,000 crewsheets into an electronic format by a crew of 44 analysts.
         [Citation.]
23       Further, Plaintiffs' counsel and their staff conducted hundreds of interviews of
         witnesses and class members. [Citation.] For example, in support of their Motion for
24       Class Certification, Plaintiffs submitted in-depth declaration from seventy-seven (77)
         fieldworkers. Id. Plaintiffs' litigation and mediation of this case were informed by a
25       thorough review of Defendant's document production, astute expert and non-expert
         review and analysis of vast amounts of electronic data, interviews with hundreds of
26       witnesses and twenty-one (21) depositions. [Citation.]

27   (Doc. 227-1 at 16-17, citations omitted)  Given the amount of discovery performed by the parties, it

28   appears that the parties made informed decisions, which lead to resolution of the matter with the

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 265 of 367
Page ID #:953
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 14 of 46

1    assistance of a mediator.  Consequently, the settlement agreement "is presumed fair," and this factor

2    supports final approval of the Settlement.  *See Adoma*, 913 F. Supp.2d at 977.

3        **F.    Experience and Views of Counsel**

4        As the Court previously observed, Class Counsel "are experienced wage and hour attorneys

5    with class action experience."  (Doc. 109 at 29)  The Class Counsel believe the Settlement "is fair and

6    reasonable given the circumstances of these cases and the strength and weaknesses of the various

7    claims."  (Doc. 227-2 at 17, Mallison Decl. ¶ 39)  Defendants agree that the Settlement "reflects a fair,

8    reasonable, and adequate settlement of the Action."  (Doc. 227-3 at 16, Settlement § III.I.9.)  Given

9    counsels' experience and familiarity with the facts, their recommendation that the Settlement be

10   approved is entitled to significant weight.  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great

11   weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts

12   of the underlying litigation"); *see also Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447

13   (E.D. Cal. 2013) ("In considering the adequacy of the terms of a settlement, the trial court is entitled to,

14   and should, rely upon the judgment of experienced counsel for the parties.")  Thus, the views of

15   counsel support final approval of the Settlement.

16       **G.    Reaction of Class Members to Settlement**

17       Significantly, no objections were filed by Class Members following service of the Class Notice

18   Packet.  The Class Representatives have indicated they "are strongly in support of the settlement."

19   (Doc. 227-1 at 19, citing Munoz Decl. ¶6; Valenzuela Decl. ¶6; Perales Decl. ¶9; Rios Decl. ¶6)

20   Although 11,174 class members received the Class Notice Packet[7], only 143 Exclusion Request Forms

21   were returned to the Settlement Administrator.  (Doc. 227-6 at 4, Schwartz Decl. ¶ 17)

22       Significantly, "the absence of a large number of objections to a proposed class action settlement

23   raises a strong presumption that the terms of a proposed class action settlement are favorable to the

24   class members."  *Nat'l Rural Telecomms.*, 221 F.R.D. at 529.  Because no class members objected to

25   the Settlement and the requests for exclusion are vastly outweighed by the number of class members

26   who have indicated their consent to the terms of settlement, this factor weighs in favor of final approval

27

28       _____
         [7] Ms. Schwartz reported that Rust Consulting sent the Class Notice Packet to 13,449 class members, but 2,275
     remained undeliverable.  (Doc. 227-6 at 3-4, Schwartz Decl. ¶¶ 9, 13)

14

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 266 of 367
Page ID #:954
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 15 of 46

of the Settlement.

### H.    Collusion between Negotiating Parties

The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others. *Staton*, 327 F.3d at 960. The parties utilized an impartial mediator, and settlement negotiations took several sessions. (*See* Doc. 227-1 at 19)  Given the duration of the negotiations, it appears the agreement is the product of non-collusive conduct.

### IV.    Conclusion

The factors set forth by the Ninth Circuit weigh in favor of final approval of the Settlement, which appears to be is fair, reasonable, and adequate as required by Rule 23.  Therefore, the Court recommends final approval of the Settlement Agreement be **GRANTED**.

### REQUEST FOR ATTORNEYS' FEES AND COSTS

Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be awarded pursuant to Rule 23(h).  Under the Settlement, Class Counsel may request attorneys' fees that total "no[] more than 33 1/3 % of the Gross Settlement Amount with interest." (Doc. 227-3 at 5, Settlement § III.B.2.)  Class Counsel are also authorized under the Settlement to seek litigation expenses in "an amount to be determined."  (*Id.*)  Here, Class Counsel request the maximum of 33 1/3% of the gross settlement fund in fees totaling $2,125,654.00 and expenses in the amount of $28,467.28.  (Doc. 227-1 at 10)  In support of these requests, a representative from each law firm has filed a declaration setting forth the hours worked and hourly rates, as well as the firms expenses. (Docs. 227-2, 227-7, 227-11, 227-19, and 227-20)

Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded their fees and costs from the fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and as such application of the doctrine is appropriate "when each member of a certified class has an undisputed and

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 267 of 367
Page ID #:955
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 16 of 46

1    mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing*

2    *Co.*, 444 U.S. at 478.  Here, the Settlement applies formulas to determine the amount paid to class

3    members who submitted a valid claim, and application of the common fund doctrine is appropriate.

4    **I.      Legal Standards**

5          "[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class

6    action settlement agreement" to determine whether it is "'fundamentally fair, adequate, and reasonable'

7    Fed.R.Civ.P. 23(e)."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003)).  To do so, the Court

8    must "carefully assess the reasonableness of a fee amount spelled out in a class action settlement

9    agreement." *Id*.

10         The Court must review the time billed and assess whether it is reasonable in light of the work

11   performed and the context of the case.  *See Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D.

12   Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (noting a court

13   may not adopt representations regarding the reasonableness of time expended without independently

14   reviewing the record); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding

15   an action for a thorough inquiry on the fee request where "the district court engaged in the 'regrettable

16   practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court

17   should not "accept[] uncritically [the] representations concerning the time expended").

18         The party seeking fees bears the burden of establishing that the fees and costs were reasonably

19   necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir.

20   2000).  Therefore, a fee applicant must provide time records documenting the tasks completed and the

21   amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins.*

22   *Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the

23   district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

24         Significantly, when fees are to be paid from a common fund, as here, the relationship between

25   the class members and class counsel is "turns adversarial."  *In re Washington Pub. Power Supply Sys.*

26   *Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

27         [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has
           become a claimant against the fund created for the benefit of the class. It is obligatory,
28         therefore, for the trial judge to act with a jealous regard to the rights of those who are
           interested in the fund in determining what a proper fee award is.

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 268 of 367
Page ID #:956
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 17 of 46

1

2   *Id.* at 1302 (internal quotation marks, citation omitted).  As a result the district court must assume a

3   fiduciary role for the class members in evaluating a request for an award of attorney fees from the

4   common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are

5   to come out of the settlement fund, the district court has a fiduciary role for the class").

6       The Ninth Circuit determined both a lodestar and percentage of the common fund calculation

7   "have [a] place in determining what would be reasonable compensation for creating a common fund."

8   *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court

9   applies the lodestar or percentage method, the Ninth Circuit requires "fee awards in common fund

10  cases be reasonable under the circumstances."  *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990);

11  *see also Staton*, 327 F.3d at 964 (fees must be "fundamentally fair, adequate, and reasonable").

12      **A.    Lodestar Method**

13      The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably

14  expended by counsel on the particular matter times a reasonable hourly rate."  *Florida* , 915 F.2d at 545

15  n. 3 (citing *Hensley*, 461 U.S. at 433).  The product of this computation, the "lodestar" amount, yields a

16  presumptively reasonable fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013);

17  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008).  Next, the court may adjust the

18  lodestar upward or downward using a "multiplier" considering the following factors adopted by the

19  Ninth Circuit in a determination of the reasonable fees:

20      (1) the time and labor required, (2) the novelty and difficulty of the questions involved,
        (3) the skill requisite to perform the legal service properly, (4) the preclusion of other
21      employment by the attorney due to acceptance of the case, (5) the customary fee, (6)
        whether the fee is fixed or contingent, (7) time limitations imposed by the client or the
22      circumstances, (8) the amount involved and the results obtained, (9) the experience,
        reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the
23      nature and length of the professional relationship with the client, and (12) awards in
        similar cases.

24

25  *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  However, the Court has since

26  determined that the fixed or continent nature of a fee and the "desirability" of a case are no longer

27  relevant factors.  *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5

28  (9th Cir. 2011) (citing *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 n.4 (9th Cir. 1992)).

17

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 269 of 367
Page ID #:957
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 18 of 46

**B.     Percentage from the common fund**

As the name suggests, under this method, attorneys who create a common fund for a class may be awarded a percentage of fees from the fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and as such application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf."  *Boeing Co.*, 444 U.S. at 478.

In the Ninth Circuit, the typical range of acceptable attorneys' fees is 20% to 30% of the total settlement value, with 25% considered the benchmark.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *Hanlon*, 150 F.3d at 1029 (observing "[t]his circuit has established 25 % of the common fund as a benchmark award for attorney fees"); *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that district courts should award in common fund cases"). The percentage may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear.  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

To assess whether the percentage requested is reasonable, courts may consider a number of factors, including "(1) the results obtained for the class; (2) the risk undertaken by counsel; (3) the complexity of the legal and factual issues; (4) the length of the professional relationship with the client; (5) the market rate; and (6) awards in similar cases."  *Romero v. Produces Dairy Foods, Inc.*, 2007 U.S. Dist. LEXIS 86270, at *8-9 (E.D. Cal. Nov. 14, 2007) (citing *Vizcaino*, 290 F.3d at 1048-1050; *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).

**II.     Evaluation of the fees requested**

"The district court has discretion to use the lodestar method or the percentage of the fund method in common fund cases." *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (quoting *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir.

18

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 270 of 367
Page ID #:958
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 19 of 46

1    1997)).  Notably, the Court must consider similar factors under either method.  *See Kerr*, 526 F.2d at

2    70; *Vizcaino*, 290 F.3d at 1048-1050.  Further, the Court may "appl[y] the lodestar method as a

3    crosscheck" to determine whether the amount requested is reasonable.  *Vizcaino*, 290 F.3d at 1050, n.5.

4    **A.      Results obtained for the class**

5    Courts have recognized consistently that the result achieved is a major factor to be considered

6    with a fee award.  *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).

7    Here, Class Counsel assert they "recovered a maximum of $6,376,961.81 on behalf of the class, that

8    the class members would likely not have recovered independent of this action."  (Doc. 227-1 at 26-27)

9    According to Ms. Schwartz, the recovery for class members ranges from $3.19 to $5,341.00, with an

10   average award of $990.82.  (Doc. 227-6 at 5, Jenkins Decl. ¶ 20)  Though these are fair results, they

11   are not exceptional and do not support an increase above the benchmark.

12   **B.      Risk undertaken by counsel**

13   The risk of costly litigation and trial is an important factor in determining the fee award.

14   *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court

15   explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual

16   merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*,

17   505 U.S. 557, 562 (1992).  As a result, the Ninth Circuit approved an award slightly above the

18   benchmark in *Vizcaino* where the case was "extremely risky for class counsel" and the "plaintiffs lost

19   in the district court – once on the merits, once on the class definition – and twice counsel succeeded in

20   reviving their case on appeal."  *Id.*, 290 F.3d at 1048.

21   Here, Class Counsel asserts, "Given the risks . . .  involved in class action contingency work,

22   [they] believe a request of 33 1/3%  – even though it is above the standard benchmark – is therefore

23   justified."  (Doc. 227-1 at 26)  In addition, Class Counsel assert "there are clear uncertainties

24   surrounding Plaintiffs' ability to prove their claims given the unpredictability associated with lengthy

25   and complex jury trials and the possibility of decertification" (*Id.*)

26   Significantly, the risks identified by counsel are not unique to this action, but rather apply to any

27   class action litigation.  Mr. Mallison even reports that "100% of Mallison & Martinez's legal practice

28   involves legal work that is on a contingency fee basis."  (Doc. 227-2 at 24, Mallison Decl. ¶ 60)

19

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 271 of 367
Page ID #:959
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 20 of 46

1    Further, the Ninth Circuit has suggested that the distinction between a contingency arrangement and a

2    fixed fee arrangement alone does not merit an enhancement from the benchmark.  *See In re Bluetooth*

3    *Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7. (9th Cir. 2011) (observing "whether the fee was

4    fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees); *but see In re Online*

5    *DVD-Rental Antitrust Litigation*, 779 F.3d at 954-55 (finding the contingent nature of litigation remains

6    a relevant factor to evaluate a request from the common fund).  Although Mr. Mallison asserts his firm

7    "would not have agreed to represent plaintiffs in this case other than on a contingency fee basis unless

8    it would have been confident that it would be awarded a contingency fee approximately 1/3 of the

9    potential recovery if we were successful in our efforts," he admits also that, rather than plaintiffs

10   seeking out the firm's assistance, "[t]he firm chose the proposed class representatives" in this action.

11   (Doc. 227-2, Mallison Decl. ¶¶ 21, 60)

12        Despite the fact that this case was taken on a contingency basis, Class Counsel do not identify

13   any evidence that demonstrates they bore more than an atypical risk.  For example, Plaintiffs succeeded

14   in overcoming Defendant's motion to dismiss, succeeded on their motion for class certification, and

15   prevailed on the motion to decertify one of the classes.  *Compare with Vizcaino*, 290 F.3d at 1048-

16   1049.  Therefore, this factor does not weigh in favor of the request for a higher award.

17        **C.      Complexity of issues and skill required**

18        The complexity of issues and skills required may weigh in favor of a departure from the

19   benchmark fee award.  *See, e.g., Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *14-15 (E.D.

20   Cal. Sept. 2, 2011) (in determining whether to award the requested fees totaling 28% of the class fund,

21   the Court observed the case involved "complex issues of constitutional law in an area where

22   considerable deference is given to jail officials," and the action "encompassed two categories of class

23   members"); *see also In re Heritage Bond Litig.,* 2005 U.S. Dist. LEXIS 13555, at *66 (C.D. Cal. June

24   10, 2005) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved

25   are significant factors in determining a fee award").

26        Class Counsel assert their skills and "the quality of work" support an award greater than the

27   benchmark in this action.  (Doc. 227-1 at 27, emphasis omitted.)  According to Class Counsel, they

28   "showed great skill, thoroughness, and conscientiousness in investigating and developing the claims,

20

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 272 of 367
Page ID #:960
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 21 of 46

1   liability theories, and estimated possible recoveries in the Litigation." (*Id.*)  Specifically, they report:

2      Plaintiffs' counsel and their staff interviewed hundreds of witnesses and reviewed
       tens of thousands of pages of documents and/or data from employees. From these
3      interviews, Plaintiffs' counsel and their staff collected seventy-seven (77)
       declarations from Giumarra fieldworkers in support of the Motion for Class
4      Certification. [Citation.] Plaintiffs' counsel also took or defended twenty-one (21)
       depositions in this case, including class member declarants, named Plaintiffs,
5      Defendant's managers and persons most knowledgeable. [Citation.]  Plaintiffs'
       counsel and their expert scanned and copied approximately 36,000 crewsheets
6      reflecting late meal periods, reviewed these documents, and used them to create a
       FRE 1006 evidence summary compiling the 1.2 million work shifts in the 36,000
7      crewsheets into an electronic format by a crew of 44 analysts. [Citation.]

8   (Doc. 227-1 at 27-28, citations omitted)  Class Counsel contend their "experience and reputation

9   assisted them" with their representation of the class members, "without causing unnecessary delay or

10  creating unnecessary work." (*Id.* at 28)

11      Notably, when this action was initiated in 2005, many of the lead attorneys— such as Stan

12  Mallison, Hector Martinez, and Eric Kingsley— had been in practice for less than 10 years.  A review

13  of the time sheets indicates a great deal of the time expended was due to conferences among counsel.

14  Because the matter did not require exceptional skills, and Class Counsel displayed skills that were

15  consistent with those of attorneys with comparable experience, this factor supports an award equal to

16  the Ninth Circuit benchmark.

17      **D.      Length of professional relationship**

18      Class Counsel do not address the length of the professional relationships. Santos R. Valenzuela,

19  Trinidad Ruiz, Marta Ricon de Diaz, Ramon Cervantes Perales, and Hugo Perez Rios filed their

20  complaint against Giummara on December 16, 2005.  (*Valenzuela*, Doc. 1) Rafael Munoz, Lidia Cruz,

21  and Yanet Hernandez were identified as plaintiffs in the Third Amended Complaint against Giumarra

22  on May 29, 2008.  (*Doe*, Doc. 172)  Though counsel have spent many years on this action, this factor

23  does not weigh in favor of departure from the benchmark. *See Six Mexican Workers v. Ariz. Citrus*

24  *Growers*, 904 F.2d 1301, 1311 (finding "the 25 percent standard award" was appropriate although "the

25  litigation lasted more than 13 years").

26      **E.      Awards in similar cases**

27      Notably, as discussed above, 25% of a common fund is "benchmark award for attorney fees"

28  in the Ninth Circuit.  *Hanlon*, 150 F.3d at 1029; *see also Vizcaino,* 290 F.3d at  1047 (9th Cir. 2002).

21

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 273 of 367
Page ID #:961
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 22 of 46

1   Previously, this Court observed that "[t]he typical range of acceptable attorneys' fees in the Ninth

2   Circuit is 20 percent to 33.3 percent of the total settlement value." *Barbosa v. Cargill Meat Solutions*

3   *Corp.*, 297 F.R.D. 431, 448 (E.D. Cal. 2013).  Thus, the amount requested by Class Counsel is at the

4   highest range of percentages from the common fund.  *See id.*

5       Class Counsel acknowledge that "courts in the Eastern District have awarded Class Counsel

6   attorneys' fees of 30% of the net settlements in recent class action cases on behalf of fieldworkers

7   employed in the tablegrape industry."  (Doc. 227-2 at 29, citing *Rodriguez v. D.M. Camp & Sons*, Case

8   No. 1:09-cv-00700 and *Morales v. Stevco*, Case No. 1:09-cv-00704).  However, Class Counsel argue

9   *Rodriguez*  and *Morales* "are distinguishable in a number of ways" that support a higher fee award.

10  (*Id.*)  Class Counsel report that "the amount of discovery in this case was substantially greater than in

11  [the] *Rodriguez* and *Morales* matters," including the number of documents reviewed, interviews

12  performed by Counsel, and 21 depositions.  (*Id.*)

13      On the other hand, the results obtained in the *Rodriguez* and *Morales* settlements were much

14  more beneficial to the class members than the estimated awards for class members in this action.  In

15  *Morales,* the average award for class members was "over $4,300" for each class member.  *Morales*,

16  2013 WL 1222058 at *2 (E.D. Cal. Mar. 25, 2013).  The Court found this was "a significant recovery"

17  that weighed in favor of a higher award.  *Id.*  Similarly, in *Rodriguez*, the average award was

18  approximately $2,200 award per worker, and "the highest award [was] estimated to be approximately

19  $17,300."  *Rodriguez*, 2013 WL 2146927 at *13 (E.D. Cal. May 15, 2013). The Court determined such

20  results were significant and weighed in favor of an award higher than the benchmark.  *See Morales*,

21  2013 WL 1222058 at *2; *Rodriguez*, 2013 WL 2146927 at *13.  In contrast, here, the average award for

22  class members $990.82 (Doc. 227-6 at 4-5, Schwartz Decl. ¶20)  Given the disparity in the awards, the

23  Court does not find the prior awards in *Morales* and *Rodriguez* support an award above the benchmark.

24      **F.    Lodestar Crosscheck and Market Rate**

25      Class Counsel provided a list of each legal professional who worked on this action and report

26  they worked at total of 4,661.52 hours, which resulted in a lodestar calculation of $2,535,424.76 . (*See*

27  Doc. 227-2 at 24-26, Mallison Decl. ¶ 62)  In general, when the lodestar is used as a cross-check for a

28  fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 274 of 367
Page ID #:962
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 23 of 46

1    hours."  *See Schiller*, 2012 WL 2117001 at *20 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294,

2    306 (3d Cir.2005); *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166 (S.D.Cal. 2007)).  However,

3    because a review of the records indicated a number of entries for tasks that did not relate to the claims

4    against Giumarra, the Court has performed a detailed review of the records, which reveals that Class

5    Counsel's lodestar calculation is flawed.

6                                   1.      Hourly rate

7            As an initial matter, the hourly rates sought by counsel and the professional staff are not in

8    accord with the market rate for this community.  The Supreme Court explained that attorney fees are to

9    be calculated with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S.

10   886, 895-96 and n.11 (1984).  In general, the "relevant community" for purposes of determining the

11   prevailing market rate is the "forum in which the district court sits."  *Camacho*, 523 F.3d at 979.  Thus,

12   when a case is filed in the Fresno Division of the Eastern District of California, "[t]he Eastern District

13   of California, Fresno Division, is the appropriate forum to establish the lodestar hourly rate . . ." *See*

14   *Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

15           The fee applicant bears a burden to establish that the requested rates are commensurate "with

16   those prevailing in the community for similar services by lawyers of reasonably comparable skill,

17   experience, and reputation."  *Blum*, 465 U.S. at 895 n.11.  The applicant meets this burden by

18   "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested

19   rates are in line with those prevailing in the community for similar services by lawyers of reasonably

20   comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11; *see also Chaudhry v. City of*

21   *Los Angeles*, 751 F.3d 1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and

22   other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the

23   prevailing market rate.")  However, "rates, other than those of the forum, may be employed if local

24   counsel was unavailable, either because they are unwilling or unable to perform because they lack the

25   degree of experience, expertise, or specialization required to handle properly the case." *Gates v.*

26   *Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992).

27

28

                                                  23

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 275 of 367
Page ID #:963
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 24 of 46

1          a.      Attorneys[8]

2          Here, the hourly rates sought by counsel range from $250 to $850 per hour.  (*See* Doc. 227-2 at

3    23-26, Martinez Decl. ¶ 62)  In support of these rates, the attorneys refer the Court to rates billed or

4    awarded in other district courts.  For example, Mr. Kingsley provided the Court with a survey

5    conducted by the *National Law Journal*, which indicates five California law firms "regularly charged in

6    excess of $500 [per hour] for their partners," and "four of these firms charge as high as $600, $620,

7    $650 and up to $850 per hour."  (Doc. 227-11 at 3, Kingsley Decl. ¶ 9)  In addition, Mr. Kingsley filed

8    an article from the *Wall Street Journal* entitled "Lawyers Gear Up Grand New Fees," which "states that

9    hourly fees are expected to rise following the trend that began in New York where the top lawyers are

10   now billing hourly at upwards of $1,000.00." (*Id.* at 5, ¶ 15)  Mr. Kingsley also provides an article from

11   *The Daily Journal* entitled "*Associate billing rates start climbing again,*" which indicates hourly rates

12   in Los Angeles, San Diego, and San Francisco ranged in average from $394 to $550 for associates and

13   from $598 to $797 for partners.  (Doc. 227-14 at 2)  However, this information is not helpful toward the

14   Court's analysis regarding fees in the Fresno Division of the Eastern District.[9]

15          Significantly, this Court has declined to calculate a lodestar with the hourly rate of $650

16   requested by Stan Mallison and Hector Martinez in *Ontiveros v. Zamora*, 303 F.R.D. 356, 373-74 (E.D.

17   Cal. 2014).  The Court noted that the hourly rates were "high for even the most experienced attorneys

18   in the Eastern District."  *Id.* at 374 (citing *Johnson v. Allied Trailer Supply*,, 2014 WL 1334006, at *5

19   (E.D. Cal. Apr. 3, 2014); *Joe Hand Promotions, Inc. v. Albright*, 2013 WL 4094403, at *2 (E.D. Cal.

20   Aug. 13, 2013).  Consequently, the Court calculated the lodestar using $400 as the hourly rate for the

21   partners at Mallison & Martinez and $175 as the rate for associates.  *Id.*  Although *Ontiveros* was filed

---

[8] Class Counsel failed to provide any information regarding the admission dates or the level of experience of the following attorneys: Jessica Juarez, Matthew Gauger, Alan Crowley, Manuel Boigues, Ira Gottlieb, David Adelstein, Erica Deutsh, Kirk Prestegard, Jonathan Cohen, Marissa Nuncio, Michelle Furukawa, Ramon Gonzalez, Benjamin Valero, Catherine Burke Schmidt, Erin M. Smith, Mitra Torabi, Matthew McNicholas, and Robert Wargo. However the Court "may take judicial notice of the State Bar of California's website regarding attorneys' dates of admission to the Bar." *Davis v. Hollins Law*, 25 F.Supp.3d 1292, 1298 n. 5 (2014). Accordingly, the Court takes judicial notice of the admission dates of each of these attorneys as represented on the website of the State Bar of California.  *See id.;* Fed. R. Evid. 201(b).
     The Court was unable to locate any information for Antranik Patanian, Reuben A. Guttman, and MJ Quinn indicating they are members of the California State Bar.  However, the Court was able to determine that Reuben A. Guttman was admitted to practice in Washington D.C., and MJ Quinn was admitted to practice in the state of New York. The Court takes judicial notice of the admission dates for these attorneys as recorded on the websites of the Washington, D.C. Bar and the NY Office of Court Administration.

[9] The law firms identified in the *National Law Journal* survey are located in Los Angeles, California (Doc. 227-12), which lies within the Central District. In addition, San Diego lies within the Southern District, and San Francisco lies within the Northern District.

24

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 276 of 367
Page ID #:964
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 25 of 46

1    in the Sacramento Division of the Eastern District, these hourly rates demonstrate that the hourly rates

2    requested herein are not aligned with hourly rates in the Eastern District.

3         Rather, the Court determined "hourly rates generally accepted in the Fresno Division for

4    competent experienced attorneys [are] between $250 and $380, with the highest rates generally

5    reserved for those attorneys who are regarded as competent and reputable and who possess in excess of

6    20 years of experience." *Silvester v. Harris*, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 2014); *see also*

7    *Trujillo v. Singh*, 2017 WL 1831941 (E.D. Cal. May 8, 2017) (awarding an hourly rate of $300 per hour

8    to counsel with 15 years of experience, finding this amount was appropriate for the Fresno area); *Miller*

9    *v. Schmitz*, 2014 WL 642729 at *3 (E.D. Cal. Feb. 18, 2014) (the "prevailing hourly rate in this district

10   is in the $400/hour range for experienced attorneys," and awarding $350 per hour for an attorney with

11   20 years of experience). For attorneys with "less than ten years of experience . . . the accepted range is

12   between $175 and $300 per hour." *Silvester*, 2014 WL 7239371 at *4 (citing *Willis v. City of Fresno*,

13   2014 WL 3563310 (E.D. Cal. July 17, 2014); *Gordillo v. Ford Motor Co.*, 2014 WL 2801243 (E.D.

14   Cal. June 19, 2014)). With these parameters in mind, the hourly rates for counsel must be adjusted to

15   calculate the lodestar.[10]

16        Hours for each of the attorneys who have been admitted to practice for 20 years or more—

17   including Stan Mallison, Hector Martinez, Eric Kingsley, Thomas Lynch, Marcos Camacho, David

18   Rosenfeld, William Sokol, Christian Raisner, Theodore Franklin, Emily Rich, Alan Crowley, Mary

19   Suzanne Murphy, Ira Gottlieb, David Adelstein, Sabrina Kim, Jeff Westerman, Elizabeth Lin, Matthew

20   McNicholas, Robert P. Wargo, and Reuben Guttman—will be calculated at the rate of $400 per hour.

21   For attorneys in practice between 15 and 20 years—including Darren Cohen, Mario Martinez, Alan

22   Crowley, Manjari Chawla, Erica Deutsch, Nicole Dukett, Benjamin Valerio, Catherine Burke Schmidt

23   and MJ Quinn—the hourly rate is adjusted to $350 per hour. Further, for attorneys in practice between

24   10 and 15 years—including Marco Palau, Steve Hernandez, Deanna Engles, Elana Levine, Jonathan

---

[10] Although rates for outside of the relevant forum may be employed if local counsel is unavailable, Plaintiffs' counsel do not assert that local counsel was unavailable. Thus, they fail to meet their burden to show that hourly rates other than those of the Fresno Division should be sued for purposes of calculating the lodestar. *See Camacho, 523 F.3d at 979; Barjon v. Dalton*, 132 F.3d 496, 500-02 (9th Cir. 1997) (affirming the district court's decision to decline an award of out-of-district billing rates where the fee applicants failed "to prove the unavailability of local counsel," and instead reduced the award to the hourly rates in the relevant community).

25

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 277 of 367
Page ID #:965
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 26 of 46

1   Cohen, Marissa Nuncio, Michelle Furukawa, Erin Smith, and Mitra Torabi—the rate is adjusted to

2   $300 per hour.  The hours worked by attorneys with experience ranging between 5 and 10 years—

3   including Joseph Sutton, Jessica Juarez, Kelsey Szamet, Liane Katzenstein, Edgar Auilasocho, Manuel

4   Boigues, Linelle Mogado, and Kerianne Steele—the lodestar will be calculated at a rate of $225 per

5   hour.  For attorneys who have been in practice for less than five years—including Eric Sebastian

6   Trabucco, David Winston, Arthur Four, and Kirk Prestegard, the rate is adjusted to $175 per hour.

7   Based upon the prior survey of the attorney fees in the Fresno Division and the Court's own

8   knowledge, these hourly rates are reasonable.  *See Silvester*, 2014 WL 7239371 at *4; *see also Ingram*

9   *v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its

10  discretion either by relying, in part, on its own knowledge and experience" to determine reasonable

11  hourly rates).

12              b.      *Non-attorney staff*

13              Class Counsel calculated their lodestar using hourly rates ranging from $75 to $325 for non-

14  attorney support staff.  (*See* Doc. 227-2 at 23-26)  Generally, paralegal rates within the Fresno Division

15  of the Eastern District range between $75 to approximately $150.00.  *See Moreau v. Daily Independent*,

16  2013 WL 796621 at *3 (E.D. Cal. Mar. 1, 2013) (observing that "$75 for paralegals [is] reasonable for

17  litigation performed in this district"); *Spence v. Wells Fargo Bank, N.A.*, 2012 WL 844713 at *5 (E.D.

18  Cal., Mar. 12, 2012) (approving "paralegal or other support rates" ranging from $125 to $155).

19              Class Counsel request hourly rates of $75 per hour for Beverly Yahata and Christopher Papaleo,

20  and $95 per hour for Joel Salas.  (*See* Doc. 227-2 at 23, 26)  Because these rates are within the range

21  generally awarded in the Fresno Division, no adjustment is required.  In addition, a higher hourly rate is

22  appropriate for Judy Castillo, Eleanor Natwick, Teresa Oviedo Rojas, and Aaron Nathan, who all have

23  extensive experience as paralegals.  (*See* Doc. 227-20 at 88-11, Rich Decl. ¶¶17-20)  Accordingly, the

24  rate for these paralegals will be adjusted to $150.  *See Spence*, 2012 WL 844713 at *5.

25              On the other hand, Class Counsel offer support for why rates higher rates per hour are

26  appropriate for Hector Hernandez, Jan Spring, Staci Schoff, Paula Sotelo, Paulino Cruz, Aida Sotelo,

27  David Rodriguez, Brenda Rizo, Martin Vasquez, Bonita Rivera, Michelle Grisat, Cecille Chaffins,

28

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 278 of 367
Page ID #:966
Case 1:09-cv-00703-AWI-JLT    Document 251    Filed 06/21/17    Page 27 of 46

1  Sharon Chang, Dana Powers, Jeremy Turner, Aaron Welo, and Antranik Patanian[11]. Given the lack of

2  information regarding their experience, the Court adjusts their hourly rates to $100 per hour. *See*

3  *Willis*, 2014 WL 3563310 at *14 (setting the hourly rate for a paralegal at $100 where the plaintiffs did

4  "not offer[] any reason" to support a rate "set at the highest level in this district").

5         Finally, Class Counsel apply an hourly rate of $150 per hour for a law clerk who worked on this

6  action. (Doc. 227-2 at 23) However, the Court has determined that an appropriate rate for law clerks is

7  $100. *See Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 460-61 (E.D. Cal. 2013) (awarding

8  the rate of $100 per hour to law clerks, upon finding the rates of "$100-$110 per hour are 'in line with

9  those rates prevailing in the community.'") Therefore, the rate for David Eckfeld is adjusted to $100

10  per hour for purposes of the lodestar calculation.

11         2.     Hours expended

12         Representatives from the law firms designated as Plaintiffs' counsel have provided a declaration

13  including the hours worked in support of the request for attorney fees. Accordingly, the Court has

14  reviewed the hours reported by each firm to determine whether they are reasonable.

15         a.     Mallison & Martinez

16         Stan Mallison reports that his law firm worked 1,708.89 hours in the course of this action since

17  2005. (Doc. 227-2 at 23) For actions taken before *Doe* was severed into six separate actions, the firm

18  seeks 1/6 of the recorded time, unless the task clearly related only to the claims against Giumarra.

19         *i.     Time expended by counsel*

20         The tasks expended by counsel include, as discussed above, not only drafting pleadings but

21  interviewing a significant number of witnesses, taking more than twenty depositions, and reviewing

22  discovery. Although there are a significant number of entries related to interoffice conferences and

23  meetings with co-counsel, which may not be compensable[12], the Ninth Circuit has observed that a

24

25

26        [11] As noted above, the Court was unable to determine whether Antranik Patanian was a member of the Bar. At the hearing, the Court noted the lack of information regarding Antranik Patanian, and counsel did not identify Antranik Patanian as an attorney.

27        [12] The Ninth Circuit has "recognized that 'the participation of more than one attorney does not necessarily constitute an unnecessary duplication of effort.'" *McGrath v. County of Nevada*, 67 F.3d 248, 256 (1995) (quoting *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989)). Generally, two attorneys cannot bill for attending the same meeting or

28  communicating with each other, as such time is unnecessary. *In re Mullins*, 84 F.3d 459, 467, 318 U.S. App. D.C. 19 (D.C. Cir. 1996); Robinson v. Plourde, 717 F. Supp. 2d 1092, 1099 (D. Haw. 2010).

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 279 of 367
Page ID #:967
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 28 of 46

1 "lodestar cross-check calculation need entail neither mathematical precision nor bean-counting." *See*

2 *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306. The Court's review of the time sheets does not reveal

3 any further issues, such as overbilling or inflated hours by counsel.

4 *ii.    Time expended by support staff*

5 Review of the time sheets reveals several tasks by support staff are purely clerical and should

6 be excluded from the lodestar calculation. *See Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989).

7 Specifically, Paula Sotelo recorded 7.4 hours for calendaring deadlines and locating, printing,

8 downloading, and circulating documents. (*See* Doc. 227-4 at 45-47)

9 Courts have discounted paralegal billing entries for "clerical tasks" such as "filing, transcript,

10 and document organization time." *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *see also*

11 *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 985 (4th Cir. 1997) (approving the court's elimination of

12 hours spent on secretarial tasks from the lodestar calculation); *Jones v. Metropolitan Life Ins. Co.*, 845

13 F. Supp. 2d 1016, 1027 (N.D. Cal. 2012) (discounting time for "filing or retrieving electronic court

14 documents or copying"). Accordingly, 7.4 hours will be deducted from the lodestar for Ms. Sotelo.

15 b.    Kingsley & Kingsley, APC

16 According to Eric Kingsley, his law firm worked a total of 722.9 hours on this action. (Doc.

17 227-11 at 12, Kingsley Decl. ¶ 30) He reports that attorneys at Kingsley & Kingsley, APC spent time

18 conducting discovery in this action including: "reviewing documents produced in discovery (payroll

19 records, policies, etc.)"; "drafting and responding to discovery, both requests to produce and

20 interrogatories;" and investigating "job functions, duties, compensation, policies, and procedures."

21 (*Id.*) Mr. Kingsley also asserts his firm was responsible for drafting pleadings including "Complaints,

22 Motions to Compel discovery responses, Opposition to Motion for Summary Adjudication, Opposition

23 to Motion to Decertify, Motion for Preliminary Approval, various documents related to Preliminary

24 Approval, Motion for Final Approval, [and] Class Notice document." (*Id.*, ¶30(g)) Finally, Kingsley

25

26 _____

27 On the other hand, many courts have recognized that staffing multiple attorneys on a single task may improve the chance of success in litigation. *See, e.g., PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010) ("division of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings. Multiple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or

28 law." (citation and internal quotation marks omitted)); *United States v. City & County of San Francisco*, 748 F. Supp. 1416, 1421 (N.D. Cal. 1990) (observing that "the presence of several attorneys at strategy sessions…may be crucial to the case").

28

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 280 of 367
Page ID #:968
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 29 of 46

& Kingsley assisted with mediation preparation, "negotiating the terms of the Settlement;" "reviewing and making changes to the Settlement Agreement;" and "coordinating and overseeing all aspects of the administration of the Settlement (review documentation, approv[ing] form and content, etc.)." (*Id.* at 12-13, ¶30(s)-(w).)

Review of the timesheets does not reveal any overbilling or inflated hours. Further, clerical tasks have not been included in the lodestar calculation. Because the time expended by the law firm on the tasks above appears reasonable, no deductions are required from the hours expended by Kingsley & Kingsley, APC.[13]

### d.    McNicholas & McNicholas, LLP

Mr. Kingsley provided time sheets from the law firm of McNicholas & McNicholas, reporting the attorneys there spent 357.5 hours on the claims against Giumarra. (Doc. 227-11 at 14-15, Kingsley Decl. ¶ 39; *see also* Doc. 227-18)

### i.    Time expended by counsel

Notably, the minimum time recorded was 0.25 hours, which is a practice that has been criticized because it inflates time spent on the matter. *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 949 (9th Cir. 2007) (affirming a reduction after finding the billing practice inflated the time recorded); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1100-01 (D. Haw. 2010) (applying a 20% reduction for billing in quarter-hour increments); *Prudential Ins. Co. v. Am. v. Remington*, 2014 U.S. Dist. LEXIS 9209 at *9 (E.D. Cal. Jan. 24, 2014) (also applying a 20% reduction where counsel billed in 15 minute-increments).

In *Welch*, the district court "imposed a 20 percent across-the-board reduction on [the] requested hours" because the law firm "billed in quarter-hour increments." *Id.*, 480 F.3d at 948. The district concluded the "practice of billing by the quarter-hour resulted in a request for excessive hours . . . because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time." *Id.* The Ninth Circuit also reviewed the time sheets, and noted: "Our own review of the time sheet confirms that it is replete with quarter-hour or half-hour charges for the

---

[13] A significant number of hours related to emails or conferences with co-counsel. However, Kingsley & Kingsley was appointed as a co-chair of the Executive Committee and charged with the responsibility of formulating and drafting materials, documents, and motions. (*See* Doc. 27 at 2.) In light of these obligations, the hours related to keeping other attorneys apprised of the actions taken and litigation planning do not appear unreasonable.

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 281 of 367
Page ID #:969
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 30 of 46

1   drafting of letters, telephone calls and intraoffice conferences." *Id.* Therefore, the reduction for

2   quarter-hour billing was affirmed. *Id.*

3        Counsel billed 15 minutes on several occasions for reading minute orders from the Court,

4   emailing to confirm a meeting, and reviewing the calendar regarding the scheduling conference. (*See*

5   Doc. 227-18 at 8-17)  In *Remington*, this Court noted that "15-minute billing for reading the three-

6   sentence Minute Order, which should have been read in 30 seconds or less time, obviously inflated the

7   time spent performing that task, and causes concern that other unverifiable tasks likely took a fraction

8   of the time billed to complete." *Prudential Ins. Co. v. Am. v. Remington*, 2014 U.S. Dist. LEXIS 9209

9   at *9.  Similarly, billing for reading brief orders issued on September 5, 2006; March 16, 2007; and

10  January 15, 2008 suggests that the reported time was inflated by the quarter-hour billing minimum on

11  other tasks such as reviewing emails, leaving a telephone message, and conferences with co-counsel.

12  *See id; Welch*, 480 F.3d at 948-49.  Consequently, the time reported by the attorneys at McNicholas &

13  McNicholas is reduced by 20% for purposes of the lodestar calculation.

14                          *ii.        Time expended by support staff*

15        The time sheets include entries for clerical tasks by Beverly Yahata, including formatting

16  documents for electronic filing, filing documents, and calendaring deadlines.  (*See* Doc. 227-18 at 3-5)

17  Because all the entries by Ms. Yahata—totaling 12.75 hours—are for clerical tasks, the time will be

18  deducted from the lodestar calculation.  *See Jones*, 845 F. Supp. 2d at 1027.

19                  d.        Bush, Gottlieb, Singer, Lopez, Kohanski, Adelstein, Dickinson

20        Mr. Kingsley also provided time sheets from the law firm of Bush, Gottlieb in support of the

21  fees request, reporting the firm expended 344.9 hours on the litigation.  (Doc. 227-11 at 13-14,

22  Kingsley Decl. ¶¶ 35-36)  However, the time sheets include several tasks that relate to the claims

23  against other grape growers, such as El Rancho Farms, DM Camp, and Sunview.  For example, Ira

24  Gottlieb billed 1.5 hours on November 17, 2005, for drafting an analysis of Kovacevich, who was a

25  supervisor of El Rancho Farms.  (*See* Doc. 227-11 at 3)  Mr. Gottlieb also billed 0.4 hours for

26  researching DM Camp on November 29, 2005.  (*Id.*) Similarly, Jonathan Cohen billed 8.0 hours on

27  December 5, 2005 for traveling to Delano to interview Sunview workers.  (*Id.* at 4)  Because these

28  tasks clearly did not relate to the claims against Giumarra, the time will be reduced from the lodestar

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 282 of 367
Page ID #:970
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 31 of 46

1    calculation.  *See Gauchat-Hargis v. Forest River, Inc.*, 2013 U.S. Dist. LEXIS 128508 at *11 (E.D.

2    Cal. Sept. 9, 2013) ("Time spent on tasks that are not relevant to the case at issue should be eliminated

3    from the lodestar analysis.")

4          The Court finds the remaining time expended by the law firm—for tasks including meeting with

5    potential class members, opposing motions to dismiss, and working on the motion for class certification

6    and related motion to strike evidence—appears reasonable.  (*See* Doc. 227-17 at 2-8)  Accordingly, no

7    further deductions are required.

8                              e.       Marcos Camacho, A Law Corp.

9          Mario Martinez, who "was previously employed as an attorney with Marcos Camacho, A Law

10   Corp.," filed a declaration on behalf of the law firm, explaining that after Mr. Camacho became a judge

11   in the Superior Court of Kern County, Mario Martinez and two partners formed Martinez Aguilascocho

12   & Lynch APLC.  (Doc. 227-19 at 2, Martinez Decl. ¶ 1)  Mr. Martinez reports that the Law Offices of

13   Marcos Camacho spent 974.85 hours on this action, including 734.79 hours by attorneys and 239.75

14   hours by paralegals.  (*Id.* at 6, ¶ 10)

15         Although the time sheets for the law firm were, apparently, inadvertently omitted, Mr. Martinez

16   has provided a detailed summary of the actions undertaken by the attorneys in this action.  According to

17   Mr. Martinez, he was "the primary attorney coordinating the fact gathering and interviewing of class

18   members in preparation for drafting the complaint in this matter," as well as "for gathering, preparation

19   and signing of class member declarations by our office and co-counsel to be used in support of

20   Plaintiffs' Motion for Class Certification, and Opposing Defendants' Motion to Decertify the Class."

21   (Doc. 227-19 at 6, ¶ 10)  Mr. Martinez reports:

22         I spent approximately over 260 hours investigating the claims, interviewing class
           members, identifying class issues, and drafting and reviewing draft declarations from
23         class members in support of Plaintiffs' Motion for Class Certification and also in
           Opposition to Defendants' Motion to Decertify the Class; I spent another approximate
24         58.5 hours researching, reviewing and providing input into the Motion for Class
           Certification; approximately 35 hours on legal research and writing on Plaintiffs' Reply
25         to Defendants' Opposition to Class Certification, including Objections to Declarations,
           and Motion to Strike Declarations; approximately 12 hours and 20 minutes on legal
26         research and writing regarding both Plaintiffs' and Defendants' Objections to Findings
           and Recommendations on Order on Class Certification; I spent approximately 40 hours
27         on mediation briefs and settlement mediations. The remainder of my time I spent in
           conferences or calls with co-counsel regarding various aspects of the litigation
28         including various filings in support of class certification; drafting and responding to
           discovery; conducting formal discovery; reviewing documents produced in discovery

                                                       31

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 283 of 367
Page ID #:971
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 32 of 46

1    (payroll records, time records, policies, etc.); briefing and appearing for hearings and
     motions; discussing issues related to damages; post-class certification motions; meeting
2    with named plaintiffs and other class members to provide updates on the status of the
     case; communicating with named plaintiffs and class members regarding preparation
3    for depositions; discussing settlement with co-counsel, and on various law and motion
     issues, teleconferences, and filings throughout the 10 plus year course of this case.

4

5    (*Id.* at 6-7)  Given the number of class member declarations prepared, the extent to which the motion

6    for class certification was challenged, and the amount of discovery produced in the action, the time

7    expended by Mr. Martinez appears reasonable.

8         In addition, the time expended by Thomas Lynch, Marcos Camacho, and Edgar Aguilasocho

9    appears reasonable.  Specifically, Mr. Lynch spent 31.58 hours on the action, and Mr. Martinez reports

10   "the bulk" of this time was spent "preparing named plaintiffs' and/or class members for depositions and

11   defending depositions."  (Doc. 227-19 at 7, ¶ 11)  Mr. Camacho "spent more than 50 hours

12   interviewing class members and drafting class member declarations in support of Plaintiffs' Motion for

13   Class Certification."  (*Id.*, ¶ 12)  Further, Mr. Martinez reports that the time expended by Edgar

14   Aguilasoho, a total of 22.1 hours, was for the purpose of researching post-certification issues.  (*Id.*)

15   Given the tasks undertaken by counsel, the time does not appear unreasonable.

16        Finally, Mr. Martinez reports that the paralegal time expended in this action "was spent

17   organizing meetings with class members, interviewing class members and drafting class member

18   declarations in support of Plaintiffs' Motion for Class Certification or Plaintiffs' Opposition to the

19   Motion to Decertify, responding to class representative and class member inquiries about the case, and

20   setting up meetings with class representative and class members regarding the progression of the case,

21   as well as sitting in on deposition preparation and depositions of class members and representatives."

22   (Doc. 227-19 at 8)  Given the number of interviews that occurred in this action and the significant

23   number of declarations filed in support of the motion for class certification, the Court finds the time

24   expended by the paralegals of the law firm was reasonable.

25                    f.    Weinberg, Roger & Rosenfeld

26        Emily Rich, a shareholder with the law firm of Weinberg, Roger & Rosenfeld, reports that "the

27   firm expended 1557.23 hours in attorney and paralegal time" prior to the severance of *Doe* in March

28   2008, and seeks 1/6 of this time, or 259.54 hours.  (Doc. 227-20 at 10, Rich Decl. ¶ 22)  In addition,

                                            32

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 284 of 367
Page ID #:972
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 33 of 46

1  Ms. Rich reports they spent 126.40 hours on the claims against Giumarra after the *Doe* action was

2  severed into six separate actions.  (*Id.* at 11, ¶ 24)

3                    i.    *Work related to other grape growers*

4         Importantly, it is clear that many tasks reported relate to the claims of individuals who were not

5  employed by Giumarra, but instead related to claims raised against other defendants in *Doe.*  For

6  example, Christian Raisner bills for conferences related to other defendants, while Linelle Moago's

7  time entries include travel to Bakersfield to interview former employees of DM Camp and Sunview.

8  Specifically, the following tasks billed by counsel relate to employers other than Giumarra:

| DATE | ATTORNEY | TASK | TIME |
|---|---|---|---|
| 11/27/2005 | Raisner | Review of court dockets and related case against bankrupt farm labor contractor Casimiro; telephone conference with co-counsel Martinez; research facts. | 3.70 |
| 12/13/2005 | Raisner | Preparation and filing of notice of related case re removed case in bankruptcy court; email with co-counsel Martinez re Rosenfeld meeting. | 3.30 |
| 1/4/2006 | Raisner | Telephone calls) from and telephone cail(s) to Amy Johnson Barks re service date and extension request for El Rancho Farms; review of possible stipulation. | 1.00 |
| 1/5/2006 | Raisner | Telephone conference with David Dixon, attorney for Defendants Stevco, FAL, Inc dba Lucich Farms. re case management and re stipulation for dismissal without prejudice from related Lara vs. Casimiro case. | 0.25 |
| 1/5/2006 | Raisner | Telephone calls) from Ron Barsamian re extension of time for defendant DM Camp to respond to first amended complaint. | 0.25 |
| 1/5/2006 | Raisner | Telephone conference with Amy Barks re stipulations for dismissal without prejudice in related Lara vs. Casimiro case; review of stipulation. | 0.25 |
| 1/6/2006 | Raisner | Telephone conference with Ronald H Barsamian (attorney for defendant DM Camp &Sons); execute stipulation for extension and fax to Barsamian with message; review of stipulation and rules. | 1.00 |
| 1/12/2006 | Raisner | Review of stipulation for Zaninovich and Sunview to extension to answer or respond to First Amended Complaint; fax with message to Brendan Dolan | 0.50 |
| 1/23/2006 | Raisner | Three letters to Victoria Bradshaw (Workforce Development Agency) re section 2699 of Labor Code re DM Camp &Sons, Marko Zaninovich, Inc.; and Sunview Vineyards of California, Inc.; fact research re same. | 1.25 |
| 3/4/2006 | Mogado | Travel to Bakersfield with co-counsel H. Martinez, S. Mallison, and C. Raisner to meet clients and witnesses. | 8.00 |
| 3/5/2006 | Mogado | Interview former workers for DM Camp. | 3.00 |
| 3/5/2006 | Mogado | Interview former Sunview worker. | 2.00 |
| 4/9/2006 | Mogado | Meet with litigation team re DM Camp motion to dismiss; review motion; discuss organization of response. | 2.00 |
| 5/30/2006 | Raisner | Review of reply on Motion to Dismiss by D.M. Camp. | 1.25 |
| 9/11/2007 | Raisner | Arrangements and preparation for telephone conference | 2.00 |

33

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 285 of 367
Page ID #:973
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 34 of 46

| | | meeting of counsel; telephone conference with William Alexander (El Rancho counsel) re same; email to all counsel; email from Dolan (Sunview) re same. | |
| 9/12/2007 | Mogado | Rule 26(f) conference by telephone with Bill Alexander (El Rancho). Confer with C. Raisner and E. Rich. Telephone call with defense counsel and plaintiffs' counsel. | 5.00 |
| 10/4/2007 | Raisner | Preparation draft separate joint scheduling conference report with D.M. Camp only; email with R. Barsamian. | 3.00 |
| 10/5/2007 | Raisner | Email exchanges with R. Barsamian and M. Quesenbery; review of draft from R. Barsamian re defendant D.M. Camp. | 3.00 |

(*See* Doc. 227-23 at 3-30)

In total, the attorneys at Weinberg, Roger & Rosenfeld worked 40.75 hours on actions that clearly did not relate to claims of individuals who were not employed by Giumarra. As such, even 1/6 the time for these tasks should not be included in the lodestar calculation. *See Gauchat-Hargis*, 2013 U.S. Dist. LEXIS 128508 at *11 ("Time spent on tasks that are not relevant to the case at issue should be eliminated from the lodestar analysis.") This results in a deduction of 6.79 hours from the lodestar.[14]

### ii.  Clerical tasks

Class Counsel's lodestar calculation included time for clerical tasks performed by attorneys Linelle Mogado and Emily Rich. For example, Ms. Rich included 3.0 hours spent dealing with "filing issues" and filing documents in the log. (*Id.* at 23-24) In addition, Ms. Mogado's time included learning data software, doing data entry, training temporary support staff employee on the software, and consulting with the firm's IT department. (*See e.g.*, Doc. 227-23 at 16, 26)

In addition, the lodestar calculation included clerical tasks by paralegals Eleanor Natwick, Judy Castillo, and Aaron Nathan. For example, Ms. Natwick's time entries include 31.25 hours for tasks such as filing; "[d]ocument organization;" downloading, printing, and saving documents from PACER; and determining deadlines.[15] (*See, e.g.,* Doc. 227-23 at 22-23, 25-27; Doc. 227-24 at 6-8) Judy Castillo and Aaron Nathan spent 3.75 hours and 0.75 hours respectively reviewing documents for deadlines after the severance of the action. (*See* Doc. 227-24 at 7-9)

Given the clerical nature of these tasks, the time expended should be deducted from the lodestar calculation. *See Missouri*, 491 U.S. at 288 n. 10; *Nadarajah,* 569 F.3d at 921. Because Class Counsel

---

[14] This includes 3.46 hours for Mr. Raisner and 3.33 hours for Ms. Mogado.
[15] This includes 26.75 hours prior to the severance of the action and 4.5 hours after the severance.

34

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 286 of 367
Page ID #:974
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 35 of 46

1    seeks 1/6 of the time prior to the severance, this results in a deduction of 0.5 hours for Emily Rich, 2.5

2    hours for Linelle Mogado, 8.96 hours for Eleanor Natwick, 3.75 hours for Judy Castillo, and 0.75 hours

3    for Aaron Nathan.

### g.      Milberg, LLP

5        David Azar submitted a declaration on behalf of Milberg LLP, reporting: "The total number of

6    hours expended on this litigation by [the] firm is 110.46 hours.  The total lodestar for [the] firm is

7    $90,576.00, consisting of $70,901.5 for attorneys' time and $19,684.50 for professional time."  (Doc.

8    298 at 2, ¶ 6.)  Importantly, however, numerous hours were billed that related to the other defendants

9    in *Doe* and for clerical tasks.

### i.      *Tasks related to other defendants*

11       Like Mallison & Martinez, Milberg LLP represented the *Doe* plaintiffs in the action initiated in

12    November 2005.  Therefore, the law firm also seeks an award of 1/6 of the time related to the litigation

13    related to *Doe*.  However, the time sheets include several tasks that did not relate to Giumarra following

14    the severance of *Doe*.  For example, Sabrina Kim noted that she prepared for a hearing and appeared at

15    a "Mandatory Scheduling Conference in El Rancho and DM Camp" in July 2009. (Doc. 227-8 at 20)

16    Nicole Duckett indicated she assisted with the "discovery exchange for D.M. Camp and El Rancho."

17    (*Id.* at 22)  Ms. Duckett, Ms. Kim, and Jeff Westerman also worked on settlement of the claims against

18    Castlerock.  (*Id.* at 24-25)  Similarly, Ms. Kim included time spent related to mediation for D.M. Camp.

19    (*Id.* at 22)  Counsel spent a total of 18.25 hours on claims that clearly do not relate to Giumarra, which

20    should be omitted from the lodestar.[16]  *See Gauchat-Hargis,* 2013 U.S. Dist. LEXIS 128508 at *11

21    ("tasks that are not relevant to the case at issue should be eliminated from the lodestar analysis").

### ii.      *Clerical tasks*

23       The lodestar calculation by Mr. Azar includes work by document clerks, such as Lindbergh

24    Cox, Jessica Ortiz and Ray Velazquez.  (Doc. 227-7 at 4)  The document clerks were responsible for

25    docketing documents, copying, printing and "monitoring" the case.  (*See, e.g.* Doc. 227-8 at 15-17)

26    Given the clerical nature of these tasks, the time attributed to a "document clerk" should not be

---

[16] This includes deductions of 7.25 hours for Ms. Kim, 10.75 hours for Ms. Duckett, and 0.25 hours for Mr. Westerman.

35

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 287 of 367
Page ID #:975
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 36 of 46

included in the lodestar calculation.  *See Missouri*, 491 U.S. at 288 n. 10; *Nadarajah,* 569 F.3d at 921.

This results in the deduction of 39.50 hours.

   3.   Lodestar Calculation

   With the hourly rates and time adjustments set forth above, the lodestar for the time expended in this action is **$1,507,918.25**:

| LAW FIRM | LEGAL PROFESSIONAL | ADJUSTED HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| **Mallison & Martinez ($536,303.00)** | Stan Mallison | 502.89 | $400 | 201,156.00 |
| | Hector Martinez | 233.37 | $400 | 93,348.00 |
| | Marco Palau | 521.23 | $300 | 156,369.00 |
| | Jessica Juarez | 4.50 | $225 | 1,012.50 |
| | Joseph Sutton | 304.60 | $225 | 68,535.00 |
| | Eric Trabucco | 32.10 | $175 | 5,617.50 |
| | Hector Hernandez | 0.82 | $100 | 82.00 |
| | Jan Spring | 2.08 | $100 | 208.00 |
| | Paula Sotelo | 3.90 | $100 | 390.00 |
| | Paulino Cruz | 78.00 | $100 | 7,800.00 |
| | Staci Schoff | 15.00 | $100 | 1,500.00 |
| | Joel Salas | 3.00 | $95 | 285.00 |
| | | | | |
| **Kingsley & Kingsley ($236,458.00)** | Eric Kingsley | 372.20 | $400 | 148,880.00 |
| | Darren Cohen | 23.70 | $350 | 8,295.00 |
| | Kelsey Szamet | 71.90 | $225 | 16,177.50 |
| | Liane Katzenstein | 10.70 | $225 | 2,407.50 |
| | David Winston | 73.00 | $175 | 12,848.00 |
| | Steve Hernandez | 139.50 | $300 | 41,850.00 |
| | Deanna Engles | 2.00 | $300 | 600.00 |
| | Elana Levine | 7.10 | $300 | 2,130.00 |
| | Arthur Four | 13.20 | $175 | 2,310.00 |
| | David Eckfeld | 9.60 | $100 | 960.00 |
| | | | | |
| **Marcos Camacho, A Law Corp. ($361,534.00)** | Mario Martinez | 584.11 | $350 | 204,438.50 |
| | Thomas Lynch | 31.58 | $400 | 93,348.00 |
| | Marcos Camacho | 87.00 | $400 | 34,800.00 |
| | Edgar Auilasocho | 22.10 | $225 | 4,972.50 |
| | Aida Sotelo | 70.00 | $100 | 7,000.00 |
| | David Rodriguez | 31.75 | $100 | 3,175.00 |
| | Brenda Rizo | 12.50 | $100 | 1,250.00 |
| | Martin Vasquez | 58.00 | $100 | 5,800.00 |
| | Bonita Rivera | 67.50 | $100 | 6,750.00 |
| | | | | |
| **Weinburg, Roger & Rosenfeld ($124,007.00)** | David Rosenfeld | 3.28 | $400 | 1,312.00 |
| | Bill Sokol | 4.04 | $400 | 1,616.00 |
| | Chris Raisner | 91.53 | $400 | 36,612.00 |

36

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 288 of 367
Page ID #:976
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 37 of 46

| | Theodore Franklin | 3.50 | $400 | 1,400.00 |
|---|---|---|---|---|
| | Emily Rich | 123.18 | $400 | 49,272.00 |
| | Matthew Gauger | 0.25 | $400 | 100.00 |
| | Alan Crowley | 24.60 | $350 | 8,610.00 |
| | Manuel Boigues | 5.90 | $225 | 1,327.50 |
| | Linelle Mogado | 70.25 | $225 | 15,806.25 |
| | Manjari Chawla | 5.17 | $350 | 1,809.50 |
| | Kerianne Steele | 18.21 | $225 | 4,097.25 |
| | Mary Murphy | 1.75 | $400 | 700.00 |
| | Michelle Grisat | 6.38 | $100 | 638.00 |
| | Eleanor Natwick | 1.33 | $150 | 199.50 |
| | Teresa Oviedo Rojas | 2.88 | $150 | 432.00 |
| | Judy Castillo | 0.50 | $150 | 75.00 |
| | Aaron Nathan | 0.00 | n/a | 0.00 |
| | | | | |
| **Bush Gottlieb** **($119,202.50)** | Ira Gottlieb | 162.10 | $400 | 64,840.00 |
| | David Adelstein | 20.10 | $400 | 8,040.00 |
| | Erica Deutsch | 98.80 | $350 | 34,580.00 |
| | Kirk Prestegard | 11.10 | $175 | 1,942.50 |
| | Jonathan Cohen | 17.00 | $300 | 5,100.00 |
| | Marissa Nuncio | 14.90 | $300 | 4,470.00 |
| | Anatranik Patanian | 2.30 | $100 | 230.00 |
| | | | | |
| **Milberg LLP** **($37,347.50)** | Sabrina Kim | 28.46 | $400 | 11,384.00 |
| | Jeff Westerman | 3.54 | $400 | 1,416.00 |
| | Nicole Duckett | 37.88 | $350 | 13,258.00 |
| | Elizabeth Lin | 15.96 | $400 | 6,384.00 |
| | Michelle Furukawa | 0.46 | $300 | 138.00 |
| | Ramon Gonzalez | 5.08 | $300 | 1,524.00 |
| | Reuben Guttman | 0.33 | $400 | 132.00 |
| | MJ Quinn | 0.71 | $350 | 248.50 |
| | "Paralegals" | 28.63 | $100 | 2,863.00 |
| | "Document Clerks" | 0.00 | n/a | 0.00 |
| | | | | |
| **McNicholas &** **McNicholas** **($93,066.25)** | Matthew McNicholas | 74.40 | $400 | 29,760.00 |
| | Robert Wargo | 7.40 | $400 | 2,960.00 |
| | Catherine Burke-Schmidt | 84.40 | $350 | 29,540.00 |
| | Benjamin Valerio | 0.60 | $350 | 210.00 |
| | Erin M. Smith | 94.40 | $300 | 28,320.00 |
| | Mitra Torabi | 4.40 | $300 | 1,320.00 |
| | Christopher Papaleo | 12.75 | $75 | 956.25 |
| | Beverly Yahata | 0.00 | n/a | 0.00 |
| | | | | |
| **TOTAL** | | | | **$1,507,918.25** |

Significantly, there is a strong presumption that the lodestar is a reasonable fee. *Gonzalez*, 729

F.3d at 1202; *Camacho*, 523 F.3d at 978. The benchmark award of 25% of the common fund of

37

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 289 of 367
Page ID #:977
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 38 of 46

1  $6,100,000.00 amounts to $1,525,000.00—which exceeds the lodestar calculation. Thus, the lodestar

2  crosscheck supports an award equal to the benchmark, and does not support an increase to a third of

3  the common fund. *See Six Mexican Workers*, 904 F.2d at 1311 (awarding "the 25 percent standard

4  award" where "the litigation lasted more than 13 years, obtained substantial success, and involved

5  complicated legal and factual issues"). Accordingly, Class Counsel's request for attorney fees is

6  **GRANTED** in the modified amount of 25% of the gross settlement fund, or $1,525,000.00.

7  <u>**REQUESTS FOR COSTS**</u>

8  **I.      Litigation Expenses**

9         Reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil

10  Procedure 54. Attorneys may recover reasonable expenses that would typically be billed to paying

11  clients in non-contingency matters. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

12  Previously, this Court noted costs "including filing fees, mediator fees . . . , ground transportation,

13  copy charges, computer research, and database expert fees . . . are routinely reimbursed in these types

14  of cases." *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011).

15         **A.      Copying**

16         As an initial matter, "The costs of making copies of any materials where the copies are

17  necessarily obtained for use in the case" may be taxed pursuant to 28 U.S.C. §1290. As a result,

18  "[c]opying costs for documents produced to opposing parties in discovery, submitted to the court for

19  consideration of motions, and used as exhibits at trial are recoverable." *McCarthy v. R.J. Reynolds*

20  *Tobacco Co.*, 2011 WL 4928623 at *6 (E.D. Cal. Oct. 17, 2011) (citation omitted). On the other hand,

21  "recoverable copying costs do not include extra copies of filed papers, correspondence, and copies of

22  cases since these are prepared for the convenience of the attorneys." *Id.*; *see also Rodriguez v. General*

23  *Dynamics Armament & Tech. Prods.*, 775 F.Supp.2d 1217, 1219 (D. Haw. 2011) (declining to award

24  costs totaling $20,750.52 for copying where "counsel state[d] only that they copies for trial exhibits and

25  list[ed] the per item cost," but "the vast majority of those documents were never used or even referred

26  to at trial").

27         Class Counsel seek $9,260.40 for costs related to copying. This total includes $5,501.80 from

28  Mallison & Martinez (Doc. 227-5 at 1); $918.40 for Kinsley & Kingsley (Doc. 227-16 at 4); $1,058.05

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 290 of 367
Page ID #:978
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 39 of 46

1    for Milberg LLP (Doc. 227-5 at 5); $1,980.75 for McNicholas & McNicholas (Doc. 227-18 at 17-20);

2    and $277.20 for the law firm of Weinberg, Roger & Rosenfeld (Doc. 227-25 at 2).  Significantly, the

3    law firms fail to explain the purpose of the copies such that the Court may determine the copies were

4    necessary for the course of the litigation, and were not, in fact, merely copies for their convenience.  *See*

5    *McCarthy,* 2011 WL 4928623 at *6; *Rodriguez,* 775 F.Supp.2d at 1219.  This results in a deduction of

6    $9,260.40 from Class Counsels' costs.

7           **B.      Exceeding the Amount in the Settlement**

8           Significantly, the Settlement provides that Class Counsel will receive "not more than $175,000

9    as their Class Counsel Litigation Expenses."  (Doc. 227-3 at 5, Settlement § III.B.2)  The Court

10   preliminarily approved "expenses up to $175,000."  (Doc. 223-15)  In addition, the Class Notice

11   Packet approved by the Court informed the class members that $175,000 was the "maximum" of the

12   litigation costs to be awarded.  (*See* Doc. 224 at 7; Doc. 225)  Despite this, Class Counsel now seek a

13   total reimbursement of $228,467.28 for costs incurred in the course of this action.  (*See* Doc. 227-2 at

14   28)

15          However, Class Counsel fail to explain how an award exceeding the amount provided for in the

16   Settlement and the amount for which the class members received notice is appropriate.  Indeed, now

17   seeking an award greater than the amount for which notice was given deprives the class members of

18   their opportunity to make any objections to the increase of more than $50,000.00 in the fees request.

19   Accordingly, the Court recommends the costs be **GRANTED** in the modified amount of $175,000.00.

20   **II.      Costs of Settlement Administration**

21          The Settlement authorizes "reasonable fees and expenses as approved by the District Court" for

22   the Settlement Administrator.  (Doc. 277-3 at 6, Settlement § III.B.3)  Although Rust Consulting

23   estimated the costs for administration to be approximately $50,000, the class members were notified

24   that "Class Counsel believe[d] that this amount could rise to as much as $75,000."  (Doc. 224 at 7) Ms.

25   Schwartz now reports: "The total cost for the administration of this Settlement, including fees incurred

26   and future costs for completion of the administration is estimated to be $75,000.00."  (Doc. 227-6 at 5,

27   Schwartz Decl. ¶ 22)  The Settlement Administrator's responsibilities will continue with the

28   calculation of the settlement checks, issuance and mailing of those settlement checks and to do the

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 291 of 367
Page ID #:979
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 40 of 46

1  necessary tax reporting on such payments.

2      This Court has awarded $ 25,000 for settlement administration in a wage and hour case

3  involving approximately 170 potential class members. *See Vasquez v. Coast Valley Roofing*, 266

4  F.R.D. 482, 483-84 (E.D. Cal. 2010).  Given that this class involves more than seventy times the

5  number of class members in *Vasquez*, the Court finds the administrative expenses are reasonable, and

6  recommends the request of $75,000.00 for the Claims Administrator be **GRANTED**.

7            <u>**PLAINTIFFS' REQUEST FOR AN INCENTIVE AWARDS**</u>

8      The Settlement provides that Plaintiffs may apply to the District Court for a class representative

9  enhancement up to $7,500 to each Plaintiff, to be paid from the gross settlement amount. (Doc. 227-3,

10  Settlement § III.B.1)  Plaintiffs seek now seek enhancement up to $7,500 for the individuals who were

11  appointed as class representatives, and $3,500 for the individuals who have withdrawn from

12  representation. (Doc. 227-1 at 32-33)

13      In the Ninth Circuit, a court has discretion to award a class representative a reasonable incentive

14  payment.  *Staton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463.  Incentive

15  payments for class representatives are not to be given routinely.  In *Staton*, the Ninth Circuit observed,

16        Indeed, '[i]f class representatives expect routinely to receive special awards in addition
      to their share of the recovery, they may be tempted to accept suboptimal settlements at

17        the expense of the class members whose interests they are appointed to guard."
      *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also*

18        *Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D.
      173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a

19        separate peace with defendants, grave problems of collusion are raised.").

20  *Id.* at 975.  In evaluating a request for an enhanced award to a class representative, the Court should

21  consider all "relevant factors including the actions the plaintiff has taken to protect the interests of the

22  class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort

23  the plaintiff expended in pursuing the litigation . . . and reasonable fears of workplace retaliation."  *Id.*

24  at 977.  Further, incentive awards may recognize a plaintiff's "willingness to act as a private attorney

25  general."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

26      **A.**    **Payments for Lidia Cruz and Yanet Hernandez**

27      In April 2011, the parties stipulated to the withdrawal of Lidia Cruz and Yanet Hernandez "as

28  named plaintiffs and class representatives" in this action.  (Doc. 36 at 2; *see also* Doc. 227-1 at 32, n.4)

40

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 292 of 367
Page ID #:980
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 41 of 46

1  However, Plaintiffs seek an award of $3,750 for Lidia Cruz and Yanet Hernandez "for their duties

2  prior to their withdrawal from the case." (Doc. 227-1 at 33)

3       Previously, the Court observed that Plaintiffs did not "identify[y] any authority for awarding

4  individuals who were not formally appointed class representatives – and in fact withdrew their

5  representation of the class…–with an enhancement." (Doc. 223 at 12)  Again, Plaintiffs have offered

6  no legal authority to support this request.  Moreover, the factors set forth before the Ninth Circuit

7  weigh against the award of any enhancement payments for Ms. Cruz and Ms. Hernandez.

8       There is no evidence regarding actions taken by Ms. Cruz and Ms. Hernandez that benefitted

9  the class, such as assisting with discovery, identifying witnesses, submitting to depositions, or

10  assisting with the mediation—or the time that may have been expended on such tasks.  Further, there

11  is no evidence that Ms. Cruz and Ms. Hernandez feared workplace retaliation.  Accordingly, the Court

12  finds enhancement payments for the individuals who withdrew their representation of the class is not

13  appropriate, and recommends the request be **DENIED**.

14      **B.**    **Payments for Trinidad Ruiz and Marta Rincon**

15       Plaintiffs request that Trinidad Ruiz and Marta Rincon be awarded "$7,500 for their duties as

16  Class Representatives." (Doc. 227-1 at 33)  Class Counsel report they have "not been able to reach"

17  Mr. Ruiz or Ms. Rincon, although they continue to attempt to do so.  (*Id.*)

18       Importantly, Plaintiffs have not identified any actions taken by Mr. Ruiz or Ms. Rincon to

19  support the award of enhancements payments, despite the fact they were appointed class

20  representatives.  In fact, Plaintiffs refer to the others—Rafael Munoz, Santos Valenzuela, Ramon

21  Cervantes Perales, and Hugo Perez Rios—as "the four active Plaintiffs," which strongly suggests the

22  actions, if any, by Mr. Ruiz and Ms. Rincon were limited.  (*See* Doc. 227-1 at 33)  Given the lack of

23  evidence regarding actions taken by these individuals to protect the interests of the class and the

24  amount of time expended in doing so, the requested enhancement payment is not appropriate. *Staton*,

25  327 F.3d at 977.  Nevertheless, the Court acknowledges these individuals were named as plaintiffs and

26  took on the responsibilities of being representatives for the Tools Class and Late Meal Break Class.

27  Therefore, the Court finds a *de minimis* award is appropriate, and recommends the incentive payments

28  for named Plaintiffs Trinidad Ruiz and Marta Rincon be **GRANTED** in the amount of $250.00 each.

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 293 of 367
Page ID #:991
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 42 of 46

**C.     Payments for Rafael Munoz, Santos Valenzuela, Ramon Cervantes Perales, and Hugo Perez Rios**

1.     Actions taken to benefit the class

Rafael Munoz, Santos Valenzuela, Ramon Cervantes Perales, and Hugo Perez Rios report they assisted counsel by reviewing their records, providing feedback regarding the allegations in the complaint, "[r]eviewing and responding to discovery requests," and having their depositions taken. (*See* Doc. 228 at 2, Munoz Decl. ¶ 4; Doc. 227-28 at 2, Rios Decl. ¶ 4; Doc. 227-29 at 2, Perales Decl. ¶4; Doc. 227-30 at 2, Valenzuela Decl. ¶ 4)  In addition, Mr. Munoz reports he traveled from New Mexico to attend the private mediation session in Fresno, California.  (Doc. 228 at 2, ¶ 4)  Notably, Plaintiffs would have likely submitted to depositions and assisted with discovery whether or not the action was brought on behalf of the class.  On the other hand, by reviewing documents and assisting with discovery, their actions undoubtedly benefitted the class such that they weigh in favor of class representative incentive payments.

2.     Time expended

The class representatives estimate that in the past twelve years, they each spent between 92 hours and 266 hours related to this action. (*See* Doc. 228 at 2, Munoz Decl. ¶ 4; Doc. 227-28 at 2, Rios Decl. ¶ 4; Doc. 227-29 at 2, Perales Decl. ¶4; Doc. 227-30 at 2, Valenzuela Decl. ¶ 4)  Mr. Munoz explains that his hours exceed those of the other representatives because he traveled from New Mexico both to have his deposition taken and to attend the private mediation, and he experienced significant travel delays returning from the mediation session. Therefore, this factor weighs in favor of incentive payments to the plaintiffs.

3.     Fears of workplace retaliation

The plaintiffs do not contend they feared retaliation for their connections to this action, and each is a *former* employee of Defendant.  Thus, this factor does not support incentive payments.

4.     Reasonableness of the request

Considering the actions taken by Plaintiff and the time expended, an incentive award is appropriate.  In determining the amount to be awarded, the Court may consider the time expended by the class representative, the fairness of the hourly rate, and how large the incentive award is compared

42

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 294 of 367
Page ID #:982
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 43 of 46

to the average award class members expect to receive.  *See, e.g., Ontiveros,* 303 F.R.D. at 373-74 (E.D. Cal. 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 U.S. Dist. LEXIS 72250, at *5 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado,* 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).

a.     Time expended

In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL 1883188 at *11.  Further, the Court noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs awarded in favor of the Defendant." *Id.*  In light of these facts, the Court found an award of $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.

Likewise, in *Bond*, the Court found incentive payments of $7,500 were appropriate for the two named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5) and prepared and evaluated the case for mediation, which was a full day session requiring very careful consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the Class." *Bond*, 2011 WL 2648879, at *15.  Similarly, the Northern District determined that class representatives failed to justify incentive awards of $10,000 although the plaintiffs reported "they were involved with the case by interacting with counsel, participating in conferences, reviewing documents, and attending the day-long mediation that resulted in the settlement." *Wade v. Minatta Transport Co.*, 2012 U.S. Dist. LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).

The plaintiffs seek an award equal to the incentive awards approved in *Alvarado* and *Bond*. Because the actions taken by Rafael Munoz, Santos Valenzuela, Ramon Cervantes Perales, and Hugo Perez Rios are similar to those by the plaintiffs in *Alvarado* and *Bond*, this factor supports the requested

43

Case 2:18-cv-08751-MCS-FFM     Document 72-4     Filed 11/22/19     Page 295 of 367
Page ID #:983
Case 1:09-cv-00703-AWI-JLT     Document 231     Filed 06/21/17     Page 44 of 46

1    incentive payment.

2                    b.      Fairness of the hourly rate

3            Previously, this Court criticized a requested award of $20,000 where the plaintiff estimated "he

4    spent 271 hours on his duties as class representative over a period of six years," because the award

5    would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D.

6    at 366. The Court explained that "[i]ncentive awards should be sufficient to compensate class

7    representatives to make up for financial risk . . . for example, for time they could have spent at their

8    jobs." *Id.* (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). The Court

9    found an award of "$50 per hour fairly compensate[] the named plaintiff for his time and incorporates

10   an extra incentive to participate in litigation," considering that the plaintiff's hourly flat rate while

11   employed by the defendant was $15 per hour. *Id.*; n.3. Nevertheless, the Court increased the award

12   from $13,550 (calculated with $50 per hour for the 271 hours) to $15,000 because "Mr. Ontiveros

13   relinquished the opportunity to bring several of his own claims." *Id.*

14           Plaintiffs estimate they spent between 92 hours and 266 hours on this action. Thus, the

15   requested award of $7,500 would compensate the plaintiffs at rates ranging from $28.19 to $81.52 per

16   hour. Because the higher rates are excessive, this factor supports an award lower than that requested by

17   the class representatives. *See Ontiveros*, 303 F.R.D. at 366.

18                   c.      Comparison of the award to those of the Class Members

19           *In Rankin*, the Court approved an incentive award of $5,000, where the "[p]laintiff retained

20   counsel, assisted in the litigation, and was an active participant in the full-day mediation." *Id.*, 2011

21   U.S. Dist. LEXIS 72250, at *5. The Court found the amount reasonable, in part because "the sum is

22   reasonably close to the average per class member amount to be received." *Id.*

23           The recovery for class members ranges from $3.19 to $5,341.00, with the average share

24   estimated to be $990.82. (Doc. 227-6 at 4-5, Schwartz Decl. ¶ 20) Thus, Plaintiffs request enhancement

25   payments that are more than seven times the average award, and this factor weighs in favor of a lower

26   incentive payment to the class representatives

27                   5.      Amount to be awarded

28           In light of the time and efforts expended, the average award expected to be received by the

                                                    44

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 296 of 367
Page ID #:984
Case 1:09-cv-00703-AWI-JLT   Document 231   Filed 06/21/17   Page 45 of 46

class members, the Court finds $5,000 is an appropriate incentive award for Hugo Perez Rios, Santos

Valenzuela, and Ramon Cervantes Perales.  However, in light of the additional efforts by Rafael

Munoz—who is the only plaintiff who attended the mediation, and traveled from New Mexico to

represent the class—the Court finds the requested rate of $7,500 is appropriate.

## FINDINGS AND RECOMMENDATIONS

Based upon the foregoing, the Court **RECOMMENDS**:

1. Plaintiff's motion for final approval of the Settlement Agreement be **GRANTED**;

2. Approval of the Settlement Class be **GRANTED** and defined a combination of the previously-certified Tools Class and Late Meal Break Class:

> The "Tool Class" means all fieldworkers employed by Giumarra from November 9, 2001 through and including December 1, 2016 who were "required to purchase necessary tools. The "Late Meal Break Class" consists of all field workers employed by Giumarra from 11/9/2001 November 9, 2001 through and including December 1, 2016 who were not provided a timely meal period.

> The "Class" for purposes of settling both claims consists of the combined Tool and Late Meal Break Class. The Class does not include irrigators and drivers; only employees, exclusive of foremen, assigned to crews that performed tasks similar to those of the named Plaintiffs: tying, pruning, picking and packing.

3. Plaintiffs' request for incentive payments be **DENIED** as to Lidia Cruz, and Yanet Hernandez;

4. Plaintiffs' request for class representative incentive payments be **GRANTED** in the amount of $250.00 each for Trinidad Ruitz and Marta Rincon de Diaz; $5,000 each for Santos Valenzuela, Hugo Perez Rios, and Ramon Cervantes; and in the amount of $7,500 for Rafael Munoz;

5. Class Counsel's motion for attorneys' fees be **GRANTED** in the modified amount of $1,525,000, which is 25% of the gross settlement amount;

6. Class Counsel's request for costs **GRANTED** in the modified amount of $175,000;

7. The request for fees for the Settlement Administrator, Rust Consulting, be **GRANTED** in the amount of $75,000;

8. The action be dismissed with prejudice, with each side to bear its own costs and

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 297 of 367
Page ID #:985
Case 1:09-cv-00703-AWI-JLT    Document 231    Filed 06/21/17    Page 46 of 46

1    attorneys' fees except as otherwise provided by the Settlement and ordered by the

2    Court; and

3    9.    The Court retain jurisdiction to consider any further applications arising out of or in

4    connection win the Settlement.

5    These Findings and Recommendations are submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local

7    Rules of Practice for the United States District Court, Eastern District of California.  Within 14 days

8    after being served with these Findings and Recommendations, any party may file written objections

9    with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and

10    Recommendations."  The parties are advised that failure to file objections within the specified time may

11    waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991);

12    *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

13

14    IT IS SO ORDERED.

15    Dated:    __June 20, 2017__            _____/s/ Jennifer L. Thurston__

16                                        UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

46

# EXHIBIT N

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 299 of 367
Page ID #:987
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 1 of 40

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11   MIGUEL ROJAS-CIFUENTES, on        No.  2:14-cv-00697-JAM-CKD
     behalf of himself, on behalf
12   of all others similarly
     situated and in the interest
13   of the general public,           **ORDER DENYING PLAINTIFF'S MOTION
                                       FOR CLASS CERTIFICATION AND**
14              Plaintiffs,            **APPOINTMENT OF CLASS COUNSEL**

15        v.

16   ACX PACIFIC NORTHWEST INC,
     PACIFIC LEASING, LLC, JOHN M.
17   GOMBOS, JOHN E. GOMBOS and
     Does 1-20,
18
                Defendants.
19

20        Plaintiff Miguel Rojas-Cifuentes ("Rojas" or "Plaintiff")

21   moves for class certification under Rule 23 of the Federal Rules

22   of Civil Procedure.  Mot., ECF No. 58; Mem., ECF No. 59.

23   Defendants ACX Pacific Northwest, Inc. ("ACX"), Al Dahra ACX

24   Global, Inc. ("Al Dahra") and Pacific Leasing, LLC (collectively,

25   "Defendants") oppose Plaintiff's motion.  ECF No. 64.  For the

26   reasons set forth below, the Court grants Plaintiff's motion to

27   certify the subclass identified by Plaintiff as the "Wilmington

28   Auto-Deduct Class" and denies the motion as to the remaining two

                                    1

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 300 of 367
Page ID #:988
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 2 of 40

1    proposed subclasses.[1]

2

3              I.   FACTUAL AND PROCEDURAL BACKGROUND

4         Plaintiff worked for ACX as a non-exempt employee for a

5    little more than one year, up to about May 2013.  Decl. of Miguel

6    Angel Rojas-Cifuentes, ¶ 3, ECF No. 3; Second Amended Compl.

7    ("SAC"), ¶ 7, ECF No. 49.

8         On March 14, 2014, ACX's former employee Pablo Hernandez and

9    Rojas filed their initial wage and hour suit against Defendants,

10   seeking to represent themselves and a class of non-exempt

11   employees employed by, or formerly employed by ACX.  Compl., ECF

12   No. 1 at 2.  On May 6, 2014, Plaintiff filed a First Amended

13   Class Action Complaint (the "FAC"), which no longer included co-

14   plaintiff Pablo Hernandez.  ECF No. 5.  Finally, on October 25,

15   2016, Plaintiff filed a Second Amended Class Action Complaint

16   (the "SAC") after the Court granted his motion to amend the FAC.

17   SAC, ECF No. 49; Order, ECF No. 48.  Seeking to proceed under the

18   California Labor Code Private Attorneys General Act ("PAGA"),

19   Plaintiff has alleged Defendants violated the Fair Labor

20   Standards Act and state wage and hour laws by failing to pay

21   minimum wage; failing to pay overtime compensation; failing to

22   provide meal and rest breaks as a result of donning and doffing

23   and walking time; failing to provide accurate itemized wage

24   statements and failing to pay class members statutory penalties.

25   SAC, ¶ 15.

26   _____

27   [1] This motion was determined to be suitable for decision without
     oral argument.  E.D. Cal. L.R. 230(g).  The hearing was scheduled
28   for March 13, 2018.

                              2

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 301 of 367
Page ID #:989
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 3 of 40

1    Plaintiff filed his motion to certify class on November 17,
2    2017.  ECF No. 58.  In response, Defendants concurrently filed
3    their opposition and evidentiary objections to Plaintiff's
4    declarations.  ECF Nos. 63, 64.  The parties then stipulated to
5    the categorization of Plaintiff's three proposed subclasses and
6    to Plaintiff amending the complaint to add Al Dahra ACX Global,
7    Inc. as a defendant because ACX Pacific Northwest changed its
8    name to "Al Dahra ACX Global, Inc." in early 2016.  ECF No. 61.
9    After Plaintiff filed his reply brief in support of his motion
10   for class certification, Defendants and Plaintiff both filed
11   notices of supplemental authority.  ECF Nos. 66, 69.  The parties
12   also stipulated to Plaintiff withdrawing the Declaration of
13   Vicente Arroyo in support of his motion.  Obj. to the Decl. of
14   Vicente Arroyo, ECF No. 63-1; Notice of Withdrawal, ECF No. 67.
15   On April 26, 2018, at the Court's request, the parties filed
16   supplemental briefs addressing issues related to resolving
17   Plaintiff's request to certify the proposed Wilmington Auto-
18   Deduct subclass and the proposed Wilmington Meal Period and
19   Stockton Second Meal Period & Third Rest Break subclasses.
20   Minute Order, ECF No. 70; Pl. Supp. Br., ECF No. 71; Defs. Supp.
21   Br., ECF No. 72.

22                    II.   OPINION

23   A.   Proposed Subclasses

24   Plaintiff seeks to certify the following three subclasses:

25        1.   Stockton Second Meal Period & Third Rest Break
26             Class

27   All current and former non-exempt hourly employees who
28   worked at Defendants' Stockton, California location (the

                                 3

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 302 of 367
Page ID #:990
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 4 of 40

1   "Stockton Branch") from March 14, 2010 to the present that

2   worked at least one shift greater than 10 hours and up to and

3   including 12 hours.  Mot. at 3.

4           2.   Wilmington Meal Period Class

5       All current and former non-exempt hourly employees who

6   worked at Defendants' Wilmington, California location (the

7   "Wilmington Branch") from March 14, 2010 to the present that

8   worked at least one shift greater than 6 hours and either:

9   (a) received a short meal period (less than 30 minutes), a late

10  meal period (after the fifth hour of work), an unrecorded first

11  meal period; or (b) did not receive a second recorded meal

12  period for shifts greater than 10 hours.  Mot. at 3-4.

13          3.   Wilmington Auto-Deduct Class

14      All current and former non-exempt hourly employees who

15  worked at the Wilmington Branch from March 14, 2010 to the

16  present that worked at least one shift greater than 6 hours and

17  had 30 minutes of pay automatically deducted for a meal period.

18  Mot. at 4.

19      B.   Discussion

20      According to Rule 23(a), a plaintiff seeking to certify a

21  class must show that "(1) the class is so numerous that joinder

22  of all members is impracticable; (2) there are questions of law

23  or fact common to the class; (3) the claims or defenses of the

24  representative parties are typical of the claims or defenses of

25  the class; and (4) the representative parties will fairly and

26  adequately protect the interests of the class."  Fed. R. Civ. P.

27  23(a).  The plaintiff must then satisfy one of the three Rule

28  23(b) categories.  In the instant case, the parties focus on the

4

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 303 of 367
Page ID #:991
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 5 of 40

1   "predominance" and "superiority" requirements under Rule

2   23(b)(3).

3          1.   <u>Numerosity</u>

4      Numerosity requires that the class be "so numerous that

5   joinder of all members is impracticable."  Fed. R. Civ. P.

6   23(a)(1).

7          2.   <u>Commonality</u>

8      Commonality requires Plaintiff to affirmatively show "that

9   the class members have suffered the same injury."  <u>Wal-Mart</u>

10  <u>Stores, Inc. v. Dukes</u>, 564 U.S. 338, 349-50 (2011) (internal

11  quotation marks and citation omitted).  The class's common

12  contention must be "capable of class-wide resolution."  <u>Id.</u>

13  "Dissimilarities within the proposed class" impede the

14  commonality requirement because they prevent the formation of

15  "even a single common question."  <u>Id.</u> at 350, 359.

16         3.   <u>Typicality</u>

17     Rule 23(a)(3) requires that the claims or defenses of the

18  class representative "be typical of the claims or defenses of

19  the class."  "A class representative must be part of the class

20  and possess the same interest and suffer the same injury as the

21  class members."  <u>Dukes</u>, 564 U.S. at 353 (citation omitted).

22  Representative parties' claims are "typical" when each class

23  member's claim arises from the same course of events, and each

24  class member makes similar legal arguments to prove the

25  defendants' liability.  <u>Armstrong v. Davis</u>, 275 F.3d 849, 868

26  (9th Cir. 2001) (abrogated on other grounds) (citing <u>Marison v.</u>

27  <u>Giuliani</u>, 126 F.3d 372, 376 (2nd Cir. 1997)).

28  ///

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 304 of 367
Page ID #:992
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 6 of 40

1              4.    Adequacy

2         "Adequacy of representation" requires that class

3    representatives "fairly and adequately protect the interest of

4    the class." Fed. R. Civ. P. 23(a)(4).  To determine legal

5    adequacy, the court must resolve whether: (1) the named

6    plaintiffs and their counsel have any conflicts of interest with

7    other class members and (2) will the named plaintiffs and their

8    counsel prosecute the action vigorously on behalf of the class.

9    Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)

10   (internal citation omitted).

11             5.    Predominance

12        To certify a class under Rule 23(b)(3), the court must find

13   that the questions of law or fact common to class members

14   predominate over any questions affecting only individual

15   members.  The predominance criterion tests whether proposed

16   classes are sufficiently cohesive to warrant adjudication by

17   representation.  Gonzalez v. Officemax North America, Nos. SACV

18   07-00452, CV 07-04839, 2012 WL 5473764, at *3 (C.D. Cal. Nov. 5,

19   2012) (citing Anchem Prods., Inc. v. Windsor, 521 U.S. 591, 623

20   (1997)).

21             6.    Superiority

22        Class certification under Rule 23(b)(3) also requires that

23   the class action be superior to other available methods for

24   fairly and efficiently adjudicating the controversy.  The

25   elements involved in this inquiry are: (A) the class members'

26   interests in individually controlling the prosecution or defense

27   of separate actions; (B) the extent and nature of any litigation

28   concerning the controversy already begun by or against class

                                  6

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 305 of 367
Page ID #:993
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 7 of 40

1    members; (C) the desirability or undesirability of concentrating

2    the litigation of the claims in the particular forum; and

3    (D) the likely difficulties in managing a class action.  Fed. R.

4    Civ. Pro 23(b)(3)(A)-(D)

5         C.    Analysis

6              1.    Stockton Second Meal Period & Third Rest Break
                     Subclass
7

8         Plaintiff contends that Defendants' policy and practice of

9    providing employees with a second meal period or third rest

10   break only after a shift exceeded twelve hours led to a failure

11   to pay Defendants' employees break premiums, in violation of

12   California Labor Code §§ 226.7(b), 512, Industrial Welfare

13   Commission Wage Order No. 8 ("Wage Order 8"), Brinker Rest.

14   Corp. v. Sup. Ct., 53 Cal. 4th 1004, 1029, 1042 (2012), and

15   Cummings v. Starbucks Corp., No. CV 12-06345, 2014 WL 1379119,

16   at *6 (C.D. Cal. Mar. 24, 2014).  Mot. at 3; Mem. at 2, 5

17   (citing Decl. of Marco Palau ("Palau Decl."), ECF No. 58-1, Ex.

18   6, ECF No. 58-7).  To support his claim, Plaintiff points to

19   ACX's "ACX Break and Meal Period Schedule" at the Stockton

20   Branch that states that if a worker's shift is "12+" hours then

21   a second 30-minute meal period is provided and a third rest

22   break is provided.  Mem. at 6 (citing Palau Decl., Ex. 6 (the

23   "ACX Schedule")).  Plaintiff also alleges Defendants failed to

24   provide full ten minute rest periods as a result of donning and

25   doffing and walking time.  SAC, ¶ 15-c.

26        Defendants' Federal Rule 30(b)(6) witnesses testified the

27   ACX Schedule accurately reflected ACX's actual practice, with

28   one of the witnesses later claiming that the "12+" hours listed

                                    7

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 306 of 367
Page ID #:994
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 8 of 40

1    on the ACX Schedule was a typo and should have read 10 hours.

2    Palau Decl., Ex. 2, Dep. of Stephanie Magana ("Magana Dep."),

3    50:7-51:17, ECF No. 58-3; Palau Decl., Ex. 1, Dep. of John E.

4    Gombos ("Gombos Dep."), 92:21-94:25, ECF No. 58-2; Decl. of John

5    E. Gombos ("Gombos Decl."), ¶ 11, ECF No. 62-3.  The ACX

6    schedule is silent on what breaks are available to employees, if

7    any, between hours 10 and 12 of their shift.  Palau Decl., Ex.

8    6.  At least one of Defendants' former employees did not recall

9    seeing any such schedule being posted at the Stockton Branch.

10   Decl. of Travis Wilson ("Wilson Decl."), ¶ 7, ECF No. 58-15.

11        In the English and Spanish versions of Wage Order 8 that

12   Defendants' witnesses testify were posted at the Stockton

13   Branch, employees were correctly advised of their entitlement to

14   rest periods at the rate of ten minutes net rest time per four

15   hours or major fraction thereof.  Decl. of Angel Gomez ("Gomez

16   Decl."), ECF No. 62-12, Exs. B-C, ECF Nos. 62-14-15; Gombos

17   Decl., ¶ 17.  The parties' witnesses who worked at the Stockton

18   Branch disagree over whether they normally got appropriate rest

19   breaks.  Wilson Decl., ¶¶ 6-8; Decl. of Frederico Delgado Arroyo

20   ("Arroyo Decl."), ¶¶ 11-19, ECF No. 62-1; Decl. of Reyes Atrian

21   ("Atrian Decl."), ¶¶ 11-17, ECF No. 62-2.

22        California Labor Code § 512 provides that "[a]n employer

23   may not employ an employee for a work period of more than ten

24   (10) hours per day without providing the employee with a second

25   meal period of not less than 30 minutes[.]"  Employers failing

26   to provide meal periods as required by the Wage Order must pay

27   "one additional hour of pay at the employee's regular rate of

28   compensation for each work day that the meal … is not provided."

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 307 of 367
Page ID #:995
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 9 of 40

1    Cal. Code Regs. § 11010, subd. 11(B); Cal. Lab. Code § 226.7(b).

2    Employers incur liability by failing to authorize and permit

3    rest breaks or the correct number of rest breaks per employee

4    shift.  Brinker, 53 Cal. 4th at 1033.  An employee, however,

5    must show that the employer actually prevented the employee from

6    taking breaks; mere proof of knowledge that the employee was

7    forgoing breaks is insufficient.  Reece v. Unitrin Auto & Home

8    Ins. Co., No. 11-CV-03960, 2013 WL 245452, at *5 (N.D. Cal. Jan.

9    22, 2013) (citing Brinker, 53 Cal. 4th at 1040).

10                    a.    Commonality

11        Plaintiff contends that the common questions with respect

12   to this subclass that are capable of resolution on a class-wide

13   basis include: (1) whether Defendants maintained a policy of not

14   providing a second meal period until the twelfth hour of work at

15   the Stockton Branch; (2) whether Defendants maintained a policy

16   at the Stockton Branch of not authorizing and permitting a third

17   rest period until the twelfth hour of work; and (3) whether

18   Defendants maintained a practice and policy during the class

19   period that failed to pay break period premiums to employees

20   that were denied break periods.  Mem. at 6-7.  Plaintiff further

21   asserts that these questions can be resolved by looking at the

22   following evidence: Defendants' policy documents; their Rule

23   30(b)(6) testimony; Defendants' electronic timekeeping records;

24   and Plaintiff and class member declarations.  Mem. at 7.  The

25   Court finds otherwise.

26        In Gonzalez, 2012 WL 5473764, at *4 (C.D. Cal. Nov. 5,

27   2012), the Central District denied certification of the

28   plaintiffs' rest break claim because the plaintiffs failed to

                                    9

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 308 of 367
Page ID #:996
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 10 of 40

1   provide any class-wide evidence that precluded the possibility

2   that some employees took rest breaks, and that some employees

3   voluntarily declined to take their rest breaks, at least some of

4   the time.  The same reasoning applies here.

5        Plaintiff has presented a facially non-compliant document

6   (the ACX Schedule) as prima facie evidence of Defendants'

7   policies at the Stockton Branch.  Palau Decl., Ex. 6.  But

8   Plaintiff's own declarant does not recall seeing the ACX

9   Schedule and it is silent on rest periods for shifts between 10

10  and 12 hours.  Id.; Wilson Decl., ¶ 7.  Further, Defendants'

11  witnesses question the document's accuracy and testify that

12  other facially compliant information was posted at the Stockton

13  Branch.  Gomez Decl. Exs. A-C; Gombos Dep., 92:21-94:25; Gombos

14  Decl., ¶¶ 11, 17.  In addition, Plaintiff cannot point to any

15  time records or documents suggesting rest period violations.

16  See Mot.; see also Not. of Errata Re: Decl. of Aaron Woolfson

17  ("Woolfson Decl."), ECF No. 60.  Without any class-wide evidence

18  that precludes the possibility of Defendants' employees being

19  able to take rest breaks, a fact-finder would need to engage in

20  individual inquiries to determine whether, when, and why an

21  employee did not take a rest period.

22       In his Notice of Supplemental Authority, Plaintiff attached

23  Richardson v. Interstate Hotels & Resorts, Inc., No. 16-06772,

24  2018 WL 1258192 (N.D. Cal. Mar. 12, 2018), where the Northern

25  District certified a rest period class.  But in Richardson,

26  unlike here, the plaintiff's theory of liability was rooted in a

27  specific practice that pressured the defendants' employees "to

28  skip their rest periods to catch up on an unreasonable

10

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 309 of 367
Page ID #:997
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 11 of 40

1  workload[.]"  Id., at *3.  For example, in Richardson, the

2  defendants' employees were usually given fourteen rooms to clean

3  each day, where each room took 30 minutes, leaving no time to

4  finish their other assigned tasks in their allotted seven hour

5  workdays.  Id.  Here, in contrast, Plaintiff relies heavily on a

6  document rather than a specific practice or policy in support of

7  his motion.

8      In addition, Plaintiff's conclusory allegation that rest

9  breaks were not available because of employees using those

10 breaks to don and doff and walk are not as specific as the

11 alleged policy in Richardson.  SAC, ¶ 15.  It is also unclear

12 how a fact-finder could resolve this allegation without needing

13 to conduct individual inquiries, since Plaintiff has not

14 supplied any records, or analysis of any records, involving rest

15 periods.  See Mot.  Finally, Plaintiff does not provide any

16 authority to support a finding that his donning and doffing rest

17 break allegation is capable of resolution by common proof.

18     Because a fact-finder could not resolve Plaintiff's claim

19 regarding rest breaks without engaging in myriad individual

20 inquiries, the Court denies certification of the Stockton Second

21 Meal Period & Third Rest Break subclass.  See Gonzalez, 2012 WL

22 5473764, at *4.[2]

23 ///

24 _____

25 [2] The Court need not reach Plaintiff's Stockton Branch meal
   period claims since the rest period claims are incapable of
26 class-wide resolution.  The Court therefore also does not need to
   address the applicability of the Lampe case cited by Defendants
27 in their notice of supplemental authority.  See Defs. Not. of
   Supp. Authorities, ECF No. 66 (citing Lampe v. Queen of the
28 Valley Medical Ctr., 19 Cal. App. 5th 832 (2018)).

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 310 of 367
Page ID #:998
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 12 of 40

2.    <u>Wilmington Meal Period Subclass</u>

Plaintiff claims that Defendants' effective policy and practice of using an ad hoc system charging supervisors with relieving employees for meal periods as production permits led to: (1) employees working longer than six hours and/or ten hours without legally compliant meal breaks; and (2) a failure to pay Defendants' employees break premiums, in violation of California Labor Code §§ 226.7(b), 512, Wage Order 8, <u>Brinker</u>, 53 Cal. 4th at 1029, 1042 (2012).  Mot. at 4; Mem. at 7.  Plaintiff does not allege that Defendants maintained a facially non-compliant policy with regard to providing meal periods for this subclass. Mem. at 8.

To support his claim, Plaintiff points to Defendants' timekeeping records showing 61.1% of Wilmington employee shifts greater than 6 hours had a meal period less than thirty (30) minutes, a meal period occurring after the fifth hour of work, no recorded first meal period, or no second meal period for shifts greater than 10 hours.  Mem. at 8 (citing Woolfson Decl. ¶ 19(i)).  One of Defendants' 30(b)(6) witnesses testified that she cannot remember any meal period premium payments ever being made.  Palau Decl., Ex. 3, Dep. of Esther Gonzalez ("Gonzalez Dep."), 29:25-30:16, ECF No. 58-4.  Plaintiff also points to testimonial evidence that employees were forced to cut their meal periods short as a result of production demands and the need to perform cleaning and donning and doffing activities during and around the time that rest and meal breaks are scheduled.  Mem. at 2 (citing Decl. of Diego Taboada ("Taboada Decl."), ¶¶ 6-7, ECF No. 58-13; Decl. of David Nunez ("Nunez

12

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 311 of 367
Page ID #:999
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 13 of 40

1  Decl."), ¶¶ 6-7, ECF No. 58-12).

2       In California, "[n]o employer shall employ any person for a
3  work period of more than five (5) hours without a meal period of
4  not less than 30 minutes...." 8 Cal. Code Regs. § 11080, subd.
5  11(A); see also Cal. Lab. Code., § 512, subd. (a).  And, as
6  explained above, "[a]n employer may not employ an employee for a
7  work period of more than ten (10) hours per day without
8  providing the employee with a second meal period of not less
9  than 30 minutes [.]" Cal. Lab. Code., § 512.  Employers incur
10  liability by failing to authorize and permit rest breaks or the
11  correct number of rest breaks per employee shift.  Brinker, 53
12  Cal. 4th at 1033.  An employee, however, must show that the
13  employer actually prevented the employee from taking breaks;
14  mere proof of knowledge that the employee was forgoing breaks is
15  insufficient.  Reece v. Unitrin Auto & Home Ins. Co., No. 11-CV-
16  03960, 2013 WL 245452, at *5 (N.D. Cal. Jan. 22, 2013) (citing
17  Brinker, 53 Cal. 4th at 1040).

18            a.   Commonality

19       Plaintiff asserts that the common questions with respect to
20  this subclass that are capable of resolution on a class-wide
21  basis include: (1) whether Defendants maintained an effective
22  policy and practice that systematically discouraged full thirty
23  minute meal periods; and (2) whether Defendants maintained an
24  effective policy and practice of not paying meal period premiums
25  for improperly denied meal breaks.  Mem. at 10.  Plaintiff
26  contends these questions can be resolved by analyzing the
27  following evidence: Defendants' electronic timekeeping and
28  payroll records; Plaintiff's class member declarations; and

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 312 of 367
Page ID #:1000
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 14 of 40

1    testimony from Defendants' 30(b)(6) witnesses.  The Court

2    disagrees.

3        In Brinker, Justice Werdegar stated in her concurrence the

4    rebuttable presumption that an employer's failure to keep

5    timekeeping records of meal breaks suggests the employee was not

6    relieved of duty and no meal period was provided.  Brinker, 53

7    Cal. 4th at 1053 (Werdegar, J., conc.).  This presumption has

8    been applied as persuasive authority by a number of federal

9    courts, including this one.  See e.g., Morales v. Leggett &

10   Platt Inc., No. 15-cv-01911, 2018 WL 1638887, at *5 (E.D. Cal.

11   Apr. 5, 2018) (applying the presumption in certifying auto-

12   deduction subclass); Brewer v. Gen. Nutrition Corp., No. 11-CV-

13   3587, 2014 WL 5877695, at *7 (N.D. Cal. Nov. 12, 2014) (applying

14   the presumption in certifying meal break and rest break

15   subclasses); Ordonez v. Radio Shack, Inc., No. CV 10-7060, 2013

16   WL 210223, n.9 (C.D. Cal. Jan. 17, 2013) (ruling that the

17   defendant had rebutted the presumption by showing plaintiff had

18   failed to identify any common policy that uniformly deprived

19   employees of the opportunity to take breaks, such that

20   individualized inquiries could be avoided).  But when a

21   plaintiff does not allege a facially unlawful policy, evidence

22   showing some employees may have been deprived of the opportunity

23   to take a proper meal break does not amount to a policy and

24   practice capable of determining an employer's liability on a

25   class-wide basis.  See Ordonez, 2013 WL 210223, at *7 (internal

26   quotation marks and citation omitted).

27                    i.  Time Entry Theory Of Liability

28       In Ordonez, the Court ruled that "[t]o the extent that

                                    14

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 313 of 367
Page ID #:1001
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 15 of 40

1   plaintiff relies on a presumption that arises from the empirical
2   evidence that many class members had short, late, or missed meal
3   periods, the Court finds that defendant has rebutted this
4   presumption" because "plaintiff failed to identify any common
5   policy that uniformly deprived employees of the opportunity to
6   take meal breaks." 2013 WL 210223, at n.9. Defendants, like
7   the defendant in Ordonez, have rebutted the presumption from
8   Brinker by showing that Plaintiff has failed to identify any
9   common policy that uniformly deprived employees of the
10  opportunity to take breaks. 2013 WL 210223. While Plaintiff
11  cites employee time records showing 61.1% of Wilmington employee
12  shifts have short, late, or missing meal periods, this only
13  shows potentially problematic meal periods for some employees.
14  As in Ordonez, showing that some employees may have been
15  deprived of an opportunity to take an uninterrupted meal break
16  does not amount to a "policy and practice capable of determining
17  [Defendants'] liability on a class-wide basis." 2013 WL 210223,
18  at *7 (internal quotation marks and citation omitted).

19     As Defendants point out, the time records that Plaintiff
20  cites say nothing about whether an employee failed to clock out
21  for a meal period, or if they forgot to clock out for a meal
22  period at the actual start of the meal period. Opp. at 5. The
23  time records, like those in Ordonez, "present[] numerous
24  possibilities as to why certain employees may have had a [non-
25  compliant] meal break during a given shift" and the Court
26  "cannot conclude that any short, late, or missed meal break that
27  plaintiff's expert identified corresponds to a legal violation
28  on a class-wide basis." 2013 WL, 210223, at *7. The Court

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 314 of 367
Page ID #:1002
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 16 of 40

1  finds that Defendants have rebutted the presumption arising from

2  the concurrence in Brinker by convincingly arguing that their

3  time records indicating late meal periods, no meal periods, or

4  short meal periods for 61.1% of shifts does not reflect a common

5  policy and practice capable of common resolution on a class-wide

6  basis.

7       Plaintiff asserts that this case is like Safeway, Inc. v.

8  Sup. Ct., 238 Cal. App. 4th 1138, 1153 (2015), where the

9  California Court of Appeal upheld the trial court's grant of

10 certification of a meal break claim because the dominant common

11 question was "did Safeway's system-wide failure to pay

12 appropriate meal break premiums make it liable to the class

13 during this period." Mem. at 8-9. That central question

14 distinguishes this case from Safeway. As explained above in the

15 discussion and application of Ordonez, Plaintiff has failed to

16 allege a common policy capable of common resolution on a class-

17 wide basis. Without being able to resolve that issue, the Court

18 cannot proceed to determining whether Defendants are liable for

19 failing to pay meal period premiums for this subclass. Also, as

20 the court in Wilson v. TE Connectivity Networks, Inc., No. 14-

21 cv-04872, 2017 WL 1758048, at *7-11 (N.D. Cal. Feb. 9, 2017)

22 pointed out in distinguishing Safeway, the plaintiff in Safeway

23 did not request premium wages accrued by class members and moved

24 for certification under California law and not Rule 23 (citing

25 Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439,

26 444 (N.D. Cal. 1994) (noting "differences between [California]

27 state court's class certification and the certification sought

28 on [Rule 23] motion")). Because Plaintiff has requested premium

16

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 315 of 367
Page ID #:1003
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 17 of 40

1    wages accrued by class members and has moved for certification

2    under Rule 23, his reliance on Safeway is misplaced.

3         Finally, in his supplemental brief, Plaintiff argues that

4    this case is different from Zayers v. Kiewit Infrastructure West

5    Co., No. 16-cv-06405, 2017 WL 4990460 (C.D. Cal. Oct. 26, 2017),

6    where the Central District denied class certification of the

7    plaintiff's second meal period claims because determining

8    whether the defendant failed to give its employees the

9    opportunity to take a second meal break necessarily required an

10   individualized inquiry.  Zayers, 2017 WL 4990460 at *3; Pl.

11   Supp. Br. at 6, ECF No. 71.  First, Plaintiff contends Zayers is

12   different because the employer in that case had a facially

13   compliant policy and here, Defendants' policy before 2015 did

14   not provide for second meal breaks or third rest breaks.  Pl.

15   Supp. Br. at 6 (citing Doc. 65-14 (Handbook effective June 2010

16   to April 2015)).  But the Wilmington Meal Period subclass does

17   not involve the second meal break and third rest break claims

18   like Plaintiff's Stockton Second Meal Period & Third Rest Break

19   subclass.  This subclass involves claims concerning whether

20   Defendants provided appropriate meal periods before the tenth

21   hour of a shift.  Second, Defendants' written policy before 2015

22   is not facially unlawful; it states that "breaks are allowed in

23   the morning and/or afternoon according to applicable state

24   laws."  ECF No. 65-14.  Finally, Plaintiff concedes in his

25   moving brief that he was not alleging Defendants maintained a

26   facially non-compliant policy statement for its meal breaks at

27   the Wilmington Branch.  Mem. at 8.

28        Plaintiff also argues Zayers is different than this case

17

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 316 of 367
Page ID #:1004
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 18 of 40

because in <u>Zayers</u>, the plaintiff did not identify time sheets where he was denied meal premiums, nor did he identify a single instance where he or anyone else missed a meal break.  Pl. Supp. Br. at 6 (citing 2017 WL 4990460, at *3).  This is a distinction without a difference.  As stated above, the <u>Ordonez</u> court found that time records showing some potential violation did not suffice to show a common policy and practice of unlawfully failing to provide meal breaks.  2013 WL 210223, at *7.

ii.  <u>Donning And Doffing Theory Of Liability</u>

Plaintiff's walking-time and donning/doffing theories also cannot be resolved by common proof, since they are highly specific.  While Plaintiff provides declarations from former employees claiming they used their meal periods to walk and don and doff (<u>see</u> Taboada Decl. ¶ 6; Nunez Decl. ¶ 6), Defendants respond with declarations from employees claiming they were given options as to the amount of gear they could wear, when and where they could remove it for breaks, and when and where they could put it on when returning to work.  Decl. of Edgar Flores ("Flores Decl."), ¶¶ 6-25, ECF No. 62-7; Decl. of Fernando Garcia ("Garcia Decl."), ¶¶ 6-26, ECF No. 62-8.  How long it took each employee to put on and remove their safety gear and where they did it would depend on each employee's habits and the specific tasks they were doing that day.  So Plaintiff's theories are not susceptible of common proof.  <u>Roth v. CHA Hollywood Med. Ctr.</u>, No. 12-cv-07559, 2013 WL 5775129, at *8 (C.D. Cal. Oct. 25, 2013) ("There is no way to determine 'in one stroke' whether a particular break for a particular putative class member was interrupted and to what degree.") (internal

18

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 317 of 367
Page ID #:1005
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 19 of 40

1    citation omitted).

2         Because Plaintiff has failed to allege a policy and

3    practice capable of determining Defendants' liability on a

4    class-wide basis, the Court finds he has not satisfied the

5    commonality element and denies certification of the Wilmington

6    Meal Period subclass.

7              3.    <u>Wilmington Auto-Deduct Subclass</u>

8         Plaintiff contends Defendants maintained an unlawful policy

9    and practice of automatically deducting 30 minutes of pay from

10   its employees' daily hours for meal periods at the Wilmington

11   Branch, regardless of whether employees were working during

12   periods of time that the operations should have ceased.  Mot. at

13   4.  Plaintiff asserts that this policy and practice violated the

14   requirements to pay an additional hour of compensation for

15   missed meal periods, and to provide accurate wage statements in

16   violation of Wage Order 8 and Cal. Labor Code §§ 201-203, 226.7,

17   510 and 512.  Mot. at 4; Mem. at 10-11.

18        To support his claims, Plaintiff points to Defendants' time

19   clock data for the Wilmington Branch indicating automatic

20   deductions of 30-minute meal periods when the time keeping did

21   not indicate a punch-out, punch-in for a meal.  Mem. at 3

22   (citing Woolfson Decl. at ¶ 21(c)).  Specifically, Plaintiff's

23   expert found that there were 9,254 shifts, worked by 121

24   employees, reflecting a 30 minute meal period-auto-deduction,

25   occurring when an employee worked a shift greater than 6 hours,

26   up to 10 hours, and there was no punch in and punch out for a

27   meal period.  Mem. at 11 (citing Woolfson Decl. at ¶ 21(c)-(d)).

28        In practice, Defendants' production workers take meal

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 318 of 367
Page ID #:1006
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 20 of 40

1   breaks together when the Wilmington Branch ceases operations,

2   but mechanics continue working.  Palau Decl., Ex. 4, Dep. of

3   Juan Rivas ("Rivas Dep.") at 19:4-20, ECF No. 58-5.  Defendants'

4   employees also testify that they are casual about punching out

5   and punching in for meal breaks.  Decl. of Esther Gonzalez

6   ("Gonzalez Decl."), ¶¶ 28-32, ECF No. 62-4; Rivas Decl. ¶¶ 44-

7   47; Gombos Decl. ¶ 6.  Defendants' policy and practice involves

8   a human resources employee investigating whether meal periods

9   were provided.  The investigation was conducted only for those

10  shifts where no meal break punches had been recorded and the

11  employee authorized removal of 30 minutes of pay only in the

12  absence of "affirmative information that the meal break had

13  actually been missed."  Opp. at 6; Defs. Supp. Br. at 3, ECF No.

14  72; see also Gonzalez Decl., ¶¶ 3, 31-41.  Defendants'

15  accounting manager, Esther Gonzalez has performed this function

16  at the Wilmington Branch since November 2011, and declared that

17  she has reviewed the time records to authorize removals of 30

18  minutes of pay from employees' time sheets.  Gonzalez Decl. at

19  ¶¶ 3, 31-41.

20       Gonzalez also testified in her declaration that "no

21  production employee, mechanic, supervisor, manager, or any other

22  employee has ever given [her] information that there was an

23  improper missed, late, or short meal break."  Gonzalez Decl. at

24  ¶ 41.  Plaintiff claims, and Defendant does not dispute, that no

25  meal period premium has ever been paid at the Wilmington Branch.

26  Mem. at 2 (citing Gonzalez Dep. at 29:25-30:16); see Opp.; see

27  Defs. Supp. Br.

28       Auto-deduction policies involve deducting time from

20

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 319 of 367
Page ID #:1007
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 21 of 40

1   employees' time sheets without maintaining records to support

2   those deductions, on the assumption that employees always take

3   meal breaks.  Wilson, 2017 WL 1758048, at *2, 7-11.  Even if an

4   employer's supervisors may correct employees' time sheets and

5   remove deductions upon learning that employees did not take a

6   break, no individual inquiries are necessary if such corrections

7   to deductions are "extremely rare."  See id., at *11.  An auto-

8   deduction subclass "can be certified where [the plaintiff]

9   presents evidence that the employer did not communicate to

10  employees the fact that auto-deduct could be manually reversed

11  or that the employer did not actually implement such reversals."

12  Wilson, 2017 WL 1758048, at *9.

13       Certification of an auto-deduction subclass is distinct

14  from certification of a rest or meal break subclass because

15  individualized issues more readily predominate in meal and rest

16  break claims.  See Wilson, 2017 WL 1758048, at *7 (citing

17  Washington v. Joe's Crab Shack, 271 F.R.D. 629, 641-42 (N.D.

18  Cal. 2010); Jasper v. C.R. England, Inc., No. CV08-5266, 2009 WL

19  873360, at *5 (C.D. Cal. Mar. 30, 2009); Brown v. Fed. Express

20  Corp., 249 F.R.D. 580, 586 (C.D. Cal. 2008); Kimoto v.

21  McDonald's Corps., No. CV 06-3032, 2008 WL 4690536, at *6 (C.D.

22  Cal. Aug. 19, 2008); Lanzarone v. Guardsmark Holdings, Inc., No.

23  CV06-1136, 2006 WL 4393465, at *4 (C.D. Cal. Sept. 7, 2006)).

24  Citing to time records may fail to support a meal period

25  subclass's claim because those time records may suggest numerous

26  possibilities as to why certain employees may have had a non-

27  compliant meal break.  Ordonez, 2013 WL 210223, at *7.  But time

28  records showing numerous deductions for meal periods without

21

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 320 of 367
Page ID #:1008
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 22 of 40

1    supporting records can support an auto-deduction subclass's

2    claims where reversals of those deductions are extremely rare.

3    Wilson, 2017 WL 1758048, at *9.

4         As explained above, numerous district courts have applied

5    Justice Werdegar's reasoning from Brinker and found that a

6    rebuttable presumption exists that an employer's failure to keep

7    timekeeping records of meal breaks suggests the employee was not

8    relieved of duty and no meal period was provided.  Brinker, 53

9    Cal. 4th at 1053 (Werdegar, J., conc.).  Defendants still argue

10   that this presumption is not the law, citing Serrano v. Aerotek,

11   Inc., 21 Cal. App. 5th 773, 781 (2018) to support their

12   argument.

13        In Serrano, the California Court of Appeal rejected the

14   plaintiff's contention that "time records show[ing] late and

15   missed meal periods creat[ed] a presumption of violations" and

16   did not specifically address the presumption from Justice

17   Werdegar's opinion.  Id.  This language from Serrano does not

18   stand for the proposition that the presumption from Justice

19   Werdegar's concurrence cannot be applied as valid law, as

20   Defendants claim.  Serrano did not involve a class action under

21   Rule 23 and has limited persuasive value for that reason alone.

22   Defs. Supp. Br. at 3.  See Wilson, 2017 WL 1758048, at *7-11

23   (citing Arnold, 158 F.R.D. at 444 in distinguishing Wilson from

24   Safeway, 238 Cal. App. 4th 1138 (noting "differences between

25   [California] state court's class certification and the

26   certification sought on [Rule 23] motion")).  Furthermore, to

27   the extent Serrano implicitly questions the persuasive value of

28   the rebuttable presumption from Justice Werdegar's concurrence

                                    22

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 321 of 367
Page ID #:1009
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 23 of 40

1   in Brinker, this contradicts the analysis from the federal

2   district courts that have applied the presumption as persuasive

3   authority.  See e.g., Morales, 2018 WL 1638887, at *5; Brewer,

4   2014 WL 5877695, at *7; Ordonez, 2013 WL 210223, at n.9.  The

5   Court rejects Defendants' contention that it should refrain from

6   applying the rebuttable presumption found in Justice Werdegar's

7   concurrence in Brinker.

8              a.    Commonality

9       Plaintiff asserts that the common question of fact with

10  respect to this subclass is whether Defendants maintained a

11  policy that automatically deducted a 30 minute meal period from

12  workers regardless of whether they took a meal period.  Mem. at

13  11.  Plaintiff contends this question can be resolved on a

14  class-wide basis through Defendants' timekeeping records, class

15  member declarations, and Defendants' 30(b)(6) testimony.  Id.

16  The Court agrees.

17      In Wilson, 2017 WL 1758048, at *7-11 (N.D. Cal. Feb. 9,

18  2017), the court certified an auto-deduction meal period

19  subclass where their payroll system was programmed to deduct 30

20  minutes for a meal period unless it was changed by a supervisor.

21  The defendants in that case argued that they never paid

22  additional compensation to employees in lieu of missed meal

23  breaks because employees always received their meal breaks.  Id.

24  at *11.  Further, the defendants' supervisors had only

25  overridden an auto-deduction on one occasion.  Id. at *2.  The

26  Court found the defendants' "assertion is insufficient to defeat

27  certification" and found that the plaintiffs' claims of the

28  auto-deduction policy, combined with the employer's extremely

23

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 322 of 367
Page ID #:1010
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 24 of 40

1    rare corrections to employees' time sheets and never paying meal

2    period premiums, sufficed to satisfy the commonality and

3    predominance requirements.  Id.

4         Besides Wilson, other courts have also found auto-deduction

5    subclasses satisfy the commonality requirement.  In Villa v.

6    United Site Servs. Of California, Inc., No. 5:12-cv-00318, 2012

7    WL 5503550, at *6 (N.D. Cal. Nov. 13, 2012), the Northern

8    District Court held that "[t]hough there may be divergent

9    factual predicates concerning how th[e] [auto-deduct] policy

10   affected different employees, it does raise shared legal issues,

11   which is all that is required to satisfy the commonality

12   requirement of Rule 23(a)") (citing Hanlon, 150 F.3d at 1019).

13   In Harp v. Starline Tours of Hollywood, Inc., No. 14-cv-07704,

14   2015 WL 4589736, at *6 (S.D. Cal. Jul. 27, 2015), the Southern

15   District Court conditionally certified an auto-deduction

16   subclass in a Fair Labor Standards Act ("FLSA") case where the

17   plaintiff presented evidence that the employer did not implement

18   any reversals of the automatic deduction policy.  Although this

19   case involved certification under the FLSA and not Rule 23, the

20   Wilson court applied its reasoning to its Rule 23 analysis.

21        Defendants attempt to distinguish Wilson by claiming that

22   most of the employees at the Wilmington Branch did clock in and

23   out.  See Defs. Supp. Br. at 3.  But Defendants fail to explain

24   how this fact negates all of the other deductions that were made

25   when the employees did not clock in or out for their meals.  See

26   Defs. Supp. Br.  Defendants' attempt to distinguish Wilson

27   fails.

28        Defendants also argue their practice does not constitute an

                                    24

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 323 of 367
Page ID #:1011
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 25 of 40

auto-deduction policy, since the account manager has to review payroll records before affecting a deduction of 30 minutes of pay from employees' time sheets. See Opp. at 6; Defs. Supp. Br. at 3-5. Defendants claim this is an individualized, case-by-case process, like the one in Ramirez v. United Rentals, Inc., No. 10-cv-04374, 2013 WL 2646648 (N.D. Cal. Jun. 12, 2013). Defs. Supp. Br. at 4-5. In Ramirez, the Court denied certification and found the deduction policy was lawful because managers exercised discretion over whether to use it and not all managers automatically deducted time for meal breaks. 2013 WL 2646648, at *1, 4-5. But here, the discretion Defendants claim Gonzalez exercised appears illusory. Despite there being 9,254 shifts at the Wilmington Branch during the class period that show a 30 minute deduction without supporting records, Gonzalez testified that nobody has ever claimed that they did not receive an improper meal period. Gonzalez Decl., ¶ 41. This claim is hard to reconcile with Defendants' time records showing more than 9,000 deductions without supporting records. As Plaintiff points out, the accounting manager's claim that she never had to alter any of these 9,000 deductions is suspect. Pl. Supp. Br. at 2.

While Defendants did not implement a computer program to commit an auto-deduction practice, the evidence suggests they implemented an automatic deduction practice where their human resources employee subtracted pay from employees 100% of the time, without any records showing meal periods were actually taken. Defendants may not flip Justice Werdegar's presumption on its head and put the onus on employees to prove they have

25

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 324 of 367
Page ID #:1012
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 26 of 40

1   been denied a proper meal period when there are no records of

2   meal periods being provided.  See Brinker, 53 Cal. 4th at 1053

3   (Werdegar, J., conc.).  The Court finds that Defendants'

4   procedures effectively constitute an improper auto-deduction

5   practice.

6        Finally, Defendants rely on Juarez v. Unified, Ltd., 2013

7   Cal. Super. LEXIS 529, at *11 (Cal. Super. Ct. Feb. 22, 2013)

8   for the proposition that "[t]he existence of a class-wide auto-

9   deduct policy, by itself, does not create commonality with

10  respect to unpaid wages."  Opp. at 7.  Juarez appears to be a

11  tentative (not final) ruling by a state trial court, and thus

12  has little persuasive authority in this Court.  2013 Cal. Super.

13  LEXIS 529.

14       The Court finds it can resolve on a class-wide basis

15  whether Defendants maintained a policy that automatically

16  deducted a 30 minute meal period from workers regardless of

17  whether they took a meal break through Defendants' timekeeping

18  records, class member declarations, and Defendants' 30(b)(6)

19  testimony.  Plaintiff has satisfied the commonality element for

20  the Wilmington Auto-Deduct subclass.

21                    b.   Numerosity

22       In their opposition, Defendants argued that Plaintiff

23  failed to set forth any evidence to meet his burden that a

24  Wilmington "auto-deduct" subclass would be "so numerous that

25  joinder of all members is impracticable."  Opp. at 7-8 (citing

26  Fed. R. Civ. P. 23(a)(1)).  But Plaintiff has identified 121

27  employees who had shifts reflecting a 30 minute meal period

28  auto-deduction.  Mem. at 10.  A proposed subclass of 121

                              26

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 325 of 367
Page ID #:1013
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 27 of 40

1    employees satisfies the numerosity requirement.  See Tait v. BSH

2    Home Appliances Corp., 289 F.R.D. 466, 473 (citing Jordan v. Los

3    Angeles Cty., 669 F.2d 1311, 1319 (9th Cir. 1982), vacated on

4    other grounds by Cty. of Los Angeles v. Jordan, 459 U.S. 810

5    (1982)) (ruling that each of the five subclasses satisfied the

6    numerosity rule because they contained at least forty members).

7                    c.    Typicality

8        Plaintiff argues that, even though he did not work at the

9    Wilmington location, his claims are typical of the Wilmington

10   Auto-Deduct subclass because he has also experienced auto-

11   deducted meals.  Mem. at 12.  Plaintiff reasons that, as a

12   result, he asserts the same legal theories inherent in the

13   proposed Auto-Deduct subclass.  Id. (citing Wang v. Chinese

14   Daily News, Inc., 231 F.R.D. 602, 608 (C.D. Cal. 2005), modified

15   on other grounds in Wang v. Chinese Daily News, Inc., 737 F.3d

16   538 (9th Cir. 2013) ("Since the named Plaintiffs raise the same

17   Labor Code violations as other putative class members, their

18   claims are typical of the class.")).

19       Defendants respond that because Plaintiff worked at the

20   Stockton Branch, where employees were not instructed to clock in

21   and clock out for their meal periods, he cannot show he was

22   personally injured by the alleged auto-deduction practices at

23   Wilmington.  Opp. at 8.  Defendants reason that this means

24   Plaintiff's claims cannot be typical of the Wilmington Auto-

25   Deduct subclass's, citing Chavez v. Amerigas Propane, Inc., No.

26   CV 13-05813, 2015 WL 12859721 (C.D. Cal. Feb. 11, 2015).  Opp.

27   at 8.  In Chavez, though, the Court found the plaintiff did not

28   have standing to represent a class of employees who did not

27

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 326 of 367
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 28 of 40
Page ID #:1014

1    receive a third rest period when working longer than ten hours

2    in one day because the plaintiff did not show that he ever

3    worked more than ten hours in one day.  Id. at *18.  In

4    contrast, here, Plaintiff has adduced evidence showing he

5    received 74 automatic deductions at Stockton during the class

6    period.  Supp. Decl. of Aaron Woolfson ("Woolfson Supp. Decl."),

7    ¶ 13, ECF No. 65-7.  So, unlike the plaintiff in Chavez,

8    Plaintiff has alleged personal injury from the same auto-

9    deduction practices he has alleged Defendants used at either

10   location, even if the specific meal period instructions were

11   different at the two locations.  See SAC, ¶¶ 31, 37, 44, 55, 68.

12        In addition, Plaintiff is not tasked with showing that his

13   claims are the exact same as the proposed subclass's, but only

14   that each member's claim arises from the same course of events

15   and that each class member will make similar legal arguments to

16   prove Defendants' liability.  Armstrong, 275 F.3d at 868.

17   Plaintiff has satisfied that burden for the Wilmington Auto-

18   Deduct subclass here: he has alleged injury by Defendants'

19   alleged auto-deduction policies and will make similar legal

20   arguments as other class members (i.e., arguing Justice

21   Werdegar's presumption from Brinker applies where Defendants did

22   not keep records of employee meal breaks).  The Court finds

23   Plaintiff has satisfied this element for the Wilmington Auto-

24   Deduct subclass.

25              4.   Adequacy

26        Defendants argue Plaintiff failed to establish legal

27   adequacy because of "conflicts of interest," including "ethical

28   and fiduciary conflicts in having to choose between class

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 327 of 367
Page ID #:1015
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 29 of 40

1   members who seek to establish statutory violations and those who

2   seek to avoid findings that they are guilty of criminal or civil

3   wrongdoing." Opp. at 14-15. Defendants' conflicts argument

4   rests on the assumption that Plaintiff seeks to represent both

5   non-exempt supervisors and non-exempt employees whom those

6   supervisors oversaw. See id. The cases Defendants rely upon to

7   support this claim are inapposite.

8        In Mateo v. V.F. Corp., No. C 08-05313, 2009 WL 3561539, at

9   *5 (N.D. Cal. Oct. 27, 2009), the Court found the named

10  plaintiff did not satisfy the adequacy requirement because she

11  herself had management responsibilities, meaning she would have

12  unique defenses from other class members. In contrast, the

13  evidence here does not suggest Plaintiff was a supervisor who

14  would have unique defenses from other class members. In Hughes

15  v. WincCo Foods, No. CV 11-00644, 2012 WL 34483, at *7 (C.D.

16  Cal. Jan. 4, 2012), the court found the defendants had shown an

17  existing conflict in the class by pointing to the plaintiffs

18  testifying in their depositions that their "Department Managers"

19  (who were non-exempt) "bore significant responsibility for" not

20  providing their meal breaks. But here, Defendants have not

21  cited any evidence or allegations by Plaintiff that charge

22  potential class members with significant responsibility for

23  Defendants' violations. See Opp. at 14-15. In addition,

24  neither of these cases involved a proposed auto-deduction

25  subclass such as the one here, where a fact-finder can defer to

26  Defendants' electronic time records and the employer's testimony

27  about their auto-deduction policies and practices. See Mateo,

28  2009 WL 3561539; Hughes, 2012 WL 34483.

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 328 of 367
Page ID #:1016
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 30 of 40

1    Plaintiff also responds to Defendants' arguments by

2  emphasizing that he does not seek recovery against non-

3  supervisory employees and is suing Defendants for causing the

4  alleged violations through their policies and practices at the

5  Stockton and Wilmington Branches.  Reply at 5.

6    Defendants then argue that Plaintiff cannot satisfy the

7  adequacy element because he did not seek certification of any

8  minimum wage or overtime claims.  Opp. at n.6 (citing Drimmer v.

9  WD-40 Co., No. 06-CV-900, 2007 WL 2456003, at *3 (S.D. Cal. Aug.

10  24, 2007) ("A class representative is not an adequate

11  representative when the class representative abandons particular

12  remedies to the detriment of the class.")).  This argument fails

13  because Drimmer did not involve minimum wage or overtime claims

14  and Defendants have provided no other authority holding that a

15  class-plaintiff fails to satisfy the adequacy element by not

16  pursuing minimum wage or overtime claims.  See Drimmer, 2007 WL

17  2456003; Opp.

18    Because Plaintiff and his counsel do not have conflicts of

19  interest with other class members and because they have

20  prosecuted this action vigorously on behalf of the class (and

21  presumably will continue to), the Court finds Plaintiff has

22  satisfied the adequacy element for the Wilmington Auto-Deduct

23  subclass.  See Hanlon, 150 F.3d at 1020.

24         5.   Predominance

25    Plaintiff contends he has satisfied this element for the

26  Wilmington Auto-Deduct subclass because liability can be

27  established through employer records and representative

28  testimony, while damages can be established through database

30

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 329 of 367
Page ID #:1017
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 31 of 40

1   analysis, statistical sampling, and selective direct evidence.

2   See Mem. at 13; Pl. Supp. Br. at 5.

3       Defendants counter that individualized inquiries would

4   predominate for each of the more than 100 employees that were

5   affected by the auto-deductions, citing Gonzalez for the

6   proposition that meal periods missing from time sheets do not

7   conclusively show missing meal periods.  See Opp. at 6-7 (citing

8   Gonzalez, 2012 US 5473764, at *5).  This proposition from

9   Gonzalez, however, applied to the meal period claims that the

10  Gonzalez court analyzed.  See Gonzalez, 2012 US 5473764, at *4-

11  6.  As the Wilson court found, however, auto-deduct claims are

12  different from meal period claims in that individual inquiries

13  do not predominate where an employer implements an auto-

14  deduction policy and almost never makes corrections to employee

15  time sheets nor awards meal period premiums.  See Wilson, 2017

16  WL 1758048, at *7-11 (citing Washington, 271 F.R.D. at 641-42;

17  Jasper, 2009 WL 873360, at *5; Brown, 249 F.R.D. at 586; Kimoto,

18  2008 WL 4690536, at *6; Lanzarone, 2006 WL 4393465, at *4).

19      Plaintiff, like the plaintiffs in Wilson, has presented

20  evidence of employer's effective auto-deduction policy and

21  practice through employee time records.  Woolfson Decl. ¶ 19(i);

22  See Wilson, 2017 WL 1758048, at *7-11. Further, Defendants have

23  admitted that they have not once reversed an auto-deduction.

24  Gonzalez Decl., ¶ 41.  Accordingly, the Court finds common

25  questions predominate over any individual inquiries for this

26  sub-class and Plaintiff has satisfied this element for the

27  Wilmington Auto-Deduct subclass.

28  ///

31

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 330 of 367
Page ID #:1018
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 32 of 40

6.   Superiority

Defendants contend that, because of the minimal support from the putative class, a class action would not be superior to individual actions or grievances brought by individual employees through the California Division of Labor Standards and Enforcement.  Opp. at n.7.  Defendants cite Romero v. Alta-Dena Certified Dairy, LLC, No. CV13-04846, 2014 WL 12479370 (C.D. Cal. Jan. 30, 2014), to support their argument.  Romero is distinguishable for two reasons.  First, the court in Romero ruled that a class action was not superior because the putative class members were part of a union and could pursue their grievances through their respective collective bargaining agreements.  Id. at *2.  Defendants in this case do not claim and have not presented any evidence that the employees are unionized.  See Opp.  Second, the court in Romero did not rule on whether resolving auto-deduction claims on a class-wide basis is superior to separate individual actions.  Here, however, resolving the auto-deduction subclass on a class-wide basis would be superior since the timesheets provide common proof and it would be more efficient to do one large study of the timesheets than separate individual ones.  Finally, Defendants do not explain why or how the support Plaintiff has from the putative class is "minimal" or why that means adjudicating the auto-deduction claims on a class-wide basis is not superior.  See Opp.  The Court finds Plaintiff has adequately shown the superiority of resolving the Wilmington Auto-Deduct subclass's claims on a class-wide basis.

///

32

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 331 of 367
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 33 of 40
Page ID #:1019

1                    7.    <u>Trial Plan</u>

2          Defendants claim Plaintiff's motion must be denied because

3    he has not submitted a workable trial plan and his proposal for

4    manageably trying this action with three subclasses fails.  Opp.

5    at 13-14.  Defendants further contend that Plaintiff's

6    suggestions are an improper trial by formula, where his case

7    would be tried through his own testimony and that "of his own

8    biased declarants, through time records that courts have

9    consistently held do not tell the whole story of whether an

10   employee was provided a proper meal period [.]"  <u>Id.</u>

11         To support their argument, Defendants cite footnote ten

12   from <u>Galvan v. KDI Distrib.</u>, No. CV 08-0999, 2011 WL 5116585

13   (C.D. Cal. Oct. 25, 2011).  In <u>Galvan</u>, the Court found the

14   plaintiff had presented a workable trial plan when his counsel

15   represented that he would prove claims relying "almost

16   exclusively on the documents and testimony that have been and

17   will be provided by [defendant]" and that he would use expert

18   testimony to analyze those documents and show how they supported

19   the plaintiff's claims.  <u>Id.</u>, at *12.  The same is true here for

20   Plaintiff's case and the Wilmington Auto-Deduct subclass (the

21   only one the Court will certify).  Plaintiff and the subclass's

22   claims can be resolved through Plaintiff's counsel's

23   presentation of the time records and Woolfson's analysis of

24   those time records.  The Court rejects Defendants' argument that

25   certification should be denied because Plaintiff has failed to

26   submit a workable trial plan.

27         Plaintiff has satisfied all of the Rule 23 elements for the

28   Wilmington Auto-Deduct subclass.  His motion to certify this

                                    33

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 332 of 367
Page ID #:1020
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 34 of 40

1 subclass is granted.

2   D. Evidentiary Objections

3   Defendants and Plaintiff assert a number of evidentiary

4 objections to the other party's declarations, both expert and

5 non-expert.  ECF Nos. 63, 65-1-6.  The Court will address them in

6 turn.

7     1. Plaintiff's Request to Strike

8   Plaintiff requests striking the declarations of Ramses

9 Herrera, Kristian Cortes, and Jorge Mena because Defendants

10 failed to disclose any of them pursuant to Federal Rule of Civil

11 Procedure 26.  Pls. Objs., ECF No. 65-2.

12   A party failing to make the required initial disclosure "is

13 not allowed to use that information or witness to supply

14 evidence on a motion, at a hearing, or at trial unless the

15 failure was substantially justified or is harmless."  Fed. R.

16 Civ. P. 37(c)(1); Yeti By Molly, Ltd. V. Deckers Outdoor Corp.,

17 259 F.3d 1101, 1106 (9th Cir. 2001).

18   Plaintiffs assert that neither Defendants' Rule 26

19 disclosures, nor any of the aforementioned class member name and

20 contact lists produced by Defendants during discovery included

21 the names and contact information for putative class members

22 Ramses Herrera, Kristian Cortes, and Jorge Mena.  Pls. Obj.

23 (citing Supp. Decl. of Marco Palau, ¶ 3).  Because Defendants

24 did not make these names and contact information available to

25 Plaintiffs before filing their opposition, the Court grants

26 Plaintiff's request to strike these declarations and has not

27 considered them in ruling on this motion.

28 ///

34

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 333 of 367
Page ID #:1021
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 35 of 40

1                 2.   <u>Non-Expert Declarations</u>

2       Plaintiffs also object to the declarations of Frederico

3 Delgado Arroyo, Reyes Atrian, Kristian Cortes, Edgar Flores,

4 Fernando Garcia, Jorge Mena, John Gombos, Angel Gomez, Esther

5 Gonzalez, and Juan Rivas.  Pl. Objs., ECF Nos. 65-2-6.

6 Defendants object to the declarations of Arturo Flores, David

7 Nunez, Diego Taboada, Marco A. Palau, Miguel Rojas-Cifuentes,

8 Travis Wilson.  Def Objs., ECF Nos. 63-1-4 and 63-6-7.  As

9 explained above, the Court has not considered the stricken

10 declarations of Kristian Cortes and Jorge Mena.

11       In general, strict adherence to the Federal Rules of

12 Evidence is not a prerequisite for class certification and courts

13 may consider inadmissible evidence in determining whether to

14 certify a class.  <u>Smith v. Microsoft Corp.</u>, 297 F.R.D. 464, 474

15 (internal citations omitted) (denying plaintiff's objections

16 because the court could consider inadmissible evidence); <u>see also</u>

17 <u>Brooks v. Darling Int'l.</u>, 14-cv-01228, 2017 WL 1198542, at * 2-3

18 (E.D. Cal. Mar. 31, 2017) (citing <u>Gonzalez v. Millard Mall Svcs.,</u>

19 <u>Inc.</u>, 281 F.R.D. 455, 459-60 (S.D. Cal. 2012) in denying motions

20 to strike data sheets that were neither notarized nor signed

21 under penalty of perjury).

22       Because the Court may consider inadmissible evidence in

23 determining whether to certify a class, it overrules both

24 parties' objections to the non-expert declarations <u>in toto</u>.  <u>See</u>

25 <u>Smith</u>, 297 F.R.D. 464, 474.

26             3.   <u>Woolfson Declaration</u>

27       Defendants argue Plaintiff's expert's declaration should be

28 stricken because his report did not provide a list of all other

35

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 334 of 367
Page ID #:1022
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 36 of 40

1    cases in which he testified as an expert in the previous four

2    years.  Defs. Obj., ECF 63-5.  Defendants also make a number of

3    objections to specific parts of Woolfson's declaration.  Defs.

4    Objs. At 3-9.

5        Where expert testimony is introduced in support of a motion

6    for class certification, the Court must act as a gatekeeper to

7    exclude junk science by making sure that testimony is reliable

8    and not speculative or irrelevant.  <u>Smith</u>, 297 F.R.D. 464

9    (internal citation and quotation marks omitted).[3]

10       District courts apply the <u>Daubert v. Merrell Down Pharms.,</u>

11   <u>Inc.</u>, 509 U.S. 579, 597, (1993) analysis in determining motions

12   to strike expert declarations.  <u>Ellis v. Costco Wholesale Corp.</u>,

13   657 F.3d 970, 982 (9th Cir. 2011).  This analysis requires

14   considering whether (1) the reasoning or methodology underlying

15   the testimony is scientifically valid; and (2) whether the

16   reasoning or methodology properly can be applied to the facts at

17   issue.  <u>Daubert</u>, 509 U.S. at 592-93.

18       Woolfson provided in his declaration a comprehensive list

19   of the different cases where his work has been used.  <u>See</u>

20   Woolfson Decl. at 2-4; Woolfson Decl. Ex. A, ECF No. 60-2.  The

21   Court rejects Defendants' request to strike Woolfson's

22   declaration on this basis.

23       Defendants also argue that Woolfson's declaration should be

24   stricken because he made (and concedes he made) a coding error

---

25   [3] Neither the <u>San Diego Comic Convention v. Dan Farr Prods.</u>, 14-
26   cv-1865, 2017 WL 4005149 case that Defendants rely on nor its
     superseding opinion, 2017 WL 4227000, involved a motion for class
27   certification. So the Court has not applied the case's
     evidentiary analyses in resolving the party's expert witness
28   objections here.

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 335 of 367
Page ID #:1023
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 37 of 40

1    that led to him identifying almost four times as many shifts

2    with a recorded meal break after the fifth hour than the

3    timekeeping data suggests.   See Defs. Obj. at 3-9.   First, the

4    portion of Woolfson's deposition that Defendants cite does not

5    suggest he concedes he made a coding error.   Ex. D to Gomez

6    Decl., Depo. of Aaron Woolfson, at 40:6-25, ECF No. 62-16.

7    During the deposition, Woolfson was asked "is the purpose of the

8    snippet that we see that you are trying to count instances where

9    a meal break was recorded after the end of the fifth hour? 'A:

10   No.'"   Id. at 40:6-10.   Woolfson then went on to explain that

11   the referenced snippet just represented shifts that were greater

12   than five hours.   Id. at 40:12-25.   In the context of the

13   deposition, it seems Woolfson specifically denied that he made

14   the so called "error" on a portion of the "snippet" Defendants

15   were referring to.   Defendants also do not appear to

16   specifically reference the snippet on which this alleged error

17   was made.   See Defs. Obj.

18       In addition, Defendants' expert's declaration does not

19   convince the Court that Woolfson made a coding error.

20   Defendant's expert, Robert W. Crandall, testifies that Woolfson

21   "committed a coding error" but does not specifically explain

22   what the error was.   See Decl. of Robert W. Crandall, ¶ 20, ECF

23   No. 62-11.   Instead, he states in a conclusory fashion that his

24   review of the timekeeping data reveals 75% fewer shifts where a

25   meal break was recorded after the fifth hour, without

26   highlighting where in the timesheet he sees this.   Id.   Crandall

27   also did not explain how the alleged coding error led Woolfson

28   to err in reporting that there were 9,254 shifts worked by 121

37

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 336 of 367
Page ID #:1024
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 38 of 40

1    employees that showed an auto-deduction.  See id.; Woolfson

2    Decl., ¶ 21-b.  The Court denies Defendants' request to Strike

3    Woolfson's declaration on the basis of the alleged coding error.

4         Finally, Defendants object to Woolfson's declaration as

5    being speculative or not supported by facts because he looked

6    for instances of the Wilmington Branch's auto-deductions being

7    implemented.  Defs. Objs. at 7.  To support their argument,

8    Defendants cite Gonzalez's testimony that she did a case-by-case

9    review of all employee time sheets before making a deduction.

10   See id.  As explained above, however, Gonzalez made a deduction

11   100% of the time, so her testimony does not clearly undermine

12   the idea of an alleged auto-deduction policy.  The Court also

13   rejects Defendants' "vague, ambiguous, and uncertain"

14   objections—these objections are not related to Woolfson's

15   qualifications as an expert and go to the weight of his evidence

16   rather than the admissibility.  See id. at 8.

17        The Court finds Woolfson's testimony passes the Daubert

18   test because (1) he has explained how he structured Defendants'

19   time keeping data using various computer programs like Microsoft

20   SQL Query Analyzer, Microsoft Excel, and Microsoft Visual Studio

21   to generate his conclusions (see Woolfson Decl. at 7-14) and (2)

22   he has demonstrated experience in doing similar analyses in many

23   other class-action cases and in other contexts.  See Woolfson

24   Decl. at 2-5.

25                   4.   Crandall Declaration

26        Plaintiff objects to Crandall's declaration, but does not

27   appear to seek to strike it on the basis of a lack of expert

28   qualifications.  Pl. Obj., ECF No. 65-1.  Plaintiff's objections

                                   38

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 337 of 367
Page ID #:1025
Case 2:14-cv-00697-JAM-CKD    Document 73    Filed 05/17/18    Page 39 of 40

1  are based on Crandall's testimony purportedly being "legally

2  irrelevant, spurious, or logically unsound."  Pl. Obj. at 1.

3  These objections go to the weight of the evidence and not the

4  admissibility.  Because the Court may consider inadmissible

5  evidence in determining whether to certify a class, it overrules

6  Plaintiff's objections to Crandall's declaration.  See Smith,

7  297 F.R.D. 464, 474.

          5.   The ACX Break And Meal Period Schedule

9       Plaintiff also argues in footnote two of his reply that the

10  Court should "disregard the purported errata pages attached as

11  Exhibit A to the Declaration of Mr. Gomez, and consider the

12  excerpts of the Deposition of Esther Gonzalez as submitted."

13  Reply at n.2.  Plaintiff's argument is made in the context of

14  discussing the purported typo on the ACX Break And Meal Period

15  Schedule which lists additional breaks after 12 hours instead of

16  10 hours.  Plaintiff cites to a court reporting officer's email

17  that they did not receive any errata pages.  See Reply at n.2

18  (citing Supp. Decl. of Marco A. Palau, Ex. 4, ECF No. 65-12).

19       First, Magana submitted the purported errata sheet and not

20  Gonzalez.  Second, as explained above, the ACX Break And Meal

21  Period Schedule is not a "smoking gun" document.  Again, the

22  Court may consider inadmissible evidence and denies Plaintiff's

23  request to disregard the purported errata pages.  See Smith, 297

24  F.R.D. 464, 474.  But the Court notes this decision is not

25  dispositive to its ruling on this motion.

26

27                    III.   ORDER

28       For the reasons set forth above, the Court GRANTS

                              39

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 338 of 367
Page ID #:1026
Case 2:14-cv-00697-JAM-CKD   Document 73   Filed 05/17/18   Page 40 of 40

1   Plaintiff's motion to certify the subclass identified by

2   Plaintiff as the "Wilmington Auto-Deduct Class."  The Court

3   DENIES Plaintiff's motion to certify either of the other two

4   proposed subclasses.

5       IT IS FURTHER ORDERED that Plaintiff Miguel Rojas-Cifuentes

6   is appointed Class Representative, and Mallison & Martinez is

7   appointed as Class Counsel.

8       IT IS SO ORDERED.

9   Dated: May 17, 2018

10

11                     JOHN A. MENDEZ,
                       UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT O

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 340 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 1 of 28
Page ID #:1028

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11  Edgar Morales, Salvador              No.  2:15-cv-01911-JAM-EFB
    Magaña, and Matthew Bagu, on
12  behalf of themselves, the
    State of California, and all
13  other similarly situated            **ORDER GRANTING IN PART AND**
    individuals,                        **DENYING IN PART PLAINTIFFS'**
14                                       **MOTION FOR CLASS CERTIFICATION**
                  Plaintiffs,           **AND APPOINTMENT OF CLASS COUNSEL**
15
          v.
16
    Leggett & Platt Incorporated,
17  a Missouri Corporation, et
    al.
18
                  Defendants.
19

20        Plaintiffs Edgar Morales ("Morales"), Salvador Magaña

21  ("Magaña"), and Matthew Bagu ("Bagu") (collectively,

22  "Plaintiffs") move for class certification under Rule 23 of the

23  Federal Rules of Civil Procedure.  Mot., ECF No. 33; Mem., ECF

24  No. 34.  Defendants Leggett & Platt Incorporated ("Leggett") and

25  L&P Financial Services Co. ("L&P") (collectively, "Defendants")

26  oppose Plaintiffs' motion.  ECF No. 44.  A hearing on this motion

27  was held on February 27, 2018.  For the reasons set forth below

28  and stated at the hearing, the Court grants Plaintiffs' motion

                                      1

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 341 of 367
Case 2:15-cv-01911-JAM-EFB    Document 51    Filed 04/05/18    Page 2 of 28
Page ID #:1029

1   for class certification as to two purported subclasses, and

2   denies the motion as to the remaining three purported subclasses.

3       The Court also grants Plaintiffs' unopposed request

4   regarding appointment of counsel and class representatives in

5   this case.

6           I.   FACTUAL AND PROCEDURAL BACKGROUND

7       Plaintiff Morales worked at Defendants' Tracy location (the

8   "Tracy Branch") from 2011-2014 as a forklift operator, peeler

9   operator, and maintenance mechanic and was paid hourly.  Decl. of

10  Edgar Morales ("Morales Decl."), ECF No. 33-47, ¶ 3.  Plaintiff

11  Magaña worked at the Tracy Branch from 2012-2014 as a maintenance

12  mechanic and was paid hourly.  Decl. of Salvador Magaña ("Magaña

13  Decl."), ECF No. 33-46, ¶ 3.  Plaintiff Bagu worked at the Tracy

14  Branch from 2013-2014 as a mold operator and was paid hourly.

15  Decl. of Matthew Bagu ("Bagu Decl."), ECF No. 33-48, ¶ 3.

16      On April 28, 2015, Plaintiffs Morales and Magaña filed their

17  initial Complaint against Defendant Leggett in San Joaquin County

18  Superior Court.  Pls. Class Action Compl., ECF No. 1-1.  On July

19  22, 2015, Plaintiffs Morales and Magaña and additional Plaintiff

20  Bagu added Defendant L&P as a second defendant and filed a First

21  Amended Complaint (the "FAC"), seeking to proceed under the

22  California Labor Code Private Attorneys General Act ("PAGA") and

23  alleging Defendants violated state wage and hour laws by failing

24  to pay minimum wage; failing to pay overtime compensation;

25  failing to provide meal and rest breaks; unlawfully deducting

26  wages of employees; knowingly and intentionally failing to

27  maintain and provide accurate wage statements; failing to produce

28  or permit inspection of records; failing to timely pay wages due

2

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 342 of 367
Case 2:15-cv-01911-JAM-EFB    Document 51    Filed 04/05/18    Page 3 of 28
Page ID #:1030

1    at termination; and failing to indemnify employees for work

2    expenses.  FAC, ECF No. 1-2, ¶¶ 16, 108.  Plaintiffs also alleged

3    that Defendants violated California's Unfair Competition Law

4    ("UCL").  Id., ¶¶ 106-114.

5        Defendants removed Plaintiffs' claims to federal court under

6    the Class Action Fairness Act, 28 U.S.C. § 1332(d), on September

7    10, 2012.  Not. of Removal, ECF No. 1, at 1-2.  On November 6,

8    2017, Plaintiffs filed their Motion for Class Certification and

9    brief in support.

10        After the February 27, 2018 hearing on this motion,

11   Plaintiffs filed a Notice of Subsequent Relevant Authority (ECF

12   No. 49) and Defendants responded.  ECF No. 50.

13

14                    II.   OPINION

15   A.   Proposed Subclasses

16        Plaintiffs seek to certify the following five subclasses:

17             1.   The Revision Zone Class

18        All nonexempt hourly employees who worked at the Tracy

19   Branch between April 28, 2011 and November 14, 2014 and whose

20   time was recorded using the Amano timekeeping system and

21   experienced time shaving as a result of the Revision Zone

22   programming in the Amano timekeeping system.  Mot. 2-3.

23             2.   Doubletime Class

24        All non-exempt hourly employees who have worked at

25   Defendants' Ontario location (the "Ontario Branch") and the

26   Tracy Branch between April 28, 2011 and the present and had a

27   shift of more than eight hours on a seventh consecutive workday

28   in a workweek.  Mot. at 4.

                            3

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 343 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 4 of 28
Page ID #:1031

1              3.   <u>30 Minute Auto-Deduction Class</u>

2     All non-exempt hourly employees who have worked at the

3 Tracy Branch, and all factory non-exempt hourly employees who

4 have worked at the Ontario Branch between April 28, 2011 and the

5 present who had 30 minutes of pay automatically deducted for

6 meal periods without a corresponding time entry showing that an

7 unpaid meal period was recorded. Mot. at 4-5.

8            4.   <u>Meal Period Premium Class</u>

9     All factory non-exempt hourly employees who (1) have worked

10 at the Ontario and Tracy Branches between April 28, 2011 and the

11 present, (2) have recorded untimely or short meal periods during

12 shifts greater than six hours, or have worked more than 10 hours

13 without recording a second meal period, and (3) have not

14 received a meal period premium. Mot. at 5-6.

15            5.   <u>Uniform Deduction Class</u>

16     All non-exempt employees who worked at the Ontario and

17 Tracy Branches between April 28, 2011 and the present and had

18 deductions on their wage statements (appearing in payroll as

19 code 870) for maintenance of their work uniform. Mot. at 6.

20     Plaintiffs' initially sought class certification of a sixth

21 subclass, i.e. the Mechanics Class, but confirmed at the hearing

22 on this motion that they had abandoned it. Mot. at 6; <u>see</u>

23 Reply, ECF No. 45.

24     B.   <u>Discussion</u>

25     Under Rule 23(a), a plaintiff seeking to certify a class

26 must show that "(1) the class is so numerous that joinder of all

27 members is impracticable; (2) there are questions of law or fact

28 common to the class; (3) the claims or defenses of the

4

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 344 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 5 of 28
Page ID #:1032

1  representative parties are typical of the claims or defenses of

2  the class; and (4) the representative parties will fairly and

3  adequately protect the interests of the class."  The plaintiff

4  must then satisfy one of the three Rule 23(b) categories. In the

5  instant case, the parties focus on the "predominance" and

6  "superiority" category under Rule 23(b)(3).

7      Failure to satisfy any element of Rule 23(a) or 23(b)

8  requires denying class certification.  Rutledge v. Electric Hose

9  & Rubber Co., 511 F.2d 668, 673 (9th Cir. 1975).

10      1.  Numerosity

11      Numerosity requires that the class be "so numerous that

12  joinder of all members is impracticable."  Fed. R. Civ. P.

13  23(a)(1).  Defendants do not challenge Plaintiffs' satisfaction

14  of this requirement for any of the purported classes and the

15  Court finds Plaintiffs satisfy the numerosity requirement for

16  all five purported subclasses.  See Opp.

17      2.  Ascertainability

18      "As a threshold matter, and apart from the explicit

19  requirements of Rule 23(a), the party seeking class

20  certification must demonstrate that an identifiable and

21  ascertainable class exists."  Backhaut v. Apple Inc., 2015 WL

22  4776427, at *9 (N.D. Cal. Aug. 13, 2015) (quoting Sethavanish v.

23  ZonePerfect Nutrition Co., No. 12-2907, 2014 WL 580696 (N.D.

24  Cal. Feb. 13, 2014)).  "A class definition should be 'precise,

25  objective, and presently ascertainable,' that is the class must

26  be 'definite enough that it is administratively feasible for the

27  court to ascertain whether an individual is a member.'"  Roth v.

28  CHA Hollywood Medical Center, L.P., No. 2:12-cv-07559, 2013 WL

5

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 345 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 6 of 28
Page ID #:1033

1   5775129, at *4 (C.D. Cal., Oct. 25, 2013) (quoting O'Connor v.

2   Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998)).

3              3.   Commonality

4      Commonality requires Plaintiffs to affirmatively show "that

5   the class members have suffered the same injury." Wal-Mart

6   Stores, Inc. v. Dukes, 564 U.S. 338, 349-50 (2011) (internal

7   quotation marks and citation omitted).  The class's common

8   contention must be "capable of class-wide resolution." Id.

9   "Dissimilarities within the proposed class" impede the

10  commonality requirement because they prevent the formation of

11  "even a single common question." Id. at 350, 359.

12             4.   Typicality

13     Rule 23(a)(3) requires that the claims or defenses of the

14  class representative "be typical of the claims or defenses of

15  the class." "A class representative must be part of the class

16  and possess the same interest and suffer the same injury as the

17  class members."  Dukes, 131 S.Ct. at 2550 (citation omitted).

18  Representative parties' claims are "typical" when each class

19  member's claim arises from the same course of events, and each

20  class member makes similar legal arguments to prove the

21  defendants' liability. Armstrong v. Davis, 275 F.3d 849, 868

22  (9th Cir. 2001) (abrogated on other grounds) (citing Marison v.

23  Giuliani, 126 F.3d 372, 376 (2nd Cir. 1997)).

24             5.   Adequacy

25     "Adequacy of representation" requires that class

26  representatives "fairly and adequately protect the interest of

27  the class." Fed. R. Civ. P. 23(a)(4).  Defendants do not

28  challenge Plaintiffs' arguments with respect to this requirement

                              6

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 346 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 7 of 28
Page ID #:1034

1   for any of the purported subclasses and the Court finds

2   Plaintiffs have satisfied the adequacy requirement for all five

3   purported subclasses.  See Opp.

4           6.   Predominance

5       To certify a class under Rule 23(b)(3), the court must find

6   that the questions of law or fact common to class members

7   predominate over any questions affecting only individual

8   members.  Vinole v. Countrywide Home Loans, Inc., 571 F.3d 935,

9   944 (9th Cir. 2009) (internal quotation marks and citation

10  omitted).  The predominance criterion tests whether proposed

11  classes are sufficiently cohesive to warrant adjudication by

12  representation.  Anchem Prods., Inc. v. Windsor, 521 U.S. 591,

13  623 (1997).

14          7.   Superiority

15      The final inquiry for certification is whether a class

16  action is superior to other available methods for fairly and

17  efficiently adjudicating the controversy.  Vinole, 571 F.3d at

18  944.

19      Defendants do not challenge Plaintiffs' satisfaction of the

20  superiority element for any of the purported subclasses.  The

21  Court therefore finds Plaintiffs have satisfied this

22  requirement for all five purported subclasses.  See Opp.

23      C.   Analysis

24          1.   The Revision Zone Class

25      Plaintiffs contend that Defendants' policy and practice of

26  shaving up to 15 minutes of compensable work time using the

27  Amano timekeeping system led to a failure to pay Defendants'

28  employees for all the time they worked, in violation of

                              7

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 347 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 8 of 28
Page ID #:1035

1   California Labor Code § 1197, case law, and Wage Order 1.  Mem.

2   at 7-8 (citing 30(b)(6) Deposition Testimony of Michelle Wingo,

3   ECF No. 33-3, at 128:17-129:5, 133:16-134:7, 134:17-23; Decl. of

4   Aaron Woolfson, ECF No. 35, ¶ 18).

5       California Labor Code § 1197 provides, in relevant part,

6   that "minimum wage for employees fixed by the commission ... is

7   the minimum wage to be paid to employees, and the payment of a

8   lower wage than the minimum so fixed is unlawful."  Wage Order 1

9   states, in relevant part, "[e]very employer shall pay to each

10  employee, on the established payday for the period involved, not

11  less than the applicable minimum wage for all hours worked in

12  the payroll period, whether the remuneration is measured by

13  time, piece, commission, or otherwise."  8 Cal. Code Regs.,

14  § 11010, subd. 4(B)."

15              a.   Commonality

16      Plaintiffs contend that "[t]he common question of fact to

17  this class is whether Defendants failed to compensate class

18  members at the minimum wage for all hours worked" and that this

19  question can be answered by looking at Defendants' Person Most

20  Knowledgeable ("PMK") testimony and an analysis of Defendants'

21  payroll and timekeeping records.  Mem. at 8.  But Plaintiffs

22  fail to explain how a factfinder can resolve, on a class-wide

23  basis, whether each individual class-member actually performed

24  compensable work in the time between when they clocked in and

25  the start of their shift.  Resolving this issue is necessary to

26  determining whether Defendants failed to compensate a class

27  member for all hours worked.

28      In contrast, Defendants have provided declarations from

8

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 348 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 9 of 28
Page ID #:1036

1   several employees stating that they do not perform compensable

2   work during the shaved time, and instead clock in and then wait

3   for a paid safety meeting to start at the beginning of their

4   shift.  Opp. at 6-7 (citing Decl. of Jaasiel Picos ("Picos

5   Decl."), ECF No. 44-16, ¶ 15; Decl. of Peter Sirivan ("Sirivan

6   Decl."), ECF No. 44-20, ¶ 15; Decl. of Jesus Bautista ("Bautista

7   Decl."), ECF No. 44-8, ¶ 1; Decl. of Aaron Aguayo ("Aguayo

8   Decl."), ECF No. 44-6, ¶ 14; Decl. of Richard Ulloa ("Ulloa

9   Decl."), ECF No. 44-22, ¶ 13; Decl. of Paco Galvan ("Galvan

10  Decl."), ECF No. 44-9, ¶ 14; Decl. of Isaac Williams ("Williams

11  Decl."), ECF No. 44-23, ¶ 12).

12      These declarations, regardless of their accuracy, affirm

13  the individual nature of determining whether an employee

14  performed compensable work in the time between when they clocked

15  in and the start of their shift.  Indeed, none of the employees

16  who provided declarations in support of Plaintiffs' motion

17  testified that they actually performed compensable work in the

18  time between when they clocked in and when they started their

19  shift.  See Decls. of Salvador Magaña, Edgar Morales, Matthew

20  Bagu, and Mike Aguilar, ECF Nos. 33-46-33-49; Decls. of Aaron

21  Aguayo, Jesus Bautista, and Jaasiel Picos, ECF Nos. 45-3-45-5.

22      Plaintiffs attached Richardson v. Interstate Hotels &

23  Resorts, Inc., No. C 16-06772, 2018 WL 1258192 (N. D. Cal. Mar.

24  12, 2018) to their Notice of Subsequent Relevant Authority in

25  support of their motion.  The court in Richardson certified a

26  class whose time punches were rounded to the quarter hour for

27  purposes of calculating wages, which, according to the plaintiff

28  in that case, resulted in under-compensating employees.  Id., at

9

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 349 of 367
Case 2:15-cv-01911-JAM-EFB   Document 57   Filed 04/05/18   Page 10 of 28
Page ID #:1037

1    *5.  But that court did not consider whether employees actually

2    worked in the time for which they were allegedly under-

3    compensated.  See id.  Because that issue is crucial to this

4    case and cannot be resolved on a class-wide basis, Richardson is

5    distinguishable.

6         The Revision Zone's class contention that Defendants failed

7    to compensate class members at the minimum wage for all hours

8    worked cannot be resolved without an individual inquiry into

9    whether each class member performed compensable work in the time

10   between when they clocked in and the start of their shift.  So

11   the Court cannot, and does not, grant class certification as to

12   this subclass.  Dukes, 564 U.S. at 350 ("That common contention,

13   moreover, must be of such a nature that it is capable of class-

14   wide resolution—which means that determination of its truth or

15   falsity will resolve an issue that is central to the validity of

16   each one of the claims in one stroke.")

17              2.   The Doubletime Class

18        Plaintiffs contend that Defendants' policy and practice

19   through their Amano timekeeping system of not providing for

20   doubletime premium pay ("Doubletime Pay") after the 12th hour in

21   a workday means that every shift over eight hours on the seventh

22   consecutive workday in a workweek violates Cal. Labor Code § 510

23   and Wage Order 1.  Mot. at 4; Mem. at 3, 8.

24        Wage Order 1 provides that employees must receive "[d]ouble

25   the employee's regular rate of pay for all hours worked in

26   excess of 12 hours in any workday and for all hours worked in

27   excess of eight (8) hours on the seventh (7th) consecutive day

28   of work in a workweek."  8 Cal. Code Regs., § 1101, subd. 3(A).

10

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 350 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 11 of 28
Page ID #:1038

1   When an employee works more than eight hours in one "workday,"

2   more than forty hours in one "workweek," or for eight or fewer

3   hours on the seventh day of the workweek, the employee is

4   entitled to receive compensation at one and one-half times the

5   employee's regular rate of pay.  Cal. Lab. Code § 510(a).

### a.   Ascertainability

7       Plaintiffs contend that determining which employees were

8   improperly denied Doubletime Pay can be ascertained by reviewing

9   the Amano time records and payroll.  Reply at 2.  Defendants

10  counter that it would be difficult for the Court to ascertain

11  which individuals worked on a seventh consecutive workday in a

12  workweek and, of those, which worked more than 8 hours and, of

13  those, who was not paid at the rate of twice the regular rate of

14  pay.  Opp. at 3-4.  Defendants' reliance on Roth, 2013 WL

15  5775129, at *4, to support their argument is misplaced.  In

16  Roth, the court found the plaintiffs' purported classes

17  unascertainable.  Id., at *5.  The court reasoned that it would

18  have had to first apply Brinker v. Sup. Ct., 53 Cal. 4th 1004,

19  1053 (2012) (Werdegar, J., conc.) to make a legal determination

20  of whether meal and rest break periods were actually provided to

21  employees to then ascertain class members, a cart-before-the-

22  horse problem.  Roth, 2013 WL 5775129, at *5.  Further, the

23  defendant in that case argued that payroll records would not

24  reveal whether employees took meal or rest breaks since

25  employees did not clock out for rest breaks and meal breaks were

26  sometimes not taken by employees.  Id.

27      Here, as explained above, the Court does not need to make a

28  legal determination before ascertaining class members.  The

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 351 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 12 of 28
Page ID #:1039

1  Court can determine which individual class members were affected
2  by Defendants' policy of not paying Doubletime Pay by looking at
3  Defendants' PMK testimony, the Amano time records, and payroll
4  data.  No individual employee testimony would be needed.
5  Accordingly, the Court finds Plaintiffs have satisfied this
6  element for this subclass.

7               b.   Commonality

8       Plaintiffs assert that a common question of fact for the
9  Doubletime Class is whether Defendants maintained a policy that
10 failed to provide workers with Doubletime Pay when required.
11 Mem. at 8.  Plaintiffs contend that this can be answered for the
12 whole class through Defendants' PMK testimony.  Id.

13      Defendants argue that there is conflicting testimony about
14 how their Doubletime Pay policies applied to individual
15 employees.  See Opp. at 8.  Defendants cite declarations
16 testifying that employees actually received Doubletime Pay.
17 Opp. at 8.  Defendants, however, fail to explain why the fact
18 finder cannot simply defer to their time records and payroll
19 data in lieu of individual testimony. Absent such an
20 explanation, the Court finds Plaintiffs have satisfied this
21 element since their class-wide contention that Defendants
22 maintained a policy that failed to provide workers with
23 Doubletime Pay is "capable of class-wide resolution" by
24 examining Defendants' PMK testimony, the Amano time records, and
25 payroll.  Dukes, 564 U.S. at 350.

26               c.   Typicality

27      Plaintiffs argue that the named Plaintiffs' claims are
28 typical of the rest of this class because they involve the same

                                12

Case 2:18-cv-08751-MCS-FFM Document 72-4 Filed 11/22/19 Page 352 of 367
Case 2:15-cv-01911-JAM-EFB Document 51 Filed 04/05/18 Page 13 of 28
Page ID #:1040

1   type of injury caused by the Defendants' standardized policy of

2   not adequately providing Doubletime Pay.  See Mem. at 11-12.

3   Defendants counter that Plaintiffs' reliance on their own

4   testimony and the testimony of one putative class member as

5   proof of company-wide practices is insufficient to establish

6   typicality.  Opp. at 5-6.  Defendants cite the following cases

7   in support of their argument: Pena v. Taylor Farms Pacific,

8   Inc., 305 F.R.D. 197, 223 (E.D. Cal. 2015), Zayers v. Kiewit

9   Infrastructure West Co., No. 16-cv-06405, 2017 WL 4990460, at *5

10  (C.D. Cal. Oct. 26, 2017), Garcia v. Sun Pacific Farming

11  Cooperative, No. CV F 06-0871, 2008 WL 2073979, at *3 (E.D. Cal.

12  Feb. 21, 2014), and Rojas v. Marko Zaninovich, Inc., No. 1:09-

13  CV-00705, 2012 WL 439398, at *29 (E.D. Cal. Feb. 9, 2012).

14  Those cases are unavailing.

15      In Pena, the court found the plaintiffs satisfied

16  typicality and certified the subclass at issue even though the

17  plaintiffs only provided a few declarations describing the

18  alleged harms.  305 F.R.D. at 223.  Here, Plaintiffs have

19  provided declarations and also analyzed time and payroll records

20  for purported class-members.  The court in Zayers did not

21  analyze typicality and so this case is of little help to the

22  Court here.  See 2017 WL 4990460.  The courts in Garcia and

23  Rojas emphasized the difficulty in certifying classes where

24  there were conflicting declarations and no time and payroll

25  records.  See Garcia, 2008 WL 2073979, at *3 (denying

26  certification where time records did not state what the

27  plaintiffs claimed); Rojas, 2012 WL 439398, at *18 and *29

28  (certifying sub-minimum hourly wage plus piece rate subclass

13

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 353 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 14 of 28
Page ID #:1041

1  where payroll database could show below minimum compensation

2  while denying certification of pre-shift work subclass where

3  plaintiffs relied on anecdotal evidence that conflicted with

4  testimony submitted by the defendants and no records of pre-

5  shift work existed).  But here, the conflicting declarations are

6  not dispositive since the factfinder can defer to Defendants'

7  time and payroll records to determine individual class-members'

8  injuries caused by Defendant's alleged policy of not providing

9  Doubletime Pay.

10      Plaintiffs and class-members who suffered from Defendants'

11  alleged standardized policy of not providing Doubletime Pay

12  would use Defendants' time and payroll records and make similar

13  legal arguments in their attempt to prove Defendants' liability.

14  The Court finds Plaintiffs have satisfied the typicality element

15  as to this subclass.  See Dukes, 131 S.Ct. at 2550; Armstrong,

16  275 F.3d at 868.

17          d.  Predominance

18      Plaintiffs claim that common questions of fact predominate

19  over individual questions for this subclass because the claim

20  could be adjudicated through a payroll redo complying with

21  California law, in light of Defendants' PMK testimony, documents

22  produced during discovery, Plaintiffs' expert analysis and class

23  members' declarations.  See Mem. at 12-13; Reply at 2.

24  Plaintiffs also argue that common questions of law and fact

25  predominate over individual inquiries because they have

26  identified the relevant policy (Defendants' failure to provide

27  Doubletime Pay) and the laws they allegedly violate (California

28  Labor Code § 1197 and Wage Order 1).  See Mem. at 12-13 (citing

14

Case 2:18-cv-08751-MCS-EFM   Document 72-4   Filed 11/22/19   Page 354 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 15 of 28
Page ID #:1042

1  Bibo v. FedEx, No. C 07-2505, 2009 WL 1068880, at *10 (N.D. Cal.
2  Apr. 21, 2009)).

3       Defendants contend that even if there was a class-wide
4  policy of not providing Doubletime Pay, it was not uniformly
5  applied.  But the only case Defendants cite to support their
6  argument, Valdez v. Neil Jones Food Co., No. 1:13-cv-00519, 2014
7  WL 3940558, at *7 (E.D. Cal. Aug. 12, 2014), is unpersuasive.
8  In Valdez, the Court found individual inquiries predominated for
9  the purported class at issue because it needed to consider
10  "where the individual employees spent their time and whether
11  they were performing similar duties."  2014 WL 3940558, at *7
12  (citing Lusby v. Gamestop Inc., 297 F.R.D. 400, 413 (N. D. Cal.
13  2013)).  Those issues do not apply to the Doubletime Class.
14  Again, the Court need only look at Defendants' time and payroll
15  records to determine which employees were improperly denied
16  Doubletime Pay.

17       Defendants also argue that the Doubletime Class asserts
18  violations of the California waiting time law, which requires an
19  inquiry into whether Defendants were willful.  Opp. at 14.
20  Defendants cite In re Taco Bell Wage & Hour Actions, 2011 WL
21  4479730, at *5, (E. D. Cal. Sept. 26, 2011) to support their
22  argument.  In Taco Bell, the court found that individual
23  inquiries would exist as to willfulness because there were
24  potential individual good faith disputes over whether wages were
25  due and whether an employer acted willfully.  Id., at *5.  But
26  here, the parties agree that Defendants' payroll and time
27  records are accurate and so the Court need not conduct
28  individual inquiries over disputes of whether wages were due.

15

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 355 of 367
Page ID #:1043
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 16 of 28

1   <u>See</u> Woolfson Decl., at 12.  Further, since <u>Taco Bell</u> was

2   decided, the Ninth Circuit has reversed denials of class

3   certification motions where waiting time penalties were

4   involved.  <u>See</u> <u>Levya v. Medline Industries, Inc.</u>, 716 F.3d 510,

5   512 (9th Cir. 2013).  So Defendants' suggestion that requesting

6   waiting time penalties dooms class certification is incorrect.

7        In sum, the Court finds that common questions of law and

8   fact—whether Defendants violated California labor laws and the

9   Wage Order by failing to provide Doubletime Pay—predominate over

10  individual inquiries.  Given that Defendants concede Plaintiffs

11  have satisfied the remaining Rule 23 elements of numerosity,

12  adequacy, and superiority, the Court grants Plaintiffs' motion

13  for class certification as to the Doubletime Class.

14             3.   <u>30 Minute Auto-Deduction Class</u>

15       Plaintiffs claim Defendants' policy of automatically

16  deducting 30 minutes of pay from employees for meal periods

17  without a corresponding time entry showing that an unpaid meal

18  period was recorded violates Wage Order 1 and Cal. Lab. Code

19  §§ 510, 512, and 226.  Mot. at 4-5; Mem. at 3-4, 8-9.  In

20  California, "[n]o employer shall employ any person for a work

21  period of more than five (5) hours without a meal period of not

22  less than 30 minutes [.]"  8 Cal. Code Regs., § 11010, subd.

23  11(A).  Further, "[a]n employer may not employ an employee for a

24  work period of more than ten (10) hours per day without

25  providing the employee with a second meal period of not less

26  than 30 minutes [.]"  Cal. Lab. Code § 512.  Wage Order 1 also

27  states that meal periods shall be recorded.  8 Cal. Code. Regs.,

28  § 11010, subd. 7(A)(3).  Finally, the failure to record meal

16

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 356 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 17 of 28
Page ID #:1044

1    periods creates a "rebuttable presumption . . . that the

2    employee was not relieved of duty and no meal period was

3    provided." Brinker, 53 Cal. 4th at 1053; see also ABM Indus.

4    Overtime Cases, 19 Cal. App. 5th 277, 311-12 (2017).

5                     a.   Ascertainability

6        Plaintiffs claim that all employees who experienced auto-

7    deductions can be ascertained by review of Defendants' records.

8    Reply at 2-3.  Defendants contend the 30 Minute Auto-Deduction

9    Class is not ascertainable because individual inquiries are

10   required to determine which employees had 30 minutes

11   automatically deducted for meal periods, which did not have a

12   corresponding time entry, and which did not receive the meal

13   period as required.  Opp. at 4.  Defendants rely on Roth for

14   support.  2013 WL 5775129, at *4.  This reliance is misplaced

15   given that the plaintiffs in Roth, unlike Plaintiffs here, did

16   not allege any auto-deductions of meal periods and only alleged

17   that there was a word-of-mouth meal break policy that was

18   unlawful.  Id.

19       Determining whether individual employees that received

20   auto-deductions actually received meal breaks may be difficult.

21   But Defendants' failure to keep records of meal breaks being

22   taken results in a presumption that meal breaks were not given.

23   Brinker, 53 Cal. 4th at 1053; see also ABM Indus. Overtime

24   Cases, 19 Cal. App. 5th at 311-12.  The Court finds that it

25   would not have to engage in possibly difficult individual

26   inquiries to decipher who should be a part of this subclass and

27   therefore Plaintiffs have satisfied this element.

28                     b.   Commonality

                              17

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 357 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 18 of 28
Page ID #:1045

1    Plaintiffs argue that a common issue of fact for this class

2  is whether Defendants maintained a policy of automatically

3  deducting 30 minutes of time from shifts lasting at least 6

4  hours without supporting records.  Mem. at 9-10.  Plaintiffs

5  assert the issue can be decided by looking at Defendant's PMK

6  testimony, Plaintiffs' declarations, and Plaintiffs' data

7  expert's analysis of Defendants' payroll and timekeeping

8  records.  Id., at 10.

9    In Wilson v. TE Connectivity Networks, Inc., No. 14-cv-

10  04872, 2017 WL 1758048, at *7-11 (N.D. Cal. Feb. 9, 2017), the

11  court certified an auto-deduction meal period class similar to

12  the one here.  The defendants in that case argued that they

13  never paid additional compensation to employees in lieu of

14  missed meal breaks because employees always received their meal

15  breaks.  Id., at *11.  The Court found the defendants'

16  "assertion is insufficient to defeat certification" and found

17  that Plaintiffs' claims of the auto-deduction policy sufficed to

18  satisfy the commonality and predominance requirements.  Id.

19    Other courts have also found auto-deduction classes satisfy

20  the commonality requirement.  See, e.g. Villa v. United Site

21  Servs. Of California, Inc., No. 5:12-cv-00318, 2012 WL 5503550

22  (N.D. Cal. Nov. 13, 2012) (ruling that "[t]hough there may be

23  divergent factual predicates concerning how th[e] [auto-deduct]

24  policy affected different employees, it does raise shared legal

25  issues, which is all that is required to satisfy the commonality

26  requirement of Rule 23(a)") (citing Hanlon v. Chrysler Corp.,

27  150 F.3d 1011, 1019 (9th Cir. 1998)); Blackwell v. SkyWest

28  Airlines, Inc., 245 F.R.D. 453, 461 (S.D. Cal. 2007) (ruling

18

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 358 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 19 of 28
Page ID #:1046

1   that the defendant having a procedure to correct the auto-deduct

2   policy did not negate the fact that common legal and factual

3   questions existed).

4       Defendants contend that Plaintiffs cannot satisfy the

5   commonality element because their written policies are to

6   provide meal periods and any inconsistencies in how meal periods

7   are taken depend on each individual employee's circumstances.

8   Opp. at 8-9.  Defendants rely on Roth, Garcia, and Dukes in

9   support of this argument.  Defendant's reliance is again

10   misplaced because none of these cases involved auto-deduction

11   policies.  See Roth, 2013 WL 5775129; Garcia, 2008 WL 2073979;

12   Dukes, 564 U.S. 338.  And even though there is conflicting

13   testimony over whether meal periods were taken, individual

14   inquiries are unnecessary to resolve the claims of the subclass

15   members because of (1) the presumption that meal periods were

16   not taken where no meal periods were recorded and (2) the

17   existence of time and payroll data showing consistent automatic

18   deductions of 30-minute meal periods.  Brinker, 53 Cal. 4th at

19   1053; See Woolfson Decl. at 14-15.

20       Defendant's PMK testimony and Defendants' payroll and

21   timekeeping data can resolve the common issue of fact for this

22   class—whether Defendants' maintained a policy of automatically

23   deducting 30 minutes of time from shifts lasting at least 6

24   hours without supporting records of meal periods being taken.

25   The Court finds Plaintiffs have satisfied this element.

26               c.   Typicality

27       Plaintiffs argue that their claims are typical of the rest

28   of this class because they involve the same type of injury

19

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 359 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 20 of 28
Page ID #:1047

1  caused by the same standardized policy of Defendants

2  automatically deducting 30 minutes of time from shifts lasting

3  at least 6 hours without supporting records of meal periods

4  being taken.  See Mem. at 11-12.  Defendants counter that

5  Plaintiffs' reliance on their own testimony and the testimony of

6  one putative class member as proof of company-wide practices is

7  insufficient to establish typicality.  Opp. at 5-6.  Defendants

8  again rely on Pena, Zayers, Garcia, and Rojas to support their

9  argument.  As explained above, those cases are of little help to

10 Defendants.  Zayers did not address typicality and Plaintiffs,

11 unlike the plaintiffs in the other three cases, have analyzed

12 time and payroll records for class-members instead of solely

13 relying on individual testimony.  See Zayers, 2017 WL 4990460;

14 Pena, 305 F.R.D. at 223; Garcia, 2008 WL 2073979, at *3; Rojas,

15 2012 WL 439498, at *18 and *29.

16     Plaintiffs and subclass members who suffered from

17 Defendants' standardized auto-deduction policy incurred the same

18 injury and would make similar legal arguments to prove

19 Defendants' liability.  The Court finds Plaintiffs have

20 satisfied this element.  Dukes, 131 S.Ct. at 2550; Armstrong,

21 275 F.3d at 868.

22                    d.   Predominance

23     Plaintiffs argue that common questions of fact predominate

24 over individual questions for this subclass because the claim

25 can be resolved through examining Defendants' PMK testimony,

26 documents produced during discovery, Plaintiffs' expert analysis

27 and class members' declarations.  See Mem. at 12-13; Reply at 2.

28 Plaintiffs further contend that common questions of law and fact

                              20

Case 2:18-cv-08751-MCS-FFM    Document 72-4    Filed 11/22/19    Page 360 of 367
Case 2:15-cv-01911-JAM-EFB    Document 51    Filed 04/05/18    Page 21 of 28
Page ID #:1048

1   predominate over individual inquiries because they have

2   identified the relevant policy (Defendants' policy of

3   automatically deducting 30 minutes of time from shifts lasting

4   at least 6 hours without supporting records of meal breaks) and

5   the laws it allegedly violates (California Labor Code § 1197 and

6   Wage Order 1).  See Mem. at 12-13 (citing Bibo v. FedEx, No. C

7   07-2505, 2009 WL 1068880, at *10 (N.D. Cal. Apr. 21, 2009)).

8        As explained above, in Wilson, 2017 WL 1758048, at *7-11,

9   the court found that the plaintiffs' claims of an auto-deduction

10  policy sufficed to satisfy the commonality and predominance

11  requirements.  At the hearing, Defendants argued that the court

12  should instead apply Villa, 2012 WL 5503550 and Blackwell, 245

13  F.R.D. at 461, where courts found plaintiffs did not satisfy the

14  predominance element.  But the predominance analyses from those

15  cases do not apply to the facts at hand.

16       In Villa, the plaintiffs could not satisfy the predominance

17  requirement for the meal and rest classes because the

18  plaintiff's single declaration was not enough to show that the

19  employer had an unlawful uniform policy.  2012 WL 5503550, at

20  *10-12.  Further, the time records in Villa did not provide

21  enough information to determine the defendant's liability for

22  the doubletime class.  Id., at *12.  In contrast, Defendants'

23  time and payroll records provide enough information to determine

24  whether Defendants implemented an unlawful auto-deduction

25  policy.  So Defendants' reliance on Villa's predominance

26  analysis is misplaced.

27       In Blackwell, the court found it could not determine which

28  employees received meal breaks without individual inquiries,

21

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 361 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 22 of 28
Page ID #:1049

1  since there were no records of meal breaks.  245 F.R.D. at 467-

2  68.  Blackwell, however, did not account for the Brinker

3  presumption that a lack of meal period records suggest meal

4  periods were not actually taken.  53 Cal. 4th at 1053.  So the

5  Blackwell meal period analysis is not persuasive.  For the other

6  classes in Blackwell, the court found numerous individual

7  questions arose that could not be answered by examining payroll

8  and time records.  245 F.R.D. at 468-70.  In contrast, here the

9  Court can use payroll and time data to determine whether

10  Defendants had an unlawful policy of automatically deducting 30

11  minutes of time from shifts lasting at least 6 hours without

12  supporting records of meal breaks.

13       Further, for the reasons stated above, the Court rejects

14  Defendants' waiting time arguments for this class.  Because the

15  Court can use Defendants' payroll and time records to determine

16  whether Defendants had an unlawful auto-deduction policy, the

17  Court finds that common questions of law and fact predominate

18  over individual inquiries for this class.

19       Finally, with respect to this subclass, Defendants concede

20  that Plaintiffs have satisfied the remaining elements of

21  numerosity, adequacy, and superiority.  Having satisfied all the

22  Rule 23 elements, Plaintiffs' motion for class certification as

23  to the 30 Minute Auto-Deduction Class is granted.

24            4.   The Meal Period Premium Class

25       Plaintiffs seek to certify this subclass based on

26  Defendants employing an ad hoc system of providing meal periods

27  where supervisors or leads are responsible for relieving workers

28  for meal breaks, as production permits.  Mem. at 4 (citing

                              22

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 362 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 23 of 28
Page ID #:1050

1   Deposition of Thomas P. Ramirez ("Ramirez Depo."), ECF No. 33-4,

2   at 35:7-36:9, 67:6-13; Deposition of Jon Ryder Gullette

3   ("Gullette Depo."), ECF No. 33-5, at 20:4-21:9).  Specifically,

4   Plaintiffs contend that Defendants' employees must obtain

5   authorization to take meal breaks and receive permission only

6   after accommodating production needs.  Mem. at 4-5 (citing

7   Ramirez Depo. at 37:1-38:16, 86:5-22, 112:8-113:25; Gullette PMK

8   Depo. at 20:4-21:19).  There are also many untimely and missed

9   meal periods in Defendants' timekeeping records.  Id. (citing

10  Woolfson Decl., ¶ 18).  Plaintiffs claim Defendants' policy

11  results in a failure to pay meal period premiums to those who

12  had a short (less than 30-minutes), late (after the fifth hour

13  of work), or missed meal period, in violation of Wage Order 1

14  and Labor Code §§ 512 and 226.  Mot. at 5-6; Mem. at 10.

15       In their opposition, Defendants include testimony that

16  managers rotated meal and rest periods between employees

17  throughout the day to keep production smoothly, while complying

18  with laws requiring employees get timely and appropriate breaks.

19  Opp. at 11 (citing Gullette Depo. 18:9-19:2; Decl. of Angel

20  Madson, ECF No. 44-13, ¶ 10; Decl. of Rafael Zermeno ("Zermeno

21  Decl."), ECF No. 44-24, ¶ 11; Picos Decl., ¶ 8; Ramirez Depo. at

22  36:13-38:6, 123:8-124:13).  Defendants provide further testimony

23  that employees were trained and reminded on proper meal period

24  compliance (one 30 minute meal period before the fifth hour of

25  work and a second 30 minute meal period after ten hours of work)

26  and were disciplined for taking short meal periods.  Opp. at 11

27  (citing Picos Decl., ¶ 10; Decl. of Raymond Moreno, ECF No. 44-

28  15, ¶ 10; Zermeno Decl., ¶ 7; Decl. of Fernando Mejia, ECF No.

23

Case 2:18-cv-08751-MCS-FFM Document 72-4 Filed 11/22/19 Page 363 of 367
Case 2:15-cv-01911-JAM-EFB Document 51 Filed 04/05/18 Page 24 of 28
Page ID #:1051

1  44-14, ¶ 9; Decl. of Gustavo Garcia, ECF No. 44-10, ¶ 9; Decl.

2  of Jerry Storey, ECF No. 44-21, ¶ 8; Decl. of Ramiro Lopez, ECF

3  No. 44-12, ¶ 11; Decl. of Ozzy Rauda, ECF No. 44-18, ¶ 12).

4      Employers failing to provide meal periods as required by

5  the Wage Order must pay "one additional hour of pay at the

6  employee's regular rate of compensation for each work day that

7  the meal … is not provided."  Cal. Code Regs. § 11010, subd.

8  11(B); Cal. Lab. Code § 226.7(b).  And a plaintiff's punch data

9  can establish that employees' accrued unpaid meal period premium

10  wages are capable of common proof.  Safeway, Inc. v. Sup. Ct.,

11  238 Cal. App. 4th 1138, 1160 (2015).

12      But an employer's duty to pay an employee a meal period

13  premium is only triggered by a failure to provide a meal period.

14  In re Taco Bell Wage and Hour Actions, 2012 WL 5932833, at *10.

15  In these cases, "individual inquiry [is] necessary to determine

16  if a meal break was in fact denied."  Id.  Inconsistency in the

17  administration of meal periods or sporadic irregular departures

18  from company policy is insufficient to certify a proposed class,

19  as it would require the court "to make individual determinations

20  as to whether employees… received meal periods."  Garcia, 2008

21  WL 2073979 at *5; see also Zayers, 2017 WL 4990460, at *4

22  (holding no common proof capable of resolving on a class-wide

23  basis whether Defendants failed to provide employees with an

24  opportunity to take meal breaks since it would require

25  individual inquiry as to every class member and whether they

26  took meal breaks, whether they were denied the opportunity to

27  take them, or whether and why they waived them).

28          a.   Commonality

24

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 364 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 25 of 28
Page ID #:1052

1    Plaintiffs argue that the common question of fact here is
2    whether Defendants maintained a policy that failed to pay meal
3    period premiums to workers who had a short (less than 30-
4    minutes), late (after the fifth hour of work), or missed meal
5    period.  Mem. at 10.  Plaintiffs claim this can be determined on
6    a class-wide basis by Defendants' PMK testimony and Plaintiffs'
7    expert's declaration.  Id.

8    Defendants respond that in cases like this, "individual
9    inquiry [is] necessary to determine if a meal break was" denied,
10   since an employer's duty to pay an employee a meal period
11   premium "is only triggered when the employer 'fails to provide'
12   a meal period."  Opp. at 10 (citing Taco Bell, 2012 WL 5932833,
13   at *10).  The Taco Bell court refused to certify the plaintiffs'
14   meal period premium class, since employers "are only liable for
15   premium pay when they fail to provide a meal break[.]"  Taco
16   Bell, 2012 WL 5932833, at *10.  Defendants argue that the same
17   is true here, since the Court will need to undertake
18   individualized inquiries to determine whether and why each
19   subclass member was denied a meal break for each meal-period.
20   Opp. at 10.  Defendants contend that this forecloses class-wide
21   adjudication of this subclass.  Id. (citing Ordonez v. Radio
22   Shack, Inc., No. CV 10-7060, 2013 WL 210223, at *7 (C.D. Cal.
23   Jan. 17, 2013) (finding there is no way of determining on a
24   class-wide basis whether time records show violations, or
25   whether individual class members voluntarily elected "to start
26   their meal break late, cut it short or take a meal break at
27   all.")).

28   Plaintiffs counter that the evidence shows a uniform

25

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 365 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 26 of 28
Page ID #:1053

1   practice of not paying meal period premiums for facially

2   noncompliant meal periods.  Reply at 3.  Plaintiffs add that

3   even though some employees sometimes execute meal period

4   waivers, those shifts can be excluded and that if any meal

5   periods are missing, it is because the employees' supervisors

6   did not allow them.  See id.

7       Plaintiffs also attempt to distinguish Ordonez by claiming

8   that commonality was not found there because the plaintiff

9   admitted there was no 'common document' that could establish who

10  was damaged and only pointed to a potentially unlawful written

11  policy.  Reply at 5 (citing Ordonez, 2013 WL 210223).  But in

12  Ordonez, as in the instant case, the plaintiff presented time

13  records showing missing meal breaks where the defendants'

14  employees also had to obtain supervisor permission to take a

15  meal break.  Ordonez, 2013 WL 210223, at *7.  The court found

16  that this evidence was not conclusive, since the missing meal

17  periods could have been violations or maybe the individual class

18  members voluntarily opted to start their meal breaks late, cut

19  them short, or skip the breaks entirely.  Id.  The same is true

20  here and the Court cannot simply assume that where meal periods

21  are missing, it is because employee supervisors did not allow

22  them.  Plaintiff's attempt to distinguish Ordonez fails.

23      Because determining whether and why employees may not have

24  taken meal periods is an individualized inquiry and because

25  there is conflicting testimony about Defendants' policies and

26  the application thereof, the Court finds Plaintiffs have not

27  shown that this subclass satisfies the commonality element.

28  Taco Bell, 2012 WL 5932833, at *10; Ordonez, 2013 WL 210223, at

26

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 366 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 27 of 28
Page ID #:1054

1    *7.  Accordingly, the Court denies certification of this

2    subclass.

3              5.   The Uniform Deduction Class

4         Plaintiffs contend that Defendants' policy of deducting

5    sums for maintenance of uniforms results in inaccurate wage

6    statements and unlawful withholding of wages or deduction from

7    wages for employees who have separated from Defendants, in

8    violation of California Labor Code §§ 203, 2802(a), and/or 221

9    and 224.  Mot. at 6; Mem. at 10-11.

10        Labor Code § 2802(a) states that "[a]n employer shall

11   indemnify his or her employee for all necessary expenditures or

12   losses incurred by the employee in direct consequence of the

13   discharge of his or her duties [.]"  Wage Order 1 states that

14   "[w]hen uniforms are required by the employer to be worn by the

15   employee as a condition of employment, such uniforms shall be

16   provided and maintained by the employer."  8 Cal. Code Regs.,

17   § 1101, subd. 9(a).

18        In response to Plaintiffs' contention, Defendants provide

19   undisputed evidence that uniforms were not required at either

20   the Tracy Branch or Ontario Branch and that any employee who

21   wore a uniform did so voluntarily.  Opp. at 12 (citing Gullette

22   Dep. 124:9-18; Ramirez Depo. 41:15-21, Moreno Decl., ¶ 15;

23   Bautista Decl., ¶ 13; Picos Decl., ¶ 14; Lopez Decl., ¶ 15).

24   Plaintiffs have neither alleged that uniforms were required or

25   submitted any evidence to support such an allegation.  See Mot;

26   Mem.  Defendants' policy would only violate Labor Code § 2802(a)

27   or Wage Order 1 if uniforms were necessary or required.

28        Because Plaintiffs have neither alleged nor produced

27

Case 2:18-cv-08751-MCS-FFM   Document 72-4   Filed 11/22/19   Page 367 of 367
Case 2:15-cv-01911-JAM-EFB   Document 51   Filed 04/05/18   Page 28 of 28
Page ID #:1055

1   evidence of any legal violations as to this subclass,

2   Plaintiffs' motion to certify the Uniform Deduction Class is

3   denied.

4       D.    Plaintiffs' Request To Strike And Evidentiary
             Objections
5
6       At the hearing, the Court denied Plaintiffs' request to

7   strike and evidentiary objections to Defendants' declarations

8   attached to their opposition.  ECF No. 46.  The Court affirms its

9   denial.

10
                        III.   ORDER
11
12      For all the reasons stated at the February 27, 2018 hearing

13  on this motion and set forth above, the Court GRANTS Plaintiffs'

14  motion to certify the two subclasses identified by Plaintiffs as

15  the "Doubletime Class" and the "30 Minute Auto-Deduction Class".

16  The Court DENIES Plaintiffs' motion to certify any of the other

17  proposed subclasses.

18      IT IS FURTHER ORDERED that Plaintiffs Edgar Morales,

19  Salvador Magana, and Matthew Bagu are appointed Class

20  Representatives, and Mallison & Martinez is appointed as Class

21  Counsel.

22      IT IS SO ORDERED.

23  Dated: April 5, 2018

24                                  _____
                                    JOHN A. MENDEZ,
25                                  UNITED STATES DISTRICT JUDGE

26

27

28

                        28