# EXHIBIT D

**Transcript of the Deposition of Aaron Woolfson ("Woolfson Tr.")**

Page 1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4       CHRISTOPHER DUEKER, on behalf of

5       himself and all persons similarly

6       situated,

7                    Plaintiffs,

8       v.                          No. 2:18-cv-00381-JAM-CKD

9       CRST EXPEDITED INC., and

10      DOES 1 - 50 inclusive,

11                   Defendants.

12      _____/

13

14

15           VIDEOTAPED DEPOSITION OF AARON WOOLFSON

16              WEDNESDAY, SEPTEMBER 25, 2019

17                  OAKLAND, CALIFORNIA

18

19

20

21

22

23

24      DEBORAH MAYER, CSR 9654, RPR CRR CRP CLR

25      Job No. 167273

Page 2

1          BE IT REMEMBERED, pursuant to the laws

2     governing the taking and use of depositions, that on

3     Wednesday, September 25, 2019, 10:18 a.m. - 4:03 p.m.,

4     at 505 14th Street, Suite 900, Oakland CA, 94612,

5     before me, Deborah Mayer, a Certified Shorthand Reporter

6     for the State of California, there personally appeared:

7

8                          AARON WOOLFSON,

9

10    called as a witness by the Defendants, who, being by me

11    first duly sworn/affirmed, was thereupon examined and

12    testified as hereinafter set forth.

13

14

15

16

17

18

19

20

21

22

23

24

25    ///

Page 3

1                   A P P E A R A N C E S

2


3     FOR PLAINTIFFS AND THE WITNESS:

4            CORREN & CORREN
             BY:  ADAM CORREN, ESQ.
5            5345 North El Dorado Street
             Stockton, CA  95207
6


7


8


9     FOR CRST EXPEDITED INC. AND THE DEFENDANTS:

10           SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY
             BY:  ADAM SMEDSTAD, ESQ.
11           BY:  ELIZABETH BOLKA, ESQ.
             3214 W. McGraw Street
12           Seattle, WA  98119

13

14

15

16

17    ALSO PRESENT:

18           JOSEPH SHERRY, Legal Video Specialist.

19

20

21

22

23

24

25    ///

Ex. D, p. 416

1    don't know, I don't have an opinion -- all fine, but

2    uh-huh, huh-uh, nods of the head, I'm going to have to

3    ask for clarification, okay?

4        A.    Understood.

5        Q.    Again, if I do that, I'm not trying to

6    antagonize you, just trying to get a clear record, okay.

7              What is your date of birth?

8        A.    December 9th.

9        Q.    And the year?

10       A.    1972.

11       Q.    And where did you go to college?

12       A.    I went to San Joaquin Community College,

13   Stockton, California.

14       Q.    And did you get any post -- what degree did you

15   get from San Joaquin?

16       A.    I did not get a degree.

17       Q.    Did you attend any other higher education

18   institutions?

19       A.    I have not.

20       Q.    Did you graduate from high school?

21       A.    Yes.

22       Q.    And when did you graduate from high school?

23       A.    1991.

24       Q.    And where did you graduate high school?

25       A.    Santa Rosa High School in Santa Rosa,

1   California.

2      Q.   Have you had any training related to your

3   expertise other than the time that you spent in college

4   at San Joaquin Community College?

5      A.   I was not trained to do my current job at

6   college.

7      Q.   Have you been trained anywhere else to do your

8   current job?

9      A.   The experience that I have is guided by

10   25 years of working on databases, and working with

11   attorneys, and close to 900 cases.

12      Q.   So yours was essentially on-the-job training?

13      A.   The experience that I have was and the

14   techniques that I use are those which I have learned on

15   the job, and from the experience of working on

16   database-related projects for clients before I was

17   engaged in this line of work.

18      Q.   Did you go to San Joaquin Community College

19   immediately after graduating high school?

20      A.   I did.

21      Q.   And how many years did you spend there?

22      A.   I think I spent around three years.

23      Q.   Why did you leave?

24      A.   I left to start my company.

25      Q.   What company did you start?

1        A.    A relational database is a system of organizing

2    information within various structures or tables so that

3    the relationship of one piece of information can be

4    drawn to other pieces of information within that same

5    database using a common query language known as

6    Structured Query Language.

7        Q.    Is that also referred to as SQL?

8        A.    SQL, or S-Q-L, is an acronym which means

9    Structured Query Language.

10        Q.    And how did you learn to work with SQL?

11        A.    Self-taught.

12        Q.    Are there courses available to learn how to use

13    SQL?

14        A.    I've been asked if I would like to create some

15    curriculum surrounding that.  I think there must be

16    courses, but I have not taken any.

17        Q.    Do you know whether or not there are in fact

18    courses to teach you how to work with SQL?

19        A.    I think it's a common course in schools such as

20    Berkeley and Stanford, yes.

21        Q.    Did you ever audit any of those courses?

22        A.    No.

23        Q.    Have you ever read the materials for those

24    courses?

25        A.    No.

Page 18

1    Q.   How about the other areas?

2    A.   Such as?

3    Q.   Well, I'm trying to make this as efficient as

4    possible.  I asked whether or not when you thought you

5    became an expert in the structure and organization of

6    databases, and you said well, at least 12 years ago or

7    before I took on my first case.  And then I asked you if

8    your answer would be the same for the other areas, and

9    you've explored your answers with respect to being a

10   father and a husband.

11       I then asked if your answer would be the same

12   for the remaining areas that you've listed, excluding

13   your skills at being a father and a husband, and you

14   identified -- segregated out the timing of your becoming

15   an expert at SQL as being somewhere in the 1994 to 1996

16   range.

17       And so my question is, with respect to the

18   remaining areas of expertise in which I count techniques

19   that computers use, expert at establishing databases

20   from foundational data, taking data and putting it into

21   a meaningful structure, communication techniques between

22   computers, and collection of data from sources such as

23   GPS servers; do you feel like you became an expert in

24   each of those areas, each of those fields approximately

25   12 years ago, or was it a different time?

1    A.    Well, you just said 12 years ago and I think

2    that I cited a date that went back 25 years.  So I think

3    you misstated my testimony.

4         To answer your question though as if you had

5    asked for 25 years, I would say with the exception of

6    GPS, I would say that 25 years ago, 23 years ago, that

7    period of time, yes, I became an expert in that, expert

8    in that.

9         With relation to GPS I would say GPS is -- or

10   collection of data from GPS systems, probably 9 years

11   ago, 8 or 9 years ago when I started becoming very

12   interested in it and built devices to collect that, see

13   what it looked like, and put it into SQL databases,

14   analyze it and structure it, draw reports from it,

15   probably about 9 years ago.

16   Q.    Have you ever sold any of the devices that you

17   built?  Commercially, I mean.

18   A.    I -- yes, I have.

19   Q.    To what organizations?

20   A.    Well, I sold the telecom license I had and the

21   affiliated equipment that I built for the collection of

22   data off of phone networks to a company called Monkey

23   Brains.

24   Q.    Can I stop you there for a second and we'll go

25   through each of that them.  Was that telecom license

1    sure for the record that you're not misstating my

2    testimony.

3        Q.    I have no interest in doing so, sir.

4        A.    Okay, then don't.

5        Q.    Let's go through them one by one then again.

6        A.    Okay.

7        Q.    When did you consider yourself an expert at the

8    structure and organization of databases?

9        A.    Sometime within -- between 1994 and 1996.

10       Q.    When were you first qualified as an expert at

11   the structure and organization of databases in any

12   court?

13       A.    That's a very good question.  I think the first

14   case that I was specifically qualified in was Archilla

15   vs KFC, A-R-C-H-I-L-L-A, vs KFC.  That would a federal

16   case, I believe in the Ninth.  The first case that I

17   have worked on in which I was qualified, obviously out

18   of chronological order because of the Appellate decision

19   in ABM Janitorial -- the ABM Janitorial decision

20   specifically stated that I qualified as an expert under

21   the Sargon standard.  I don't want to misquote the

22   Court, but that's my understanding of that order.

23       Q.    So my question is, when were you first

24   qualified in any case as an expert at the structure and

25   organization of databases?

Page 24

1      A.   Archilla vs KFC and I don't remember the date.

2      Q.   What year was it?

3      A.   I don't remember.

4      Q.   What decade was it?

5      A.   Well, it's in my CV and it's in my report, so

6  whatever the case is, you can see approximately when --

7  I think the Order was actually attached to my report.

8      Q.   Was your expertise challenged in that case?

9      A.   Yes.

10     Q.   When were you first qualified as an expert in

11 the techniques that computers use?

12     A.   Qualified by the court?

13     Q.   By any court.

14     A.   I don't know if they've specifically qualified

15 me in the techniques that computers use, but I believe

16 the words "techniques" were within the Order in ABM

17 Janitorial, and I have been qualified both -- both

18 passed a Daubert challenge and several other types of

19 objections to my expertise, and the Orders -- I don't

20 want to misquote the Court, but I think that in ABM

21 Janitorial, the word "technique" was used.

22     Q.   When were you first qualified as an expert at

23 SQL?

24     A.   I think it was Archilla vs KFC; could have been

25 earlier but I think it was Archilla vs KFC.

1    Q.    So other than the instance in which Judge

2    Thurston found that you were not qualified to act as an

3    expert witness, can you recall any other instances in

4    which a Court has declined to find you to be qualified

5    to testify as an expert witness?

6    A.    No.

7    Q.    When were you first qualified as an expert at

8    establishing databases from foundational data?

9    A.    Archilla vs KFC.

10    Q.    When were you first qualified as an expert in

11    taking data and putting it into a meaningful structure

12    that can be queried?

13    A.    That would be Archilla vs KFC.

14    Q.    When were you first qualified as an expert in

15    the communication techniques between computers?

16    A.    I don't think that I was qualified by any Court

17    in that area.

18    Q.    When were you first qualified as an expert in

19    the collection of data such as from GPS servers?

20    A.    I do not believe there is any specific language

21    from a Court that has been proffered related to any

22    qualifications.

23    Q.    Are you qualified -- excuse me.

24    Do you consider yourself to be an expert in

25    writing computer code?

1    in-sleeper while a truck was driving in California?

2        A.    When?

3        Q.    Yes, when.

4        A.    Sometime between my first communication with

5    counsel and when I started working on it.  That's as

6    much as I recall.  It was within two weeks of that first

7    phone call that I started working on it.  May have been

8    even just a week -- wasn't much -- it wasn't much time

9    there.  So sometime between mid-May and the 1st of June.

10       Q.    What did you tell plaintiff's counsel that you

11   would need in order to perform this assignment?

12       A.    The DOT truck log data that was provided by the

13   defendants or should be provided by defendants, and any

14   other data such as payroll.

15       Q.    Did you request any other information?

16       A.    I don't think so.

17       Q.    Why did you need the DOT log data?

18       A.    Well, the data that the defendants provided, or

19   the DOT data that's within the possession of the

20   defendants, indicates on-duty, off-duty, driving, and

21   sleeper, the same type of data that I was using in

22   Bluford when I was expert on behalf of Bluford in

23   Bluford vs Summit and Bluford vs Safeway.

24           So I remembered what we had used in Bluford,

25   and in some other cases involving DOT truck logs, and I

1    database expert would be able to reasonably assemble a

2    set of reports or joins or connections between those two

3    data points.

4         The ping data is really just -- it was only in

5    the second set of data that you provided; I don't think

6    you provided it in the first set of data.  But the ping

7    data is really reflective on a more granular detail of

8    what's happening to the truck, to the mechanics of the

9    truck -- I don't mean mechanics as in a classification

10   of worker, but I mean the actual movement, right.  So

11   that is really just a corroborative or a secondary data

12   point.

13        Q.   What does GPS stand for?

14        A.   Global Positioning System.

15        Q.   So it's a way of determining where on the

16   planet something is, right?

17        A.   Based upon a constellation of satellites and a

18   formula within the firmware of those chip sets that is

19   able to interpolate that, yes.

20        Q.   So the purpose is to -- is it three satellites

21   that send a signal and measures the distance?

22        A.   Well, typically there's between 5 and 13

23   satellites that are going to be -- going to be providing

24   the RF or the radio frequency signal.

25        Q.   And that tells you where, in this instance, the

Page 70

1   is the hours worked.

2       Q.   My question is, which is more accurate as a

3   reflection of whether or not a truck is in fact moving,

4   the DOT data or the GPS ping data?

5       A.   The DOT -- I'm sorry.  The ping data accurately

6   reflects at various intervals when a truck is moving,

7   but A, you didn't produce it for the first set of data;

8   B, you don't pay employees who are driving down the

9   freeway in a traffic jam when the truck ping data says

10  it's not moving even though they're showing an on-duty

11  position on the DOT.

12          And it's -- sure, CHP or whoever else would

13  consider if a driver shows 14 hours of drive time or

14  whatever it is on those DOT sheets, the driver [sic]

15  can't say well, he's only really driving eight of those

16  because the other six of those he's just sitting in

17  traffic; I don't think that's how -- how this all works.

18          But that's a hypothetical.  It's not what's in

19  evidence, it's just me expressing my own opinion right

20  there.

21      Q.   But we agree that, as between the information

22  contained on the DOT logs and the GPS ping data, the GPS

23  ping data is more -- it is a more accurate reflection of

24  whether a truck is in fact moving.

25      A.   Whether in fact a tractor driving that

Page 84

1      A.    Right.

2      Q.    Then it shows an odometer reading of 705.1 at

3    11:3 something, right?

4      A.    Okay, yes.

5      Q.    Don't say okay if it's not true.  If you're

6    saying something different --

7      A.    You're reading from my report, and I'm saying

8    okay, I'm in agreement that you're reading that from my

9    report.  I'm not saying yes or no, I'm saying okay.  I'm

10   waiting for a question.

11     Q.    So is the difference between those two times

12   approximately three hours?

13     A.    It would appear to be, but I think there's a

14   finish time on here as well that's on the next column

15   over that I can't see.

16           But there is a duration column which is -- says

17   185 and 10 on the fifth column over.  So 185 plus 10

18   divided by 60 is 3.25 hours.  So approximately.

19     Q.    So the truck moved 55.8 miles in 3.25 hours?

20     A.    It -- yes, between those two -- between those

21   two weigh points.

22     Q.    And for purposes of your analysis did you

23   assume that the truck was moving the entire 3.25 hours?

24     A.    No.

25     Q.    How long did you assume that it was moving?

Page 85

1    What would you have calculated that as?

2        A.   I would have calculated that by looking at the

3    Distance Matrix and the amount of time that the Google

4    Distance Matrix said between those two points, because

5    the distance between those two points may have a GPS

6    that actually indicated another point that isn't

7    reflected here, so I didn't use -- I didn't use this as

8    the amount of time.   I would have attributed the amount

9    of time that's the most reasonable distance between

10   those two locations and the most reasonable time between

11   those two locations according to Google Distance Matrix.

12       Q.   So you would have taken the location data of

13   four miles west of Grand Terrace, California, and

14   measured the distance between that location and three

15   miles north of Huntington Park, California; is that

16   correct?

17       A.   Yes.

18       Q.   Then you would have looked at how long Google

19   said it would have taken to travel that distance?

20       A.   Yes.

21       Q.   And that is the amount of time that you would

22   use?

23       A.   That is.

24       Q.   And that's reflected in your code?

25       A.   That is.

Page 86

1    Q.    Pardon me for a moment.  I'm just going to see

2    what Google on my phone tells me is the distance there

3    and how long it would show.

4    (Pause in the proceedings.)

5    Q.    Google shows a distance, and I didn't do the

6    three miles north and what-have-you, of 60 miles and

7    one hour 24 minutes; that's what you would have

8    recorded?

9    A.    That's what I would have used.  And that

10    particular information would have not necessarily been

11    even indicated in the GPS ping data.  But I wanted to be

12    most conservative in my approach, and that's what I

13    would have used.

14    Q.    And how did you determine whether or not the

15    truck was in California for the entire time?

16    A.    Well, I looked at the most likely egress point

17    from the State of California, and I used the city, not

18    the border itself, but I used a major metropolitan area

19    that was closest -- metropolitan area I should say --

20    closest to the egress state along the route that the

21    truck would have taken.

22        That's where we get back to the Dunsmuir

23    example earlier that I spoke about an hour or two and a

24    half ago about where, if the data indicated that the

25    truck went from a location in the State to a location in

Page 87

1  another State, I would have used the ratio of the entire

2  amount of time between those two places, but I would

3  have used only the distance between the city and the

4  most -- the most efficient egress from California.  So

5  it's possible that a truck was actually longer in

6  California, but I used the most efficient egress.

7      Q.   Let me see if I can't paraphrase this.  You in

8  effect pushed the California border inward towards the

9  largest, closest metropolitan area --

10     A.   Well --

11     Q.   -- and then used the mileage from -- or excuse

12  me, the mileage from that city to the endpoint to

13  determine the amount of miles that were outside of

14  California, and then assumed a constant rate of speed?

15     A.   I did not assume a constant rate of speed, but

16  I assumed the formulas that -- or the methodology that

17  Google Maps has attributed to driving time and distance

18  and the laws above road, i.e., speed limit, and so on

19  and so forth.

20          So you are correct, I used the ratio of the

21  California point of origin to the city that was closest

22  to the exit of California, without leaving California,

23  and that distance, the ratio of that distance compared

24  with the ratio of the entire trip -- or the distance of

25  the entire trip, to then determine the amount of time.

Page 88

1      Q.    And then did you look to Google to determine

2    the amount of time that it would take from the origin to

3    the ultimate destination?

4      A.    I did.

5      Q.    And then you would just multiply that amount of

6    time by the percentage between the origin and the egress

7    point as you've said?

8      A.    Um, yeah.  I think that's a good way to

9    describe it.

10      Q.    Are you able to say with certainty the number

11    of minutes that each driver spent in the sleeper berth

12    of a truck that was moving in California?

13      A.    Well, not with certainty, except for the fact

14    that the drivers reported their time in that truck or

15    when they punched the -- or changed their status from

16    on-duty to sleeper, off-duty to sleeper, so on and so

17    forth.  But a very, very close approximation, meaning

18    that if it's off by a minute or two, that would be

19    something that would speak to damages rather than the

20    fact that it is or it is not happening.

21          And one of the reasons why I chose a city or an

22    ingress point that is within California, not right on

23    the border, is because I wanted to make sure that I did

24    not use a set of data that would show that an employee

25    was in the sleeper for more time within California than

Page 94

1    some outliers in which your calculation calculated an

2    amount of time that a driver was in the sleeper berth of

3    a moving truck within the State of California, correct?

4         A.   I said that.

5         Q.   And those outliers would be a product of your

6    code, correct?

7         A.   No.

8         Q.   No?

9         A.   No.  They'd be a product of your data that was

10   indicated based upon the DOT transportation log as

11   compared with the GPS log, the disparities, small

12   disparities.

13        Q.   Did the data that you looked at contain any

14   instances in which the individual was in a sleeper berth

15   of a moving truck in California for more than 15 hours?

16        A.   Yes.

17        Q.   And did you count those 15 hours in your

18   calculations?

19        A.   I don't think I did.  I looked for a couple of

20   different segment types that were indicative of data

21   issues or things that didn't seem reasonable to me.  And

22   so I -- I believe that I don't have those in the data in

23   my analysis any more.  It's in my SQL.  We could look at

24   that a little bit later.  Your expert would be able to

25   tell.  But I don't think I included things where there

1    were unreasonable amounts of sleeper time.

2        Q.    What is the maximum length of time that you

3    included in your calculations for an individual spending

4    in the sleeper berth of a moving truck in California?

5        A.    I don't remember.  It's a great question.  I

6    don't remember.  I used your records, and there were

7    some very odd instances of long sleeper times, and I

8    accommodated for those in a table called "Work

9    Data_Misalign" and took those out.  But I don't remember

10   the specifics while I'm sitting here.

11       Q.    Did you write in your code something that would

12   exclude segments of time spent in the sleeper berth of a

13   moving truck in California that you considered to be

14   unreasonable?

15       A.    I think I just answered that.

16       Q.    I'm asking if it's in your code?

17       A.    Yes.

18       Q.    So this doesn't require you to go through and

19   manually spot-check to insure that your code operated

20   correctly?

21       A.    I don't think it does, no.

22       Q.    And somebody who is familiar with SQL could see

23   your code and see what that trigger -- that strike time

24   is?

25       A.    Yeah, I don't know what strike time means as a

Page 96

1    term of art.  But I could tell you that somebody could

2    look at my code and somebody could also look at the

3    database itself and see how I structured everything and

4    be able to reasonably determine that.

5         Q.   Do you know how long a driver can legally drive

6    in a single 24-hour period?

7         A.   You know, I used to know, but it wasn't

8    something I was asked to review in this case, so I don't

9    know in the context of drawing a legal conclusion.  I

10   wouldn't be able to tell you.

11        Q.   Did you use the length of time that a driver

12   can legally drive in a single 24-hour period as the

13   basis to exclude sleeper berth segments greater than

14   that time?

15        A.   Wonderful question.  I would be able to tell by

16   looking in my SQL database and also at the code.  But I

17   don't know sitting right here.  I think I used -- I want

18   to say 14 hours as an indication that something was

19   misaligned or something didn't make reasonable sense,

20   but I don't remember factually what I did.

21        Q.   You have your computer here, don't you?

22        A.   I do.

23        Q.   Does it contain your database?

24        A.   No.

25        Q.   Does it contain your code?

Page 102

1    information contained in your report?

2        A.    No.  But the database itself, all the

3    underlying data would be able to show that.  And once

4    again, it's based on your data.  So if your information

5    says somebody was sleeping for 13 hours, for instance, I

6    guess you just have to take that out and that would

7    speak to damages.  But I have to rely on your data as

8    being accurate and authentic.

9        Q.    Well, you're talking about the information that

10   the drivers input, correct?

11       A.    Well, I'm talking about what your records

12   indicate and what the -- what the payroll indicates.

13   It's not my business what -- if you're representing

14   something that your drivers' input is incorrect, that's

15   not what I've been asked to do.  I've not been asked to

16   provide an analysis of where drivers or employees put

17   things as incorrect.

18            But I would imagine that CRST, being the

19   sophisticated company it is, would have corrected that

20   before getting data out and certainly would have

21   annotated that on timesheets as I've seen in other cases

22   that used the same type of data.

23       Q.    It is your understanding that the drivers are

24   the ones who populated the changes in duty status,

25   correct?

1    A.   It is an understanding that that's the case,

2    but I don't know factually who put those in.  Could have

3    been a co-driver, could have been someone else.  But

4    it's not my business -- that wasn't part of my analysis.

5    Q.   As you sit here today, are you able to tell us

6    what the average sleeper berth duration was that you

7    calculated and counted for individuals in the sample who

8    were in the sleeper berth of a moving truck in

9    California?

10    A.   I provided all that to Dr. Peterson, and he was

11    going to include those totals.  So I don't know what the

12    totals of those or the averages were.

13    Q.   Are you able to tell us today, on average, how

14    many miles the trucks moved during a sleeper berth while

15    in California, a single sleeper berth duration?

16    A.   I output all that for Dr. Peterson, and he was

17    going to include that.  I don't remember if I put that

18    in my report or not.  I could certainly -- certainly

19    could have, and certainly the data is there if somebody

20    cares about the database, wants it.

21    Q.   Have you provided it?

22    A.   Have you asked for it?

23    Q.   Sir, when you decide to depose me I'll answer

24    all of your questions.  Have you provided it?

25    A.   I provided anything that was pursuant to any

Page 168

1                        CERTIFICATE OF DEPONENT

2

3              I, the undersigned, declare, under the penalty

4       of perjury, that I have read the foregoing transcript,

5       and I have made any corrections, additions, or deletions

6       as I deemed necessary.  The foregoing is a true and

7       correct transcript of my testimony contained therein.

8

9       Dated: _____  Signed at: _____
                                          (City, State)

10

11

12              BY:_____
                              AARON WOOLFSON

13

14

15

16

17

18

19

20

21

22

23

24

25      ///