# EXHIBIT E

**September 2019 Expert Report of Charles Platt ("Platt Report")**

UNITED STATES DISTRIC COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DUEKER, individually, and on behalf of all other similarly situated current and former employees of Defendants, | Case No.: 2:180cv008751-FMO-FEM<br>The Hon. Fernando M. Olguin |
| Plaintiffs, | CLASS ACTION |
| v. | REBUTTAL REPORT OF CHARLES PLATT |
| CRST EXPEDITED, INC. and DOES 1 through 50, inclusive, | |
| Defendants. | |

REBUTTAL REPORT OF CHARLES PLATT

## I.       Qualifications and Experience

1.       I, Charles Platt, state that I am providing this rebuttal report as an expert retained to provide expert testimony in this case.  I maintain a reasonable degree of certainty of the opinions and conclusions stated herein.

2.       I am the Director of Structured Data Analytics at iDiscovery Solutions, Inc. ("iDS"), a consulting firm that provides digital forensics, data analytics, and electronic discovery services in conjunction with litigation and investigations.  I have held this position, among others, since I joined iDS in 2014.  Including at iDS, I have over twenty-nine (29) years of experience in information technology, relational database technology, digital forensics, and electronic discovery.  My CV is attached as Exhibit A to this Report.

3.       I have a bachelor's degree in Computer Information Systems and a master's degree in Management of Secure Information Systems.  I hold industry certifications in software development,

Dueker v. CRST                                              Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                         September 30, 2019

database administration, digital forensics, and cyber-security, including Microsoft Certified Database

Administrator (MCDBA), EnCase Certified Examiner (EnCE), C/C++ Certified Unix Developer, and

Certified Information Systems Security Professional (CISSP).

    4.      I have provided consulting services related to litigation, electronic discovery and

structured data analysis for over 15 years and have testified in both state and federal court as an expert

related to the same.  I have analyzed and produced data from various database systems, including Driver

Logs, and have developed, described, and implemented methodologies for expert analysis of structured

data. I have previously evaluated and testified regarding another expert's methodology for analyzing

structured data (Rigzone v. Oilpro, Case No. 4:16-cv-01670).

    5.      On June 14, 2019, Scopelitis, Garvin, Light, Hanson & Feary, P.C., Counsel for CRST

Expedited, Inc. ("CRST") retained iDS to assist with the analysis of data related to this matter.

Specifically, iDS was engaged to review the June 3, 2019 ("June Report") and September 6, 2019

("September Report") Expert Reports of Aaron Woolfson and provide an expert opinion regarding his

analysis.

    6.      iDS is being compensated at the hourly rate of $495 for my time. The hourly rates of the

iDS professionals who have performed work at my direction in connection with my preparation of this

report range from $295 to $495. My compensation is unaffected by the content of this report, my

testimony, or the outcome in this matter.

    7.      In addition to my own work, I was assisted by members of iDS' Data Analytics Team in

performing analysis in this matter.  When I state 'I,' 'Myself,' or 'iDS' I mean this work was done by

myself, or by people working at my direction within iDS.

## II.    Scope of Engagement and Summary Opinions

    8.      Counsel for CRST has requested that iDS review and assess the methodology and

opinions of Aaron Woolfson.  Additionally, iDS was asked to replicate Mr. Woolfson's analysis, if

possible.

9.      Based on my analysis to date, I have made several conclusions that fall into two general categories: Analysis and Methodology.

10.     My **Analysis Conclusions** are related to the analysis performed by Mr. Woolfson upon which his results are based.  My primary conclusion is that Mr. Woolfson's analysis is overly generalized, does not properly account for specific situations that are present in the data, ignores data that would address these situations, and overlooks the potential impact this will have on the overall damage analysis.

11.     My **Methodology Conclusions** are related to the methodology Mr. Woolfson employed for his analysis and upon which his results are based.  These conclusions include:

a) The Woolfson Report lacks sufficient explanation and detail to replicate his analysis and confirm his findings.

b) Mr. Woolfson's methodology for data handling is unnecessarily complex, prone to error, and illustrates a lack of concern for proper data handling techniques.

c) The source code produced by Mr. Woolfson in Exhibit J is not an accurate and complete representation of the code used by Mr. Woolfson for his analysis as it includes syntax errors, is missing code, and includes improper sequencing of code.

d) The source code produced by Mr. Woolfson in Exhibit J is unreliable and inconsistent. Replicating his analysis based on this code is a matter of guesswork and speculation.

12.     The basis for my opinions is presented below.

## III.    Background Information

13.     This report is based upon my education, training, and years of experience, as well as the Expert Reports of Aaron Woolfson ("Woolfson Reports"), the attached exhibits, primarily Exhibits J1 and J2, the rough transcript of Mr. Woolfson's September 25, 2019 Deposition, and the data produced by plaintiff and defendants in this matter and referenced in the Woolfson Reports.  The materials received and relied upon for this report are listed in Exhibit B.  This includes the data produced in this litigation and related correspondence between counsel. I understand that Mr. Woolfson has offered to produce the

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                              September 30, 2019

database he used for his analysis. In the case that his database or additional data is produced, I reserve the

right to modify this report and any opinions I have made based upon that evidence.

## IV.     My Methodology for Analysis

14.     In order to review and understand the data that was used in Mr. Woolfson's reports I used

several industry standard tools and followed a specific methodology.

15.     The methodology I followed was:

a) Cataloged and hashed the files produced by defendant (Included as Exhibit B to this

report).

b) Identified and separated all Excel files (files with the extension "xlsx" or "xls") from

the data set.

c) When present, removed excess header information from the excel files[1].

d) Loaded the excel spreadsheets into a SQL Server database, tracking source file and

line number[2] for each set of data loaded.

e) Verified the data loaded into SQL Server:

(i)   Manual spot-checking of specific files and records.

(ii)  Counting and Reconciling of lines in source files and records in SQL tables.

(iii) Confirming field types (e.g. dates are valid) and ranges (same date ranges in

source and destination).

(iv)  Performed high level counts for Driver IDs, including date ranges, total records

per driver, and total unique drivers.

f) Created specific fields for typed values (e.g. dates and integers.)[3]

---

[1] In many cases the excel spreadsheets contained additional, redundant header information in the first 15-20 rows of
the sheet.  This data was also present to the extent required within the body of the sheet.
[2] This is the line number after removal of excess header information.
[3] When loading data from Excel to SQL Server all data was loaded as character (nvarchar) data.  This is done so that
if any data does not fit the expected data type, it will still be loaded and not return any errors.  Once loaded into SQL
it is then confirmed and converted.  The data is converted to specific type fields (integer and datetime) so that SQL

    g) Extracted date and integer values into typed fields, specifically odometer values (IDS_StartOdometer) and start times (IDS_StartTime).

    h) Deduplicated the records.

       (i) Identified duplicate records and near-duplicate values by concatenating fields and hashing them using the MD5 algorithm, where the hash value was the same the records were considered duplicates.  The hash values were stored with each record (IDS_Hash and IDS_Hash_NoDepot).

       (ii) Duplicate records required all source fields to be identical.

       (iii) Near duplicate records required all fields to be identical with the exception of DepotID.

       (iv) Added flag ('bit') fields to each table (IDS_Duplicate and IDS_Duplicate_NoDepot) that were set to 0 for unique records and 1 for duplicates.

    i) Identified Historical vs. Active records.

       (i) I used the Edit, OrigLogID and LogID fields.

       (ii) Added a 'bit' field to each table (IDS_Historical) that was set to 0 for active records and 1 for historical.

    j) Determined the Ending Time of the logentry by adding the Duration value to the StartTime value and stored the result in a datetime field called "IDS_EndTime".

    k) I then sequenced the data based on DriverID, Date, and LogID, and determined the next log entry for the Driver.

       (i) For performance purposes, I copied the odometer value from the next log entry to the current log entry into a field called "IDS_EndOdometer", thus providing both start and stop odometer values on a single record.

---

functions can operate on them.  For example, filter for all dates after 12/27/2013 only works correctly if the field being filtered on is in datetime format, not nvarchar.

(ii) I also copied the location value from the subsequent entry to the current log entry and stored this in a field call "IDS_EndLocation", thus provided both start and stop location values on a single record.

l) I identified data that had imperfect values, such as odometer values of "0" and "-1". I did not exclude these records from my analysis, as they are an important part of the sequence, but I did account for them when computing total distance moved.

m) I created a flag ('bit') field ("IDS_Include") to determine the log entries that were within the proper date range as explained to me by counsel, all log entries that were dated on or after December 27, 2013 and prior to April 16, 2019.

16.     I was then able to query the database to determine the total time spent in 'sleeper' status and compare it to the total distance (change in odometer reading between status changes) travelled by the tractor.

17.     I relied upon the following tools during my engagement and for the analyses contained within this report:

a) Adobe Acrobat Pro DC (Version 2019.012.20035)

b) Microsoft® SQL Server (Enterprise, 13.0.4474.0)

c) Microsoft® SQL Server Management Studio 2016 (13.0.16000.28)

d) Microsoft® Excel (Version 16.0.11727.20210)

e) xIOT® (3.0)

## V.     Conclusions Related to Analysis

18.     Mr. Woolfson's analysis is generalized, does not properly account for and include the data produced by defendant, and is based on assumptions that are illogical when the specific data is accounted for.

19.     Mr. Woolfson assumes that if the tractor is moving during a sleeper berth segment wholly within California, that the entire sleeper berth segment should be considered as "moving." This

Dueker v. CRST                                                                   Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                                                September 30, 2019

assumption is not sustained by the data.  For example, if the average speed of the tractor over the entire

period is less than 5mph, it would seem overly generalized to believe that the entire segment should be

considered as movement while in the berth.[4]

20.     Mr. Woolfson makes an attempt to correct for this by excluding any segment that is less

than 2 miles (See *Figure 2: Miles <= 2*) in total.  He also excludes any sleeper berth segment that exceeds

15 hours (See *Figure 1: Minutes > 900*) in total duration from his analysis.  These exclusions fail to take

into consideration the total time spent in the berth against the total movement, e.g. 5 miles over 10 hours

would not be excluded.  Both of these points are in conflict with his deposition testimony that he excluded

segments of less than 5 miles in total distance and more than 10 hours in total duration.

| Line No. | Source Code |
|---|---|
| 001 | If Val(californiaMinutes(temp2)) > 900 Then californiaMinutes(temp2) = "" |

*Figure 1: Minutes > 900 Excluded Exhibit J1 of September Report Page 25 (emphasis added)*

```
Page 108 of Rough Transcript Woolfson Deposition
7  Q. So tell me how that is excluded as counting any
8  sleeper berth time greater than 10 hours? Because you
9  linked it to new date, right?
10 A. Right.
11 Q. So does that mean that for example, if the date
12 was not new, right, let's say somebody goes into the
13 sleeper at 6 a.m. And then is there until midnight.
14 A. That wouldn't be included in my sleeper
15 minutes.
16 Q. Would that be excluded by this?
17 A. Yeah, because that 600 minutes, they're not
18 going to be in the sleeper for 10 hours.
```

| Line No. | Source Code |
|---|---|
| 001 | If Val(miles(temp1)) <= 2 Then miles(temp1) = "" |

*Figure 2: Miles <= 2 Excluded Exhibit J1 of September Report Page 23 (emphasis added)*

```
Page 75 of Rough Transcript Woolfson Deposition
2  Q. Do you have a recollection generally of what it
3  was?
4  A. I think it had to be five miles.
5  Q. So if the odometer reported a one or two-mile
```

---

[4] On January 28, 2014 at 12:32am Driver ID 699BD logged his status as Sleeper.  His next status change is on the same date at 11:06am, to Driving.  Between these times the tractor's odometer increased by 2.2 miles. This is present in CRST_D016014 on line nos. 653 through 656.  This equals an average speed of 0.2mph for a duration of roughly 10½ hours.

Dueker v. CRST                                            Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                        September 30, 2019

```
6  change over a period exceeding an hour, how would you
7  have handled computing the total amount of time that the
8  driver spent in the sleeper berth while the truck was
9  moving?
10 A. Well, that depends upon whether or not there
11 are multiple entries of two hours between, or an hour
12 between, and the number of miles. But if the number of
13 miles, as a sum of the difference of each of those parts
14 of those segments of DOT-indicated trips was less than
15 five miles, I don't think that I incorporated those into
16 my analysis even if there was a significant amount of
17 sleeper time.
```

21.     Upon a cursory review of the original data set I have been able to identify over 1,000

relevant log entries[5] where the change in the tractor's odometer over time indicates movement would

have been at less than 5 mph for the entire sleeper berth period or where the entire period spent in the

sleeper berth was 10 hours in length or longer.

22.     Some specific examples of this are depicted in *Figure 3*.  The examples in *Figure 3*

represent a total of 2 Days 4 Hours and 11 Minutes of what Mr. Woolfson's report and analysis would

count as compensable sleeper berth time for a total tractor movement of less than 100 miles, or

approximately a constant speed of just under 2mph.

| Line No. | Source File Bates No. | Source Line No. | Log ID | Sleeper Duration | Start Odometer[6] | End Odometer | Total Distance | Average Speed (MPH) |
|---|---|---|---|---|---|---|---|---|
| 001 | CRST_D016014 | 653 | 35284482 | 10hrs 34min | 1,377.2 | 1,379.4 | 2.2 | 0.2 |
| 002 | CRST_D016016 | 799 | 57045532 | 4hrs 53min | 75,580.7 | 75,583.6 | 2.9 | 0.6 |
| 003 | CRST_D016011 | 2,236 | 88184278 | 8hrs 24min | 104,500.5 | 104,519.8 | 19.3 | 2.3 |
| 004 | CRST_D016025 | 2,874 | 54576399 | 13hrs 7min | 324,186.2 | 324,223.9 | 37.7 | 2.7 |
| 005 | CRST_D016025 | 2,992 | 54858645 | 14hrs 36min | 329,511.8 | 329,542.4 | 30.6 | 2.1 |

*Figure 3: Examples of sleeper berth segments where tractor odometer changes.*

23.     Lines 001 through 003 are indicative of the tractor moving only a minor distance when

the individual was logged in the sleeper berth for a long period.  Stating that the entire sleeper berth

duration should be assumed as under movement in this scenario is simply illogical, and yet Mr. Woolfson

---

[5] The relevant log entries are all or partially within California and fall between the dates of December 27, 2013 and April 16, 2019.

[6] Odometer values in the source date provided do not contain decimals points, but are precise to the 10th of a mile. The odometer values presented in this report have had the decimal points added to them for clarity.

only filters these out of his analysis if the total distance travelled is less than 2 miles.  It is also quite

possible that the actual time spent in the sleeper berth was not the entire 8 or 10 hours indicated by the log

and that the movement time did not coincide with time spent in the sleeper berth.  Mr. Woolfson fails to

take this possibility into account.

24.      Lines 004 through 005 are indicative of larger movements of the tractor, but over such

long periods of time, a minimum of 12 hours, that it is difficult to believe that an individual was actually

in the sleeper berth the entire time.  The improbability of Mr. Woolfson's conclusion to the contrary is

increased when one considers that the driver of a commercial motor vehicle can only drive for 11 hours in

a 24-hour period before being required to take a 10-hour break. Therefore, if the driver identified was in

the sleeper berth, it is almost certain that the truck was not moving the entire time.

25.      This does not tell us if the movement all occurred within California or if the individual

was in the sleeper berth during the movement.  It is important to note that the data relied upon, driver

logs, <u>cannot</u> be used to determine at what point during this long duration an individual was in the berth or

if that coincided with when the movement occurred.  The GPS data from the tractors produced would

provide the answer as to when the tractor was moving, but Mr. Woolfson chose not to use this data for his

analysis or his conclusions.  Without being able to determine when the tractor was moving, it is not

possible to conclude if an individual was in the sleeper berth during the time the tractor was in movement,

or for how long the tractor was in motion during the sleeper berth segment.  Mr. Woolfson fails to take

this into account and ignores data that was produced that would have been able to help answer this

question more accurately than just relying on the driver logs.

26.      Without knowing the speed of the tractor or the times that it was in movement it cannot

be determined how much time an individual may have been in the sleeper berth during movement.  For

these log entries, Mr. Woolfson's analysis would incorrectly conclude that the tractor was in movement

the entire time that the individual was in the sleeper berth.

27.      Mr. Woolfson's process for determining how much time was spent in California on

multi-state segments is flawed.  First, he assumes that when leaving California, the tractor must pass

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                              September 30, 2019

through one of five cities, which he refers to as "egress" points.  These cities are Hombrook, Blythe,

Needles, Nipton, and Mystic.

> **Page 81 of Rough Transcript Woolfson Deposition**
> ```
> 13 A. Well, I looked at the most likely egress point
> 14 from the State of California, and I used the city, not
> 15 the border itself, but I used a major metropolitan area
> 16 that was closest -- metropolitan area I should say --
> 17 closest to the egress state along the route that the
> 18 truck would have taken.
> ```

28.    Second, he uses miles in California as a proxy for time in California.  Without knowing

the speed at which the tractor was moving this cannot be assumed to be accurate.

29.    This can be seen in *Figure 4* which shows the code used by Mr. Woolfson to access the

Google Distance Matrix[7].  He extracts both the mileage and the time (Lines 003 through 015) from

Google, but only stores the mileage in his SQL database (Lines 024 through 027.)

---

[7] The Google Distance Matrix, or Google Maps API, is a library of computer programs provided by Google for
performing mapping and geolocation functions.  This code allows developers to use pre-built functions for
calculating distance, time, and geolocation of GPS and map data, for example determining the distance between two
locations.

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                           September 30, 2019

| Line No. | Source Code |
|----------|-------------|
| 001 | `AB$ = FileText.ReadLine` |
| 002 | |
| 003 | `If InStr(AB$, "<duration>") > 0 Then isDuration = True: isDistance` |
| 004 | `= False: duration = ""` |
| 005 | `If InStr(AB$, "<distance>") > 0 Then isDuration = False: isDistance` |
| 006 | `= True: distance = ""` |
| 007 | `Debug.Print AB` |
| 008 | `If isDuration Then` |
| 009 | `Text = XML(AB$, "<text>")` |
| 010 | `If Text <> "" Then duration = Text` |
| 011 | `End If` |
| 012 | `If isDistance Then` |
| 013 | `Text = XML(AB$, "<text>")` |
| 014 | `If Text <> "" Then distance = Text` |
| 015 | `End If` |
| 016 | `Loop` |
| 017 | |
| 018 | `FileText.Close` |
| 019 | |
| 020 | `If distance <> "" Then` |
| 021 | `miles = 0` |
| 022 | `miles = (Val(LTrim(RTrim(Before(distance, "mi")))))` |
| 023 | |
| 024 | `SQL "update AZ set [miles] = " & p(miles, 0, True) & ""` |
| 025 | `SQL "where cityA = " & p(locationA, 0, True)` |
| 026 | `SQL "and cityZ = " & p(locationZ, 0, True)` |
| 027 | `GoSQL` |
| 028 | |
| 029 | `End If` |

*Figure 4: Google API Code Exhibit J1 of September Report Page 18 (emphasis added)*

30.   This is in direct conflict with his deposition testimony, where he stated:

> **Page 82 of Rough Transcript Woolfson Deposition**
> 13. A I did not assume a constant rate of speed.
>
> **Page 79 of Rough Transcript Woolfson Deposition**
> 23 Q. How long did you assume that it was moving?
> 24 What would you have calculated that as?
> 25 A. I would have calculated that by looking at the
>
> **Page 80 of Rough Transcript Woolfson Deposition (emphasis added)**
> 1 distance matrix and the <u>amount of time that the Google</u>
> 2 <u>Distance Matrix said between those two points,</u> because
> 3 the distance between those two points may have a GPS
> 4 actually indicated another point that isn't reflected
> 5 here. So I didn't use -- I didn't use this as the
> 6 amount of time. I would have attributed the amount of
> 7 time that the most reasonable between those two
> 8 locations and the <u>most reasonable time between those two</u>
> 9 <u>locations, according to Google Distance Matrix.</u>

31.   In his deposition testimony he states that he used the Google Distance Matrix to

determine the amount of time spent in the sleeper berth while the tractor was moving.  He also stated that

Dueker v. CRST                                           Rebuttal Report of Charles Platt
Case No. 2:18‌0cv008751-FMO-FEM                                      September 30, 2019

he did not assume a constant rate of speed when calculating the time spent in the sleeper berth. This is

incorrect. In his code he never actually stores[8] the Google Distance Matrix duration and he does not rely

upon it for his analysis, rather he relies upon the total segment time and multiplies time by the percent of

miles in California, in effect assuming a constant rate of speed.

32.    Exhibit C includes extracts, marked as Figures C.1 through C.13, from Mr. Woolfson's

source code that was included in his September Report as Exhibits J1 and J2. These extracts walk

through the process used by Mr. Woolfson to determine the total minutes spent in the sleeper berth while

the tractor was in motion.

a) Figures C.1 through C.3 show the total segment time being extracted from the driver

logs into the sleeper table.[9]

b) Figures C.4 through C.5 show the total odometer miles being extracted from the driver

logs into the sleeper table.

c) Figure C.7 shows Mr. Woolfson's notation that the Visual Basic Code ("VB Code[10]")

should be run at this point.

d) Figure C.8 shows the VB Code that saves the segment time and odometer mileage

from the sleeper table to a local file.

e) Figure C.9 shows the VB Code reading these values back out of the local file and

stored into variables, e.g. *minutes()* for time and *miles()* for mileage.

f) For segments where both end points are in California:

---

[8] Storing the Google Distance Matrix time duration is a required step for Mr. Woolfson to take in order for him to be able to use it later in his analysis. This is the equivalent of asking a question and then writing the response down so you can refer to it later. Mr. Woolfson requests from Google how long it will take to travel between two locations and how far it is. Google responds with both the duration and the distance. Mr. Woolfson electronically writes down the distance in his database, but fails to write down the duration. Therefore, later on, when he needs to compute the duration, he no longer has the duration that was provided by Google and instead has to rely on the duration provided by the driver logs.

[9] Mr. Woolfson extracts data from the driver logs into the 'sleeper' table. He relies on the sleeper table to compute the total time spent in the sleeper berth while the tractor is in motion. Extracting data into the sleeper table shows the data that he relied upon for these calculations, in this instance the driver log data rather than the Google Distance Matrix data.

[10] VB Code is Visual Basic source code written by Mr. Woolfson for performing analysis against the driver log data, specifically in this instance related to the Google Distance Matrix analysis that he performed.

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                         September 30, 2019

         i) Figure C.10 shows that for segments with both end points in California, Mr.

             Woolfson used the total segment time to determine the time spent while the

             tractor was moving in California.

      g) For segments which are multi-state:

         i) Figure C.11 shows code retrieving the distance in miles from the current

             location to the nearest egress city based on data retrieved from the Google

             Distance Matrix.

         ii) Figure C.12 shows the code that computes the total time spent in California.

             This is based on segment minutes[11], segment miles[12], and caMiles[13].

      h) Figure C.13 shows these miles and minutes being stored back into the sleeper table.

33.     I therefore conclude that Mr. Woolfson's formula for time spent in the sleeper berth on

multi-state segments while in California is:

*(((Total Segment Minutes) x ((Google Miles to Nearest Egress City) / (Total Odometer Miles))) – 1*

34.     In addition to this formula, in his revised September Report, Mr. Woolfson includes a

second, different set of code that he uses to determine the total mileage for segments that are multi-state.

This is inconsistent with the text of his report, which states that he "compared the number of miles driven

on the odometer, against the number of miles that was in the Google geocoding distance matrix, to

determine what percentage of driven miles were in California."[14]

35.     The new formula only applies to multi-state segments, only to the new, larger data set,

and highlights a difference in methodology between his initial report and his revised report.  The primary

difference is that, rather than using the odometer mileage, he relies on the Google Distance Matrix to

---

[11] Total segment minutes from the sleeper table populated in Figures C.1 through C.3.
[12] Total segment miles from the sleeper table populated in Figures C.4 through C.5.
[13] Distance to nearest egress city calculated by using the Google Distance Matrix shown in Figure C.10.
[14] Woolfson September Report, Page 12, Paragraph 36(c).

determine the total miles.  He still inappropriately, and contrary to his deposition testimony, relies on the

total segment minutes for the duration.  This new formula is:

*(((Total Segment Minutes) x ((Google Miles to Nearest Egress City) / (Google Total Miles))) – 1*

36.    I also conclude that Mr. Woolfson's didn't use a formula for time spent in the sleeper

berth during sleeper segments with both end points in California.  Rather he used the total duration of the

sleeper segment for this purpose.

37.    It is inappropriate to use mileage, as done by Mr. Woolfson, to determine time.  Mileage

can only be related to time if we know the speed at which the vehicle was moving.  Contrary to his

testimony, Mr. Woolfson's code shows that he did assume a constant rate of speed for the tractor and also

assumed that the tractor was in motion for the entire sleeper berth segment.

38.    For example, if a segment of 6 hours and 150 miles were split into California miles and

Arizona miles, with 100 miles being in California and 50 miles in Arizona, one cannot then conclude that

4 hours were spent in California and 2 in Arizona.  If the average speed in California were 50mph, those

100 miles would have taken only 2 hours to complete and the remaining 4 would be in Arizona at lower

average speeds.  Or, it is entirely possible that the tractor was stationary for 2 hours as well.  The data

relied upon by Mr. Woolfson does not indicate the speed of the vehicle, only total time and total mileage,

and does not indicate for what portion of the time the tractor was in motion.  Mr. Woolfson chose to not

use the GPS data produced by defendant which would have answered this question conclusively.

39.    It is also overly generalized to assume that simply because the start and end points of a

single segment are within California, that the entire trip had to be wholly within California.  The data

provided does not provide a detailed route of the tractor's movement, only the approximate current

position of the tractor when duty status changes.  Mr. Woolfson chose to not use the GPS data which

would have answered this question.

40.    I have reached the following opinions about Mr. Woolfson's analysis:

Dueker v. CRST                                          Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                   September 30, 2019

a) First, it is my opinion that not only are there critical flaws in the the assumptions that Mr. Woolfson based his conclusions on, but that he had access to data that would have resolved these flaws and he chose not to use it.

b) Second, his analysis is overly generalized and ignores specific evidence to the contrary that is present in the data. The data does not support the assumption that an individual was in the sleeper berth while the tractor was moving because (i) the tractor's odometer reading increased, (ii) after they set their duty status to 'sleeper', and (iii) before they changed it to another status.

c) Third, assuming that the individual was in the berth and the tractor was moving for the entire time that their status was set to 'sleeper' is illogical. This is especially true when presented with 'sleeper' log entries that continue for 10 hours or longer combined with mileage that indicates average speeds of less than 5mph.

d) Finally, there is no basis for Mr. Woolfson's assumption, and he makes no attempt to explain such in his report, that the tractor had to pass through one of the five 'egress' cities he selected when leaving California. In his deposition testimony he fails to mention that the egress city must be one of his five pre-selected cities and instead refers to them as "the closest egress point."[15] The GPS data that Mr. Woolfson had in his possession would have given conclusive evidence as to exactly where the tractor left California, but he chose not to rely on that data for his analysis.

## VI.    Conclusions Related to Woolfson Methodology

41.    In order to allow me to independently verify Mr. Woolfson's work, Mr. Woolfson needed to produce a clear and complete explanation of his methodology. His report fails to set this out. In the instances where Mr. Woolfson's methodology is partially explained, it is overly complex and prone to error. This illustrates a less than rigorous methodology underlying his data analysis.

---

[15] Woolfson Deposition, Rough Transcript, Page 84, Line 23.

Dueker v. CRST                                                 Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                         September 30, 2019

42.     Additionally, the source code provided by Mr. Woolfson in Exhibit J to his reports contains syntax errors, is not presented in the correct sequence, and is missing sections of code. In short, when I tried to run the code Mr. Woolfson provided, it did not work.

<u>Lack of Sufficient Explanation</u>

43.     Mr. Woolfson's report provides generalized descriptions of the processes he undertook to analyze the data, but these descriptions largely lack specifics required to reproduce his analysis.

44.     For example, on Page 8 of the June Report, in Paragraph 21(d), Mr. Woolfson states "1,910 of the 141,754 timeclock entries that had occurred after 12/27/2013 were duplicates." In the September Report there is no longer any mention of deduplication of the data. I am therefore left with three possible scenarios:

    a) Mr. Woolfson determined that he was wrong in his initial determination of duplicate records, and the data no longer required deduplication,

    b) Mr. Woolfson forgot to deduplicate the records when performing his analysis for the September report, or

    c) Mr. Woolfson failed to properly document his methodology and left this step out of his September report.

45.     And nowhere in either report does he describe how he identified the duplicates or if they were identical duplicates or near duplicates. My initial analysis indicates that near duplicates appear in the data where the only difference between two records is the DepotID. Due to the lack of clarity in Mr. Woolfson's report, I am unsure if he included or excluded these entries from his de-duplication process.

46.     Additionally, the data includes historical changes, or what might be thought of as current and historical records. There are three fields provided, Edit, LogID, and OrigLogID. When OrigLogID contains a value other than "0" it appears that those records are part of a revised set of entries. When this is true, the driver and start time for the log entries will be identical, and in many cases the only difference between the records is that the Duty Status has been changed. For example, on February 14, 2015 at

Dueker v. CRST                                                         Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                                  September 30, 2019

5:19pm, driver 056J has six log entries as shown in *Figure 5*.  Note the primary difference between these

sets of records is the duty status of "Off Duty" vs. "Sleeper".  Also, note the Edit column appears to

indicate the sequence in which the records were edited.

| Depot ID | Descript | Driver ID | Duration | Edit | Location | Log ID | Orig Log ID | Start Time | Tractor ID |
|---|---|---|---|---|---|---|---|---|---|
| 8 | OffDuty | 056JD | 401 | 1 | 4 mi W of Grand Terrace, CA | 50488584 | 50704624 | 2/14/15 5:19 PM | 1591 |
| 3 | OffDuty | 056JD | 401 | 1 | 4 mi W of Grand Terrace, CA | 50488584 | 50704624 | 2/14/15 5:19 PM | 1591 |
| 1 | OffDuty | 056JD | 401 | 1 | 4 mi W of Grand Terrace, CA | 50488584 | 50704624 | 2/14/15 5:19 PM | 1591 |
| 3 | Sleeper | 056JD | 401 | 2 | 4 mi W of Grand Terrace, CA | 50704624 | 50488584 | 2/14/15 5:19 PM | 1591 |
| 8 | Sleeper | 056JD | 401 | 2 | 4 mi W of Grand Terrace, CA | 50704624 | 50488584 | 2/14/15 5:19 PM | 1591 |
| 1 | Sleeper | 056JD | 401 | 2 | 4 mi W of Grand Terrace, CA | 50704624 | 50488584 | 2/14/15 5:19 PM | 1591 |

*Figure 5: Historical Records excerpt from CRST_D016009_CONFIDENTIAL.xlsx rows 1,126 – 1,131.*

47.     Mr. Woolfson does not provide any explanation as to how he handled this scenario or any

clarification as to the assumptions he made about how the data was organized.  During his deposition Mr.

Woolfson stated that this conflict did not occur in the data.



*Figure 6: Example Worksheet from Woolfson September Report Page 7 (blue emphasis added)*

48.     Mr. Woolfson was asked about the data from his report shown in *Figure 6* and asked to

reconcile the entries circled in blue that appear with the same date, time, and Driver ID.  His testimony

was as follows:

**Page 138 of Rough Transcript Woolfson Deposition**
10 Q. Do you remember telling me that you did not
11 recall coming across any conflicting duty statuses for
12 the same individual at the same time?
13 A. I do recall that, and those were not -- any
14 shifts that had any conflicts whatsoever were not part
15 of my analysis.

**Page 140 of Rough Transcript Woolfson Deposition**
7  That's pretty common. Those aren't
8  conflicting. Those aren't conflicting entries. A
9  conflicting entry is that you have two sheets where the

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                          September 30, 2019

```
10 same person is doing two different things in the middle
11 of something that is illogical, doesn't make sense.
```

**Page 140 of Rough Transcript Woolfson Deposition**
```
18 Looks like -- well, there's no seconds that are
19 listed on here so I'd have to look at the exact data,
20 right. This is just a -- an output representation of
21 what came in on the Excel sheet as it is represented on
22 your Excel sheet.
```

49.      Mr. Woolfson appears to be stating that these entries had seconds when he analyzed

them, and that for reporting purposes the seconds were dropped off.  That sorting them chronologically,

with the seconds included, would resolve what appears to be a conflict.  This is incorrect.  The log data

includes only hours and minutes, not seconds, and these are indeed conflicting records.  They must be

properly accounted for in order to arrive at the correct duty status for the driver when more than one duty

status is present for the same date and time, and yet Mr. Woolfson does not account for this in either his

report or in his code and when asked specifically about it during his deposition he misrepresents the data

and his methodology.

50.      Both *Figure 5* and *Figure 6* show current and historical records.  The steps taken to

determine which are current and which are historical would have a significant impact on the results of the

analysis.  In *Figure 6* at 8:26 AM on July 14, 2015 this driver either went into On Duty status or Sleeper

status.  If the driver's correct status is Sleeper, then the segment should be considered in the analysis.  On

the other hand, if the driver's status is On Duty it should be excluded from the analysis.  We do not know,

and Mr. Woolfson appears not to know, which status would have been used in his analysis.

51.      We are therefore left with two options for what Mr. Woolfson did: (i) either he took steps

to address this conflict and didn't explain in his report or in his deposition, or (ii) he was unaware of it,

didn't take steps to address it, and his results are flawed.  Even if he took steps to address it during his

analysis, he did not explain how he did so in his report and was unable to elaborate on that point during

his deposition.  When reviewing his report and exhibits I am unable to locate any code that would take

this into account and determine which are historical and which are current.  As a result, we are unable to

determine if his analysis treated the data appropriately or not.

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                              September 30, 2019

52.    Not only are there historical and active records shown in *Figure 5*, but there are multiple

records for the same driver and start time, six in total.  It is unclear how Mr. Woolfson handled this in his

analysis and if these were considered duplicates and removed from analysis or not.  Nothing in Mr.

Woolfson's Reports, testimony, or data sheds light on this issue.

53.    Mr. Woolfson also fails to adequately explain the methodology he used for data

cleansing.  I have identified numerous relevant log entries where the odometer reading indicates "0" or "-

1".  Since this is not a valid odometer reading, this data should be considered imperfect and accounted for

when performing the movement analysis.  Mr. Woolfson states in both his June Report and his September

Report that he relied upon this odometer data[16], and his code[17] makes use of it, but he makes no mention

of this imperfection and or how he accounted for it.  This means that Mr. Woolfson either failed to

explain his methodology thoroughly or that his conclusions are flawed because he failed to account for

this imperfection in the data.

54.    It is also interesting that in his revised September report, Mr. Woolfson appears to

include new code[18] that would identify these invalid odometer readings, and yet nowhere does he exclude

these invalid entries.  Additionally, he only analyzes the odometer for invalid entries for some of the

segments not all of them.

55.    It is therefore my opinion that either Mr. Woolfson failed to properly and thoroughly

explain the methodology he used for his analysis or his report gives a complete explanation and his results

are flawed.

<u>Data Handling</u>

56.    When iDS receives data for analysis, it is generally provided in file formats such as CSV

(Comma Separated Values) or Excel, as was done in this case.  In order to work with the data, iDS moves

---

[16] Woolfson June Report, Page 9, Paragraph 21(g), "In other words, according to the odometer, the tractor was in
motion…"  also Woolfson September Report, Page 14, Paragraph 37(b), "In other words, according to the odometer
within California."
[17] Woolfson September Report, Exhibit J2, A0 - Pages 17 – 21, B0 - Pages 17 – 22.
[18] Woolfson September Report, Exhibit J2, B0 - Pages 20

Ex. E, p. 458

the data into a format better suited for analysis.  For iDS, this is typically a Microsoft SQL Server database.

57.     Each time the data is moved there is a risk of inadvertently altering it.  To minimize this risk, iDS keeps the number of times the data is moved as small as possible and, when it must be moved, takes steps to verify the data after each move.  For example, verification might include counting the total number of records in the source and reconciling that to the number in the destination to verify that all the records made it from source file A into database B.

58.     In his report, Mr. Woolfson describes his process for moving data from the Excel files produced by defendant into the SQL Server Database he used for his analysis.  When describing this process, he identifies multiple times where he moves the data between different formats but fails to mention how he verified the data after each move.

59.     This is an overly complex process. Each move increases the possibility of introducing errors into the data.  Mr. Woolfson began with data largely contained in Excel spreadsheets. Data from Excel spreadsheets can be directly moved into SQL Server with no interim steps.  SQL Server provides this functionality natively through SQL Server Integration Services ("SSIS").  Mr. Woolfson should have used this process to move the data a single time. Instead, Mr. Woolfson undertook a multi-step process to load the data into the database.  According to his report, these steps include:

    a)  First move the Excel data into text files[19],

    b)  then modify the text files using Visual Basic[20],

    c)  then move the text files back into Excel[21],

    d)  then convert the Excel files into MS Access databases (mdb files)[22], and

    e)  then finally transfer the MS Access database into SQL Server[23].

---

[19] September Report, Page 11, Paragraph 36(b).
[20] September Report, Page 12, Paragraph 36(d).
[21] September Report, Page 12, Paragraph 36(e).
[22] September Report, Page 12, Paragraph 36(e).
[23] September Report, Page 13, Paragraph 36(f) & 36(g).

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                          September 30, 2019

60.     This five-step process is much more complex and error-prone than simply transferring the

Excel spreadsheets directly into SQL Server.  While generally using a multi-step process would not be of

great concern, Mr. Woolfson did not document his process for verifying the data after each step in the

process, meaning I could not review his validation process to determine whether he properly accounted

for the data in each step.

61.     It is my opinion that an expert exercising due care and due diligence when handling data

would seek to limit the number of times the data was moved and would seek to verify the data after each

move.  Mr. Woolfson's complex process and lack of verification indicates a lack of concern with regards

to best practices for data handling and, as a result, leads me to be concerned about the validity of the data

he is relying upon for his analysis.

Conclusions Related to Source Code

62.     In his report, Mr. Woolfson claims that he uses source code to "restore the structure and

contents of the time cards into the local SQL database."[24] The source code he purports to have used was

provided in Exhibit J to his reports.

63.     Source code represents the detailed instructions followed by the computer to achieve a

specific desired outcome, in this instance loading, processing, and analysis of the data produced by

defendants.  When writing source code there are rules that must be followed.  If these rules are not

properly followed, in the correct order and with the proper syntax, the computer will not be able to

understand and properly execute the code.

64.     These rules are in many ways similar to writing a book.  Similar to writing a book, the

sequence in which things occur is important.  If we were to tear the pages out of a book and rearrange

them, it would prove difficult, if not impossible, to read and understand the story.  The same is true with

computer source code, especially with SQL Source Code such as that provided by Mr. Woolfson in

Exhibit J1.  When the source code is not properly ordered, we are left to guess the sequence required to

---

[24] Woolfson September Report, Page 11, Paragraph 35.

Dueker v. CRST                                                     Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                          September 30, 2019

reproduce the results obtained by the author.  Mr. Woolfson's source code is not properly sequenced and

does not provide adequate information needed to put it into the proper sequence. Colloquially, Mr.

Woolfson's source code fails to tell us a story.

65.      Similarly, introducing a character to the reader prior to involving that character in the

story is important.  If the character is not properly introduced, the reader may be left wondering where

they came from and who they are.  The same is true in source code, if objects are not properly introduced,

or declared, the computer will be unable to understand them and will return an error rather than

proceeding.  Mr. Woolfson repeatedly uses objects prior to introducing them in the source code provided.

This is a key indicator that the source code provided is not presented in the same sequence that it was

executed in by Mr. Woolfson.

66.      Additionally, when an author introduces a character and gives them a name, the author

should consistently refer to that character by the same name or provide clear notice to the reader that the

character has other names.  For example, if an author introduces a character named Robert, and then in

the subsequent chapters refers to Bobby; the reader will be confused and left wondering if this is the same

character as Robert or if Bobby is a new character.  While a human reader might be able to make the

intuitive leap and draw the connection between Robert and Bobby, a computer will not make such a

connection and will refuse to recognize the new name as the same object.  Consistently referring to the

same object by its correct name is therefore critical for the program to work.  If the name is changed, even

by just a single character, the computer will assume that this is a new object that has not been properly

introduced and will return an error rather than proceeding.  Mr. Woolfson's source code is not consistent

in the use of object names.  This is a key indicator that this is not the specific code Mr. Woolfson used for

his analysis.

67.      In a similar vein, when an author introduces a character and tells you who that character

is, for example stating that Robert is a doctor, the reader expects for that to remain true for the duration of

the story, unless the author makes an explicit and stated change.  If Robert is suddenly and inexplicably

working as an accountant, the reader would be confused, and the continuity and integrity of the story

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                            September 30, 2019

would be questioned.  The same is true with source code.  If a specific object is defined in one way and

then later that definition is altered without explanation it calls into question the integrity, continuity, and

ultimately the reliability, of the code.  Mr. Woolfson's code includes changes to the formulas used to

calculate values for specific fields that he relies upon to connect data points for his analysis.  This is a key

indicator that either this is not the code used by Mr. Woolfson for his analysis or that his analysis is

flawed.

68.     Finally, having the entire book is a critical factor in understanding the story.  If several

chapters of a book were removed the reader would be missing important information, including

potentially critical events and characters.  The same is true with source code.  If code is missing, we are

left guessing what that code may have done and how it may have altered the data.  Further, once code is

obviously missing, it is unclear how much additional code may be missing that isn't obvious.  Mr.

Woolfson's code has obvious sections that are missing.  This is a key indicator that the code provided by

Mr. Woolfson is not the totality of the code relied upon by Mr. Woolfson for his analysis.

69.     In summary, all of these issues are present in the source code provided by Mr. Woolfson:

    a)  Code is missing,

    b)  object definitions / formulas are inconsistent,

    c)  objects are used prior to being declared, and

    d)  object names are used inconsistently.

70.     The following sections highlight specific examples from the Woolfson Report where

each of these issues is present.

*Missing Code*

71.     In some instances when code is missing it is obvious.  I have provided two obvious

examples of missing code below.  In the first instance the missing code will cause the program to fail with

an error.  In the second instance the code will run without error but will be ineffective and produce no

results.

Page **23** of **28**

Ex. E, p. 462

72.     An example of missing code that will cause the program to fail can be seen on line 005 of *Figure 7*.  SQL code has strict requirements for what constitutes a complete statement and, in the example found on line 005, the "from" clause, which is required, is missing.  A similar statement, seen on line 006, includes the required "from" clause.

73.     Microsoft documentation explains this requirement, stating "The FROM clause is usually required on the SELECT statement. The exception is when no table columns are listed, and the only items listed are literals or variables or arithmetic expressions."[25] This sole exception, when no table columns are listed, is not relevant here as the asterisk ("*") is a place holder for "all columns"[26].

| Line No. | Source Code |
| --- | --- |
| 001 | -- calendar day? |
| 002 | -- this is just california crews where the entirety of the trips from the excel |
| 003 | sheets |
| 004 | -- within califonia |
| 005 | select * into b_drivers |
| 006 | select * into allDrivers from drivers |

*Figure 7: Missing "from <tablename>" Code Exhibit J2 Page 4*

74.     When run this code will fail to execute and will produce the error shown in *Figure 8*.

| Line No. | Source Code |
| --- | --- |
| 001 | Msg 263, Level 16, State 1, Line 1 |
| 002 | Must specify table to select from. |
| 003 | Msg 1038, Level 15, State 5, Line 1 |
| 004 | An object or column name is missing or empty. For SELECT INTO statements, verify |
| 005 | each column has a name. For other statements, look for empty alias names. Aliases |
| 006 | defined as "" or [] are not allowed. Change the alias to a valid name. |

*Figure 8: Resulting Error when running code from Line 005 of Figure 4.*

---

[25] Microsoft "Transact-SQL (T-SQL) Reference" documentation, https://docs.microsoft.com/en-us/sql/t-sql/queries/from-transact-sql?view=sql-server-2017

[26] "* Specifies that all columns from all tables and views in the FROM clause should be returned. The columns are returned by table or view, as specified in the FROM clause, and in the order in which they exist in the table or view." extract from Microsoft online reference documentation, https://docs.microsoft.com/en-us/sql/t-sql/queries/select-clause-transact-sql?view=sql-server-2017

Dueker v. CRST                                           Rebuttal Report of Charles Platt
Case No. 2:18cv008751-FMO-FEM                                    September 30, 2019

75.     Not only does this code produce an error, but for Mr. Woolfson to perform his analysis he

must have used a corrected version of the code that was not provided.  According to the comments[27]

(lines 001 through 004) this code is used to segregate California drivers from all drivers, a key part of the

analysis.  Without this code, we do not know the rules that he applied to segregate out California drivers

and cannot repeat his analysis or properly validate his results.

76.     While the code from this example produces the errors shown in *Figure 5*, not all missing

code will result in such obvious error messages.  In some instances, when a section of code is missing, the

program will execute without error but will produce ineffective or unreliable results.  An example of this

is illustrated in *Figure 9*.

77.     In *Figure 9*, lines 004 through 007 are used to create the "AZ" table.  Lines 009 through

012 are used to update data in the "AZ" table.  This code will execute without raising any errors, but the

"AZ" table is never populated with data, and since it has no data, the update code, lines 009 through 012,

will do nothing.

| Line No. | Source Code |
|---|---|
| 001 | -- this is where we create a table |
| 002 | -- to create the major ingress/egress points in califorina |
| 003 | -- to determine the number of miles. |
| 004 | create table AZ (locationA varchar(180) null, locationZ varchar(180) null) |
| 005 | alter table AZ add cityA varchar(120) null, cityZ varchar(120) null |
| 006 | alter table AZ add offsetA int null |
| 007 | alter table AZ add offsetZ int null |
| 008 | |
| 009 | update az set cityA = substring(locationa,charindex('of ',locationA)+3,50) |
| 010 | update az set cityZ = substring(locationz,charindex('of ',locationZ)+3,50) |
| 011 | update az set cityA = substring(citya,4,50) where substring(cityA,2,1) = ')' |
| 012 | update az set cityZ = substring(cityz,4,50) where substring(cityz,2,1) = ')' |

*Figure 9: Missing Code from Woolfson Exhibit J2 Pages 29 & 30*

---

[27] Lines that are prefixed with "--" in SQL are comments.  Comments are non-executing code used by developers to add plain English explanations for what the code is expected to be doing.  Comments can provide insight into what a developers intent and mindset were when writing the code and assist other developers in reading the code.

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                          September 30, 2019

78.    The results of executing the code from *Figure 6* are presented in *Figure 10*. There are no

errors, as seen in the previous example, but the results are consistently "0 rows affected". This indicates

that the code in lines 009 through 012 did not do anything.

| Line No. | Source Code |
|---|---|
| 001 | (0 rows affected) |
| 002 | |
| 003 | (0 rows affected) |
| 004 | |
| 005 | (0 rows affected) |
| 006 | |
| 007 | (0 rows affected) |

*Figure 10: Results from running code in Figure 6.*

79.    The question this raises is, "If the code does nothing, why is it included?" It is my

opinion that additional code should be present between lines 007 and 009, the purpose of which would be

to populate the "AZ" table with data. The original code provided by Mr. Woolfson in his June Report

never does populate the "AZ" table with data. If the "AZ" table was populated the code in lines 009

through 012 would become effective and produce results. The code produced with Mr. Woolfson's

September Report does include populating the "AZ" table, but this occurs many pages after this section.

This does not alleviate my concern that code is missing but raises the additional concern that the code is

not presented in the sequence in which Mr. Woolfson executed it and that in order to replicate his analysis

speculation is required to determine the proper sequence for executing his code.

*Missing Code Conclusion*

80.    These examples show that the source code produced is not complete and that sections of

code are missing. These are not the only instances where code is missing or incomplete. The examples

also show that where code is missing or incomplete it is also critical to the functioning of the analysis and

to understanding how Mr. Woolfson arrived at his results.

81.    Not only does obviously missing code impact our ability to replicate and validate Mr.

Woolfson's results but knowing that the source code is incomplete leaves us unsure if other, less obvious,

sections of code have been omitted.

Dueker v. CRST

Rebuttal Report of Charles Platt

Case No. 2:180cv008751-FMO-FEM

September 30, 2019

*Object Use Prior to Declaration*

82.     Prior to using an object in SQL, the author must create and/or declare it.  If this is not done, when the code is executed it will fail and result in an error.  There are several instances in Mr. Woolfson's code where objects are used prior to being declared or created.

83.     In *Figure 11* the table object "b_trips" is referenced, indicating that it must have been previously created, but there is no section prior to this in the code that would create and populate the table.

| Line No. | Source Code |
|---|---|
| 001 | select |
| 002 | [Column 0]      as source, |
| 003 | [Column 1]      as  counter, |
| 004 | [Column 2]      as          loadNumber      , |
| 005 | [Column 3]      as          LdOrDh          , |
| 006 | [Column 4]      as          Leg             , |
| 007 | [Column 5]      as          pickup          , |
| 008 | [Column 7]      as          completed       , |
| 009 | [Column 8]      as          startCity       , |
| 010 | [Column 10]      as          startState      , |
| 011 | [Column 11]      as          startAlias      , |
| 012 | [Column 12]     as          finishCity      , |
| 013 | [Column 13]     as          finishState     , |
| 014 | [Column 15]     as          finishAlias     , |
| 015 | [Column 16]     as          miles           , |
| 016 | [Column 17] as              TractorId          , |
| 017 | [Column 18] as              trailerId          , |
| 018 | [Column 19] as              TrlrDivi           , |
| 019 | [Column 20] as              driver1            , |
| 020 | [Column 21] as              name1              , |
| 021 | [Column 22] as              driver2         , |
| 022 | [Column 23] as              name2           , |
| 023 | [Column 24] as              bookingSource      , |
| 024 | [column 25] as              driver1Division, |
| 025 | [newId]      as newId |
| 026 | into trips from **b_trips** |

*Figure 11: Object use prior to declaration from Pages 2 & 3 of Exhibit J2 (emphasis added)*

84.     In *Figure 12* on Line 005 the table object "californiaOnlyDrivers" is referenced.  The code or process used to create this table is not provided by Mr. Woolfson in either his source code exhibits or in his report.  Mr. Woolfson not only fails to tell us how he created this table, he also fails to tell us what data the table contained.

Dueker v. CRST                                                     Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                              September 30, 2019

| Line No. | Source Code |
|---|---|
| 001 | `-- all parts of the trip are exclusively within california` |
| 002 | `select * into driversEntirelyWithinCalifornia from allDrivers where crossRef in` |
| 003 | `(select crossRef from allDrivers (nolock) where state = 'CA')` |
| 004 | `delete from driversEntirelyWithinCalifornia where crossRef in (select crossRef from` |
| 005 | **`californiaOnlyDrivers`** `where state <> 'CA')` |
| 006 | |
| 007 | `-- SET THE CROSSREF` |
| 008 | `select top 10 * from drivers` |
| 009 | **`update drivers set crossRef`** `= convert(varchar(30),date,101) + '|' + tractorId +` |
| 010 | `'|' + driverId` |

*Figure 12: Object use prior to deceleration from Page 4 of Exhibit J2 (emphasis added)*

85.     This is concerning because in *Figure 12* on lines 004 and 005 this table is being used as a reference for deleting data from another table, "driversEntirelyWithinCalifornia." The comments associated with this section of code (Line 001 of *Figure 9*) indicate that this is part of the code that Mr. Woolfson relies upon for an essential part of his analysis – distinguishing if all or part of a segment occurred within California.

86.     The requirement of declaring an object prior to using it applies to fields as well as table objects. In *Figure 13* on Line 003, the field "crossRef" is associated with the drivers table. This field has not yet been created and added to the drivers table. This doesn't occur until Line 008.

| Line No. | Source Code |
|---|---|
| 001 | `update drivers set newId = (select top 1 newId from` |
| 002 | `drivers_including_all_duplicates` |
| 003 | `where drivers_including_all_duplicates.crossRef =` **`drivers.crossRef`** |
| 004 | `and drivers_including_all_duplicates.startTime = drivers.startTime` |
| 005 | `and drivers_including_all_duplicates.descript = drivers.descript` |
| 006 | `and drivers_including_all_duplicates.doc = drivers.doc)` |
| 007 | `---` |
| 008 | `alter table` **`drivers add crossRef`** `varchar(30) null` |
| 009 | `alter table drivers add driver1 varchar(120) null` |
| 010 | `alter table drivers add driver2 varchar(120) null` |

*Figure 13: Field use prior to deceleration from Page 3 of Exhibit J2 (emphasis added)*

87.     It may seem possible to manually reorder this specific example and run the code in the the correct sequence, but resequencing requires speculation and guesswork without knowing the specific order in which order Mr. Woolfson ran the code originally. This is also only a single example from the code and leaves out the process of populating the field with data. Populating the field with data appears on Page 4 (*Figure 12*, Line 009).

Dueker v. CRST                                                              Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                                        September 30, 2019

88.     Re-sequencing the code to be in the correct order requires speculation and guesswork.

Even where it is somewhat obvious, as in this example, there is no guarantee it will be the same order in

which Mr. Woolfson performed his analysis.

89.     In order to properly reproduce Mr. Woolfson's analysis a complete and properly

sequenced set of source code should be produced.  Barring this, a complete outline of the methodology,

including the steps taken and the order they were taken in, relied upon by Mr. Woolfson to arrive at his

conclusions should be produced.

*Inconsistent Object Definition*

90.     When using formulas for field values it is important to remain consistent in both setting

the value and when later referring to the value.  For example, an object "US_State" can be set to values

such as "CA", "VA", "ME", and "FL".  If later the same object is referred to using values such as

"California", "Virginia", "Maine", and "Florida" the code will fail.  If we are inconsistent in how we set

the values, for example using "CA", "The Golden State", "California", and "Cali" to represent California,

there will be an adverse impact on our ability to analyze the data. These variances will not raise explicit

errors, but rather will quietly fail to work and potentially go unnoticed when returning unreliable or

inconsistent results.  Therefore, unless Mr. Woolfson took additional verification steps—and he did not

document such additional steps in his report— he would not have identified inaccuracies in his results.

91.     This type of error can be seen in the code provided by Mr. Woolfson on Page 4 of Exhibit

J1.  In this code he defines the values associated with the "crossRef" field.  He originally defines this

value as a combination of Date, TractorID, and DriverID.  This can be seen on lines 003 through 006 of

*Figure 14*.  Subsequently he changes the definition to be only Date and DriverID, dropping TractorID.

This can be seen on lines 007 and 008 of *Figure 14*.

Dueker v. CRST                                        Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                September 30, 2019

| Line No. | Source Code |
|---|---|
| 001 | -- SET THE CROSSREF |
| 002 | select top 10 * from drivers |
| 003 | update drivers set crossRef = convert(varchar(30),**date**,101) + '|' + **tractorId** + '|' |
| 004 | + **driverId** |
| 005 | update allDrivers set crossRef = convert(varchar(30),**date**,101) + |
| 006 | '|' + **tractorId** |
| 007 | update driversEntirelyWithinCalifornia set crossRef = convert(varchar(30),**date**,101) |
| 008 | + '|' + **driverId** |

*Figure 14: crossRef field definition from Page 4 of Exhibit J2 (emphasis added).*

92.     Still further on the definition changes again to be StartTime and DriverID, swapping

StartTime for Date and removing TractorID.  An example of this can be seen on lines 004 and 005 of

*Figure 15.*

| Line No. | Source Code |
|---|---|
| 001 | select * from sleeper where crossRef = '01/05/2017|021nd' |
| 002 | |
| 003 | -- this is just to preserve the continuity... |
| 004 | update drivers set crossRef = convert(varchar(30),**starttime**,101) + '|' + **driverId** |
| 005 | where crossRef is null |
| 006 | |
| 007 | -- ============================================================ |
| 008 | -- This is where we attribute the disperate, discrete elements |
| 009 | -- to the various categories so that we can determine when |
| 010 | -- and where the time is taking place. |
| 011 | -- ============================================================ |
| 012 | -- create a master crossWalk for sleeper |
| 013 | -- create a master crossWalk for sleeper |
| 014 | -- create a master crossWalk for sleeper |
| 015 | -- create a master crossWalk for sleeper |
| 016 | -- drop table sleeper |
| 017 | select distinct driverId, crossRef into sleeper from drivers where descript = |
| 018 | 'sleeper' |

*Figure 15: crossRef field from Page 5 of Exhibit J2 (emphasis added).*

93.     The crossRef field is relied upon by Mr. Woolfson to link the sleeper berth segments to

drivers and to segments spent in California.  How this field is calculated and the specific data it relies

upon is critical to ensuring the code operates properly and that the results of the code are accurate and

reliable.

94.     It is my opinion that this inconsistency must either have gone unnoticed by Mr. Woolfson

or this is not the actual code that he relied upon for his analysis, assuming that, had he been aware of the

error, he would have corrected it.  The crossRef code as provided by Mr. Woolfson in Exhibit J will fail

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                          September 30, 2019

to link the events correctly.  This will not produce an error message, but the code will not function

properly and the results will be flawed.  This leaves us in one of two situations: either this is not the code

Mr. Woolfson relied upon for his analysis or his code contained critical flaws.

95.     Also of note, in *Figure 15* on Line 001 the field "crossRef" is associated with the

"sleeper" table.  The "sleeper" table is not created until later in the code (lines 017 and 018 in *Figure 15*),

which is an additional example of "Object Use Prior to Declaration."  Not only would this code fail

because the crossRef values are inconsistent, but it would also fail because the "sleeper" table has not yet

been created.

*Inconsistent Object Naming*

96.     The names assigned to objects in SQL are important.  While SQL is not case sensitive,

meaning that variations in upper and lower case are not important, the specific names are important.  For

example, "Drivers", "DRIVERS", and "drivers" all refer to the same object, but "drive", "driver", and

"drivers" all refer to different objects.

97.     The code provided by Mr. Woolfson in Exhibit J1 vacillates between different names for

what appear to be the same tables.  For example, in *Figure 16* on Line 001 a new table is created and

assigned the name "driver".  A few lines further on, on Line 007, it is referred to as "drivers".  While this

is relatively easy for a human reader to interpret and conclude that they likely reference the same object,

the computer will not make such an intuitive leap.

| Line No. | Source Code |
|---|---|
| 001 | select * into **driver** from data where [column 4] in |
| 002 | ('driving','onDuty','offDuty','sleeper') |
| 003 | select * into hours from data where [column 2] like '%/%' |
| 004 | select * into trips from data where [column 5] like '%/%' |
| 005 | -- now since we have done this, let's figure |
| 006 | -- out what we need to do next. |
| 007 | delete from data where newId in (select newId from **drivers**) |
| 008 | delete from data where newId in (select newId from hours) |
| 009 | delete from data where newId in (select newId from trips) |

*Figure 16: crossRef field definition from Page 1 of Exhibit J2 (emphasis added).*

98.     It is my opinion that this inconsistency could not have gone unnoticed by Mr. Woolfson

as it would cause the code to fail with an error.  Therefore, Mr. Woolfson must have used a corrected

Dueker v. CRST                                                    Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                             September 30, 2019

version of the code for his analysis.  This leaves me with a single conclusion: this is not the code Mr.

Woolfson relied upon for his analysis as represented by him in his report.

## VII.    Overall Conclusion

99.    I make the following conclusions in relation to the analysis performed by Mr. Woolfson:

a) Mr. Woolfson's analysis does not properly take into account the data produced and is overly simplistic.

b) Mr. Woolfson ignored data, specifically GPS ping data, produced by defendant that could have provided specific and reliable answers to the questions he was asked to answer.

c) It is not possible to conclude with certainty based on the data relied upon by Mr. Woolfson that simply because the tractor moved after an individual went to 'sleeper' status, that the individual was in the sleeper berth while the tractor was moving, or that the tractor was moving for the entirety of the sleeper berth segment, or for what period of time the tractor was in California and was moving.

100.    I make the following conclusions about Mr. Woolfson's methodology and the source code provided:

a) Mr. Woolfson does not properly explain the methodology he undertook to reach his conclusions.

b) Mr. Woolfson's methodology for data handling is unnecessarily complex and prone to error.

c) Replicating Mr. Woolfson's analysis based on his report is a matter of guesswork and speculation.

Dueker v. CRST                                                     Rebuttal Report of Charles Platt
Case No. 2:180cv008751-FMO-FEM                                          September 30, 2019

## VIII.  Signature

101.    I provide these opinions with a reasonable degree of professional certainty, based on

information available to me at this time, and I reserve the right to modify these opinions if more

information is provided.  I also reserve the right to provide additional expert opinions based on any new

information disclosed in this matter and to augment my opinions based on further analysis of Mr.

Woolfson's code and database.

102.    I declare under penalty of perjury that, to the best of my knowledge, information, and

belief, the foregoing is true and correct.

Executed this 30th day of September 2019.


_____
Charles Platt
Director, Structured Data Analytics
iDiscovery Solutions, Inc.

# **EXHIBIT A**

# CV of Charles Platt



# CHARLIE PLATT

Expert Services Affiliate



🏠 3000 K Street NW, Suite 330
Washington, DC 20007

☎ 703.489.7707

✉ cplatt@idsinc.com

in Profile on LinkedIn

🐦 @iDiscoveryInc

🌐 idiscoverysolutions.com

### SUMMARY

Mr. Charlie Platt, Director of the Data Analytics Practice for iDiscovery Solutions (iDS) in Washington DC, has over 29 years' experience working on data systems, data analytics, digital forensics, cybersecurity strategic planning, incident response, information systems development, infrastructure planning, database design, eDiscovery, and project management. He has consulted on projects ranging from large-scale forensics investigations to highly complex intellectual property cases in the legal and eDiscovery industries. In addition, Mr. Platt has developed applications and managed projects for a variety of Fortune 50 corporations and large government clients and has managed comprehensive, multifaceted collections, both in the U.S. and internationally.

Mr. Platt is a Certified Ethical Hacker (CEH), Certified Information Systems Security Professional (CISSP), Certified Information Systems Management Professional (ISSMP), Certified Cloud Security Professional (CCSP), an EnCase Certified Examiner (EnCE), a Microsoft Certified DBA (MCDBA), and holds certifications in C/C++, Infrastructure and Networking. He has a Certificate in Information Risk Management from Harvard, an M.S. in Management of Secure Information Systems from George Mason University, and a B.S. in Computer Information Systems. Prior to iDS, he was the owner and founder of Bitscope Consulting, a Managing Consultant at LECG and manager of the DC Forensics Lab, and a Sr. Consultant at FTI.

# CHARLIE PLATT



## SELECT CONSULTING EXPERIENCE

1. Led the onsite team investigating an alleged internal breach and compromise for one of the largest naval architecture firms in the US.  Responded to FBI demands and allegations of breach.  Worked directly with client to document corporate infrastructure and defenses, reviewed forensic evidence produced by the FBI, and acquired and reviewed additional evidence.  I developed and tested theories for the incident and delivered an expert report documenting the breach and exposure for presentation to law enforcement.  I presented our findings orally to corporate executive staff, including the CEO and CISO.

2. Provided expert testimony for plaintiff in a McKesson Medical Records database systems and audit trail data case.  The court had significant concerns about HIPAA and the expertise required to review medical database records.  As a result of deposition and court testimony, the court ordered defendant to provide direct access to medical records systems for our expert review, as well as sanctions ordering defendant to pay a significant portion of the cost of the onsite review.  Onsite at defendant's IT offices I reviewed McKesson databases for missing or unproduced audit trail data, which resulted in an expert report and additional deposition testimony on the state of the McKesson records and audit trail data.  I was also able to identify and produce additional audit trail data that was previously undisclosed.

3. Assisted $200M government contractor with response to ransomware attack.  Developed and delivered expert report and reconstituted corporate IT infrastructure post-incident.  Successfully recovered critical data and had systems up and running at pre-incident levels in under 72 hours.

4. Testified for defendant in an expert role relating to McKesson Medical Records database systems and alleged data spoliation.  Analyzed metadata and database processes to understand current state of medical records metadata.  Testified in deposition and provided expert opinions related to the metadata.  Ultimately spoliation charges were dropped and client was found innocent of data destruction.

5. Authored report and ran incident response to remote desktop breach and instance of ransomware at a government contractor.  Ran triage and immediate response, planned short term objectives and managed the team that analyzed the incident and authored the final report.

6. Co-authored report on cyber breach of public utility and provided technical knowledge and analysis that was key in determining no need to disclose.  Was able to show that breach identified did not disclose PII.  Report clearly explained that, though the risk was present, there was no evidence proving the vulnerability had been exploited to a level that would have disclosed PII, and there was evidence indicating PII had not been disclosed.

7. Managed structured data discovery and putative collective analysis for large financial firm facing class action litigation.  Assisted counsel with identification and production of putative collective information, analysis of PC members to determine dis-similar situated members, and consulted on method and format of production from large structured data systems.

8. Managed structured data discovery project for Fortune 10 Company. Discovery encompassed multiple structured data sources and 100s of millions of records, majority of which were in non-standard proprietary formats. Reviewed infrastructure of client and identified of relevant systems for preservation. Assisted counsel with technical aspects of meet and confers and with written response to opposing counsel and experts requests as they related to technology and structured data.

9. Authored report to the ITC on cyber breach and inadvertent exposure of CBI to the Internet. Managed incident response process and authored final reports for submission to specific ITC courts involved.  Was

## CHARLIE PLATT



instrumental in taking a serious and potentially sanctionable security breach and providing solid analysis and reporting on the actual scope of the breach, resulting in no adverse consequences.

10. Led multi-disciplinary, international teams in responding to court order for forensic investigation into counterfeiting allegations.  Forensic team onsite in Shenzhen, China performed onsite acquisition, processing and in country review of dozens of laptops, email and file servers and personal devices. Domestically, the Washington, DC and New York City teams performed structured data analytics against SQL Server databases to determine sales volumes and post-lawsuit alteration of sales records. Washington DC team wrote expert report and assisted with subsequent written testimony.  Ultimately led to successful spoliation charges and sanctions.

11. Managed project schedule, budget and team for multiple country eDiscovery project. Reviewed over 500 backup tapes to be included in response, restoring and processing over 150. Processed over 6TB of data and analyzed content and extracted archived email for 50 relevant custodians.

12. For large litigation project, developed quality control application to review SQL data for consistency and accuracy.  Designed SQL database for analysis of over 1billion records encompassing 1TB.

13. Managed project schedule, budget and team surrounding rebuilding a corrupt email archive for a large financial institution. Designed and developed the application used to analyze email data from the optical platters and load into SQL Server. Restored over 700 platters and processed over 4TB of email. Analyzed content and rebuilt SQL Server database for archive.

14. For large litigation project, developed methodology and architecture for analyzing 750GBs of mainframe reports and developed application to parse for bulk load to SQL Server.

15. Designed and developed application to process files and email for eDiscovery at a large company. Functionality included deduplication of email and electronic files, full-text indexing, keyword searching and exporting of relevant files.

16. Developed utility to analyze and export email from Lotus Notes NSF files into SQL Server and HTML for review by attorneys.  Multi-Threaded application monitored processing queue in SQL Server for NSF files to convert, then loaded and exported email into HTML files and metadata into SQL Tables.

17. Created a Collection and Digitization Reporting System (CDRS) for the Smithsonian Institution.  CDRS interacts with multiple databases to capture and report on collections and digitization data.  CDRS is user configurable, with the system managers able to add and change the data being requested from the units on a macro- and micro-level.

18. Member of development team for the CARES-Medical System for the National Zoo's veterinary hospital. The project was initially tasked with evaluating and recommending a course of action for systems modernization of National Zoo's Medical Records System. Our project team deemed the existing architecture too high risk to continue operating, so a replacement was designed and developed to provide similar functionality while residing on a modern architecture with enhanced availability, reliability and disaster recovery capabilities.  The system was released on time and under-budget to the accolades of the National Zoo's veterinary staff and administration.

19. Integrated third-party online booking platform for large travel company. Integration included SSO and Cryptography API.  Developed security protocol and algorithm for secure handshake and single sign-on between both products.

## CHARLIE PLATT



20. Created a Personnel Security Case Management System (PSCMS) for the Smithsonian Institution.  The PSCMS receives electronic delivery of background investigation results from OPM, as well as providing a case management framework for OPS to manage, work and review cases.  The final system had a significant impact on the processing of background investigations.

**TESTIFYING EXPERIENCE**

1. **Digital Forensics Analysis of USB Device Use**, deposition testimony, Digital Assurance Certification, LLC v. Alex Pendolino, Jr., US District Court, Middle District of Florida, Case No. 6:17-cv-72-Orl-31TBS, December 2018.

2. **Rebuttal to Forensic Investigation Protocols and Methods**, declaration, Digital Assurance Certification, LLC v. Alex Pendolino, Jr., US District Court, Middle District of Florida, Case No. 6:17-cv-72-Orl-31TBS, November 2018.

3. **Analysis of Expert Report and Expert's Methodology**, declaration, DHI Group, Dice, Rigzone.com v. David Kent, Oilpro.com, US District Court, Southern District of Texas, Case No. 4:16-cv-01670, November 2018.

4. **Digital Forensics Analysis on USB Device Use**, expert report, Digital Assurance Certification, LLC v. Alex Pendolino, Jr., US District Court, Middle District of Florida, Case No. 6:17-cv-72-Orl-31TBS, November 2018.

5. **Incident Response Investigation / FBI Investigation**, Expert Report, Confidential Client, April 2018.

6. **Structured Data Analysis / Medical Records**, deposition testimony, Culpepper v. Wellstar Kennestone, State Court of Dekalb County, GA, Case No. 15A54645E7, January 2018.

7. **Forensic Analysis of Laptop**, affidavit, Gondolier Properties, LLC et. al. v. Joellen Tilseth, Don Tilseth, et. al., State Court of Lee County, FL, Case No. 16-CA-1206.

8. **PeopleSoft Database Forensics**, declaration, Private Internal Investigation, November 2017.

9. **Structured Data Analysis / Medical Records**, Expert Report, Culpepper v. Wellstar Kennestone, State Court of Dekalb County, GA, Case No. 15A54645E7, September 2017.

10. **Electronic Discovery and Forensics**, declaration, Digital Assurance Certification, LLC v. Alex Pendolino, Jr., US District Court, Middle District of Florida, Case No. 6:17-cv-72-Orl-31TBS, September 2017.

11. **Structured Data Analysis / Medical Records**, court hearing testimony, Culpepper v. Wellstar Kennestone, State Court of Dekalb County, GA, Case No. 15A54645E7, August 2017.

12. **Structured Data Analysis / Medical Records**, deposition testimony, Culpepper v. Wellstar Kennestone, State Court of Dekalb County, GA, Case No. 15A54645E7, May 2017.

13. **Source Code Versioning System Forensics**, declaration, Sotera Wireless, Inc. Debtor, US Bankruptcy Court, Southern District of California, Case No. 16-05968-LT11, January 2017.

Ex. E, p. 477

## CHARLIE PLATT



14. **USB Device Forensic Analysis**, declaration, Digital Assurance Certification, LLC v. Alex Pendolino, Jr., US District Court, Middle District of Florida, Case No. 6:17-cv-72-Orl-31TBS, January 2017.

15. **Structured Data Analysis / Medical Records**, deposition testimony, Ruchotzke v. Methodist Medical Center, Circuit Court, Tenth Judicial Circuit, Peoria County, IL, Case No. 13-L-78, September 2016.

16. **Cybersecurity Breach Response / Ransomware**, expert report, Government Contractor, Ransomware and Remote Desktop Breach, April 2016.

17. **Results of Cybersecurity / PII Exposure**, expert report, Public Utility, July 2015.

18. **Collection and Processing of Email from Webmail Systems**, declaration, Maddy et al v. General Electric Company, US District Court, District of New Jersey, Case No. 14-cv-00490-JEI-KMW, August 2015.

19. **Cost of Collecting and Processing of Email**, declaration, Maddy et al v. General Electric Company, US District Court, District of New Jersey, Case No. 14-cv-00490-JEI-KMW, November 2015.

20. **Preservation of Structured Data**, declaration, Maddy et al v. General Electric Company, US District Court, District of New Jersey, Case No. 14-cv-00490-JEI-KMW, December 2015.

21. **Preservation of Structured Data**, deposition testimony, Maddy et al v. General Electric Company, US District Court, District of New Jersey, Case No. 14-cv-00490-JEI-KMW, December 2015.

22. **Cybersecurity Breach Response / CBI Exposure**, expert reports, Multiple Related Cases, United States International Trade Commission, September 2014.

### EDUCATION

1. Certificate in Information Risk Management, Harvard University, 2019
2. MS in Management of Secure Information Systems, George Mason University, 2013
3. George Washington University
   - Introduction to Criminal Investigations, 2006
   - Introduction to Criminal Procedure, 2005
   - C/CC++ and Unix Systems Development, 2002
4. BS in Computer Information Systems, Roanoke College, 1992

### CERTIFICATIONS/TRAINING

1. Certified Information Systems Security Professional (CISSP)
2. Certified Information Systems Management Professional (ISSMP)
3. Certified Cloud Security Professional (CCSP)
4. Certified Ethical Hacker (CEH)
5. EnCase Certified Examiner (EnCE)
6. Microsoft Certified DBA (MCDBA)

## CHARLIE PLATT



7.  A+ Certified
8.  Network+ Certified
9.  Microsoft Certified Professional (MCP)
10. Principal Certified Lotus Professional (PCLP)

**PUBLICATIONS**

1.  C. Platt, *Java Mail Metadata Analysis*, Digital Forensics Magazine (November, 2017)
2.  C. Platt, *Danger Lurking in the IT Shadows*, "The Forensicators" blog for iDiscovery Solutions (June, 2017)
3.  C. Platt, D. Regard, *Turning Liabilities Into Assets*, Metropolitan Corporate Counsel (May, 2017)
4.  C. Platt, *How to Protect Your Company from Ransomware Attacks*, "The Ethical Hacker: Data, Disputes, Discovery, and More…" website contribution for Metropolitan Corporate Counsel (May, 2017)
5.  C. Platt, *Great Employee or Insider Threat*, "The Ethical Hacker: Data, Disputes, Discovery, and More…" column for Metropolitan Corporate Counsel (May, 2017)
6.  C. Platt, *Technically Speaking, Cybersecurity Isn't About Speaking Technically*, "The Ethical Hacker: Data, Disputes, Discovery, and More…" column for Metropolitan Corporate Counsel (April, 2017)
7.  C. Platt, *Leveraging IoT Data Isn't a Budget Killer*, "The Ethical Hacker: Data, Disputes, Discovery, and More…" column for Metropolitan Corporate Counsel (March, 2017)
8.  C. Platt, *I Got 99 Problems, But No Data Ain't One*, "The Ethical Hacker: Data, Disputes, Discovery, and More…" column for Metropolitan Corporate Counsel (February, 2017)
9.  C. Platt, *IoT Data: Objective, Consistent and Pervasive – Using Metadata to Build Compelling Narratives for Litigation*, Metropolitan Corporate Counsel (December, 2016)
10. C. Platt, B. Leatha, *Ten Key Legal Considerations for Cloud Solutions*, Metropolitan Corporate Counsel (November, 2016)
11. C. Platt, A. D'Ambra, S. Sessler, *Data Analytics: How Parties Are Using Tools Beyond TAR*, Law360 (November, 2016)
12. C. Platt, *Metadata Analysis in Email*, Digital Forensics Magazine (May, 2016)
13. C. Platt, D. Myers, *Big Data Yields Big Results*, Metropolitan Corporate Counsel (May, 2016)
14. C. Platt, *Data Breach & Incident Response*, Metropolitan Corporate Counsel (February, 2016)
15. D. Regard, C. Platt, *A Brief Legal History of Time: Part Two of Two*, Digital Discovery and E-Evidence (BNA, February, 2016).
16. D. Regard, C. Platt, *A Brief Legal History of Time: Part One of Two*, Digital Discovery and E-Evidence (BNA, January, 2016).
17. C. Platt, *The Most Crucial Time During a Data Breach*, BNA Bloomberg (January, 2016)
18. C. Platt, B. Kim, *Structured What? Leveraging structured data to build a better story*, Metropolitan Corporate Counsel (November, 2015).

**SELECT SPEAKING ENGAGEMENTS**

1.  Metropolitan Corporate Counsel Webinar, "*IoT & Disparate Data for Labor & Employment Cases*", May 2017.
2.  The Executive Employer, "*The Power of Your Electronic Data*", panelist, Phoenix, AZ, May 2017.
3.  Temple Law School, "A Lawyer's Introduction to Computers", January 2017.

## CHARLIE PLATT



4.  Today's General Counsel Institute, Data Privacy and Cybersecurity Forum, "Outsourcing Big Data to the Cloud", November 2016.
5.  Organization of Legal Professionals, Webinar, "IoT: Content is the New Context", November 2016.
6.  The Masters Conference, Panel Moderator, "The Internet of Things Creates a Thousand Points of (Evidentiary) Light: Can you see it?", Washington D.C., October 2016.
7.  Littler Mendelson, "eDiscovery, Forensics and the Rise of Google Docs", October 2016.
8.  University of Pennsylvania Law School, "A Lawyer's Introduction to Computers", September 2016
9.  The Masters Conference, Panel Moderator, "The Internet of Things Creates a Thousand Points of (Evidentiary) Light: Can you see it?", New York City, July 2016.
10. Metropolitan Corporate Counsel Webinar, "The Internet of Things: How IoT Data and Relational Analytics Can Make or Break Your Case", June 2016.
11. The Masters Conference, "The Internet of Things Creates a Thousand Points of (Evidentiary) Light:  Can you see it?", Chicago, May 2016.
12. Pennsylvania Bar Association, "Practicing Law in the Cloud", January 2016 – multiple dates and locations.
13. American University Law School, "A Lawyer's Introduction to Computers", January 2016.
14. The Knowledge Group Webinar, "Structured Data Discovery", December 2015.
15. Today's General Counsel Institute, Data Privacy and Cyber Security Forum, "Breach Response:  What Do I Do Now?", November 2015.
16. Temple Law School, "A Lawyer's Introduction to Computers", January 2015.
17. American University Law School, "A Lawyer's Introduction to Computers", January 2015.
18. Browne Academy, "Securing the Academy, IT Security Plan for Browne Academy", June 2013.
19. Georgetown Law School, "Introduction to Computer Forensics", April 2006.
20. Merrill Lynch CLE, "Digital Discovery and Forensics", May 2006.

## ORGANIZATIONS

1.  Chair of the Cyber Security committee for Board of Trustees, Browne Academy
2.  Phi Kappa Phi Honor Society

# EXHIBIT B

Data Source Materials Relied Upon

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 001 | ..\CRST_D000001-000163 (20180608)\CRST_D000001.pdf | 54160515DBED1ECD7C9F872EBDDB2F0C | 316,621 |
| 002 | ..\CRST_D000001-000163 (20180608)\CRST_D000002.pdf | 6CFA0CD33D308A2009A549AAB35705C6 | 1,840,055 |
| 003 | ..\CRST_D000001-000163 (20180608)\CRST_D000010.pdf | 5F7E96684C1C787218414A89700A1865 | 871,770 |
| 004 | ..\CRST_D000001-000163 (20180608)\CRST_D000031.xlsx | C5627677FCB2247F524C9DA46C20C651 | 28,626 |
| 005 | ..\CRST_D000001-000163 (20180608)\CRST_D000032.pdf | 815A0611274D828E9E7362D6492A71B3 | 1,831,144 |
| 006 | ..\CRST_D000001-000163 (20180608)\CRST_D000057.pdf | D12DCDB5C2FCCAE1871895F0DA01723B | 1,656,101 |
| 007 | ..\CRST_D000001-000163 (20180608)\CRST_D000078.pdf | D6EB1B970D2B1278F31D690B90F2F7E0 | 4,158,830 |
| 008 | ..\CRST_D000001-000163 (20180608)\CRST_D000156.pdf | 9372C1EE393CF3B55577DA0069C4FF8A | 344,878 |
| 009 | ..\CRST_D000001-000163 (20180608)\CRST_D000163.xlsx | 8E8D1C1F79759FF1ABC63029195E3ED3 | 47,582 |
| 010 | ..\CRST_D000164-010813 (20190108)\CRST_D000164.pdf | 1F8136E5BD115F5DC128989FAAE04E70 | 29,083,869 |
| 011 | ..\CRST_D000164-010813 (20190108)\CRST_D000415.pdf | 442941FE60BA1A7FA6FD88AE3CB42340 | 67,460,551 |
| 012 | ..\CRST_D000164-010813 (20190108)\CRST_D000574.pdf | F18805C31CC4E679FFDD9A266F2D4EE7 | 6,938,629 |
| 013 | ..\CRST_D000164-010813 (20190108)\CRST_D000626.pdf | 9FF2E2254AD8511E6BC694DC1B1E5212 | 864,112 |
| 014 | ..\CRST_D000164-010813 (20190108)\CRST_D000627.xlsx | 4E30DD12C5FF625DDA401FA963EC1BAB | 241,037 |
| 015 | ..\CRST_D000164-010813 (20190108)\CRST_D000628.pdf | B8F2F9607A59CACE24EBE5B1CAB2866D | 6,222,364 |
| 016 | ..\CRST_D000164-010813 (20190108)\CRST_D000651.pdf | A1D3547F90AB0768BE4C02901BB847A8 | 49,922 |
| 017 | ..\CRST_D000164-010813 (20190108)\CRST_D000652.pdf | 491811E2B8AC2FEBA289449E32772A35 | 28,036 |
| 018 | ..\CRST_D000164-010813 (20190108)\CRST_D000653.pdf | 57A0AF110222571ED89E7FF2B769B721 | 103,223 |
| 019 | ..\CRST_D000164-010813 (20190108)\CRST_D000655.pdf | 731D51EF1F9B70DE732CB53BF8E07589 | 46,256 |
| 020 | ..\CRST_D000164-010813 (20190108)\CRST_D000656.pdf | 62024D108572BA1B3F0CCC06B7D55E4B | 51,722 |
| 021 | ..\CRST_D000164-010813 (20190108)\CRST_D000657.pdf | 6C4FA304385CBE3F8631FFEB23E21C48 | 124,824 |
| 022 | ..\CRST_D000164-010813 (20190108)\CRST_D000659.pdf | C280176C13C146939718DB2B81E9ED4D | 93,957 |
| 023 | ..\CRST_D000164-010813 (20190108)\CRST_D000661.pdf | 994AE90FA5AC822A9F8512467023CEAD | 131,491 |
| 024 | ..\CRST_D000164-010813 (20190108)\CRST_D000663.pdf | D99844E13BF617023E6ED2C90D211D38 | 43,501 |
| 025 | ..\CRST_D000164-010813 (20190108)\CRST_D000664.pdf | 015AFC4302EC4EEB2D5095EFB375645F | 170,695 |
| 026 | ..\CRST_D000164-010813 (20190108)\CRST_D000667.pdf | 7670C19DE0E274BF5646C819FCB69898 | 165,122 |
| 027 | ..\CRST_D000164-010813 (20190108)\CRST_D000670.pdf | 19106470332EFF486CB730C35957EE6F | 38,058 |
| 028 | ..\CRST_D000164-010813 (20190108)\CRST_D000671.pdf | 57D8ADA834E77C7C70A27FBE281253E1 | 25,794 |
| 029 | ..\CRST_D000164-010813 (20190108)\CRST_D000672.pdf | F6D545371B2FDDB44239365F5749D95D | 55,968 |
| 030 | ..\CRST_D000164-010813 (20190108)\CRST_D000673.pdf | 554B91856F9DDF11550E44215BBC6CBD | 41,982 |
| 031 | ..\CRST_D000164-010813 (20190108)\CRST_D000674.pdf | E71E11240DB4187E37290723CF95D502 | 46,978 |
| 032 | ..\CRST_D000164-010813 (20190108)\CRST_D000675.pdf | B3EF3AF5817CC8DDD65F143BB21E41D4 | 33,855 |
| 033 | ..\CRST_D000164-010813 (20190108)\CRST_D000676.pdf | D6B6E2243318A842BD186EDC843A0AFA | 36,055 |
| 034 | ..\CRST_D000164-010813 (20190108)\CRST_D000677.pdf | ACADB0D5236C44ADEDDA52406FE81048 | 49,264 |
| 035 | ..\CRST_D000164-010813 (20190108)\CRST_D000678.pdf | EC05A18FCDED5D5A27F9451A837EFC44 | 32,618 |
| 036 | ..\CRST_D000164-010813 (20190108)\CRST_D000679.pdf | 5097CFA6B283AC653AF3B77F340C8BD3 | 35,313 |
| 037 | ..\CRST_D000164-010813 (20190108)\CRST_D000680.pdf | 8ADD2B8B867FD65D39C346596D121384 | 33,833 |
| 038 | ..\CRST_D000164-010813 (20190108)\CRST_D000681.pdf | CDE1E35A7AD3EB8112A5BB8C3A93F406 | 29,752 |
| 039 | ..\CRST_D000164-010813 (20190108)\CRST_D000682.pdf | 16AEF6E40AE44C5FB6C7E0481456813B | 35,254 |
| 040 | ..\CRST_D000164-010813 (20190108)\CRST_D000683.pdf | ED55EDE6E9E0A4C5EFD77AE885459BAC | 47,582 |
| 041 | ..\CRST_D000164-010813 (20190108)\CRST_D000684.pdf | 7B70E9F8CA1D45833602D252029C387A | 56,693 |
| 042 | ..\CRST_D000164-010813 (20190108)\CRST_D000686.pdf | 4D7C7300C302ADB1602BFB0A654D544E | 68,154 |
| 043 | ..\CRST_D000164-010813 (20190108)\CRST_D000687.pdf | A521207403643OB21B88CEBF85D4FDFA | 47,643 |
| 044 | ..\CRST_D000164-010813 (20190108)\CRST_D000689.pdf | BC015FAE4BD285581C5A365788C01086 | 26,174 |
| 045 | ..\CRST_D000164-010813 (20190108)\CRST_D000690.pdf | BF88D0222C8D453BF74BCDD9DDCDE65 | 42,578 |
| 046 | ..\CRST_D000164-010813 (20190108)\CRST_D000691.pdf | 0819668DD597C D8F45C50D5594A80C56 | 74,985 |
| 047 | ..\CRST_D000164-010813 (20190108)\CRST_D000693.pdf | 9721F92E86C2C27966CC62FC91FB7532 | 36,968 |
| 048 | ..\CRST_D000164-010813 (20190108)\CRST_D000694.pdf | D6E6454D2D81995D37C0E31299909EC7 | 109,531 |

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 049 | ..\CRST_D000164-010813 (20190108)\CRST_D000696.pdf | 58288D3D7EB6FD29BE7AA4429E4A6947 | 42,137 |
| 050 | ..\CRST_D000164-010813 (20190108)\CRST_D000697.pdf | 52DBC5F79B29F6E3A32EAAD962B4F55B | 43,654 |
| 051 | ..\CRST_D000164-010813 (20190108)\CRST_D000698.pdf | E9C2FC27BB4F389CF2A20AF58597F4B5 | 15,569 |
| 052 | ..\CRST_D000164-010813 (20190108)\CRST_D000699.pdf | A39F870EDF1C530C814D7F13B0B61EF8 | 38,295 |
| 053 | ..\CRST_D000164-010813 (20190108)\CRST_D000700.pdf | 0D571935D57FE1E7E2A636E460E28218 | 173,499 |
| 054 | ..\CRST_D000164-010813 (20190108)\CRST_D000706.pdf | 20433EBDC26D989CFFEAD38B3419ADDB | 126,170 |
| 055 | ..\CRST_D000164-010813 (20190108)\CRST_D000710.pdf | A6EDAB57B33CD2141C22DB675EF31D29 | 91,557 |
| 056 | ..\CRST_D000164-010813 (20190108)\CRST_D000713.pdf | B0C008D4B98E9B34E10ACF6EA5DA68EF | 47,798 |
| 057 | ..\CRST_D000164-010813 (20190108)\CRST_D000714.pdf | 8BF72632364BFF393A2E3E3ED261E6B0 | 8,915,071 |
| 058 | ..\CRST_D000164-010813 (20190108)\CRST_D005364.pdf | FC2D1C408E6379C13E3ED94A30E92A32 | 1,303,822 |
| 059 | ..\CRST_D000164-010813 (20190108)\CRST_D006122.pdf | 99DB3C2A5F61C0DF76BB2E49F7403F00 | 144,435,328 |
| 060 | ..\CRST_D000164-010813 (20190108)\CRST_D007954.pdf | 6656B567CF7428EFEE010E042938D44E | 22,122,678 |
| 061 | ..\CRST_D000164-010813 (20190108)\CRST_D008259.pdf | 496B2466CB277888C53F0BDB6F8DAE87 | 83,315,985 |
| 062 | ..\CRST_D000164-010813 (20190108)\CRST_D008865.pdf | 6873CDB03FF633AC4B4F8A0717C26695 | 135,010,801 |
| 063 | ..\CRST_D000164-010813 (20190108)\Thumbs.db | A92F53148F9F420C710BB10329CF14CE | 18,432 |
| 064 | ..\CRST_D010814-010937 (20190129)\CRST_D010814.pdf | 8314F1B40901691602DC512545A3038F | 21,076,375 |
| 065 | ..\CRST_D010814-010937 (20190129)\CRST_D010843.pdf | 4C1BEF13CD6F7748E6BD267582B40677 | 16,762,236 |
| 066 | ..\CRST_D010814-010937 (20190129)\CRST_D010869.pdf | 2681861D3D3546170CD7A787BB497D9B | 2,879,536 |
| 067 | ..\CRST_D010814-010937 (20190129)\CRST_D010888.pdf | 94E3D2FB2AF65E5C5EF29DE376BD4C02 | 4,436,291 |
| 068 | ..\CRST_D010814-010937 (20190129)\CRST_D010912.pdf | 597931072A15D0863C2F100BAC1048AC | 4,132,246 |
| 069 | ..\CRST_D010814-010937 (20190129)\CRST_D010934.pdf | E6FE7866F6D9BB095D9F5ECE74DC70FD | 698,552 |
| 070 | ..\CRST_D010938-010938 (20190320)\CRST_D010938_CONFIDENTIAL.xlsx | 4C82C5AE33C61CDE53375614BCD781C8 | 530,218 |
| 071 | ..\CRST_D010939-014160 (20190408)\CRST_D010939_CONFIDENTIAL.xlsx | 9FACF78FAA5C7D336A4516D2795C35A6 | 22,777 |
| 072 | ..\CRST_D010939-014160 (20190408)\CRST_D010940_CONFIDENTIAL.xlsx | 2F539E36298AB7F856C5FAA2C3158E29 | 26,518 |
| 073 | ..\CRST_D010939-014160 (20190408)\CRST_D010941.pdf | B4FFCAC24D89B3FA2C06EDCF25FA9F02 | 537,707 |
| 074 | ..\CRST_D010939-014160 (20190408)\CRST_D010950.pdf | ECF30ED0DDAD774D617D8EE128565318 | 1,688,942 |
| 075 | ..\CRST_D010939-014160 (20190408)\CRST_D010983.pdf | D7E892B19D7BD2D3242DFFC212584B6B | 445,555 |
| 076 | ..\CRST_D010939-014160 (20190408)\CRST_D010993.pdf | 792735383C26EBEEBF483FB786BBA7A2 | 699,530 |
| 077 | ..\CRST_D010939-014160 (20190408)\CRST_D011005.pdf | 25576D049F9551D2CB5E93D537525825 | 217,348 |
| 078 | ..\CRST_D010939-014160 (20190408)\CRST_D011008_CONFIDENTIAL.xlsx | DB4F01E132177F80FE6EB9248EC4C2B0 | 18,317 |
| 079 | ..\CRST_D010939-014160 (20190408)\CRST_D011009.pdf | 5F820E7F8E58E1F9BE3A609176285177 | 1,313,759 |
| 080 | ..\CRST_D010939-014160 (20190408)\CRST_D011035_CONFIDENTIAL.xlsx | ACF4DEB0F9A634BC5AB7B35304395195 | 14,450 |
| 081 | ..\CRST_D010939-014160 (20190408)\CRST_D011036.pdf | F54F3FA69FAD8B0965DA26111A20A8B5 | 1,682,938 |
| 082 | ..\CRST_D010939-014160 (20190408)\CRST_D011058_CONFIDENTIAL.xlsx | 247BB8B5ACDDA1E113D79E4F188B93F2 | 32,669 |
| 083 | ..\CRST_D010939-014160 (20190408)\CRST_D011059.pdf | D964E45FB174E55B77E93700DAF266B5 | 3,197,688 |
| 084 | ..\CRST_D010939-014160 (20190408)\CRST_D011119.pdf | 82B689463FB48C9755500C5739A5F09C | 332,682 |
| 085 | ..\CRST_D010939-014160 (20190408)\CRST_D011126_CONFIDENTIAL.xlsx | DF4881350713A2857CEA8EED5F6F5023 | 42,481 |
| 086 | ..\CRST_D010939-014160 (20190408)\CRST_D011127.pdf | F85F0FD9B733669F96665A017E78BE53 | 656,878 |
| 087 | ..\CRST_D010939-014160 (20190408)\CRST_D011135.pdf | 3633E7B179D90A6E47713205B01C45CE | 354,903 |
| 088 | ..\CRST_D010939-014160 (20190408)\CRST_D011142.pdf | 922259E3353E761E10F67DDB908960C2 | 246,511 |
| 089 | ..\CRST_D010939-014160 (20190408)\CRST_D011148_CONFIDENTIAL.xlsx | 319254FB1458CE21196C093ED0B8D7D6 | 16,172 |
| 090 | ..\CRST_D010939-014160 (20190408)\CRST_D011149.pdf | C40C82861D7D36262EAAA6AC9CFE5A56 | 336,049 |
| 091 | ..\CRST_D010939-014160 (20190408)\CRST_D011155_CONFIDENTIAL.xlsx | 4631D234382424A2ED0BB79CF8EDF2AC | 39,002 |
| 092 | ..\CRST_D010939-014160 (20190408)\CRST_D011156.pdf | 1F250D37104BD448FAC22840BBDF8E3E | 4,002,769 |
| 093 | ..\CRST_D010939-014160 (20190408)\CRST_D011231.pdf | E289C78BBD8060949CE7F999FB111E8E | 593,646 |
| 094 | ..\CRST_D010939-014160 (20190408)\CRST_D011241_CONFIDENTIAL.xlsx | 5E8977F6D03314A7940D1A4522B6335C | 51,096 |
| 095 | ..\CRST_D010939-014160 (20190408)\CRST_D011242_CONFIDENTIAL.xlsx | 6C297B28F3E3ADAAD2A7769478DB26C0 | 17,576 |
| 096 | ..\CRST_D010939-014160 (20190408)\CRST_D011243.pdf | CE4A152D4A1E012AF26E259AEFC59EA9 | 141,340 |

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 097 | ..\CRST_D010939-014160 (20190408)\CRST_D011245.pdf | 90AF3E0ABDB5682580C24E3459B967A4 | 1,020,644 |
| 098 | ..\CRST_D010939-014160 (20190408)\CRST_D011265.pdf | DAEA22BD14A0828B12CA35C0A4806B07 | 530,273 |
| 099 | ..\CRST_D010939-014160 (20190408)\CRST_D011276_CONFIDENTIAL.xlsx | 84A3C4A10AEFB636F22A720D92B3FA2C | 13,035 |
| 100 | ..\CRST_D010939-014160 (20190408)\CRST_D011277.pdf | 2B229E745AD54170FB02160E8EDEF5AD | 258,064 |
| 101 | ..\CRST_D010939-014160 (20190408)\CRST_D011281_CONFIDENTIAL.xlsx | 85B539C3382D0CC798259F3AD9F3B116 | 20,135 |
| 102 | ..\CRST_D010939-014160 (20190408)\CRST_D011282.pdf | 32F20333E5B489FDA90269A56325AB7A | 1,291,175 |
| 103 | ..\CRST_D010939-014160 (20190408)\CRST_D011307.pdf | 21BF01737SE89F50B44729F38F2D2168 | 493,864 |
| 104 | ..\CRST_D010939-014160 (20190408)\CRST_D011316_CONFIDENTIAL.xlsx | 58C706B7F3903B7511ACF7874C137D2C | 26,635 |
| 105 | ..\CRST_D010939-014160 (20190408)\CRST_D011317.pdf | 36FB8786ADEBD3BD3E61BAF45BA20163 | 1,303,086 |
| 106 | ..\CRST_D010939-014160 (20190408)\CRST_D011325_CONFIDENTIAL.xlsx | 43572A9EB4DDF4BB9158057AB8629847 | 35,304 |
| 107 | ..\CRST_D010939-014160 (20190408)\CRST_D011326.pdf | 091D0852C11ABD98CE638E2CB36188C8 | 3,212,045 |
| 108 | ..\CRST_D010939-014160 (20190408)\CRST_D011386.pdf | 416E157950598B9A81D467912B152067 | 203,552 |
| 109 | ..\CRST_D010939-014160 (20190408)\CRST_D011393_CONFIDENTIAL.xlsx | 30D8E6BEE3228F6D76D9DFD5D247088D | 51,697 |
| 110 | ..\CRST_D010939-014160 (20190408)\CRST_D011394_CONFIDENTIAL.xlsx | 33E1EF90435E6C28989C821BCCAA0B03 | 112,158 |
| 111 | ..\CRST_D010939-014160 (20190408)\CRST_D011395.pdf | F4B5A599C73303DB0F6269691A9E73B5 | 2,366,183 |
| 112 | ..\CRST_D010939-014160 (20190408)\CRST_D011423_CONFIDENTIAL.xlsx | 302AD5B22CB680AE6138C389C7CF193B | 61,336 |
| 113 | ..\CRST_D010939-014160 (20190408)\CRST_D011424.pdf | 0156C09E65D4E03CDD6BF2C25329AC2C | 7,947,124 |
| 114 | ..\CRST_D010939-014160 (20190408)\CRST_D011571.pdf | 5853779FC8D21A4DCDA61627EFDBB62E | 733,438 |
| 115 | ..\CRST_D010939-014160 (20190408)\CRST_D011582.pdf | 505D0C5E3988FB16B2A3A0D8B18B5FAB | 2,097,696 |
| 116 | ..\CRST_D010939-014160 (20190408)\CRST_D011606_CONFIDENTIAL.xlsx | F7C6D4AEF4A1F9FC7E596AD811F123AA | 33,681 |
| 117 | ..\CRST_D010939-014160 (20190408)\CRST_D011607.pdf | 4C1659E0B27D2AADF6D0555C52C0D6BB | 3,653,603 |
| 118 | ..\CRST_D010939-014160 (20190408)\CRST_D011675.pdf | 7D352AE57BAAF7EECCF81D6EF268AF81 | 552,983 |
| 119 | ..\CRST_D010939-014160 (20190408)\CRST_D011685_CONFIDENTIAL.xlsx | 372C36A3603460CA044D48AADA14D593 | 55,863 |
| 120 | ..\CRST_D010939-014160 (20190408)\CRST_D011686.pdf | 733BFD4D41362E8EDBB7AF4A33A00F94 | 1,765,255 |
| 121 | ..\CRST_D010939-014160 (20190408)\CRST_D011709_CONFIDENTIAL.xlsx | E0D3A65D4E5459E6A71148D52B7803DA | 39,065 |
| 122 | ..\CRST_D010939-014160 (20190408)\CRST_D011710.pdf | 0B154150B5E79A631CECB527B8D2B399 | 3,632,218 |
| 123 | ..\CRST_D010939-014160 (20190408)\CRST_D011780.pdf | 73160DB2C1BEB9186EEBFBF6615906FD | 532,372 |
| 124 | ..\CRST_D010939-014160 (20190408)\CRST_D011793_CONFIDENTIAL.xlsx | 44F08410F6984384EF063ED2DB0654D3 | 47,286 |
| 125 | ..\CRST_D010939-014160 (20190408)\CRST_D011794.pdf | 71C2E7D3B0D38C7213173552C44328B3 | 2,604,880 |
| 126 | ..\CRST_D010939-014160 (20190408)\CRST_D011835_CONFIDENTIAL.xlsx | 22FA5F4863233CB94EFB6B8F0D6B2FCB | 135,205 |
| 127 | ..\CRST_D010939-014160 (20190408)\CRST_D011836.pdf | 306A7A70CECBE91BC33B480D4185314D | 23,544,163 |
| 128 | ..\CRST_D010939-014160 (20190408)\CRST_D012264.pdf | 20AE578C879AF85EE9AB25E01974E3F3 | 611,176 |
| 129 | ..\CRST_D010939-014160 (20190408)\CRST_D012278_CONFIDENTIAL.xlsx | 355A91FF115BCA29C68F2B995917C6D8 | 280,315 |
| 130 | ..\CRST_D010939-014160 (20190408)\CRST_D012279.pdf | F9FAD80C4092F89BC3A4F7D246D551AF | 11,622,422 |
| 131 | ..\CRST_D010939-014160 (20190408)\CRST_D012494.pdf | 19FA58B071D166DC164E6C222C0108CF | 811,950 |
| 132 | ..\CRST_D010939-014160 (20190408)\CRST_D012508_CONFIDENTIAL.xlsx | 283FC09C0B9B233483B602D31F4E6213 | 79,717 |
| 133 | ..\CRST_D010939-014160 (20190408)\CRST_D012509.pdf | 4154575256A86BCCA9395A99F4D3E56E | 286,954 |
| 134 | ..\CRST_D010939-014160 (20190408)\CRST_D012517_CONFIDENTIAL.xlsx | 44F81486727249AF43C8147BC34A642C | 162,662 |
| 135 | ..\CRST_D010939-014160 (20190408)\CRST_D012518.pdf | 320C9F85619C4E9A00A5B2C304C059F8 | 1,340,730 |
| 136 | ..\CRST_D010939-014160 (20190408)\CRST_D012542.pdf | 2C02C49EC8205CE103B5674351SDC00C | 440,299 |
| 137 | ..\CRST_D010939-014160 (20190408)\CRST_D012555_CONFIDENTIAL.xlsx | E841D80B0ED32BFC8EB41955D04A2C63 | 54,731 |
| 138 | ..\CRST_D010939-014160 (20190408)\CRST_D012556.pdf | 97F6DF3979301046C0D49D48BEA6176D | 7,282,462 |
| 139 | ..\CRST_D010939-014160 (20190408)\CRST_D012689.pdf | A10059691CFD44593383E912E594B26C | 107,273 |
| 140 | ..\CRST_D010939-014160 (20190408)\CRST_D012690.pdf | 970F6EED2EFBA3F7FF6AB0B3E150177A | 1,085,746 |
| 141 | ..\CRST_D010939-014160 (20190408)\CRST_D012705_CONFIDENTIAL.xlsx | 04EACD06D6BEBCAEB2801E221A345FF7 | 62,029 |
| 142 | ..\CRST_D010939-014160 (20190408)\CRST_D012706.pdf | C506A83777B5F4A4C4E0FFA2045BD405 | 7,621,427 |
| 143 | ..\CRST_D010939-014160 (20190408)\CRST_D012847.pdf | 1626ED5C56AC30BF3D2299884BDEB8C4 | 579,537 |
| 144 | ..\CRST_D010939-014160 (20190408)\CRST_D012858_CONFIDENTIAL.xlsx | 3FD6D3BCCB69C4381B09F9AE4DF944A4 | 106,375 |

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 145 | ..\CRST_D010939-014160 (20190408)\CRST_D012859.pdf | 58F57FFAE1609AA4DCCADF50E458C8A1 | 223,982 |
| 146 | ..\CRST_D010939-014160 (20190408)\CRST_D012862_CONFIDENTIAL.xlsx | 52367F398A413702C6643DEEA55AE9D3 | 26,648 |
| 147 | ..\CRST_D010939-014160 (20190408)\CRST_D012863.pdf | D9FBA0BB52C3ED0192A999C93AB6C87F | 1,715,054 |
| 148 | ..\CRST_D010939-014160 (20190408)\CRST_D012895.pdf | 847537BA63E93F490F96FA76C94D4F03 | 530,304 |
| 149 | ..\CRST_D010939-014160 (20190408)\CRST_D012902_CONFIDENTIAL.xlsx | 21407631F62E5670FBCA8CB9BE1DFADB | 37,979 |
| 150 | ..\CRST_D010939-014160 (20190408)\CRST_D012903.pdf | C64CD8999C14056F348941BF60BB5EC9 | 2,717,347 |
| 151 | ..\CRST_D010939-014160 (20190408)\CRST_D012936_CONFIDENTIAL.xlsx | 1A6F13E00F555F5DCE04FF54B6562E5B | 200,657 |
| 152 | ..\CRST_D010939-014160 (20190408)\CRST_D012937.pdf | BD7E19B6E49D17DB60A5D9D338FCF911 | 28,515,256 |
| 153 | ..\CRST_D010939-014160 (20190408)\CRST_D013463.pdf | 6EA0B0ACFCD58DF9DEAD201C8C586C4E | 659,800 |
| 154 | ..\CRST_D010939-014160 (20190408)\CRST_D013480_CONFIDENTIAL.xlsx | 4BE81B2CEDB3AB68A2E411FED79EC13E | 276,934 |
| 155 | ..\CRST_D010939-014160 (20190408)\CRST_D013481_CONFIDENTIAL.xls | 41616F39B49FC246276A87F6BC9FBADC | 19,968 |
| 156 | ..\CRST_D010939-014160 (20190408)\CRST_D013482.pdf | FBBA341EDE373E86730A2705878F653D | 538,494 |
| 157 | ..\CRST_D010939-014160 (20190408)\CRST_D013491.pdf | 721B9294FB181E8B6C43E54FB41B25DB | 199,542 |
| 158 | ..\CRST_D010939-014160 (20190408)\CRST_D013495_CONFIDENTIAL.xlsx | 1ABB40D0609CC806C879325A6C9439F6 | 16,937 |
| 159 | ..\CRST_D010939-014160 (20190408)\CRST_D013496.pdf | 6E7D25D8417E69A320535F95C12A0EBE | 2,336,345 |
| 160 | ..\CRST_D010939-014160 (20190408)\CRST_D013527_CONFIDENTIAL.xlsx | B50EC5A34EEAFB969DBDFE23CBA32F14 | 38,844 |
| 161 | ..\CRST_D010939-014160 (20190408)\CRST_D013528.pdf | DA06EDE22DAAC19A2DCCFE48D3A517FC | 4,019,350 |
| 162 | ..\CRST_D010939-014160 (20190408)\CRST_D013604.pdf | 3FE9F3BFE451B91845FBCC3776B6AD52 | 521,297 |
| 163 | ..\CRST_D010939-014160 (20190408)\CRST_D013615_CONFIDENTIAL.xlsx | B41BB215453173807F968103D2E231DB | 54,359 |
| 164 | ..\CRST_D010939-014160 (20190408)\CRST_D013616.pdf | 9AEBCC6F014A99B815632C7CE485FA34 | 49,602 |
| 165 | ..\CRST_D010939-014160 (20190408)\CRST_D013617.pdf | 22EFD65DC69DB395A7271D5FEBD44584 | 1,235,356 |
| 166 | ..\CRST_D010939-014160 (20190408)\CRST_D013640_CONFIDENTIAL.xlsx | B9771606184048D92915176A3375D06 | 21,467 |
| 167 | ..\CRST_D010939-014160 (20190408)\CRST_D013641.pdf | 0B7291A3DEAE87EB45046423823D10C8 | 5,688,354 |
| 168 | ..\CRST_D010939-014160 (20190408)\CRST_D013760_CONFIDENTIAL.xlsx | E0FF0C8A71E7DB01E807353C7F935316 | 26,171 |
| 169 | ..\CRST_D010939-014160 (20190408)\CRST_D013761.pdf | 6C0FEB73AC7870BCDDFC752BDDB1D2BF | 219,942 |
| 170 | ..\CRST_D010939-014160 (20190408)\CRST_D013764_CONFIDENTIAL.xlsx | 710DDDE3F62F9A6E9B8EB8BDF1987FC1 | 15,225 |
| 171 | ..\CRST_D010939-014160 (20190408)\CRST_D013765.pdf | A9A9655D4AA185F5739D9BDCB7B80D63 | 615,678 |
| 172 | ..\CRST_D010939-014160 (20190408)\CRST_D013777.pdf | 3CC030604413AFAB52366035A274BA5F | 510,150 |
| 173 | ..\CRST_D010939-014160 (20190408)\CRST_D013786_CONFIDENTIAL.xlsx | 0553AB802C0D571663376F4912762B9E | 18,336 |
| 174 | ..\CRST_D010939-014160 (20190408)\CRST_D013787_CONFIDENTIAL.xlsx | 06987F861E0DDDC0943595AE87C15750 | 21,891 |
| 175 | ..\CRST_D010939-014160 (20190408)\CRST_D013788.pdf | 40282ADC4E0C621B037F8DFF2CE587C0 | 1,317,408 |
| 176 | ..\CRST_D010939-014160 (20190408)\CRST_D013813.pdf | 8DF116164BD765D4A714994D2E2A89AA | 414,670 |
| 177 | ..\CRST_D010939-014160 (20190408)\CRST_D013820_CONFIDENTIAL.xlsx | AD72236194D18D7CE3D82DC5FF782A0F | 28,873 |
| 178 | ..\CRST_D010939-014160 (20190408)\CRST_D013821.pdf | F421C452090312E4EE57FC85E8E04E96 | 676,786 |
| 179 | ..\CRST_D010939-014160 (20190408)\CRST_D013830_CONFIDENTIAL.xlsx | 255B78528EE5320531515E4308A79FC6 | 35,830 |
| 180 | ..\CRST_D010939-014160 (20190408)\CRST_D013831.pdf | B1D965A6DB49603048E75392E4151SB1 | 3,401,603 |
| 181 | ..\CRST_D010939-014160 (20190408)\CRST_D013894.pdf | FE9827C3D0843D8A38B58DABDD4B3095 | 250,876 |
| 182 | ..\CRST_D010939-014160 (20190408)\CRST_D013900_CONFIDENTIAL.xlsx | DA4B403979A8C5FB9391953491DAB75C | 57,799 |
| 183 | ..\CRST_D010939-014160 (20190408)\CRST_D013901_CONFIDENTIAL.xlsx | AE66E7DBD3864573718E97CE85464C3C | 14,458 |
| 184 | ..\CRST_D010939-014160 (20190408)\CRST_D013902.pdf | F88485DEE3D7669A474272A055D2D0D9 | 261,210 |
| 185 | ..\CRST_D010939-014160 (20190408)\CRST_D013907.pdf | B91854D49BADD5279E4E41C8067B6F84 | 5,852,688 |
| 186 | ..\CRST_D010939-014160 (20190408)\CRST_D014032_CONFIDENTIAL.xlsx | 8084D4A2F6E4D54EEDE0E2B1AF0F9550 | 17,033 |
| 187 | ..\CRST_D010939-014160 (20190408)\CRST_D014033.pdf | F68504DADC821B58B1679A1A9E4DD855 | 2,151,568 |
| 188 | ..\CRST_D010939-014160 (20190408)\CRST_D014068_CONFIDENTIAL.xlsx | 35295662CAFFAB46D131CD80FAA61832 | 37,672 |
| 189 | ..\CRST_D010939-014160 (20190408)\CRST_D014069.pdf | FFE3873E0F3652F7E655A846B39B1AEB | 4,446,165 |
| 190 | ..\CRST_D010939-014160 (20190408)\CRST_D014152.pdf | D98ED72165C028C94B6027FD53F1D965 | 393,020 |
| 191 | ..\CRST_D010939-014160 (20190408)\CRST_D014160_CONFIDENTIAL.xlsx | 095030E608831CC1384A36ED29F6C15F | 62,043 |
| 192 | ..\CRST_D014161-015635 (20190418)\CRST_D014161.pdf | 3DC38E6C1AD06E116DB8676E5322F4B6 | 219,658 |

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 193 | ..\CRST_D014161-015635 (20190418)\CRST_D014164_CONFIDENTIAL.xlsx | 462E92D1A35252AB78EF2F6C7DF98F96 | 15,435 |
| 194 | ..\CRST_D014161-015635 (20190418)\CRST_D014165.pdf | 0BE663436A7DCF9A7A2A168DA07BE86A | 506,162 |
| 195 | ..\CRST_D014161-015635 (20190418)\CRST_D014175.pdf | 76DA782CE417229815BBC861711AB911 | 511,175 |
| 196 | ..\CRST_D014161-015635 (20190418)\CRST_D014184_CONFIDENTIAL.xlsx | 5031910104267ADCC4D80EB99239D6B5 | 17,163 |
| 197 | ..\CRST_D014161-015635 (20190418)\CRST_D014185_CONFIDENTIAL.xlsx | 40E0574A2CF495EC977EA755BFF6CFB6 | 17,800 |
| 198 | ..\CRST_D014161-015635 (20190418)\CRST_D014186.pdf | 4428C1E4521D1E6084F52BBDDAF7FB7A | 1,152,533 |
| 199 | ..\CRST_D014161-015635 (20190418)\CRST_D014194.pdf | B9A3FFCB6A56552BD7A9562AE49C5694 | 8,829 |
| 200 | ..\CRST_D014161-015635 (20190418)\CRST_D014209_CONFIDENTIAL.xlsx | 3288C6A8F1F02D122F91AA77BF936C70 | 24,464 |
| 201 | ..\CRST_D014161-015635 (20190418)\CRST_D014210.pdf | 56A99671E76B53F4EC2691C75196A9AC | 931,605 |
| 202 | ..\CRST_D014161-015635 (20190418)\CRST_D014222_CONFIDENTIAL.xlsx | 534B9CE3D7AF3FED9E9FAC46D9813DBA | 27,950 |
| 203 | ..\CRST_D014161-015635 (20190418)\CRST_D014223.pdf | D5614077127A801126F63DD5FF429BF2 | 2,505,139 |
| 204 | ..\CRST_D014161-015635 (20190418)\CRST_D014271.pdf | 8E77B2F685B3670E16340C1324769457 | 359,149 |
| 205 | ..\CRST_D014161-015635 (20190418)\CRST_D014279_CONFIDENTIAL.xlsx | C5EC9C4E7A52A21C811092EC0CD34467 | 40,028 |
| 206 | ..\CRST_D014161-015635 (20190418)\CRST_D014280.pdf | 52EA9116055131A8239DBF388F19AFB4 | 20,956 |
| 207 | ..\CRST_D014161-015635 (20190418)\CRST_D014281.pdf | C78D020F7E16CDE5732E06C626E14DB7 | 246,742 |
| 208 | ..\CRST_D014161-015635 (20190418)\CRST_D014286.pdf | 25C6C54843A251182A98E567DCA58E55 | 380,640 |
| 209 | ..\CRST_D014161-015635 (20190418)\CRST_D014294.pdf | 9C5F4FB7BA4BD28DFA0CDD646FEA75FB | 826,320 |
| 210 | ..\CRST_D014161-015635 (20190418)\CRST_D014305_CONFIDENTIAL.xlsx | A80AE72E21331C4CAB2ECF5C8B2B91BF | 15,750 |
| 211 | ..\CRST_D014161-015635 (20190418)\CRST_D014306.pdf | BBEFFE90B7AECDF3F44F7ED02EA43EAD | 458,353 |
| 212 | ..\CRST_D014161-015635 (20190418)\CRST_D014315.pdf | 563687AAD8A37782DFAA7AFBBF856C55 | 565,909 |
| 213 | ..\CRST_D014161-015635 (20190418)\CRST_D014324_CONFIDENTIAL.xlsx | DB8D41B479836A5C32F367152526CA4B | 17,346 |
| 214 | ..\CRST_D014161-015635 (20190418)\CRST_D014325_CONFIDENTIAL.xlsx | FF70AB2560758CB3CBB4349D6C75E445 | 14,613 |
| 215 | ..\CRST_D014161-015635 (20190418)\CRST_D014326.pdf | EA4EF12A0DE7E20AC82828B98A630253 | 359,877 |
| 216 | ..\CRST_D014161-015635 (20190418)\CRST_D014333.pdf | D9EC005F2135A8DB74A0E200B7999ADD | 978,970 |
| 217 | ..\CRST_D014161-015635 (20190418)\CRST_D014355_CONFIDENTIAL.xlsx | 11FC2A28A397E05E83E56F9BCFC79661 | 17,366 |
| 218 | ..\CRST_D014161-015635 (20190418)\CRST_D014356.pdf | 29BAA060134BC106BCE58417D611C425 | 266,998 |
| 219 | ..\CRST_D014161-015635 (20190418)\CRST_D014359.pdf | 8A33172212CFC8EE14CBAA8F9C3FD3F3 | 99,620 |
| 220 | ..\CRST_D014161-015635 (20190418)\CRST_D014361.pdf | 665C794FBC7F831BBE841B53D1C44CFF | 8,283 |
| 221 | ..\CRST_D014161-015635 (20190418)\CRST_D014362.pdf | 17612F20EED8A8A521A758CDEED75DDF | 163,679 |
| 222 | ..\CRST_D014161-015635 (20190418)\CRST_D014365_CONFIDENTIAL.xlsx | C530A2DE89890711659BDB26D7EEFD65 | 15,462 |
| 223 | ..\CRST_D014161-015635 (20190418)\CRST_D014366.pdf | AB4F31CA445DE256546C52C9879BDE68 | 494,327 |
| 224 | ..\CRST_D014161-015635 (20190418)\CRST_D014376.pdf | 54F40B158C23710893DC03A507C960C5 | 1,965,352 |
| 225 | ..\CRST_D014161-015635 (20190418)\CRST_D014405_CONFIDENTIAL.xlsx | FA46D7BD403700EE72EB727B95084D2F | 16,263 |
| 226 | ..\CRST_D014161-015635 (20190418)\CRST_D014406.pdf | 1ED57BCB1D9416AE0996767F878A6F09 | 698,854 |
| 227 | ..\CRST_D014161-015635 (20190418)\CRST_D014414_CONFIDENTIAL.xlsx | 449A852FED3BDD1361587421F48C8FF9 | 26,272 |
| 228 | ..\CRST_D014161-015635 (20190418)\CRST_D014415.pdf | F37B3E5473D73B4085F5B68857E20AC7 | 2,588,264 |
| 229 | ..\CRST_D014161-015635 (20190418)\CRST_D014464.pdf | 9320CAE3914B9CA071BEA74AF6357E0E | 456,588 |
| 230 | ..\CRST_D014161-015635 (20190418)\CRST_D014473.pdf | 08752DF7343EDCFC475C78E9236A9FB3 | 39,846 |
| 231 | ..\CRST_D014161-015635 (20190418)\CRST_D014474.pdf | B193F1A289D98E1F83519161E7773C4C | 2,884,459 |
| 232 | ..\CRST_D014161-015635 (20190418)\CRST_D014517_CONFIDENTIAL.xlsx | B0958ECD55132F0B3E5D4C616D6ADF54 | 57,427 |
| 233 | ..\CRST_D014161-015635 (20190418)\CRST_D014518.pdf | DD1FB009AC50686A4E12C9C0B6464896 | 13,802,271 |
| 234 | ..\CRST_D014161-015635 (20190418)\CRST_D014775.pdf | 135D299C012397970F134F57723C81AE | 718,598 |
| 235 | ..\CRST_D014161-015635 (20190418)\CRST_D014792.pdf | 8F2CD907A75994B13F17C4D38D1B8CDD | 59,709 |
| 236 | ..\CRST_D014161-015635 (20190418)\CRST_D014793.pdf | 984A76C708C6ABDA19B13FFE2A369620 | 2,206,481 |
| 237 | ..\CRST_D014161-015635 (20190418)\CRST_D014822_CONFIDENTIAL.xlsx | C01C24CFC1F6D7C98738D353A4400D9C | 19,538 |
| 238 | ..\CRST_D014161-015635 (20190418)\CRST_D014823.pdf | 2CD400065A98ADFD1768EFBA809027D1 | 1,051,991 |
| 239 | ..\CRST_D014161-015635 (20190418)\CRST_D014843.pdf | 581FE85F78AFE9F1489B9C80D9062A97 | 428,895 |
| 240 | ..\CRST_D014161-015635 (20190418)\CRST_D014852_CONFIDENTIAL.xlsx | 002C4B6209FAEA2D26062993A910FEC4 | 21,670 |

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 241 | ..\CRST_D014161-015635 (20190418)\CRST_D014853_CONFIDENTIAL.xlsx | E195F8E5DF9FCFB2958B4DA9ED48E405 | 20,481 |
| 242 | ..\CRST_D014161-015635 (20190418)\CRST_D014854.pdf | 14AB8341ABF8DD2ADBD5AEBC0A515438 | 1,020,385 |
| 243 | ..\CRST_D014161-015635 (20190418)\CRST_D014877.pdf | 050621D47FED3660CDE870AE17E4530E | 310,441 |
| 244 | ..\CRST_D014161-015635 (20190418)\CRST_D014881_CONFIDENTIAL.xlsx | 045063B6C1A7370AA8E0946D64F97B23 | 27,903 |
| 245 | ..\CRST_D014161-015635 (20190418)\CRST_D014882_CONFIDENTIAL.xlsx | 92BB01D05647F5D4FB73A7BFBE3B6E78 | 15,147 |
| 246 | ..\CRST_D014161-015635 (20190418)\CRST_D014883.pdf | B157AB11CB24AD9812EBC52759CB128C | 429,809 |
| 247 | ..\CRST_D014161-015635 (20190418)\CRST_D014891.pdf | C24C20829D5CFEDBF8E775AED2525F79 | 423,247 |
| 248 | ..\CRST_D014161-015635 (20190418)\CRST_D014897_CONFIDENTIAL.xlsx | 21D9022328C686610CC9A9569BE072CE | 21,601 |
| 249 | ..\CRST_D014161-015635 (20190418)\CRST_D014898.pdf | 58BEF2070B637DF379F48CBAD59ADD9B | 223,112 |
| 250 | ..\CRST_D014161-015635 (20190418)\CRST_D014901_CONFIDENTIAL.xlsx | 3AC972652F3BF67C61FBEE4D616B5D6A | 25,732 |
| 251 | ..\CRST_D014161-015635 (20190418)\CRST_D014902.pdf | 8B1919C017B0FA43D04E84F629EF90E4 | 2,246,235 |
| 252 | ..\CRST_D014161-015635 (20190418)\CRST_D014944.pdf | 854723E3FEC4BF1B79BF62D560CB96A6 | 590,022 |
| 253 | ..\CRST_D014161-015635 (20190418)\CRST_D014952_CONFIDENTIAL.xlsx | 422D32CB2873442DED085F1AD049ACCB | 41,524 |
| 254 | ..\CRST_D014161-015635 (20190418)\CRST_D014953.pdf | CA1762808B4042E7FF38DC527FCDAA7F | 292,614 |
| 255 | ..\CRST_D014161-015635 (20190418)\CRST_D014959_CONFIDENTIAL.xlsx | B48A9F007A774BFCDB7F9E40F0EEFDC3 | 48,081 |
| 256 | ..\CRST_D014161-015635 (20190418)\CRST_D014960.pdf | 360411C0661FA4A92E48D5374902F740 | 5,350,233 |
| 257 | ..\CRST_D014161-015635 (20190418)\CRST_D015058.pdf | 8E3CED0ACFC2BEE5FA763ECA58BF870A | 469,645 |
| 258 | ..\CRST_D014161-015635 (20190418)\CRST_D015068_CONFIDENTIAL.xlsx | E6A7CCCFD385FD3732C19FD5E68FD495 | 77,322 |
| 259 | ..\CRST_D014161-015635 (20190418)\CRST_D015069.pdf | E9ED3D26EA42F018DB55F408B449803A | 319,765 |
| 260 | ..\CRST_D014161-015635 (20190418)\CRST_D015074_CONFIDENTIAL.xlsx | 7434A3D5847A652D57C7762CA0FC3E57 | 16,621 |
| 261 | ..\CRST_D014161-015635 (20190418)\CRST_D015075.pdf | B9A2FE7A4935EF984B212E7552D3F2E2 | 980,523 |
| 262 | ..\CRST_D014161-015635 (20190418)\CRST_D015094.pdf | 0BA0AE88AC19703B8533F2BAC5F0D540 | 584,994 |
| 263 | ..\CRST_D014161-015635 (20190418)\CRST_D015102_CONFIDENTIAL.xlsx | 4F62F59EAEA15D8CE88663D3D8E21C88 | 20,518 |
| 264 | ..\CRST_D014161-015635 (20190418)\CRST_D015103.pdf | F828431B6B2859269F4535AA478FBBD9 | 1,776,787 |
| 265 | ..\CRST_D014161-015635 (20190418)\CRST_D015128_CONFIDENTIAL.xlsx | CFD7D39A3CEEAE44976B18642D19AE0D | 23,343 |
| 266 | ..\CRST_D014161-015635 (20190418)\CRST_D015129.pdf | 0B6E2BF8A551B7D4715EFA1DBF62BD01 | 1,517,448 |
| 267 | ..\CRST_D014161-015635 (20190418)\CRST_D015158.pdf | 0E4CE9BFD83D44CF1D55FE53D9682D06 | 577,117 |
| 268 | ..\CRST_D014161-015635 (20190418)\CRST_D015168_CONFIDENTIAL.xlsx | 68260A2639C15631EA02FD071601A665 | 32,023 |
| 269 | ..\CRST_D014161-015635 (20190418)\CRST_D015169.pdf | 13585BA78B4D848DD6288B69714DAC41 | 325,533 |
| 270 | ..\CRST_D014161-015635 (20190418)\CRST_D015175_CONFIDENTIAL.xlsx | 1216B1956AA5E28F5BE9515748A2B15E | 44,992 |
| 271 | ..\CRST_D014161-015635 (20190418)\CRST_D015176.pdf | 973463F7E6C84551E676C469DD04B142A | 7,495,270 |
| 272 | ..\CRST_D014161-015635 (20190418)\CRST_D015319.pdf | 3F30E20B712BE3F865EAE9D7E0DA559D | 467,677 |
| 273 | ..\CRST_D014161-015635 (20190418)\CRST_D015330_CONFIDENTIAL.xlsx | BA94486258DFEAD1B9D672FB26E2711D | 78,941 |
| 274 | ..\CRST_D014161-015635 (20190418)\CRST_D015331.pdf | 87B1086C0592179A258274C651A2C152 | 770,165 |
| 275 | ..\CRST_D014161-015635 (20190418)\CRST_D015341_CONFIDENTIAL.xlsx | 287BEC34D91FD9228C5FAFB588AB3317 | 21,715 |
| 276 | ..\CRST_D014161-015635 (20190418)\CRST_D015342.pdf | B144D3B2BC044F6C2ABAF368E3DF0E60 | 1,199,777 |
| 277 | ..\CRST_D014161-015635 (20190418)\CRST_D015365.pdf | FA43BCCE8C3531AD32F6E07867FBB87E | 311,484 |
| 278 | ..\CRST_D014161-015635 (20190418)\CRST_D015373_CONFIDENTIAL.xlsx | BA6D098BA90DE076FC365075845925C4 | 26,491 |
| 279 | ..\CRST_D014161-015635 (20190418)\CRST_D015374.pdf | 83BFF9B5474A3CE0060ADAB9D95CE258 | 1,469,498 |
| 280 | ..\CRST_D014161-015635 (20190418)\CRST_D015394_CONFIDENTIAL.xlsx | 7994C3894621DBB2EF58AEFD97C7D743 | 55,998 |
| 281 | ..\CRST_D014161-015635 (20190418)\CRST_D015395.pdf | 7561DD5B1667DBD45E7DFA000D00990C | 5,508,433 |
| 282 | ..\CRST_D014161-015635 (20190418)\CRST_D015498.pdf | 1BC5B4D348497F428C976365C92DEB86 | 525,906 |
| 283 | ..\CRST_D014161-015635 (20190418)\CRST_D015509_CONFIDENTIAL.xlsx | 388DBE6A5F3174D4DF88BF033B27B9B6 | 74,228 |
| 284 | ..\CRST_D014161-015635 (20190418)\CRST_D015510.pdf | A5CF414C418938B154407AF7E38B77B4 | 3,050,941 |
| 285 | ..\CRST_D014161-015635 (20190418)\CRST_D015542_CONFIDENTIAL.xlsx | 0F1CDE00CE159FA36600FB956017942F | 38,918 |
| 286 | ..\CRST_D014161-015635 (20190418)\CRST_D015543.pdf | 0014553594BFFF62DEC4FCEE289AA320 | 4,331,759 |
| 287 | ..\CRST_D014161-015635 (20190418)\CRST_D015623.pdf | 2910BEB7B1CF5426F38EED7DB809C726 | 585,334 |
| 288 | ..\CRST_D014161-015635 (20190418)\CRST_D015635_CONFIDENTIAL.xlsx | A4D3650A4C630774735D92F1EA853E4A | 73,034 |

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 289 | ..\CRST_D015636-016052 (20190418)\CRST_D015636.pdf | 3C01C268BE62DB1DB783EC945C76A909 | 1,848,692 |
| 290 | ..\CRST_D015636-016052 (20190418)\CRST_D015660.pdf | 68329AD4A815C5783F97B14F4A45F1CA | 1,685,268 |
| 291 | ..\CRST_D015636-016052 (20190418)\CRST_D015688.pdf | 727B9135B201A3E2F0551BE8D6735E4B | 1,151,997 |
| 292 | ..\CRST_D015636-016052 (20190418)\CRST_D015706_CONFIDENTIAL.xlsx | BB3D51AF95DF7413117FBE2E2FFB3C50 | 37,104 |
| 293 | ..\CRST_D015636-016052 (20190418)\CRST_D015707.pdf | 45F3C976FE8C43931CB882996290E224 | 3,783,459 |
| 294 | ..\CRST_D015636-016052 (20190418)\CRST_D015776_CONFIDENTIAL.xlsx | 122B4C9CE42F24317022D5573016F148 | 67,016 |
| 295 | ..\CRST_D015636-016052 (20190418)\CRST_D015777.pdf | E09E93D53D4F1E1093ED776D5D3E44DD | 146,680 |
| 296 | ..\CRST_D015636-016052 (20190418)\CRST_D015782.pdf | 8DBD567BEA86954209D6E80B51A2EE5D | 404,006 |
| 297 | ..\CRST_D015636-016052 (20190418)\CRST_D015795.pdf | 9A84F9DF3D9D25990559713A3878A6BF | 891,591 |
| 298 | ..\CRST_D015636-016052 (20190418)\CRST_D015809_CONFIDENTIAL.xlsx | DA29E423D507CBF52314CD97006DAC77 | 48,012 |
| 299 | ..\CRST_D015636-016052 (20190418)\CRST_D015810.pdf | 7C46731AFD1910E51A43F52150CE9B24 | 6,797,828 |
| 300 | ..\CRST_D015636-016052 (20190418)\CRST_D015935_CONFIDENTIAL.xlsx | 42873269FF42CF1605B297572B7BD97B | 90,533 |
| 301 | ..\CRST_D015636-016052 (20190418)\CRST_D015936.pdf | 8A258C9310911169E35FC485C647F8CB | 1,190,003 |
| 302 | ..\CRST_D015636-016052 (20190418)\CRST_D015956_CONFIDENTIAL.xlsx | 55EF2E051EEB6B6646C0E829C0A1BE59 | 50,054 |
| 303 | ..\CRST_D015636-016052 (20190418)\CRST_D015957.pdf | 1CB1179DBAC6038AB5DE7A2F938F2909 | 693,633 |
| 304 | ..\CRST_D015636-016052 (20190418)\CRST_D015970.pdf | 329A9C58EA21F7073BBA4DE0488F2A3D | 559,010 |
| 305 | ..\CRST_D015636-016052 (20190418)\CRST_D015985_CONFIDENTIAL.xlsx | 368F3842CE40EE4A7E2361394B451A56 | 64,489 |
| 306 | ..\CRST_D015636-016052 (20190418)\CRST_D015986_CONFIDENTIAL.xlsx | A8736E963E96FC42EF17C7A7D11A1BE4 | 15,153 |
| 307 | ..\CRST_D015636-016052 (20190418)\CRST_D015987.pdf | 840A34AE5907520561CCD546EC13624F | 461,943 |
| 308 | ..\CRST_D015636-016052 (20190418)\CRST_D015996.pdf | 395BFDD3503AD2501C54B016AFCF62AE | 525,545 |
| 309 | ..\CRST_D015636-016052 (20190418)\CRST_D016006_CONFIDENTIAL.xlsx | E33EDF0D8260DC5D05426E8E8F60AAE4 | 18,032 |
| 310 | ..\CRST_D015636-016052 (20190418)\CRST_D016007_CONFIDENTIAL.xlsx | 9A15D78A6706B62AF2815D40761417D7 | 70,290 |
| 311 | ..\CRST_D015636-016052 (20190418)\CRST_D016008_CONFIDENTIAL.xlsx | 04E8CF3FFE8D6EDA78F91F63BF261BE9 | 48,677 |
| 312 | ..\CRST_D015636-016052 (20190418)\CRST_D016009_CONFIDENTIAL.xlsx | ACE8D8DB4ED5B88062215F64559674C0 | 269,745 |
| 313 | ..\CRST_D015636-016052 (20190418)\CRST_D016010_CONFIDENTIAL.xlsx | DFBCD471E737E14A6DEC554FFBE9735B | 46,857 |
| 314 | ..\CRST_D015636-016052 (20190418)\CRST_D016011_CONFIDENTIAL.xlsx | 5247DB5975BC38D7D074B6D6457D6952 | 334,701 |
| 315 | ..\CRST_D015636-016052 (20190418)\CRST_D016012_CONFIDENTIAL.xlsx | 26C1123CDD0A2761F0D65E7BFC05668A | 56,292 |
| 316 | ..\CRST_D015636-016052 (20190418)\CRST_D016013_CONFIDENTIAL.xlsx | 709230F082CCDA913D191D1D3B0B9D87 | 93,134 |
| 317 | ..\CRST_D015636-016052 (20190418)\CRST_D016014_CONFIDENTIAL.xlsx | 602BD6BF641CA45D7E7FCCCE56309768 | 354,990 |
| 318 | ..\CRST_D015636-016052 (20190418)\CRST_D016015_CONFIDENTIAL.xlsx | 3F3D873375E3606B31E705F278365200 | 579,418 |
| 319 | ..\CRST_D015636-016052 (20190418)\CRST_D016016_CONFIDENTIAL.xlsx | 1E31064FFE445BAFFF4DAE7603069DD9 | 294,253 |
| 320 | ..\CRST_D015636-016052 (20190418)\CRST_D016017_CONFIDENTIAL.xlsx | 24319462307103DDAA17B451A3C87E8B | 191,959 |
| 321 | ..\CRST_D015636-016052 (20190418)\CRST_D016018_CONFIDENTIAL.xlsx | 77326FB8BC0BEEF79ED34A7A8D1C9361 | 1,475,986 |
| 322 | ..\CRST_D015636-016052 (20190418)\CRST_D016019_CONFIDENTIAL.xlsx | 82D7454FC32B358A7C2DD8D11FF6C204 | 928,576 |
| 323 | ..\CRST_D015636-016052 (20190418)\CRST_D016020_CONFIDENTIAL.xlsx | B3D37C2086AE1250B3205ED8600BBFEF | 672,368 |
| 324 | ..\CRST_D015636-016052 (20190418)\CRST_D016021_CONFIDENTIAL.xlsx | 6B79D7B3B1B0F0D120090534F00E8751 | 730,965 |
| 325 | ..\CRST_D015636-016052 (20190418)\CRST_D016022_CONFIDENTIAL.xlsx | 2708E0072B0583C88A191F5A16F0A801 | 140,595 |
| 326 | ..\CRST_D015636-016052 (20190418)\CRST_D016023_CONFIDENTIAL.xlsx | 63481E700961282AE5EECFFC5708C461 | 1,599,457 |
| 327 | ..\CRST_D015636-016052 (20190418)\CRST_D016024_CONFIDENTIAL.xlsx | 45E4B02EBADFBCF56DE64E43C0A7E6F7 | 19,095 |
| 328 | ..\CRST_D015636-016052 (20190418)\CRST_D016025_CONFIDENTIAL.xlsx | 1D5DA107362333C46F262A9ED06E3516 | 423,240 |
| 329 | ..\CRST_D015636-016052 (20190418)\CRST_D016026_CONFIDENTIAL.xlsx | 935C2FFF4A5A55B82E7B9A881B93907C | 268,538 |
| 330 | ..\CRST_D015636-016052 (20190418)\CRST_D016027_CONFIDENTIAL.xlsx | 6558F80C06019F9A689B729642BE9C15 | 36,272 |
| 331 | ..\CRST_D015636-016052 (20190418)\CRST_D016028_CONFIDENTIAL.xlsx | 60FADD22649FEFDB08D20EE653890412 | 448,509 |
| 332 | ..\CRST_D015636-016052 (20190418)\CRST_D016029_CONFIDENTIAL.xlsx | 7AFBAA9D076ACD9EDE8E8CACDA77FEED | 26,495 |
| 333 | ..\CRST_D015636-016052 (20190418)\CRST_D016030_CONFIDENTIAL.xlsx | 2F1FC080150EBF41076559FFD1BC548D | 313,323 |
| 334 | ..\CRST_D015636-016052 (20190418)\CRST_D016031_CONFIDENTIAL.xlsx | 26E9FA38C49C792F31D0402EEF34B9DD | 22,807 |
| 335 | ..\CRST_D015636-016052 (20190418)\CRST_D016032_CONFIDENTIAL.xlsx | D6A0DDD901F5E7328F68131F6E7C6E9C | 74,861 |
| 336 | ..\CRST_D015636-016052 (20190418)\CRST_D016033_CONFIDENTIAL.xlsx | 36AD62E08A026B56B87A91CD422849E4 | 172,503 |

| Line No. | Filename | MD5 Hash | Size (bytes) |
|---|---|---|---|
| 337 | ..\CRST_D015636-016052 (20190418)\CRST_D016034_CONFIDENTIAL.xlsx | F393F3754BC1BA8C496789C476E210F3 | 34,676 |
| 338 | ..\CRST_D015636-016052 (20190418)\CRST_D016035_CONFIDENTIAL.xlsx | C786162811A73DCAB5D3D011FA394146 | 49,083 |
| 339 | ..\CRST_D015636-016052 (20190418)\CRST_D016036_CONFIDENTIAL.xlsx | F4A0140AF26A11CACAC1C6C0DF692BF0 | 390,784 |
| 340 | ..\CRST_D015636-016052 (20190418)\CRST_D016037_CONFIDENTIAL.xlsx | 76B12DE1C3D626A1EF0E3A13D0053A26 | 22,562 |
| 341 | ..\CRST_D015636-016052 (20190418)\CRST_D016038_CONFIDENTIAL.xlsx | EE9F48F4E4540907999BF4AE996AA29B | 411,437 |
| 342 | ..\CRST_D015636-016052 (20190418)\CRST_D016039_CONFIDENTIAL.xlsx | E35E069266E9AB2917118B1AC9063C96 | 887,355 |
| 343 | ..\CRST_D015636-016052 (20190418)\CRST_D016040_CONFIDENTIAL.xlsx | 038EEEBDCE120447C95091A4F45D714F | 155,646 |
| 344 | ..\CRST_D015636-016052 (20190418)\CRST_D016041_CONFIDENTIAL.xlsx | 584BB299B17CACE9A6927048D44375A9 | 85,828 |
| 345 | ..\CRST_D015636-016052 (20190418)\CRST_D016042_CONFIDENTIAL.xlsx | B76B054210A546B583D1502C08992591 | 32,675 |
| 346 | ..\CRST_D015636-016052 (20190418)\CRST_D016043_CONFIDENTIAL.xlsx | 0221496AE0C84295459FD14002F292F6 | 153,989 |
| 347 | ..\CRST_D015636-016052 (20190418)\CRST_D016044_CONFIDENTIAL.xlsx | 45E94BD84A478997298AD2ADBF5B064F | 447,577 |
| 348 | ..\CRST_D015636-016052 (20190418)\CRST_D016045_CONFIDENTIAL.xlsx | BFDC96617657B49E0877943F01099EE9 | 285,856 |
| 349 | ..\CRST_D015636-016052 (20190418)\CRST_D016046_CONFIDENTIAL.xlsx | 99867FC15BC0751E8F1DD616354B02F9 | 46,092 |
| 350 | ..\CRST_D015636-016052 (20190418)\CRST_D016047_CONFIDENTIAL.xlsx | BCB9227925916D00616FF3E7C8A7805E | 99,858 |
| 351 | ..\CRST_D015636-016052 (20190418)\CRST_D016048_CONFIDENTIAL.xlsx | 26D2410C05C41BA7001983F56773B547 | 36,497 |
| 352 | ..\CRST_D015636-016052 (20190418)\CRST_D016049_CONFIDENTIAL.xlsx | D6144BC9F209CF841FD75414C3EDD116 | 253,175 |
| 353 | ..\CRST_D015636-016052 (20190418)\CRST_D016050_CONFIDENTIAL.xlsx | DEE02139210D7EB9BD9B9FDFA3CF35B3 | 180,320 |
| 354 | ..\CRST_D015636-016052 (20190418)\CRST_D016051_CONFIDENTIAL.xlsx | 7B4F74D223C9E63B4701B25CABF5923E | 467,105 |
| 355 | ..\CRST_D015636-016052 (20190418)\CRST_D016052_CONFIDENTIAL.xlsx | 7B8CFD6F3CC54EC29A197AB1AB6E1F18 | 368,570 |
| 356 | ..\CRST_D016053-016053 (20190502)\CRST_D016053.xlsx | A68EEE9C2464BC81FFEF627BCC647D1E | 659,474 |
| 357 | ..\DKR000001-000556 (20180809)\Plaintiff's Initial Disclosures Pursuant to FRCP 6.5.18.pdf | 4AA9C4CC539436C4AB4F2C234842C0EA | 68,403,800 |
| 358 | ..\DKR000557-000848 (20180608)\STAMPED\DKR000557_Dueker, Christopher-Comdate Cardholder Activity Summary.pdf | AD2AE849DBE0F71E4874AAC48EE69A12 | 2,026,166 |
| 359 | ..\DKR000557-000848 (20180608)\STAMPED\DKR000569_Dueker, Christopher-CRST balance.pdf | 9598EC8A3218B0880DFC159AA42B2D76 | 1,320,915 |
| 360 | ..\DKR000557-000848 (20180608)\STAMPED\DKR000574_Dueker, Christopher-CRST Driver Employment Contract.pdf | 1B4A4E53012FEB083428E3EA536E5B33 | 1,187,989 |
| 361 | ..\DKR000557-000848 (20180608)\STAMPED\DKR000577_Dueker, Christopher-Driver Logs 4.5.17-10.4.17.pdf | 0323A4FA2BA66AB3E2609D2570C87113 | 27,252,955 |
| 362 | ..\DKR000557-000848 (20180608)\STAMPED\DKR000786_Dueker, Christopher-Labor Commissioner Initial Report.pdf | 13E3335E1FA28D019AD42042996D42A | 1,472,221 |
| 363 | ..\DKR000557-000848 (20180608)\STAMPED\DKR000790_Dueker, Christopher-Payroll Statement 3.28.17-12.27.17.pdf | 0D3C9EFD29596D2C4EB5906EA5B437B4 | 10,758,565 |
| 364 | ..\DKR000557-000848 (20180608)\STAMPED\DKR000845_Dueker, Christopher-Student Coordinator Matching Screen.pdf | 04760797F829CD910CDA6E25AAFB4A3B | 856,174 |
| 365 | ..\DKR000849-000849 SUPPLEMENTAL NATIVE EXCEL\STAMPED\DKR000849_Spreadsheets - PODs, Set One.xlsx | 8A1E694C51258EB0E4DCC3F5F980D88F | 27,036 |
| 366 | ..\DKR000850-000916\DKR000850.pdf | 45B41E87126464A9ACF7295DF23A25A9 | 6,695,742 |

# EXHIBIT C

## Time Spent in California in Sleeper Status

Source Code Extracts from Exhibit J1 and J2

Woolfson September Report

| Line No. | Source Code |
|---|---|
| 001 | update sleeper set [**start1**] = (select **startTime** from drivers where |
| 002 | drivers.driverId = sleeper.Driverid and drivers.counter = [c1]); |
| 003 | update sleeper set [**start2**] = (select **startTime** from drivers where |
| 004 | drivers.driverId = sleeper.Driverid and drivers.counter = [c2]); |
| 005 | update sleeper set [**start3**] = (select **startTime** from drivers where |
| 006 | drivers.driverId = sleeper.Driverid and drivers.counter = [c3]); |
| 007 | update sleeper set [**start4**] = (select **startTime** from drivers where |
| 008 | drivers.driverId = sleeper.Driverid and drivers.counter = [c4]); |

*Figure C.1: Store Start Time into Sleeper Table Exhibit J2 of September Report Page 12 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | update sleeper set [**finish1**] = (select **startTime** from drivers where |
| 002 | drivers.driverId = sleeper.Driverid and drivers.counter = [c1]+1) |
| 003 | update sleeper set [**finish2**] = (select **startTime** from drivers where |
| 004 | drivers.driverId = sleeper.Driverid and drivers.counter = [c2]+1) |
| 005 | update sleeper set [**finish3**] = (select **startTime** from drivers where |
| 006 | drivers.driverId = sleeper.Driverid and drivers.counter = [c3]+1) |
| 007 | update sleeper set [**finish4**] = (select **startTime** from drivers where |
| 008 | drivers.driverId = sleeper.Driverid and drivers.counter = [c4]+1) |

*Figure C.2: Store Finish Time into Sleeper Table Exhibit J2 of September Report Page 14 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | update sleeper set [**minutes1**] = datediff(minute,[**start1**] , [**finish1**] ) where |
| 002 | [miles1] > 2; |
| 003 | update sleeper set [**minutes2**] = datediff(minute,[**start2**] , [**finish2**] ) where |
| 004 | [miles2] > 2; |
| 005 | update sleeper set [**minutes3**] = datediff(minute,[**start3**] , [**finish3**] ) where |
| 006 | [miles3] > 2; |
| 007 | update sleeper set [**minutes4**] = datediff(minute,[**start4**] , [**finish4**] ) where |
| 008 | [miles4] > 2; |

*Figure C.3: Calculate Total Minutes based on Start and Finish of Driver Log Segment and store in Sleeper Table Exhibit J2 of September Report Page 22*

| Line No. | Source Code |
|---|---|
| 001 | update sleeper set [**oStart1**] = (select **odometer** from drivers where |
| 002 | drivers.driverId = sleeper.Driverid and drivers.counter = [c1]); |
| 003 | update sleeper set [**oStart2**] = (select **odometer** from drivers where |
| 004 | drivers.driverId = sleeper.Driverid and drivers.counter = [c2]); |
| 005 | update sleeper set [**oStart3**] = (select **odometer** from drivers where |
| 006 | drivers.driverId = sleeper.Driverid and drivers.counter = [c3]); |
| 007 | update sleeper set [**oStart4**] = (select **odometer** from drivers where |
| 008 | drivers.driverId = sleeper.Driverid and drivers.counter = [c4]); |

*Figure C.4: Store Odometer Start Miles into Sleeper Table Exhibit J2 of September Report Page 17 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | update sleeper set [**oFinish1**] = (select **odometer** from drivers where |
| 002 | drivers.driverId = sleeper.Driverid and drivers.counter = [c1]+1) |
| 003 | update sleeper set [**oFinish2**] = (select **odometer** from drivers where |
| 004 | drivers.driverId = sleeper.Driverid and drivers.counter = [c2]+1) |
| 005 | update sleeper set [**oFinish3**] = (select **odometer** from drivers where |
| 006 | drivers.driverId = sleeper.Driverid and drivers.counter = [c3]+1) |
| 007 | update sleeper set [**oFinish4**] = (select **odometer** from drivers where |
| 008 | drivers.driverId = sleeper.Driverid and drivers.counter = [c4]+1) |

*Figure C.5: Store Odometer Finish Miles into Sleeper Table Exhibit J2 of September Report Page 18 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | update sleeper set [**miles1**] = [**oFinish1**] - [**oStart1**] ; |
| 002 | update sleeper set [**miles2**] = [**oFinish2**] - [**oStart2**] ; |
| 003 | update sleeper set [**miles3**] = [**oFinish3**] - [**oStart3**] ; |
| 004 | update sleeper set [**miles4**] = [**oFinish4**] - [**oStart4**] ; |

*Figure C.6: Calculate Total Miles based on Odometer and store in Sleeper Table Exhibit J2 of September Report Page 20 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | -- RUN THE SQL / VB PROCESS HERE. |
| 002 | -- RUN THE SQL / VB PROCESS HERE. |
| 003 | -- RUN THE SQL / VB PROCESS HERE. |

*Figure C.7: Run the VB Code to Calculate the California Miles Exhibit J2 of September Report Page 32*

| Line No. | Source Code |
|---|---|
| 001 | `Filename For Output As #1` |
| 002 | `SQL "SELECT crossRef, "` |
| 003 | `SQL " [stateStart1] , [stateFinish1] , [minutes1] , [miles1] ,"` |
| 004 | `SQL " [stateStart2] , [stateFinish2] , [minutes2] , [miles2] ,"` |
| 005 | `SQL " [stateStart3] , [stateFinish3] , [minutes3] , [miles3] ,"` |
| 006 | `SQL " [stateStart4] , [stateFinish4] , [minutes4] , [miles4] ,"` |
| 007 | `.` |
| 008 | `.` |
| 009 | `.` |
| 010 | `SQL " [stateStart39], [stateFinish39], [minutes39] , [miles39] ,"` |
| 011 | `SQL " [stateStart40], [stateFinish40], [minutes40] , [miles40] "` |
| 012 | `SQL " from sleeper"` |
| 013 | `SQL "where [1] is not null"` |
| 014 | `GoSQL` |
| 015 | |
| 016 | `Counter = 0` |
| 017 | `Do While SqlResults And Not DoEvents()` |
| 018 | `        DoEvents` |
| 019 | `        Counter = Counter + 1` |
| 020 | `        If (Counter Mod 50) = 0 Then L_Info(0).Caption = CStr(Counter)` |
| 021 | `        Text = ""` |
| 022 | `        For temp = 1 To 161` |
| 023 | `                Text = Text & G((temp)) & Chr(9)` |
| 024 | `        Next` |
| 025 | `        Text = Left(Text, Len(Text) - 1)` |
| 026 | `        Print #1, Text` |
| 027 | `        Call MoveNext:` |
| 028 | `Loop` |

*Figure C.8: VB Code to pull data previously stored data from Sleeper Table and save to Local File (#1) Exhibit J1 of September Report Page 21 & 22 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | `Counter = Counter + 1` |
| 002 | `L_Info(1).Caption = CStr(Counter)` |
| 003 | `Line Input #1, AB$` |
| 004 | `Aaron = Split(AB$, Chr(9))` |
| 005 | `.` |
| 006 | `.` |
| 007 | `.` |
| 008 | `crossref = Aaron(0)` |
| 009 | `temp1 = 0` |
| 010 | `For temp = 1 To UBound(Aaron) Step 4` |
| 011 | `        temp1 = temp1 + 1` |
| 012 | `        stateStart(temp1) = LCase(Aaron(temp))` |
| 013 | `        stateFinish(temp1) = LCase(Aaron(temp + 1))` |
| 014 | `        minutes(temp1) = LCase(Aaron(temp + 2))` |
| 015 | `        miles(temp1) = Aaron(temp + 3)` |
| 016 | `        If Val(miles(temp1)) <= 2 Then miles(temp1) = ""` |
| 017 | `        If Val(miles(temp1)) > 900 Then miles(temp1) = ""` |
| 018 | `Next` |

*Figure C.9: VB Code to read data from Local File (#1) into temporary variables Exhibit J1 of September Report Page 23 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | If Right(locationA, 2) = "ca" And Right(locationZ, 2) = |
| 002 | "ca" Then |
| 003 |         californiaMiles(temp) = miles(temp) |
| 004 |         californiaMinutes(temp) = minutes(temp) |
| 005 | End If |

*Figure C.10: VB Code to use Total Segment Time and Odometer Miles if both end points of a segment are in California Exhibit J1 of September Report Page 23 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | SQL "select **hombrook, blythe, needles, mystic, nipton**" |
| 002 | SQL "from AZ where locationA = " & p(locationA, 0, True) |
| 003 | SQL "and locationZ = " & p(locationZ, 0, True) |
| 004 | GoSQL |
| 005 | |
| 006 | isFound = False |
| 007 | Do While SqlResults And Not DoEvents() |
| 008 |         isFound = True |
| 009 |         **caMiles** = Val(G(1)) |
| 010 |         If Val(G(2)) < **caMiles** Then caMiles = Val(G(2)) |
| 011 |         If Val(G(3)) < **caMiles** Then caMiles = Val(G(3)) |
| 012 |         If Val(G(4)) < **caMiles** Then caMiles = Val(G(4)) |
| 013 |         If Val(G(5)) < **caMiles** Then caMiles = Val(G(5)) |
| 014 |         Call MoveNext: |
| 015 | Loop |

*Figure C.11: VB Code to read data from AZ Table for distance to the Egress City into temporary variable caMiles Exhibit J1 of September Report Page 24 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 | If caMiles > 0 Then |
| 002 |         **californiaMinutes**(temp) = CInt(Val(**minutes**(temp) * (**caMiles** / |
| 003 | **miles**(temp)))) - 1 |
| 004 | End If |

*Figure C.12 VB Code to compute CaliforniaMinutes based on total segment minutes and odometer data from sleeper Table Exhibit J1 of September Report Page 24 (emphasis added)*

| Line No. | Source Code |
|---|---|
| 001 |         Text = Text & **"californiaMiles"** & CStr(temp2) & " = " & |
| 002 | p(californiaMiles(temp2), 0, True) & "," |
| 003 |         Text = Text & **"californiaMinutes"** & CStr(temp2) & " = " & |
| 004 | p(californiaMinutes(temp2), 0, True) & "," |
| 005 | Next |
| 006 | Text = Left(Text, Len(Text) - 1) |
| 007 | SQL **"update sleeper"** |
| 008 | SQL "set " & Text |
| 009 | SQL "where crossRef = " & p(crossref, 0, True) |
| 010 | GoSQL |

*Figure C.13 VB Code to save CaliforniaMinutes and CaliforniaMiles back to sleeper Table Exhibit J1 of September Report Page 24 (emphasis added)*