# EXHIBIT H

**Trial Transcript from Robinson v. Open Top Sightseeing San Francisco, LLC,  ("Robinson Tr.")**

Case 2:18-cv-08751-MCS-FFM Document 72-10 Filed 11/29/19 Page 2 of 100 Page
Case 4:14-cv-00852-PJH Document 234 Filed 10/19/17 Page 1 of 99
ID #:1257

**ORIGINAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable PHYLLIS J. HAMILTON, Judge

| | | |
|---|---|---|
| Harold C. Robinson, Jr., on behalf of himself and all others similarly situated, | ) ) ) | **Bench Trial** |
| | ) | Volume 1 |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. C 14−00852 PJH |
| OPEN TOP SIGHTSEEING SAN FRANCISCO, LLC; and DOES 1−20, | ) ) ) ) | Pages 1 − 98 |
| Defendants. | ) ) ) | Oakland, California Tuesday, October 10, 2017 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          The Tidrick Law Firm
                         2039 Shattuck Avenue, Suite 308
                         Berkeley, California  94704
                 BY:  STEVEN G. TIDRICK,
                      JOEL B. YOUNG, ATTORNEYS AT LAW

                         Burton Employment Law
                         1939 Harrison Street, Suite 400
                         Oakland, California  94612
                 BY:  JOCELYN BURTON, ATTORNEY AT LAW

           (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

**A P P E A R A N C E S (CONT'D.)**

For Defendant:            Valla & Associates, Inc., P.C.
                          333 Bush Street, Suite 2020
                          San Francisco, California 94104
                    BY:   STEFANO ABBASCIANO,
                          ANTONIO VALLA, ATTORNEYS AT LAW


                          MICHAEL P. PURCELL, ATTORNEY AT LAW
                          3567 Redwood Road
                          Oakland, California  94619



                          --o0o--

## I N D E X

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| WOOLFSON, AARON | | |
| DIRECT EXAMINATION BY MR. TIDRICK | 6 | 1 |
| CROSS-EXAMINATION BY MR. PURCELL | 13 | 1 |
| REDIRECT EXAMINATION BY MR. TIDRICK | 21 | 1 |
| RECROSS-EXAMINATION BY MR. PURCELL | 22 | 1 |
| REDIRECT EXAMINATION BY MR. TIDRICK | 25 | 1 |
| | | |
| PETERSEN, JEFFREY SCOTT | | |
| DIRECT EXAMINATION BY MR. TIDRICK | 27 | 1 |
| CROSS-EXAMINATION BY MR. PURCELL | 65 | 1 |
| EXAMINATION BY THE COURT | 83 | 1 |
| REDIRECT EXAMINATION BY MR. TIDRICK | 85 | 1 |
| RECROSS-EXAMINATION BY MR. PURCELL | 88 | 1 |
| FURTHER EXAMINATION BY THE COURT | 89 | 1 |
| FURTHER REDIRECT EXAM BY MR. TIDRICK | 92 | 1 |

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 78 | | | 56 | 1 |

--o0o--

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM Document 72-104 Filed 11/29/19 Page 5 of 100 Page
Case 4:14-cv-00852-PJH Document 234 Filed 10/29/17 Page 4 of 99 Page
ID #:1260

| 1 | Tuesday, October 10, 2017 | 8:35 a.m. |

2                    P R O C E E D I N G S

3        **THE CLERK:**  Calling civil action 14-852, Robinson

4  versus Open Top Sightseeing.

5     Counsel, please state your appearances.

6        **MS. BURTON:**  Jocelyn Burton for plaintiffs.

7        **MR. TIDRICK:**  Steven Tidrick for plaintiffs.

8        **MR. YOUNG:**  Joel Young for plaintiffs.

9        **MR. PURCELL:**  Michael Purcell for the defendant.

10        **MR. VALLA:**  Antonio Valla for the defendant.

11        **MR. ABBASCIANO:**  Stefano Abbasciano for the

12  defendant.

13        **THE COURT:**  All right.

14     All right.  We're ready to go with the damages portion.

15  Each side gets three hours.  Call your first witness.

16        **MR. TIDRICK:**  May I give a brief opening statement?

17  It will just give an outline that I think will actually be

18  helpful for the various issues that are going to be decided.

19        **THE COURT:**  Why don't you save it for a closing

20  statement.  I'd like to hear a summary after I've heard the

21  testimony.

22        **MR. TIDRICK:**  Understood.

23     One issue, because it will affect the number of witnesses.

24  We are planning on calling both of plaintiffs' experts, which

25  includes Aaron Woolfson and Jeff Petersen.  We will not have

Case 2:18-cv-08751-MCS-FFM   Document 72-104   Filed 11/29/19   Page 6 of 100   Page
Case 4:14-cv-00852-PJH   Document 234   Filed 10/29/19   Page 6 of 99
ID #:1261

```
 1    to call -- we probably will not have to call Andrew Smith to

 2    lay the evidentiary foundation with respect to the payroll

 3    records because there is a stipulation that was reached.  And

 4    I would refer to the Joint Pretrial Statement.  It was docket

 5    165 at ECF page 4, lines 4 to 26.

 6         The parties stipulated that the defendant's payroll

 7    records are authentic and admissible to show the amounts that

 8    Open Top paid to operators for the time periods covered by the

 9    records.

10         And assuming that the court is willing to take judicial

11    notice of that stipulation and defendants have no basis for

12    withdrawing from that stipulation, we have the evidentiary

13    foundation for the payroll records.

14              THE COURT:  It's a stipulation that was filed?

15              MR. TIDRICK:  Yes.  It was.

16              THE COURT:  Then I don't need to take judicial notice

17    of it.  It's part of the record.

18              MR. TIDRICK:  All right.

19         Plaintiffs call Aaron Woolfson.

20                   (Pause in the proceedings.)

21                        AARON WOOLFSON,

22    called as a witness for the plaintiffs, having been duly

23    sworn, testified as follows:

24              THE CLERK:  Please be seated.  And if you'll speak

25    clearly into the microphone.  Would you please state your full
```

Case 2:18-cv-08751-MCS-FFM  Document 72-104  Filed 11/29/19  Page 7 of 100  Page
Case 4:14-cv-00852-PJH  Document 234  Filed 10/29/19  Page 6 of 99
ID #:1262
WOOLFSON - DIRECT / TIDRICK

| | |
|---|---|
| 1 | name and spell your last name. |
| 2 | **THE WITNESS:**  Good morning, Your Honor.  My name is |
| 3 | Aaron Woolfson spelled A-a-r-o-n, last name, W-o-o-l-f like |
| 4 | Frank, s, Sam, o-n. |
| 5 | <div align="center">**DIRECT EXAMINATION**</div> |
| 6 | BY MR. TIDRICK: |
| 7 | **Q.**  Good morning, Mr. Woolfson. |
| 8 | What is your professional background? |
| 9 | **A.**  I am a expert in databases and organization of large |
| 10 | amounts of unstructured and structured data. |
| 11 | **Q.**  Have you ever been relied upon by a court as a testifying |
| 12 | expert? |
| 13 | **A.**  Yes, I have. |
| 14 | **Q.**  Can you tell us any specific cases? |
| 15 | **A.**  I've been relied upon by both expert -- as an expert by |
| 16 | both plaintiffs and defendants in class actions; in |
| 17 | particular, a case called *La Salsa*.  I've been relied upon in |
| 18 | several matters in which Pizza Hut was a defendant. |
| 19 | I've also been relied upon by the court on behalf of |
| 20 | Verizon in *Lofton v. Verizon*.  And my work has been used to |
| 21 | reach settlement right before trial after a class in a |
| 22 | Jack-In-The-Box case had been certified by the court. |
| 23 | There were some other cases that involved drivers of -- of |
| 24 | trucks that had been -- in which I had been the expert, but I |
| 25 | don't remember the names of those cases at this moment. |

Case 2:18-cv-08751-MCS-FFM-PJH Document 72-104 Filed 11/29/19 Page 8 of 100 Page
Case 4:11-cv-00554-PJH Document 234 Filed 10/29/19 Page 7 of 99
WOOLFSON - DIRECT / TIDRICK
ID #:1263

1    **Q.**  In order to refresh your recollection, do you need to look

2    at your expert report?

3    **A.**  It would be helpful.  I think I have my C.V. attached to

4    my expert report.

5    **Q.**  If you could please, Exhibit 54, which is part of the

6    exhibit binders -- if you could please refer to that.

7            **THE COURT:**  You know, it would be helpful if you

8    asked him questions that would explain to me who -- who he is,

9    what he does for a living, what his educational background is,

10   what his experience is before you get into the question of how

11   many lawsuits he's participated in.

12   **BY MR. TIDRICK:**

13   **Q.**  Can you please tell us more about your professional

14   background.

15   **A.**  Sure.  So I started writing databases at the University of

16   Illinois when I was 15 and a half years old, which was when I

17   first turned 15 and a half, I was hired by the university.

18       I've been writing databases and organizing database

19   information as both a hobby and then a career since I've --

20   professionally since 1994 when I started my company,

21   TelSwitch.

22       I have -- did not achieve a formal degree in information

23   management or computer science, but the databases that I was

24   writing on behalf of the university probably predated any

25   classes that would have taught those.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM Document 72-101 Filed 10/29/19 Page 8 of 100 Page
Case 4:14-cv-00852-PJH Document 234 Filed 10/29/19 Page 8 of 99
ID #:1264
WOOLFSON - DIRECT / TIDRICK

```
 1          I then went on to serve as an expert in probably by this

 2     time approximately 550 cases.

 3     Q.  Can you give us some specific examples of your

 4     professional experience with respect to structuring and

 5     analyzing data sets?

 6     A.  Sure.

 7          So the -- the main idea in any case is -- whether I'm --

 8     whether I'm hired by plaintiffs or defendants, I am given a --

 9     large sets of data that are essentially fingerprints or

10     indications of those data points that get produced through

11     somebody's work experience or through somebody's clocking in

12     and out of a point of sale system or time clock entries that

13     are indicated on payroll reports.

14          This is very typical of what I do.  I get this

15     information, and then I normalize it, and I structure it into

16     formats that are easily understood and can easily explain

17     complex relationships between data points that appear in

18     different places in order to establish fact patterns that can

19     be used by courts and -- and attorneys and companies and

20     whoever hires me.

21     Q.  You have particular experience with respect to organizing

22     data sets of payroll data where, for back (sic) of a letter

23     (sic) word, the data comes in an unorganized fashion?

24     A.  Yes.  In this case, it was very well organized in Excel

25     sheets.  But in general, yes, the data that I receive is not
```

Case 2:18-cv-08751-MCS-FLM   Document 73-10   Filed 10/19/22   Page 10 of 100   9
Case 4:14-cv-00852-PJH   Document 234-10   Filed 10/19/17   Page 3 of 99
WOOLHOUSE DISTRICT / TIDRICK
Page ID #:1205

```
 1    as -- as organized as that data which was produced in this

 2    case.  And I -- I just want to say -- to add to that question,

 3    if I may, Your Honor, that the -- the answers -- I -- the

 4    steps that I took in here are the same steps that I took in

 5    dozens and dozens of other cases related to time entries, and

 6    there's nothing novel about what I've done here.  This is just

 7    simply --

 8              THE COURT:  What is your area of expertise?  Am I

 9    correct that you're not schooled; you have no undergraduate

10    degree or graduate degree?

11              THE WITNESS:  Right.  I was so interested in database

12    and management -- databases and management of the data

13    contained within those databases that I started my -- my

14    company in my second year of college, and I continued on with

15    that in perpetuity.  I still have the same company.

16              THE COURT:  So you dropped out of college?

17              THE WITNESS:  I did because I -- I love organizing --

18              THE COURT:  I don't need to know why.

19              THE WITNESS:  Yeah.

20              THE COURT:  So you dropped out of college; you start

21    your own company.

22              THE WITNESS:  Right.

23              THE COURT:  And have you ever been trained by anyone?

24              THE WITNESS:  I was trained by the inventors of -- of

25    a mainframe system at the University of Illinois in how to
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 24-10   Filed 11/22/19   Page 11 of 100
Case 4:14-cv-00952-JM   Document 234-10   Filed 10/19/17   Page 11 of 99
WOOLDRIDGE DIRECT / TIDRICK
Page ID #: 1266
10

```
 1    manage large amounts of data and to organize that information,
 2    so I was trained, but at that time, there's just -- there
 3    weren't any classes in what's called structure Cory (phonetic)
 4    language.  It's just -- It was such a new area of information
 5    technology.
 6         THE COURT:  Okay.  So you don't have a background in
 7    accounting or in economics or anything like that?
 8         THE WITNESS:  No background in accounting or
 9    economics.  But in this case, I was just simply asked to
10    structure data that was on a spreadsheet and not to opine in
11    any areas of economics or -- which would require expertise in
12    that area because I wasn't asked to.
13      I am qualified as a database -- I am qualified to conduct
14    tasks that would be considered or would fall under the
15    expertise of a database expert and not an economist.
16         THE COURT:  But you're not a computer scientist.
17         THE WITNESS:  I consider myself one just as an
18    artifact of having been doing this for 25 years and --
19         THE COURT:  Have you been trained as a computer
20    scientist even if you've not received a degree in computer
21    science?
22         THE WITNESS:  Yes.
23         THE COURT:  All right.  So you essentially took all
24    the information they gave you and organized it.
25         THE WITNESS:  That's all I did, yes, Your Honor.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 12 of 100
Case 4:14-cv-00852-FJM   Document 264-10   Filed 10/19/17   Page 13 of 99
WOOLPLAINTIFF / TIDRICK
Page ID #:1267

| 1 | **THE COURT:** Okay. |

2  **BY MR. TIDRICK:**

3  **Q.** And is it fair to say you organized it for the purposes of

4  Dr. Jeff Petersen being able to do analysis of that data?

5  **A.** Yes. I organized it in -- regardless of who's looking at

6  that data, whether it was Jeff Petersen or the defendants, the

7  data could be used for the same purposes or different purposes

8  by anyone because the data was organized in such a fashion

9  that it made very logical sense or logical organization.

10  **Q.** And is that a fair description of what your assignment was

11  in this case?

12  **A.** Yes.

13  **Q.** What specifically did you do to complete this assignment

14  in this case?

15  **A.** I was provided with several Excel sheets that contain

16  timekeeping and payroll by the -- by counsel. I -- appears

17  that that originated from defendant. And I -- I structured

18  that data into a sequel database that allowed for the data to

19  be looked at on a per-paycheck basis and a per-day basis and

20  cross-referenced the time clock entries to the payroll to see

21  whether or not the data indicated employees were being paid a

22  hourly rate of pay -- or -- as indicated by regular hours or

23  overtime hours and whether or not there were indications of

24  premiums in the paycheck. That's what my task was.

25  **Q.** The final line of inquiry I have is simply, are you able

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-03751-MCS-FFM   Document 232-10   Filed 11/22/19   Page 13 of 100 12
Case 4:34-cv-00852-PJH   Document 234-10   Filed 10/19/17   Page 129 of 99
WOOLF   CONTRACT / TIDRICK
Page ID #:1268

1   to recall from memory the other cases in which you've --

2   courts have accepted your work as an expert?

3   **A.**   *La Salsa.*   There's a case called Piatti's, *Lofton v.*

4   *Verizon.*

5        There's K-F -- *Heinz v. KFC.*   There's probably eight or

6   ten others that I have seen where the court has specifically

7   cited to my work in their determination of granting class

8   certification.

9   **Q.**   In order provide the case numbers, would you need to look

10   at the expert disclosure, the Exhibit 54?

11   **A.**   I would.   That would be helpful.

12   **Q.**   If you could, please, look to the Exhibit 54.

13   **A.**   (Reviewing document.)

14   **Q.**   And all I'm asking is that you provide the specific case

15   citations for the courts that have relied upon --

16            **THE COURT:**   I don't need the citations, Counsel.   I

17   have the report in front of me.   I can read them myself.

18            **THE WITNESS:**   There was also a -- a case that's not

19   listed that was recently granted certification called *15 Main*

20   that was in Alameda Superior that was just granted a week ago.

21   **BY MR. TIDRICK:**

22   **Q.**   Thank you.

23        And Exhibit 54 does include the report that you prepared,

24   correct?

25   **A.**   It does.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Ex. H, p. 598

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 14 of 100   13
Case 4:14-cv-00982-PJH   Document 264-10   Filed 10/19/17   Page 13 of 99
WOOLFSON / PURCELL
Page ID #:1269

**Q.** And that report includes the case citations, correct?

**A.** Yes.

     **MR. TIDRICK:** No further questions.

     **THE COURT:** Any cross?

     **MR. PURCELL:** Yes Your Honor.

<u>**CROSS-EXAMINATION**</u>

**BY MR. PURCELL:**

**Q.** Good morning, Mr. Woolfson.

     It may not -- It wasn't clear from (sic) me from your testimony earlier, but are you offering opinions in this case?

**A.** I am offering a set of structured data or conclusions that are based upon your data that has been structured into a way that's easy for anybody to review. So if those are opinions, then -- then I suppose I am offering an opinion.

     I'm not sure if I was specifically asked to offer an opinion in this case, but I do have opinions, yes.

**Q.** What conclusions are you offering, though?

**A.** It appears that most of your employees were paid regular hours for all their time worked.

**Q.** And -- And on -- Now, you testified earlier you're not an economist, correct?

**A.** I'm not an economist.

**Q.** Okay. And that you are an expert in database?

**A.** I'm an expert in compiling large sets of data in -- from databases into other databases or structuring unstructured

Case 2:18-cv-08751-MCS-FFM   Document 264-10   Filed 11/22/19   Page 15 of 100   14
Case 4:18-cv-00092-FJM   Document 234-1   Filed 10/19/17   Page 14 of 99
WOOLFSON / PURCELL
Page ID #:1270

 1   data so that it could easily be used by fact-finders.

 2   **Q.**  And you testified that this information that you

 3   structured appears to have originated with the defendant.  And

 4   on what do you base that conclusion?

 5   **A.**  So I -- I think that I said that the -- the data that I

 6   have received appears to have been produced by the defendant.

 7   **Q.**  It only appears to have been produced, so you don't know

 8   where it came from, correct?

 9   **A.**  Well, I'm assuming that.  It had your name on the company

10   payroll sheet, so I assume that it came from -- from Open Top.

11   **Q.**  And -- But you don't know.  You just testified that you

12   don't know where -- whether -- where it originated from.

13   **A.**  I was not the individual who was your payroll manager, so

14   I don't have first-hand knowledge that that payroll originated

15   from your company, but it has been represented to me --

16           **MR. YOUNG:**  Move to strike.

17           **THE WITNESS:**  -- as having been originated from Open

18   Top.

19           **MR. PURCELL:**  Move to strike as non-responsive.

20           **THE COURT:**  Overruled.

21   **BY MR. PURCELL:**

22   **Q.**  Mr. Woolfson, do you have any -- Excuse me.  Strike that.

23           Does anyone else rely on your database systems?

24   **A.**  That's a really broad question.  I don't understand what

25   you're asking.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 16 of 100
Case 4:18-cv-00052-FJM   Document 224-10   Filed 10/19/17   Page 1596 of 99
WOOLLEN - DAVIS / PURCELL
Page ID #:1203
15

1   **Q.**  Are there any other companies that use this or other

2   experts that rely on your database system when preparing for

3   testimony in court?

4   **A.**  Are you talking about the data that I have structured in

5   this matter?  Are you talking about other cases?  I really

6   need you to be --

7                    (Simultaneous colloquy.)

8   **BY MR. PURCELL:**

9   **Q.**  -- when talking about the -- the testimony you said you

10  were offering as an expert was in database matters; is that

11  correct?

12  **A.**  I think that I was asked what area I am an expert, and I

13  said that I'm an expert in structuring large amounts of data.

14      But the area in which I specifically was tasked in this

15  case was to structure your timekeeping and -- and payroll into

16  a way that could be used by fact-finders, by defendants, by

17  plaintiffs, by whoever wants to see your data in a more

18  structured and organized format.

19  **Q.**  And this methodology by which you've structured this

20  information, does anyone else use a similar methodology or use

21  your methodology to perform this task in other circumstances?

22  **A.**  "In other circumstances," are you talking about other

23  cases I've worked on?

24  **Q.**  No.  I'm talking about whether any other people who hold

25  themselves out as database experts use your methodology to

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 64-10   Filed 11/22/19   Page 17 of 100
Case 4:94-cv-00852-FJM   Document 254-10   Filed 10/19/17   Page 16 of 99
WOOLLEY-LOOMIS / PURCELL   Page ID #:1272
16

1    organize and structure data.

2    **A.**   Yes.

3    **Q.**   And who are those people?

4    **A.**   You know, there -- if you read the opinions of the

5    opposing experts in cases that have -- in which I've been

6    retained, those experts have also very similarly organized my

7    data and even have cited to my work as agreeing with it.

8    **Q.**   Okay.  Can you identify any of those people, 'cause I am

9    not here to testify?

10   **A.**   Yeah, I'm not personally familiar with those people, but

11   certainly the orders in the *KFC* and *Pizza Hut* cases would

12   agree -- I'm sorry.  I'm sorry, Your Honor.  I misspoke.

13        The experts who worked on behalf of the defendant

14   Pizza Hut and KFC has agreed with -- with my methodology in

15   their reports or their rebuttals.  They didn't agree with the

16   findings, but they agreed with my methodology.

17        And I am -- even been complimented after cases have been

18   completed that the way that I structured things was -- was

19   helpful to the opposing party and that they believe that my

20   data structuring techniques were solid and were -- made things

21   go along a lot faster.

22   **Q.**   And have you -- other than these other experts whose names

23   you don't recall, has anyone outside of the cases in which

24   you've testified employed these methodologies in other cases

25   or other tasks in the world?

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 232-10   Filed 11/22/19   Page 18 of 100   17
Case 4:14-cv-00852-FJM   Document 264-10   Filed 10/19/17   Page 17 of 99
WOOLDRIDGE vs / PURCELL
Page ID #:1203

1    **A.**   Well, I -- I think your own payroll company did exactly

2    what I did.  They took the sum of the number of minutes

3    appearing in the regular column of your reports and made

4    paychecks to your employees.  So I would say that my

5    methodology as cross-referenced within the time clock report

6    that I produced as part of my production, that I produced per

7    the -- per the deposition notice, I did cross-references and

8    made sure that my formulas matched your payroll company's

9    formulas, so I think your payroll company uses the formulas

10   that I use.

11   **Q.**   What is that payroll company?  And whose payroll company?

12   **A.**   I'm talking about Open Top.  I don't remember the specific

13   name captioned at the top of the payroll reports.  May have

14   been ADP.

15   **Q.**   Now, would all payroll companies be qualified to testify

16   as experts on these matters?

17   **A.**   That's something beyond the scope of which I've been asked

18   to be an expert.  I've not been asked to testify about

19   something outside of what I have specifically have been tasked

20   to do.

21   **Q.**   And did you review any paper records from any parties in

22   this case as part of the process of preparing this information

23   that you organized?

24   **A.**   Everything was produced electronically.

25   **Q.**   Okay.  Did you view these electronic documents?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Ex. H, p. 603

Case 2:18-cv-08751-MCS-FFM   Document 24-10   Filed 11/22/19   Page 19 of 100 18
Case 4:18-cv-00852-FJM   Document 234-1   Filed 10/19/17   Page 189 of 99
WOOLFSON / PURCELL
Page ID #:1204

1    **A.**   I opened those electronic documents, yes.

2    **Q.**   Okay.  And did you perform any analysis to determine

3    whether the raw data was matched by the output that you

4    created?

5    **A.**   Yes.

6    **Q.**   Okay.

7         What are you testifying as an expert about?  Or proposing

8    to testify as an expert about?

9    **A.**   Well, I'm -- I've already -- Are you talking about my

10   declaration, or are you talking about what I'm here on the

11   stand doing today?

12   **Q.**   That's what I'm talking about, what you're on the stand

13   doing today.

14   **A.**   Well, I stated earlier that I'm testifying as to, first,

15   my expertise as a database expert.  Second thing I am is

16   testifying as to the -- the structuring of your timekeeping

17   and payroll records and that those match the indications -- or

18   my results in my reports match the indications that are within

19   your Excel spreadsheets and -- and other files that were

20   produced.

21        I'm prepared to testify on any questions that I'm asked

22   that are related to my subject expertise.

23   **Q.**   And -- And, Mr. Woolfson, has any of your work been

24   subject to a peer-review process?

25   **A.**   I -- I mean, I -- I don't mean to be cheeky, but I think

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Ex. H, p. 604

Case 2:18-cv-03751-MCS-FFM   Document 254-10   Filed 11/22/19   Page 20 of 100   19
Case 4:14-cv-00852-FJM   Document 234-1   Filed 10/19/17   Page 190 of 90
WOOLFSON / PURCELL
Page ID #:1275

```
 1    adding the number of minutes that appears in a column doesn't
 2    need to be peer-reviewed.  It's just simply adding number of
 3    minutes and the number of shifts that occurred in a day.
 4        My task was very simple.
 5  Q.  And, in fact, it's essentially arithmetic, correct?
 6  A.  It's not arithmetic as per se, one-to-one relationship of
 7    adding two things together.  But it is -- it is a form of
 8    arithmetic, I suppose.
 9  Q.  Okay.  And if this task is as simple as you say it is,
10    it's not even the subject of any expertise, correct?
11  A.  No, the subject of the expertise is the organization of
12    the data in the databases so that one can perform the
13    arithmetic.
14  Q.  So it -- Essentially, you're not offering any expert
15    testimony today?
16  A.  I didn't say that.  You said that.
17  Q.  Okay.  Thank you, Mr. Woolfson.
18        THE COURT:  Anything else?
19        MR. TIDRICK:  No further questions.
20        THE COURT:  You're done with this witness?
21        MR. TIDRICK:  Yes.
22        THE COURT:  Is someone going to explain to me what
23    the methodology is, what the data structuring -- structuring
24    techniques are?  I'm -- I'm flummoxed by this witness.
25        Are you calling this witness as an expert?
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 24-10   Filed 11/22/19   Page 21 of 100
Case 4:14-cv-00852-PJH   Document 264-10   Filed 10/15/17   Page 200 of 99   20
Page ID #:1276

```
 1          MR. TIDRICK:  This witness establishes the foundation

 2    for the testimony about Dr. Jeff Petersen.

 3          THE COURT:  Who is an expert.

 4          MR. TIDRICK:  Who is an expert, yes.

 5          THE COURT:  Are you offering this gentleman as an

 6    expert in this case?

 7          MR. TIDRICK:  We're offering him with respect to

 8    the -- essentially the evidentiary foundation for the

 9    testimony that Dr. Jeff Petersen will provide, so what

10    Mr. Woolfson did was to take data and essentially just to

11    organize it so that Jeff Petersen was able to do expert

12    analyses of that data.

13          THE COURT:  Why wasn't he able to examine the data in

14    its raw form?  What -- What is the methodology or the

15    structuring techniques that have been performed by this

16    witness that were necessary for your expert?

17       And -- And you do need to clarify.  Are you proffering

18    Mr. Woolfson as an expert or as a percipient witness of some

19    sort?

20                  (Off-the-record discussion.)

21          MR. TIDRICK:  An expert with respect to structuring

22    data.

23          THE COURT:  All right.  Then I -- I'm not prepared to

24    accept him as an expert.  I need a lot more information about

25    what methodology he's applying, what exactly is the data
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-03751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 22 of 100   21
Case 4:14-cv-00052-PJH   Document 264-10   Filed 10/19/17   Page 22 of 99
Page ID #:1277

```
 1    structuring techniques that he's referred to.  What are they?
 2              MR. TIDRICK:  If I may on redirect, Your Honor?
 3              THE COURT:  All right.
 4                      REDIRECT EXAMINATION
 5    BY MR. TIDRICK:
 6    Q.  What are the data structuring techniques you used to
 7    structure the data?
 8    A.  Okay.  The first thing I do is I have obtained a set of
 9    Excel sheets containing the timekeeping and the payroll
10    information from -- from Open Top.  The data is put into a
11    sequel database by a set of scripts that I've written in order
12    to extract that information that's on the timekeeping sheets
13    including the start and stop times that are indicated by the
14    drivers, as well as the amount of computed hours that Open Top
15    indicates as indicated by the regular hours, overtime hours,
16    and double-time hours columns on those spreadsheets.
17          I then structure those so that each particular day has a
18    series of in and out punches indicating the contiguous
19    ingress -- the contiguous day from ingress to egress so that
20    the specific information or entries within the Excel sheets
21    are on a single row containing all of the compensable work
22    time in a particular day as indicated by Open Top.
23          Otherwise what happens is in the Open Top data, each
24    driver and each paycheck period is represented on a single
25    individual worksheet within a large Excel file, and it becomes
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 23 of 100
Case 4:14-cv-00652-PJH   Document 264   Filed 10/19/17   Page 229 of 99
WOOLFSON - RECROSS / PURCELL
Page ID #:1278

```
 1    fantastically complicated or difficult for somebody who

 2    doesn't have what's called relational database expertise to

 3    structure that data in a way that they can easily analyze it.

 4             THE COURT:  Are you finished?

 5             MR. TIDRICK:  Yes.

 6             THE COURT:  All right.

 7        Anything else from the defense?

 8             MR. PURCELL:  Yes, Your Honor.

 9                      RECROSS-EXAMINATION

10    BY MR. PURCELL:

11    Q.  Mr. Woolfson, do you have an understanding as to how many

12    class members there are in this case?

13    A.  I think there were a hundred and -- I'd to have look at my

14    report and look at my -- my sequel database, but there are --

15    there was certainly over a hundred.

16    Q.  You're sure there were over a hundred?

17    A.  Yes.

18    Q.  And was there any reason that this could -- this

19    information could not simply just be mechanically inputted

20    into a Excel spreadsheet?

21    A.  Well, there were 46,000 and some entries on your Excel

22    sheets in various locations.  Some of those entries are

23    duplicated so they had to be de-duplicated so required a set

24    of formulas that I've -- I've used in, I don't know, hundreds

25    of other cases in order to de-duplicate and to identify items
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-09751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 24 of 100   23
Case 4:94-cv-00653-PJH   Document 264-10   Filed 10/15/14   Page 239 of 99
WOOLF / CROSS / PURCELL
Page ID #:1279

1    of information which were related but on face value didn't

2    seem to be related.

3    **Q.**  Okay.  And just to confirm, you're not aware of anyone

4    else who uses your database to perform this sort of work,

5    correct?

6    **A.**  I have -- I am aware of other experts who have used the

7    methods and procedures that I have established and the

8    databases.  I know many, many experts use sequel database to

9    contain the results of their analyses and to structure data.

10   And I know of -- at least in -- in *KFC* and *Pizza Hut*, the

11   experts used the exact same methodology that I used.  And

12   those were certified.

13   **Q.**  But, again, that's -- those are cases that you worked on,

14   correct?

15   **A.**  Yes.  Those are cases that I've worked on, but --

16   **Q.**  And you're not aware of anything outside of cases that

17   you've worked on, correct?

18   **A.**  Well, I have worked with other experts in other

19   capacities.  For instance, one I'm working on behalf of

20   defendants.  And I've worked with plaintiffs experts and

21   assisted them in other matters.  They have -- have -- have

22   concurred with me.

23        I'm thinking of a particular gentleman named Fred who

24   works for a company called AB Data, and he is -- has adopted

25   my methodology in the way that he structures data.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 25 of 100
Case 4:14-cv-00052-PJH   Document 234-10   Filed 10/19/17   Page 24 of 99   24
WOOLF — CROSS / PURCELL
Page ID #:1280

1    **Q.** Other than Fred, does the industry as a whole adopt your

2    approach to structuring data?

3    **A.** I think they adopt similar approaches because I think I'm

4    following the methodology that is generally accepted practice

5    as indicated by the fact that your payroll sheets, when I look

6    at the amount of hours that have been paid to employees,

7    matches the formulas that I have applied when I structure the

8    data.

9        So in other words, when your time sheet said somebody had

10   driven for 10 hours or 12 hours, I look on the particular

11   payroll sheet, after the fact of having analyzed the time

12   sheets, my analysis matches the payroll, which indicates to me

13   that the payroll company's using the same formula that I've

14   come up with.

15   **Q.** You said earlier that you consider this to be generally

16   accepted practice; is that correct?

17   **A.** I don't remember what in specific you asked that I said

18   the generally accepted practice.

19   **Q.** Okay.  The methodology that you're employing.

20   **A.** The methodology that I'm employing is -- is accepted and,

21   it has also been cited by -- by judges in cases as being

22   sufficient to establish certification.

23   **Q.** Outside of cases that you've testified in, though, by whom

24   is this practice generally accepted?

25   **A.** Well, I --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 26 of 100
Case 4:18-cv-00052-PJH   Document 234-10   Filed 10/19/19   Page 250 of 99   25
WOOLF - REDIRECT / TIDRICK
Page ID #:1281

1    Q.  Can you identify that?

2    A.  The formulas that are within ADP's payroll system reflect

3    the same formulas that I use in order to establish the number

4    of minutes worked as the sum of the ingress and egresses of an

5    employee's work day.

6            MR. PURCELL:  That's all I have.  Thank you.

7            THE COURT:  Anything else?

8            MR. TIDRICK:  Yes, please.

9                    **REDIRECT EXAMINATION**

10           MR. TIDRICK:  Redirect.

11   Q.  Just want to clarify one thing.  You were asked some

12   questions about the number of class members.  You didn't do

13   any analyses of who counted as a class member or who didn't,

14   right?

15   A.  Thank you for the clarification.  That is -- That is

16   correct.  Under -- I don't know of where in this case the

17   parties have decided what counts as a class member or -- or

18   potential class member or not.

19       I'm just simply talking as to the number of employees who

20   had worked during the period in which data was produced which

21   I assumed to be the -- during the putative class period.

22   Q.  That's all.  Thank you.

23   A.  Thank you.

24           THE COURT:  Anything else?

25           MR. PURCELL:  No, Your Honor.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Ex. H, p. 611

Case 2:18-cv-09751-MCS-FFM   Document 224-10   Filed 11/22/19   Page 27 of 100   26
Case 4:94-cv-00092-FJM   Document 264-10   Filed 10/19/17   Page 269 of 99
WOOLFSON - DIRECT / TIDRICK
Page ID #:1282

```
 1            THE COURT:  You're excused.

 2            THE WITNESS:  Thank you, Your Honor.

 3            THE COURT:  Next witness.

 4            MR. TIDRICK:  Plaintiffs call Dr. Jeff Petersen.

 5                  (Pause in the proceedings.)

 6            MR. PURCELL:  Your Honor, I wasn't clear if he's

 7     being offered as an expert or not.

 8            THE COURT:  No one's offered him as an expert.

 9            MR. PURCELL:  Thank you.

10            MR. TIDRICK:  Plaintiffs have offered -- Plaintiffs

11     do offer Mr. Woolfson as a expert specifically with respect to

12     the structuring of data.

13            THE COURT:  Any objection?

14            MR. PURCELL:  Yes, Your Honor.  We object.  It

15     doesn't appear that the testimony given suggests that this is

16     accepted by anyone outside of the people he's worked with on

17     other cases.  And it wasn't even clear to me exactly how he's

18     identifying what he's doing or what -- what constitutes the

19     expert nature of that task.

20            THE COURT:  Yes.  I don't accept him as an expert.

21        His testimony will be treated as a percipient witness.

22     I'll give it whatever weight I think is appropriate, but he's

23     no expert.

24        All right.  Mr. Petersen -- Dr. Petersen, please take the

25     stand.
```

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 28 of 100   27
Case 4:94-cv-00652-PJH   Document 234-10   Filed 10/19/17   Page 29 of 99
PETERSEN - DIRECT / TIDRICK
Page ID #:1283

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | **THE CLERK:**  Please raise your right hand.                |
| 2  | (Pause in the proceedings.)                                  |
| 3  | **JEFFREY SCOTT PETERSEN**,                                   |
| 4  | called as a witness for the PLAINTIFFS, having been duly      |
| 5  | sworn, testified as follows:                                  |
| 6  | **THE CLERK:**  Please be seated.  And if you'll speak        |
| 7  | into the microphone, scoot up, and then please state your full |
| 8  | name and spell your last name.                               |
| 9  | **THE WITNESS:**  Jeffrey Scott Petersen,                    |
| 10 | P-e-t-e-r-s-e-n.                                             |
| 11 | **DIRECT EXAMINATION**                                       |
| 12 | BY MR. TIDRICK:                                              |
| 13 | **Q.**  Morning, Dr. Petersen.                              |
| 14 | **A.**  Morning.                                            |
| 15 | **Q.**  What is your educational background.                |
| 16 | **A.**  I have a Bachelor's degree in economics, Ph.D. in    |
| 17 | economics from the University of Utah.  I also completed a    |
| 18 | health economics training program at U.C. Berkeley as part of |
| 19 | my post-doctoral fellowship there.                          |
| 20 | **Q.**  Do you currently teach anything?                    |
| 21 | **A.**  Yes.  I teach -- I teach -- I'm an adjunct assistant |
| 22 | professor at St. Mary's College in Moraga, and I teach       |
| 23 | Managerial Economics in the M.B.A. program.                 |
| 24 | **Q.**  Do you serve in any capacity with any professional   |
| 25 | organizations?                                              |

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-09751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 29 of 100
Case 4:34-cv-00952-PJH   Document 264-10   Filed 10/19/17   Page 2 of 99   28
PETERSEN - DIRECT / TIDRICK
Page ID #:1284

1    **A.**   Yes.  I'm a member of the board of American Academy of

2    Economic and Financial Experts, which is one of the leading

3    organizations for conducting research on forensic economics.

4           **MR. TIDRICK:**  Your Honor, plaintiffs proffer

5    Dr. Petersen as an expert in the areas of economics and

6    analysis of payroll data.

7           **THE COURT:**  Any objection?

8           **MR. PURCELL:**  We don't object to him being designated

9    as an economics expert.

10          **THE COURT:**  All right.  Accepted.

11   **BY MR. TIDRICK:**

12   **Q.**   What was your assignment in this matter?

13   **A.**   My assignment was to analyze payroll data prepared by

14   Mr. Woolfson and determine if a threshold of 40 hours per week

15   had been crossed to calculate the overtime that would be due

16   associated with that -- with those hours, and the associated

17   penalties and interest that go along with those -- those

18   payments.

19   **Q.**   Did you conduct any surveys?

20   **A.**   Yes.  I did conduct a survey in this matter.

21   **Q.**   Have you authored any relevant publications?

22   **A.**   Yes.  I have a peer-reviewed journal article in the

23   *Journal of Legal Economics* on how to conduct surveys in class

24   action wage and hour cases.

25   **Q.**   You conduct surveys in other wage and hour class actions?

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-03751-MCS-FFM   Document 264-10   Filed 11/22/19   Page 30 of 100   29
Case 4:14-cv-00052-FJM   Document 264-10   Filed 10/19/17   Page 290 of 90
PETERSON / DIRECT / TIDRICK
Page ID #:1285

```
 1    A.   Yes, I've conducted surveys in six other wage and hour

 2    cases.

 3    Q.   Have any of those cases gone to trial?

 4    A.   Yes.

 5    Q.   Did any of them result in a verdict with respect to your

 6    methodology on surveys?

 7    A.   Yes, the one that did was a default judgment, and Judge

 8    Lucy Koh validated my survey results and the inferential

 9    statistics I performed on the survey data to project

10    class-wide damages was scientifically valid for determining

11    the amount due the class.

12    Q.   Have you ever received any training with respect to

13    surveys?

14    A.   Yes.  I used to be a senior economist at the Government

15    Accountability Office, which is the research arm of the States

16    Congress.  And I -- I received course work in how to conduct

17    surveys and how to -- and survey question writing during my

18    tenure there.

19    Q.   Outside litigation, have you ever conducted a survey?

20    A.   Yes, I have.

21    Q.   Was that in an academic setting?

22    A.   Yes, it was.  It was with some professors at the

23    University of California San Francisco, and we studied trauma

24    victims and their return to work following -- following

25    trauma, so we did a baseline survey immediately following the
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 24-10   Filed 11/22/19   Page 31 of 100
PETER ... ECT / TIDRICK
Case 4:14-cv-00852-FJM   Document 234-1   Filed 10/19/17   Page 300 of 99
Page ID #:1286                                                          30

| 1 | trauma, and then we followed up with them six months later. |
| 2 | And the results of that were published in the -- of the |
| 3 | conference proceedings for the American Academy of the -- of |
| 4 | Surgery of Trauma. |
| 5 | **Q.** Did you use any statistical methods to project damages in |
| 6 | this case? |
| 7 | **A.** Yes, I did use inferential statistics to project damages |
| 8 | in this case. |
| 9 | **Q.** Is that essentially projecting from a sample? |
| 10 | **A.** Yes. Every -- Some of the data -- Some of the analysis in |
| 11 | this case required projecting from a sample to the population. |
| 12 | **Q.** Have you ever published any articles on that subject, how |
| 13 | to do that? |
| 14 | **A.** Yes. I have three peer-reviewed publications that utilize |
| 15 | survey data to be able to project to the population to draw |
| 16 | the conclusions of the study. |
| 17 | **Q.** Are you able to estimate how many class action wage and |
| 18 | hour cases you've projected damages in? |
| 19 | **A.** In approximately 35 to 40. |
| 20 | **Q.** What's the breakdown between plaintiff's side and defense |
| 21 | side for your work? |
| 22 | **A.** It's approximately three-quarter plaintiff, one-quarter |
| 23 | defense. |
| 24 | **Q.** Are you currently retained as an expert for the defense in |
| 25 | any wage and hour cases? |

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-03751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 32 of 100   31
Case 4:18-cv-00052-PJH   Document 224-10   Filed 10/19/17   Page 31 of 99
PETER DISTRICT / TIDRICK
Page ID #:1287

1    **A.**   Yes.

2    **Q.**   Who?

3    **A.**   The California Attorney General's Office currently

4    retained me in a class action wage and hour case.

5    **Q.**   In this case, what was the assignment that was given to

6    you?

7    **A.**   Well, it was to analyze instances where the bus operators

8    worked in excess of 40 hours per week and overtime was not

9    paid.  And then, as I stated earlier, I also computed the

10   associated penalties and interest due.

11   **Q.**   How specifically did you complete your assignment?

12   **A.**   I analyzed the payroll and timekeeping records that were

13   prepared by Mr. Woolfson.  And if no payroll data was

14   available, which occurred for -- which I'll explain as prior

15   to when the payroll data was made available, or was -- or was

16   available, I used inferential statistical methods to be able

17   to project the payments that were due if there were no -- if

18   there was no payroll data available.

19   **Q.**   Did you use generally accepted scientific methods to

20   calculate damages and penalties?

21   **A.**   Yes, at every phase of this project, I used generally

22   accepted scientific methods.  You note that my report contains

23   footnotes citing the sources for those methods.

24   **Q.**   And your report are you referring to -- if you could

25   please in the binder refer to Exhibit 57.  Is that what you're

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 33 of 100   32
Case 4:14-cv-00852-FJM   Document 264   Filed 10/19/17   Page 329 of 99
PETERS — DIRECT / TIDRICK
Page ID #:1288

1   referring to as your report?

2   **A.**   (Reviewing documents.)

3       Yes.

4   **Q.**   With respect to data, I have some questions for you with

5   respect to data.

6       What information is contained in the data that you used to

7   project overtime damages?

8   **A.**   Well, it -- there's two -- there's two data sets that were

9   utilized, the payroll data and the timekeeping data.   In the

10  payroll data, contains the person's name, the payroll start

11  date, payroll end date, the check date, the hours worked,

12  regular earnings, total earnings, and the hourly wage.

13      And the timekeeping data contains the hours worked for the

14  first week within the payroll period and the second week

15  within the payroll period.   And that's important because in

16  the payroll data, the hours are all lumped together in one

17  two-week period, so the timekeeping data allows us to separate

18  out the hours from week one and week two.

19  **Q.**   Now, are you referring to the Exhibit 57 as you go through

20  those items?

21  **A.**   Yes.   It's all in -- It's all in my report, yes.

22          **MR. TIDRICK:**   Plaintiffs move that Exhibit 57 be

23  admitted into evidence.

24          **THE COURT:**   Any objection?

25          **MR. PURCELL:**   We object, Your Honor.   The document

Case 2:18-cv-08751-MCS-FFM  Document 264-10  Filed 10/19/12/19  Page 34 of 100  33
Case 4:14-cv-00629-PJH  Document 234-10  Filed 10/19/12/19  Page 33 of 99
PETER — DIRECT / TIDRICK
Page ID #:1289

```
 1    is -- is hearsay.  It's -- He's here to testify, but the

 2    report itself is not evidence.

 3              THE COURT:  Yeah.  I don't typically admit expert

 4    reports and -- absent a stipulation, so it won't be admitted.

 5    BY MR. TIDRICK:

 6    Q.  How many individuals did you potentially compute overtime

 7    damages for?

 8    A.  There were 96 individuals on what I understand was a

 9    stipulated class list.

10    Q.  Are you aware of any subgroup of Fair Labor Standards Act,

11    FLSA, collective action members?

12    A.  Yes.

13    Q.  Did you compute specific damages for those individuals?

14    A.  Yes.

15    Q.  Do you recall how many there were?

16    A.  There are 29 individuals.

17    Q.  You computed overtime damages for them?

18    A.  Yes.

19    Q.  Based on a three-year statute of limitations time period?

20    A.  Yes.  Three years -- Three years from whenever they signed

21    their opt-in form.  I went back that far, so if they were

22    working prior to that time period, then it would start as of

23    that date.  Or if they were -- started working after that

24    date, then the computations started with their employment

25    date, start of their employment date.
```

Case 2:18-cv-08751-MCS-FFM   Document 274-10   Filed 11/22/19   Page 35 of 100   34
Case 4:14-cv-00952-PJH   Document 264-10   Filed 10/19/17   Page 349 of 99
PETERSEN - DIRECT / TIDRICK
Page ID #:1290

1   **Q.**   From -- Do I understand three years from the date that

2   FSLA opt-in form was filed?

3   **A.**   Yes.

4   **Q.**   What method did you use for computing whether overtime

5   payments were due during a specific work week?

6          **THE COURT:**   I'm sorry.  I missed something.  You

7   asked him first about 96 class members and then 29 collective

8   action members.

9      The class members are on what specifically?  I thought we

10  were just talking about the overtime claims.

11         **MR. TIDRICK:**   So Mr. Petersen did calculations with

12  respect to damages, penalties, restitution, and interest.  And

13  for example, with respect to the restitution under the UCL,

14  that covers the entire class of -- the entire class of 96.

15  The --

16         **THE COURT:**   I'm just asking you what you were asking

17  him.  I have the stipulation with regard to the UCL claim.

18  All right.  So I don't --

19         **MR. TIDRICK:**   It --

20         **THE COURT:**   I'm not assuming that you're talking

21  about that.  I don't understand your question.  You asked him

22  first about 96 class members.  I assume that that's for

23  something other than the overtime claims.

24         **MR. TIDRICK:**   Yes.  So I can run through those

25  quickly.

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 36 of 100   35
Case 4:18-cv-00052-PJH   Document 64   Filed 10/19/12   Page 36 of 99
PETERSEN DIRECT / TIDRICK
Page ID #:1291

```
 1            THE COURT:  Okay.

 2            MR. TIDRICK:  So UCL restitution, there was a

 3   stipulation as to that amount, 410,000.  The -- The

 4   calculation of the prejudgment interest on the restitution --

 5   so that also applies to the full 96.

 6        The Labor Code Section --

 7            THE COURT:  So it's 410 plus --

 8            MR. TIDRICK:  Plus the prejudgment interest.  Right.

 9        So there was a stipulation that the UCL restitution is

10   410,000, and Dr. Petersen --

11                  (Off-the-record discussion.)

12            MR. TIDRICK:  -- calculated prejudgment interest on

13   the UCL restitution.  That's in addition.

14        Also there's the Labor Code Section 203 penalties, which

15   applies to the -- the full class, not just the collective, but

16   that's the class.

17        There's also the Labor Code Section 226 penalties, which

18   are the wage statement penalties.  That also applies on the

19   class basis, not the collective, but rather the class.

20        With respect --

21            THE COURT:  Okay.  I'm sorry.  You're not answering

22   my question.  You just go ahead.  I'll wait until the end.

23            MR. TIDRICK:  I apologize, your Honor.  With respect

24   to the FLSA in particular, is that -- I wasn't totally clear

25   on what you were asking about.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 37 of 100   36
Case 4:14-cv-00852-FJM   Document 234-10   Filed 10/19/17   Page 360 of 99
PETERSON - DIRECT / TIDRICK
Page ID #:1292

| 1 | **THE COURT:** Just go ahead. Just -- |
| 2 | **MR. TIDRICK:** Okay. |
| 3 | **THE COURT:** Just go forward. |
| 4 | BY MR. TIDRICK: |
| 5 | **Q.** What method did you use for computing whether overtime |
| 6 | payments were due during a specific work week? |
| 7 | **A.** That would be hours work worked in excess of 40 during a |
| 8 | specific work week. And after determining if more than 40 |
| 9 | hours had been worked, I would then multiply those hours by |
| 10 | the hourly wage and then multiply that by .5 so that would be |
| 11 | the overtime premium that would be due. |
| 12 | **Q.** How much did you compute as a overtime wages due? |
| 13 | **A.** Well, in my report, Tables 1 and 3 show the overtime wages |
| 14 | due the class members. And Table 1 shows that -- 302,707, and |
| 15 | Table 3 shows 63,595, so the total is 366,302. |
| 16 | **Q.** Can you briefly summarize the difference between what you |
| 17 | described as Tables 1 and 3? |
| 18 | **A.** So Table 1 is for the time period when the payroll data |
| 19 | was available. And Table 3 was for the time period when there |
| 20 | was no payroll data available, so that's when I used the |
| 21 | inferential statistical methods to be able to project the |
| 22 | payments that would be due during that time period. So that's |
| 23 | the difference between Tables 1 and 3. |
| 24 | **Q.** What were the start and stop dates that you used for |
| 25 | computing overtime wages due? |

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-09751-MCS-FFM   Document 32-10   Filed 11/22/19   Page 38 of 100   37
Case 4:94-cv-00952-FJM   Document 234-10   Filed 10/19/12   Page 379 of 99
PETERSON DISTRICT / TIDRICK
Page ID #:1293

1    **A.**   The start date was November 26th, 2009, and the stop date

2    is April 30th, 2016.

3    **Q.**   Why did you stop calculating overtime damages as of April

4    30th, 2016?

5    **A.**   I was -- I was -- I assumed that defendants began paying

6    overtime as of this date.

7    **Q.**   Out of the 96 class members who appeared in the payroll

8    data, how -- how many of the 96 class members appeared in the

9    payroll data?

10   **A.**   Eighty-eight.

11   **Q.**   What was the time period of the payroll data that

12   defendant produced that you reviewed?

13   **A.**   March 7th, 2011 to April 30th, 2016.

14   **Q.**   Did Mr. Woolfson assist you in preparing timekeeping

15   records for you to review?

16   **A.**   Yes, sir.

17   **Q.**   How did you use those records?

18   **A.**   The -- Well, the timekeeping records were used to

19   apportion the hours, the -- the total hours for the payroll

20   period, which was a two-week period between the two separate

21   weeks.  So if the payroll data said that someone worked 90

22   hours, for example, then Mr. Woolfson dug into the timekeeping

23   records to determine how to -- how those hours were

24   apportioned between the first week and the second week.

25       So for example, it could -- the timekeeping records could

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 39 of 100 38
Case 4:14-cv-00852-FJM   Document 234-10   Filed 10/19/17   Page 39 of 99
PETERSON - DIRECT / TIDRICK
Page ID #:1294

 1   show 45 hours on the first week, 45 hours on the second week,
 2   or they could show 40 hours on the first week, 50 hours on the
 3   second week.  So the timekeeping records were utilized to be
 4   able to specifically compute the overtime by week.
 5   **Q.**  Did you do a projection for the overtime payments that was
 6   due class members who had payroll data available?
 7   **A.**  Yes.  Yes.  As I noted earlier, all those are contained in
 8   Table 1 of my report.
 9   **Q.**  And you've already described what those numbers were?
10   **A.**  Yes.  I already described the methodology that was used to
11   compute those numbers.
12   **Q.**  What are the bottom-line numbers for the overtime payments
13   due the class who had payroll data available?  That was
14   Table 1, you said?
15   **A.**  That was in Table 1, yes.  Table 1 shows $302,707 in
16   Table 1.
17   **Q.**  Did you prepare a separate set of overtime calculations
18   for the FLSA collective action members?
19   **A.**  Yes.
20   **Q.**  You included those calculations at some table of your
21   report?
22   **A.**  Yes.  Those are contained on Table 2.
23   **Q.**  Are you able to tell us the bottom-line numbers for the
24   overtime calculations for the FLSA collective action members?
25   **A.**  Yes.  So these I just used the same methodology that I

Case 2:18-cv-09751-MCS-FFM   Document 264-10   Filed 11/22/19   Page 40 of 100   39
Case 4:14-cv-00052-FJM   Document 264-10   Filed 10/19/17   Page 39 of 90
PETERSEN - DIRECT / TIDRICK
Page ID #:1295

```
 1    used for the previous set of the overtime calculations that we
 2    went through, but just the time period's going to be different
 3    depending on when the opt-in form was -- was filed, that we go
 4    back three years from that date and then add up the -- the
 5    damages for the overtime payments that are already computed in
 6    Table 1 during that specific time period.
 7         So three years from the filing date, the overtime wages
 8    are 114,524.  That's shown on Table 2.
 9    Q.  Why do you have calculations labeled "two-year period from
10    filing of consent form" and "three-year period from filing of
11    consent form" in that table?
12    A.  That was at request of plaintiffs' counsel.  They wanted
13    me to do it both of those ways.
14         THE COURT:  Counsel, what's the difference between
15    the two different lists?  I see some of the names repeat on
16    both lists.
17         MR. TIDRICK:  Your Honor, you're referring to the
18    exhibit --
19         THE COURT:  I'm looking at Table 1, and I'm looking
20    at the first column on Table 2 in the three-year segment.
21    BY MR. TIDRICK:
22    Q.  Dr. Petersen, can you explain why some of those name
23    repeat?
24    A.  Yes, because I was instructed to compute both the overtime
25    wages shown on Table 1, and then in addition, if they were in
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 264-10   Filed 11/22/19   Page 41 of 100   40
Case 4:14-cv-00052-PJH   Document 264-10   Filed 10/19/17   Page 40 of 99
PETERSON — DIRECT / TIDRICK
Page ID #:1296

1    the FLSA class, to compute based upon the -- to compute the

2    overtime wages based upon the two- and three-year time periods

3    from the data filing the opt-in.  So these -- these numbers

4    are in addition to the numbers calculated on Table 1.

5    Q.  And --

6         THE COURT:  Table 1's the UCL claim for restitution,

7    correct?

8         MR. TIDRICK:  Yes.

9         THE WITNESS:  Yes.

10         THE COURT:  For which there's a stipulation?

11         MR. TIDRICK:  I'm trying to get at what the -- to

12    explain how he calculated the FLSA numbers.  And in order to

13    understand the FLSA numbers, that that background is

14    important.

15         And to anticipate a question that Your Honor might have,

16    the reason that we still need to identify what the -- the FLSA

17    overtime numbers are is that the liquidated damages under the

18    FLSA for which the -- the court's summary judgment order

19    granted liability on that claim for liquidated damages, under

20    the statute, that amount is exactly the same as what the

21    amount of the FLSA overtime.

22         So to kind of make a long story short, the -- the

23    calculation of -- of this subset of individuals are in the

24    FLSA collective establishes what the amount of FLSA overtime

25    is due, and that's the amount that is appropriate for

Case 2:18-cv-09751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 42 of 100   41
Case 4:14-cv-00052-FJM   Document 254-10   Filed 10/19/17   Page 44 of 99
PETER BRANDT / TIDRICK
Page ID #:1297

1    liquidated damages.

2              THE COURT:  Okay.

3    BY MR. TIDRICK:

4    Q.  Can you explain why the table includes a liquidated

5    damages number?

6    A.  That was done at the request of plaintiffs' counsel that

7    liquidated damages should be an amount equivalent to the

8    overtime wages due for the FLSA members.

9    Q.  Now, some questions about your methodology for determining

10   payments that were due to individuals who were not in the

11   payroll records.  There are individuals who appear in the

12   class list for whom no payroll records were available,

13   correct?

14   A.  That's correct.

15   Q.  Was -- Was it 96 individuals?  Or --

16   A.  No.

17   Q.  Rather was it some subset of the 96 individuals --

18              (Simultaneous colloquy.)

19             THE WITNESS:  Yes, a subset of the 96 individuals.

20   Think the number was 22, so there were some -- there's some

21   people that have no payroll records available for them, and

22   there's some people that have payroll records but also worked

23   outside of the payroll period.

24        So those would be the people that I was doing the

25   projection of the damages for because we didn't have the

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 43 of 100   42
Case 4:14-cv-00052-FJM   Document 234-10   Filed 10/19/17   Page 429 of 99
PETER BELL — DIRECT / TIDRICK
Page ID #:1298

 1   payroll data for them.

 2   **BY MR. TIDRICK:**

 3   **Q.**  In order to project damages for those individuals, you

 4   utilized the results of the damages for individuals who do

 5   appear on the payroll data; is that right?

 6   **A.**  Yes, that's correct.

 7   **Q.**  Why?

 8   **A.**  Well, that's because we have data of what actually

 9   happened during the -- during the payroll period that -- that

10   I described.  And after doing my statistical analysis of that

11   data, it was a very reliable predictor for the damages

12   estimates outside of the payroll period.

13   **Q.**  How did you do that projection?

14   **A.**  Well, the key statistic is the average payment of overtime

15   that was due per year of work, and I computed that as $4,286.

16       And this average payment has a margin of error of only 4.7

17   percent, which means it's a very reliable predictor.  It means

18   that there's a 4.7 chance that it's too high.  There's also a

19   4.7 chance that it's too low, so it's a less than 5 percent

20   chance that this estimator is going to be incorrect.

21       And so the average hourly wage during the payroll period

22   was $18.86.  And the hourly wage prior to the start of the

23   payroll period was $17 per hour on average.

24       So therefore if we adjust this figure that I just cited,

25   the $4,286, we adjust that down from the average hourly wage

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-03751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 44 of 100   43
Case 4:18-cv-00052-PJH   Document 234-1   Filed 09/19/19   Page 44 of 99
PETERSON — DIRECT / TIDRICK
Page ID #:1299

| 1 | of 18.86 down to the $17 per hour, then we come up with a |
| 2 | figure of $3,863. |
| 3 | So for every year that's worked prior to the start of the |
| 4 | payroll period, that's my estimate of what the overtime |
| 5 | payments that are due. |
| 6 | **Q.** The methodology utilized gives an estimate that the |
| 7 | average Open Top bus driver worked 454 hours per year of |
| 8 | overtime? |
| 9 | **A.** Yes, that's the average.  Yes. |
| 10 | **Q.** What does that translate to on a weekly basis? |
| 11 | **A.** On a weekly basis, that translates into a work week of |
| 12 | 48.73 hours, which would be 8.73 hours of overtime per week. |
| 13 | **Q.** That's the number you used for projecting damages when no |
| 14 | payroll records were available? |
| 15 | **A.** Yes. |
| 16 | **Q.** Did you do anything to verify that that was an accurate |
| 17 | estimate for the individuals who were not in the payroll |
| 18 | records? |
| 19 | **A.** Yes.  Well, the first thing is, as I stated, the margin of |
| 20 | error on that statistic is 4.7 percent, which is incredibly |
| 21 | low.  And then also I conducted a survey of the individuals |
| 22 | who had no payroll data available for them during that time |
| 23 | period prior to the start to the payroll data period to ask |
| 24 | them, how many hours did you work on average, to verify that |
| 25 | they all -- to verify that they were working at least this |

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 45 of 100   44
Case 4:18-cv-00052-PJH   Document 234-10   Filed 10/19/21   Page 44 of 99
PETER GABRIEL TIDRICK / TIDRICK
Page ID #:1300

1    many overtime hours.

2    **Q.**  What did the survey indicate?

3    **A.**  The survey indicated the survey respondents stated that

4    they worked approximately -- a little more than 60 hours per

5    week on average.  That's in excess -- That's going to be in

6    excess of what -- the computation that I -- the estimator that

7    I used, which was 48.73 hours of work per week.

8         So that confirms that that's a very conservative estimate.

9    **Q.**  Based on your report, do I understand that the individuals

10   surveyed stated they worked approximately 66 hours per week?

11   **A.**  Yes.  Actually, that's right.  It's approximately 66 hours

12   per week, is how often -- how much hours they were claiming

13   that they worked.

14   **Q.**  So on average they -- they worked more hours than the

15   projected -- than this projection that you utilized?

16   **A.**  That's correct.

17   **Q.**  Fair to say that your analysis, then, is a conservative

18   estimate?

19   **A.**  Yes, I'd say it's a conservative estimate.

20   **Q.**  How many individuals in the class list worked outside the

21   payroll period?

22   **A.**  Twenty-two.

23   **Q.**  How many of those individuals did you have contact

24   information for?

25   **A.**  Phone numbers for 13 of them.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 46 of 100   45
Case 4:14-cv-00982-PJH   Document 234-10   Filed 10/19/17   Page 496 of 90
PETER'S DIRECT / TIDRICK
Page ID #:1301

1    **Q.**  How many of them actually took the survey that you

2    conducted?

3    **A.**  Eleven.  That's a very high response rate, which again

4    goes to validating the -- validating the data.  When you get

5    11 out of the 13 responses, that's a very good response rate

6    to a survey.

7    **Q.**  You believe that the survey results confirm that your

8    estimate of 454 hours per year of overtime is accurate?

9    **A.**  Yes, they do.

10   **Q.**  Or conservative even, right?

11   **A.**  Yes.

12   **Q.**  Does your work include a table that shows the overtime

13   payments that are due for individuals who worked outside the

14   payroll period?

15   **A.**  Yes, that information is contained in Table 3.

16   **Q.**  Does that include a bottom-line number?

17   **A.**  (Reviewing document.)

18        Yes, it does.  The bottom-line number is 63,595.

19   **Q.**  Now, with respect to calculations of penalties for

20   overtime violations, did you do an analysis or prepare a table

21   on that?

22   **A.**  Yes, I did.  That's Table 4 of my report.  Actually

23   Tables 4 and 5.  Table 4 is going to be for the people who

24   appear in the -- individuals who appear in the payroll data.

25   Table 5 will be for the individuals where there was no payroll

Case 2:18-cv-08751-MCS-FFM   Document 24-10   Filed 11/22/19   Page 47 of 100   46
Case 4:14-cv-00921-PJH   Document 224-10   Filed 10/19/17   Page 49 of 99
PETERSON / DIRECT / TIDRICK
Page ID #:1302

 1    data available.

 2    **Q.**  Can you walk us through those tables and -- Let me ask a

 3    different way.

 4         Can you explain how you computed the penalties?

 5    **A.**  Yes, I can.

 6         But, Your Honor, I'm going to read from my report because

 7    there's dates and --

 8         (Reviewing document.)

 9         There's dates and amounts that I may mess up if I try to

10    do it off the top of my head, so I'm going to read from my

11    report on paragraph 31 on page 7.

12         The first penalty that I computed is Labor Code 203,

13    waiting time.  And I computed up to 30 days of pay per

14    individuals no longer employed by defendants, and individuals

15    currently employed by the company who had a break in

16    employment based on the formula of number of days up to 30,

17    times 8 hours per day, times the average wage during the

18    employment period.  And I computed this from November 26, 2010

19    to the present for all members of the Rule 23 class whose

20    employment terminated at any time during that time frame.

21              **THE COURT:**  November 26th, 2010?

22              **THE WITNESS:**  Yes.

23              **THE COURT:**  Okay.

24              **THE WITNESS:**  The second penalty I computed is the

25    PAGA Labor Code 2699(f), and it's the waiting time civil

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-02751-MCS-FFM   Document 224-10   Filed 11/22/19   Page 48 of 100   47
Case 4:94-cv-00652-FJM   Document 764-10   Filed 10/19/17   Page 49 of 99
PETERSON DISTRICT / TIDRICK
Page ID #:1303

```
 1    penalty, and this will be related to the Labor Code -- the
 2    waiting time penalty.  So if there was a waiting time penalty,
 3    it would generate this penalty.  And it was computed from
 4    December 22nd, 2012 to April 20th, 2016 or $100 for the
 5    initial pay period violation and $200 per pay period for
 6    subsequent violation.
 7         So you see that if you -- if someone had a waiting time
 8    penalty, then they were going to get the $100 additional from
 9    this penalty.
10         The third penalty is Labor Code 226(e), inaccurate wage
11    statements, computed from November 26, 2012 to April 20th,
12    2016 based on the formula of $50 for the initial pay period
13    and $100 per pay period for subsequent pay period violations
14    up to a maximum of $4,000 per individual.
15         And the final penalty is PAGA Labor Code 2699(f) related
16    to the inaccurate wage statements computed from December 22nd,
17    2012 to April 20th, 2016 based upon the formula of $100 for
18    initial pay period violation, and $200 per pay period for
19    subsequent pay period violations.
20         So those four penalties were computed and shown on Tables
21    4 -- 4 and -- Table 4 for the -- for the persons who had
22    payroll data available for them.  And then 4A for the people
23    who did not appear in the payroll data.  I misstated when I
24    said "Table 5".  I meant to say Table 4A.
25
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 49 of 100   48
Case 4:14-cv-00652-PJH   Document 234-10   Filed 10/15/17   Page 49 of 99
PETER RIECT / TIDRICK
Page ID #:1304

1    **BY MR. TIDRICK:**

2    **Q.**  So just to make sure I got the numbers right that you

3    calculated with respect to the waiting time penalties, which

4    the lawyers referred to as Section 203 penalties, the waiting

5    time penalties, what was your calculation of the bottom-line

6    number of the -- of those waiting time penalties?

7    **A.**  (Reviewing document.)

8        287,698.

9                    (Off-the-record discussion.)

10            **THE WITNESS:**  For the individuals on the payroll

11   data.

12   **BY MR. TIDRICK:**

13   **Q.**  And that number, again, is what, 287,000?

14   **A.**  698.

15   **Q.**  And that's the number of the penalties for individuals who

16   are in the payroll data?

17   **A.**  Yes.

18   **Q.**  And for the individuals who are not in the payroll, you

19   calculated the Labor Code Section 203 penalties for them as

20   well?

21   **A.**  Yes.

22   **Q.**  And what was that number?

23   **A.**  I just noticed I didn't summarize that number in Table 4A,

24   so I'd have to -- I can pull out my calculator right now and

25   compute it really quickly if you'd like.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 232-10   Filed 10/11/19   Page 49 of 90
Case 4:14-cv-00982-PJH   Document 234-10   Filed 11/22/19   Page 50 of 100   49
PETER DUBROWSKI / TIDRICK
Page ID #:1305

| | |
|---|---|
| 1 | **Q.** Yes, please. |
| 2 | **A.** Okay. |
| 3 | (Pause in the proceedings.) |
| 4 | **THE WITNESS:** This is on Table 4A, the -- |
| 5 | (Pause in the proceedings.) |
| 6 | **THE WITNESS:** So for that first column on Table 4A, |
| 7 | the total is -- oops, I probably shouldn't be marking that -- |
| 8 | it's $23,719. |
| 9 | **BY MR. TIDRICK:** |
| 10 | **Q.** And so do I understand correctly for the total Section 203 |
| 11 | penalties, the waiting time penalties, the numbers are 287,698 |
| 12 | for individuals in the payroll data? |
| 13 | **A.** Yes. |
| 14 | **Q.** And for individuals not in the payroll data, it's 23,719? |
| 15 | **A.** Yes. |
| 16 | **Q.** And to make sure I understand the numbers right that you |
| 17 | calculated for the wage statement, the inaccurate wage |
| 18 | statement penalties, the Labor Code Section 226, what was the |
| 19 | bottom-line number of penalties you calculated for that? |
| 20 | **A.** For the individuals in the payroll data, it's 65,950. |
| 21 | **Q.** For the individuals who are not in the payroll data? |
| 22 | **A.** Again, this number's not included on my Table 4A, but I |
| 23 | can quickly add it up here. That would be $9,000. |
| 24 | **Q.** And what was your bottom-line number for your calculation |
| 25 | of the PAGA penalties, the Labor Code Section 2699 penalties |

Case 2:18-cv-09751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 51 of 100   50
Case 4:14-cv-00982-PJH   Document 264-10   Filed 10/19/17   Page 500 of 99
PETERSON v. DICT / TIDRICK
Page ID #:1306

```
 1    for the violation of Labor Code 226, the wage statements?
 2    A.   For individuals who had payroll data available, 149,900.
 3         And then for the individuals with no payroll data, I'm
 4    going to have to add this up on my calculator.
 5                   (Pause in the proceedings.)
 6         THE WITNESS:   27,600.
 7    BY MR. TIDRICK:
 8    Q.   Now, with respect to the PAGA penalties, the Labor Code
 9    Section 2699 penalties that you calculated for the -- for the
10    Labor Code Section 203, waiting time instances, what was your
11    bottom-line number with respect to that calculation of
12    penalties?
13    A.   That would be -- On Table 4, it would be $6,800 for the
14    individuals who appear in the payroll data.
15    Q.   And then for the individuals not in the payroll data, the
16    number is what?
17    A.   I'm going to have to add that up real quick.
18         $600.
19    Q.   Now, with respect to interest -- Part of your assignment
20    was to calculate interest for certain categories of damages,
21    correct?
22    A.   Yes.
23    Q.   What categories of damages did you compute interest for?
24    A.   (Reviewing document.)
25         For the overtime.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-03751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 52 of 100   51
Case 4:14-cv-00962-PJH   Document 264-10   Filed 10/19/17   Page 53 of 99
PETERS — DIRECT / TIDRICK
Page ID #:1307

```
 1   Q.  What interest rate did you use?

 2   A.  Sorry.  The overtime, that's on Tables 1 and 3.  I didn't

 3   compute any interest on the overtime on Table 2, the FLSA.

 4   Just Tables 1 and 3.

 5   Q.  So the interest that you calculated was based on what the

 6   UCL restitution number was, correct?

 7   A.  Yes.

 8   Q.  And that amount was what, the UCL restitution amount that

 9   you based your interest calculation off of?

10   A.  The total amount?

11   Q.  Yes.

12   A.  (Reviewing document.)

13       302,707.

14   Q.  Now, I'll represent to you that --

15           THE COURT:  Now, excuse me.  Was that interest or was

16   that the overtime?

17           MR. TIDRICK:  That was the underlying -- that was the

18   UCL restitution amount.

19           THE WITNESS:  The overtime.

20           THE COURT:  I thought you submitted a stipulation.

21           MR. TIDRICK:  Yes.  And that's what I was getting to.

22   Q.  The interest that you calculated on -- I'll represent to

23   you that the parties have actually stipulated that the UCL

24   restitution amount is higher than -- than what you calculated.

25       The parties agree that the UCL restitution amount is
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 53 of 100   52
Case 4:14-cv-00920-PJH   Document 264-10   Filed 10/19/17   Page 529 of 99
PETERS DIRECT / TIDRICK
Page ID #:1308

1    $410,000.

2         So my question is simply, the calculation that you did for

3    prejudgment interest was actually based on a lower number.

4    **A.**  That's correct.

5    **Q.**  So fair to say your calculation of the prejudgment

6    interest is extremely conservative, right?

7    **A.**  Yes.

8    **Q.**  And the interest rate that you used to calculate that

9    interest on the UCL restitution was what?

10   **A.**  10 percent simple.

11   **Q.**  And are you able to walk us through the computations you

12   did of the interest?

13   **A.**  Yes.  Very straightforward computation.  It's from the

14   date of the -- you take the date of the trial --

15        Well, you take the date when the -- when the overtime

16   was -- was due, and you calculate the number of years until

17   the present.  And then you multiply that number by the amount

18   of overtime due as of that date and then multiply that number

19   by 10 percent.  That's how you compute 10 percent simple

20   interest.

21   **Q.**  Are the FLSA collective action members contained in

22   Table 6 and 7?

23   **A.**  Well, their names are going to be there, but none of

24   the F-L -- I did not compute interest on any of the FLSA

25   numbers that are contained in Table 2.

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 54 of 100   53
Case 4:14-cv-00852-PJH   Document 234   Filed 10/19/17   Page 53 of 99
PETERSON - DIRECT / TIDRICK
Page ID #:1309

1    **Q.** So if you were to exclude the FLSA collective action

2    members, there would be no change in your calculation of the

3    prejudgment interest?

4    **A.** Well, if I -- are you asking me if I took -- if I took the

5    FLSA members out of that table?

6    **Q.** Did you?

7    **A.** There are FLSA members that are in Table 6. So, yeah, if

8    I took them out, that would lower the number.

9    **Q.** Just circling back, I believe you were testifying with

10   respect to -- you have testified this morning with respect to

11   the amount of FLSA overtime. I want to make sure I

12   understand, what was your bottom-line number on the amount of

13   Fair Labor Standard Act FLSA overtime compensation owed?

14   **A.** Well, for the three-year period from consent filing date,

15   it's 114,524 for the overtime wages. Same number for the

16   liquidated damages, 114,524, for a total of 229,049.

17              **THE COURT:** Which table is that reflected on?

18              **THE WITNESS:** That's on Table 2, Your Honor.

19   **BY MR. TIDRICK:**

20   **Q.** Did you prepare a table that summarizes all the different

21   damages that you computed?

22   **A.** Yes.

23   **Q.** Are you able to walk us through all of those damages

24   amounts?

25   **A.** (Reviewing document.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-03751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 55 of 100   54
Case 4:14-cv-00052-PJH   Document 264-10   Filed 10/19/17   Page 54 of 99
PETERSON - DIRECT / TIDRICK
Page ID #:1310

1     Yes.  That's included on Table 9, and that table in my

2   report also contains the rest break payments, so I prepared a

3   separate table that excludes the rest break payments, and if

4   you would -- if Your Honor would like to have that for her

5   reference to get the total amount of -- of what we talked

6   about just today.

7   **BY MR. TIDRICK:**

8   **Q.**  We don't need the rest break amounts.

9           **THE COURT:**  Right.

10          **THE WITNESS:**  Right.  So I have -- So if you look at

11  Table 9, it includes the rest break payments 'cause I computed

12  that in my original report.  But I prepared a separate table

13  for today which excludes those amounts.

14          **THE COURT:**  Okay.  All right.  Do you have an extra

15  copy?

16          **THE WITNESS:**  Yes, I do.

17                  (Pause in the proceedings.)

18          **THE COURT:**  Isn't it taking out the third block?

19          **THE WITNESS:**  The third block plus also eliminating

20  the rows that are entitled "FLSA Overtime Two Years" because

21  it's my understanding that that number is no longer in play.

22      We're using the FLSA overtime three years, so that

23  simplifies that issue as well.

24          **THE COURT:**  Okay.

25

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 56 of 100   55
Case 4:14-cv-00052-PJH   Document 272-10   Filed 10/19/17   Page 56 of 99
PETERS - DIRECT / TIDRICK
Page ID #:131

```
 1    BY MR. TIDRICK:

 2    Q.   Now, I just want to make sure --

 3                 (Off-the-record discussion.)

 4    BY MR. TIDRICK:

 5    Q.   -- with respect to your calculation of the waiting time

 6    penalties, that was based on data that you were given access

 7    to regarding termination dates of the various class members,

 8    correct?

 9    A.   Yes, I had data on their employment periods.

10    Q.   And if you -- do you recall that that came out of

11    responses that defendant had provided responding to

12    interrogatories?

13    A.   That's my understanding of the data.

14    Q.   And if you could, please, in the binder turn to Exhibit

15    78.

16    A.   (Reviewing documents.)

17         Okay.  I'm there.

18    Q.   And just looking at Exhibit 78, is -- does Exhibit 78

19    include the various data on termination dates that you used to

20    calculate the waiting time amounts?

21    A.   Yes.  This is the data that I used.  Or looks like the

22    data I used.  Yes.

23                 MR. TIDRICK:  Your Honor, plaintiffs move that

24    Exhibit 78 be admitted into evidence.

25                 THE COURT:  Any objection?  What is 78?
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 57 of 100   56
Case 4:19-cv-00052-PJH   Document 131-12   Filed 10/19/12   Page 58 of 99
PETERSON DISTRICT / TIDRICK
Page ID #:1312

```
 1           MR. TIDRICK:  It's Defendant Open Top Sightseeing
 2    San Francisco LLC's Supplemental Response to Plaintiff's
 3    Special Interrogatories Set Three.  And this is an exhibit for
 4    which there was a stipulation as to authenticity.
 5           THE COURT:  Any objection?
 6           MR. PURCELL:  Your Honor, I -- just as clarification,
 7    are they offering this for all of the interrogatory responses
 8    or --
 9           THE COURT:  What -- For what purpose are you offering
10    their (sic) exhibit?
11           MR. TIDRICK:  This is data regarding termination
12    dates that the expert relied upon.
13           MR. PURCELL:  What I'm asking is there are several
14    interrogatories in -- all of these interrogatories that you --
15           MR. TIDRICK:  Yes, it's all of them, and that's
16    because there are some individuals who were terminated just
17    once.  There are some individuals who were terminated but then
18    rehired and then terminated again.  And so for those
19    individuals, there'd be multiple instances of waiting time
20    penalties.  All of the interrogatories -- interrogatory
21    responses in this document, No. 5 No. 6, No. 7 --
22           THE COURT:  All right.  It's admitted.
23           MR. TIDRICK:  -- No. 8.
24       (Plaintiffs' Exhibit 78 received in evidence)
25           MR. TIDRICK:  Now, among the documents that were
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Ex. H, p. 642

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 58 of 100   57
Case 4:14-cv-00852-FJM   Document 234-10   Filed 10/19/17   Page 57 of 99
PETERSEN - DIRECT / TIDRICK
Page ID #:1313

1    submitted to the court, it -- lodged with the court electronic

2    format because they're extremely voluminous, were payroll

3    records.

4        And specifically Exhibit 11 includes payroll data that the

5    expert relied upon.  I don't know whether the court still has

6    the flash drives that were lodged with the court.  I have

7    additional copies today.  I simply want to get these into

8    evidence that these are records that the expert relied upon.

9        **THE COURT:**  Once again, something more than this?

10       **MR. TIDRICK:**  Yes.  Right now I'm referring to

11   Exhibit 11, which is hundreds of electronic payroll records

12   that were included in an electronic exhibit on a flash drive.

13   These are the records for which there was a stipulation about

14   the authenticity and admissibility.

15       **THE COURT:**  And you don't have the actual records?

16       **MR. TIDRICK:**  Oh, well -- we have the records in

17   electronic format.  There are hundreds of files.  Some of them

18   are not amenable to printing.  They include spreadsheets.

19   Some are pdf's that can be printed.  But many of them are

20   essentially database files that are not amenable to printing.

21       **THE COURT:**  And you don't have a summary?

22       **MR. TIDRICK:**  Dr. Petersen is able --

23       **THE COURT:**  Generally I don't admit voluminous

24   documents about which there's no testimony.  If the -- You can

25   call a summary witnesses under the rules of evidence to

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-09751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 59 of 100   58
Case 4:14-cv-00625-PJH   Document 264-10   Filed 10/19/17   Page 59 of 99
PETERSEN - DIRECT / TIDRICK
Page ID #:1314

```
 1    summarize the evidence.

 2        I don't quite understand why you need all the underlying

 3    documents that were relied upon by the expert.

 4            MR. TIDRICK:  Belt and suspenders.  There was a

 5    stipulation as to authenticity.

 6    Q.  Dr. Petersen, do you recall that you relied upon

 7    electronic payroll records that were in a Exhibit 11 folder?

 8    A.  Exhibit 11?  Should I open up the binder here?

 9    Q.  Well, it was electronic -- electronic payroll records.

10    A.  Oh, yes.  Yes.

11            THE COURT:  And where's the stipulation?

12            MR. TIDRICK:  It is in the Joint Pretrial Statement,

13    Docket 165, at ECF page 4, lines 4 to 26.

14            THE COURT:  Page 4, line 4 to 26.  I don't see --

15            MR. TIDRICK:  So there's a statement near the top

16    that -- a stipulation that --

17            THE COURT:  I'm looking at the document.  Page 4 is

18    statement of all relevant undisputed facts --

19            MR. TIDRICK:  Yes.

20            THE COURT:  -- for which the parties will stipulate

21    and -- into the trial record without the necessity for

22    supporting testimony or exhibits?  Is that what I'm --

23            MR. TIDRICK:  Correct.

24                    (Simultaneous colloquy.)

25            MR. TIDRICK:  And then below that, there's a
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 60 of 100  59
Case 4:19-cv-00852-PJH   Document 264-10   Filed 10/19/12   Page 59 of 99
PETER TIDRICK / TIDRICK
Page ID #1315

1   statement about one, two, three, four, five bullet points

2   down --

3          THE COURT:  Okay.

4          MR. TIDRICK:  -- that defendant's payroll records are

5   authentic and admissible to show the amounts that Open Top

6   paid to operators for the time periods covered by those

7   records.

8          THE COURT:  Okay.  All right.  So there's no dispute,

9   correct?

10         MR. PURCELL:  Yes, Your Honor.

11         THE COURT:  All right.  So the expert can certainly

12  testify -- I don't want to take ownership of a flash drive

13  that I'm sure I will lose unless I need to look at the

14  documents.

15         MR. TIDRICK:  I just wanted to make absolute (sic)

16  sure that we didn't have any foundational issues with respect

17  to the evidence that was relied upon.

18         THE COURT:  All right.  Is there any objection to the

19  expert relying upon what's in those payroll records that

20  you've stipulated to?

21         MR. PURCELL:  No, Your Honor.  To the -- we would

22  stand by our stipulation that those show the amounts that Open

23  Top paid the operators.

24         THE COURT:  Okay.

25         MR. TIDRICK:  And just -- That's all I have got on

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-03751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 61 of 100
Case 4:13-cv-00092-PJH   Document 264   Filed 10/19/17   Page 61 of 99   60
PETER BIRECT / TIDRICK
Page ID #:1316

```
 1    direct.  Thank you.

 2              THE COURT:  Okay.

 3        Cross?  Am I to assume, then, that the last exhibit before

 4    the interrogatories, that summary, that's what's being sought

 5    in this case?

 6              MR. TIDRICK:  The last table, is that --

 7              THE COURT:  Table 9?  Yes?  No?

 8              MR. TIDRICK:  Well, with least one exception.

 9                   (Pause in the proceedings.)

10              MR. TIDRICK:  With respect to the UCL restitution,

11    the amount sought is $410,000 pursuant to the stipulation that

12    was filed yesterday.  With respect to the prejudgment interest

13    on the restitution, the amount is 166,195 as -- as the

14    testimony indicated.

15              THE COURT:  Is that in one of the tables?

16              THE WITNESS:  It's in the table that I -- that I just

17    handed you, the supplemental Table No. 9.  And it's also in my

18    original report, too.

19              THE COURT:  That is the interest on overtime wages?

20              THE WITNESS:  Yes.

21              THE COURT:  All right.  And that's on the UCL versus

22    the -- Well, I'll wait.

23              MR. TIDRICK:  That is on the UCL restitution.

24              THE COURT:  On the UCL restitution.

25              MR. TIDRICK:  Yes.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 62 of 100   61
Case 4:14-cv-00052-PJH   Document 234-10   Filed 10/19/17   Page 62 of 99
PETERSON - DIRECT / TIDRICK
Page ID #:13117

1   **THE COURT:**  And am I correct, are you seeking on

2   behalf of the FLSA class the unpaid overtime amount, that's

3   $366,302; the liquidated damages in the amount -- in that same

4   amount --

5      Actually, while the witness is on the stand, would you

6   summarize for me the Table 9?

7   **THE WITNESS:**  Yes.  So are you talking about the

8   Table 9 that I just handed you or the one that was in my

9   report?

10   **THE COURT:**  Either one.  It doesn't matter.

11   **THE WITNESS:**  So the table -- So the first -- the

12   first line is overtime wages, which is the amount of 366,302.

13   And my understanding is that number's no longer in play

14   because that's the number that's been stipulated to as 410,000

15   something.

16      So --

17   **THE COURT:**  Is that correct?

18      I'm trying figure out, are you seeking double recovery for

19   overtime wages?

20   **MR. TIDRICK:**  We are not seeking double recovery.

21      So the -- the $229,000 -- $229,049 figure includes both

22   the liquidated damages and the underlying FLSA overtime.

23      We're only seeking half of that.  In other words, we're

24   only -- because the FLSA overtime is already covered by the

25   UCL restitution.  So the -- the amount that we're seeking for

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 63 of 100   62
Case 4:18-cv-00052-PJH   Document 264-10   Filed 10/15/19   Page 629 of 99
PETERSEN - DIRECT / TIDRICK
Page ID #:1318

```
 1      liquidated damages is half of that amount.  It's the -- the

 2      figure that Dr. Petersen testified to, 114,524.

 3                  THE COURT:  Okay.

 4          Okay.  Sorry.  I interrupted.

 5                  MR. TIDRICK:  And to go through the other figures --

 6                  THE COURT:  Okay.

 7                  MR. TIDRICK:  -- the Labor Code Section 203

 8      penalties, Dr. Petersen testified that the amounts are -- the

 9      sum of 287,698 and 23,719.

10          The sum of those two numbers is the Labor Code Section 203

11      penalties.

12                  THE COURT:  And where is that reflected on Table 9?

13                  MR. TIDRICK:  That's not in Table 9.

14      Q.  Are you able to identify the table that that's in?

15      A.  (Reviewing document.)

16          Yeah.  Well, the number in Table 9 under "penalties on

17      overtime wages," the 592,988, that Labor Code 203 is a

18      component of that.  So this is going to sum up -- this table

19      just sums up all the different penalties that are on Tables 4

20      and 4A.  So Table 4 and 4A will give you the specific numbers

21      that go into that number that's on the summary table.

22                  THE COURT:  Okay.

23                  MR. TIDRICK:  And so I was simply going to walk

24      through in the proposed findings and fact, we have it broken

25      down penalty by penalty.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 64 of 100   63
Case 4:14-cv-00982-PJH   Document 264-10   Filed 10/15/17   Page 63 of 99
PETERSON DIRECT / TIDRICK
Page ID #:1319

```
 1              THE COURT:  Okay.

 2   BY MR. TIDRICK:

 3   Q.  And so just to make sure we've got those numbers, with

 4   respect to the Labor Code Section 203, you said that the --

 5   it's the sum of 287,698 plus 23,719, correct?

 6   A.  Correct.

 7   Q.  And with respect to the Labor Code Section 226, wage

 8   statements penalties, you testified it's the sum of 65,950

 9   plus 9,000, correct?

10   A.  Yes.

11   Q.  And with respect to the penalties under PAGA, do I

12   understand right, you testified that for the PAGA Labor Code

13   Section 2699 penalties associated with the Labor Code Section

14   226 violations, the inaccurate wage statements, you testified

15   that that figure is the sum of 149,900 and 27,600, correct?

16   A.  Yes.

17   Q.  And with respect to the Labor Code Section 2699 penalties,

18   you calculated that for -- in connection with defendants'

19   violation of Labor Code Section 203, the waiting time, you

20   calculated that that was the sum of 6,800 plus 600, correct?

21   A.  Yes.

22   Q.  And the sum is 7400, correct?

23   A.  Yes.

24   Q.  And I -- just to be clear, the prejudgment on the

25   restitution, the prejudgment interest you calculated on the
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 232-10   Filed 11/22/19   Page 65 of 100   64
Case 4:14-cv-00852-PJH   Document 264-10   Filed 10/13/17   Page 64 of 99
PETER __ JCT / TIDRICK
Page ID #:1320

```
 1        UCL restitution amount, that figure was 166,195, correct?
 2   A.   Yes.
 3                  (Pause in the proceedings.)
 4             MR. TIDRICK:  So I believe I've covered them.
 5             THE COURT:  Okay.  So the overtime on -- looking once
 6        again at Table 9, the top figure of $366,302 is superseded by
 7        the $410,000 stipulation, correct?
 8             MR. TIDRICK:  Correct.
 9             THE COURT:  And where do the -- in the second box,
10        we're just looking at the three-year statute of limitations?
11        And is that subsumed?
12             MR. TIDRICK:  When you say "the second box," you're
13        saying the FLSA overtime wages --
14             THE COURT:  Right.
15             MR. TIDRICK:  -- three years?
16        That $229,049 figure, half of it is subsumed by the UCL
17        restitution.
18             THE COURT:  And the other half is the liquidated
19        damages?
20             MR. TIDRICK:  Exactly.  And the number dividing that
21        in 2 is 114,524.  So that figure -- the -- is the figure that
22        is being sought for the FLSA liquidated damages, 114,524.
23             THE COURT:  Okay.
24        All right.  Cross-examination?
25             MR. PURCELL:  Yes, Your Honor.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 66 of 100   65
Case 4:14-cv-00982-PJH   Document 234-10   Filed 10/19/17   Page 69 of 99
PETERSEN / PURCELL
Page ID #:1321

| 1 | <u>CROSS-EXAMINATION</u> |
| 2 | **BY MR. PURCELL:** |
| 3 | **Q.** Good morning, Dr. Petersen. |
| 4 | **A.** Good morning. |
| 5 | **Q.** Dr. Petersen, is it fair to say that all the testimony |
| 6 | that you gave today was based on documentation provided to you |
| 7 | by Mr. Woolfson? |
| 8 | **A.** No. |
| 9 | **Q.** Okay. What was not provided by Mr. Woolfson? |
| 10 | **A.** The analysis that I did -- Well, Mr. Woolfson provided me |
| 11 | payroll and timekeeping records that I based my analysis on in |
| 12 | Table 1, which was the -- Tables 1 and 2, which was for the |
| 13 | payroll data period. But then I also did my statistical |
| 14 | analysis and projections for the time period outside of the |
| 15 | payroll data. |
| 16 | **Q.** Okay. And other than the liquidated damages under the |
| 17 | FLSA, does your statistical analysis have any bearing on any |
| 18 | other claims that are still at issue? |
| 19 | **A.** On the penalties. |
| 20 | **Q.** You testified that you based your analysis on whether or |
| 21 | not unpaid overtime was due to a class member based on whether |
| 22 | or not they had worked more than 40 hours in a work week; is |
| 23 | that correct? |
| 24 | **A.** Yes. |
| 25 | **Q.** Okay. |

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 67 of 100 66
Case 4:19-cv-00562-PJH   Document 234-10   Filed 10/19/17   Page 68 of 99
PETER RINOS / PURCELL
PageID #:1322

```
 1        And do you know if Open Top paid its operators for their
 2   lunch breaks?
 3   A.   For their lunch breaks?
 4   Q.   Yes.
 5   A.   I don't recall ever discussing that issue.
 6   Q.   Did you review any of the testimony in this trial?
 7   A.   Any of the testimony that's preceding me being here, is
 8   what you're saying?
 9   Q.   Yes.
10   A.   I have not.
11   Q.   And Ms. Jamie White, the operating -- or excuse me -- the
12   Chief Operations Officer for Open Top testified that all the
13   drivers are paid for their lunch break.
14        Do you have any reason to -- to doubt that based on your
15   analysis of the records?
16   A.   I didn't analyze that issue.
17   Q.   Okay.  Would that affect your analysis if they -- the
18   drivers were being paid for an additional half hour or hour
19   depending on the amount of days -- the time they worked that
20   day for a lunch break?
21   A.   Well, did they actually work during that time period?  Is
22   this -- is this a payment for not taking the lunch break?  Is
23   that what you're telling me?
24   Q.   The testimony was that they're paid for their lunch breaks
25   and it's a break.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 10/19/17   Page 68 of 100
Case 4:18-cv-00552-JM   Document 234-10   Filed 11/22/19   Page 679 of 99   67
PETERSON CLASS / PURCELL
Page ID #:1323

| | |
|---|---|
| 1 | **A.** So they didn't work for the half an hour -- they did work |
| 2 | for -- they got the half an hour off; in addition, they got |
| 3 | paid; is what you're stating. |
| 4 | **Q.** Yes. |
| 5 | **MR. TIDRICK:** Your Honor, objection to this line of |
| 6 | questioning. It appears that defendant is trying to get at |
| 7 | some kind of an offset defense which was never pleaded in this |
| 8 | case. |
| 9 | **THE COURT:** Overruled. |
| 10 | **THE WITNESS:** Well, I hadn't thought about that prior |
| 11 | to coming up here right now, so let me think about it for a |
| 12 | second. So -- |
| 13 | (Pause in the proceedings.) |
| 14 | **THE WITNESS:** So if someone got a half an hour of pay |
| 15 | for the time that they're not working, that -- what you're |
| 16 | asking is would that lower the overtime that I -- that I |
| 17 | computed. |
| 18 | **BY MR. PURCELL:** |
| 19 | **Q.** Yes. |
| 20 | **A.** Because you're stating that that should be an offset, is |
| 21 | what you're trying to claim here. |
| 22 | **Q.** What I'm asking is, did you analyze whether or not they |
| 23 | were paid for a lunch break, and your answer was no. |
| 24 | But now I'm asking you, would that affect your analysis of |
| 25 | what they're due for any claims that were related to the |

Case 2:18-cv-08751-MCS-FFM    Document 234-10    Filed 11/22/19    Page 69 of 100  68
Case 4:19-cv-00852-FJM    Document 234-10    Filed 10/19/19    Page 68 of 99
PETERSS / PURCELL
Page ID #:1324

```
 1    overtime?

 2    A.  Well, let's take an example.  Can I just think out loud

 3    here?

 4    Q.  Certainly.

 5    A.  If we had a ten-hour -- ten-hour work day, that would mean

 6    that there would be two hours of overtime premiums that would

 7    be -- would be due, what I would have calculated in my

 8    analysis.

 9        So if you're -- so if the question is do you then subtract

10    off a half an hour, so that it would only be an hour and a

11    half of payments due because a half an hour has already been

12    paid.

13    Q.  Well, they are due -- if they are provided a paid lunch

14    break, does that affect your analysis of whether or not

15    they're due overtime pay for that time period?

16    A.  I'm not sure if that's a legal question or not.  I've

17    never -- I've never addressed that issue in all my time doing

18    these calculations, so I've never been given any legal

19    guidance on that.

20    Q.  So you have no idea whether or not one they were paid for

21    their lunch breaks?

22    A.  I don't know if they were paid for the lunch breaks,

23    that's correct.

24    Q.  And, two, you don't know whether that would affect your

25    analysis as to the whether or not there was unpaid overtime?
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 70 of 100   69
Case 4:14-cv-00852-FJM   Document 24-10   Filed 10/19/17   Page 69 of 99
PETERSON IS / PURCELL
Page ID #:1325

```
 1   A.  That's correct.  I don't know if this is a legal question

 2   or not.

 3   Q.  But you're not qualified to testify as to the legal

 4   issues, correct?

 5   A.  No.

 6   Q.  And if they -- if it is correct that a employee who

 7   receives a paid lunch break has a different calculation for

 8   overtime, that would affect all your calculations that were

 9   based on the 40-hour-a-week standard that you articulated,

10   correct?

11   A.  Well, what was the time period that they were paid for

12   these lunch breaks?

13   Q.  Ms. White testified that they were all paid --

14         THE COURT:  Well, hold on.  Hold on.  He doesn't have

15   to answer your questions.  He's asking the question.  To the

16   extent that you can, answer if you can.

17         THE WITNESS:  Oh, I'm sorry.  I was just getting to

18   the -- I didn't know what the magnitude of the line -- I

19   didn't know if it was for the whole period or this was just a

20   small subset as to how much it would affect my computations.

21         THE COURT:  Ask your question again.

22         MR. PURCELL:  Yeah.

23   Q.  How would it affect your computations if there is a

24   additional half hour that they were paid for and if California

25   law does not require a paid lunch break, how would that affect
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 71 of 100   70
Case 4:18-cv-00052-PJH   Document 32-10   Filed 10/19/17   Page 70 of 99
PETERSON / PURCELL
Page ID #:1326

| 1 | your calculation as to whether or not overtime was due to |
| 2 | them? |

**A.** Well, let me go back to my example there so I can kind of talk my way through it. You know, it seems like it's pretty straightforward, but then these things never end up being exactly that way.

So you had someone who worked their ten-hour day. My calculation would say that they were due two hours of overtime, and I've assumed that they've taken a half an hour -- in my computation, I've assumed that they've taken an half an hour unpaid lunch break, so that's what I had in my analysis. So now you're stating that they've gotten a half an hour of pay, and if you want to -- if it's legally required that that would be an offset, then, yeah, I would think that that would reduce the amount of overtime payments that would be due.

**Q.** And the -- the FLSA liquidated damages payment, too, correct?

**A.** Yes.

**Q.** Okay. And can you provide any estimate based on the analysis you did in this case as to how many hours of overtime would have potentially been miscalculated if you did not account for their paid lunch break?

**MR. TIDRICK:** Objection, Your Honor. This assumes facts not in evidence.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

| | |
|---|---|
| 1 | **THE COURT:** Overruled. |
| 2 | **THE WITNESS:** I would need to know the -- the time |
| 3 | period that you're stating as to when this payment was made. |
| 4 | **BY MR. PURCELL:** |
| 5 | **Q.** And if a -- in your analysis, did you come across any bus |
| 6 | operators who worked more than 12 hours in a day? |
| 7 | **A.** I don't recall off the top of my head. |
| 8 | **Q.** Okay. And if those operators were provided a second meal |
| 9 | break that was also paid, would that affect your analysis of |
| 10 | the overtime that's due? |
| 11 | **A.** Yes, in the same manner that I just discussed. |
| 12 | **Q.** And you cannot -- |
| 13 | **A.** If it's legally required that -- that can be counted as a |
| 14 | offset towards the overtime, which I'm sure of, 'cause -- |
| 15 | **Q.** And you don't have any -- you're not here opining on any |
| 16 | legal requirements, are you? |
| 17 | **A.** No. |
| 18 | **Q.** Okay. So you're -- the basis of your analysis was -- was |
| 19 | it instruction from plaintiffs' counsel? |
| 20 | **A.** Well, my experience in computing overtime damages in these |
| 21 | type of matters and the instruction from plaintiffs' counsel. |
| 22 | **Q.** Did you review Mr. Smith's deposition testimony as part of |
| 23 | your -- your assignment in this case? |
| 24 | **A.** Can you remind me who Mr. Smith is? |
| 25 | **Q.** He's the general manager of Open Top. |

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-03751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 73 of 100   72
Case 4:18-cv-00052-FJM   Document 234-10   Filed 10/19/17   Page 73 of 99
PETERSON / JONES / PURCELL
Page ID #:1328

1    **A.**  I think I did.

2    **Q.**  Okay.  And do you recall Mr. Smith testifying that

3    starting on May 1st, 2015 (sic), the sixth day of work for all

4    bus operators was paid at time and a half?

5    **A.**  I -- I don't recall that statement.

6    **Q.**  Okay.  Did that factor into your analysis at all as to

7    what was due to these operators for overtime payments?

8    **A.**  No.

9    **Q.**  So if that is true, would it -- could that potentially

10   affect your analysis as well?

11   **A.**  Yes.

12   **Q.**  Are you familiar with a class member named James Ludwig?

13   **A.**  (Reviewing documents.)

14       Yes, he's in Table 1.

15   **Q.**  Okay.  And you calculated overtime that was due to

16   Mr. Ludwig, correct?

17   **A.**  Yes.

18   **Q.**  And Mr. Ludwig testified when he appeared in court that he

19   spent substantial amount of time as a revenue protection agent

20   and not as a driver.

21       Did you factor that into your analysis of Mr. Ludwig's

22   claim?

23   **A.**  No.

24   **Q.**  And if Mr. Ludwig was paid overtime as a revenue

25   protection agent, then that would also affect the overtime

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 24-10   Filed 11/22/19   Page 74 of 100   73
Case 4:19-cv-00852-PJH   Document 234-10   Filed 10/19/21   Page 73 of 99
PETERSEN S / PURCELL
Page ID #:1329

| 1 | that he's entitled to, correct? |
| 2 | **A.** Well, yeah, if he was actually paid overtime during the |
| 3 | period when I computed he was not paid overtime, then, yes, |
| 4 | that would have an affect on the computation. |
| 5 | **Q.** Did you review Mr. Ludwig's payroll records? |
| 6 | **A.** Only insofar as Mr. Woolfson summarized them for me. |
| 7 | **Q.** Did you review any driver's payroll records other than in |
| 8 | Mr. Woolfson's summaries? |
| 9 | **A.** Yes. |
| 10 | **Q.** Which drivers? |
| 11 | **A.** I don't recall. It was when I first got the data, I |
| 12 | reviewed the payroll records. And then I also checked some of |
| 13 | Mr. Woolfson's data analysis. |
| 14 | **Q.** How many of Mr. Woolfson's -- how many instances of it did |
| 15 | you analyze? |
| 16 | **A.** Thirty random data points. |
| 17 | **Q.** Dr. Petersen, you testified about your calculations as it |
| 18 | related to prejudgment interest. On what basis do you |
| 19 | understand that the drivers are entitled to prejudgment |
| 20 | interest? |
| 21 | **A.** That was an instruction from plaintiffs' counsel. |
| 22 | **Q.** Okay. Did they instruct you as to the -- the amount of |
| 23 | interest to which they claim the drivers are entitled? |
| 24 | **A.** Well, usually I calculate 10 percent simple in these type |
| 25 | of cases, so I asked them if that was the appropriate interest |

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 10/19/21   Page 75 of 100   74
Case 4:94-cv-00652-PJH   Document 22-10   Filed 11/22/19   Page 74 of 99
PETERSEN / PURCELL
Page ID #:1330

1    rate to be using, and they said yes.

2    **Q.**  Okay.  But do you know what statute that the basis of that

3    10 percent interest is?

4    **A.**  No.

5    **Q.**  Is it a federal statute?

6    **A.**  I think it's a California statute, but I'm not a hundred

7    percent sure.

8    **Q.**  So you don't know -- do you know if that statute has been

9    amended at any point while you've been performing this sort of

10   work?

11   **A.**  I don't know.

12   **Q.**  Dr. Petersen, you'll recall that you were deposed in this

13   case, correct?

14   **A.**  Yes.

15   **Q.**  By me, correct?

16   **A.**  Yes.

17   **Q.**  And when discussing the Labor Code penalties, you

18   testified that essentially what you did was to -- to take the

19   amount of violations and multiply them by either fifty or a

20   hundred depending what the penalty amount is; is that correct?

21   **A.**  Well, for some of them.  That's not applicable for the

22   Labor Code 203 penalties.  But for the other penalties, there

23   were one of -- one or two of them were fifty and a hundred,

24   and some of them were a hundred and two hundred.

25   **Q.**  And the only task you performed was to multiply them by a

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 76 of 100   75
Case 4:18-cv-00052-PJH   Document 234-10   Filed 10/19/17   Page 76 of 99
PETERSON / PURCELL
Page ID #:1331

```
1    number of violations; is that correct?
2    A.  Well, no, my underlying analysis of the overtime payments
3    due then generated those computations.
4    Q.  Okay.  Could you explain that to me.
5    A.  Well, if there was a -- within -- if within a payroll
6    period, if a overtime wage payment was due, then that would
7    trigger those penalties that are based on the payroll periods.
8    Q.  You're not here offering any testimony as to what
9    constitutes a Labor Code violation on any of these issues, are
10   you?
11   A.  No.
12   Q.  Are you aware of that the jury returned a verdict on the
13   inaccurate wage statement claim in this case?
14   A.  I did -- I read a jury verdict, but I can't remember what
15   it said about that.
16   Q.  Okay.  And do you -- have you calculated how many
17   inaccurate wage statement penalties are applicable to the
18   claim in this case that Open Top misstated its name on its
19   wage statements?
20   A.  There was a discussion -- I had a discussion with
21   plaintiffs' counsel about that following the -- following the
22   jury verdict, but I didn't factor that in during my -- when I
23   computed these other -- when -- for the numbers in my report.
24   Q.  Okay.  So you didn't calculate or analyze in any way how
25   many violations occurred because of a inaccurate entity name
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 77 of 100
Case 4:19-cv-00512-PJH   Document 234-10   Filed 10/19/19   Page 77 of 99   76
PETERSON NEWS / PURCELL
Page ID #:1332

1   on a wage statement?

2   **A.**   That's correct.

3   **Q.**   Okay.  So you have no testimony to offer on that; is that

4   correct?

5   **A.**   I haven't -- It's not in my report.

6   **Q.**   Okay.

7        And as we talked about earlier, there were -- you were

8   not -- you based your -- your determination as to whether or

9   not overtime was due on a 40-hour-a-week standard, correct?

10   **A.**   Yes.

11   **Q.**   And we discussed whether or not Open Top's payment of

12   lunch periods would affect that analysis, correct?

13   **A.**   Yes.

14   **Q.**   Okay.  And if the lunch periods exceeded the amount of

15   overtime that you had calculated and therefore overtime was

16   not due, would that affect whether or not those wage

17   statements were accurate?

18   **A.**   Again, I think you're asking me to draw legal conclusion

19   that I'm not prepared to -- to make at this time.

20   **Q.**   So you don't have any way of determining whether or not,

21   for example, the statement was accurate because overtime

22   wasn't due because of that.

23   **A.**   Well, it wasn't part of my analysis.

24   **Q.**   Okay.

25        Regarding the inaccurate wage statement penalties, did you

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 78 of 100   77
Case 4:19-cv-00652-PJH   Document 264-10   Filed 10/19/22   Page 79 of 99
PETERS / PURCELL
Page ID #:1333

 1   perform any determination of -- as to whether or not a

 2   particular wage statement was accurate or not?

 3   **A.**   Yes, in the -- when I was computing overtime payments that

 4   were due.

 5   **Q.**   Okay.  And -- But you -- you, as you said earlier, are not

 6   testifying as to whether or not a legal violation has

 7   occurred, correct?

 8   **A.**   Well, I'm just testifying to the numbers in my report that

 9   state how I computed the penalties.

10   **Q.**   Okay.

11        And how was that done?

12   **A.**   Do you want me to reread the statement that I already read

13   earlier about how I computed the penalties?

14   **Q.**   Well, I'd like you to testify as to how you computed

15   penalties, yes.

16   **A.**   I already did earlier.  It was based on paragraph 31 of my

17   report.

18           **THE COURT:**  Re -- Ask the question.  Reask the

19   question.  I'm not so sure he understood exactly what you're

20   asking.

21           **MR. PURCELL:**  Okay.

22   **Q.**   I'm not sure if I can remember what I --

23        Did you -- Are you testifying -- Let me try it this way.

24        Are you testifying at all as to whether or not statements

25   were inaccurate?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 79 of 100
Case 4:14-cv-00982-PJH   Document 234-10   Filed 11/12/19   Page 79 of 99   78
PETERSONS / PURCELL
Page ID #:1334

```
 1   A.   Yes, in regards to what I wrote in paragraph 31 of my

 2   report.

 3   Q.   Okay.  And -- But you're not here testifying as to -- as a

 4   expert on Labor Code penalties, correct?

 5   A.   Just in the computation of them.

 6   Q.   But that computation involved determining whether or not a

 7   penalty was due, correct?

 8   A.   Yes.

 9   Q.   And when you testified about the damages due for these

10   wage statements, on what did you base your damage amounts?

11   A.   I'm sorry.  Could you ask that question again?

12   Q.   Sure.

13        You know, let me make it more clear.  How did you

14   determine what the applicable penalty was for what you

15   perceived to be a violation?

16   A.   Well, I've calculated these penalties on numerous cases,

17   and I also consulted with plaintiffs' counsel as to the

18   appropriate amount to be able to calculate.

19   Q.   Did you ask plaintiffs' counsel if, for any of these

20   claims, penalty claims, there were any notices of violation

21   from any governmental entities or anyone else regarding that

22   issue?

23   A.   No.

24   Q.   Did you review anything such as a violation notice for --

25   under PAGA was issued to Open Top?
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Ex. H, p. 664

Case 2:18-cv-09751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 80 of 100   79
Case 4:14-cv-00852-FJM   Document 264-10   Filed 10/19/11   Page 79 of 99
PETERS / PURCELL
Page ID #:1335

```
 1   A.   No.
 2   Q.   As part of your preparation, did you review the -- the
 3   statutes on which you base these civil penalty claims?
 4   A.   I've read them in the past.
 5   Q.   Did you read them this time?
 6   A.   I can't recall if I read them.  I've done them on so many
 7   cases, I can't recall when I -- I periodically review them,
 8   but I can't recall if I specifically did on this case.
 9   Q.   Okay.  Do you recall if there is a difference in how the
10   Private Attorney General Act, Labor Code 2699(f), assesses
11   penalties as opposed to the other claims on which plaintiffs
12   have made penalty claims?
13   A.   Well, my understanding of the penalties is laid out in
14   paragraph 31 of my report.
15   Q.   And what is that understanding?
16   A.   Well, that -- the paragraph 31 lays out exactly how I
17   computed the penalties and for what time periods.
18   Q.   Okay.  Did you take this language, for example, in the
19   Labor Code 2699(f), waiting time civil penalties claim, from
20   the actual statute?
21   A.   (Reviewing document.)
22        I don't think it's exactly that, but it's a summary of it.
23   It's derived from it.
24   Q.   Okay.  And the statute's -- actually says for each
25   aggrieved employee per pay period for the initial violation,
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-09751-MCS-FFM   Document 224-10   Filed 11/22/19   Page 81 of 100   80
Case 4:14-cv-00052-FJM   Document 234-1   Filed 10/19/17   Page 800 of 99
PETERSON vs. JONES / PURCELL

 1     there's a hundred dollar penalty, not a hundred dollars for an

 2     initial pay period violation.

 3         And if the -- the multiplier of a $200 penalty isn't

 4     assessed until a violation has occurred, would that affect

 5     your analysis as to what the penalties are that are due to the

 6     class members?

 7     **A.**   Sorry.  I didn't understand your question.  Can you ask it

 8     again.

 9     **Q.**   Yes.  The statute says that for each aggrieved employee

10     per pay period for the initial violation, there's a hundred

11     dollar penalty and a two hundred dollar penalty for subsequent

12     violations.

13         Now, if -- my understanding is that you've calculated the

14     first violation that you perceive as a violation as a hundred

15     dollar penalty?

16     **A.**   Yes.

17     **Q.**   And all remaining violation, there's a $200 penalty; is

18     that correct?

19     **A.**   And we're referring to PAGA Labor Code 2699(f), waiting

20     time civil penalties?

21     **Q.**   Yes.

22     **A.**   Yes.

23     **Q.**   Okay.  So if a penalty does not -- is not multiplied until

24     after there's been a violation, my understanding of this -- or

25     excuse me.  I'm not testifying.

Case 2:18-cv-09751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 82 of 100   81
Case 4:14-cv-00682-PJH   Document 264-10   Filed 10/19/17   Page 84 of 99
PETERS / PURCELL
PageID #:1337

```
 1         But this language appears to contemplate that there can be
 2    more than one violation pay period in a -- more pay periods
 3    that are violations for an initial violation.
 4              MR. TIDRICK:  Objection, calls for a legal
 5    conclusion.
 6              MR. PURCELL:  And --
 7              THE COURT:  Finish your question.
 8              MR. PURCELL:  Okay.
 9    Q.  And if that is accurate, and there has -- there's been no
10    violation, wouldn't all these penalties under PAGA remain as a
11    hundred dollar penalty?
12              THE COURT:  Overruled.  He may answer.
13              THE WITNESS:  Are you -- I think you're making a
14    semantic argument as to how the wording --
15              THE COURT:  Excuse me.  Just either answer it, or if
16    you cannot answer it, say you can't answer it.
17              THE WITNESS:  I'm not quite sure what he's asking,
18    Your Honor.
19              THE COURT:  Okay.  That's sufficient.
20         Rephrase.
21    BY MR. PURCELL:
22    Q.  Okay.  Is it accurate to say that for all the Labor Code
23    2699 penalties that you've assessed, you've assessed one $100
24    penalty on what you decided was the first violation, and all
25    other violations were $200; is that correct?
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 83 of 100   82
Case 4:14-cv-00952-PJH   Document 234-1   Filed 10/19/17   Page 829 of 99
PETERSON-PURCELL APPS / PURCELL
Page ID #:1338

1     **A.**   Yes.

2     **Q.**   Okay.

3        And that's true, not just on the waiting time civil

4     penalties but also true of the inaccurate wage statement civil

5     penalties, correct?

6     **A.**   Yes.

7     **Q.**   And so if no violation has occurred -- Let me strike that.

8        You're not aware of any violation having occurred,

9     correct?

10    **A.**   Well, yeah.  It shows up in the data.  That's why I

11    computed the penalty as I did.

12    **Q.**   Well, you did -- you determined it was a penalty, correct?

13    **A.**   Yes.

14    **Q.**   But you've seen no evidence that some other entity or

15    regulatory body decided it was a -- it was a violation,

16    correct?

17    **A.**   That's correct.

18    **Q.**   And if, in fact, there were no violations, the -- and

19    the -- there needs to be a violation for that higher number of

20    penalty to be applied, then that would affect your analysis of

21    the penalties due, correct?

22    **A.**   Yes.

23    **Q.**   Okay.  And how would it affect it?

24    **A.**   Well, the number would be lower.

25    **Q.**   How much lower?

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 84 of 100   83
Case 4:14-cv-00052-FJM   Document 234-10   Filed 10/19/17   Page 83 of 99
PETERSEN - EXAMINATION / THE COURT
Page ID #:1339

| | |
|-|-|

1  **A.**  Well, I think I computed all the penalties correctly, so I

2  wouldn't be adjusting that number.

3  **Q.**  And your basis for determining when the first -- the

4  initial and subsequent violation occurred is solely based on

5  instructions from plaintiffs' counsel, correct?

6  **A.**  No, it's based upon the data.

7  **MR. PURCELL:**  I have no further questions.

8  **EXAMINATION**

9  **THE COURT:**  There are two things I want to clarify

10  before we redirect.

11  On the wage statement, inaccurate wage statement

12  violations, you calculated those based upon the existence of

13  one way in which there was inaccuracy only; is that correct?

14  The jury was asked in this -- in this case whether or not

15  the wage statements were inaccurate in their omission of

16  overtime hours and, secondarily, if they were inaccurate

17  because they misstated the legal entity at -- of the

18  employer's name, two ways.  And the jury found in favor.

19  Did you make a distinction between either of those

20  grounds, or did you just count one inaccurate wage statement

21  per --

22  **THE WITNESS:**  I only did the former.  I didn't do the

23  latter, so it would only be one.

24  **THE COURT:**  "The former" being the lack of overtime

25  hours.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 85 of 100   84
Case 4:14-cv-00852-FJM   Document 234   Filed 10/19/17   Page 84 of 99
PETERSEN - EXAMINATION / THE COURT
Page ID #:1340

```
 1              THE WITNESS:  Yes, Your Honor.

 2              THE COURT:  All right.  So you didn't pay any

 3    attention at all to the other -- the second way in which the

 4    jury found the statements to be inaccurate.

 5              THE WITNESS:  That's correct, Your Honor.

 6              THE COURT:  Okay.

 7        And then secondly, you said earlier during your direct

 8    examination that you calculated hours -- a 66-hour work week

 9    for drivers.

10              THE WITNESS:  That's what -- That was the result of

11    survey questions.  That's when I was testing -- 'cause what I

12    computed for the -- for the un- -- for when we didn't have

13    payroll records, I computed -- from the payroll data -- Let me

14    back up here.

15        From the payroll data, I computed that people were working

16    on average 48.73 hours per week.  That's what the payroll

17    records show.

18        So then I wanted to see if that number would be valid for

19    projecting overtime that would be due when there was no

20    payroll data available.  So I surveyed individuals who had --

21    who had -- who had worked not during the period -- during the

22    period when there was no payroll data available, and I asked

23    them how many hours per week they worked on average.  And then

24    that's when they responded 66 hours per week.

25        So I never -- I only used that number to confirm that the
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 22-10   Filed 11/22/19   Page 86 of 100 85
Case 4:19-cv-00552-PJH   Document 264-10   Filed 10/19/22   Page 89 of 99
PETERSON - DIRECT / TIDRICK
Page ID #:1341

```
 1    48.73 hours per week number would be a conservative estimate,

 2    so I never used the 66 hours in calculating damages.

 3             THE COURT:  Did you use the 48.73 as the basis for

 4    calculating damages?

 5             THE WITNESS:  Yes.  For when there was no payroll

 6    data available, that was the estimate.

 7             THE COURT:  And with regard to those for which there

 8    was payroll data available, what was the average?

 9             THE WITNESS:  That was -- That was the average for

10    them.  That was the 48.73.

11             THE COURT:  48.73.

12        Okay.  All right.  We're going to take a 15-minute break.

13        (Recess taken at 10:41 A.M.; proceedings resumed at 10:59

14    A.M.)

15             THE CLERK:  Remain seated.  Court is in session.

16    Come to order.

17             THE COURT:  All right.  Redirect?

18             MR. TIDRICK:  Yes.  Thank you, Your Honor.

19                  (Pause in the proceedings.)

20                  REDIRECT EXAMINATION

21    BY MR. TIDRICK:

22    Q.  I'd like to clarify one thing which I think goes to an

23    issue that the judge was asking you about before the break.

24    And that is calculation of penalties for the wage statement

25    violations.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 87 of 100 86
Case 4:14-cv-00632-PJH   Document 234-10   Filed 10/19/17   Page 88 of 99
PETERSEN - DIRECT / TIDRICK
Page ID #:1342

1    And specifically you understand now that the jury returned

2  a verdict that the wage statements were inaccurate in two

3  ways.  One, that the legal name of the employer entity wasn't

4  included, as well as that the wage statements didn't reflect

5  overtime rates and -- and associated information.

6    You understand that the jury returned verdicts on both

7  issues?

8  **A.**  Yes.

9  **Q.**  And just to be clear, your calculation of penalties

10  doesn't do any kind of double-counting?  In other words, just

11  because a wage statement has inaccuracies with respect to

12  overtime rates, you're not assessing a penalty both for that

13  as well as for the other inaccuracy in the wage statement, the

14  lack of the legal name, correct?

15  **A.**  Yes.

16  **Q.**  And is it fair to say -- so for your calculation of the

17  penalties based on the wage statement, do I understand

18  correctly it was based on a subset of -- of all the wage

19  statements that were issued?

20  **A.**  Yeah, that's correct.  But sometimes they weren't --

21  the -- the individual wouldn't have been due overtime so I

22  calculated a wage statement violation during that pay period.

23  **Q.**  In other words, you calculated wage statement violations

24  based on all of the wage statements that were issued that

25  failed to include the -- the information about overtime; is

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 224-10   Filed 11/22/19   Page 88 of 100   87
Case 4:14-cv-00052-PJH   Document 264   Filed 10/19/17   Page 87 of 99
PETERS - REDIRECT / TIDRICK
Page ID #:1343

```
 1    that fair?

 2    A.  Yes.

 3    Q.  It's a subset of all the wage statements?

 4    A.  That's correct.

 5    Q.  And so understanding that actually the population of wage

 6    statements that was issued is larger than that because none of

 7    the wage statements included the proper legal entity name, is

 8    it fair to say that your assessment of the number of

 9    violations -- your assessment of the number of times that

10    inaccuracies appeared in the wage statements would actually

11    undercount in light of what the jury's verdict was?

12    A.  Yes.

13    Q.  Defendant's counsel asked you some questions about

14    payments for meal breaks.  I'd like to ask you some questions

15    about the Exhibit 33 document which was already admitted into

16    evidence.

17    A.  (Reviewing document.)

18        Okay.  I'm there.

19    Q.  The Exhibit 33 -- those are documents that you reviewed?

20    A.  Yes.

21    Q.  You understand that those are wage statements that were

22    issued to one of the plaintiffs in this case, Lawrence Muse?

23    A.  Yes.

24    Q.  And you said you reviewed these documents.

25        Did -- In your review of the documents, did you see any
```

Case 2:18-cv-03751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 89 of 100 88
Case 4:18-cv-00052-PJH   Document 234-10   Filed 10/19/17   Page 889 of 99
PETERSEN-RECROSS / PURCELL
Page ID #:1344

```
 1    indications that there were payments made for any meal breaks?

 2    A.   No.

 3    Q.   In all the various payroll records that you reviewed, did

 4    you see any indication that there were payments being made for

 5    any meal breaks?

 6    A.   I never saw a payment for a meal break.

 7              MR. TIDRICK:  That's all, Your Honor.

 8              THE COURT:  All right.  Anything else, Mr. Purcell?

 9                   (Pause in the proceedings.)

10                        RECROSS-EXAMINATION

11    BY MR. PURCELL:

12    Q.   Dr. Petersen, did you, in determining whether or not

13    overtime was due when reviewing these wage statements, take

14    into account whether operators were -- had taken sick leave,

15    for example?

16    A.   No.  I just used the regular earnings.

17    Q.   Okay.  And what about vacation time?

18    A.   That wouldn't have factored in either.

19    Q.   Now, earlier, I believe you testified that you never

20    actually considered before today whether or not meal breaks

21    were paid for Open Top employees, correct?

22    A.   That's correct.

23              MR. PURCELL:  Thank you, Dr. Petersen.

24              THE COURT:  All right.  Anything else?

25              MR. TIDRICK:  No, not for Dr. Petersen.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 90 of 100   89
Case 4:14-cv-00052-FJM   Document 234-10   Filed 10/19/17   Page 89 of 99
PETERSEN – FURTHER EXAMINATION / THE COURT

| | |
|---|---|
| 1 | **FURTHER EXAMINATION** |
| 2 | THE COURT:  All right.  Let me clarify just a few |
| 3 | more things. |
| 4 | This average that you came up with, 48.73 hours per work |
| 5 | week, does that mean, then, that the overtime calculations are |
| 6 | based upon your determination that the number of hours worked |
| 7 | more than 40 in each given week for every operator was 8.73? |
| 8 | THE WITNESS:  That was the average for the whole time |
| 9 | period, so some -- some weeks would be higher, some weeks |
| 10 | would be lower. |
| 11 | THE COURT:  Okay.  Was it done on a -- Okay.  So the |
| 12 | whole period being, like, a three-year period. |
| 13 | THE WITNESS:  Being the payroll data period, which |
| 14 | was May of 2011 to April of 2016, so almost a five-year |
| 15 | period. |
| 16 | THE COURT:  Okay.  So for five-year period, then, you |
| 17 | looked at all of the hours worked by all of the members of the |
| 18 | class, correct? |
| 19 | THE WITNESS:  Yes, that were in the payroll data. |
| 20 | Yes. |
| 21 | THE COURT:  All right.  And how many people were in |
| 22 | the payroll data? |
| 23 | THE WITNESS:  Eighty-eight. |
| 24 | THE COURT:  Eighty-eight. |
| 25 | THE WITNESS:  Out of the 96. |

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 11/22/19   Page 91 of 100   90
Case 4:14-cv-00852-FJM   Document 264-10   Filed 10/19/17   Page 90 of 99
PETERSEN - EXAMINATION / THE COURT
Page ID #:1346

 1              THE COURT:  Okay.  So for 88 people over a five-year

 2   period, the average for each individual was 48.73?

 3              THE WITNESS:  No.

 4              THE COURT:  Did you do it on a per-driver basis based

 5   upon how much Driver "X" worked for five years and took the

 6   average?

 7        Or did you do it by virtue of how many all of the 88

 8   worked -- how many hours all of them worked?

 9              THE WITNESS:  Yes.  It was based on the aggregate,

10   for the total, yes, for all of them.

11              THE COURT:  Okay.

12        All right.  And that aggregate didn't take into account

13   vacation time or sick leave time, correct?

14              THE WITNESS:  That's correct.

15              THE COURT:  And did it take into account the fact

16   that there were weeks in which the -- Well, let me ask --

17              THE WITNESS:  I'm sorry.  Can I -- Can I backtrack?

18        It would take it into an account insofar that if someone

19   took sick leave and they wouldn't be working the regular

20   hours, so it accounts for it that way.  That computation is

21   based solely on the regular hours worked.  I did not add in

22   vacation and sick leave to that number.

23              THE COURT:  Okay.

24        And the -- And is it based upon a work week of five days

25   or six days or four days?  Does that matter?

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FFM   Document 234-10   Filed 10/19/19   Page 93 of 100
Case 4:18-cv-00052-FJM   Document 234-10   Filed 11/22/19   Page 92 of 100   91
PETERSEN - RECROSS-EXAMINATION / THE COURT   Page ID #1347

```
 1              THE WITNESS:  Just whatever -- whatever they worked,
 2      'cause remember, my testimony was that you have the total
 3      number of hours for the pay period that was on the payroll
 4      fdata, and then Mr. Woolfson was able to break that down by
 5      week within specific -- for the specific hours worked in each
 6      week.
 7              THE COURT:  Okay.  And then you took the specific
 8      hours worked in each week and averaged it.
 9              THE WITNESS:  Yes.
10              THE COURT:  Okay.
11          And did that average come out to 48.73?
12              THE WITNESS:  Yes.
13              THE COURT:  And did -- did it take into -- and so you
14      did the whole five-year period, so that in the same way that
15      that would take into an average, takes into account the -- the
16      highs and the lows, would that also take into account that the
17      drivers worked fewer days and therefore fewer hours in what
18      they called the "off season"?
19              THE WITNESS:  Yes.
20              THE COURT:  Okay.  And the number -- the 48.73 is
21      substantially fewer hours than the drivers who testified
22      testified they worked.
23          Did you look at any variations among them where -- could
24      you tell me, were there some that were lower than 40 hours in
25      certain weeks?
```

Case 2:18-cv-03751-MCS-FFM   Document 234-10   Filed 10/19/21   Page 93 of 100   92
Case 4:18-cv-00052-PJH   Document 222-10   Filed 11/22/19   Page 92 of 99
PETERSEN - FURTHER REDIRECT / TIDRICK
PageID #:1348

```
 1            THE WITNESS:  I could if you -- if I looked at my
 2   spreadsheet, I could tell you exactly how many hours that they
 3   worked for each -- each individual.
 4            THE COURT:  Is that information that you had before
 5   you when you were doing your analysis?
 6            THE WITNESS:  Yes.
 7            THE COURT:  Okay.
 8       Okay.  Thank you.
 9       All right.  You're excused.
10            MR. TIDRICK:  Your Honor, if I may, there's just a
11   follow-up I'd like to do based on some questioning that you
12   just did.
13            THE COURT:  All right.
14            MR. TIDRICK:  It's very quick.
```

<div align="center">FURTHER REDIRECT EXAMINATION</div>

```
16   BY MR. TIDRICK:
17   Q.  I just want to clarify with respect to the average that
18   you've described, this 48.73 hours, do I understand correctly
19   that's an average that you used for purposes of projecting and
20   assessing damages for the handful of operators for which the
21   payroll data wasn't available, correct?
22   A.  That's correct.
23   Q.  In other words, for the vast majority, what was the number
24   for which you had payroll data?
25   A.  Eighty-eight out of ninety-six.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-00751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 94 of 100   93
Case 4:18-cv-00052-PJH   Document 264   Filed 10/13/21   Page 94 of 99
PETERSEN - REDIRECT / TIDRICK   Page ID #:1349

1   **Q.**   So for those 88 people, you weren't doing any

2   extrapolations or any assessments based on averages, correct?

3   **A.**   That's correct.

4   **Q.**   For the 88 people, you were using the data that existed

5   about their number of hours worked?

6   **A.**   That's correct.

7   **Q.**   This -- The statements you've made about the average

8   amount of hours worked, this 48.73, you came up with that only

9   for the purposes of assessing and -- and estimating damages

10   for this very small number of operators for which there was no

11   payroll data, correct?

12   **A.**   There was either no payroll date for them or they worked

13   outside of the payroll period.

14   **Q.**   And -- And are you able to tell us approximately how many

15   people that was.

16   **A.**   That was 22.

17   **Q.**   So for 22 of the class members, you used this average in

18   determining their damage amounts?

19   **A.**   Yes.

20          **THE COURT:**   And with regard to the 88, was there an

21   average, or did you base it on the hours actually worked?

22          **THE WITNESS:**   I -- For the 88, yeah, that was -- that

23   was the actual payroll data, their actual hours worked.

24       And then that number -- then after I did that computation,

25   I then -- then used that -- the results of the actual payroll

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-00751-MCS-FFM   Document 234-10   Filed 01/22/19   Page 95 of 100   94
Case 4:14-cv-00052-JM   Document 264   Filed 10/19/17   Page 95 of 99
PETERSEN - REDIRECT / TIDRICK
Page ID #:1350

```
 1   data to compute the 48.73 hours from that.  And then that's
 2   what I applied to the individuals who worked outside of the
 3   payroll period to estimate their --
 4            THE COURT:  I understand.  I understand that now.
 5   That -- I didn't understand it as you were explaining it
 6   before.
 7       With regard to the 88 for which you had real payroll data,
 8   did you come up with this average of 48.73 for them?
 9            THE WITNESS:  From them.
10            THE COURT:  "From them."
11            THE WITNESS:  From them.
12            THE COURT:  From what they worked?
13            THE WITNESS:  From what they actually worked.
14            THE COURT:  And are your calculations based upon what
15   they actually worked or based upon this 48.73 projection?
16            THE WITNESS:  What they actually worked.
17            THE COURT:  Okay.
18       Okay.  Thank you.  You're excused.
19            THE WITNESS:  Thank you.
20            THE COURT:  Next witness?
21            MR. TIDRICK:  Your Honor, no further witnesses.
22       The -- The only other piece of evidence for our
23   case-in-chief is with respect to the PAGA notice, and I -- I
24   believe we can short-circuit this because I believe there's a
25   stipulation that was reached at the pretrial conference that
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 96 of 100   95
Case 4:14-cv-00825-PJH   Document 264-10   Filed 10/19/17   Page 96 of 99
Page ID #:1351

```
 1    there's no issues that the defendant received the notice as

 2    required by the PAGA statute.

 3        So understanding that there's a stipulation on that, we --

 4    we won't to have present evidence on that.

 5             THE COURT:  I have no idea what you're talking about.

 6             MR. TIDRICK:  There's a process by which a plaintiff

 7    provides notice under the PAGA statute prior --

 8             THE COURT:  Notice to...?

 9             MR. TIDRICK:  Notice to the defendant.

10             THE COURT:  The defendant.

11             MR. TIDRICK:  To the employer.  And my understanding,

12    based on the discussion that at the pretrial conference, a

13    stipulation was reached that the defendant is raising no

14    issues about whether there was adequate PAGA notice.

15        And if I understand that stipulation correctly, then we're

16    not going to be producing any evidence on that.

17             THE COURT:  Is the stipulation in the record?

18             MR. TIDRICK:  It's -- It's in the pretrial conference

19    transcript at page 50 to 51.

20             THE COURT:  Is it in the pretrial statement?

21             MR. TIDRICK:  It's not.

22             THE COURT:  Okay.  Did the defendants enter into a

23    stipulation with the plaintiffs that there was adequate notice

24    by the plaintiffs of their PAGA claims?

25             MR. VALLA:  We did, Your Honor.
```

Case 2:18-cv-09751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 97 of 100   96
Case 4:94-cv-00653-PJH   Document 264-10   Filed 10/19/17   Page 98 of 99
Page ID #:1352

```
 1          THE COURT:  All right.  That takes care of it.

 2      You rest?

 3          MR. TIDRICK:  We do.

 4          THE COURT:  All right.  Defense?

 5          MR. PURCELL:  Your Honor, we're not going to call any

 6      witnesses.

 7          THE COURT:  All right.

 8      Do you all wish to make closing statements?  I am going to

 9      require that you file proposed finding of fact conclusions of

10      law.

11      The plaintiffs jumped the gun and filed theirs today.  I'm

12      going to ask you to revise it and to put in the actual figures

13      that comport with the testimony that was provided today.

14      And I would like the defendants to file a set of findings

15      and conclusions as well.  I want them no later than a week

16      from today.

17      Yes?

18          MR. VALLA:  Your Honor -- Yes, Your Honor.

19      If I may be heard on the subject of closing statements.

20          THE COURT:  Okay.

21          MR. VALLA:  Defendant would ask that briefs in lieu

22      of closing statements be submitted feeling that the issues can

23      best be addressed in brief format and briefly in brief format.

24      So that is our request for the court.

25          THE COURT:  Okay.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-08751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 98 of 100   97
Case 4:13-cv-00952-PJH   Document 264-10   Filed 10/15/12   Page 99 of 99
Page ID #:1353

```
 1              MR. TIDRICK:  Plaintiffs have no objection to that

 2      procedure.

 3              THE COURT:  All right.  That's fine.  I want them in

 4      a week.

 5              MR. VALLA:  Very well, Your Honor.

 6              THE COURT:  I want them simultaneously, briefs

 7      in lieu of closing argument, and a revised proposed finding of

 8      fact and conclusions of law -- of the law within one week.

 9              MR. VALLA:  Your Honor, just to be clear,

10      simultaneous briefs, no replies; is that correct?

11              THE COURT:  That's right.  Simultaneous briefs, no

12      replies.

13              MR. VALLA:  Understood.

14              MR. TIDRICK:  Was there a page limit?

15              THE COURT:  On the proposed findings of fact and

16      conclusions of law, no.  They should be what they are.

17          In terms of briefs, is there some reason why you think you

18      would need an excessive amount of -- How about ten pages?  Can

19      you make your arguments in ten pages?

20              MR. YOUNG:  We can probably do five.

21              MR. TIDRICK:  Let's -- Let's -- Ten would be great.

22              THE COURT:  Okay.  Ten pages.

23              MR. VALLA:  Thank you, Your Honor.

24              THE COURT:  All right.  Within one week.

25          All right that's it.  We're adjourned.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

Case 2:18-cv-09751-MCS-FFM   Document 72-10   Filed 11/22/19   Page 99 of 100
Case 4:14-cv-00982-PJH   Document 234-10   Filed 10/19/17   Page 99 of 99
Page ID #:1354
98

```
 1                MR. VALLA:  Thank you very much.

 2                     (Pause in the proceedings.)

 3                     (Off-the-record discussion.)

 4            MR. TIDRICK:  I apologize, Your Honor.

 5            THE COURT:  Yeah.

 6            MR. TIDRICK:  I may have misheard, but did you state

 7    that there were some specific amounts that you wanted

 8    plaintiffs to plug into the --

 9                THE COURT:  I wanted you -- there's a bunch of blanks

10    in the one you submitted.  I want you to fill in the blanks.

11            MR. TIDRICK:  Right.

12            MR. YOUNG:  Oh, thank you.

13            MR. TIDRICK:  Thank you, Your Honor.

14            THE COURT:  No problem.

15                (Proceedings were concluded at 11:16 A.M.)

16                            --o0o--

17

18

19

20

21

22

23

24

25
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

Case 2:18-cv-08751-MCS-FBM   Document 72-10   Filed 11/22/19   Page 100 of 100
Case 4:14-cv-00852-PJH   Document 234-10   Filed 10/19/17   Page 99 of 99
Page ID #:1355

1

2            **CERTIFICATE OF REPORTER**

3

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that I am neither counsel for, related to,

7    nor employed by any of the parties to the action in which this

8    hearing was taken, and further that I am not financially nor

9    otherwise interested in the outcome of the action.

10

11   _____

12        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13              Tuesday, October 10, 2017

14

15

16

17

18

19

20

21

22

23

24

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**