Adam Blair Corren, SBN: 183067
acorren@correnlaw.com
Spencer D. Sinclair, SBN: 294340
ssinclair@correnlaw.com
LAW OFFICES OF CORREN & CORREN
5345 North El Dorado, Suite 7
Stockton, CA 95207
P: 209-478-2621
F: 209-478-3038

Attorneys for Plaintiff, Christopher Dueker

Christopher C. McNatt, Jr. (SBN 174559)
cmcnatt@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
2 North Lake Avenue, Suite 560
Pasadena, CA 91101
P: 626-795-4700
F: 626-795-4790

Charles Andrewscavage (Admitted *Pro Hac Vice*)
candrewscavage@scopelitis.com
Jared S. Kramer (Admitted *Pro Hac Vice*)
jskramer@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 600
Chicago, IL 60603
P: 312-255-7200
F: 312-422-1224

Attorneys for Defendant, CRST Expedited, Inc.

**ADDITIONAL COUNSEL LISTED ON NEXT PAGE**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DUEKER, on behalf of himself and all persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CRST EXPEDITED, INC., and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:18-cv-08751-FMO-FFM<br><br>**JOINT BRIEF RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: January 9, 2020<br>Time:     10:00 a.m.<br>Courtroom:  6D<br>Judge:     Fernando M. Olguin |

1    James H. Hanson (Admitted *Pro Hac Vice*)
     jhanson@scopelitis.com
2    R. Jay Taylor, Jr. (Admitted *Pro Hac Vice*)
     jtaylor@scopelitis.com
3    Elizabeth M. Bolka (Admitted *Pro Hac Vice*)
     ebolka@scopelitis.com
4    SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.
     10 West Market Street, Suite 1400
5    Indianapolis, IN 46204
     P: 317-637-1777
6    F: 317-687-2414

7    Adam. C. Smedstad (SBN 303591)
     asmedstad@scopelitis.com
8    SCOPELITIS GARVIN LIGHT HANSON & FEARY, P.C.
     3214 West McGraw Street, Suite 301F
9    Seattle, WA 98199
     P: 206-288-6192
10   F: 206-299-9375

11   Attorneys for Defendant, CRST Expedited, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

        A.      Plaintiff's Introduction ..........................................................1

        B.      Defendant's Introduction.......................................................1

II.     RELEVANT FACTS ..........................................................................3

        A.      Plaintiff's Facts .....................................................................3

        B.      Defendant's Facts ..................................................................9

                1.      The Parties..................................................................9

                2.      CRST's Compensation Structure.............................10

                3.      CRST's Operations, DOT Hours of Service, and Sleeper Berth Time ......................................................11

                4.      Putative Class Members' Work ...............................13

                5.      CRST's motion in limine to exclude Aaron Woolfson. ...........16

                6.      Evidentiary objections .............................................16

III.    LEGAL ANALYSIS ...........................................................................18

        A.      Standard ...............................................................................18

                1.      Plaintiff's Standard ..................................................18

                2.      Defendant's Standard ...............................................18

        B.      Ascertainability ....................................................................19

                1.      Plaintiff's Position ...................................................19

                2.      Defendant's Position ................................................20

        C.      Numerosity ...........................................................................20

                1.      Plaintiff's Position ...................................................20

                2.      Defendant's Position ................................................20

        D.      Commonality & Predominance.............................................21

                1.      Standard ....................................................................21

                        a.      Plaintiff's Position ........................................21

                        b.      Defendant's Position.....................................22

i

2.    Minimum Wage ................................................22

    a.    Plaintiff's Position ................................ 22

    b.    Defendant's Position................................ 26

        i.    Individualized issues as to whether CRST controlled drivers in the sleeper berth predominate. ................................26

        ii.    Plaintiff cannot identify when putative class members were in the sleeper berth of a moving truck in California. ...................31

        iii.    Even if Plaintiff could identify when drivers were confined to the sleeper berth of a moving truck in California, he cannot establish minimum wage liability on a class-wide basis. ................................32

3.    Wage Statements................................................33

    a.    Plaintiff's Position ................................ 33

    b.    Defendant's Position................................ 35

4.    Waiting Time Penalties................................................36

    a.    Plaintiff's Position ................................ 36

    b.    Defendant's Position................................ 37

5.    Rest Break Wages................................................37

    a.    Plaintiff's Position ................................ 37

    b.    Defendant's Position................................ 38

6.    Unfair Business Practices................................................39

    a.    Plaintiff's Position ................................ 39

    b.    Defendant's Position................................ 39

E.    Typicality................................................40

1.    Plaintiff's Position................................................40

2.    Defendant's Position................................................40

F.    Adequacy of Class Counsel and Representative................................41

1.    Plaintiff's Position................................................41

2.    Defendant's Position................................................41

G.    Superiority ........................................................................42

    1.    Plaintiff's Position ....................................................42

    2.    Defendant's Position ..................................................44

H.    Declaratory & Injunctive Relief.......................................45

    1.    Plaintiff's Position ....................................................45

    2.    Defendant's Position ..................................................46

IV.    CONCLUSION.................................................................46

A.    Plaintiff's Conclusion .....................................................46

B.    Defendant's Conclusion ..................................................46

# TABLE OF AUTHORITIES

## Cases

*Arredondo v. Delano Farms*,
  301 F.R.D. 493 (E.D. Cal. 2014) .................................................................. 42, 43

*Ayala v. U.S. Xpress Enterprises, Inc.*,
  2017 WL 3328087 (C.D. Cal. 2017) ............................................................. 24, 29

*Ballard v. Bank of America, N.A.*,
  2013 WL 4807193 (C.D. Cal. Sep. 16, 2013) ..................................................37

*Bias v. Moynihan*,
  508 F.3d 1212 (9th Cir. 2007) ..........................................................................17

*Bono Enterprises, Inc. v. Bradshaw*,
  32 Cal.App.4th 968 (1995) ...............................................................................22

*Bowerman v. Field Asset Servs., Inc.*,
  2015 WL 1321883 (N.D. Cal. 2015) .................................................................42

*Brinker v. Superior Court*,
  53 Cal.4th 1004 (2012) .....................................................................................20

*Burnell v. Swift Transportation Co. of Arizona, LLC*,
  2016 WL 2621616 (C.D. Cal. May 4, 2016) .............................. 31, 34, 35, 36, 38

*Cole v. CRST, Inc.*,
  2012 WL 4479237 (C.D. Cal. Sept. 27, 2012) .................................................31

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...................................................................................... 18, 31

*Daar v. Yellow Cab Co.*,
  67 Cal.2d 695 (1967) ........................................................................................40

*Davis v. Morris*,
  37 Cal.App.2d 269 (1940) .................................................................................35

*DeLodder v. Aerotek, Inc.*,
  2009 WL 3770670 (C.D. Cal. Nov. 9, 2009) ............................................... 37, 44

*Duran v. Maxim Healthcare Servs. Inc.*,
  2018 WL 5915644 (C.D. Cal. Mar. 9, 2018) .............................................. 37, 44

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) .................................................................................... 21, 43

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...................................................................... 37, 44

*Franze v. Equitable Assurance*,
  296 F.3d 1250 (11th Cir. 2002) .................................................................. 37, 39

*Gentry v. Superior Court*,
  42 Cal.4th 443 (2007) ............................................................ 18, 40

*Guerrero v. Halliburton Energy Servs., Inc.*,
  231 F. Supp. 3d 797 (E.D. Cal. 2017)....................................37

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................... 19, 20, 21

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010)..................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)..................................16

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013)..................................24

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003) .......................... 37, 44

*Maldonado v. Epsilon Plastics, Inc.*,
  22 Cal. App. 5th 1308 (Cal. Ct. App. 2018) ......................34

*Mazur v. eBay Inc.*,
  257 F.R.D. 563 (N.D. Cal. 2009)..................................18

*Mendez v. R+L Carriers, Inc.*,
  2012 WL 5868973 (N.D. Cal. Nov. *19, 2012)* ........................... 24, 38

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
  311 F.R.D. 590 (C.D. Cal. 2015) ........................... 42, 43

*Morillion v. Royal Packing Co.*,
  22 Cal.4th 575 (2000) ........................................... 22, 25

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)..................................37

*Osman v. Tatitlek Support Servs., Inc.*,
  2017 WL 945024 (C.D. Cal. Mar. 1, 2017).............................28

*Quezada v. Con-Way Freight, Inc.*,
  2012 WL 4901423 (N.D. Cal. Oct. 15, 2012) ........................ 18, 19, 38

*Reinhardt v. Gemini Motor Transp.*,
  869 F. Supp. 2d 1158 (E.D. Cal. 2012)............................. 31, 34

*Ridgeway v. Wal-Mart Stores, Inc.*,
  107 F.Supp.3d 1044 (N.D. Cal. 2015) ........................ 22, 28, 29

*Ridgeway v. Wal-Mart Stores, Inc.*,
  2014 WL 4477662 (N.D. Cal. Sept. 10, 2014) ........................ 23, 24

*Rose v. Daimler Trucks N. Am. LLC*,
    2010 WL 11651593 (C.D. Cal. May 11, 2010) ...................................................17

*Shady Grove Orthopedic Assocs. P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ...................................................................................21

*Simon v. Eastern Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976) .....................................................................................37

*Simpson v. Fireman's Fund Insurance Company*,
    231 F.R.D. 391 (N.D. Cal. 2005) ...............................................................20

*Taylor v. FedEx Freight, Inc.*,
    No. 13-CV-1137-LJO-BAM, 2015 WL 2358248 (E.D. Cal. May 15, 2015) .....24

*Trosper v. Styker Corp.*,
    2014 WL 4145448 (N.D. Cal. 2014) ...........................................................41

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ...............................................................................21

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996)......................................................................40

*Vaquero v. Ashley Furniture Indus., Inc.*,
    824 F.3d 1150 (9th Cir. 2016) ...................................................................41

*Vaquero v. Stoneledge Furniture LLC*,
    (2017) 9 Cal.App.5th 98 .............................................................................24

*Wal–Mart Stores, Inc. v. Dukes*,
    *564 U.S. 338 (2011)* ...................................................... 3, 20, 21, 36, 44

*Wang v. Chinese Daily News, Inc.*,
    709 F.3d 829 (9th Cir. 2012)......................................................................20

*Wyatt v. Terhune*,
    315 F.3d 1108 (9th Cir. 2003) ...................................................................16

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...................................................................21

**Statutes**

Cal. Lab. Code § 1174 ..................................................................................19

Cal. Lab. Code § 1194 ..................................................................................24

Cal. Lab. Code § 203 ....................................................................................35

Cal. Lab. Code § 226 ............................................................................ 32, 36

### Rules

Fed. R. Civ. P. 23 ................................................................. 17, 18, 20, 21, 40, 43, 44

Fed. R. Civ. P. 53 ................................................................................................42

Fed. R. Evid. 201 ................................................................................................16

### Regulations

49 C.F.R. § 395 .............................................................................. 6, 11, 12, 27

Cal. Code of Regs., title 8, section 13520 ...............................................................35

### Other Authorities

1 Newberg on Class Actions § 3:27 (5th ed.) ...........................................................20

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535-39 (2d ed. 1986)...............................................................21

Federal Practice & Procedure § 5106.4 (2d ed.).....................................................17

Plaintiff, Christopher Dueker ("Dueker" or "Plaintiff"), and Defendant, CRST Expedited, Inc. ("CRST" or "Defendant"), respectfully submit this Joint Brief regarding class certification.

## I.    INTRODUCTION

### A.    Plaintiff's Introduction

This is a California wage and hour class action brought by Plaintiff Christopher Dueker against Defendant CRST Expedited Inc., involving a Class of more than 5,500 California truck drivers who have worked for Defendant from December 27, 2013 to the present.  Plaintiffs  request certification of this Class of California drivers who were uniformly: 1) not compensated the California minimum wage for their logged sleeper berth shift segment time within the territorial boundaries of California during which there was some truck movement; 2) were not provided accurate itemized wage statements with the actual number of hours worked, among other things, as required by California law;  3) were not paid all wages due at the conclusion of their employment as required by California law; and 4) were not separately compensated for their rest breaks as required by California law.

### B.    Defendant's Introduction

Plaintiff is a former truck driver who previously worked as a team driver for CRST, a nationwide motor carrier that provides long-haul expedited freight delivery services to its clients throughout the nation. Sometimes, in team freight delivery operations, one driver will drive while the other rests in the truck's sleeper berth. CRST compensates its employee drivers a flat rate for delivering a load. This flat rate compensates a driver for all the work time (and all tasks performed during that work time) drivers spend delivering a load. Like most employers, CRST does not compensate drivers for time when they are not working, or when they are sleeping, including when they do so in a truck's sleeper berth.

Plaintiff filed a complaint claiming that he *should be paid* for non-work time, including time he spent sleeping, *if* he was in the sleeper berth of his truck *and* the truck

was moving in the state of California. Plaintiff asserted that being in a moving truck effectively rendered him under CRST's "control," thereby converting the non-compensable time he spent in the sleeper berth while the truck was moving to compensable time. Tacitly conceding that he has no method for demonstrating when he or any other driver was in the sleeper berth of a truck that was *actually moving* in California, Plaintiff now contends he is entitled to be paid the minimum wage for all time he logged as being in the sleeper berth if the truck moved *at all* in California, regardless of how long it moved, the distance it moved, where he was when the truck was not moving during that sleeper berth time, or what he was doing when the truck was not moving during that sleeper berth time.

The key factual determination in resolving Plaintiff's minimum wage claim is whether CRST controlled Plaintiff and the putative class members while logged off duty in the sleeper berth of the truck. Plaintiff has not identified a single CRST policy that would subject him to CRST's control while he was logged as in the sleeper berth of a truck, and CRST has no policy telling any driver what they can or cannot do while in the sleeper berth.

To the contrary, the evidence demonstrates that drivers logged sleeper berth time while they were showering, eating, on home time, and performing personal errands while outside of the sleeper berth. The only way Plaintiff can equate time logged as in the sleeper berth with being restricted to the sleeper berth is if the truck were in constant motion during all sleeper berth time. And the evidence developed thus far—including that drivers were often outside of the sleeper berth performing personal tasks or on home time when logged in the sleeper berth—means that Plaintiff cannot rely on CRST's driver logs to demonstrate control if there was only *some* movement during a sleeper berth period. Again, continuous movement is essential to Plaintiff's theory. And while Plaintiff hired an expert—Aaron Woolfson—to identify when a driver was in the sleeper berth of a moving truck in California, his testimony is unreliable and inadmissible. In short, Plaintiff has offered no method to demonstrate that CRST

2

exerted *any control* over him or the other class members while they were logged in the sleeper berth. Without evidence to do so, Plaintiff has no basis, even accepting his legal theory, for establishing liability on a class wide basis. *See infra* § III.D.2.b. The Court should not certify his minimum wage subclass. And because his waiting time penalty subclass is derivative of the minimum wage subclass, the Court should deny Plaintiff's motion to certify that subclass as well. *See infra* § III.D.4.b. The same is true regarding Plaintiff's attempt to certify a class for his claims regarding wage statement penalties, *see infra* § III.D.3.b, and violations of California's Unfair Competition Law, *see infra* § III.D.6.b, each of which are derivative of his minimum wage claim.

Finally, Plaintiff seeks a declaration that putative class members were not separately compensated for their rest breaks as required by California law. However, because he is not a current employee of CRST, he has no standing to assert this claim, *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364 (2011), and the Court should deny certification on that claim as well. *see infra* § III.D.5.b

## II.    RELEVANT FACTS

### A.    <u>Plaintiff's Facts</u>

Defendant is a trucking company specializing in team driving services (2 drivers per truck), which allows for freight to be transported virtually around the clock and for loads to be transported more quickly than with a single driver model. *[Ex. 23, p. 190 (Defendant's Statement of Material Facts "D's SMF" #9); Ex. 11, p. 90-91 (Chapman Depo. 12:17-13:3); Ex. 20, p. 156-157 (Smith Depo. 8:21-9:15); Ex. 12, p. 96 (Davis Depo. 17:9-11); Ex. 18, p. 141 (Porter Depo. 16:4-14); Ex. 15, p. 120-121 (Marburger Depo. 10:20-11:16); Ex. 13, p. 108-109 (Haffenden Depo. 12:9-13:16); Ex. 10, pp. 82-83 (Bruek Depo. 12:14-13:3); Ex. 4, p. 16 (Bruek Decl. ¶4); Ex. 5, p. 21 (Gannon Decl. ¶4); Ex. 1, p. 3 (Dueker Decl. ¶8); Ex. 2, p. 8 (Warmsley Decl. ¶7); Ex. 3, p. 12 (Andree Decl. ¶7)]*

The Class alleged in this case consists of all truck drivers employed by Defendant who have resided in the State of California at any time during their employment with

Defendant.  The Class Period is from December 27, 2013 to the present.  As of January 18, 2019, the identities and contact information for 5,597 Class members were provided to Plaintiffs' counsel following a *Belaire-West* notice. *[Ex. 6, p. 26 (Corren Decl. ¶5); Ex. 7, p. 33 (Sinclair Decl. ¶5)]*

With the exception of a few occurrences involving flat rate payments which are not relevant to this litigation, Defendant has a companywide policy of solely paying the Class member truck drivers on a piece rate/per mile basis. Class member driver compensation is calculated by multiplying a predetermined number of load miles by the driver's mileage rate. *[Ex. 11, p. 92 (Chapman Depo. 36:7-22); Ex. 14, p. 113 (Holzer Depo. 27:6-28:12); Ex. 12, p. 100 (Davis Depo. 29:2-9); E. 18, p. 144 (Porter Depo. 45:13-21); Ex. 15, p. 125 (Marburger Depo. 32:11-19); Ex. 10, p. 81 (Bruek Depo. 7:17-25); Ex. 4, p. 17 (Bruek Decl. ¶7); Ex. 5, p. 22 (Gannon Decl.¶8); Ex. 1, p. 4 (Dueker Decl.¶10); Ex. 2, p. 8 (Warmsley Decl. ¶9); Ex. 3, p. 12 (Andree Decl. ¶9) Ex. 21, p. 167 (Defendant's Response to Request for Admissions ("Response to RFA") Nos. 4&5); Ex. 24, p. 197 (Defendant's Driver Handbook); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]*

This per mile rate only compensates Class member drivers for their time spent on duty and driving. *[Ex. 23, p. 192 (D's SMF #148); Ex. 14, p. 115 (Holzer Depo. 42:10-19); Ex. 18, p. 143 (Porter Depo. 44:12-15); Ex. 15, p. 125 (Marburger Depo. 32:11-19); Ex. 4, p. 17 (Bruek Decl.¶8); Ex. 5, p. 22 (Gannon Decl., ¶6&8); Response to RFA Nos. 4&5); Ex. 24, p. 197 (Driver Handbook)]* Defendant agrees it does not pay Class members an hourly rate of pay nor does it separately compensate Class members for their rest breaks as required by California law. *[Ex. 14, p. 113 (Holzer Depo. 27:6-11); Ex. 20, p. 162 (Smith Depo. 58:11-14); Ex. 19, pp. 149-150 (Schneider Depo. 21:23-22:3); Ex. 12, p. 99 (Davis Depo. 28:18-21); Ex. 18, p. 144 (Porter Depo. 44:19-25); Ex. 4, p. 17 (Bruek Decl. ¶7-8); Ex. 5, p. 22 (Gannon Decl.¶8); Ex. 1, p. 4 (Dueker Decl.¶11&14); Ex. 2, p. 9 (Warmsley Decl. ¶10&13); Ex. 3, p. 13 (Andree Decl.*

*¶10&13)]    Ex. 21, pp. 167&169 (Response to RFA Nos. 4,5&11); Ex. 22, p. 177 (Defendant's Response to Interrogatory ("Response to Int.") No. 4); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]*

Defendant also acknowledges it has adopted a common practice of not maintaining timecards nor maintaining any other timekeeping records for the actual hours the Class member drivers actually work. *[Ex. 15, p. 126 (Marburger Depo. 41:15-23); Ex. 17, p. 137 (Pasker 2017 Depo. 7:15-18); Ex. 1, p. 3 (Dueker Decl.¶7); Ex. 2, p. 8 (Warmsley Decl. ¶6); Ex. 3, p. 12 (Andree Decl. ¶6)]; Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]*

The Defendant's Driver Payroll Supervisor has admitted that the drivers' payroll statements do not record the Class member drivers' actual hours worked as required by California law. *[Ex. 20, p. 161 (Smith Depo. 46:22-24); Ex. 19, p. 152 (Schneider Depo. 30:13-20); Ex. 17, p. 137 (Pasker 2017 Depo. 7:15-18); Ex. 1, p. 3 (Dueker Decl.¶7); Ex. 2, p. 8 (Warmsley Decl. ¶6); Ex. 3, p. 12 (Andree Decl. ¶6); Ex. 26, p. 204 (D's Message to P.); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]*

> Q.  Well, really anything.  I mean do you have any knowledge or information, when you look at payroll statements, as to how many hours a driver actually worked?
>
> A. No.

*[Ex. 16, pp. 132-133 (Pasker 2019 Depo. 40:23-41:1)]*

In fact, the only time related records maintained by the Defendant are reflected in the Class members' driver logs, which are mandated by the Department of Transportation ("DOT") for safety reasons and not indicative of actual hours worked. *[Ex. 12, p. 97 (Davis Depo. 20:17-21); Ex. 5, p. 22 (Gannon Decl.¶6); Ex. 1, p. 3 (Dueker Decl.¶7); Ex. 2, p. 8 (Warmsley Decl. ¶6); Ex. 3, p. 12 (Andree Decl. ¶6); Ex.*

5

*30, pp. 501-507 (Driver Logs); Ex. 31, pp. 507-547 (Driver Data Logs)]*

Hours of Service Time are recorded in these driver logs in one of the following 4 time categories:

1) Driving Time;

2) On Duty Time;

3) Sleeper Berth Time; and

4) Off Duty Time.

*[Ex. 23, p. 191 (D's SMF #142); Ex. 20, p. 159 (Smith Depo. 22:1-6); Ex. 18, p. 142 (Porter Depo. 37:7-14); Ex. 4, p. 16 (Bruek Decl.¶5); Ex. 1, p. 3 (Dueker Decl.¶7); Ex. 2, p. 8 (Warmsley Decl. ¶6); Ex. 3, p. 12 (Andree Decl. ¶6);  49 CFR § 395.8; Ex. 24, p. 196 (Driver Handbook); Ex. 25, p. 201 (Safety & Operations Handbook); Ex. 30, pp. 501-507 (Driver Logs); Ex. 31, pp. 507-547 (Driver Data Logs)]*

The logs are maintained to establish compliance with the DOT's hours of service rules. *[Ex. 5, p. 22 (Gannon Decl.¶6); Ex. 1, p. 3 (Dueker Decl.¶7) Ex. 2, p. 8 (Warmsley Decl. ¶6) Ex. 3, p. 12 (Andree Decl. ¶6); Ex. 24, p. 196 (Driver Handbook); Ex. 25, pp. 201-202 (Safety & Operations Handbook); Ex. 30, pp. 501-507 (Driver Logs); Ex. 31, pp. 507-547 (Driver Data Logs)]*

The pertinent portions of the rules are as follows:

1) Class member drivers can drive for up to 11 hours within a 14-hour window of time;

2) during said 14-hour window of time, Class member drivers can be on duty for the non-driving time; and

3) after that 14-hour window, a Class member driver cannot drive again until they have been in sleeper berth for 10 consecutive hours.

*[Ex. 23, p.191 (D's SMF #141); 49 CFR § 395.3; Ex. 12, pp. 97&103-104 (Davis Depo. 20:24-21:25, 66:22-67:7); Ex. 11, p. 91 (Chapman Depo. 13:12-17); Ex. 20, p. 158 (Smith Depo. 15:16-19); Ex. 18, p. 145 (Porter Depo. 54:10-19); Ex. 15, pp. 123-124*

1  *(Marburger Depo. 30:24-31:2); Ex. 24, p. 196 (Driver Handbook); Ex. 25, pp. 201-202*

2  *(Safety & Operations Handbook pp. 83&91)]*

3        As Defendant uses a team driving system, when one Class member driver reaches

4  his/her maximum drivetime hours, the second Class member driver then assumes the

5  driving duties while the first Class member driver switches to sleeper berth time. *[Ex.*

6  *12, pp. 101-102 (Davis Depo. 44:1-10, 45:5-9); Ex. 15, p. 121 (Marburger Depo. 11:8-*

7  *11); Ex. 10, pp. 82-83 (Bruek Depo. 12:14-13:3); Ex. 13, p. 108 (Haffenden Depo. 12:9-*

8  *13:16); Ex. 4, p. 16 (Bruek Decl.¶4); Ex. 5, p. 21 (Gannon Decl.¶4); Ex. 1, p. 3 (Dueker*

9  *Decl.¶8); Ex. 2, p. 8 (Warmsley Decl. ¶7); Ex. 3, p. 12 (Andree Decl. ¶7)]*

10        Using this model, the truck remains in almost constant motion, and Class member

11  drivers are required to be with the truck almost 24 hours per day, but are uniformly not

12  compensated for their sleeper berth time. *[Ex. 23, pp. 190&192 (D's SMF #9,148,149);*

13  *Ex. 15, pp. 120-121 (Marburger Depo. 10:20-11:2); Ex. 13, p. 108 (Haffenden Depo.*

14  *12:9-13:16); Ex. 10, pp. 82-83 (Bruek Depo. 12:14-13:3); Ex. 4, p. 17 (Bruek Decl.¶8);*

15  *Ex. 5, p. 22 (Gannon Decl.¶6&8); Ex. 1, p. 4 (Dueker Decl.¶8,9,11,12); Ex. 2, p. 8*

16  *(Warmsley Decl. ¶7,8,10,11); Ex. 3, p. 12 (Andree Decl. ¶7,8,10,11)  Ex. 21, p. 167*

17  *(Response to RFA Nos. 4&5); Ex. 24, pp. 196-197 (Driver Handbook); Ex. 25, p. 201*

18  *(Safety & Operations Handbook); Ex. 26, p. 204 (D's Message to P.); Ex. 27, pp. 206-*

19  *283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex.*

20  *29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)]*

21        While some Defendant managers have recently testified that Class member

22  drivers should be compensated for sleeper berth time, Defendant has consistently

23  admitted that it does not actually compensate the Class member drivers for such sleeper

24  berth time. *[Ex. 23, p. 192 (D's SMF #148,149);  Ex. 14, p. 115 (Holzer Depo. 42:20-*

25  *43:12); Ex. 20, p. 160 (Smith Depo. 31:18-23); Ex. 19, p. 151 (Schneider Depo. 25:1-*

26  *4); Ex. 15, p. 122 (Marburger Depo. 23:7-24); Ex. 4, p. 17 (Bruek Decl.¶7-8); Ex. 5, p.*

27  *22 (Gannon Decl.¶6&8); Ex. 1, p. 4 (Dueker Decl. ¶11); Ex. 2, p. 9 (Warmsley Decl.*

28  *¶10); Ex. 3, p. 13 (Andree Decl. ¶10);  Ex. 21, p. 167 (Response to RFA Nos. 4&5); Ex.*

*22, p. 175 (Response to Int. No. 1); Ex. 24, pp. 196-197 (Driver Handbook); Ex. 25, p. 201 (Safety & Operations Handbook); Ex. 26, p. 204 (D's Message to P.); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)]*

Q. Okay. And the mileage compensation formula, is it intended to compensate drivers for sleeper-berth time?

A. Not that I'm aware of. That's off duty time.

*[Ex. 10, p. 84 (Brueck Depo. 19:15-19)]*

Q. Okay. Is it CRST Expedited's position that drivers are only performing work for CRST when they are driving the vehicle or logged in as on duty?
…

A. The alternatives are sleeper berth or off duty, so I would say that our view is that they're performing work when they're driving and/or on duty.

*[Ex. 10, p. 85 (Brueck Depo. 25:17-26:2)]*

Christopher … you should change your duty status and then edit what wasn't work related to off-duty or sleeper.

*[Ex. 26, p. 204 (D's Message to P.)]*

This uniform failure to pay practice is further evidenced by the fact that the "hours worked" number recorded on drivers' payroll wage statements does not include any such sleeper berth time and is admittedly based on "unaudited log data." *[Ex. 17, p. 137 (Pasker 2017 Depo. 7:15-18); Ex. 10, p. 85 (Brueck Depo. 25:17-26:2); Ex. 1, p. 4 (Dueker Decl.¶13); Ex. 2, p. 9 (Warmsley Decl. ¶12); Ex. 3, p. 13 (Andree Decl. ¶12) Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]* Defendant has also admitted that it has a uniform policy regarding the contents of Class member drivers' payroll wage statements. *[Ex. 21, p. 171 (Response to RFA No. 20); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex.*

*29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)]*

In addition, the Defendant's driver payroll wage statements uniformly do not itemize productive versus nonproductive time as required by California law, such as designating driving time as productive and sleeper berth time as nonproductive. *[Ex. 1, p. 4 (Dueker Decl.¶13); Ex. 2, p. 9 (Warmsley Decl. ¶12); Ex. 3, p. 13 (Andree Decl. ¶12); Ex. 21, p. 171 (Response to RFA No. 20); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]* As simply stated by the Defendant's Driver Payroll Supervisor, Class member's payroll wage statements do not reflect actual hours worked let alone specify which hours worked are productive verses nonproductive. *[Ex. 16, pp. 132-133 (Pasker 2019 Depo. 40:23-41:1); Ex. 20, p. 161 (Smith Depo. 46:22-24); Ex. 19, p. 152 (Schneider Depo. 30:13-20); Ex. 17, p. 137 (Pasker 2017 Depo. 7:15-18); Ex. 1, p. 4 (Dueker Decl.¶13); Ex. 2, p. 9 (Warmsley Decl. ¶12); Ex. 3, p. 13 (Andree Decl. ¶12); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]*

## B. **Defendant's Facts**

### 1. **The Parties**

CRST is an interstate motor carrier authorized by the Federal Motor Carrier Safety Administration ("FMCSA"), an agency of the U.S. Department of Transportation ("DOT"), that provides long-haul expedited freight delivery services to its customers throughout the nation. Ex. 24, p. 195 (Driver Handbook), Ex. 40, p. 818 (*Marburger Tr.* at 11:3-16). Using team drivers allows CRST to efficiently provide these services to its customers. Ex. 24, p. 195 (Driver Handbook); Ex. 34, p. 625 (*Warmsley Tr.* at 18:13-26); Ex. 38, pp. 797-98 (*Chapman Tr.* at 12:17-13:3); Ex. 41, pp. 828-29 (*Porter Tr.* at 15:18-16:14); Ex. 39, p. 807 (*Davis Tr.* at 39:9-11). CRST's drivers perform work across all 48 contiguous states; none are assigned or actually work primarily in California. Ex. 32, pp. 557-58, 563 (*Dueker Tr.* at 21:14-22:18, 49:7-16); Ex. 33, pp. 593, 601-602 (*Andree Tr.* at 17:14-22, 32:28-33:8); Ex. 34, p. 626

9

(*Warmsley Tr.* at 31:20-22).

Dueker was an employee team driver for CRST from February 15, 2017 to December 16, 2017. *See* Ex. 32, p. 565 (*Dueker Tr.* at 61:7-8); Ex. 1, p.3 (*Dueker Decl.* ¶ 5). Dueker did not have prior experience as an over the road interstate truck driver operating under a Class A commercial driver's license. Ex. 32, pp. 552-56 (*Dueker Tr.* at 13:16-14:11, 15:15-17:18).

### 2. CRST's Compensation Structure

CRST compensates its drivers for delivering loads. *See* Ex. 24, p. 197 (Driver Handbook); Ex. 14, pp. 113-14 (*Holzer Tr.* at 27:6-28:12). In other words, when a driver is given a load, he knows how much it will pay—CRST provides mileage that CRST's computer software assigns to the trip, which the driver can then multiply by his mileage rate. Ex. 24, p. 197 (Driver Handbook); Ex. 14, pp. 113-14 (*Holzer Tr.* at 27:6-28:12); Ex. 33, pp. 614-15 (*Andree Tr.* at 72:21-73:2); Ex. 34, pp. 641-42 (*Warmsley Tr.* at 65:3-66:11). Because CRST's employee drivers are team drivers, their load pay is calculated on a "split-mile" basis. This means CRST's employee drivers are paid for half of all miles attributable to the load, regardless of which driver is actually driving or working at any given time in order to get the load delivered.[1] Ex. 34, pp. 627-29, 641-42, 647-50 (*Warmsley Tr.* at 38:25-40:7, 65:18-66:7, 78:16-79:15, 82:3-83:14); Ex. 40, p. 821 (*Marburger Tr.* at 33:13-25); Ex. 32, pp. 571-73, 586 (*Dueker Tr.* at 84:22-86:13, 271:17-20); Ex. 33, pp. 617-18 (*Andree Tr.* at 76:26-77:4). A driver's compensation for delivering a load is designed to cover all "normal duties"[2] of a driver

---

[1] For example, if a team transports a 2,000-mile load, each driver earns compensation for 1,000 miles multiplied by the driver's per-mile pay rate (which varies based on the driver's experience level and tenure). Driver A will earn this compensation even if he is off duty in the sleeper berth for 1,500 miles. Ex. 33, pp. 617-618 (*Andree Tr.* at 76:26-77:4) ("I got paid for half the miles no matter if I drove one mile or all of them . . . If it was a 2,000-mile trip, I got paid 1,000 miles, no matter if I drove 5 of them or 1,500 of them.").

[2] CRST's handbook specifically provides that "normal duties of a driver include but are not limited to pre-trip and post-trip inspections, fueling, driving, travel and waiting time,

necessary to safely complete delivery of a load. Ex. 24, p. 197 (Driver Handbook); Ex. 40, pp.819-20 (*Marburger Tr.* at 26:13-27:12); Ex. 42, pp. 836-837 (*Schneider Tr.* at 24:22-25:4). This includes all on duty time, not just time spent driving. Ex. 21, pp. 165-67 (CRST's Responses to Plaintiff's RFAs Nos. 1-4).

### 3. CRST's Operations, DOT Hours of Service, and Sleeper Berth Time

The FMCSA regulates motor carriers and drivers. As part of its regulation of the trucking industry, the DOT requires all drivers, such as Plaintiff and the putative class members, to comply with hours of service ("HOS") regulations promulgated by the FMCSA. 49 C.F.R. § 395.8. Under the HOS regulations, a driver must log their time each day in one of four duty status, two of which describe time spent working—(1) on duty (driving), (2) on duty (not driving)—and two of which designate non-working time during which they should rest—(3) off duty outside the sleeper berth, or (4) off duty inside the sleeper berth. *Id.* Drivers must record their time 24 hours a day. 49 C.F.R. § 395.8; Ex. 34, p. 636 (*Warmsley Tr.* at 57:23-25). The HOS regulations limit drivers to a maximum of 14 hours of on-duty time once they begin work for the day, and they can only drive up to a maximum of 11 hours before having to take 10 consecutive hours off duty (inside or outside the sleeper berth) in order to drive or work again. 49 C.F.R. § 395.3.

When a driver performs any work (*i.e.* any task related to delivering the load), he or she is required to be logged as either on duty (driving) or on duty (not driving). Ex. 33, pp. 599, 611 (*Andree Tr.* at 30:22-26 ("Q. And that's because whenever you're doing work you're . . . you had to be on-duty? A. On-duty . . . . And when I am waiting for it to be unloaded, I'm still working."), 67:3-14); Ex. 34, pp. 630-32 (*Warmsley Tr.*

---

attending safety and other meetings, submitting to drug, alcohol, and other forms of testing, completing paperwork, loading and unloading freight (opening the doors, spotting the trailer, sweeping the trailer, counting the freight, waiting for the load/unload process, securing the load, and closing the doors)." Ex. 24, p. 197 (Driver Handbook).

at 48:16-50:5). The on-duty (driving) status denotes when a driver is driving the truck. 49 C.F.R. § 395.2; Ex. 24, p. 196 (Driver Handbook); Ex. 34, p. 630 (*Warmsley Tr.* at 48:16-26). When a driver performs other tasks related to delivering the load, such as doing DOT-mandated pre-trip and post-trip inspections, setting the tandems, doing paperwork, waiting for a shipper or receiver to load or unload the truck, and corresponding with their driver managers, he would log his time as on duty (not driving). Ex. 33, pp. 598-600, 611 (*Andree Tr.* at 29:27-31:22, 67:6-14); Ex. 34, pp. 630-32 (*Warmsley Tr.* at 48:13-50:5); Ex. 24, p. 196 (Driver Handbook). Drivers log their non-work status as off duty outside the sleeper berth or off duty inside the sleeper berth when they have been completely relieved of all duties related to delivering a load or responsibility for the load or CRST's equipment. Ex. 34, pp. 650-51 (*Warmsley Tr.* at 83:26-84:7); Ex. 33, pp. 605-606, 611 (*Andree Tr.* at 47:15-48:17, 67:15-21). Pursuant to HOS regulations, time logged as sleeper berth is considered off duty time. 49 C.F.R. § 395.2. In other words, this time is solely drivers' own. Nothing in CRST's policies or the FMCSA's HOS regulations place any restrictions on drivers' movement or activities when their trucks are stationary and the drivers are logged as in the sleeper berth. CRST'S Handbook contains a section on the DOT's HOS requirements. That section explains that, under the HOS regulations, drivers should log only time spent in the sleeper berth as sleeper berth time. Ex. 24, p. 196 (Driver Handbook); Ex. 25, p. 201 (Safety & Operations Handbook).

CRST's drivers record their on duty and off duty hours using electronic logs. Ex. 33, pp. 610, 615-16 (*Andree Tr.* at 62:9-11, 73:24-74:3); Ex. 34, p. 630 (*Warmsley Tr.* at 48:4-12); Ex. 40, p. 822 (*Marburger Tr.* at 45:7-21). CRST's driver logs show the status of a driver, an estimate of the location of the truck when a driver's status changed, and the day and time a driver entered a certain status. Ex. 35, p. 663 (*Platt Report*, ¶ 25). CRST's driver logs cannot be used to determine when a truck was moving. *Id*. A driver's logs can also contain errors regarding a given duty status. Ex. 33, p. 603 (*Andree Tr.* at 45:10-25). It is a driver's responsibility to review and certify his logs

12

each day for accuracy. If a finds errors in his logs, he must report the error to CRST and review and recertify his logs to fix the errors. Ex. 34, pp. 637-38 (*Warmsley Tr.* at 61:17-62:1); Ex. 33, pp. 603-606 (*Andree Tr.* at 45:26-46:1). But if those errors are not identified by a driver, they would not be fixed. *See* Ex. 39, pp. 808-09, 813-14 (*Davis Tr.* at 47:5-48:2, 69:16-70:3).

### 4. Putative Class Members' Work

CRST provides its customers with expedited freight hauling services within the continental United States. As a result, CRST's drivers, such as Dueker and the putative class, perform their work primarily outside of California. Ex. 32, pp. 557-58, 563-64 (*Dueker Tr.* 21:14-22:18, 49:7-16, 53:6-10); Ex. 33, pp. 601-602 (*Andree Tr.* at 32:28-33:8); Ex. 34, p. 626 (*Warmsley Tr.* at 31:20-22). CRST drivers receive their loads from CRST driver managers. Ex. 33, pp. 594-95 (*Andree Tr.* at 18:23-19:3); Ex. 38, pp. 799,800 (*Chapman Tr.* at 27:13-28:4); Ex. 39, p. 810 (*Davis Tr.* at 59:6-7). CRST driver managers deliver the dispatch information to the onboard messaging and logging Qualcomm unit assigned to their trucks. Ex. 34, pp. 638-40 (*Warmsley Tr.* at 62:18-64:11); Ex. 33, p. 595 (*Andree Tr.* at 19:4-12); Ex. 32, p. 559 (*Dueker Tr.* at 23:17-25); Ex. 39, pp. 804-805 (*Davis Tr.* at 9:18-10:9); Ex. 43, pp. 844-45 (*Smith Tr.* at 65:24-66:1). The dispatching instructions contain pickup and delivery times and locations, delivery instructions, suggested route instructions, suggested fueling stops, and any special instructions related to the load. Ex. 33, pp. 595-97 (*Andree Tr.* at 19:7-12, 20:1-21:17); Ex. 32, p. 560 (*Dueker Tr.* at 24:4-10); Ex. 41, pp. 830-31 (*Porter Tr.* at 17:24-18:9).

Once a putative class member receives a dispatch communication, he and his co-driver would plan their route based on the number of driving hours they had available, the length of the trip, weather, and traffic patterns. Ex. 32, pp. 561-62 (*Dueker Tr.* at 28:13-29:3); Ex. 43, pp. 844-45 (*Smith Tr.* at 65:11-66:1). When a driver logs himself into the sleeper berth, this does not mean he is automatically sleeping. Instead, this is off-duty time where a driver can unwind and do any personal tasks. Ex. 33, pp. 605-606

(*Andree Tr.* at 47:22-48:11 ("If I got done with my 11 hours and now it's time for me to be in the sleeper, I would be logged in sleeper berth. . . . it doesn't say you have to sleep for 10 hours. You can, you know, just like normal people, you just don't hit up the switch and you go to bed. You unwind after driving, watch a movie, talk to your wife; and then you go to bed.")). For example, Plaintiff explained that he would often "make phone calls to family or friends," used the internet, read, had a cup of coffee, and generally relaxed while he was logged as in the sleeper berth. Ex. 32, pp. 569-70 (*Dueker Tr.* at 73:19-74:4). Other putative class members similarly used their sleeper berth time to watch movies, speak to family members, video conference with family members, and use their computers or phones to surf the internet. Ex. 33, pp. 607-608 (*Andree Tr.* at 49:9-50:2); Ex. 34, pp. 633-35 (*Warmsley Tr.* at 51:25-53:16).

Under the HOS regulations, drivers are only supposed to log time as sleeper berth if they are actually in the sleeper berth. But because sleeper berth is considered off-duty time for purposes of HOS compliance, drivers often leave their status as off duty "sleeper berth" even if they get out of the truck and are doing something else. For example, some drivers would remain logged into sleeper berth while they went into a truck stop to eat, buy goods, or shower. *See* Ex. 34, pp. 651-52 (*Warmsley Tr.* at 84:8-85:22 ("If I went inside to get something to eat, or use the bathroom or be -- I would still be logged in as sleeper berth . . . Usually when we stop to take a shower, both of us would probably be sleeper berth.")); Ex. 32, pp. 575-77 (*Dueker Tr.* at 95:17-96:1, 97:13-23 ("If I was in sleeper berth, I don't believe I took myself out to go take a shower . . . But that's not an absolute either.")); Ex. 33, pp. 611, 619-21 (*Andree Tr.* at 67:15-21, 83:27-85:22 (only time he logged "off duty" was when he was at home for a few days, otherwise he logged all off duty time as sleeper berth even if he was stopped and not in the sleeper berth)); Ex. 39, pp. 811-12 (*Davis Tr.* at 67:8-68:7 ("Some drivers don't log off-duty when they're on home time. They keep themselves in the sleeper berths. So that could be four straight days of being in the sleeper when they should be off-duty.")).

Drivers had different practices with how they logged time spent outside the sleeper berth both from driver to driver and even from day to day for the same driver. Ex. 32, pp. 578-79 (*Dueker Tr.* at 98:3-99:15 ("It's hard to [say how I logged time doing things that were not work related, like eating or showering] without knowing each – where you were each day or what you were doing each day."); 99:16-22 ("I think different drivers logged differently")); Ex. 33, pp. 612-13 (*Andree Tr.* at 70:17-71:4 (might have logged time as sleeper berth or off-duty, "either or")).

The lack of uniformity in logging sleeper berth time is apparent when one examines the drivers' logs. Those logs contain many instances in which drivers logged themselves as in the sleeper berth for days at a time. *See, e.g.*, Ex. 36, pp. 718-79 (*Platt Suppl. Report*, ¶¶ 26, 27 (citing example where driver's log is set to sleeper berth for 6 days)); *see also* Ex. 39, pp. 811-14 (*Davis Tr.* at 67:8-70:12 (saw drivers who logged 15 or 24+ hours in sleeper berth, some several days; she would not ask questions of this as it may be normal)). In other words, even if a driver's logs show him as logged in the sleeper berth, the driver may or may not have been outside the sleeper berth on home time, eating, showering, or doing whatever else he chose to do. This is because every day is different in the life of an over-the-road driver. Ex. 34, pp. 642-43 (*Warmsley Tr.* at 66:24-67:3); Ex. 32, p. 566 (*Dueker Tr.* at 67:11-13).

CRST does not impose—and is prohibited by the federal HOS regulations from imposing—any obligations on drivers while they are in the sleeper berth. Ex. 33, p. 603 (*Andree Tr.* at 45:6-9). In fact, CRST driver managers testified they would try to avoid contacting drivers who were logged in the sleeper berth, though again, their practices related to interactions with drivers differ. Ex. 41, p. 832 (*Porter Tr.* at 34:1-5 ("unless there's a dire emergency, the driver that's on duty is the driver that I'd contact")); Ex. 40, p. 823 (*Marburger Tr.* at 81:11-15 (sometimes I look at driver logs to "see who's . . . driving because you don't want to call someone who is in the sleeper berth.")); Ex. 39, p. 806 (*Davis Tr.* at 17:3-21 ("I think it would depend on the driver manager [whether both drivers could go see a movie]. Some driver managers would want

somebody to watch the Qualcomm and be with the truck.")).

Finally, even though CRST's drivers operate as a team, this does not mean that the truck's wheels are moving 24 hours a day, seven days a week. Drivers are free to take breaks whenever they feel fatigued or need a break. Ex. 32, pp. 583-84 (*Dueker Tr.* at 133:16-134:24). At times, both drivers can log themselves in the sleeper berth at the same time because they both want or need to rest. Ex. 43, pp. 842-43 (*Smith Tr.* at 29:15-30:4); Ex. 34, pp. 644-46, 652 (*Warmsley Tr.* at 69:27-71:4, 85:15-22). Further, when the truck is stopped, drivers are free to leave the truck to run personal errands. For example, Plaintiff would sometimes take an Uber to a "friend's cousin's to watch TV and dinner," to a downtown area simply to "walk around," or to "get coffee." Ex. 32, p. 585 (*Dueker Tr.* at 214:10-15). He would also leave to "get a meal, take a walk" or go to Walmart to "pick[] up some supplies." Ex. 32, p. 582 (*Dueker Tr.* at 115:15-21).

## 5.    CRST's motion in limine to exclude Aaron Woolfson

Plaintiff hired Aaron Woolfson ("Woolfson"), a "self-taught" database "expert" to analyze and structure a sample of CRST's driver data to identify when putative class members were in the sleeper berth of a moving truck in California. Ex. 9, p. 52 (*Petersen Report*, ¶ 1); Ex. 37, pp. 788-92 (*Woolfson Tr.* at 10:7-11, 29:18-30:2, 31:5-12, 31:23-32:9). Mr. Woolfson's admissibility is the subject of the parties' joint motion *in limine* filed contemporaneously with this motion.

## 6.    Evidentiary objections[3]

CRST objects to Plaintiff's reliance on deposition testimony and statements of

---

[3] This Court's Order re Motions for Class Certification requires all evidentiary objections to be made in the relevant section of the parties' joint brief. (Doc. 49, at 3:9-10). To the extent CRST has an evidentiary-based objection, it is raising it in this brief. However, CRST disagrees with many of Plaintiff's characterizations of the testimony. To the extent those characterizations are relevant to this motion, CRST has raised them. To the extent those characterizations are not relevant to certification, CRST does not address them and, instead, will wait to address those issues during summary judgment and at trial.

fact filed in other cases and his request that the Court take judicial notice of such facts. *See* Exs. 4, 5, 10, 13, 17, 23, *Plaintiff's Request for Judicial Notice*. Under Fed. R. Evid. 201(b) a court can take notice of an "adjudicative fact" if it is "not subject to reasonable dispute." A fact is "not subject to reasonable dispute" if it either (i) is generally known; or (ii) can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); Fed. R. Evid. 201(b)(1)-(2).

While Courts can take judicial notice of the existence of records and findings in other cases, the general rule is that they may not take judicial notice of the truth of the matters asserted in those records. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010) ("the content of a deposition is not a clearly established "fact" of which this panel can take notice."); *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007); *Rose v. Daimler Trucks N. Am. LLC*, 2010 WL 11651593, at *2 (C.D. Cal. May 11, 2010) ("The Court declines to take judicial notice of the deposition transcripts, as they are neither generally known nor capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see also* Charles Alan Wright & Kenneth W. Graham, Federal Practice & Procedure § 5106.4 (2d ed.) ("It seems clear that a court cannot notice pleadings or testimony as true simply because these statements are filed with the court.").

CRST also objects to the testimony of Mr. Woolfson and Dr. Petersen, Plaintiff's experts. CRST's objections are the subject of a separate contemporaneously filed joint motion *in limine*. CRST incorporates the objections it makes to the testimony of Mr. Woolfson and Dr. Petersen in that motion here.

Finally, Plaintiff did not take a 30(b)(6) deposition in this case. To the extent Plaintiff attempts to bind CRST using individual testimony taken from low-level corporate employees. CRST objects to Plaintiff's use of such testimony to bind CRST

on issues such as compensation policy, rest break policy or other issues. These individuals are not at a level for which they have authority to speak for and bind the corporation. *Kelly v. Provident Life & Acc. Ins. Co.*, 2011 WL 2448276, at *4 (S.D. Cal. June 20, 2011) ("Plaintiff seeks to compel corporate testimony . . . . Plaintiff is entitled to the knowledge of the corporation and the corporation's positions on matters clearly relevant and discoverable in this phase of the case. Therefore, any testimony provided by employees as individuals does not satisfy the need for Plaintiff to obtain binding testimony from the corporate entity. 'Without having a witness or witnesses who can testify and bind the corporation, the deposing party is left at an unfair disadvantage, having no understanding of what the corporation's position is as to many areas of inquiry. Such is the case here.'"); *Sanders v. Circle K Corp.*, 137 F.R.D. 292, 294 (D. Ariz. 1991) ("The purpose behind Rule 30(b)(6) is to create testimony that will bind the corporation.")

## III.  LEGAL ANALYSIS

### A.  <u>Standard</u>

#### 1.  **Plaintiff's Standard**

Under Rule 23, class certification is appropriate when: 1) the class is so numerous that joinder of all members is impractical (numerosity); 2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative party are typical of the class (typicality); (4) the representative party will fairly and adequately protect the interests of the class (adequacy); (5) questions of law or fact common to the members of the class predominate over questions affecting individual members (predominance); and (6) a class is superior to other methods for the fair and efficient adjudication of the controversy (superiority). (Fed. R. Civ. P. 23(a), (b)(3))

California's public policy favors the use of class actions to resolve claims of wage and hour violations. (*Gentry v. Superior Court*, 42 Cal.4th 443, 456 (2007))

#### 2.  **Defendant's Standard**

The class action is "an exception to the usual rule that litigation is conducted by

18

and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citations omitted). A party seeking to certify a class must affirmatively demonstrate the elements of Federal Rule of Civil Procedure 23. *Id.* Certification is only proper if, after a "rigorous analysis", the Court is satisfied that the Rule 23 requirements are met. *Id.* This inquiry frequently involves considerations enmeshed in the factual and legal issues comprising the plaintiff's causes of action. *Id.* at 34.

### B.    Ascertainability

#### 1.    Plaintiff's Position

"As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." (*Quezada v. Con-Way Freight, Inc.,* 2012 WL 4901423 at 2 (N.D. Cal. Oct. 15, 2012); *Mazur v. eBay Inc.,* 257 F.R.D. 563, 567 (N.D. Cal. 2009) ("A class definition should be precise, objective, and presently ascertainable.")

Plaintiffs propose the following class definition, and minimum wage and waiting time penalty subclass definitions:

**Class Definition:** "All California residents employed by Defendant as a truck driver at any time during the Class Period of December 27, 2013 through the date of trial."

**Minimum Wage Subclass:** "All California residents employed by Defendant as a truck driver during the Class Period who logged sleeper berth shift segment time within the territorial boundaries of California during which there was some truck movement."

**Waiting Time Penalty Subclass:** "All Minimum Wage Subclass Members who have separated from their employment with Defendant."

The class period would run from a date of four years prior to the filing of this action through the date of trial.

Here, the Class is easily identifiable using Defendant's own business records.

(Cal. Labor Code section 1174) Defendant possesses documents which 1) list the names and addresses of all of its California employed drivers, and 2) log each employee's sleeper berth time. Pursuant to a *Belaire-West* notice process, Defendant produced a list containing contact information for all such California employed Class member drivers as of January 18, 2019. Therefore, the Class is easily identifiable and ascertainable. *[Ex. 6, p. 26 (Corren Decl.¶5&6); Ex. 30, pp. 501-507 (Driver Logs); Ex. 31, pp. 507-547 (Driver Data Logs)]*

### 2.    Defendant's Position

As Defendant stated during the parties' meet and confer, Defendant does not dispute that Plaintiff's proposed classes are ascertainable.

### C.    Numerosity

### 1.    Plaintiff's Position

To meet the "numerosity" requirement, Plaintiffs must demonstrate that the proposed class is "so numerous that joinder of all members is impracticable." (FRCP §23(a)(l); see also *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998)) Generally, a class consisting of more than 75 members usually satisfies the numerosity requirement. (*Quezada*, *supra*, 2012 WL 4901423 at 3)

It is undisputed that Defendant employed over 5,500 Class Members during the Class Period. As discussed above, Defendant identified the names and addresses of 5,597 Class Members as of January 18, 2019. Plaintiffs believe that the number will be approximately 7,000 by the time the motions for class certification and summary judgment are resolved. Accordingly, the Class is sufficiently numerous. *[Ex. 6, p. 26 (Corren Decl.¶5)]*

### 2.    Defendant's Position

As Defendant stated during the parties' meet and confer, Defendant does not dispute that the class is sufficiently numerous.

**D.  Commonality & Predominance.**

    **1.  Standard**

        **a.  Plaintiff's Position**

Commonality requires that there be "questions of fact or law which are common to the class." (F.R.C.P. 23(a)(2); *Hanlon*, *supra*, 150 F.3d at 1019)  The class claims "must depend on a common contention," which "must be of such a nature that it is capable of classwide resolution - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." (*Wal-Mart Stores, Inc., v. Dukes,* 564 U.S. 338, 350 (2011)) "Plaintiffs must show significant proof that (the employer) operated under a general policy of (violating California's minimum wage laws)." (*Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 834 (9th Cir. 2012)) However, "Rule 23(a)(2) has been construed permissively.  All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." (*Hanlon, supra*, at 1019; *Simpson v. Fireman's Fund Insurance Company,* 231 F.R.D. 391, 395 (N.D. Cal. 2005).  The California Supreme Court has found that "[c]laims alleging a uniform policy consistently applied to a group of employees … are suitable for class treatment." (*Brinker v. Superior Court,* 53 Cal.4th 1004, 1022 (2012))

Rule 23 also requires that the common questions predominate. (F.R.C.P. 23(b)(3)) These are distinct requirements, though as a practical matter they tend to merge. (*see* 1 Newberg on Class Actions § 3:27 (5th ed.) "Due to the similarities between the two requirements . . . courts will often treat the application of [commonality] and [predominance]) together. If the [predominance] requirement is met, the [commonality] prerequisite is automatically satisfied.")

The predominance inquiry asks whether "common questions present a significant aspect of the case and [if] they can be resolved for all members of the class in a single adjudication, [and if so] there is clear justification for handling the dispute on a

1  representative rather than on an individual basis." (*Hanlon, supra,* at 1022)

2        **b.  Defendant's Position**

3        There is no right to try a case on a class wide basis; the class vehicle is a

4  procedural device that establishes a form of joinder. *See Shady Grove Orthopedic*

5  *Assocs. P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010). What matters is whether the

6  evidence to be offered at trial will competently prove the elements of the claim for each

7  class member. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016). "If

8  the main issues in a case require the separate adjudication of each class member's

9  individual claim or defense, a Rule 23(b)(3) action would be inappropriate.'" *Zinser v.*

10  *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (quoting 7A Charles

11  Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §

12  1778 at 535-39 (2d ed. 1986)).

13        To meet this burden, Plaintiff must affirmatively set forth *evidence* at the

14  certification stage that demonstrates compliance with Fed. R. Civ. Proc. 23. *Wal-Mart*,

15  564 U.S. at 350-51. In other words, Plaintiff must demonstrate how he will prove his

16  minimum wage claim for sleeper berth time on a class wide basis so the Court can

17  envision the form a trial on this issue will take. *Eisen v. Carlisle & Jacquelin*, 417 U.S.

18  156, 177 (1974). Plaintiff has not met his burden.

19        **2.    Minimum Wage**

20        **a.    Plaintiff's Position**

21        The common questions in this litigation regarding the minimum wage claims are

22  whether Class Members are entitled to the minimum wage for their logged sleeper berth

23  shift segment time within the territorial boundaries of California during which there was

24  some truck movement; and whether Defendant failed to compensate the Class Members

25  for such sleeper berth time in violation of California law.

26        California Industrial Welfare Commission Wage Order Number 9 defines the

27  term "hours worked" as the time "during which an employee is subject to the control of

28  the employer, and includes all the time an employee is suffered or permitted to work,

whether or not required to do so." (*Morillion v. Royal Packing Co.,* 22 Cal.4th 575, 582 (2000); Wage Order No. 9)

> When an employer directs, commands or restrains an employee from leaving the workplace … and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control. According to [the definition of hours worked], that employee must be paid.

(*Id.* at 583)

An employee who is "subject to an employer's control" does not have to be performing his normal job duties, or for that matter any job duties at all to be entitled to compensation under California's wage orders. (*Id.*, citing *Bono Enterprises, Inc. v. Bradshaw,* 32 Cal.App.4th 968, 974-975 (1995))

Here, Defendant has acknowledged that its uniform per mile compensation formula does not compensate drivers for sleeper berth time. Therefore, there is a common legal question regarding whether such time is compensable under California law. *[Ex. 10, p. 84 (Brueck Depo. 19:15-19); Ex. 10, p. 85 (Brueck Depo. 25:17-26:2); Ex. 23, p. 192 (D's SMF #148,149); Ex. 15, p. 122 (Marburger Depo. 23:7-24); Ex. 4, p. 17 (Bruek Decl.¶7-8); Ex. 5, p. 22 (Gannon Decl.¶6&8); Ex. 1, p. 4 Dueker Decl.¶11; Ex. 2, p. 9 (Warmsley Decl. ¶10); Ex. 3, p. 13 (Andree Decl. ¶10)] Ex. 21, p. 167 (Response to RFA Nos. 4&5); Ex. 22, p. 175 (Response to SI No. 1); Ex. 24, pp. 196-197 (Driver Handbook); Ex. 25, p. 201 (Safety & Operations Handbook); Ex. 26, p. 204 (D's Message to P.); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)]*

In 2015, the Northern District of California addressed the specific issue of whether sleeper berth time was compensable. The Court in *Ridgeway v. Wal-Mart Stores, Inc.*, 107 F.Supp.3d 1044 (N.D. Cal. 2015), held that when the employees were required to remain in the truck during the sleeper berth period, the time was considered hours worked and was compensable. The Court had previously certified the Class of

drivers who, like here, were not compensated for all hours worked pursuant to the employer's uniform compensation structure. (*Ridgeway v. Wal-Mart Stores, Inc.*, 2014 WL 4477662, at 7-9 (N.D. Cal. Sept. 10, 2014))

And because this Plaintiff Class is limiting its damages to only include sleeper berth time when the log data commonly indicates Class members were confined to their truck, there are no individualized issues because it is irrelevant that individual Class members might have been arguably engaged in non-work related activities.  If Defendant's driver logs and data demonstrate both sleeper berth time and truck movement, then the parties can be certain that Class members were correctly logging their compensable time.  Unfortunately, it is Defendant's own lack of accurate record keeping that has compelled Plaintiffs to limit their damages.  But consequently, Plaintiffs have eliminated the possibility that a driver Class member had logged time in the sleeper berth when said Class member arguably and/or incorrectly may not have in fact been working.  *[Ex. 30, pp. 501-507 (Driver Logs); Ex. 31, pp. 507-547 (Driver Data Logs); Ex. 8, pp. 48-50 (Woolfson Report); Ex. 1, p. 4 (Dueker Decl.¶9&15); Ex. 2, pp. 8&9 (Warmsley Decl. ¶8&14); Ex. 3, pp. 12&13 (Andree Decl. ¶8&14)]*

Accordingly, there are common questions as to whether such sleeper berth time is defined as hours worked under California law, and whether Defendant failed to compensate drivers for such time in violation of California law.  As Defendant had a common policy in regards to the compensability of sleeper berth time, the predominance inquiry is satisfied because the above common questions can be resolved for all members of the Class in a single adjudication. *[Ex. 23, p. 192 (D's SMF #148,149); Ex. 14, p. 115 (Holzer Depo. 42:20-43:12); Ex. 20, p. 160 (Smith Depo. 31:18-23); Ex. 19, p. 151 (Schneider Depo. 25:1-4); Ex. 15, p. 122 (Marburger Depo. 23:7-24); Ex. 4, p. 17 (Bruek Decl.¶7-8); Ex. 5, p. 22 (Gannon Decl.¶6&8); Ex. 1, p. 4 (Dueker Decl. ¶11); Ex. 2, p. 9 (Warmsley Decl. ¶10); Ex. 3, p. 13 (Andree Decl. ¶10); Ex. 21, p. 167 (Response to RFA Nos. 4&5); Ex. 22, p. 175 (Response to Int. No. 1); Ex. 24, pp. 196-197 (Driver Handbook); Ex. 25, p. 201 (Safety & Operations Handbook); Ex. 26, p. 204*

*(D's Message to P.); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)]*

Not only does *Vaquero* [*v. Stoneledge Furniture LLC* (2017) 9 Cal.App.5[th] 98, 110] indict Defendants' compensation structure generally, it also suggests that Plaintiff's minimum wage claim is susceptible to class wide resolution. This is because Plaintiff must only prove that Defendants' per mile pay scale does not adequately compensate class members for all the tasks they perform. Plaintiff will not need to prove that any individual employee was ever paid less than minimum wage in a given hour, only that Defendants' uniform policy denied compensation for tasks that require compensation. The only individual inquiries necessary will concern the exact amount of non-compensated work performed by each class member, and will thus relate only damages, and not liability. See *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-514 (9th Cir. 2013) ("[T]he amount of damages is invariably an individual question and does not defeat class action treatment.").

Several courts in this Circuit have granted certification for wage claims like Plaintiff's, brought by piecemeal employees whose employers did not separately compensate for nonproductive work time. *See e.g., Ridgeway v. Wal-Mart Stores Inc.*, No. C-08-05221-SI, 2014 WL 4477662 (N.D. Cal. September 2014); *Taylor v. FedEx Freight, Inc.*, No. 13-CV-1137-LJO-BAM, 2015 WL 2358248 (E.D. Cal. May 15, 2015) (certifying class because plaintiff's theory that "Defendant's mileage pay plan systematically [failed] to separately compensate employees for non-driving activities did not require "identify[ing] specific hours that were not compensated below minimum wage for each class member"); *Mendez v. R+L Carriers, Inc.*, No. C-11-2478-CW, 2012 WL 5868973 (N.D. Cal. November 19, 2012)

(*Ayala v. U.S. Xpress Enterprises, Inc.,* 2017 WL 3328087, at *8 (C.D. Cal. 2017))

Finally, a common question exists regarding Defendant's liability for liquidated damages pursuant to Labor Code section 1194.2 for the unpaid minimum wages.

### b.    Defendant's Position

### i.    Individualized issues as to whether CRST controlled drivers in the sleeper berth predominate.

California Industrial Welfare Commission Wage Order No. 9 ("Wage Order No. 9") defines "hours worked" as time "during which an employee is subject to the control of the employer, and includes all the time an employee is suffered or permitted to work, whether or not required to do so." *Morillion*, 22 Cal.4th at 582. When an employer "prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control." *Id.* at 583. Plaintiff alleges that there is a common question as to whether the time a putative class member spent in the sleeper berth of a moving truck in California is compensable. Leaving aside whether this is true, it is impossible to resolve the key factual predicate to this inquiry—whether CRST controlled a putative class member during any of a driver's logged sleeper berth period—on a class wide basis.

For his minimum wage claim, Plaintiff seeks to certify a class of individuals defined as "[a]ll California residents employed by Defendant as a truck driver during the Class Period who logged sleeper berth shift segment time within the territorial boundaries of California during which there was some truck movement." *See supra* III.B.1. The key to Plaintiff's certification theory is that CRST uniformly exercised control over putative class members, converting sleeper berth time into compensable working hours, whenever (i) a class member was physically present in the sleeper berth (ii) the driver's log shows some movement while the driver was logged as being in the sleeper berth and (iii) that movement was in California. Under Plaintiff's theory, truck movement during a sleeper berth shift equals control, and any sleeper segment with some portion in California during which the truck moves *at all* is wholly compensable without any showing that the driver was actually confined to the sleeper berth of the truck or somehow otherwise

subject to CRST's control.[4] Plaintiff asserts he can use his and the putative class members' driver logs to make this showing of control. The record demonstrates that this is not so.

Putative class members' driver logs are insufficient, standing alone, to demonstrate when drivers were restricted to being in the sleeper berth since driver logs do not show when or for how long a truck was in movement during a given sleeper berth segment (i.e., how long the driver was physically confined to the sleeper berth). Ex. 35, p. 663 (*Platt Report*, ¶ 25 ("It is important to note that the data relied upon, driver logs, <u>cannot</u> be used to determine at what point during [a sleeper berth] duration an individual was in the berth or if that coincided with when the movement occurred.")). Therefore, to the extent Plaintiff is relying on the truck's movement to demonstrate control, he cannot solely use driver logs to prove his case.[5]

This evidentiary gap is important for two reasons. First, Plaintiff has not identified any CRST policy that demonstrates CRST exercised control over him or the putative class members while they were logged as being in the sleeper berth. While Plaintiff cites to CRST's Driver Handbook and Safety & Operations Handbook's

---

[4] For example, under Plaintiff's theory, if a driver logs 14 hours in the sleeper berth on a segment wholly within California, and the truck moves 40 miles (which should take about 47 minutes), the driver should get 14 hours of additional compensation. Ex. 36, pp. 727-30 (*Platt Suppl. Report*, ¶¶ 45-51). Or, if a driver logs sleeper berth time during a 424-mile trip from California to Arizona (the California portion of which should take about 2 hours and 41 minutes to drive), the driver should get additional compensation for whatever amount of time he logged as sleeper berth time, which could range from 3 hours to 15 hours. Ex. 36, pp. 723-25 (*Platt Suppl. Report*, ¶¶ 36-41). This is so regardless of whether the truck was stationary during the majority of the sleeper berth segment or whether the putative class member spent only a short portion of the sleeper berth segment in California or even in the sleeper berth at all.

[5] Nor can Plaintiff rely on the testimony from individual drivers. Some drivers testified that there is no way for any individual driver to determine the amount of time they spent in a truck's sleeper berth while the truck was moving in California. Ex. 33, p. 618 (*Andree Tr.* at 77:15-27).

discussion of the HOS regulations, *see supra* § III.D.2.a*,* (citing Ex. 24, pp. 196-97 (Driver Handbook), Ex. 25, p. 201 (Safety & Operations Handbook)), these are not formal CRST policies. Instead, they simply describe the legal requirements of logging time according to the DOT's HOS regulations, which require drivers to log sleeper berth time when they are actually within the sleeper berth. *Compare* Ex. 25, p. 196 ("2. Sleeper Berth (Line 2): 49 C.F.R. § 395.2 ("Only time spent in a sleeper berth of a CMV may be recorded as Sleeper Berth time on a driver's record of duty status (driver's log) and can be no other location.") *with* 49 C.F.R. § 395.2 (defining on duty time as "all time in a commercial motor vehicle, other than . . . time spent resting in a sleeper berth" and defining sleeper berth as "a berth conforming to the requirements of [40 C.F.R.] § 393.76 of this chapter.").

Second, even if there was a CRST policy that drivers should only log sleeper berth time if they are physically in the sleeper berth, the evidence developed thus far reflects that drivers did not follow that policy when completing their logs. For example, Plaintiff testified that he would sometimes log sleeper berth time while he was showering or in a restaurant eating. Ex. 32, pp. 575-77 (*Dueker Tr.* at 95:17-97:18). In fact, Plaintiff believes that he logged sleeper berth time, in at least one occasion, when he was in a hotel while the truck was receiving maintenance. Ex. 32, p. 574 (*Dueker Tr.* at 90:8-12 ("Q. When you were in Carlisle and you said you went to a motel, how did you log that time in your logbook? A. I believe we both were off-duty, and it was shown as sleeper berth because the truck had to get maintenance. We couldn't stay in the truck.")). Plaintiff also admitted that how he logged his sleeper berth time varied over the course of his employment and that, at the beginning of his employment, his logging of sleeper berth time may not have included time spent in the sleeper berth. *See* Ex. 32, pp. 579-81 (*Dueker Tr.* at 99:23-100:11, 100:20-101:2).

Other putative class members similarly testified to logging time spent outside of the truck as sleeper berth time. Ex. 33, pp. 607-608, 612-13 (*Andree Tr.* at 49:18-50:2, 70:17-71:21); Ex. 34, pp.651-652 (*Warmsley Tr.* at 84:8-85:22). Additionally, just

28

because an individual is logged as being in the sleeper berth does not mean that was always accurate. Ex. 33, pp. 615-16 (*Andree Tr.* at 73:24-74:3 ("You're dealing with electronic logs. And those machines get glitches, and they don't send everything in properly sometimes.")). Finally, CRST's driver managers testified that it was some drivers' practice to log sleeper berth time when they were home on leave. Ex. 12, pp. 811-12 (*Davis Tr.* at 67:8-68:7 ("Some drivers don't log off-duty when they're on home time. They keep themselves in the sleeper berths. So that could be four straight days of being in the sleeper when they should be off-duty.")).

The above testimony is also consistent with what CRST's expert—Charles Platt— found when he analyzed the logs as part of his rebuttal report in this matter. Platt identified that some drivers have consecutive sleeper berth entries that last for days at a time. *See, e.g.*, Ex. 36, pp. 718-19 (*Platt Suppl. Report*, ¶¶ 26, 27 (citing example in which driver's log is set to sleeper berth for 6 days)). In fact, Platt determined that more than 44% of the time Plaintiff's expert counted as compensable sleeper berth time was related to sleeper berth entries exceeding 10 hours in length. Ex. 36, pp. 713, 717, 731 (*Platt Suppl. Report*, ¶¶ 10(a), 25, 52). Because an individual's co-driver can only drive for 11 hours in a 14 consecutive hour period, it is not possible for these individuals to have been in the sleeper berth of a moving truck for such long periods of time. As a result, the only way to identify whether an individual was subject to CRST's control when logged as being in the sleeper berth is to ask them. *Osman v. Tatitlek Support Servs., Inc.*, 2017 WL 945024, at *3-4 (C.D. Cal. Mar. 1, 2017).

Whatever may be said about these practices, one thing is certain—nothing constrained these individuals to stay with the truck for the entirety of the time that they logged themselves as in the sleeper berth. The allegation that Plaintiffs were required to stay in the truck while logged in the sleeper berth is *the central* fact on which Plaintiff's theory of control, and liability, turns. They cannot solely use driver logs to establish control. Without any class-wide way of establishing control, certification of this claim is inappropriate.

Plaintiff's reliance on *Ridgeway* and *Ayala* does not lead to a different conclusion. Contrary to Plaintiff's assertion, *Ridgeway* did *not* hold that all sleeper berth time during a segment in which there was some truck movement was categorically compensable. Indeed, the drivers in *Ridgeway* were not team drivers. It was therefore impossible for the plaintiffs in that case to have been in the sleeper berth of a moving truck. Instead, the *Ridgeway* court found that since Wal-Mart required drivers to take mandatory "layover" periods, which were subject to the control of the employer and constrained to specific locations (*i.e.*, the sleeper berth), such periods constituted "hours worked" and should have been compensated at least at the minimum wage rate. *Ridgeway*, 107 F.Supp.3d at 1054–55. The court relied on Wal-Mart's written policies in its pay manuals which demonstrated Wal-Mart's intent to pay drivers for layovers when taken in the tractor cab but not layovers taken at home. *Id.*

*Ayala* is also distinguishable. In *Ayala,* the plaintiff submitted evidence that the defendants, as a matter of uniform policy, required drivers to (1) secure their loads at all times, and (2) respond to Drivertech messages at all times. *Ayala,* 2017 WL 3328087, at *8. Because of this evidence of uniform policies subjecting drivers to control while in the sleeper berth, the court reasoned that "liability will turn on whether "securing the load" and responding to alerts messages rises to the level of employee control that would turn any break periods provided into impermissible on call breaks, that would consequently require compensation." *Id.* at *10.

Here, unlike in *Ridgeway* and *Ayala,* Plaintiff has submitted no evidence of any policies indicating CRST exercises control over drivers while they are in the sleeper berth. To the contrary, Plaintiff and other putative class members specifically stated they were generally free to do as they wished when they were logged off duty in the sleeper berth. Ex. 32, pp. 567-70 (*Dueker Tr.* at 71:13-74:4); Ex. 33, pp. 603, 606, 609 (*Andree Tr.* at 45:6-9, 48:1-11, 51:5-22); Ex. 34, pp. 633-35 (*Warmsley Tr.* at 51:25-53:8). Given these differences, Plaintiff has not—and cannot—point to any uniform policies of control over drivers who are logged in the sleeper berth.

### ii.    Plaintiff cannot identify when putative class members were in the sleeper berth of a moving truck in California.

Plaintiff's entire premise for liability for sleeper berth time is based on the notion that if a putative class member is confined to the sleeper berth of a truck when the truck is moving and is therefore subject to CRST's control. However, as discussed above, putative class members did not always accurately record their log entries and frequently recorded sleeper berth time when they were not physically in the sleeper berth. Therefore, Plaintiff cannot simply rely on the face of the driver logs to establish class-wide liability. Instead, under Plaintiff's theory of control, he must prove (i) the amount of time the truck was in motion, and (ii) how much of that moving sleeper berth time took place in California for each sleeper segment. But, even with that evidence, it is still not enough.

In an effort to show that it is possible to identify when drivers were in the sleeper berth of a moving truck, Plaintiff hired Mr. Woolfson, a "self-taught" database "expert" to structure CRST's data. Ex. 9, p. 52 (*Petersen Report*, ¶ 1); Ex. 37, pp. 788-92 (*Woolfson Tr.* at 10:7-11, 29:18-30:2, 31:5-12, 31:23-32:9). However, for the reasons set forth in more detail in the Joint Motion in Limine to Exclude Plaintiff's Experts[6] simultaneously filed with this motion, Woolfson is unqualified to offer his opinion on the issue and his analysis is unreliable.[7] CRST incorporates its objections and arguments here.

---

[6] On October 15, 2019, counsel for CRST and Plaintiff met and conferred in person to try and resolve any disputes regarding the admissibility of the testimony of Mr. Woolfson and Dr. Petersen. The parties were unable to resolve their dispute. As a result, the parties are filing a joint motion *in limine*, in accordance with the Court's Scheduling and Case Management Order (Doc. 47, at 8:8-10), simultaneously with this motion. While CRST has summarized its objections to Woolfson's testimony here, it refers the Court to that motion which fully addresses Woolfson's inadequacies.

[7] As stated in the Joint Motion in Limine, Petersen's economic analysis is wholly dependent on Woolfson's flawed report and must also be excluded.

Without any evidentiary basis on which to establish (i) if a truck was moving, (ii) if a truck was in California when it was moving, or (iii) how long an individual was in a sleeper berth while the truck he was in was moving in California, Plaintiff cannot establish liability. *See Comcast,* 569 U.S. at 38.

### iii.    Even if Plaintiff could identify when drivers were confined to the sleeper berth of a moving truck in California, he cannot establish minimum wage liability on a class-wide basis.

The minimum wage "is determined by analyzing the compensation paid for each hour worked" without relying on averaging across hours. *Reinhardt v. Gemini Motor Transp.*, 869 F. Supp. 2d 1158, 1168 (E.D. Cal. 2012); *see also Cole v. CRST, Inc.*, 2012 WL 4479237 (C.D. Cal. Sept. 27, 2012) (concluding that the relevant question under California law is whether an employee "generated enough compensation . . . in one hour to exceed the minimum wage for that hour"); Wage Order No. 9-2001, Section 4(A) (setting forth an hour-by-hour standard and stating that "every employer shall pay to each employee wages not less than [$9 in 2015] per hour for all hours worked"). Liability for minimum wage depends on whether a driver, in fact, performed any tasks for which he was not compensated and for how long—e.g., whether his performance of those tasks resulted in him earning less than the minimum wage in a given hour. *Burnell v. Swift Transportation Co. of Arizona, LLC*, 2016 WL 2621616, at *3 (C.D. Cal. May 4, 2016).

Even if Plaintiff could identify some policy of control, and Plaintiff's expert could reliably identify when drivers were subject to that policy, Plaintiff's class still should not be certified because individualized questions predominate as to whether the failure to pay for sleeper berth time in any given hour resulted in the driver receiving less than the minimum wage for that hour. For example, if the driver logs 50 minutes of driving and 10 minutes of sleeper berth time in an hour and, due to his mileage rate, earns $15.00 in that hour, there is no minimum wage violation. The only way to identify this issue is to look at each log entry for each driver during a given day. Such an

32

individualized inquiry is not appropriate for trying a case as a class.

### 3. Wage Statements

#### a. Plaintiff's Position

A common question in this litigation regarding Defendant's wage statements provided to the Class Members is whether Defendant is liable for penalties under California Labor Code section 226(e) for knowingly and intentionally failing to issue wage statements in compliance with California Labor Code sections 226(a) and 226.2(a)(2).

Section 226 requires Defendant to provide each employee with each periodic wage payment a writing setting forth, among other things, the dates of labor for which payment of wages is made, the total hours worked by the employee, the gross and net wages earned and paid, all deductions from those wages, and the name and address of the employer.

In addition to the requirements of section 226, Cal. Lab. Code section 226.2(a)(2) requires Defendant to provide the following on drivers' wage statements:

> (A) The total hours of compensable rest and recovery periods, the rate of compensation, and the gross wages paid for those periods during the pay period.

> (B) …the total hours of other nonproductive time, as determined under paragraph (5), the rate of compensation, and the gross wages paid for that time during the pay period.

(Cal. Lab. Code section 226.2(a)(2))

Here, common questions exist 1) whether Defendant was required to include sleeper berth time on the wage statements as "hours worked;" 2) whether sleeper berth time is considered nonproductive time and must be included on the wage statements as such; 3) whether Defendant's use of "unaudited log data" for purposes of identifying the "hours worked" complied with California law; and 4) whether Defendant's failure to identify the total hours of compensable rest periods violated California law.

Here, Defendant has acknowledged that the contents of the Class member

drivers' payroll wage statements are uniform. [*Ex. 21, p. 171 (Response to RFA No. 20); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)*]    The statements uniformly fail to itemize a category for: "nonproductive" hours, the total hours of compensable rest breaks, or the compensation for such nonproductive and rest break time. [*Ex. 21, p. 171 (Response to RFA No. 20); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)*]    The statements all commonly reference that the hours worked is based on "unaudited log data," which Defendant has acknowledged is not representative of the actual hours worked. [*Ex. 16, pp. 132-133 (Pasker 2019 Depo. 40:23-41-:1); Ex. 17, p. 137 (Pasker 2017 Depo. 7:15-18); Ex. 10, p. 85 (Brueck Depo. 25:17-26:2); Ex. 1, p. 4 (Dueker Decl.¶13); Ex. 2, p. 9 (Warmsley Decl. ¶12); Ex. 3, p. 13 (Andree Decl. ¶12)  Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)*]    Further, pursuant to Mr. Woolfson's Ex. 8 report, the statements do not include any separate compensation for sleeper berth time, and Defendant has acknowledged that the piece rate/per mileage compensation was not intended to compensate for any sleeper berth time. [*Ex. 23, p. 192 (D's SMF #148,149); Ex. 14, p. 115 (Holzer Depo. 42:20-43:12); Ex. 20, p. 160 (Smith Depo. 31:18-23); Ex. 19, p. 151 (Schneider Depo. 25:1-4); Ex. 15, p. 122 (Marburger Depo. 23:7-24); Ex. 4, p. 17 (Bruek Decl.¶7-8); Ex. 5, p. 22 (Gannon Decl.¶6&8); Ex. 1, p. 4 (Dueker Decl. ¶11); Ex. 2, p. 9 (Warmsley Decl. ¶10); Ex. 3, p. 13 (Andree Decl. ¶10);  Ex. 21, p. 167 (Response to RFA Nos. 4&5); Ex. 22, p. 175 (Response to Int. No. 1); Ex. 24, pp. 196-197 (Driver Handbook); Ex. 25, p. 201 (Safety & Operations Handbook); Ex. 26, p. 204 (D's Message to P.); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)*]

Additionally, to recover wage statement penalties, it must be shown that

Defendant knowingly and intentionally failed to include the required information on the wage statements.  Therefore, there is an additional common question as to whether Defendant's companywide policy of not including the above-information was knowing and intentional.  As Defendant's policy regarding the contents of payroll wage statements is uniform, this question can be answered on a class-wide basis. *[Ex. 21, p. 171 (Response to RFA No. 20, P. 8); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements); Ex. 8, p. 50 (Woolfson Report)]*

### b.    Defendant's Position

Plaintiff claims CRST violated California's wage statement requirements by using "unaudited log data" to identify hours worked, failing to identify total hours of compensable rest periods, and failing to either include sleeper berth time as part of "hours worked" or separately listing sleeper berth time as non-productive time.[8] For the same reasons Plaintiff's minimum wage claim is not amenable to class-wide resolution, his derivative wage statement claim likewise fails. *See Burnell*, 2016 WL 2621616, at *5. Specifically, individualized issues predominate as to whether any given time logged off duty in the sleeper berth is compensable under California law and whether that time took place within California.

Additionally, individualized questions predominate as to whether drivers took compensable rest periods. There are no records of rest breaks taken either inside or outside of California because there is no requirement in the law to keep such records. Cal. Code Regs. tit. 8, § 11040(7); *Cleveland v. Groceryworks.com, LLC*, 200 F. Supp.

---

[8] Plaintiff's claim that there is a wage statement violation assumes that Plaintiffs worked non-productive time (and that CRST knew Plaintiffs worked non-productive time). That is not the case. CRST compensates drivers for all worked performed; drivers only performed work that is covered by its compensation policy. In other words, drivers did not perform "non-productive time" work. Similarly, while Plantiff complains that log data is "unaudited," this does not mean the wage statements do not contain hours worked. They do.

3d 924, 953 (N.D. Cal. 2016), and courts have refused to certify rest break claims on that very basis. *See, e.g., Cole v. CRST, Inc.*, 317 F.R.D. 141, 145 (C.D. Cal. 2016). California courts have rejected Plaintiff's position that a failure to properly calculate wages and then reporting actual wages paid instead of the wages that should have been paid entitles Plaintiff to wage statement penalties. *See, e.g., Maldonado v. Epsilon Plastics, Inc.*, 22 Cal. App. 5th 1308 (Cal. Ct. App. 2018) (holding "inaccurate wage statements alone do not justify penalties; the plaintiffs must establish injury flowing from the inaccuracy").

Finally, Plaintiff has not appropriately limited his wage statement class: the statute of limitations for wage statement claims is one year. *Reinhardt v. Gemini Motor Transp.*, 869 F. Supp. 2d 1158, 1169-70 (E.D. Cal. 2012).

### 4. Waiting Time Penalties

#### a. Plaintiff's Position

A common question in this litigation is whether Defendant violated Labor Code section 203 by willfully failing to pay all wages due and owing to each Class Member whose employment ended at any time during the Class Period. Specifically, whether Defendant's failure to pay all sleeper berth wages as discussed above triggers a violation of Labor Code section 203.

Labor Code section 203 simply states if an employer willfully fails to pay an employee all wages due at the conclusion of their employment, employees are entitled to recover daily wages for as many as thirty (30) days.

The issue of willfulness is also common to all class members because the type of wages that were unpaid is the same – the sleeper berth time alleged in the minimum wage claim.

California Code of Regulations, title 8, section 13520 provides,

A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of

36

waiting time penalties under Section 203.

(a) Good Faith Dispute. A "good faith dispute" that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee…

(Cal. Code of Regs., title 8, section 13520; see *Davis v. Morris,* 37 Cal.App.2d 269, 274 (1940)), Willful does not mean the failure to pay wages must be based on a deliberate evil purpose, only that the employer intentionally failed or refused to perform an act which was required to be done.)

Accordingly, common questions predominate regarding the waiting time penalty claims.

### b.    Defendant's Position

Plaintiff's claim for waiting time penalties is derivative of his other substantive claims and should rise or fall with those claims. *Burnell*, 2016 WL 2621616, at *5. To the extent the Court denies certification of those other claims, it should also deny certification of the waiting time penalty claim. *Id.* Separately, the Court should deny Plaintiff's motion to certify his waiting time penalty claim because Plaintiff has failed to set forth any evidence of how CRST "willfully" failed to pay each putative class member and totally fails to explain how he will make that demonstration on a class wide basis. Without this showing, the Court should not certify a class. *Wal-Mart*, 564 U.S. at 350-51; *Eisen*, 417 U.S. at 177. Plaintiff has not met his burden.

### 5.    Rest Break Wages

### a.    Plaintiff's Position

A common question in this litigation is whether Defendant's failure to compensate the Class member drivers for rest breaks taken in California violates Labor Code section 226.2(a)(1).

For employees who are compensated on a piece rate or per mile basis, as they are here, said section requires employers to separately compensate employees at least the minimum wage for rest breaks.

Defendant had a companywide policy of not separately compensating drivers for rest break time as required by California law; and because Plaintiffs only seek declaratory/injunctive relief and not rest break damages, no individual inquiry is required as to the frequency of when or if certain Class members actually took their rest breaks. Accordingly, the commonality and predominance requirements are satisfied. *[Ex. 20, p. 162 (Smith Depo. 58:11-14); Ex. 1, p. 4 (Dueker Decl.¶14); Ex. 2, p. 9 (Warmsley Decl. ¶13); Ex. 3, p. 13 (Andree Decl. ¶13); Ex. 21, pp. 167&169 (Response to RFA Nos. 4,5&11); Ex. 22, p. 177 (Response to Int. No. 4); Ex. 27, pp. 206-283 (Dueker Wage Statements); Ex. 28, pp. 285-406 (Warmsley Wage Statements); Ex. 29, pp. 408-499 (Andree Wage Statements)]*

### b. Defendant's Position

Plaintiff admits individualized issues predominate with regards to whether or when individuals took rest breaks; hence, he does not seek certification of a class alleging damages for failure to separately compensate employees for rest breaks. Instead, he only seeks declaratory/injunctive relief. The Court should deny his request because it is well-established that Plaintiff, as a former employee, lacks standing to assert a claim for declaratory/injunctive relief on behalf of current employee putative class members. *See, e.g.*, *Dukes*, 564 U.S. at 364 (acknowledging that those plaintiffs no longer employed by the defendant "lack standing to seek injunctive or declaratory relief against its employment practices."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) ("Plaintiffs not employed by Costco throughout this case do not have standing to seek injunctive relief."); *Duran v. Maxim Healthcare Servs. Inc.*, 2018 WL 5915644, at *6 (C.D. Cal. Mar. 9, 2018) (dismissing request for injunctive relief with prejudice since former employees lack standing to pursue such relief); *DeLodder v. Aerotek, Inc.*, 2009 WL 3770670, at *3 (C.D. Cal. Nov. 9, 2009) ("[P]laintiffs lack standing to seek prospective relief under the UCL because plaintiffs do not dispute that they are no longer employees of defendant, and thus, they cannot demonstrate 'a real or immediate threat of irreparable injury' by defendant's

38

1  employment practices."); *Guerrero v. Halliburton Energy Servs., Inc.*, 231 F. Supp. 3d

2  797, 809 (E.D. Cal. 2017) ("Plaintiff [as a former employee] lacks standing to pursue

3  injunctive relief under the UCL").

4      "[I]f [plaintiff] has no [ ] claim, she cannot represent others who may have such

5  a claim.... This principle is dispositive of [a motion for] class certification." *Lierboe v.*

6  *State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (citing 3 Herbert

7  B. Newberg on Class Actions § 3:19, at 400 (4th ed.2002) ("[S]tanding is the threshold

8  issue in any suit. If the individual plaintiff lacks standing, the court need never reach

9  the class action issue.")); *see also Ballard v. Bank of America, N.A.*, 2013 WL 4807193,

10 *4 (C.D. Cal. Sep. 16, 2013) (denying certification with respect to claims for which the

11 plaintiff lacked standing). Whether putative class members might have standing is

12 irrelevant because class representatives "must allege and show that they have *personally*

13 been injured, not that the injury has been suffered by other, unidentified members of the

14 class to which they belong and which they purport to represent." *Simon v. Eastern*

15 *Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)) (emphasis added); *O'Shea*

16 *v. Littleton*, 414 U.S. 488, 494 (1974); *see also Franze v. Equitable Assurance,* 296 F.3d

17 1250, 1254 (11th Cir. 2002) (noting that "without individual standing to raise a legal

18 claim, a named representative does not have the requisite typicality to raise the same

19 claim on behalf of a class")*.* Because Plaintiff has no standing to bring a claim for

20 injunctive or declaratory relief, the Court cannot certify this claim.

21      **6.    Unfair Business Practices**

22           **a.    Plaintiff's Position**

23      A final common question exists regarding whether the Class Members are

24 entitled to restitution for Defendant's unfair pay practices.  Through this claim, the Class

25 Members seek the same relief as sought in the minimum wage claim, although the

26 statute of limitations applicable to this claim is 4 years versus the 3 year statute

27 applicable to the minimum wage claim.

28           **b.    Defendant's Position**

Plaintiff's UCL claim is derivative of his other substantive claims and certification should be denied for the same reasons. *Burnell*, 2016 WL 2621616, at *5.

### E.    **Typicality**

#### 1.    **Plaintiff's Position**

Rule 23(a)(3)'s typicality requirement provides that a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (*Mendez v. R&L Carriers, Inc., supra*, 2012 WL 5868973 at 12)

> Typicality requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class.    As with the commonality requirement, the typicality requirement is applied permissively.    Representative claims are typical if they are reasonably co-extensive with those of absent class members, they need not be substantially identical.

(*Quezada v. Con-Way Freight, Inc., supra*, 2012 WL 4901423 at 3)

Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove defendant's liability." (*Id.*)

In this case, Plaintiff/Class Representative Christopher Dueker meets the typicality requirement of the Class.    Mr. Dueker is a California resident who worked for Defendant as a driver during the Class Period.    Mr. Dueker was subjected to Defendant's uniform pay practices and policies that are addressed in this lawsuit.    Mr. Dueker has suffered the same type of injuries as the Class members as a result of said policies and practices.    Accordingly, the typicality requirement is met. *[Ex. 1, pp. 2-5 (Dueker Decl.)]*

#### 2.    **Defendant's Position**

Plaintiff has not met his burden to satisfy typicality for two reasons. First, Plaintiff has not demonstrated that he can satisfy any of the elements of predominance, commonality, or superiority. And for the reasons further explained by CRST in those sections, Plaintiff's claims also fails to satisfy the typicality requirements. Second,

40

typicality is not satisfied as to Plaintiff's claim for declaratory/injunctive relief that Defendant did not separately compensate drivers for rest breaks. As described above, as a former employee, Plaintiff lacks standing to assert a claim for declaratory/injunctive relief. Without standing, Plaintiff "does not have the requisite typicality to raise the same claim on behalf of a class." *Franze,* 296 F.3d at 1254.

### F. Adequacy of Class Counsel and Representative

#### 1. Plaintiff's Position

"Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interest of the class.  To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of judgment which binds them.  In order to determine whether the adequacy prong is satisfied, courts consider the following two questions: 1) do(es) the representative [plaintiff] and [his] counsel have any conflict of interest with other class members, and 2) will the representative [plaintiff] and [his] counsel prosecute the action vigorously on behalf of the class?" (*Quezada, supra*, at 6)

Here, there is no evidence of any conflicts or issues which exists among the Plaintiff/Class Representative, his attorneys, or the putative class.  Plaintiffs' attorneys are experienced in class action and employment wage and hour litigation.  Proposed Class Representative and Class Counsel have, and are willing to vigorously pursue the action on behalf of the Class; have thoroughly investigated the claims; have served and responded to voluminous written discovery; have taken the deposition of eight (8) Defendant management employees in Cedar Rapids, Iowa; engaged two (2) experienced and competent experts; and conducted expert discovery, including three depositions taken in Washington D.C. and Oakland, CA.  Accordingly, the adequacy requirement has been satisfied. *[Ex. 1, pp. 2-3 (Dueker Decl.¶4); Ex. 6, p. 26 (Corren Decl. ¶10); Ex. 7, p. 33 (Sinclair Decl.¶10)]*

#### 2. Defendant's Position

As Defendant stated during the parties' meet and confer, Defendant does not

1    dispute the adequacy requirement is met.

2    **G.    Superiority**

3    **1.    Plaintiff's Position**

4    In addition to the predominance requirement, Rule 23(b)(3) requires that class

5    resolution be superior to other methods, i.e. individual lawsuits. (*Valentino v. Carter-*

6    *Wallace, Inc.*, 97 F.3d 1227, 1231-1232 (9th Cir. 1996))  The factors to be considered

7    include: 1) the class members' interest in individually controlling the litigation; 2) the

8    extent and nature of any pending litigation by the class members; 3) the desirability of

9    concentrating the litigation in one forum; and 4) the difficulties in managing a class

10    action. (F.R.C.P. 23(b)(3))

11    Class treatment is particularly appropriate in wage and hour employment cases

12    in which employees are often reluctant to sue their current or former employer for fear

13    of retaliation or future negative references. (see *Gentry v. Superior Court,* 42 Cal.4th

14    443, 459 (2007))  Further, the wages due may be insufficient to cause employees and

15    counsel to bring such actions, particularly with respect to Defendant as the sampling of

16    class members had an average employment duration of less than 12 months. *[Ex. 9,*

17    *p. 59 (Peterson Report)]*  Absent a class action, Defendant has and likely will continue

18    to wrongfully benefit from its wage and hour violations, and "a procedure that would

19    permit [employees] to recover … is preferred over the foregoing." (see *Daar v. Yellow*

20    *Cab Co.,* 67 Cal.2d 695, 715 (1967))  Further, resolution of these uniform issues on a

21    class-wide basis is clearly a more efficient use of the time and resources of the Court

22    and the parties.  Alternatively, thousands of drivers would be forced to initiate

23    individual claims to pursue relatively small sums of money. (see *Vaquero v. Ashley*

24    *Furniture Indus., Inc.,* 824 F.3d 1150, 1154-1155 (9th Cir. 2016))

25    Plaintiffs are only aware of one other lawsuit pending against Defendant in

26    California that alleges a few similar claims, and that lawsuit was just recently filed in

27    July 2019.  Plaintiffs are also aware of a FLSA class action that is pending in the U.S.

28    District Court for the District of Massachusetts that includes a few related issues.

However, the Massachusetts case does not involve any claims for violations of California law. *[Ex. 6, p. 27 (Corren Decl.¶11)]*

The class claims asserted here are also entirely manageable. "Manageability concerns must be weighed against the alternatives and will rarely, if ever, be sufficient to prevent certification of a class." (*Trosper v. Styker Corp.*, 2014 WL 4145448 at 17 (N.D. Cal. 2014))  As discussed above, Plaintiffs challenge Defendant's common policies, practices, and procedures regarding the compensability of sleeper berth time, the contents of the wage statements provided to Class members, and rest breaks. Defendant's liability will likely be decided at the summary judgment stage as the facts are largely undisputed.

Pursuant to the Expert Reports of Dr. Peterson and Mr. Woolfson, Plaintiffs have established a method proving class-wide damages at trial through the use of statistical analysis of the Class member data sample produced by Defendant.  Mr. Woolfson organized and analyzed said sample driver log data records and payroll wage statements to obtain sample damage numbers; and then Dr. Peterson used those sample damage numbers to calculate and project damages for the entire Class. *[Ex. 8, pp. 34-50 (Woolfson Report); Ex. 9, pp. 51-77 (Peterson Report)]*

Following certification, Plaintiffs seek an order compelling disclosure of an updated Class list and records for all Class members.  As their reports provide, Mr. Woolfson and Dr. Peterson can then perform the same analysis to the complete set of data for all Class members to achieve a precise calculation of Class damages. *[Ex. 8, pp. 34-50 (Woolfson Report); Ex. 9, pp. 51-77 (Peterson Report)]*

In the event liability is not established at the summary judgment stage and this case proceeds to trial, Plaintiffs would propose a bifurcated liability/damages trial procedure.  In the first phase, Class member claims could be adjudicated using common methods of proof, including documentary evidence, such as Class members' driver log data and payroll wage statement records, and Defendant's policy documents and handbooks; deposition testimony of Defendant management employees; and class

43

member testimony. *(see Exs 1-31)*

If liability is established, the Court could then conduct a second phase to assess damages. The Court, or a special master appointed under Federal Rule of Civil Procedure 53, could calculate damages and allocate relief to Class members. (see *Bowerman v. Field Asset Servs., Inc.,* 2015 WL 1321883 at 13 (N.D. Cal. 2015); *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.,* 311 F.R.D. 590, 624 (C.D. Cal. 2015) ("As to any individualized issues of damages, the court could adjudicate liability and conduct a second phase of trial, or appoint a special master to assess damages.")) As previously discussed, damages could be calculated using the same Defendant wage statement and log data records as was used with the Class sample produced by Defendant.

To the extent Defendant argues that its records are inadequate or inaccurate, such an argument should not defeat certification. The fact that damages calculations may be more difficult due to the lack or insufficiency of records "is of little consequence." (*Moore, supra*, 311 F.R.D. at 621) "Where an employer has failed to keep records, 'the consequences for such failure should fall on the employer, not the employee,'" and will not defeat class certification. (*Id.*; *Arredondo v. Delano Farms*, 301 F.R.D. 493, 545 (E.D. Cal. 2014) ("[T]o allow the [] systematic failure [to maintain records] to defeat class certification would undermine the very purpose of class action remedies."))

Consequently and because of the foregoing reasons, a class action is a superior method of adjudicating the claims in this litigation.

### 2. Defendant's Position

Plaintiff's inability to satisfy Rule 23(b)(3)'s predominance requirement underscores similar superiority issues that cut against certification. When considering a motion for class certification, courts and the parties should be capable of envisioning "the form a trial on" the claim would take if certified. *Eisen*, 417 U.S. at 177.

As explained above, Plaintiff needs to demonstrate that each putative class member was in the sleeper berth of a truck while the truck was moving in California in order to recover under his minimum wage theory. Plaintiff intends to rely on his

44

experts—Woolfson and Petersen—to establish class-wide liability and damages. However, as discussed in the parties' joint motion *in limine* to exclude the testimony of Plaintiff's experts, their testimony is inadmissible; Plaintiff cannot rely on it to either establish liability or support his contention that class adjudication is superior here.

Because the face of the driver logs does not demonstrate when a driver was physically in the sleeper berth or the amount of time the truck was moving in California during a given sleeper berth period, Plaintiff cannot simply rely on the face of the driver logs to establish liability or calculate damages. While Plaintiff tries to treat this as a lack of recordkeeping issue, this is not the case. It is a driver's obligation, not CRST's to accurately enter and record its log entries. Putative class members, including Plaintiff, did not always do so here. Additionally, CRST is under no obligation to keep records related to when or for how long the truck was in motion or when or how long it was in motion *in California*. As such, Plaintiff's reliance on *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.* 311 F.R.D. 590, 624 (C.D. Cal. 2015) and *Arredondo v. Delano Farms*, 301 F.R.D. 493, 545 (E.D. Cal. 2014) are inapposite. Because Plaintiff has not identified any coherent way to prove liability and calculate damages on a class-wide basis, he has not met his burden of proving class adjudication is superior here.

## H. **Declaratory & Injunctive Relief**

### 1. **Plaintiff's Position**

Pursuant to Rule 23(b)(2), Plaintiff also seeks certification of this Class to obtain declaratory and injunctive relief on the grounds that Defendant has acted and refused to act in a manner generally applicable to the Class. Specifically, Plaintiff seeks declaratory relief that Defendant has violated California's minimum wage, wage statement, and rest break laws. Further, Plaintiff seeks injunctive relief preventing the recurrence of Defendant's unlawful wage and hour practices.

Accordingly, the Class and Subclasses should also be certified under Rule 23(b)(2).

### 2.    Defendant's Position

Plaintiff's request for certification of a rest break class seeking declaratory or injunctive relief should be denied because it is well-established that Plaintiff, as a former employee, lacks standing to assert a claim for declaratory/injunctive relief on behalf of current employee putative class members. *See, e.g.*, *Dukes*, 564 U.S. at 364; *Ellis*, 657 F.3d at 986; *Duran*, 2018 WL 5915644, at *6; *DeLodder*, 2009 WL 3770670, at *3. Without personal standing to assert the claim, Plaintiff cannot represent the class. *Lierboe*, 350 F.3d at 1022.

## IV.    CONCLUSION

### A.    <u>Plaintiff's Conclusion</u>

Based on the foregoing reasons and legal authority, Plaintiffs request the Court grant Plaintiffs' motion for class certification, that the Class and subclasses be certified under Fed. R. Civ. Procedure (b)(2&3), and that Plaintiff and Plaintiffs' counsel be approved as adequate Class Representative and Class Counsel.

### B.    <u>Defendant's Conclusion</u>

For the reasons stated in Defendant's portions of this memorandum, Defendant requests the Court deny Plaintiff's motion for class certification.


DATED: 11/22/19                    LAW OFFICES OF CORREN & CORREN


                                   *Spencer D. Sinclair*
                                   SPENCER D. SINCLAIR
                                   Attorney for Plaintiff

DATED: 11/22/19                    SCOPELITIS, GARVIN, LIGHT,
                                   HANSON & FEARY, P.C.


                                   *Charles Andrewscavage*
                                   Charles Andrewscavage
                                   Attorney for Defendant

## SIGNATURE CERTIFICATION

I hereby certify that the content of this document is acceptable to Charles Andrewscavage, counsel for Defendant, and that I have obtained the authorization from Charles Andrewscavage to affix his electronic signature to this document.

DATED: 11/22/19

*Spencer D. Sinclair*

SPENCER D. SINCLAIR