# EXHIBIT 9

# Allman & Petersen Economics, LLC

7677 Oakport Street, Suite 610
Oakland, CA 94621
(510) 382-1550
(510) 382-1472 (FAX)

Phillip H. Allman, Ph.D.
Jeffrey S. Petersen, Ph.D.

www.allmaneconomics.com

Christopher Dueker et al. v. CRST Expedited Inc. et al.

September 5, 2019

Report of Plaintiffs' Statistical and Economic Expert

## I.  Assignment, Overview of Methodology, and Results in Brief

1. I was retained by the Law Offices of Corren & Corren in the case of *Christopher Dueker et al. v. CRST Expedited Inc. et al.* (Case Number: 2:18-cv-08751-FMO-FFM) (hereafter "this matter") to project class-wide damages for unpaid wages.  Unpaid wages are calculated as the time periods when an individual was in the sleeper berth of the truck and the truck was moving within California.  The class period for unpaid wages is December 27, 2013 to the present and there are 5,575 potential class members.  In addition, I have been retained to calculate the class-wide penalties for: (1) wage statements (California Labor Code 226) and (2) waiting time (California Labor Code 203).  The class period for waiting time penalties is December 27, 2014 to the present and there are 3,678 potential class members.  The class period for wage statement penalties is December 27, 2016 to the present and there are 2,515 potential class members.

2. The data I utilized to project class-wide damages contains employment records for 370 randomly selected individuals (hereafter "the data sample") that worked for CRST Expedited during the unpaid wages class period.[1]  The data sample was structured by Aaron Woolfson.  I have worked with Mr. Woolfson in several class action wage and hour cases in which he has

---

[1] The data prepared by Aaron Woolfson contained 371 individuals.  This data also contained employment records for Christopher Dueker.  Since Mr. Dueker was not randomly selected, I did not include his data in the analysis.

structured data and I have performed the statistical analysis. It is my understanding that Mr.
Woolfson will be providing a report that details the data and his process to structure the data.

3. The amount due the class members for unpaid wages is **$4,310,835**. The class-wide damages
were projected from the average number of hours per year of unpaid wages for the individuals in
the data sample. The average number of unpaid hours per year per individual in the data sample
is 144.7 hours. This statistic was utilized to project damages to the class members not in the data
sample since their employment years are a known variable but their unpaid hours while in the
sleeper berth are unknown. The class members, in statistical terms, are the "population." The
data sample is a random sample of the population, therefore, statistical inference -- using a
sample to project to a population -- can be utilized to project the population values. Moreover,
the data sample in this matter conforms to the *"Bell Standard"* for projecting damages in a class
action wage and hour case. The *Bell Standard* refers to the California Court of Appeals decision
in *Bell v. Farmers Insurance*[2] where the court accepted sample data that had a 9.6 percent
relative margin of error as the basis for projecting class-wide damages.[3] The data sample in this
matter has a 5.8 percent relative margin of error in regard to the unpaid hours per year.
Moreover, all projected class-wide damages in this report conform to the *Bell Standard*.

4. The interest due on the unpaid wages is **$1,351,047**. This is calculated based on simple
interest at ten percent.

5. The percentage of individuals in the data sample with unpaid wages is 92.7 percent. The
margin of error on this percentage is 2.6 percent. Therefore, 92.7 percent is a valid and reliable
projection of the number of class members that have unpaid wages for sleeper berth time.

---

[2] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th· 715, 9 Cal.Rptr.3d 544.
[3] Petersen, Jeffrey S. and Phillip Allman. "The Margin of Error on Damages Calculations Based on Sample Survey
Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, forthcoming.

6. The amount due the class members for California Labor Code 226 wage statement penalties is **$4,048,650** if all wage statements within the class period are due a penalty; or **$1,843,750** if only wage statements with unpaid sleeper berth time within California are due a penalty. Mr. Woolfson computed the total number of wage statements per individual in the data sample and the number of wage statements with unpaid wages. I utilized these values to determine the amounts due the class members for wage statement penalties.

7. The amount due the class members for waiting time penalties is **$24,703,342**. Waiting time penalties were computed based on whether an employee worked within the waiting time class period and had separated from employment. The penalty is adjusted by the projection of eligibility for the payment based on incurring unpaid wages -- the 92.7 percent of the data sample that had unpaid wages.

8. See Table 1 for a summary of class-wide damages for all categories. The total amount due the class members for unpaid wages, interest, wage statement penalties and waiting time penalties is **$34,413,874** if wage statement penalties are based on all wage statements. If wage statement penalties are based only on wage statements within unpaid sleeper berth time within California, the total amount due the class members is **$32,208,974**.

9. The aforementioned class-wide damages are based on the data sample without weighting the individual values. I also projected class-wide damages based on weighting the individual values by the length of employment. This method gives more influence to longer tenured employees in establishing class-wide damages. The class-wide damages projected from the weighted sample are listed in Table 2. Class-wide damages for unpaid wages based on the weighted sample are 9.0 percent higher than the unweighted data. The weighted wage statement penalties are 4.2 percent lower than the unweighted if based on all wage stubs. If the wage statement penalties are

based only on wage statements in California with unpaid sleeper time, then the weighted

penalties are 12.1 percent higher. The waiting-time penalty damages should not be based on

weighted data. The total amount due the class members for all categories of damages based on

the weighted data is **$34,750,813** if wage statement penalties are based on all wage statements.

If wage statement penalties are based only on wage statements within unpaid sleeper berth time

within California, the total amount due the class members is **$32,938,513**. The margin of error

on all the weighted values is less than 10 percent and therefore conform to the *Bell Standard*.

The unweighted data and the weighted data are both valid and reliable projections of class-wide

damages.


**II. Professional Qualifications**

10. A true and correct copy of my resume is attached as Exhibit A. I received a Ph.D. in

economics from the University of Utah. My primary fields of expertise are labor economics,

forensic economics and statistics. My fee schedule for report preparation and testimony is

attached. The list of trials and depositions in which I have testified over the last four years is

attached. See Exhibit A for true and correct copies of all items listed in this paragraph.

11. My publications in the fields of labor economics, forensic economics, statistics and survey

science have been cited 122 times according to Google Scholar. I have publications in the

following peer-reviewed journals: Journal of Legal Economics, Industrial Relations, Journal of

Policy Analysis and Management, and the American Journal of Industrial Medicine. In addition,

I am the co-author of a peer-reviewed book published by the W.E. Upjohn Institute for Employment Research.[4]

12. I am an adjunct associate professor of economics at St. Mary's College in Moraga, California. I teach managerial economics in the Master of Business Administration. I am a member of the Board of Directors of the American Academy of Economic and Financial Experts. My term as a board member is April 2017 to April 2020.

13. I have substantial expertise in projecting class-wide damages based on utilizing inferential statistical analysis (i.e. using a data sample to project to a larger population). My experience is in the form of academic qualifications and litigation consulting experience.

14. I am the lead author of an article in the peer-reviewed Journal of Legal Economics on the subject of projecting class-wide damages from sample data.[5] The article examines the legal decisions in *Bell v. Farmers Insurance*[6] and *Duran v. U.S. Bank*[7] and describes the generally accepted statistical science for projecting class-wide damages in light of these decisions.

15. Another article I published regarding projecting damages in class action wage and hour cases is on the subject of survey science.[8] This article describes the unique aspects of conducting surveys in wage and hour class actions and remedies for potential bias among the survey respondents.

---

[4] Levine, David I., Frank W. Neuhauser, Richard Reuben, Jeffrey S. Petersen, and Christian Echeverria, *Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003.

[5] Petersen, Jeffrey S. and Phillip Allman. "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics,* forthcoming.

[6] *Bell v. Farmers Insurance Exchange.* 2004. Cal.App 4th. 715, 9 Cal.Rptr.3d 544.

[7] *Duran et al. v. U.S. National Bank Association.* 2014. California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.

[8] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics,* Volume 22, Number 1, October 2015.

16. I have conducted surveys in eleven class action cases and utilized the survey responses to project class-wide damages. In the federal case titled *Coleman v Brown* (Case No. 2:90-cv–0520 KJM DB P), I am part of a Special Master research team appointed by the Honorable Kimberly Mueller. My role is to supervise the design and implementation of a survey to psychiatrists employed by the California Department of Corrections.

17. I have presented at professional conferences of survey experts, statisticians and damages experts regarding projecting class-wide damages from sample data. I presented on this topic at the following conferences:

- Western Economic Association (June 2019)

- Allied Social Sciences Association (January 2019)

- Pacific Chapter of the American Association for Public Opinion Research (December 2018)

- American Academy of Economic and Financial Experts (March 2018)

18. I have published two peer-reviewed journal articles that utilize inferential statistical analysis from sample data.[9][10] According to Google Scholar, one of the articles has been cited 73 times. No comparable statistic is available for the second article since it was recently published but one of the reviewers of the article stated it was an "important contribution to the literature that is likely to be widely cited."

19. I have worked on 64 class action cases in determining the payments due the class members. The vast majority of these cases have been wage and hour class actions. Moreover, these cases have typically involved utilizing a random sample of data to project class-wide damages. The

---

[9] Petersen, Jeffrey S. and Craig Zwerling, "Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, Volume 34, Number 3, 1998.
[10] Petersen, Jeffrey S. and Phillip Allman, "The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017.

breakdown between plaintiff and defense retentions in these cases is 84 percent for plaintiffs and

16 percent for defendants. I have testified at trial for both plaintiffs and defendants in class

action wage and hour cases.

### III. The Data Sample

20. In June 2019, I analyzed a data sample provided by Defendants that contained 46 individuals

and their sleeper berth time. This data sample was prepared by Aaron Woolfson. The data sent

by Mr. Woolfson totaled 47 individuals because it included Christopher Dueker. Since Mr.

Dueker was not randomly selected, I did not include him in the analysis. The margin of error

for projecting class-wide damages from the sample average from this data was considerably

higher than the *Bell Standard* of ten percent. I recommended that the sample size be increased to

400 individuals. I was subsequently provided with a list of potential class members and I

randomly selected 354 of them and requested that their drive time data be provided in the same

manner as the 46 individuals I had already analyzed. Mr. Woolfson performed the analysis on

the additional data provided by Defendants and reported to me that it contained sleeper berth

time information for 324 individuals. Therefore, the total sample size for the data set prepared

by Mr. Woolfson is 370 individuals after excluding Mr. Dueker.

21. Mr. Woolfson compiled the data sample for the randomly selected 370 individuals. I

utilized the following information contained in the data sample to compute class-wide damages:

- amount of time spent in the sleeper berth while the truck was moving in California
  during the class period

- start and end dates of employment

- number of paystubs with unpaid wages

**IV. Data and Statistical Analysis**

*Unpaid Wages*

22. The total number of individuals in the data sample is 370. The average number of years these individuals were employed by CRST Expedited during the class period for unpaid wages is 0.83 years.

23. The known variable for all class members is their employment period with CRST Expedited. The unknown variable for the class members not in the data sample is the number of hours they spent in the sleeper berth in California for which they were not paid. The data sample contains the employment period and the number of hours in the sleeper berth. Therefore, to project from the data sample to the class members not in the sample, the appropriate statistic is unpaid sleeper berth hours per year of employment.

24. The average amount of time spent in the sleeper berths per year while the truck was moving in California for the individuals in the data sample during the class period is 144.7 hours. This is called the "sample average" or "sample mean" and is one statistic that can be utilized to project the unpaid wages due the class members. However, this projection has an estimated error rate. This is known as the "margin of error" as it can be utilized to project the magnitude of the potential overpayment or underpayment by Defendants if the sample average is utilized for estimating damage payments due the class members.

25. The margin of error on the average unpaid hours per year is +/- 8.3 hours. The relative margin of error is the percentage difference between the boundaries of the confidence interval and the sample average which equates to +/- 5.8 percent. These statistics were computed using a

95 percent level of confidence.[11]  According to the Federal Judicial Center's Reference Manual on Scientific Evidence, a 95 percent confidence interval is widely accepted among scientists:

> Traditionally, scientists adopt the 95 percent level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value.[12]

26. The 95 percent confidence interval for the population mean is found by adding and subtracting the margin of error from the sample average.  This means that if we had hourly sleeper berth data for all class members, the average of their time spent in the sleeper berth would fall within this range with a 95 percent level of confidence.  The 95 percent confidence interval for the population average is 136.4 to 153.1 hours.  Therefore, there is only a five percent probability the population average is outside of this range.[13]  The statistical measurement used in this analysis is a "two-tailed" test which divides the probability of error in half and places 2.5 percent on the lower end and 2.5 percent on the upper end.  Thus, there is only a 2.5 percent probability that the population average is below the lower boundary of 136 hours.[14]

27. The 5.8 percent relative margin of error on the sample average of 144.7 hours conforms to the *Bell Standard* as a valid and reliable estimator for class-wide damages in this matter.  The 5.8

---

[11] In equation form, the margin of error for continuous data that is not proportional is calculated as follows: *Critical Value* x *(Standard Deviation / $\sqrt{Sample\ Size}$ )*. The critical value for the sample size in this matter is 2.021. Source: McClave, James T. and Terry Sincich. 2017. *Statistics, Thirteenth Edition,* Boston: Pearson.

[12] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.381.

[13] Freedman, David, Robert Pisani and Roger Purves, *Statistics, Fourth Edition*, New York: W.W. Norton & Company, 2007, p. 381.

[14] Petersen, Jeffrey S. and Phillip Allman. "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, forthcoming.

percent margin of error is substantially lower than the 9.6 percent relative margin of error accepted by the California Court of Appeals in *Bell v. Farmers Insurance*[15]:

> The *Bell* (p. 43) decision states: "We conclude that the proof of aggregate damages for time-and-a-half overtime by statistical inference reflected a level of accuracy consistent with due process under the Doehr balancing test." The Doehr balancing test refers to the United States Supreme Court decision in *Connecticut v. Doehr (1991), which assesses* whether the sampling methodology was permissible. The ruling in *Bell* that a 9.6 percent margin of error was acceptable has led to courts accepting ten percent at the threshold for an acceptable margin of error. A ten percent margin of error is often called the "*Bell* standard."[16]

The California Supreme Court decision in *Duran v. U.S. Bank* states that *Bell* is the premier case for using a data sample to project to a larger population.[17]

28. The sleeper berth hours are the "unpaid hours" in this matter. The California minimum wage was utilized to value the unpaid hours. I did not compute any damages after January 31, 2019 since the employment dates in the class list did not go past this month.[18]

29. The amount due each class member can be computed from the average yearly unpaid hours and a weighted average of the minimum wage during the class member's employment during the class period. For example, James Aaron Jr. is not in the data sample and therefore the amount of unpaid wages he is due has to be computed from the statistics derived from the sample data. His dates of employment with CRST Expedited were September 25, 2014 to May 27, 2015 which is

---

[15] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th 715, 9 Cal.Rptr.3d 544.

[16] Petersen, Jeffrey S. and Phillip Allman. "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, forthcoming, p.8.

[17] *Duran et al. v. U.S. National Bank Association*. 2014. California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916. See page 6.

[18] If I am provided with updated employment dates, I will revise the damages computations based on the new information.

a period of 0.671 years. The minimum wage was $9.00 during this entire period, therefore, that

is the value of the unpaid hours. The total amount of unpaid wages is found in equation 1:

> *Equation 1:  Unpaid Wages = Years of Employment x Weighted Average Hourly*
> *Minimum Wage x Sample Average of Unpaid Hours per*
> *Year of Employment*

Applying Equation 1 to Mr. Aaron's employment period yields an amount of unpaid wages of

$874:

> *Equation 1 (James Aaron Jr.):  Unpaid Wages = 0.671 Years of Employment x $9.00 per*
> *hour x 144.7 Unpaid Hours per Year = $874.*

30. Table 1 shows class-wide damages for unpaid wages. As noted above, the values in the

"sample average" column in Table 1 conform to the *Bell Standard* and therefore meets the

criterion of a valid and reliable projection of class-wide damages in this matter. However, in

order to supply the trier-of-fact with the full range of possible outcomes for class-wide damages

utilizing a 95 percent level of confidence, I have included the lower and upper bound values for

the 95 percent confidence interval in Table 1.

31. The "lower bound value" in Table 1 shows the projections of class-wide damages that have a

97.5 percent probability of not being an overpayment by Defendants in this matter.[19] The lower

bound value also shows the potential magnitude of overpayment by Defendants if in this matter

if 144.7 hours per year is utilized to project class-wide damages. The potential magnitude of

overpayment is the percentage difference between the lower bound of 136.4 hours and the

sample average of 144.7 hours. This difference is 6.1 percent. In *Bell v. Farmers Insurance* the

---

[19] Petersen, Jeffrey S. and Phillip Allman. "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, forthcoming.

potential magnitude of overpayment by Defendants was 10.6 percent and the California Court of Appeals found this acceptable. Therefore, the potential magnitude of overpayment in this matter is substantially lower.

32. In deciding whether to use the sample average or the lower bound of the confidence interval to award damages, the trier-of-fact should consider how to balance the welfare of plaintiffs and defendants. The sample average is the midpoint of the confidence interval. Therefore, it represents the point at which the probability of overpayment is equivalent to the probability of underpayment. Thus, it equally balances the welfare of plaintiffs and defendants. The lower bound of the confidence interval results in 97.5 percent probability Defendants will not be overpaying for damages. Therefore, Defendants welfare is completely protected in regard to not overpaying for damages.[20]

33. Table 2 shows the class-wide damages for unpaid wages using "weighted" values for the employment period. The weighted data gives a higher weight to individuals who have longer employment periods with CRST Expedited. In other words, individuals who worked for longer time periods have a greater influence in establishing the sample average. The rationale for using weighted data is that the individuals who have longer employment periods have more exposure to situations that may or may not include sleeper berth time in California. The unweighted data in Table 1 gives equal weight to each individual in the data sample. Since the sample average is utilized to project damages to all employees, not just longer tenure employees, the unweighted data has merit in projecting class-wide damages. This is a large sample size that has been randomly selected. Therefore, the unweighted data is an unbiased estimator for projecting class-wide damages. The weighted data calculations show the trier-of-fact the effect of giving more

---

[20] Petersen, Jeffrey S. and Phillip Allman. "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, forthcoming.

emphasis to longer tenured employees when projecting class-wide damages. Either method, weighted or unweighted data, are valid and reliable projections in this matter.

34.  The average hours per year of unpaid time for the weighted data is 157.7 hours. The margin of error is +/- 13.9 hours and the relative margin of error is 8.8 percent. The margin of error on the weighted data is higher than the unweighted data because the variance on the data points is higher due to the "effective sample size"[21] and "design effects"[22] that are applied when making the computation.

### *Waiting Time Penalties*

35.  California Labor Code 203 waiting time penalties were determined from the dates of employment on the class list and the results of the data sample analysis. Waiting time penalties were calculated for individuals who are listed as separated from employment from CRST Expedited per the class list information. The waiting time penalty is calculated as the minimum hourly wage at date of separation multiplied by 24 hours multiplied by 30 days. This value is adjusted based on the probability of accruing unpaid wages. The percentage of the data sample that accrued unpaid wages is 92.7 percent with a margin of error of 2.6 percent. This value should not be weighted since the length of the employment period will skew the results since all employees will likely incur unpaid wages as the employment period increases. In other words, the weighted data will skew the results of the waiting-time penalty since it will project that nearly all sample members have unpaid time. Therefore, the values for waiting time penalties in Table 1 and Table 2 are the same.

---

[21] Williams, Rick L., "Effective Sample Size," *Encyclopedia of Survey Research Methods*, Sage Publications: Thousand Oaks, CA, 2008.
[22] Siegfried, Gaber, Matthias Ganninger, Sabine Hader and Ralph Munnich, "Design Effects," *Encyclopedia of Survey Research Methods*, Sage Publications: Thousand Oaks, CA, 2008.

### *Wage Statement Penalties*

36.  California Labor Code 226 penalties are computed based on the projections from the wage statements in the data sample.  Mr. Woolfson compiled the number of wage statements for each individual in the data sample.  Mr. Woolfson also compiled the number of wage statements with unpaid wages based on sleeper berth time within California.  I projected the wage statement penalties based on both of these numbers.

37.  The first computation of wage statement penalties is based on the assumption that all wage statements within the class period are due a penalty.  I compared the number of wage statements and the number of weeks within the employment period to compute a percentage of employment weeks in which a wage statement was issued.  The result is that 85.6 percent of employment weeks had a wage statement.  This statistic has a 3.5 percent margin of error.  I then computed the number of weeks of employment for each class member and multiplied this number by 85.6 percent to project the number of wage statement penalties.  The formula is $50 for the first wage statement and $100 for each subsequent wage statement up to a maximum of $4,000.  The projection of class-wide wage statement penalties is listed on Table 1.

38.  The second computation of wage statement penalties is based on only wage statements with unpaid sleeper time within California as being due a penalty.  The average number of employment weeks with unpaid sleeper berth time is 30.9 percent.  The margin of error on this statistic is 4.5 percent.  I utilized the same formula as listed in paragraph 37 to determine the wage statement penalties due the class members.  See Table 1 for the projection of the wage statement penalties.

39. I also projected the wage statement penalties based on the weighted data (see Table 2). If all wage statement are due a penalty, the average number of employment weeks with a wage statement penalty is 79.9 percent for the weighted data. The margin of error on this statistic is 6.5 percent. If only the wage statements with unpaid sleeper berth time is due a penalty, the average number of weeks with a wage statement penalty is 34.7 percent. The margin of error on this statistic is 7.7 percent.

## V. Conclusion

40. The data sample produced by Defendants is valid and reliable for projecting class-wide damages. The 370 individuals in the data sample are representative of the class members. Therefore, the class-wide projections of damages in Tables 1 and 2 are valid and reliable numbers.

41. All numbers in Tables 1 and 2 conform to the *Bell Standard* for class-wide projections. The margin of error on all the numbers listed in the column "Based on Sample Average" are less than ten percent. The margin of error was computed based on a 95 percent level of confidence.

42. The unweighted and weighted data are both valid and reliable for projecting class-wide damages. If the trier-of-fact determines that longer tenured employees should be given more influence in determined class-wide damages, then the weighted values in Table 2 should be awarded to the class members.

43. The statistical analysis in this report was conducted based upon generally accepted scientific statistical methods. I am prepared to testify to the contents of this report in deposition or at trial if called upon to do so. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____

Jeffrey S. Petersen, Ph.D.

Table 1: Class-Wide Projections of Damages (Unweighted)

| | Based on Sample Average[1] | 95% Confidence Interval[2] | |
| --- | --- | --- | --- |
| | | Lower Bound Value | Upper Bound Value |
| Unpaid Wages (Sleeper Berth Time) | $    4,310,835 | $    4,062,709 | $    4,558,961 |
| Interest on Unpaid Wages | $    1,351,047 | $    1,273,282 | $    1,428,811 |
| Unpaid Wages + Interest | $    5,661,882 | $    5,335,991 | $    5,987,773 |
| Wage Statement Penalties (Labor Code 226) -- Based on All Wage Statements | $    4,048,650 | $    3,946,000 | $    4,144,900 |
| -- Based on Wage Statements with Unpaid Wages within California | $    1,843,750 | $    1,569,750 | $    2,110,950 |
| Waiting Time Penalties (Labor Code 203) | $    24,703,342 | $    24,020,794 | $    25,385,890 |
| Total Class-Wide Damages -- Based on Labor Code 226 Penalties for All Wage Statements | $    34,413,874 | $    33,302,785 | $    35,518,563 |
| -- Based on Labor Code 226 Penalties for Wage Statements with Unpaid Wages within California | $    32,208,974 | $    30,926,535 | $    33,484,613 |

1. All values in this column conform to the "Bell Standard" per *Bell v. Farmers Insurance* since the margin of error for each category of damages is less than 10 percent.

2. This specifies the projected range of class-wide damages if data was available for all class members with a 95 percent level of confidence.

Table 2: Class-Wide Projections of Damages (Weighted)

| | Based on Sample Average[1] | 95% Confidence Interval[2] | |
| --- | --- | --- | --- |
| | | Lower Bound Value | Upper Bound Value |
| Unpaid Wages (Sleeper Berth Time) | $ 4,696,960 | $ 4,283,567 | $ 5,110,353 |
| Interest on Unpaid Wages | $ 1,472,061 | $ 1,342,501 | $ 1,601,622 |
| Unpaid Wages + Interest | $ 6,169,021 | $ 5,626,067 | $ 6,711,974 |
| Wage Statement Penalties (Labor Code 226) | | | |
| -- Based on All Wage Statements | $ 3,878,450 | $ 3,667,550 | $ 4,071,900 |
| -- Based on Wage Statements with Unpaid Wages within California | $ 2,066,150 | $ 1,616,250 | $ 2,454,750 |
| Waiting Time Penalties (Labor Code 203) | $ 24,703,342 | $ 24,020,794 | $ 25,385,890 |
| Total Class-Wide Damages | | | |
| -- Based on Labor Code 226 Penalties for All Wage Statements | $ 34,750,813 | $ 33,314,411 | $ 36,169,764 |
| -- Based on Labor Code 226 Penalties for Wage Statements with Unpaid Wages within California | $ 32,938,513 | $ 31,263,111 | $ 34,552,614 |

1. All values in this column conform to the "Bell Standard" per *Bell v. Farmers Insurance* since the margin of error for each category of damages is less than 10 percent.

2. This specifies the projected range of class-wide damages if data was available for all class members with a 95 percent level of confidence.

# EXHIBIT A

# JEFFREY S. PETERSEN

Allman & Petersen Economics, LLC
7677 Oakport Street, Suite 610
Oakland, CA 94621

Phone: (510) 382-1550
FAX: (510) 382-1472
E-mail: jeff@allmaneconomics.com

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2003 – present | ***Partner***<br>Allman & Petersen Economics, LLC<br>Oakland, California |
| 2014 – present<br>& 1999 – 2001 | ***Adjunct Associate Professor of Economics***<br>St. Mary's College<br>Moraga, CA |
| 1998 – 2003 | ***Senior Economist***<br>U.S. Government Accountability Office (formerly the General Accounting Office)<br>San Francisco, California |
| 1999 – 2001 | ***Economics Instructor***<br>Golden Gate University<br>San Francisco, California |
| 1995 – 1998 | ***Postdoctoral Fellow***<br>University of California, Berkeley |
| 1990 – 1995 | ***Research and Teaching Assistant***<br>University of Utah<br>Salt Lake City, Utah |

## EDUCATION

| | |
|---|---|
| 1996 | Postdoctoral Training Program in Health Economics<br>University of California, Berkeley |
| 1995 | Ph.D. in Economics, University of Utah |
| 1989 | B.A. in Economics, San Jose State University |

## PUBLICATIONS

***Peer-Reviewed Book***

"Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry, W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003 (co-authored with David Levine, Frank Neuhauser, Richard Reuben, and Christian Etcheverria).

### Peer-Reviewed Journal Articles

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, forthcoming.

"The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017 (co-authored with Phillip Allman).

"Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015 (co-authored with Phillip Allman and William Lee).

"Carve-Outs from the Workers Compensation System," *Journal of Policy Analysis and Management*, 2002, Volume 21, No. 3, (co-authored with David Levine and Frank Neuhauser).

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws," *Industrial Relations*, 2000, Volume 39, No. 2.

"A Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, 1998, Volume 34, No. 3, (co-authored with Craig Zwerling).

### Other Publications

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," proceedings of the 2019 Allied Social Sciences Association, National Association of Forensic Economics Section (co-authored with Phillip Allman).

"International Responses to an Aging Labor Force," *Work Options for Mature Americans*. Teresa Ghilarducci and John Turner eds., Notre Dame, Indiana: University of Notre Dame Press, 2005. (co-authored with Charles Jeszeck, Anthony Defrank, Katherine Leavitt, Janice Peterson, Yunsian Tai, and Howard Wial).

"Benefits vs. Wages: How Prevailing Wage Laws Affect the Mix and Magnitude of Compensation to Construction Workers," in *The Economics of Prevailing Wage Laws,* Peter Philips and Hamid Azari eds., Ashgate Publishing, 2005. (co-authored with Erin Godtland).

"Private and Public Sector Employment Policies to Extend the Labor Force Participation of Older Workers," *Proceedings of the 55th Annual Industrial Relations Research Association Annual Conference, 2003.*

"Return to Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,* 1999, (co-authored with Lara Papadakis, Diane Morabito, Herb Ochitill, Alicia Bocellari, and Robert Mackersie).

*Portable Pensions for Casual Labor Markets: Lessons from the Operating Engineers Central Pension Fund*, Quorum Books, Westport, CT, 1996 (co-authored with Teresa Ghilarducci, Garth Mangum, and Peter Philips).

*Selected General Accounting Office Reports*

> "Older Workers: Policies of Other Nations to Increase Labor Force Participation,"
> GAO-03-307, Feb. 2003

> "Older Workers: Demographic Changes Pose Challenges for Employers and Workers,"
> GAO-01-85, Nov. 2001

> "Characteristics of Persons in Labor Force Without Pension Coverage,"
> GAO/HEHS-00-131, Aug. 2000

> "Social Security Reform: Implications of Raising the Retirement Age,"
> GAO/HEHS-99-112, Aug. 1999

## JOURNAL ARTICLE REVIEWER FOR PEER-REVIEWED JOURNALS

> Industrial Relations (University of California, Berkeley)
> Perspectives (peer-reviewed section of the Social Security Bulletin)
> Journal of Labor Economics

## PRESENTATIONS

"Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

"The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

"Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

"Surveys in Class Action Wage and Hour Cases," CLE Seminar, San Francisco, CA, October 2018.

"Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

"Working to Age 70 or Older – How Much Does Intention Matter?  Evidence from the Health and Retirement Study," 28th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, March 2016.

"Policies to Extend the Labor Force Participation of Older Workers" – Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Washington, DC, Jan. 2003.

Discussant for the panel "The Population Age 50-70 -- Past Trends and Future Projections" at the National Academy of Social Insurance conference on the Implications of an Aging Workforce for Income Security and Employee Benefits, Washington, D.C., Nov. 2001

"Raising the Eligibility Ages for Social Security Benefits: Work and Health Issues Associated with this Policy Change" - School of Public Policy, University of California, Los Angeles, Jan. 2001

"The Labor Market for Older Workers" - Bay Area Labor Economists Fall Workshop, Public Policy Institute of California, San Francisco, CA, Nov. 2000

"Raising the Eligibility Ages for Social Security Benefits: An Analysis of the Policy Implications" - Association for Public Policy Analysis and Management Annual Research Conference, New York, NY, Oct. 1998.

"Carving Out Construction Employees from the Workers Compensation System in California: Putting Theory into Practice"
- Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Chicago, IL, Jan. 1998
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Return to Work Following Acute Traumatic Injury"
- American Association for the Surgery of Trauma Annual Meeting, Boston, MA Sept. 1999
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws"
- Health Economics Research Organization Section of the Allied Social Sciences Association Annual Meetings, New Orleans, LA, Jan. 1997

"Retirement from the Construction Industry" – University of California, Berkeley, Department of Demography, May 1995.

## HONORS

| | |
|---|---|
| Member of the Board of Directors, American Academy of Economic and Financial Experts | 2017-present |
| National Research Service Award, Public Health Postdoctoral Fellowship, U.S. Department of Health and Human Services | 1995-1997 |
| Outstanding Scholar Athlete Honor Roll, San Jose State University | 1988-1989 |
| NCAA Division I Tennis Team, San Jose State University | 1987-1989 |

## PROFESSIONAL ORGANIZATIONS

American Economic Association

National Association of Forensic Economics

American Academy of Economic and Financial Experts

American Association for Public Opinion Research

Western Economic Association International

# ALLMAN & PETERSEN ECONOMICS, LLC

Phillip H. Allman, Ph.D.
Jeffrey S. Petersen, Ph.D.
Max Allman, MA, CFA

7677 Oakport Street, Suite 610 • Oakland, CA 94621
TEL (510) 382-1550  FAX (510) 382-1472

## FEE SCHEDULE (1/25/19)

(1) Economic research and analysis, report preparation, document review, office and client consultations, deposition preparation and trial preparation.[1]

| | |
|---|---|
| -- Ph.D. Economist | $550 / hour |
| -- Senior Economist | $375 / hour |
| -- Economist or CPA | $250 / hour |
| -- Survey Administration | $125 / hour |
| (2) Deposition testimony[2] | $650 / hour |
| (3) Arbitration and trial testimony[3] | $650 / hour |
| (4) Travel time | $250 / hour |

---

[1] Bills will be submitted periodically and are due upon presentation, not at the conclusion of the case.

[2] Payment for deposition testimony shall be paid in accordance with C.C.P. '2034 (i) (3) --i.e. payment of an expert's fees for the anticipated length of a deposition shall be paid at the commencement of his/her deposition, and any outstanding balance shall be paid within five days of receiving an itemized statement of the expert's services.

[3] All invoices to date must be paid prior to trial testimony. In addition, an additional retainer must be paid prior to the trial testimony based upon the estimated invoice for the testimony.

## Trial & Deposition List for Jeffrey S. Petersen (Last Four Years)

| | Case | Case Number | Jurisdiction | Date |
|---|---|---|---|---|
| **Trials & Arbitrations** | Fernandez et al. v. Villas Papillon | RG13683606 | Alameda | February, 2016 |
| | Fernandez et al. v. Villas Papillon | RG13683606 | Alameda | February, 2017 |
| | Shields et al. v. Security Paving Company | BC4922828 | Los Angeles | September, 2017 |
| | Robinson Jr. et al. v. Open Top Sightseeing | 4:14-CV-00852-PJH | Northern District of California | October, 2017 |
| | Yumul et al. v. Indus Investments et al. | BC565881 | Los Angeles | April, 2018 |
| **Depositions** | Fernandez et al. v. Villas Papillon | RG13683606 | Alameda | February, 2016 |
| | Bowerman et al. v. Field Asset Services | CV 13-00057 WHO | Northern District of California | March, 2017 |
| | Bowerman et al. v. Field Asset Services | CV 13-00057 WHO | Northern District of California | June, 2017 |
| | Robinson Jr. et al. v. Open Top Sightseeing | 4:14-CV-00852-PJH | Northern District of California | July, 2017 |
| | Ruiz et al. v. Jack in the Box | RG16807477 | Alameda | August, 2017 |
| | Shields et al. v. Security Paving Company | BC4922828 | Los Angeles | September, 2017 |
| | Pineda et al. v. Lithographix | BC612372 | Los Angeles | January, 2018 |
| | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | June, 2019 |