# EXHIBIT A

**Transcript of the Deposition of Aaron Woolfson ("Woolfson Tr.")**

Page 1

1       UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF CALIFORNIA

3

4  CHRISTOPHER DUEKER, on behalf of

5  himself and all persons similarly

6  situated,

7           Plaintiffs,

8  v.                    No. 2:18-cv-00381-JAM-CKD

9  CRST EXPEDITED INC., and

10 DOES 1 - 50 inclusive,

11          Defendants.

12 _____/

13

14

15     VIDEOTAPED DEPOSITION OF AARON WOOLFSON

16          WEDNESDAY, SEPTEMBER 25, 2019

17              OAKLAND, CALIFORNIA

18

19

20

21

22

23

24 DEBORAH MAYER, CSR 9654, RPR CRR CRP CLR

25 Job No. 167273

Page 2

1      BE IT REMEMBERED, pursuant to the laws
2  governing the taking and use of depositions, that on
3  Wednesday, September 25, 2019, 10:18 a.m. - 4:03 p.m.,
4  at 505 14th Street, Suite 900, Oakland CA, 94612,
5  before me, Deborah Mayer, a Certified Shorthand Reporter
6  for the State of California, there personally appeared:
7
8                    AARON WOOLFSON,
9
10 called as a witness by the Defendants, who, being by me
11 first duly sworn/affirmed, was thereupon examined and
12 testified as hereinafter set forth.
13
14
15
16
17
18
19
20
21
22
23
24
25 ///

1               A P P E A R A N C E S

2

3    FOR PLAINTIFFS AND THE WITNESS:

4         CORREN & CORREN
          BY:  ADAM CORREN, ESQ.
5         5345 North El Dorado Street
          Stockton, CA  95207
6

7

8

9    FOR CRST EXPEDITED INC. AND THE DEFENDANTS:

10        SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY
          BY:  ADAM SMEDSTAD, ESQ.
11        BY:  ELIZABETH BOLKA, ESQ.
          3214 W. McGraw Street
12        Seattle, WA  98119

13

14

15

16

17   ALSO PRESENT:

18        JOSEPH SHERRY, Legal Video Specialist.

19

20

21

22

23

24

25   ///

Page 52

1  opposing expert, whoever that would be, would find that
2  very beneficial. Not trying to help you, I'm just
3  trying to say maybe I'm a little honest to a point.
4      Q.  Are you finished?
5      A.  Yes, sir.
6      Q.  And now I'm just asking you whether you know,
7  one way or the other: Do you know whether CRST pays
8  both members of a team-driving operation for all of the
9  miles the truck travels regardless of who is driving?
10     A.  I do not.
11     Q.  You said that even if they did, it would not
12 change your opinion; do you remember saying that?
13     A.  If I had that data, it would not change my
14 opinion that employees who are driving -- or employees
15 in California are supposed to have certain mileage
16 attributes on their paychecks -- I'm sorry, pardon me --
17 hourly attributes on their paychecks that I did not see,
18 hence Bluford, and AB1513.
19     Q.  You calculated the number of minutes that
20 drivers spent in the sleeper berth of a truck moving in
21 California, correct?
22     A.  I did.
23     Q.  And you did so for purposes of identifying the
24 total number of minutes that were unpaid, is that
25 correct?

Page 53

1  A.  The total number of minutes that employees were
2  in the sleeper berth in California, number of employees
3  who were affected by that or had experienced one or more
4  shifts incurring that condition, and I think I set up
5  the database so I could determine how many paychecks had
6  that particular experience occurring for penalties.
7  Q.  For right now, I'm just talking about your
8  calculations regarding the total number of minutes.
9  A.  Right.
10  Q.  And you calculated the total number of minutes
11  that individuals spent in the sleeper berth of a truck
12  moving in California for purposes of identifying the
13  total number of minutes that those individuals were
14  unpaid; is that correct?
15  A.  Unpaid or underpaid.
16  Q.  Did your analysis take into account that CRST
17  credits individuals who are in the sleeper berth of a
18  moving truck with mileage pay?
19  A.  It's not listed in your paychecks.
20  Q.  I'm not asking what the paycheck -- I'm asking
21  if your analysis took that into account, yes or no?
22  A.  I can't speak to anything that's not in
23  evidence.  I have to base my analysis upon the pure
24  facts and the data that your -- your client represented
25  as being accurately reflective of the time that was

1  truck is, right?
2      A.   In a very -- in a very generally -- or in a non
3  particular -- yes --
4      Q.   Okay.
5      A.   -- with a great degree of accuracy, within, I
6  don't know, 10 or 20 meters, something like that.  It's
7  pretty good.
8      Q.   It's the most accurate, isn't it?
9      A.   Well, I think there's other things that are
10 more accurate.  The military has their own flavor of GPS
11 that is probably a little bit better.  Our airplanes
12 work on GPS, so better hope it's accurate.
13     Q.   And part of your assignment was to determine
14 the length of time that individuals were in the sleeper
15 berth of a truck that was moving in the State of
16 California, correct?
17     A.   Yes.
18     Q.   And did you use the GPS ping data to determine
19 whether an individual who was logged as in the sleeper
20 berth of a truck was moving within California?
21     A.   No.
22     Q.   Why not?
23     A.   Because the -- the activity of the employee was
24 indicated on the DOT transportation logs, and the DOT
25 transportation logs are what were specifically

Page 75

1    to have been provided?
2         A.   I believe that to be the case.
3         Q.   But you still didn't use the ping data because
4    you thought it wasn't available for the first set?
5         A.   No, it was because the data that I have was
6    sufficiently corroborative of the DOT data.  You guys
7    put it on.  And because I'd already proffered a report,
8    I didn't want to confuse anybody, the Court, or any
9    trier of fact, jurist, by creating a conflict in my own
10   testimony, but there wouldn't have been any conflict
11   because the data was sufficiently corroborative.
12        Q.   Did you also determine how many minutes a truck
13   was moving once it had begun moving?
14        A.   Yes.
15        Q.   And how did you determine how many minutes a
16   truck was moving once it had begun moving?
17        A.   I did two different ways; I looked at the data
18   that was on your records indicating the delta or the
19   differential between the start or ingress of a
20   particular activity, and the egress of that activity.  I
21   also looked at the number of miles of the point-to-point
22   duration that would have been driven according to
23   Google, the Google Distance Matrix, or the -- and the
24   amount of time that would have been.  And then I looked
25   at it both ways.  And I have to say, your DOT records

Page 76

1  are pretty spot-on, pretty accurate.
2      Q.   What do you mean by ingress and egress of an
3  activity?
4      A.   A transition between driving and sleeper, or
5  driver off-duty, driver on-duty, these sorts of
6  activities.
7      Q.   What do you mean by the "Google Distance
8  Matrix"?
9      A.   Google Distance Matrix is an application layer
10 interface or API that produces a set of XML spelled
11 JSON, J-S-O-N, outputs that is going to calculate the
12 distance and driving time between two locations based
13 upon a conservative or a generous attribution of traffic
14 conditions.
15          So I, for the benefit of this project, just for
16 your edification, I used the most generous -- in other
17 words, the amount of time that was most favorable and
18 the amount -- well, the distance is the distance, but
19 the amount of time that is most favorable for the
20 defendants.
21     Q.   Are you finished?  Are you finished?
22     A.   Oh.  Yes.
23     Q.   Would it have been more accurate to use the GPS
24 ping data to determine the amount of time that the truck
25 is moving?