UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER DUEKER, on behalf of himself and all persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CSRT EXPEDITED INC., and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:18-cv-08751-MCS-FFM<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERTS [72] AND DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [73]** |

Before the Court is a Motion to Exclude Plaintiff's experts ("Expert Motion") Aaron Woolfson ("Woolfson") and Dr. Jeffrey S. Petersen ("Petersen"). *See* Joint Br. Re: Expert Mot. ("Expert Mot."), ECF No. 72-1. Defendant CRST Expedited Inc. ("CRST") filed a reply. *See* Reply Br. Re: Expert Mot. ("Expert Reply"), ECF No. 77.

Also before the Court is a Motion for Class Certification ("Certification Motion"). *See* Joint Br. Re: Cert. Mot. ("Cert. Br."), ECF No. 73. Plaintiff Christopher Dueker filed a reply. *See* Reply Brief Re: Certification Mot. ("Cert. Reply"), ECF No. 77. The Court held oral arguments and took the matter under submission. *See* Nov. 9, 2020 Hearing Transcript, ECF No. 97.

The Expert Motion is **GRANTED** and the Certification Motion is **DENIED**.

1

## I. BACKGROUND

Dueker is a former employee truck driver alleging that CRST did not pay him for all tasks he performed and for all rest periods. *See generally* First Amended Complaint ("FAC"), ECF No. 20. Dueker specifically avers that CRST's piece rate/mile compensation structure, calculated by multiplying load miles by the driver's mileage rate, did not compensate all hours worked because employees who worked in "driving teams" were not paid for time spent performing non-driving tasks. *Id.; see also* Declaration of Christopher Warmsley ("Warmsley Decl.") ¶¶ 7-9, ECF No. 74-2. Driver compensation covers "normal duties," including "pre-trip and post-trip inspections, fueling, driving, travel, and waiting times" and other tasks. *See* CRST Driver Handbook 197, ECF No. 74-24. Dueker's claims center on the contention that his time in a truck's sleeper berth—a cabin where drivers reside while the other employee drives—should be compensated under California law, but was not. Dueker seeks recovery on behalf of himself and all "California residents employed by Defendant as a truck driver during the Class Period of December 27, 2013 through the date of trial." Cert Mot. 1. Dueker also seeks to certify the following subclasses:

    **a. Minimum Wage Subclass:** All California residents employed by Defendant as a truck driver during the Class Period who logged sleeper berth shift segment time within the territorial boundaries of California during which there was some truck movement.

    **b. Waiting Time Penalty Subclass:** All Minimum Wage Subclass Members who have separated their employment with Defendant.

*Id.*

Dueker's FAC asserts the following claims on behalf of himself and a putative class of more than 5,700 current and former drivers: (1) failure to pay minimum wage compensation; (2) nonpayment of wages; (3) failure to provide accurate itemized wage statements; (4) unlawful deductions from wages; (5) failure to reimburse expenses; (6) failure to provide paid rest breaks; (7) failure to pay all wages due upon discharge; (8)

unlawful and unfair business practices; and (9) conversion. FAC ¶¶ 37-84. Dueker's claims primarily rest on the theory that time spent in the sleeper berth of a truck moving in California is compensable because such movement amounts to CRST's control over drivers under California law. *Id.*

In support of this theory, Dueker hired Woolfson "to provide structure to, and analyze time keeping and payroll data produced by" CRST and "to provide an opinion on whether the data… could be analyzed to show similar application of time-keeping rules to the time keeping for all putative class members." *See* Woolfson Expert Report ("Woolfson Report") ¶¶ 1-2, ECF No. 72-4; *see also* Expert Mot. 10 ("Mr. Woolfson used the Defendant's driver logs to calculate Class members' logged sleeper berth shift segment time within the territorial boundaries of California during which there was some truck movement.") Dueker hired Petersen "to project class-wide damages for unpaid wages" using Woolfson's report and analysis. *See* Petersen Expert Report ("Petersen Report") ¶¶ 1-2, ECF No. 72-5 ("The data I utilized to projected class-wide damages… was structured by Aaron Woolfson.") CRST hired Charles Platt—the Director of Data Analytics for iDiscovery Solutions—to rebut Woolfson's methodology and conclusions. Platt Expert Report ("Platt Report") ¶ 39, ECF No. 72-7; *see also* Platt Supp. Expert Report ("Platt Supp. Report"), ECF No. 72-8 (analyzing Woolfson's database[1]); *see also* Platt Deposition Transcript ("Platt Dep."), ECF No. 72-9.

Woolfson's analysis is based on: (1) records from driver logs; (2) GPS data from trucks driven by class members; and (3) pay statements issued to class members. Woolfson Report ¶¶ 23-28; *see also* Woolfson's Deposition Transcript ("Woolfson Dep.") 32:10-23, 64:4-14, ECF No. 72-6. The driver logs are mandated by the Department of Transportation ("DOT") for safety reasons and indicate a driver's status as "on-duty, off-duty, driving, and" sleeper berth time. Woolfson Dep. 32:10-23; *see*

---

[1] "A database is a computerized compilation of data organized into tables, each having columns (attributes), with column headings, and rows of information." Woolfson Report ¶ 31.

3

*also* Declaration of Adam Blair Corren ("Corren Decl."), ECF No. 72-11; *see also* Declaration of Christopher Dueker ("Dueker Decl.") ¶ 7, ECF No. 74-1. The logs are maintained to establish compliance with DOT's hours of service rules, which include that drivers can drive up 11 hours before having to take 10 consecutive hours off duty. 49 C.F.R. 395.3(a); CRST Driver Handbook 196-97; CRST Safety and Operations Handbook 83, 89. Time logged as sleeper berth time is considered off-duty time per these regulations. 49 C.F.R. 395.2. CRST drivers input their own log data, which reveals that drivers sometimes forget to change their status when transitioning duties. Woolfson Dep. 102:2-17; Cary B. Andree Deposition Transcript ("Andree Dep.") 45:10-25, ECF No. 74-33. Drivers, including Dueker, testified that they intentionally logged time spent on personal tasks outside the sleeper berth as sleeper berth time. *See, e.g.,* Dueker Deposition Transcript ("Dueker Dep") 574, ECF No. 74-32 ("Q: When you… said you went to a motel, how did you log that time in your logbook? A: I believe we were both off-duty, and it was shown as sleeper berth because the truck had to get maintenance.") Drivers must certify their logs and report errors to CRST before fixing them. *See, e.g.,* Christopher Warmsley Deposition Transcript ("Warmsley Dep.") 61:17-62:1, ECF No. 74-34. The log data reflects the estimated location of the truck at the time of the recorded duty status, but does not reflect a truck's speed, route, or exact location. *Id.;* Platt Report ¶¶ 38-39. GPS data available to Woolfson precisely shows a truck's location, speed, and route. Woolfson Dep. 64:6-9, 70:2-11; Platt Report ¶¶ 25, 38-39.

The "voluminous" log data was "contained within a series of Excel and PDF sheets" and Woolfson structured "it in a manner that all events related to a single day's activity were contained within the same row of an [Structured Query Language ("SQL")] server, so that similar workplace activities were organized together, in chronological order, to tally the measurements of the cumulative time for each employee's activities." Woolfson Report ¶ 21. The worksheet Woolfson used "contained approximately 141,754 entries for 47 employees" and the file CRST_D016054.txt "contained approximately 809,825 additional entries for 324

4

employee's driver-related activities." *Id.* ¶ 23. Woolfson created "databases to serve as a repository for time keeping and payroll data" and then created "SQL queries that provide the means to: (a) identify whether an event occurred in the data (such as a meal period or rest break if such data is provided), (b) accumulate the number of hours and type of work that was performed in a work day," and "(c) identify the persons associated with that event (such as the employees)." *Id.* ¶ 32. Attached to Woolfson's report are the computer code he "authored to restore the structure and contents of the time cards into the local SQL database" and the "SQL code [he] used to conduct" his calculations. *Id.* ¶ 35. The report also details the roughly 12-step process Woolfson used "to organize and restructure the clock punches" in CRST's source data. *Id.* ¶ 36(a)-(l). Based on his analysis of 15,998 shifts worked by 371 employees which included "sleeper" minutes, Woolfson concludes that the truck was moving in California during "sleeper" segments for 7,231 shifts. *Id.* ¶¶ 37-38. Woolfson opines that 5,613 of the 371 employees' 12,946 "weekly pay periods" included at least one shift "indicating sleeper minutes in California during truck movement." *Id.* ¶ 38.

Platt's report, supplemental report, and deposition testimony criticize Woolfson's methodology and analysis, opining in part that:

**1.** Woolfson often relied on driver logs that cannot "tell us if the movement occurred in California or if the individual was in the sleeper berth during the movement" when more reliable GPS data could determine these factors. Platt Report ¶¶ 25, 38-39.

**2.** Woolfson's database shows he attributed more than 24 hours of unpaid wages to some drivers for single workdays. Platt Supp. Report ¶¶ 59-62. This is despite Woolfson's ostensibly incorrect testimony that he excluded excessively long sleeper berth segments. Woolfson Dep. 94-96.

**3.** Again contrary to his testimony, Woolfson assumed that the truck moved for the entirety of a sleeper berth segment, irrespective of how far the truck traveled. Platt Report ¶¶ 29-36.

**4.** Woolfson attributed widely ranging times to the same trip. For a particular 172-mile segment, Woolfson's estimates spanned from 14 hours, 51 minutes to 3 hours, 5 minutes, even though the tool Woolfson purportedly used—Google—estimates a 2 hour, 41 minute travel time. Platt Supp. Report ¶¶ 36-41. For a particular 40-mile segment, Woolfson's estimates spanned from 14 hours, 6 minutes to 1 hour, 10 minutes. *Id.* ¶¶ 45-49. Google's estimate for that trip is 47 minutes. *Id.*

**5.** Woolfson's methodology overestimated sleeper berth durations by an average of 100% for multistate trips and over 400% for intra-state strips. *Id.* ¶¶ 53-54.

Platt opines that Woolfson's analysis "is overly generalized, does not properly account for specific situations that are present in the data," and "ignores data that would address these situations…" Platt Report ¶ 10. Platt further believes that Woolfson's methodology cannot be replicated, is "prone to error, and illustrates a lack of concern for proper data handling techniques." *Id.* ¶ 11. Finally, Platt concludes that Woolfson's proffered source code "includes syntax errors, is missing code, and includes improper sequencing of code" and, thus, that replicating Woolfson's "analysis based on this code is a matter of guesswork…" *Id.* ¶ 12.

Platt testified that Woolfson counted 12 occasions where drivers logged sleeper berth time for a period greater than 24 hours. Platt Dep. 31:18-22. CRST's manager testified that there are instances where a CRST employees *does* remain in the sleeper berth for more than 15 hours per work shift segment, or even more than 24 hours per work shift segment, due to sickness, weather, waiting for a load, or other reasons. Margaret Davis Deposition Transcript ("Davis Dep.") 67:17-68:25, ECF No. 72-12. Finally, Platt agreed that sleeper berth time "Woolfson counted in his analysis included only time in which a segment had at least some truck movement." Platt Dep. 64:11-15.[2]

---

[2] CRST objects to certain evidence offered by Dueker. Cert Mot. 16-18. To the extent the Court relies without discussion on evidence to which CRST has objected, the Court **OVERRULES** the relevant objections. As to the remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence and because the motions are resolved in CRST's favor.

## II. MOTION TO EXCLUDE EXPERTS

### A. Legal Standard

Rule 702 governs the admissibility of expert testimony. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. Testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods." *Id.* Further, the expert witness must have "applied the principles and methods reliably to the facts of the case." *Id.* The Supreme Court has imposed a "gatekeeping responsibility" for courts to engage in objective screening to ensure that evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141–42 (1999) (clarifying the "gatekeeping" obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge").

In *Daubert*, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. 509 U.S. at 593–94. The Supreme Court emphasized the "flexible" nature of this inquiry. *Id.* at 594; *see also Kumho*, 526 U.S. at 141-42 ("Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as [the court] enjoys in respect to its ultimate reliability determination.") Indeed, a "trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho*, 526 U.S. at 152).

### B. Woolfson

Even if Woolfson is qualified to structure and analyze CRST's data, his testimony is unreliable. Woolfson's reports and deposition transcript demonstrate that his methodology is not peer-reviewed and unnecessarily difficult, if not impossible, to test or replicate. *Daubert*, 43 F.3d at 1319 n.11 ("The party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully."); *Wyatt Tech. Corp. v. Malvern Instruments, Inc.*, 2010 WL 11505684, at *7 (C.D. Cal. Jan. 25, 2010) ("[O]ffer[ing] no evidence from which [defendant]—or any other scientist—could replicate this experiment."), *aff'd in part*, 526 F. App'x 761 (9th Cir. 2013); *Hutchinson v. Hamlet*, 2006 WL 1439784, at *4 (N.D. Cal. May 23, 2006) (finding expert's experiment did "not comport with proper scientific methodology" and "clearly did not provide for any peer review or scrutiny"). Like in other matters, Woolfson's report here fails to explain critical assumptions underlying his opinions or to address data anomalies. *See, e.g., Rojas v. Marko Zaninovich, Inc.*, 2011 WL 6671737, at *5 (E.D. Cal. Dec. 21, 2011) ("Mr. Woolfson's original expert report is marred by serious methodological flaws."); *Rojas*, 2011 WL 4375297, at *10 ("Mr. Woolfson's methodology is so inherently flawed that it cannot permit the use of his opinions rendered thus far."); *Chavez v. Angelica Corp.*, 2014 WL 6973497, at *14 (Cal. Ct. App. Dec. 10, 2014) ("[W]e conclude plaintiffs have failed to show the trial court abused its discretion in discounting the testimony of Woolfson...") (citation omitted).

As discussed, CRST's rebuttal expert provides detailed, persuasive analysis showing that Woolfson's computer code did not function when using Woolfson's own database and that Woolfson's methodology could not be recreated or reliably tested. *See, e.g.,* Platt Supp. Report ¶¶ 12, 63, 72-76; Platt Report ¶¶ 11, 20, 32, 34, 42, 49, 51, 62-89; Platt Dep. 29:15-21, 41:9-16. Woolfson does not meaningfully account for his inexplicable assignment of widely ranging trip times—up to a 13-hour variance—for

the same routes, nor can he explain away that he attributed more than 24 hours of unpaid wages to some drivers for single workdays. Platt Supp. Report ¶¶ 36-49, 59-62; *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (an expert's methods must be "adequately explained"). Indeed, a near majority of the time Woolfson calculated as uncompensated were occurrences where drivers logged more than 11 consecutive hours in the sleeper berth of a moving truck, which would violate regulations forbidding driving more than 11 daily hours and requiring a stop after the eighth consecutive hour. 49 C.F.R. 395.3(a).

Dueker blames deficiencies in Woolfson's report on CRST's internal records, arguing that a defendant's erroneous recordkeeping does not warrant experts' wholesale exclusion. Expert Mot. 17-20. But Woolfson does not adequately account for, among other things, reliance on logs he acknowledges are prone to driver error when he had access to far more reliable GPS data. Platt Report ¶¶ 25, 38-39; *Rojas*, 2011 WL 6671737, at *5 ("Due to the fact that Mr. Woolfson did not use all available information available at the time he analyzed his data, his report was flawed.") In any event, Woolfson's opinions are intended to apply on a class-wide basis, and to address "whether the data… could be analyzed to show similar application of time-keeping rules to the time keeping for all putative class members." Woolfson Report ¶¶ 1-2. That certain drivers inaccurately logged their duty status does nothing to bolster the reliability of Woolfson's analysis, let alone does it compensate for fatal methodological errors independent of shortcomings in CRST's data. *Kumho,* 526 U.S. at 153-54 (trial court did not abuse its discretion to exclude expert testimony due to unreliability of methodology in analyzing data, even though expert was qualified, where there was no evidence that industry experts used the expert's approach). Accordingly, Woolfson's testimony is unreliable, inadmissible, and must be excluded under Rule 702. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("[T]he district court can exclude [an expert] opinion if the expert fails to identify and defend the reasons that his conclusions are anomalous.")

1 Dueker alternatively requests that the Court treat Woolfson as a "percipient 2 witness regarding the contents of Defendant's records." Expert Mot. 18. At the hearing, 3 Dueker's counsel clarified that Woolfson's role would be "essentially summarizing 4 what the records show and relaying that information to Mr. Petersen." Nov. 9, 2020 5 Hearing Tr. 6. When asked how the Court could allow such a process given the record 6 before it, Dueker's counsel stated that "Mr. Petersen could also review the records 7 himself and would not necessarily need Mr. Woolfson to do that." *Id.* ("I suppose at 8 that point if the Court was unwilling to consider Mr. Woolfson's testimony as to what 9 the records themselves show, we wouldn't need Mr. Woolfson to testify.") The nature 10 of Dueker's alternative request remains unclear, and the Court nevertheless finds that it 11 is not properly before the Court by way of the Expert Motion. The Court thus declines 12 Dueker's unsupported suggestion that the Court should allow Woolfson to testify as a 13 percipient witness.

### C. Petersen

Petersen used Woolfson's data analysis and structuring to calculate "time spent in the sleeper berths per year while the truck was moving in California." Petersen Report ¶¶ 2, 24; *see also id.* ¶ 21 ("Mr. Woolfson compiled the data sample for the randomly selected 370 individuals.") A review of Petersen's report makes clear that his analysis and opinions are wholly dependent on Woolfson's data. *See, e.g., id.* ¶¶ 1-9, 20-21 (identifying Woolfson as source of all data underlying Petersen's opinions and calculations). Dueker does not and cannot argue otherwise. *See generally* Expert Mot.; Nov. 9, 2020 Hearing Tr. 6-7. Because Petersen's testimony is wholly dependent on Woolfson's unreliable analysis and outputs, it too must be excluded under Rule 702 for lack of reliability. *United States v. Redlightning*, 624 F.3d 1090, 1111–12 (9th Cir. 2010) (citing *United States v. W.R. Grace,* 504 F.3d 745, 761 (9th Cir. 2007) (holding that although the facts and data relied on by the expert need not be admissible, they must be "reasonably relied upon by experts in the particular field").

The Court therefore **GRANTS** the Expert Motion (ECF No. 72).

10

## III. MOTION FOR CLASS CERTIFICATION

### A. <u>Legal Standard</u>

Rule 23 governs class actions and requires the party seeking class certification to "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 339 (2011) (emphasis in original). This requires a district court to conduct "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* A plaintiff must first demonstrate that the four requirements of Rule 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. These requirements effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 155 (1982) (citation omitted). If the Rule 23(a) requirements are met, the court must consider whether the class is maintainable under one of the three alternatives set forth in Rule 23(b). *Dukes,* 564 U.S. at 339. Dueker seeks certification under Rule 23(b)(3), which requires "that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[3] In evaluating predominance and superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests that members in the class have in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely encountered in the management of a class action. *Id.*

---

[3] The Court disregards the Certification Reply's untimely reference to Rule 23(c)(4). *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")

### B. Commonality and Predominance

The commonality requirement is met where "the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] with one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation and citation omitted). The predominance test is "far more demanding" than the commonality test and due to the tests' similarities, courts often address commonality and predominance together, as the Court does here. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624, (1997); *see also Ubaldi v. SLM Corp.*, 2014 WL 1266783, at *10 (N.D. Cal. Mar. 24, 2014) ("The predominance standard is similar to and more stringent than the commonality standard.") The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. "[M]ore important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). In determining whether Rule 23's requirements are met, the court considers the legal theories on which the plaintiffs' claims are based. *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) ("Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised.")

California Industrial Welfare Commission Wage Order Number 9 defines "hours worked" as "the time during which an employee is subject to the control of an employer, ... includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so." *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 576 (2000). When "an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control." *Id.* at 583 (citations omitted).

*1. Minimum Wage*

For his minimum wage claim, Dueker seeks to certify a class of all "California residents employed by Defendant as a truck driver during the Class Period who logged sleeper berth shift segment time within the territorial boundaries of California during which there was some truck movement." Cert Mot. 1. Dueker claims there is a common question concerning whether members of this putative class are entitled to compensation for such sleeper berth time. *Id.* 22, 26. Because CRST "has acknowledged that its uniform per mile compensation formula does not compensate drivers for sleeper berth time," Dueker contends "there are common questions as to whether such sleeper berth time is defined as hours worked" and if CRST thus violated California law in failing to compensate such time. *Id.* 23-25.

Even if Dueker's legal theory is sound, the record before the Court makes clear that it raises individualized issues that are not susceptible to common proof. *Hootkins v. Chertoff*, 2009 WL 57031, at *8 (C.D. Cal. Jan. 6, 2009) ("The greater the number of individual issues to be litigated, the more difficult it will be for the court to manage the class action.") Dueker's theory depends on class-wide evidence of drivers' presence in the sleeper berth of a truck moving in California. As the Court has excluded Dueker's unreliable expert testimony and Dueker obtained no Rule 30(b)(6) testimony, Dueker's evidence to prove drivers' confinement to the sleeper berth of a moving truck is driver logs and driver testimony. Dueker admits this evidence is largely undependable, inferring that it cannot be reliably used to determine class-wide liability in a manner that does not require inefficient individualized inquiry. Expert Mot. 4; Cert Mot. 24 ("Unfortunately, it is Defendant's own lack of accurate record keeping that has compelled Plaintiffs to limit their damages."); Andree Dep. 615-616 ("You're dealing with electronic logs. And those machines get glitches, and they don't send everything in properly sometimes."); *Haley v. Medtronic, Inc.,* 169 F.R.D. 643, 647 (C.D. Cal. 1996) ("Class actions have two primary purposes: (1) to accomplish judicial economy

13

by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis.") (citation omitted).

As discussed, drivers oftentimes input erroneous log data or log time spent on personal tasks as sleeper berth. *See, e.g.,* Andree Dep. 70:10-71:3 (testifying that time eating outside of truck often logged as sleeper berth); Warmsley Dep. 84:16-20 ("Q: So even if when you were outside of the truck, you may still have it logged as off-duty, sleeper berth? A: Yes."); Dueker Dep. 95:17-97:18 (testifying that time in restaurant and showering logged as sleeper berth); Platt Supp. Report ¶¶ 26-27 (citing example where log set to sleeper berth for six days). Logging practices also vary according to, for example, how long a driver has worked for CRST and nuances in a driver's common routes. *See, e.g.,* Dueker Dep. 99-101 (testifying about evolving logging practices throughout course of employment); Davis Dep. 68:2-5 ("Some drivers don't log off-duty when they're on home time. They keep themselves in the sleeper berths. So that could be four straight days of being in the sleeper when they should be off duty.") Such individualized proof is problematic for many reasons, not the least of which is that compensable time under California law "does not include 'time spent engaging in personal activities by choice.'" *Pavloff v. Cardinal Logistics Mgmt. Corp.*, 2020 WL 6821072, at *6 (C.D. Cal. Oct. 7, 2020) (citation omitted).

On Reply, Dueker argues that CRST requires drivers to be in the sleeper berth when not logged in as driving or on duty and stresses that "that sleeper berth time is always spent primarily" for CRST's benefit. Cert. Reply 3-4. Dueker claims that CRST opposing certification is really a premature attempt at summary judgment or attacking damages. *Id.* 2 ("Defendant's suggestion that individualized issues predominate regarding Defendant's level of control over Class Members is simply an inappropriate attempt to transform this class certification motion into a motion for summary judgment and/or make inappropriate damages argument.") But aside from potential substantive infirmities in Dueker's legal theory concerning control that may be addressed at

14

summary judgment, the record presents insufficient *class-wide* evidence under Plaintiff's *own theory* demonstrating that drivers were not paid minimum wages for compensable work. *Alvarez v. AutoZone, Inc.*, 2017 WL 10562874, at *10 (C.D. Cal. Oct. 4, 2017) ("Every employer shall pay to each employee wages not less than [the minimum wage] per hour for all hours worked" under wage order and "this language expresses the intent to ensure that employees be compensated at the minimum wage for each hour worked and, therefore, employers may not average the total amount earned by an employee over all hours worked in order to comply with minimum wage laws.") (internal quotations and citations omitted); *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir. 2001) ("If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 12(b)(3) action would be inappropriate.") (citation omitted).

CRST sets forth examples illustrating problems in class-wide application of Dueker's theory given the evidentiary record: "[I]f a driver logs 14 hours in the sleeper berth on a segment wholly within California, and the truck moves 40 miles (which should take about 47 minutes), the driver should get 14 hours of additional compensation." Cert Mot. 27 n.4 (citing Platt Report ¶¶ 45-51). And specifically with respect to minimum wage liability: "[I]f a driver logs 50 minutes of driving and 10 minutes of sleeper berth time in an hour and, due to his mileage rate, earns $15.000 in that hour, there is no minimum wage violation." *Id.* 32. Again, even accepting Dueker's liability theory, these examples demonstrate that individual inquiries are required to determine, among other things, whether CRST failed to sufficiently compensate any particular driver for time spent in the sleeper berth of a truck moving in California. *Mazza*, 666 F.3d at 588 (plaintiffs seeking to certify a class must "demonstrate the capacity of class-wide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation.") (internal quotations and citation omitted). Such individualized inquiries abound with putative class

members and show that Rule 23(b)'s predominance requirement is not satisfied with respect to Dueker's minimum wage claim. *Pavloff*, 2020 WL 6821072, at *6 ("Accordingly, the fact that a driver logged time as "sleeper berth" does not necessarily mean he or she is entitled to compensation for that time under California law. Determining whether 'sleeper berth' time is compensable would require an individualized inquiry into how each proposed class member spent their 'sleeper berth' time."); *Ayala v. U.S Xpress Enterprises, Inc.*, 2020 WL 4760177, at *4 (C.D. Cal. July 10, 2020) ("An obvious limitation on team driving is that both drivers need to be in the truck while it is moving. Ayala recognizes the necessity of physical presence, but argues that it is irrelevant. He contends that USX is still exerting control, and therefore must separately compensate drivers for this time. According to this reasoning, if California law applied to cruise ships, all non-exempt cruise-ship employees would have to be separately compensated for all off-duty time because they were necessarily trapped on the ship. However, California case law recognizes that some limitations on employees' off-duty time are unavoidable.") (internal quotations and citation omitted).

### 2. *Inaccurate Wage Statement, Waiting Time, and UCL Claims*

CRST argues that Dueker's claims for wage statement violations, waiting time penalties, and unfair business practices are derivative of his minimum wage claim and therefore cannot be certified. Cert Mot. 35-37, 40. The Court agrees, and determines that these claims cannot be adjudicated on a class-wide basis for the same reasons as Dueker's minimum wage claim. *Burnell v. Swift Transportation Co of Arizona, LLC*, 2016 WL 2621616, at *5 (C.D. Cal. May 4, 2016) ("Plaintiffs' wage statement claim, California Labor Code § 203 claim, and UCL claim are derivative of their minimum wage and meal and rest period claims and cannot be adjudicated on a class basis for the same reasons.") (citation omitted); *Pavloff*, 2020 WL 6821072, at *9-10 (declining to certify waiting time, wage statement, and UCL claims in factually and legally analogous case for same reasons as minimum wage claim).

### *3. Rest Break Wages*

Dueker contends there is a common question concerning whether CRST failed to pay putative class members under California Labor Code section 226.2(a)(1), which requires employers to separately compensate employees at least the minimum wage for rest breaks. Cert Mot. 37-38. But Dueker's rest break claim seeks injunctive relief and it is well-established that former employees such as Dueker lack standing to pursue such relief. *Ellis*, 657 F.3d 970, 986 ("Plaintiffs not employed by Costco throughout this case do not have standing to seek injunctive relief. As former employees, [Plaintiffs] would not share an interest with class members whose primary goal is to obtain injunctive relief. Thus, as the class currently stands, [Plaintiffs] will not adequately protect the interests of the class as a whole.") Dueker's lack of standing defeats certification with respect to his rest break claim. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022–23 (9th Cir. 2003) (plaintiff with no standing "cannot represent others who may have such a claim, and her bid to serve as a class representative must fail. This principle is dispositive of the appeal of the class certification.")

### C. **Disposition**

Because common questions of fact and law do not predominate over questions affecting only individual drivers, Dueker's Certification Motion fails and the Court need not address Rule 23's additional requirements. Even accepting his legal theory, Dueker has insufficient evidence to establish liability on a class-wide basis.

### IV. CONCLUSION

For the foregoing reasons, the Expert Motion (ECF No. 72) is **GRANTED** and the Certification Motion (ECF No. 73) is **DENIED**.

**IT IS SO ORDERED.**

Dated: December 7, 2020

_____
HON. MARK C. SCARSI
UNITED STATES DISTRICT JUDGE